Sonya D. Winner, SB # 200348
David M. Jolley, SB # 191164
Margaret G. May, SB # 234910
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
E-mail: mmay@cov.com

Attorneys for Defendants
WELLS FARGO BANK, N.A. and
WELLS FARGO & CO.

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERONICA GUTIERREZ, *et al.*,<br><br>     Plaintiffs,<br><br>  v.<br><br>WELLS FARGO & COMPANY, *et al.*,<br><br>     Defendants. | CASE NO. CV-07-5923 WHA (JCSx)<br><br>**NOTICE OF MOTION AND MOTION OF DEFENDANT WELLS FARGO BANK, N.A. FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:    August 21, 2008<br>Time:    8:00 a.m.<br>Courtroom:  9<br><br>Honorable William H. Alsup |

# **TABLE OF CONTENTS**

NOTICE OF MOTION ................................................................................................ 1

ISSUES TO BE DECIDED ........................................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 2

I.      INTRODUCTION ............................................................................................ 2

II.    STATEMENT OF UNDISPUTED FACTS .................................................... 3

     A.    The Bank's Processing of Debit-Card Transactions ............................. 3

     B.    Information Provided to Customers About Their Accounts and
           Balances ................................................................................................ 5

     C.    Plaintiffs' Claims in this Case .............................................................. 7

     D.    Experiences and Knowledge of the Three Plaintiffs ........................... 8

          1.    Veronica Gutierrez .................................................................. 9

          2.    Erin Walker ............................................................................. 10

          3.    William Smith ......................................................................... 11

III.   ARGUMENT .................................................................................................... 13

     A.    All of Plaintiffs' Claims Are Barred by Federal Preemption. ............. 13

     B.    Plaintiffs' Claims Fail on the Undisputed Facts .................................. 18

          1.    Plaintiffs Lack Standing to Bring Their Statutory and
               Common-Law Claims Concerning the Adequacy of the Bank's
               Disclosures About Their Available Balances. ......................... 18

          2.    Any Substantive Challenge to the "Float" on Debit-Card
               Transactions Is Without Legal Basis, and These Plaintiffs Lack
               Standing to Pursue Such a Challenge in Any Event. ............... 20

IV.   CONCLUSION ................................................................................................. 23

# TABLE OF AUTHORITIES

## FEDERAL CASES

*American Bankers Association v. Lockyer*,
   239 F. Supp. 2d 1000 (E.D. Cal. 2002) ...................................................................................18

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).................................................................................................................13

*Bank of America v. City & County of San Francisco*,
   309 F.3d 551 (9th Cir. 2002) .......................................................................................14, 15, 16

*Barnett Bank of Marion County, N.A. v. Nelson*,
   517 U.S. 25 (1996)...............................................................................................................13, 14

*Fidelity Federal Savings & Loan v. de la Cuesta*,
   458 U.S. 141 (1982).................................................................................................................15

*First National Bank of San Jose v. California*,
   262 U.S. 366 (1923).................................................................................................................13

*Franklin National Bank v. New York*,
   347 U.S. 373 (1954).......................................................................................................13, 14, 15

*Laster v. T-Mobile USA, Inc.*,
   407 F. Supp. 2d 1181 (S.D. Cal. 2005).....................................................................................20

*Lopez v. Washington Mutual Bank*,
   302 F.3d 900 (9th Cir. 2002) .............................................................................................16, 22

*Martinez v. Wells Fargo Bank*,
   2007 WL 2213216 (N.D. Cal. 2007) ....................................................................14, 16, 17, 18

*Montgomery v. Bank of America Corp.*,
   515 F. Supp. 2d 1106 (C.D. Cal. 2007) ................................................................16, 17, 18

*NNDJ, Inc. v. National City Bank*,
   540 F. Supp. 851 (E.D. Mich. 2008) .......................................................................................16

*NationsBank of N.C., N.A. v. Variable Annuity Life Insurance Co.*,
   513 U.S. 251 (1995).............................................................................................................14, 16

*Rose v. Chase Bank USA, N.A.*,
   513 F.3d 1032 (9th Cir. 2008) ..........................................................................14, 16, 17

*Silvas v. E*Trade Mortgage Corp.*,
   514 F.3d 1001 (9th Cir. 2008) ..........................................................................................15, 16

MOTION OF DEFENDANT WELLS FARGO BANK, N.A.
FOR SUMMARY JUDGMENT; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. CV-07-5923 WHA

ii

*Smiley v. Citibank (S.D.), N.A.*,
    517 U.S. 735 (1996)............................................................................................16

*T.C. Jefferson* v. *Chase Home Finance*,
    2008 WL 1883484 (N.D. Cal. 2008) ..............................................................14, 17

*Watters v. Wachovia Bank, N.A.*,
    127 S. Ct. 1559 (2007)...........................................................................13, 14, 15

*Wells Fargo Bank, N.A. v. Boutris*,
    419 F.3d 949 (9th Cir. 2005) ...................................................................3, 13, 14

## STATE CASES

*Hartford Financial Corp. v. Burns*,
    96 Cal. App. 3d 591, 598 (1979) .......................................................................22

*Massachusetts Mutual Life Insurance Co.* v. *Superior Court*,
    97 Cal. App. 4th 1282 (2002) .............................................................................20

*Mirkin* v. *Wasserman*,
    5 Cal. 4th 1082 (1993).......................................................................................20

*United States Fidelity & Guaranty Co.* v. *America Employer's Insurance Co.*,
    159 Cal. App. 3d 277 (1984) .............................................................................20

## FEDERAL STATUTES

12 C.F.R. § 7.4002(a) ..............................................................................................14

12 C.F.R. § 7.4007(b)(2) .....................................................................................15, 17

12 C.F.R. § 7.4009(b) ..............................................................................................15

12 C.F.R. § 7.5001....................................................................................................14

12 U.S.C. § 24 (Seventh) .....................................................................................14, 15

12 U.S.C. § 43...........................................................................................................15

12 U.S.C. § 93a.........................................................................................................15

Fed. R. Civ. P. 56.................................................................................................1, 13

MOTION OF DEFENDANT WELLS FARGO BANK, N.A.
FOR SUMMARY JUDGMENT; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. CV-07-5923 WHA

iii

1

## STATE STATUTES

2

Cal. Bus. & Prof. Code § 17204 .................................................................................................20

3

Cal. Bus. & Prof. Code § 17535 .................................................................................................20

4

Cal. Civ. Code § 1780(a) .............................................................................................................20

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that on August 21, 2008, at 8:00 a.m. in the courtroom of the Honorable William H. Alsup, United States District Court for the Northern District of California, San Francisco Division, 450 Golden Gate Ave., Courtroom 9, 19th Floor, San Francisco, California, or at such date and time as the Court may otherwise direct, defendant Wells Fargo Bank, N.A. ("Wells Fargo") will move and hereby does move the Court for summary judgment on the entirety of the claims alleged in plaintiffs' [Adjusted] First Amended Complaint ("FAC").

This motion is made pursuant to Fed. R. Civ. P. 56 on the separate and independent grounds that: (a) all of the claims in the FAC are preempted by federal law; and (b) plaintiffs' claims fail as a matter of law on the undisputed facts. The motion is based on this notice, the memorandum of points and authorities set out below, and the accompanying declarations of David Jolley, Kenneth Zimmerman, and John Ahrendt, together with such further argument and evidence as the Court shall permit.

**ISSUES TO BE DECIDED**

1. Does federal law preempt plaintiffs' state-law challenges to Wells Fargo's method of determining a customer's available balance and its disclosures on that subject?

2. Do plaintiffs' claims fail as a matter of law on the undisputed facts?

   a. Do plaintiffs lack standing to pursue their non-disclosure claims, in light of their admission that they knew the facts that they claim were not adequately disclosed?

   b. Is plaintiffs' substantive challenge to the banking practice at issue without legal support, and do plaintiffs lack standing to bring that challenge?

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

## I.    INTRODUCTION

3    This case involves a challenge to the existence of (and disclosures concerning) a

4 "float" on transactions made using funds in consumer checking accounts.  For many decades,

5 consumers have relied on this float to write checks when the money was not yet in their

6 accounts, counting on the deposit of a paycheck or other incoming funds to cover a check before

7 it was presented for payment and posted to the account.  In this case, ironically, plaintiffs are

8 complaining that the float disadvantages consumers.  Plaintiffs claim that they did not know that

9 a float similar to that existing for checks often exists also for electronic transactions they initiate

10 with their debit cards, and that defendant Wells Fargo Bank ("Wells Fargo" or "the Bank") acts

11 improperly in not posting all such transactions immediately and reflecting them fully in the

12 available balances it calculates for their accounts.[1]

13    Leaving aside the inherent peculiarity of this theory, plaintiffs' claims fail at the

14 threshold for at least two separate and independent reasons.  First, state-law challenges such as

15 this to the core banking operations and disclosures of a national bank are barred by well-

16 established principles of federal preemption under the National Bank Act and its implementing

17 regulations.  Second, insofar as plaintiffs are claiming that Wells Fargo failed adequately to

18 disclose the banking practice on which they focus, their claims are barred by their admission

19 that they knew the real facts at the time of the challenged transactions, and hence did not rely on

20 any misrepresentations (or misunderstandings deriving from inadequate disclosures) in making

21 the transactions that they personally challenge.  And insofar as plaintiffs seek to challenge the

22 substance of the banking practice at issue, that challenge has no legal basis – and these plaintiffs

23 in any event lack standing to make it.

24

25 _____

26 [1]    Plaintiffs' complaint named as defendants both Wells Fargo Bank, N.A., and its parent company, Wells Fargo & Company.  However, Wells Fargo & Company has no involvement in
27 any of the matters at issue in this case, and a stipulation dismissing it as a defendant has been filed with the Court.

28

## II.    STATEMENT OF UNDISPUTED FACTS

The only specific fact that is material to Wells Fargo's first ground for summary judgment (federal preemption) is that Wells Fargo Bank, N.A. is a national bank chartered by the federal government under the National Bank Act.[2]  The remaining facts set out below provide a general context for the preemption issue but are primarily pertinent to Wells Fargo's other grounds for summary judgment discussed in Part B of the Argument below.

### A.    The Bank's Processing of Debit-Card Transactions[3]

When a consumer writes a check and delivers it to a landlord, merchant, or other third party, the amount of the check is not automatically deducted from the consumer's bank account.  Rather, the consumer has continued use of the funds until the check is actually presented to the Bank for payment and is posted to his account.  If, by the time that occurs, the consumer has spent down the account so that there are insufficient funds to cover the check, and if the Bank nonetheless chooses to pay the check instead of rejecting it, an overdraft occurs and the customer will be charged a fee.[4]  Conversely, if there are insufficient funds in the account at the time the check is written, but the accountholder makes a deposit before the check is presented for payment, the check will clear with no overdraft and no overdraft fee.

The same thing can, and often does, happen when a consumer uses his bank debit card to pay a bill or to make a purchase from a merchant using funds in his checking account.[5]

---

[2]    Declaration of Kenneth A. Zimmerman ("Zimmerman Declaration" or "Zimmerman Dec.") ¶ 2; *see Wells Fargo Bank, N.A. v. Boutris*, 419 F.3d 949, 956 (9th Cir. 2005).

[3]    A detailed discussion of Wells Fargo's procedures for processing debit-card transactions, and the circumstances under which a customer will and will not incur overdraft fees for such transactions, is provided in the accompanying Zimmerman Declaration.  Wells Fargo expects also to rely on this declaration in opposing plaintiffs' motion for class certification (which Wells Fargo expects to be noticed for hearing on the same day as this motion for summary judgment). Accordingly, in the interests of efficiency and for the benefit of the Court, the Zimmerman Declaration addresses facts and details not material to this motion that may nonetheless be pertinent to class certification issues.

[4]    The Bank (and quite possibly the merchant as well) will also charge a fee if the Bank chooses not to pay the check and returns it.

[5]    A "debit" card (sometimes referred to as a "check" card or "ATM" card) authorizes payment for a transaction directly out of the cardholder's bank account.  Such transactions are often referred to as "Point of Sale" or "POS" transactions.  When a consumer uses a "credit" (continued…)

As with a check, the transaction typically does not settle immediately.  Accordingly, as is the case with checks, customers in certain instances enjoy a "float" with debit-card transactions, and a customer will not incur an overdraft fee if there are insufficient funds to cover a debit-card purchase at the time the purchase is made if the customer deposits sufficient funds into the account before the transaction is submitted for settlement.  Thus, for example, if a California customer uses his debit card on Saturday morning for a $100 purchase but has only $90 in his account *at that time*, he will not be charged an overdraft fee if he makes a deposit of $10 or more on Monday to cure the insufficiency.  Conversely, however, if there are sufficient funds in the account at the time a customer initiates a debit-card purchase but he then withdraws funds or otherwise reduces the account balance, he will incur an overdraft fee if there are insufficient funds in the account at the time the transaction settles.  *See* Zimmerman Dec. ¶¶ 13, 25-34.

In many instances, the Bank has some information about a debit-card transaction before settlement, but that is not always the case.  Most debit-card transactions are submitted for electronic "authorization" by the Bank, but the electronic messages accompanying such an authorization request typically do not include the full information needed to settle the transaction.  For many transactions, the Bank does not even know at the time of authorization whether the transaction will be completed at all – or, if it is completed, what the final transaction amount will be.  For example, some merchants seek authorization of only a token amount and do not inform the Bank of the final transaction amount until settlement.  Certain other merchants may seek authorization in amounts that *exceed* the final amount.  Some merchants do not seek authorization at all.  *See* Zimmerman Dec. ¶¶ 11, 14.

If the merchant submits the transaction for authorization and the Bank knows the final amount of the transaction, it will usually place a "memo hold" on the customer's account.  These holds are then used by the Bank to calculate the customer's "available balance," which

---

card, in contrast, he receives a separate consolidated bill for all transactions made with the card, which he must separately pay from his bank account or another source.

MOTION OF DEFENDANT WELLS FARGO BANK, N.A.
FOR SUMMARY JUDGMENT; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. CV-07-5923 WHA

4

1    the Bank uses as its starting point in authorizing and posting transactions.[6]  However, memo

2    holds cannot be placed and maintained for transactions that are not submitted for authorization

3    or for which the Bank does not know the final transaction amount.  Nor can they be maintained

4    in place indefinitely if a merchant for some reason does not submit the transaction for payment

5    in a timely manner.[7]  Accordingly, the Bank's calculation of a customer's "available balance" at

6    any given time will not always reflect all transactions the customer has initiated.

7           **B.      Information Provided to Customers About Their Accounts and Balances**

8                  Wells Fargo provides information to customers about their accounts in many

9    forms.  Every customer receives a monthly account statement that shows the activity on his

10   account during the previous month and the resulting ending (or "ledger") balances (*i.e.*, the

11   balances resulting after transactions have actually posted to the account).  A customer who signs

12   up for online banking also has access to more up-to-date information during the course of a

13   month.  A customer who views his "Account Activity" page online can see (a) a list of all

14   transactions on the account that the Bank has posted, as well as "pending" transactions of which

15   the Bank is aware, (b) the Bank's most recent calculation of the customer's ending balance, and

16   (c) the Bank's current calculation of the available balance on the account.  Zimmerman Dec. ¶ 6

17   & Ex. H.  This information can also be obtained from a teller in a branch, through calling Wells

18   Fargo's phone bank, or at an ATM.  *Id.* ¶ 6.

19

20

21

_____

22   [6]      Zimmerman Dec. ¶ 15.  The Bank may authorize debit-card transactions that exceed the available balance at the time of the transaction (a fact that is fully disclosed in the Account

23   Agreement and other disclosures).  *Id.* ¶¶ 28-30.  This practice, and the Bank's disclosures concerning it, were the subject of previous litigation, and plaintiffs here have disclaimed any

24   intention to seek to relitigate those issues.  Plaintiffs do not claim here that Wells Fargo authorized transactions for which plaintiffs had insufficient funds; they instead complain that

25   the Bank authorized transactions when they had *sufficient* funds but then nonetheless charged them overdraft fees.

26   [7]      Zimmerman Dec. ¶¶ 16-17.  For example, under the rules of the Visa debit-card

27   network, a hold on a transaction routed over that network can only be maintained for three days, so as to avoid inappropriate long-term holds on customers' funds.  *Id.* ¶ 16.

28

1    When a customer checks his available balance online, he will see a link on the

2    webpage saying "What's this?"  That link takes him to a definition of "available balance" that

3    reads as follows:

4         "**Available balance**:  The most current picture of funds you have
          available for withdrawal.  It reflects the latest balance based on
5         transactions recorded to your account today including deposited
          funds, paid checks, withdrawals and point-of-sale purchases.
6         (*Please note that some transaction activity may not be
          immediately recorded to your account and will then not be
7         reflected in the available balance….*)"

8    Zimmerman Dec. ¶ 43 & Ex. H (emphasis added).[8]

9    Every customer who opens a Wells Fargo account receives extensive disclosures

10   about the Bank's policies and practices with respect to his account.  For example, the Consumer

11   Account Agreement, which is provided upon account opening and updated thereafter through

12   notices printed on or included with monthly statements, includes disclosures on how the Bank

13   processes transactions and how overdraft fees may be incurred.  Zimmerman Dec. ¶ 35 & Ex.

14   A.[9]  Customers are specifically warned that they must:

15        "Keep accurate records.  You can avoid many fees to your
          Account by keeping an accurate record of your Account
16        Balance….  Remember to record any transaction you make at an
          ATM, or by telephone or online.  Also remember to record any
17        POS transaction or automatic payment from your Account."

18   Zimmerman Dec. Ex. A at 14; *see also id.* at 11 (discussing the customers' obligation to review

19   all statements and other account-related information and to notify the Bank of any errors).  The

20

21

22   ───────────────────────

     [8]    The same definition appears in a glossary provided on Wells Fargo's website.  *Id.* ¶ 43 &
23   Ex. I.

24   [9]    The Introduction section of the Consumer Account Agreement informs the customer that
     "[t]his Agreement governs your Account and related Services," and that "[b]y signing the
25   Bank's signature card for your Account or using your Account or Service, you will be deemed
     to have received and Agreed to this Agreement."  Zimmerman Dec. Ex. A at 7.  The precise
26   language used in the Consumer Account Agreement has varied over time.  Material revision are
     provided to existing customers with (or, in some cases, printed on) their monthly statements.  *Id.*
27   ¶ 35.  The language quoted here is from the 2004 version; the pertinent sections of subsequent
     versions are substantially the same.  *Id.* ¶ 35.

28

1    Agreement states that the Bank reserves the discretion to cover overdraft items and that the

2    customer agrees to pay the applicable overdraft fees.[10]

3            In a separate section specifically addressing ATM Transactions and POS/debit-

4    card purchases, the Consumer Account Agreement reminds the customer that the Bank retains

5    discretion in authorizing such transactions that may exceed the customer's available balance; it

6    also discusses the Bank's discretion to place holds on the account for electronic transactions of

7    which it receives notice, with the amount of the hold potentially varying from the actual

8    transaction amount "depending on the merchant's practice." *Id.* at 50-51. Customers are

9    explicitly warned that "[t]he time required to debit or credit your Account after the [debit card]

10   is used will depend on the location of the ATM or POS and the type of transaction." *Id.* at 49.

11           Plaintiffs Smith and Walker did not read any of the disclosures discussed above.

12   *See* Declaration of David Jolley ("Jolley Dec.") Exs. 2 at 23-24, 3 at 26-27. Plaintiff Gutierrez

13   testified to having read and understood the "What's this?" definition of available balance; she

14   did not read any of the other specific disclosures discussed above, although she did review other

15   sections of her Account Agreement. *Id.* Ex. 1 at 51-53; 31-32.

16       **C.    Plaintiffs' Claims in this Case**

17           As discussed above, because debit-card transactions typically do not settle

18   immediately, a customer who spends in excess of his "available balance" at any given point in

19   time will not necessarily incur an overdraft fee.[11] Conversely, however, for the same reason, a

20   customer who makes a transaction that is within his available balance at the time of the

21

22   ───────────────

23   [10]     *Id.* at 30. The specific amounts of the fees are set out in a fee schedule provided to
     customers and updated from time to time through account statement notices. Zimmerman Dec.
     ¶ 40 & Ex. B.

24   [11]     While the Bank could charge overdraft fees in many such situations by treating as fee-
25   eligible overdrafts any transaction that exceeds the customer's available balance (thus
     eliminating the customers' ability to take advantage of the "float" for pending transactions for
26   which the Bank has memo holds in place), it does not currently do so. While the Bank classifies
     any transaction that exceeds the customer's available balance as an "overdraft," no overdraft
27   fees are charged for transactions in excess of the available balance that could be paid absent
     holds for debits that have been authorized but not yet posted. Zimmerman Dec. ¶ 33.

28

1   transaction may nonetheless incur an overdraft if there are no longer sufficient funds in his

2   account at the time the transaction posts.

3              It is this last situation that is the subject of plaintiffs' complaint in this case.

4   (Unsurprisingly, plaintiffs do not complain about the benefits that consumers receive from the

5   fact that transactions are not posted in real time.)  Plaintiffs challenge both the substance of the

6   Bank's practice in not posting debit-card transactions immediately and the adequacy of the

7   Bank's disclosures on that subject.[12]  Thus, in summarizing their claims in Paragraph 3 of the

8   FAC, plaintiffs accuse Wells Fargo of (a) "wrongfully taking overdraft fees from Wells Fargo

9   customers' checking accounts after debit transactions and ATM withdrawals when customers

10  had sufficient funds in their checking accounts to cover these transactions at the time they were

11  made," and (b) of "increasingly (sic) the likelihood of assessing these charges by identifying and

12  publishing inaccurate 'available balance' information to customers" and "fail[ing] to adequately

13  notify Customers of this practice."  FAC ¶ 3.  The complaint then goes on to identify specific

14  instances in which each plaintiff allegedly made one or more debit-card purchases when he or

15  she had a "positive balance" in his or her account at the time of the purchases but was then

16  charged overdraft fees when those transactions later posted to the account.  FAC ¶¶ 15-16

17  (Gutierrez), 19-20 (Walker), 21-22 (Smith).[13]

18          **D.    Experiences and Knowledge of the Three Plaintiffs**

19              The undisputed facts show that all of the plaintiffs were very much aware that the

20  "available balance" information Well Fargo supplied online did not always include all

21  transactions they had initiated, and that they needed to keep independent track of their own

22

23  [12]    Plaintiffs assert causes of action under the California Consumer Legal Remedies Act
    ("CLRA"), the Unfair Competition Law ("UCL"), and the False Advertising Law ("FAL"), as
24  well as claims for fraud, negligent misrepresentation, and conversion.

25  [13]    In some instances additional transactions were identified in plaintiffs' responses to
    interrogatories propounded by Wells Fargo.  *See* Jolley Dec. Ex. 6 at 2.  Each plaintiff has
26  confirmed that the identification of challenged transactions in their interrogatory answers is
    accurate and complete.  *Id.* Exs. 1 at 72-73, 2 at 112-113, 3 at 97-98.  The FAC also includes
27  allegations about another individual, Tim Fox, but he has since been dismissed as a named
    plaintiff in this case.  Those allegations are accordingly not addressed here.

28

1    transactions to determine how much they could spend without incurring an overdraft.  The

2    undisputed facts further show that these plaintiffs incurred the challenged overdraft fees for the

3    simple reason that they spent more money than they had in their accounts.[14]

4                    **1.    Veronica Gutierrez**

5                Plaintiff Gutierrez challenges the overdraft fees on transactions she made during

6    the period of October 5-9, 2006.  She asserts that she had a positive balance in her account when

7    each of these transactions was authorized by the Bank.  FAC ¶¶ 15-16.

8                Gutierrez claims that she regularly checked her available balance online,

9    although she admits that she does not recall whether she checked it during the October 5-9,

10   2006, period.  Jolley Dec. Ex. 1 at 97-98, *see also id.* Ex. 1 at 90-91.  She further admits that she

11   was aware that the "available balance" displayed for her account online did not always reflect

12   all of her pending transactions and that she had an independent responsibility to keep track of

13   her transactions.  Jolley Dec. Ex. 1 at 39-44.

14               As it happens, the overdraft fees Gutierrez challenges were caused, not by any

15   "inaccuracy" in the Bank's calculation of her available balance, but rather by a check she had

16   written in late September 2006.  *See* Zimmerman Dec. ¶¶ 46-48.   Had Gutierrez checked her

17   available balance between October 5 and October 9, it would have reflected all of her pending

18   transactions *except* this check – which she admits the Bank could not have known about.  Jolley

19   Dec. Ex. 1 at 41; *see* Zimmerman Dec. ¶ 46.

20               The Bank received the check for posting on October 10, 2006, along with several

21   of the transactions from the October 5-9 period and an online transfer that Gutierrez made out of

22   her account on October 10.  Zimmerman Dec. Ex. K; Jolley Dec. Ex. 1 at 88.  The sum of these

23

24

25   ───────────────────────────

26   [14]        None of the plaintiffs disputes the legitimacy of any of the transactions at issue or the
     accuracy of the amounts that the Bank posted to their accounts.  Jolley Dec. Exs. 7 at 2, 9 at 2,
27   11 at 2.  They challenge only the fact that they were charged overdraft fees for some of those
     transactions.

28

1  debits exceeded the funds in her account, and several overdrafts resulted, for which she was

2  charged overdraft fees.[15]

3        **2.    Erin Walker**

4        Plaintiff Walker challenges the overdraft fee assessed on June 5, 2007, for a

5  $9.66 debit-card purchase she made on May 29, 2007.  FAC ¶¶ 19-20.  The FAC asserts "on

6  information and belief" that at the time that transaction was authorized by the Bank, she had at

7  least $53.05 in her account.[16]  Her interrogatory answers refer more generally to overdraft fees

8  for transactions between May 29, 2007, and June 1, 2007.  Jolley Dec. Ex. 5 at 2, 5.

9        Walker, a college student, had a history of spending in excess of her available

10  balance.  In most previous instances, she had avoided incurring overdraft fees for these

11  transactions because she had overdraft protection, which transferred funds from her savings

12  account to her checking account to cover overdraft amounts.  Zimmerman Dec. ¶ 50.  However,

13  in late May 2008, her savings account balance was depleted.  *Id.*

14        When Walker made the $9.66 purchase that she challenges, her available balance

15  was sufficient to cover it.  However, over the following days she made several additional

16  purchases.  The Bank put memo holds in place for most of those transactions (although there

17  was one the Bank did not know about, as the merchant apparently did not submit it for

18  authorization).  By June 1, her accumulated pending transactions were greater than her account

19  balance, but she incurred no overdraft fees that day, because some of the transactions had not

20  yet posted.  Had she deposited sufficient funds to cover those pending transactions on or before

21  ───────────────

15      Zimmerman Dec. ¶¶ 46-48.  Gutierrez incurred multiple overdraft fees on October 10,
22  2006, rather than just one because her transactions were posted from highest dollar amount to
   lowest in accordance with the bank's standard practice; the payment of her largest items left
23  insufficient funds to cover several other items that posted subsequently.  Neither the complaint
   nor plaintiffs' interrogatory answers identifies this as a challenged practice.  In any event, the
24  bank fully discloses this posting order (and its potential impact on overdraft fees) in the
   Consumer Account Agreement.  *See* Zimmerman Dec. ¶ 38 & Ex. A at 23.

25  16      FAC ¶ 19.  In her deposition, Walker testified that she does not know what her balance
   was at that time; the $53.05 figure was supplied by her counsel.  Jolley Dec. Ex. 2 at 75-77.  It
26  appears that plaintiffs' counsel derived the figure from Walker's ending ledger balance on May
   29, as reflected on her monthly account statement.  *See* Zimmerman Dec. Ex. L.  Her available
27  balance on May 29 would have been lower, but still positive.  *Id.* ¶ 51.

28

June 4, therefore, she would have incurred no overdraft fees, even though she had already spent more money than she had in the account.  But she did not do so and, on June 4, nearly all of her accumulated debit transactions were submitted for settlement, and several items posted into overdraft, including the May 29 purchase of $9.66.  Zimmerman Dec. ¶¶ 51-52.[17]

Walker claims that she frequently checked her available balance online. However, she does not specifically recall checking it during the May 29-June 1, 2007 period, Jolley Dec. Ex. 2 at 76-77, and Wells Fargo's records show that she did not do so.  *See* Declaration of John Ahrendt ("Ahrendt Dec.") ¶ 3.   Moreover, Walker admitted in her deposition that she was aware that the Bank's online listing of her transactions (and the account balance shown) did not always include all of her pending transactions.  She testified that she knew she needed to adjust the available balance she saw online to take into account any transactions that were not listed.  Jolley Dec. Ex. 2 at 27-29.

Overall, Walker was a net beneficiary of the "float" on her debit-card transactions during this period.  Had the Bank had the ability to post each of Walker's transactions during this period on the day of the transaction, and had it done so, she would have incurred six more overdraft fees than she was in fact assessed.   Zimmerman Dec. ¶ 54 & Ex. M.

### 3.    William Smith

Plaintiff Smith asserts that he made a check-card purchase on July 3, 2007, at TNT Fireworks, that he had sufficient funds in his account on July 3 to cover that purchase, but that he incurred an overdraft fee when that transaction posted on July 12.  FAC ¶¶ 21-22.

According to Wells Fargo's records, Smith did make a debit-card purchase from a "TNT Fireworks" on July 3.  However, the merchant did not submit the transaction for payment and settlement until July 12, when the Bank posted it to Smith's account.  In the meantime, Smith had made several additional debit-card purchases and other withdrawals from

---

[17]    It took four business days for the merchant to submit the $9.66 transaction for settlement, which is slightly longer than the one to three days that is the norm for such transactions.  *Id*. ¶ 53.

1    his account.  As a result of all of the cumulative activity, two transactions posted into overdraft

2    on July 12, including the June 3 TNT Fireworks purchase.

3              Like Gutierrez and Walker, Smith was well aware that the Bank did not keep

4    holds in place indefinitely, that his available balance would not reflect all transactions that had

5    not yet posted, and that he needed to keep track of his transactions and to adjust the available

6    balance displayed online to take into account any purchases that were not listed.   Only a few

7    months earlier, Smith had had a similar experience with a purchase made on his business

8    account (which is not at issue in this case and which he does not challenge).  *See* Jolley Dec. Ex.

9    3 at 51-56.  In that case, a purchase Smith had made did not post for an unusually long time, was

10   not reflected in his available balance, and resulted in an overdraft fee when it did post.  *Id.* at 51-

11   53.  On that occasion, he called the Wells Fargo phone bank to complain, and it was explained

12   to him that "sometimes after I do the electronic transaction, that sometimes it will fall off

13   because they are waiting for the receipt to show up."  *Id.* at 52-53; *see also id.* at 88.[18]

14   Accordingly, when Smith made the TNT Fireworks purchase on July 3 – and then additional

15   transactions thereafter – he already knew that the Bank's available balance would not always

16   reflect all of his transactions and that he had to keep independent track of them.  Smith testified

17   that after the previous experience he kept a watch out for transactions similarly "falling off" his

18   account activity and available balance.  Jolley Dec. Ex. 3 at 87-88.  However, when the Bank

19   dropped the hold for the TNT Fireworks transaction after three business days (as it is required to

20   do under Visa rules, *see* Zimmerman Dec. ¶ 16), he claims he "didn't catch it."  Jolley Dec. Ex.

21   3 at 87.

22             Had Wells Fargo had the ability to post all of Smith's transactions during the

23   statement period at issue on the original transaction date, and had it in fact done so, Smith would

24   have incurred a total of three overdraft fees for the period rather than two, although the TNT

25   Fireworks purchase would not have been one of them.  *See* Zimmerman Dec. ¶ 58 & Ex. N.

---

[18]    On that occasion, Wells Fargo reversed the overdraft fee as a customer service because
he did not have a substantial history of past overdrafts.  Jolley Dec. Ex. 3 at 52-53.

## III.    ARGUMENT

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issues as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis upon which a reasonable jury could find for the nonmoving party, and a fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In this case, Wells Fargo is entitled to summary judgment for the separate and independent reasons that (a) all of plaintiffs' claims are barred by federal preemption, (b) all of plaintiffs' claims fail as a matter of law – all of the plaintiffs were fully aware of the information that they claim the Bank failed to disclose, and none of the challenged transactions were handled unlawfully or in a way that injured these plaintiffs.

### A.    All of Plaintiffs' Claims Are Barred by Federal Preemption.

All of the causes of action asserted by plaintiffs in this case assert that the challenged practices of Wells Fargo violate California state law. Any such application of state law to Wells Fargo's account posting practices and disclosures is preempted by the National Bank Act ("NBA") and the implementing regulations of the Office of the Comptroller of the Currency ("OCC").

Wells Fargo is a National Bank regulated by the federal government under the NBA. Zimmerman Dec. ¶ 2; *see Wells Fargo Bank, N.A. v. Boutris*, 419 F.3d at 956. As the United States Supreme Court has recognized repeatedly over the course of the last century, and reiterated as recently as last year, federal regulation of national banks under the NBA and other federal statutes has a special status that leads to expansive – and *presumed* – preemption of conflicting state-law regulation. *See, e.g. Watters v. Wachovia Bank, N.A.*, 127 S. Ct. 1559, 1567 (2007); *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 32 (1996); *Franklin Nat'l Bank* v. *New York*, 347 U.S. 373, 375 (1954); *First Nat'l Bank of San Jose v. California*, 262 U.S. 366, 368-69 (1923). In fact, the NBA "was enacted to protect banks against intrusive

1    regulation by the States." *Bank of America v. City & County of San Francisco*, 309 F.3d 551,

2    561 (9th Cir. 2002). [19]

3            The federal preemption accorded by the NBA covers areas in which federal

4    statutes and regulations have granted or recognized "powers" of national banks to operate,

5    regardless of the content of any federal regulation of the exercise of those "powers."  Thus, as

6    the Supreme Court has stated, the history of applying this national bank legislation "is one of

7    interpreting grants of both enumerated and incidental 'powers' to national banks as grants of

8    authority not normally limited by, but rather ordinarily pre-empting, contrary state law."

9    *Barnett Bank*, 517 U.S. at 32; *see also Watters*, 127 S. Ct. at 1567; *City & County of San*

10   *Francisco*, 309 F.3d at 561.

11           Among the "powers" granted to national banks under the NBA are the power "to

12   take deposits" and all other powers "incidental … to … the business of banking."  12 U.S.C.

13   § 24 (Seventh).  The term "business of banking," as used in the statute, is itself broadly

14   construed, *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 258 n.2

15   (1995), and the "incidental powers" granted to carry out that business are "not limited to

16   activities deemed essential to the exercise of enumerated powers but include activities closely

17   related to banking and useful in carrying out the business of banking."  *City & County of San*

18   *Francisco*, 309 F.3d at 562; *see also Martinez v. Wells Fargo Bank*, 2007 WL 2213216, at *3

19   (N.D. Cal. 2007).  These powers include, among other things, the power to offer electronic

20   account access through the Internet, telephone, or ATMs and the power to charge non-interest

21   charges and fees, including overdraft fees.  12 C.F.R. §§ 7.4002(a), 7.5001.

22           Any state-law regulation that interferes with the exercise of a national bank's

23   federal powers is preempted.  *Franklin Nat'l Bank* illustrates this principle.  In that case, New

24   York law, in furtherance of a public policy seeking to distinguish between depositor-owned

---

[19]    "Accordingly, 'the usual presumption against federal preemption of state law is
inapplicable to federal banking regulation.'"  *Rose v. Chase Bank USA, N.A.*, 513 F.3d 1032,
1037 (9th Cir. 2008) (quoting *Wells Fargo Bank, N.A.  v. Boutris*, 419 F.3d at 956); *see also
T.C. Jefferson v. Chase Home Finance*, 2008 WL 1883484 (N.D. Cal. 2008).

"savings" institutions and commercial banks, prohibited banks from using the terms "saving" or "savings" in their advertising or business. The Supreme Court held that this state prohibition was in conflict with, and hence preempted and invalidated by, national banks' "incidental powers" under 12 U.S.C. § 24(Seventh) to advertise their products and services. 347 U.S. at 376; *see also City & County of San Francisco*, 309 F.3d at 563-64 (national banks' federal "incidental" powers to charge and collect fees for banking services preempted local laws barring imposition of surcharges on ATM withdrawals).

In addition to the federal preemption created directly by the NBA itself, Congress has delegated to the OCC specific rulemaking powers, including the power to issue rules preempting state law. 12 U.S.C. §§ 43, 93a. Such federal regulations have the same preemptive effect as federal statutes. *See, e.g., Fidelity Fed. Sav. & Loan v. de la Cuesta*, 458 U.S. 141 (1982). Invoking this authority, the OCC has promulgated regulations expressly preempting "state law limitations concerning" national banks' "deposit-taking powers," including any state-law limitations on "checking accounts," "disclosure requirements," and "funds availability." 12 C.F.R. § 7.4007(b)(2).[20] Another OCC regulation expressly recognizes preemption of any state law that impedes a national bank's "operations." 12 C.F.R. § 7.4009(b).[21]

---

[20] The OCC's regulations recognize that national banks remain subject to state criminal, contract, and tort laws in areas that do not involve any of the specific categories of banking activity enumerated in the regulation and that otherwise do no more than incidentally affect a bank's exercise of its federal powers. 12 C.F.R. § 7.4007(c). However, if state law is invoked in an effort to regulate one of the specifically enumerated subjects identified in Section 7.4007(b)(2) – or if it interferes significantly with the bank's ability to exercise its federal powers in conducting the business of banking – it is preempted. *See Silvas v. E*Trade Mortgage Corp.*, 514 F.3d 1001, 1007 & n.3 (9th Cir. 2008) (construing parallel regulation of the Office of Thrift Supervision); *see generally Watters*, 127 S. Ct. at 1567 (although state laws of general applicability may apply to national banks, they may do so only "where doing so does not prevent or significantly interfere with the national bank's or the national bank regulator's exercise of its powers…. [W]hen state prescriptions significantly impair the exercise of authority, enumerated or incidental under the NBA, the State's regulations must give way.").

[21] The preemption of state law in these areas does not, of course, leave a national bank free from any legal supervision of its activities. To the contrary, national banks are subject to intensive supervision and regulation by the OCC. *See Watters*, 127 S. Ct. at 1564.

1          Federal preemption bars, not just direct assertion of state law by a state agency

2    to regulate the exercise of national banking powers, but also the assertion of state-law causes of

3    action by private plaintiffs who seek to challenge as unfair business practices a national bank's

4    banking practices and related disclosures.  *See, e.g.*,  *Rose,* 513 F.3d at 1038, *Martinez,* 2007

5    WL 2213216 at * 3-6; *Montgomery v. Bank of America Corp.*, 515 F. Supp. 2d 1106 (C.D. Cal.

6    2007); *see also Silvas v. E\*Trade Mortgage Corp.*, 514 F.3d at 1008 (applying parallel

7    preemption for federally regulated thrift institutions); *Lopez v. Wash. Mut. Bank,* 302 F.3d 900,

8    905 (9th Cir. 2002) (same).

9          Plaintiffs' claims here are squarely preempted by the NBA and the OCC's

10   regulations.  There can be few, if any, subjects more central to the "business of banking" than a

11   bank's procedures for authorizing and posting transactions on a customer's account and

12   determining the account balance.  The bank's federal authority to perform these functions – and

13   to calculate overdrafts and assess overdraft fees – was expressly addressed and confirmed in a

14   recent interpretive letter issued by the OCC:

> "The process by which a bank honors overdraft items is typically part of the Bank's administration of a depositor's account. Creating and recovering overdrafts have long been recognized as elements of the discretionary deposit account services that banks provide.  Where a customer creates debits on his or her account for amounts in excess of the funds available in that account, a bank may elect to honor the overdraft and then recover the overdraft amount as part of its posting of items and clearing of the depositor's account.  These activities are part of or incidental to the business of receiving deposits.
>
>      A bank's authority to provide products or services to its customers necessarily encompasses the ability to charge a fee for the product or service."

OCC Interp. Letter No. 1083, at 3 (2007) (footnotes and citations omitted).  The OCC went on

to confirm that the "fees" that may be assessed and recovered include overdraft fees.  *Id.* at 1,

7.[22]

---

[22]     The OCC's interpretation of the National Bank Act, as well as of its own regulations under that statute, is afforded great deference.  *See Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 739 (1996); *NationsBank of N.C.*, 513 U.S. at 256-57; *City & County of San Francisco*, 309 F.3d at 563; *NNDJ, Inc. v. Nat'l City Bank*, 540 F.Supp. 851 (E.D. Mich. 2008).  The (continued…)

1          Plaintiffs' challenge to Wells Fargo's practices in calculating account balances,

2    determining overdrafts, and imposing overdraft fees for customer-initiated transactions that

3    exceed those balances seeks to impose state requirements that would impair and impede – and

4    therefore conflict with – Wells Fargo's federal authority under the National Bank Act and OCC

5    regulations.  As a result, plaintiffs' state-law claims are preempted by federal law.  *See Rose*,

6    513 F.3d at 1038, *Martinez*, 2008 WL 2213216, at *4-6; *see also T.C. Jefferson*, 2008 WL

7    1883484, at *10 (observing that if plaintiffs had challenged banking practices or disclosures,

8    such claims "would be preempted").

9          Plaintiffs' challenge to the adequacy of Wells Fargo's *disclosures* concerning

10   these subjects – including its disclosures of available balance information to customers – are

11   similarly preempted.  The OCC's regulations specifically identify "disclosure requirements" as

12   an area of express preemption.  12 U.S.C. § 7.4007(b)(2)(iii).  A number of recent decisions in

13   the Ninth Circuit and elsewhere have explicitly confirmed and enforced the OCC's preemption

14   of state-law claims challenging the adequacy of a national bank's disclosures.  For example, in

15   *Rose v. Chase Bank USA, N.A.*, 513 F.3d at 1038, the Ninth Circuit affirmed the dismissal on

16   preemption grounds of a complaint seeking to assert causes of action under the California

17   CLRA, UCL, and FAL (the same statutes invoked by plaintiffs here), based on the defendant's

18   alleged misleading statements and inadequate disclosures relating to "convenience checks"

19   mailed to customers.  The court found these claims to be preempted under the NBA and the

20   OCC's regulations.  *Id.*

21         Similarly (and squarely on point here), in *Montgomery v. Bank of America Corp.*,

22   515 F. Supp. 2d 1106 (C.D. Cal. 2007), the plaintiffs brought claims under the same California

23   statutes, asserting that Bank of America failed adequately to disclose its policies on overdraft

24   fees.  The court found the claims to be expressly preempted under the OCC's regulations, which

25   provide that "'[a] national bank may exercise its deposit-taking powers *without regard to state*

26   ─────────────────────

27   agency's interpretive letters are available on the agency's website.  The letter cited above can be
     accessed at http://www.occ.treas.gov/interp/jun07/int1082.pdf.

28

1    *law limitations* concerning … disclosure requirements."  515 F. Supp. 2d at 1114 (quoting 12

2    C.F.R. § 7.4007(b)(2)(iii); emphasis added by court).  *See also Martinez*, 2007 WL 2213216

3    (applying preemption to unfair business practice claims directed at bank's disclosures);  *Am.*

4    *Bankers Ass'n v. Lockyer*, 239 F. Supp. 2d 1000, 1018 (E.D. Cal. 2002) (applying preemption to

5    invalidate California statute that purported to require banks to include additional disclosures in

6    monthly statements).

7           Because federal preemption bars plaintiffs' state-law claims, Wells Fargo is

8    entitled to summary judgment as a matter of law against all plaintiffs on all causes of action.

9         **B.**    **Plaintiffs' Claims Fail on the Undisputed Facts**

10           Separate and apart from the preemption of plaintiffs' claims under federal law,

11    their claims also fail as a matter of law on the undisputed facts.

12

13         **1.**    **Plaintiffs Lack Standing to Bring Their Statutory and Common-Law Claims Concerning the Adequacy of the Bank's Disclosures About Their Available Balances.**

14           At the core of plaintiffs' complaint here is their theory that consumers do not

15    realize that a float exists for debit-card transactions, that they do not keep independent track of

16    their transactions, that they may misunderstand what is and is not included in the "available

17    balance" disclosed to them online, and that they therefore may – either deliberately or by

18    accident – continue spending funds that they do not have, thus eventually incurring an overdraft.

19    Thus, plaintiffs' primary claim here is that Wells Fargo does not sufficiently warn customers of

20    the fact that their "available balances" may not reflect all transactions they have initiated and

21    that the Bank may treat as "available" funds that the customer has already spent.  In fact, Wells

22    Fargo does disclose this fact in multiple ways.  (*See* pp. 5-7 above.)  But in this case the

23    adequacy of those disclosures is moot, because all three plaintiffs admit that they *knew* that their

24    available balances did not always reflect all of their debit-card transactions.  Moreover, none of

25    the plaintiffs was given materially inaccurate information about their accounts.  Accordingly,

26

27

28

1  whatever the merits may be of plaintiffs' theory as it may apply to other customers, these

2  plaintiffs lack standing to pursue their nondisclosure claims.[23]

3          All three plaintiffs admitted in their depositions that they knew the fact that they

4  now claim was inadequately disclosed – *i.e.*, that "available balance" information provided to

5  them online did not always reflect all of their debit-card purchases.  Walker and Gutierrez

6  admitted that they had both noticed that some of their transactions did not "show up" on their

7  online account activity report right away, and that they understood that they needed to adjust the

8  available balances they saw online to reflect those transactions.[24]  Smith also knew that his

9  available balance did not always reflect all of his transactions, because he had previously

10  experienced a late-posted transaction on his business account and had had this fact explained to

11  him when he called Wells Fargo to complain.[25]

12          Moreover, with respect to the specific transactions and time periods that they

13  challenge, none of the plaintiffs was in fact given materially inaccurate information about their

14  available balances.  Walker did not check her account balance at all during the pertinent period

15  and so was not given any information about her available balance.  (*See* p. 11 above.)  Gutierrez

16  does not know whether or not she checked her available balance during the time pertinent to her

17  challenged transactions,[26] but had she done so her available balance would have accurately

18  reflected all of her pending transactions – except for the check that the Bank did not know about

19  

_____

20  [23]     Plaintiffs plainly lack standing to challenge the Wells Fargo advertisements and other
documents cited in their complaint.  *See* FAC ¶ 27.  In their interrogatory answers, they
21  identified these as items that were challenged in the case because their counsel was aware of
them, not as items that they had seen and relied upon personally.  Jolley Dec. Ex. 4 at 3-4, 5 at
22  3-4, 6 at 3-4.

23  [24]     Jolley Dec. Exs. 1 at 40-41, 2 at 26-28.  In addition, Gutierrez acknowledged that she
had read the definition of "available balance" provided on the bank's website.  *Id.* Ex. 1 at 51-
24  52.

    [25]     Jolley Dec. Ex. 3 at 51-52.
25
    [26]     Due to a technical error in preparing backup tapes that occurred before Gutierrez became
26  a plaintiff in this case, Wells Fargo does not have records of its customers' online activity for
the month during which Gutierrez's challenged transactions fall.  It accordingly does not have a
27  record of whether she checked her account during the pertinent period.  Ahrendt Dec. ¶ 4.
However, she does not recall having done so.  Jolley Dec. Ex. 1 at 97-98, *see also id.* at 90-91.
28

1    and that was the subsequent cause of her overdrafts.  Zimmerman Dec. ¶ 46.  And Smith does

2    not deny that when he checked his account online after his purchase from TNT Fireworks, the

3    purchase was identified as a pending transaction.  Jolley Dec. Ex. 3 at 87; *see* Zimmerman Dec.

4    ¶ 57.[27]

5            To prevail on any of their claims – indeed to have standing to pursue those

6    claims at all – plaintiffs must be able to demonstrate that the challenged practice caused their

7    alleged injuries (*i.e.*, the overdraft fees they claim they should not have been assessed).[28]  In the

8    case of a claim of misrepresentation or non-disclosure, this means that a plaintiff must be able to

9    demonstrate that he relied on the misrepresentation (or did not know the undisclosed

10   information).  *See Massachusetts Mut. Life Ins. Co. v. Super. Ct.*, 97 Cal. App. 4th 1282, 1292-

11   93 (2002) (CLRA); *Laster v. T-Mobile USA, Inc.*, 407 F. Supp. 2d 1181, 1194 (S.D. Cal. 2005)

12   (UCL and FAL); *Mirkin*, 5 Cal. 4th at 1089 n.2, 1092 (fraud and negligent misrepresentation).

13           Here, none of the plaintiffs actually relied on any misrepresentation about what

14   was and was not included in their account balances, and all were aware of the true facts.  For

15   this separate reason, therefore, Wells Fargo is entitled to summary judgment on plaintiffs' non-

16   disclosure and misrepresentation claims.

17           **2.    Any Substantive Challenge to the "Float" on Debit-Card
                     Transactions Is Without Legal Basis, and These Plaintiffs Lack
18                   Standing to Pursue Such a Challenge in Any Event.**

19           Plaintiffs' substantive challenge to the fact that they incurred overdraft fees on

20   certain transactions even though they had sufficient funds in their accounts at the time those

21   _____

22   [27]    The listing of this transaction as a pending transaction subject to a memo hold ended
         when the Bank, in compliance with Visa rules, ended its hold on the funds after three business
23   days.  However, the Bank did not list the transaction as having been posted, and Smith was fully
         aware (based on his similar past experience) that the transaction would be subtracted from his
24   account once the Bank received it for payment and settlement.

25   [28]    Causation of injury is a required element for each of plaintiffs' six claims.  *See* Cal. Civ.
         Code § 1780(a) (CLRA); Cal. Bus. & Prof. Code § 17204 (UCL); Cal. Bus. & Prof. Code
26   § 17535 (FAL); *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1089 n.2, 1092 (1993) (fraud and
         negligent misrepresentation); *United States Fid. & Guar. Co. v. Am. Employer's Ins. Co.*, 159
27   Cal. App. 3d 277, 285 (1984) (conversion – noting requirement of "chain of causation" for
         intentional torts).

28

1    transactions were initiated also lacks merit.  It is undisputed that each of the plaintiffs did in fact

2    spend more funds than he or she had in his or her account – none of the plaintiffs challenges the

3    validity or amount of any of the transactions that were posted to their accounts.  Instead, their

4    complaint appears to be that Wells Fargo permits a "float" to exist on debit-card transactions, so

5    that even though a customer may have sufficient funds at the time a transaction is initiated, it is

6    nonetheless possible for the customer to incur an overdraft fee on the transaction by spending

7    down the account before the transaction actually posts.

8            Leaving aside the fact that it would be both factually and legally impossible for

9    Wells Fargo to eliminate the float on debit-card transactions – either by posting such

10   transactions in "real time" or by creating (and maintaining indefinitely) holds for all such

11   transactions – there is simply no legal requirement that it do so.  Wells Fargo's contract with its

12   customers, embodied in its Consumer Account Agreement, certainly imposes no such

13   requirement and in fact specifically warns that transactions may not be reflected on their

14   accounts immediately and that the customer needs to keep accurate records of his transactions.

15   Nor is such a requirement imposed under any existing statute or other legal precedent of which

16   Wells Fargo is aware.

17           Nor would any such requirement make sense as a matter of basic consumer

18   protection.  While it is certainly possible to envision a circumstance under which a consumer

19   would be better off if there were no "float" on a particular transaction because of the accident of

20   timing of his various debits and credits, it will surely more often be the case – as it is for checks

21   – that consumers will, if anything, benefit from having a small amount of additional time when

22   they have effective use of funds they have already spent and can make good any overspending

23   through a covering deposit.  These plaintiffs could have avoided all of the overdraft fees about

24   which they complain simply by making covering deposits before their excess transactions

25   posted.  Absent the float, no such opportunity to make a covering deposit would have existed.

26           Nor can plaintiffs show "conversion" of their property.  A claim for conversion

27   under California law requires proof of the plaintiff's ownership or right to possess property, the

28   defendant's conversion of that property by a wrongful act, and damages caused by the

1  conversion. *Hartford Fin. Corp. v. Burns*, 96, Cal. App. 3d 591, 598 (1979). Under the

2  undisputed facts, plaintiffs cannot show that Wells Fargo "converted" any property belonging to

3  them, much less that it did so wrongfully or that they suffered injury as a result of any such

4  wrongful act.[29]

5          In any event, these plaintiffs once again lack standing to pursue any claims based

6  on a substantive challenge to the float on debit-card transactions. None of these plaintiffs

7  suffered any injury caused by the practice that they challenge. Had the Bank posted their

8  transactions on a same-day basis (or otherwise made the funds spent in those transactions truly

9  "unavailable" to them), Walker and Smith would both have incurred *more* overdraft fees, not

10  fewer. Zimmerman Dec.¶¶ 54, 59. And Gutierrez's account went into overdraft, not because

11  her available balance failed to reflect all of her debit-card transactions immediately, but because

12  of her failure to take into account a check she had written about which the bank had no

13  knowledge. *Id.* ¶ 46.

14          Accordingly, to the extent plaintiffs purport to challenge on substantive grounds

15  the "float" on debit-card transactions, there is no legal basis for such claims, and plaintiffs lack

16  standing to pursue them in any event.

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24

25  [29]    Plaintiffs do not dispute that the transactions posted to their account were genuine. To
    the extent plaintiffs' conversion claim focuses on the overdraft fees assessed on their accounts,
26  it is undisputed that (a) there were in fact insufficient funds in their accounts, and (2) the
    overdraft fees were calculated and assessed as provided in their Customer Account Agreements.
27  *See Lopez v. Wash. Mut. Bank,* 302 F.3d at 905 (bank customer validly consented to assessment
    and payment of overdraft fees as provided in his account agreement).

28

1    **IV.    CONCLUSION**

2           For the reasons stated above, the Court should grant summary judgment in favor

3    of Wells Fargo on all counts of plaintiffs' FAC.

4

5    DATED:  July 10, 2008                        COVINGTON & BURLING LLP

6

7

8                                                By:  _____/s/_____
                                                      Sonya D. Winner
9                                                     Attorneys for Defendants
                                                      WELLS FARGO BANK, N.A. and
10                                                    WELLS FARGO & CO.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28