Sonya D. Winner, SB # 200348
David M. Jolley, SB # 191164
Margaret G. May, SB # 234910
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
E-mail: mmay@cov.com

Attorneys for Defendants
WELLS FARGO BANK, N.A. and
WELLS FARGO & CO.

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

VERONICA GUTIERREZ, *et al.*,

                    Plaintiffs,

        v.

WELLS FARGO & COMPANY, *et al.*,

                    Defendants.

CASE NO. CV-07-5923 WHA (JCSx)

**DECLARATION OF KENNETH A. ZIMMERMAN IN SUPPORT OF WELLS FARGO BANK, N.A.'S MOTION FOR SUMMARY JUDGMENT**

**[PUBLIC REDACTED VERSION]**

Date:        August 21, 2008
Time:        8:00 a.m.
Courtroom:   9

Honorable William H. Alsup

## PUBLIC VERSION - CONFIDENTIAL MATERIAL REDACTED

**TABLE OF CONTENTS**

I.    Introduction ...................................................................................................1

II.   Customer Account Balances ...........................................................................1

III.  Overview of Authorization and Posting Practices .........................................3

    A.    Authorization of Debit Transactions and Memo Holds. .......................3

    B.    Receipt of Final Settlement Information and Posting ...........................7

    C.    Overdrafts and Overdraft Fees ............................................................9

IV.   The Bank's Disclosures................................................................................11

    A.    The Customer Account Agreement and Fee Schedule........................11

    B.    Other Disclosures .............................................................................13

V.    Challenged Overdrafts Incurred by the Plaintiffs.........................................14

    A.    Veronica Gutierrez ...........................................................................14

    B.    Erin Walker .....................................................................................15

    C.    William Smith ..................................................................................17

VI.   Responsibility of a Bank Customer to Keep Track of His or Her Transactions ..............18

DECLARATION OF KENNETH A. ZIMMERMAN IN
SUPPORT OF WELLS FARGO BANK, N.A.'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. CV-07-5923 WHA

i

**I.    Introduction**

1.    I am Executive Vice President of the Consumer Deposit Group of Wells Fargo Bank, N.A. ("Wells Fargo" or "the Bank"). In that position, I am responsible for overseeing the Bank's policies and procedures with respect to the management of deposit accounts and the assessment of fees, including overdraft fees, on those accounts. I make the statements in this declaration based on my personal knowledge of Wells Fargo's policies and practices on the subjects discussed and, in the case of my discussion in ¶¶ 44-59 of the plaintiffs' account histories, following a review of the Bank's records of those accounts.

2.    Wells Fargo is a national bank chartered under the National Bank Act, with operations throughout most of the United States, including in California. This declaration discusses Wells Fargo's policies and procedures relating to consumer checking accounts in California. I understand that this declaration is to be submitted to the Court to provide factual information that may be relevant to Wells Fargo's motion for summary judgment and/or plaintiffs' motion for class certification.

**II.    Customer Account Balances**

3.    When discussing consumer deposit accounts, the term "balance" or "account balance" can be used in different ways, depending on context. Of significance in this case are "ledger" (or "ending") balances and "available" balances.

4.    A "ledger" (or "ending") balance is the net balance of funds that have posted to a customer's account – deposits and inbound transfers that have been formally paid into the account and debits that the bank has paid from account funds. The Bank processes an average of over 32 million separate transactions each and every day. The cumulative amount of computer processing resources required to post all of these transactions to customers' deposit accounts is immense. The Bank accordingly does not (and, as a practical matter, cannot) post transactions in "real time" during the course of the day, when its computer resources must be devoted to ongoing operations. Instead, the Bank conducts a "batch" posting of all transactions to all accounts during the late night hours each business day. (The posting process is discussed in more detail below.) The net balance of funds that are fully settled and present in the

1  customer's account following the daily posting is the ledger balance and ties to the Bank's

2  General Ledger.

3         5.     A customer's "available balance" is the amount that is available,

4  according to the bank's records, to pay new transactions and is based on the most recent ledger

5  balance, which is adjusted:  (a) upward for deposits and transfers into the account that have not

6  yet posted,[1] and (b) downward for pending (not yet posted) debits to the account, including

7  ATM withdrawals, electronic transfers made after the daily cut-off time, and most pending

8  debit-card transactions for which the bank has not yet paid and settled the transaction.  The

9  available balance does *not* reflect pending debits about which the bank is completely unaware

10  (such as checks the customer has written, Automated Clearing House ("ACH") transactions the

11  customer has initiated, or debit card transactions for which the merchant did not seek

12  authorization) or pending transactions for which the Bank does not have a hold in place, such as

13  those for which the Bank does not know the final transaction amount or for which it is precluded

14  from holding funds.

15         6.     When a customer checks his or her account balance online, the bank will

16  display both the most recent ledger balance and the available balance.  (As discussed in ¶ 43

17  below, a definition of the term "available balance" is also supplied with the online screen.)  The

18  online account display also lists the customer's recent transactions that are taken into account in

19  the available balance.  This list identifies both transactions designated as "pending" (where the

20  bank knows of the transactions and, in the case of debits, has a hold in place), as well as those

21  that have posted.  Available balance information and information about specific transactions can

22  also be obtained over the telephone, in person at a branch, or through an ATM.

23         7.     At the consumer's assigned monthly statement cycle, a summary of all

24  transactions that posted to the deposit account during the statement period, along with the ledger

25

26  [1]    This upward adjustment is net of any "hold" on availability (for example, because of uncertainty about the likelihood and timing of payment of a third-party check submitted for

27  deposit).  A deposit hold is placed only rarely (on less than 2% of all deposits).  Holds are not placed on electronic deposits, such as "direct deposit" items.

28

1  balance as of the end of the statement period, are reported on a Consumer Deposit Statement.

2  This monthly statement is mailed to the consumer's address of record and/or made available in

3  .pdf format via a secure online banking session for consumers who have requested online

4  statements. (The content of the statement is the same regardless of mode of delivery.)

5  **III.    Overview of Authorization and Posting Practices**

6      **A.    Authorization of Debit Transactions and Memo Holds.**

7          8.    The bank's first knowledge of some categories of debits to a customer's

8  account occurs when it receives the item for settlement and posting. Thus, for example, there is

9  usually no separate "authorization" step for a check – the bank typically first learns of a check

10  when it is presented for settlement. Another category of debit for which there is no initial

11  authorization step is an Automated Clearing House or "ACH" transaction. In this type of

12  transaction, which is becoming increasingly popular, the consumer authorizes a third party to

13  initiate a direct transfer of funds from his account. Like checks, ACH transactions are submitted

14  by the third party (or its bank) for payment without a prior Wells Fargo authorization step.

15          9.    An authorization step is usually (but not always) used for two other

16  common types of debits to an account: ATM withdrawals and debit-card (sometimes referred to

17  as "Point of Sale" or "POS") purchases made at a merchant with a Wells Fargo debit card (a

18  "Check Card" or "ATM Card"). When the Bank authorizes one of these transactions, it

19  commits that payment will be made in the amount of the authorization. This commitment is

20  ordinarily binding on the Bank regardless of whether funds are still available in the customer's

21  account when the transaction is submitted for settlement. However, the transaction is not

22  actually paid until it is submitted for settlement.

23        **1.    Authorization of Debit-Card Transactions**

24          10.    Point-of-sale purchases with debit cards may be made through one of two

25  methods: Some merchants employ a POS terminal on which the consumer can enter her

26  personal identification number ("PIN") to initiate the transaction (a "PIN-based" transaction).

27  Alternatively, if no PIN is entered on a POS terminal, the transaction will be treated as a

28

1    "signature-based" transaction. A customer will often be asked to provide a signature for a

2    signature-based transaction, but a signature is not always required.

3          11.    The first contact that Wells Fargo receives for a debit card transaction is

4    an authorization query from the merchant, typically routed through a POS network and/or other

5    intermediate third party. For a signature-based transaction, the query is routed through the

6    VISA network and then to a third-party processor, FDR, for routing to Wells Fargo.

7    Authorization queries for signature-based transactions include the card number and the amount

8    for which authorization is sought but typically do not include all of the information necessary to

9    settle the transaction. Indeed, in many cases, the amount for which authorization is sought is

10   ultimately not the final amount of the transaction. For example, restaurants typically submit

11   authorization requests only for the initial amount of a check, pre-gratuity. Gas stations typically

12   seek authorization only for $1. Other merchants also seek authorizations for amounts that differ

13   from those ultimately submitted for payment. The bank receives no notice of the final

14   transaction amount until the transaction is submitted for settlement.

15         12.    Upon receipt of an authorization query through the applicable network

16   and/or third-party processor, the Bank conducts a set of initial verification steps and, if those are

17   satisfied, determines if sufficient funds are available in the account given information then

18   known to the Bank, including the ending balance from the previous posting date plus any

19   information then available about transactions conducted by the customer in the interim, such as

20   pending deposits or debits. In addition to the available balance at the time of the authorization

21   query, the Bank will also consider available funds in a linked overdraft protection source (such

22   as a savings account) and the amount by which the particular account is permitted to go into

23   overdraft should the account balance and overdraft protection funds otherwise appear to be

24   insufficient. (*See* ¶ 30 below.) If sufficient funds appear to be available based on the foregoing

25   factors, the Bank sends an authorization back to the merchant using the same system that carried

26   the initial authorization query.

27         13.    It is important to recognize that the mere fact that the bank may authorize

28   a transaction for which there are insufficient funds in the available balance at the time of the

1    authorization query does not necessarily mean that the transaction will create an overdraft or

2    cause the customer to incur an overdraft fee. This is in part because, as discussed below, the

3    bank always posts deposits before debits when it performs its daily batch posting. Thus, for

4    example, if a consumer has insufficient funds in his account for a debit-card purchase made at

5    9:00 a.m., he or she may make a deposit later that day to cover the amount of that purchase and

6    hence to avoid an overdraft. The bank does not, and cannot, know whether a transaction will

7    result in an overdraft until it receives and processes the transaction – and all other transactions

8    made in the interim – for posting to the account.

9           14.    The vast majority of debit-card transactions go through the authorization

10   process described above. However, there are two types of exceptions. In some cases, a

11   merchant may not submit the transaction for authorization at all, in which case the Bank will

12   have no knowledge of the transaction until it is submitted for settlement. And in rare situations

13   in which one or more of the electronic systems are "down," a stand-in limit will be used until

14   system connectivity is resumed.

15                 **2.    Memo Holds**

16          15.    When a debit card transaction is authorized, the Bank usually places a

17   "memo hold" on the cardholder's account in the amount of the authorization request to subtract

18   that pending debit from the customer's available balance. A memo hold is usually in place

19   within a few minutes of the authorization. If the customer checks his account online while a

20   memo hold is in place, the transaction will appear with the designation "pending."

21          16.    For PIN-based POS transactions, the Bank places a memo hold on the

22   cardholder's account in the amount of the authorization request. This hold remains in place for

23   one business day, after which the transaction is nearly always posted to the account. For most

24   signature-based transactions, the Bank's policy is to keep the memo hold in place until the

25   earlier of (1) receipt and posting of the final settlement information for the transaction or (2)

26   three business days. The Bank must limit a memo hold to three business days to comply with

27   VISA rules, which recognize that after three business days there is an increased possibility that

28   either (a) the transaction will never be submitted for settlement or (b) the transaction has already

1   been submitted and posted but has not been "matched" with the memo hold (for example,

2   because of a difference in the final transaction amount). For transactions less than $5, the memo

3   hold will be kept in place for one business day.[2]

4           17.

5

6

7

8                           **REDACTED**

9

10

11

12

13          18.     If a memo hold is in place for a debit card transaction, customers who

14  view their transactions online will see that transaction listed as "pending" until the memo hold is

15  lifted. If the transaction is of a type for which a memo hold is not in place (because, for

16  example, the merchant did not seek authorization or the transaction is in a category – such as

17  gasoline – for which the Bank has insufficient information about the final amount of the

18  transaction), or if the memo hold has been removed because more than three business days have

19  passed, the transaction will not be reflected as pending; nor will it be reflected in the available

20  balance until and unless it is posted.

21

22  _____

23  [2]     For purposes of the memo hold policies described here, the Bank's "business day" ends
    at the daily cut-off time on a day when the Bank performs batch posting to customers' deposit
24  accounts (Monday through Friday, excluding holidays). For a transaction performed after
    the applicable cut-off time (which will vary depending on the location and type of transaction
25  but is typically in the evening), the first business day will elapse, not with a posting occurring
    that same night, but rather on the next batch posting occasion. For example, for a transaction
26  performed on a (non-holiday) Tuesday morning, one business day will have elapsed when the
    account is posted on Tuesday night. For a transaction that occurs at 11:59 p.m. on Tuesday, one
27  business day will elapse on Wednesday night. For a transaction that occurs at 11:59 p.m. on
    Friday, one business day will elapse on Monday night (unless Monday is a holiday).
28

1

### 3.   Authorization of ATM Withdrawals

2      19.    If a Wells Fargo customer uses a debit card to make an ATM withdrawal,

3  the bank applies processes and criteria similar to those described above for POS transactions to

4  verify the status of the card and to ascertain whether the transaction should be authorized. The

5  Bank then sends a response back to the ATM network (if the customer is using a non-Wells

6  Fargo ATM) or the customer (at a Wells Fargo ATM).

7      20.    If an ATM withdrawal transaction is approved and completed by the

8  customer, the Bank places a memo hold on the cardholder's account in the amount of the

9  authorization request to subtract this pending debit from the customer's available balance until

10 the next batch posting, which nearly always occurs within one business day.

11     ### B.   Receipt of Final Settlement Information and Posting

12     21.    The Bank posts transactions to customers' accounts during the late night

13 or early morning hours every business day (typically Monday through Friday, excluding

14 holidays).

15     22.    The Bank cannot post a transaction until full settlement information is

16 received as required under federal regulations. The Bank usually receives the full settlement

17 information needed to post a PIN-based debit-card transaction or an ATM transaction in time to

18 post the transaction in its batch posting the same business day. The Bank usually (but not

19 always) receives the settlement information needed to post a signature-based transaction within

20 one to three business days. Checks, ACH transactions, and deposits – for which there is no

21 prior authorization step – nearly always post the same business day that they are received by the

22 Bank.

23     23.    During the course of each day, the Bank receives dozens of batch

24 settlement files from multiple sources, including third-party processors, POS and ATM

25 networks, other banks that are paying (or requesting payment of) checks, and entities submitting

26 ACH payment requests and payments. Each batch file contains the full settlement files for an

27 accumulated collection of transactions from that source for Wells Fargo customers. All of these

28 batch files are then analyzed and matched to customer accounts during batch processing.

24. Before sending a collection of final settlement files for signature-based debit-card transactions, the Bank's third-party processor, FDR, examines the transactions to identify those for which an existing memo hold should be removed because the transaction is ready for posting and settlement from the consumer's account. Those holds are then removed from the account at the outset of the posting process, along with all holds that have expired.

25. During batch posting, the Bank sorts the files of all credits and debits received by the Bank before the cut-off time for that day to each customer's account. In posting to an individual account, credits are posted before debits. This means, for example, that deposits made since the last business day are posted to a customer's account before any debits are posted, even if the deposit is made later in the day and perhaps following a previously authorized debit transaction. Under the Bank's current practice in California, the same holds true over a weekend. Thus, a deposit on Monday morning will be posted to the ledger balance before an ATM withdrawal or PIN-based debit-card purchase made on Saturday afternoon.

26. Deposits are generally posted to a customer's account when received, even if the Bank has not received settlement of the funds. For example, if on Tuesday morning a customer deposits into her account a third-party check drawn on Bank A, the Bank will post the deposit to the customer's account Tuesday night, even though Wells Fargo has not yet actually received the funds for that check from Bank A.[3] In some circumstances, the Bank will place a full or partial hold on availability of the deposit for a period of time pending payment. This hold will affect the customer's available balance while the hold is in place but not his ledger balance. If Bank A subsequently refuses to pay the check, the posted credit will be reversed.

27. After all the credits are processed and posted, the Bank then posts debits to the account. The Bank prioritizes the posting of some debits (including ATM transactions

---

[3] Detailed federal regulations govern the requirements for funds availability on deposits, although the Bank's practices are in some respects more favorable to the customer than federal regulations require.

DECLARATION OF KENNETH A. ZIMMERMAN IN
SUPPORT OF WELLS FARGO BANK, N.A.'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. CV-07-5923 WHA

8

1   and cash transfers to another account), which are combined and sorted from highest amount to

2   lowest and posted before other debits.  Then the remaining debit transactions, including all debit

3   card transactions, personal checks, and ACH transactions, are combined and sorted together

4   from highest to lowest and posted.  Transactions that exceed the available balance in the deposit

5   account are handled through additional steps, as described below.

6           **C.     Overdrafts and Overdraft Fees**

7           28.     An "overdraft" occurs when a debit is posted for which there are

8   insufficient funds in the account.  Many overdrafts occur in situations over which the Bank has

9   no control; in other instances, the Bank exercises its right under the Account Agreement to post

10  items into overdraft.  In most overdraft situations, the bank charges fees for overdrafts.  A per-

11  item overdraft fee is assessed for each item that posts into overdraft.  It is my understanding that

12  the plaintiffs' claims in this case relate to these fees.

13          29.     To determine whether there is an overdraft, the Bank begins by

14  determining the available balance in the account, calculated as described in paragraph 5 above.

15  The Bank then posts any deposits that increase the available balance.  Debit transactions that

16  can be paid with available funds are then posted to the account.  When debit transactions exceed

17  the available balance – but can be paid with funds available in a linked overdraft protection

18  source (such as a savings account) – the debit transaction(s) post to the account and a single

19  credit transaction moves funds from the linked overdraft protection account into the deposit

20  account at the end of posting.

21          30.     If debit transactions exceed both available funds and any linked

22  overdraft protection funds, the transactions are "flagged" as exceeding available funds.  If an

23  item is returnable (such as a check or ACH transaction), the Bank must make a decision either

24  to pay the item or to return it for insufficient funds.  The amount by which the Bank will

25  authorize an account to go into overdraft, or to post items into overdraft, is determined

26  electronically for each individual account through a proprietary algorithm that takes into

27  consideration a variety of factors about the characteristics and history of the account.  If the

28  Bank determines to pay an item for which there are insufficient funds, it will become an

1   overdraft item. If the Bank determines that the criteria for payment are not met, it will refuse

2   payment and return the item.

3          31.     If the Bank refuses payment for insufficient funds and returns an item, it

4   charges a per-item returned item fee, which is similar in amount to the overdraft item fee. In the

5   Bank's experience, when it refuses payment on an item and returns it, the entity submitting the

6   item for payment will often resubmit it, sometimes multiple times. (Automated ACH payments

7   for car loans or other bill payments to merchants, for example, are often automatically

8   resubmitted as many as two additional times if returned unpaid.) Because the Bank charges a

9   returned item fee each time the item is returned (and because many merchants impose additional

10  fees of their own if an item is returned), the customer will usually be better off if the Bank elects

11  to pay the item.

12         32.     Authorized and completed debit-card transactions and ATM withdrawals

13  cannot be returned for insufficient funds and so will always be posted and paid once submitted

14  for settlement, even if the transaction will cause the account to exceed the overdraft limit. Any

15  such debits that are paid into overdraft are then treated as overdraft items.

16         33.     Any debit item paid into overdraft usually results in the assessment of an

17  overdraft item fee. However, no overdraft item fees are assessed if the debit items that put the

18  account into overdraft could have been paid by available funds if the Bank had not adjusted the

19  available balance for pending debit transactions subject to memo holds. As a practical matter,

20  this means that in many instances no overdraft fees are imposed even when a customer spends

21  money that he has already committed elsewhere – so long as he makes up the difference with a

22  deposit before everything posts. Also, overdraft item fees are not assessed on overdraft items

23  that are themselves fee transactions (such as a monthly service fee or an overdraft fee).

24         34.     Following the day's posting, if an overdraft or returned item fee is to be

25  assessed on an account, an electronic notice is sent to the branch at which the customer

26  maintains the account, where branch personnel have the ability to review and reverse the fee. If

27  the fee is not reversed, it is then posted to the account, and an overdraft/insufficient funds notice

28  is sent to the customer.

DECLARATION OF KENNETH A. ZIMMERMAN IN          10
SUPPORT OF WELLS FARGO BANK, N.A.'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. CV-07-5923 WHA

IV.     **The Bank's Disclosures**

     A.     **The Customer Account Agreement and Fee Schedule**

          35.     When a customer opens a consumer deposit account with Wells Fargo, he or she is supplied with a copy of the Bank's Consumer Account Agreement ("CAA" or "Account Agreement") and Consumer Account Fee and Information Schedule ("CAFIS" or "Fee Schedule"). The Account Agreement and Fee Schedule are revised from time to time. Existing customers receive amendments to their Account Agreements and the Fee Schedule through notices printed on their monthly account statements or provided in inserts with their statements. Sample copies of the versions of these documents in effect in California as of October 2004 are attached as Exhibits A and B to this declaration. Quotations provided in this declaration are to these versions; there has been some variation over time in the precise language used but the pertinent portions of all subsequent versions are substantially the same.

          36.     The Introduction section of the Consumer Account Agreement informs the customer that "[t]his Agreement governs your Account and related Services," and that "[b]y signing the Bank's signature card for your Account or using your Account or Service, you will be deemed to have received and agreed to this Agreement." (CAA at 7.)

          37.     The Consumer Account Agreement sets out explicitly the customer's obligation to review all of her statements and account related information and to notify the bank of any errors. (CAA at 11.) Specific guidance is provided to the customer on record-keeping:

> "Keep accurate records. You can avoid many fees to your Account by keeping an accurate record of your Account Balance…. Remember to record any transaction you make at an ATM, or by telephone or online. Also remember to record any POS transaction or automatic payment from your Account."
> (CAA at 14.)

          38.     The Consumer Account Agreement also includes extensive disclosures about the handling of withdrawals from the customer's account, about the bank's rights in determining the account balance, and about how transactions will be posted. For example, the Bank expressly discloses that transactions may be posted from highest dollar amount to lowest and explains that this may result in a higher number of Overdraft Item Fees than if the opposite

order were used.  (CAA at 23.)  The Agreement is also explicit on the subject on the Bank's

discretion in handling items for which there are insufficient funds in the account:

> "**Overdrafts and Insufficient Funds**.  The Bank may, at its
> option, pay or refuse to pay any *Item* if it would create an
> overdraft on your Account, without regard to whether the Bank
> may have previously established a pattern of honoring or
> dishonoring such an *Item*.  The Bank may take the following
> actions if the Bank receives an *Item* (including an ATM or POS
> *Item*) drawn against your Account and there are insufficient
> available funds in your Account to cover the *Item* without prior
> notice to you:
>
> - Cover the *Item* in accordance with the terms of any written overdraft
>   protection plan that you and the Bank have established.
>
> - Pay the *Item* and create an overdraft to your Account.
>
> - Return the *Item*.  The Bank may return the *Item* (or if the *Item* is an ATM or
>   POS *Item*, decline the *Item*) if the *Item* would create an *Overdraft* on your
>   Account.
>
> You agree to pay the Bank's fee that may vary depending on the
> action it takes…."  (CAA at 26.)

39.     In a separate section specifically addressing ATM Transactions and POS

purchases, the Consumer Account Agreement again reminds the customer that the Bank retains

this same discretion in authorizing such a transaction if there are insufficient funds in the

account; it also discusses the Bank's discretion to place holds on the account for electronic

transactions for which it receives notice, with the amount of the hold potentially varying from

the actual transaction amount "depending on the merchant's practice."  (CAA at 45-46.)

Customers are explicitly warned that "[t]he time required to debit or credit your Account after

the [debit card] is used will depend on the location of the ATM or POS and the type of

transaction."  (CAA at 49.)

40.     The Fee Schedule sets out the fees charged by the Bank for services and

activities relating to the account, including Overdraft Item Fees and Returned Item Fees.

(CAFIS at 50-51.)  The amounts of these fees have changed over time; customers (including the

plaintiffs) have been given notice of these changes through notices printed on their account

statements.

DECLARATION OF KENNETH A. ZIMMERMAN IN
SUPPORT OF WELLS FARGO BANK, N.A.'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. CV-07-5923 WHA

12

### B.    Other Disclosures

41.    The Bank provides ongoing disclosure to its customers on a wide variety of subjects through multiple modes in addition to the Consumer Account Agreement. Information about account services and the bank's procedures are provided regularly in notices printed on account statements or inserted into account statement envelopes.  For instance, in November 2003, a disclosure about changes in the amount of overdraft fees and the fact that debit-card transactions could be authorized into overdraft was printed on account statements. (Exhibit C.)[4]  A direct mailing disclosing that debit-card transactions could be authorized into overdraft was sent to customers in 2002.  (Exhibit D.)   Changes to the amount of overdraft fees was again disclosed on statements mailed in October 2006.  (Exhibit E.)

42.    Pertinent disclosures are also provided in other written material.  The "Getting Started:  Your New Checking Account" brochure, distributed to new customers starting in 2007, contains a section on avoiding overdrafts and provides that while a customer can check his or her balance with the Bank, maintaining accurate transaction records will provide "the most up-to-date balance."  It also informs customers that "some transaction activities may not be immediately recorded to [an] account and may not yet be reflected in the available balance." (Exhibit F.)  The current version of the Insufficient Funds Notice sent to customers who have incurred an overdraft or returned item fee reminds customers to keep track of their pending transactions and any other transactions that may not be included in the Bank's "available balance." (Exhibit G.)

43.    A substantial amount of information is also provided online.  For example, when a customer goes to view his account online and visits his Account Activity page (the page that displays his ending and available balances, as well as listing his most recent transactions), a link entitled "What's this?" appears directly next to the words "available

---

[4]    To preserve the privacy of the plaintiffs, account numbers and addresses have been redacted from their attached account statements.

1   balance." (A sample of this page and of the linked page are provided in Exhibit H.)  This link

2   takes the user to a definition of "Available balance" that states as follows:

3               "**Available balance**:  The most current picture of funds you have
            available for withdrawal.  It reflects the latest balance based on
4           transactions recorded to your account today including deposited
            funds, paid checks, withdrawals and point-of-sale purchases.
5           (Please note that some transaction activity may not be
            immediately recorded to your account and will then not be
6           reflected in the available balance....)"

7   A similar definition of "available balance" is provided in the glossary of key account terms

8   available on Wells Fargo's website and in the "Getting Started" brochure.  (Exhibits I, F.)

9   **V.    Challenged Overdrafts Incurred by the Plaintiffs**

10          44.    With assistance from other Bank personnel, I have reviewed the account

11  statements and other available Bank records of each of the three plaintiffs for the periods and

12  transactions that I understand they have identified as subject to challenge in this case.  A review

13  of this information confirms that all of the challenged transactions were properly posted and that

14  all overdraft fees at issue were properly assessed.

15          **A.    Veronica Gutierrez**

16          45.    My understanding is that plaintiff Veronica Gutierrez challenges

17  overdraft fees for transactions (an ATM withdrawal and several purchases) she made during the

18  period October 5-9, 2006.  I understand that Ms. Gutierrez believes that she had a positive

19  balance in her account when she conducted those transactions.

20          46.    A review of Ms. Gutierrez's account statement supplies a simple

21  explanation for her overdraft fees.  As far as Wells Fargo knew at the time it authorized Ms.

22  Gutierrez's ATM and debit-card transactions on October 5-9, 2006 (which on that year fell over

23  the Columbus Day weekend), she would indeed have had a positive available balance sufficient

24  to cover these transactions.  Memo holds would have been put in place for all of those

25  transactions in accordance with the procedures set out above, and the amounts subtracted from

26  her available balance as they took place.  However, what the Bank did not know – and what Ms.

27  Gutierrez presumably did know – was that she had written a check on September 28 that had not

28  yet been submitted for payment.  Because the Bank did not know about this check, it was not

1    subtracted from her available balance before it posted.  The Bank received the check for posting

2    on October 10, along with several of the transactions from the October 5-9 period.  Ms.

3    Gutierrez also made an online transfer out of her account on October 10, which also posted that

4    night.  The sum total of all of the debits submitted for settlement on October 10 exceeded the

5    funds in her account, and several overdrafts resulted.  (Exhibit J shows how the items posted to

6    Ms. Gutierrez's account on October 10 and the resulting impact on her balance.  Ms. Gutierrez's

7    monthly account statement for the pertinent period is provided in Exhibit K.)

8        47.    Of the items that posted on October 10, the only item as to which the

9    Bank had any discretion on posting was the check, as it was already committed to payment of

10   the debit-card transactions it had authorized and the transfer Ms. Gutierrez had made to the

11   account of a third party.  The Bank exercised its right under the Consumer Account Agreement

12   to pay the check.

13       48.    On October 11, 2006, the bank posted four overdraft fees of $22 each to

14   Ms. Gutierrez's account, reflecting the four overdraft items from October 10.  Ms. Gutierrez's

15   remaining transaction from October 9 then posted on October 11.  Since no deposits or other

16   credits had been received in the interim, this resulted in another overdraft item.  Another

17   overdraft fee posted for this item on October 12.  This completed the posting of all items, and

18   overdraft fees, associated with transactions she made during the October 5-9 period.

19   **B.    Erin Walker**

20       49.    My understanding is that plaintiff Erin Walker questions the overdraft fee

21   assessed on June 5, 2007, for a debit-card transaction she made on May 29, 2007, for a purchase

22   of $9.66.  I understand that she has also referred generally to overdraft fees for transactions

23   between May 29, 2007 and June 1, 2007.

24       50.    An examination of Ms. Walker's account statements over time reveals

25   that it was common for the debit transactions on her account to exceed her available (and

26   ledger) balance.  On most such occasions, Ms. Walker benefited from Overdraft Protection,

27   which covered negative balances with transfers from her savings account and so avoided

28

1  overdrafts and resulting overdraft fees.  However, during the period under discussion here there

2  were insufficient funds in Ms. Walker's savings account to cover the excess debits she initiated.

3       51.  In 2007, May 29 was the Tuesday after the Memorial Day weekend.  At

4  the end of posting the preceding Friday night, Ms. Walker's ledger balance was $21.16.  Over

5  the weekend, she made a deposit and several debit card transactions.  During the course of the

6  day on May 29, Ms. Walker's available balance would have declined as she made further

7  purchases.  However, it appears that her available balance would have remained slightly positive

8  at the end of the day.  Accordingly, one can infer that her available balance at the time the bank

9  authorized the $9.66 transaction was also positive.[5]

10       52.  On May 30, May 31, and June 1, Ms. Walker made several additional

11  debit-card purchases.  The bank put memo holds in place for most of those transactions

12  (although it appears a merchant did not submit one of the transactions for authorization, so that

13  the bank did not learn of it at all until it was submitted for settlement).  Although by June 1 Ms.

14  Walker had spent more than was in her account, the lag in the posting of debits meant that she

15  did not incur overdraft fees until June 4.  But on June 4, nearly all of her accumulated debit

16  transactions posted, and eight items posted into overdraft, including the May 29 debit-card

17  purchase of $9.66.  Had she made a deposit sufficient to cover these transactions on or before

18  June 4, she could have avoided all of these overdrafts.

19       53.  It is not clear why Ms. Walker is specifically concerned about the posting

20  of the $9.66 transaction.  While that transaction did not post until slightly later than the usual

21  one-to-three business day period for a debit-card purchase, this was because of delays in the

22  bank's receipt of the settlement information.[6]  As indicated above, while the Bank put a memo

23  hold in place against Ms. Walker's available balance on May 29, the Bank could not post the

24

25  _____

26  [5]      Ms. Walker's account statements for the period at issue are provided in Exhibit L.
Summary tables covering the activity described here are supplied in Exhibit M.

27  [6]      A review of Ms. Walker's account shows that transactions with this merchant regularly
take more than three days to settle.

28

1  transaction until it received the full settlement file from the merchant on June 4, four business

2  days later.

3      54.    Had Wells Fargo posted each of Ms. Walker's transactions during this

4  statement period on the day of the transaction, she would have incurred more, not fewer,

5  overdraft fees than she was in fact assessed.  If one orders Ms. Walker's transactions during this

6  statement period by transaction date instead of posting date (and then orders the transactions on

7  each day according to the Bank's usual protocol, as described above), the result is twenty

8  overdrafts – and twenty overdraft fees – instead of the fourteen overdraft fees that she was

9  actually assessed during this period, including the eight assessed for overdrafts on June 4.  (*See*

10  Ex. M.)

11      55.    Ms. Walker left her account in overdraft status for a month.  On July 9, a

12  branch employee reversed four of the overdraft fees she was assessed during the statement

13  period that included June 4.  These reversals were not formally "assigned" in the Bank's

14  systems to any particular overdraft items; instead, she was simply given a credit to her account

15  in the subsequent statement period.

16      **C.    William Smith**

17      56.    I understand that Plaintiff William Smith asserts that he made a check

18  card purchase on or about July 3, 2007, at TNT Fireworks in San Bernardino, and that he had

19  sufficient funds in his account on July 3 to cover that charge.

20      57.    According to Wells Fargo's records, Mr. Smith did make a debit card

21  purchase from a "TNT Fireworks" on July 3, 2007.  However, the transaction was not submitted

22  by the merchant (or its processor) for payment and settlement until July 12, when it was posted

23  to Mr. Smith's account.  The Bank does not know why the merchant and/or its third-party

24  processor delayed for so long (six business days) in submitting the transaction for settlement.

25      58.    The Bank has no direct record of Mr. Smith's available balance at the

26  time he made the TNT Fireworks purchase, which was one of several debit-card purchases he

27  made that day.  However, it appears that all of his purchases that day were, in total, less than his

28  available balance at the end of the previous day and that his available balance therefore was

DECLARATION OF KENNETH A. ZIMMERMAN IN         17
SUPPORT OF WELLS FARGO BANK, N.A.'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. CV-07-5923 WHA

1  likely positive at the time the TNT Fireworks transaction occurred.  Over the subsequent days,

2  Mr. Smith continued to make additional debit-card purchases, many of which posted with the

3  usual one-to-three day lag. He also made several transfers in and out of his account.  As a result

4  of all of the cumulative activity, on July 12, two transactions posted into overdraft, including the

5  June 3 TNT Fireworks purchase and a pin-based POS purchase Mr. Smith made from another

6  merchant on July 12. Fees for those two overdrafts were then posted on July 13.  (*See* Ex. N.)[7]

7        59.    For the reasons discussed above, the Bank did not have the ability to post

8  the TNT Fireworks transaction to Mr. Smith's account on the day it occurred.  Had the Bank

9  had the ability to post all of Mr. Smith's transactions during that statement period on the original

10  transaction date, and had it in fact done so, his total number of overdraft transactions for the

11  period would have been three instead of two.  Under that alternative scenario, the TNT

12  Fireworks transaction would not have posted into overdraft, but two other transactions, from

13  July 10 and 11, would have done so.  The second July 12 overdraft item would have been an

14  overdraft item either way.  (*See* Ex. N.)

15  **VI.**    **Responsibility of a Bank Customer to Keep Track of His or Her Transactions**

16        60.    The Wells Fargo Customer Account Agreement warns customers that

17  they have an independent responsibility to track their transactions and balances.  The Bank

18  attempts to assist customers in this process by offering customers access to the Bank's own

19  internal running calculation of available balances, while also permitting a customer to check

20  online to see which of her pending transactions the bank knows about and has accounted for in

21  the available balance. But as the experiences of the plaintiffs discussed above illustrate, the

22  Bank cannot provide a "balance" figure that authoritatively accounts for all transactions the

23  customer has initiated.  The Bank's knowledge of transactions conducted on an account can

24  never equal that of the customer herself.

25

26

27  [7]    Mr. Smith's account statement covering this period is provided in Ex. O.

28

DECLARATION OF KENNETH A. ZIMMERMAN IN      18
SUPPORT OF WELLS FARGO BANK, N.A.'S MOTION FOR
SUMMARY JUDGMENT
CASE NO. CV-07-5923 WHA

1    61.    The Bank cannot, for example, deduct from a customer's available

2    balance the amount of a check that the customer has written and that the Bank will not learn

3    about until the check is submitted for payment. Nor can the Bank deduct from the available

4    balance a debit-card purchase that was never submitted for authorization (or for which the

5    merchant did not inform the Bank of the transaction amount) or an ACH transaction the

6    customer has initiated – which, again, is completely unknown to the Bank until the transaction is

7    actually submitted for payment. Nor can the Bank ever know at any point during the day what

8    the customer will do affecting her account later that day.

9    62.    Thus, for example, when the Bank is asked to authorize a debit-card

10    purchase at 10:00 a.m. for which there appear to be insufficient funds in the account, it cannot

11    know whether the customer is at that moment on her way to a branch to make a deposit that will

12    more than cover the purchase. Nor, conversely, when the Bank authorizes a debit-card purchase

13    for which there do appear to be sufficient funds in the account, can it know if the customer's

14    landlord is about to walk into a branch to cash her rent check.

15    63.    The Bank's procedures for dealing with these situations are established,

16    in accordance with federal regulations and under the oversight of its supervisory regulator, in an

17    effort to deal with these uncertainties. Ultimately, the only person who has perfect knowledge

18    of all transactions initiated by a customer is the customer himself or herself. And the Bank

19    ultimately must rely on the customer to maintain his or her own records in a responsible way.

20    I declare under the penalty of perjury under the laws of the United States and the

21    State of California that the foregoing is true and correct.

22    Executed in San Francisco, California on July 9, 2008.

23

24

25    _____

Kenneth A. Zimmerman

26

27

28