Sonya D. Winner, SB # 200348
David M. Jolley, SB # 191164
Margaret G. May, SB # 234910
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA  94111
Telephone:  (415) 591-6000
Facsimile:  (415) 591-6091
E-mail: mmay@cov.com

Attorneys for Defendant
WELLS FARGO BANK, N.A.

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERONICA GUTIERREZ, *et al.*,<br><br>         Plaintiffs,<br><br>v.<br><br>WELLS FARGO & COMPANY, *et al.*,<br><br>         Defendants. | CASE NO. CV-07-5923 WHA (JCSx)<br><br>**[REDACTED] DECLARATION OF MARK LENTZ**<br><br>*[Submitted in connection with Opposition of Wells Fargo Bank, N.A. to Plaintiffs' Motion for Class Certification]*<br><br>Date:       August 21, 2008<br>Time:       8:00 a.m.<br>Courtroom:  9<br><br>Honorable William H. Alsup |

## PUBLIC VERSION - CONFIDENTIAL MATERIAL REDACTED

## I.    Introduction

1.   I am the manager of the analytic team for the Consumer Deposit Group of Wells Fargo Bank, N.A. ("Wells Fargo" or "the Bank"). In this capacity, I am often called upon to perform analyses of the transaction activity in the Bank's consumer deposit accounts. I am therefore familiar with the databases and resources available to the Bank to analyze activity in the Bank's consumer deposit accounts, both individually and collectively. In preparing this declaration, I have also explored other sources of information about consumer deposit accounts that are not typically used by the Bank for broad analytical purposes, but that might be considered for such use, and I have considered the extent, if any, to which those sources could be used to perform the types of analyses that the plaintiffs in this litigation seek to perform. In considering these issues, I have spoken with others at Wells Fargo and have reviewed deposition testimony from Wells Fargo's designated Rule 30(b)(6) witnesses on the relevant topics.[1] I have also reviewed the declaration of the plaintiffs' expert, Professor Lewis Mandell. I make the statements in this declaration based on my personal knowledge and informed belief.

2.   In his declaration, Professor Mandell identifies a list of information that he understands to be within the possession of Wells Fargo (although, importantly, he does not discuss the format in which this information is kept), and then offers the opinion that "an algorithm can be written to determine which customers have been charged overdraft fees for transactions on a date when at the end of the day, the account would have stated a positive available balance" and/or "the account would have had a positive real balance," and then to determine "the number and amount of overdraft changes" such customers "would have received if they were not charged for overdraft transactions when they either had a positive available balance or positive real balance at the end of the day the overdraft transaction was authorized." Mandell Dec. ¶ 4.

---

[1]    Specifically, I reviewed the following pages of deposition testimony: Deposition of John Ahrendt at 12-14, 17-24, 44-49 (attached as Exhibit A); Deposition of Dawn Avrech at 11-16, 20-22 (attached as Exhibit B); Deposition of Debbie Chacon at 18-36, 41-45, 51-53 (attached as Exhibit C); Deposition of Paul Williamson at 13, 16-19, 23-30 (attached as Exhibit D).

3.  Professor Mandell's declaration does not describe any actual algorithm for making these determinations; nor does he explain how such an algorithm could be developed. However, it is clear from his reference to an "algorithm" that he assumes that all of the necessary data to make these determinations is available in a readily manipulable computerized database. That assumption is incorrect. Some of the required information does not exist at all; some does not exist for a substantial proportion of the relevant transactions; and much of the critical information that does exist is not maintained in a format that can be readily analyzed through any computerized "algorithm." As a result, making any of these determinations – where they can be made at all – would require an intensely time-consuming and laborious process, which would have to be performed manually, account by account.

## II.    The Bank's Systems, Databases, Files, and Reports

4.  Wells Fargo uses a modified version of the "Hogan" system (used by many banks) as its system of record for consumer deposit accounts. Hogan is the accounting system that processes and posts the day-to-day transaction activity of the Bank's customers. Hogan receives customer transaction information to authorize against the customer accounts from two other Bank systems – the Retail Delivery System ("RDS" or "authorization system") and the Settlement System.

5.  RDS is the system that receives electronic authorization requests from merchants who are conducting debit-card transactions with Wells Fargo customers. RDS forwards these requests to Hogan for approval or denial and then relays Hogan's authorization responses back to the merchants.

6.  The Settlement System is the system that later receives the information from RDS and/or the Bank's third-party processor indicating which completed transactions should be settled and posted to customers' accounts. The Settlement System uses this information to identify for Hogan which transactions to post (settled activity) and which transactions should have a reapplied "hold." For any outstanding transaction that is not identified as either a post or a reapplied hold, the former hold for that transaction is dropped.

7.    None of these transaction or accounting systems – RDS, the Settlement System, or Hogan – are intended to be used as information archival systems.  Rather, these systems only retain the current (or very recent) transaction information that is needed to perform their specific functions.  Wells Fargo does, however, extract certain account information for analytic purposes from these systems for storage in databases, files, and reports.  The principal database used within Wells Fargo to store and analyze historic deposit account information is the BMG data warehouse ("BMG" or the "BMG database").  The BMG database can be readily manipulated to perform analyses of most of the datafields it contains, such as account number, transaction amount, ledger balance, assessed fees, and posting date.  However, not all BMG datafields are in a format that allows for computerized analytic searches or manipulation of all discrete portions of the information they contain.  For example, as discussed more fully below at Paragraph 18, although the transaction date of a debit-card purchase is typically embedded within the text string of the BMG "transaction statement description" datafield, BMG is not able to extract the transaction date from the rest of the text contained in that datafield for automated searches or queries.

8.    Information from Wells Fargo's transaction and accounting systems is also used to create a number of files and reports that contain additional information not included in the BMG database.  However, unlike the BMG database, these reports and files are "fixed" – they cannot be manipulated and queried on an aggregate basis through a computerized algorithm of the type referred to by Professor Mandell.  Instead, they can only be individually searched according to certain specific criteria (such as account number or date) and then manually reviewed for responsive information on an account-by-account or day-by-day basis.

9.    The Hogan system maintains and updates the current available balances for all consumer deposit accounts.  This is done by taking the last "ledger" balance, which represents the total amount of funds in the account following the last transaction posting session (typically occurring in the late evening or early morning following the last business day), and then adjusting the balance up or down to account for "pending" transactions or account adjustments that the Bank is aware of but that have not yet been submitted for settlement.

1  Therefore, the available balance of an account can be in constant flux depending on when new

2  pending credits or debits are submitted.

3      10. Hogan keeps track of customers' pending authorized debit transactions by

4  applying "memo holds" to their accounts.  Memo holds are temporary account entries that hold

5  funds to cover anticipated debits.  The memo hold remains in place until the next posting

6  session, at which point it is removed from the account.  If the Bank settles the transaction during

7  that posting session, the memo hold is permanently discarded.  If the transaction is not settled

8  and remains pending, the Settlement System (based on information received from the Bank's

9  third-party processor) may, depending on the nature and date of the transaction, instruct Hogan

10  to re-apply the memo hold for that transaction to the customer's account after the posting

11  session is completed.[2]

12      11. Although Wells Fargo's transaction and accounting systems do not

13  themselves store customers' historical account information (beyond a limited amount of recent

14  transaction data to respond to customer inquiries), some information relating to authorization of

15  transactions and/or customers' available balances is exported and stored in certain fixed files

16  and reports.

17      12. Customers' available balances at the time of debit-card transactions are

18  exported from the Settlement System and stored in electronic files on Wells Fargo's mainframe

19  for a rolling 180 days.  This information is not available in any analytic database, but rather only

20  in a fixed file format, and only for 180 days, after which the information must be overwritten

21  due to storage limitations.  The Bank does not generally retain data on customers' available

22  balances beyond 180 days; only data on customers' posted ledger balances is routinely

23  retained.[3]

24  _____

25  [2]    The memo hold process is set forth in more detail in the Declaration of Kenneth A.
       Zimmerman in Support of Wells Fargo's Motion for Summary Judgment ("Zimmerman
26     Declaration") ¶¶ 15-18, filed on July 10, 2008.

27  [3]    End-of-the-day available balances are also contained in Overdraft Activity Reports
       created by the Hogan system.  These fixed reports are generated on an individual account-by-
28     account basis, but only for dates when the account incurs an overdraft (not on the dates the
       (continued...)

[REDACTED] DECLARATION OF MARK LENTZ IN          4
OPPOSITION TO CLASS CERTIFICATION
CASE NO. CV-07-5923 WHA (JCSx)

13. Information about the time and date that Wells Fargo authorizes a transaction is recorded in Authorization Reports that are created by the Settlement System. Each Authorization Report contains approximately 24-hours' worth of transaction information, which can be manually reviewed by account number to determine when the Bank authorized specific debits and credits and for what dollar amounts. The Authorization Reports do not allow for an aggregate analysis of customer transaction activity – rather, information from the reports can only be retrieved by manually searching for transactions involving a specific account number within the specific period covered by an individual report.[4]

14. In January 2006, Wells Fargo began saving memo-hold information from the Hogan System in XR-MEMO Reports. Each XR-MEMO Report contains approximately 24-hours' worth of memo-hold information, which can be manually reviewed by account number to determine the time and date that specific holds were applied and for what dollar amount. No records exist of memo holds for any period before January 2006.

III.    **Identifying Overdraft Transactions in Accounts with Positive End-of-the-Day Available Balances**

15. Professor Mandell has opined that Wells Fargo could write an algorithm to determine which customers "have been charged overdraft fees for transactions on a date when at the end of the day, the account would have stated a positive available balance." Mandell Dec. ¶ 4a. Based on my knowledge of Wells Fargo's systems, databases, and reports, the computerized algorithm theorized by Professor Mandell is not possible. Key information needed for such an analysis (such as the dates that transactions were initiated and historical

_____

transactions were initiated). Information from these reports, for the limited dates that they exist, can only be recovered through a manual account-by-account review.

[4]    The BMG database downloads and stores the authorization time and date information for some debit-card purchases – specifically, those purchases that happen to post to customers' accounts on the same day that they are made. The BMG database has no authorization information for other debit-card purchases. Thus, for example, for plaintiffs' relevant transaction periods, the BMG database contains time and date information for 3 of the 16 debit-card transactions initiated by plaintiff Gutierrez from October 3-13, 2006; for 15 of the 33 debit-card transactions initiated by plaintiff Walker from May 24-June 14, 2007; and for 15 of the 19 debit-card transactions initiated by plaintiff Smith from July 1-13, 2007. Such an incomplete set of information does not allow the BMG database to conduct a reliable historical analysis to reconstruct the available balance in an account.

1    available balance amounts) is not regularly retained by the Bank in a format that is subject to

2    manipulation by a computerized algorithm. Therefore, such an analysis of a customer's

3    transaction history – where it is possible at all – would require a manual, account-by-account

4    review of information.

5         16. If I were called upon to perform such an analysis, I would begin by

6    determining which transactions were associated with the assessment of an overdraft fee. This

7    preliminary part of the analysis can be accomplished with an automated search on the BMG

8    database.

9         17. I would then need to determine the actual date on which the customer

10   initiated each of his transactions during the relevant time period (e.g., when he made his debit-

11   card purchase). I could not use a BMG query for this purpose, as that database does not

12   regularly store such information in a searchable datafield.[5] Instead, I would have to manually

13   determine the actual date of each transaction from a review of its respective "Transaction

14   Statement Description" ("TSD"). (These TSDs appear verbatim as the activity detail

15   "descriptions" on customers' account statements. Attached as Exhibit E is a sample page from

16   an account statement of plaintiff Smith with the TSD for a sample transaction underlined.)

17        18. A TSD is a text string consisting of up to 172 characters that is supplied by

18   the Settlement System from information provided at the time a transaction settles. The entire

19   TSD for a particular transaction represents a single datafield. The following are examples of

20   TSDs relating to a selection of plaintiffs' transactions in this case:

21        A. "BILL PAY  MBNA America ON-LINE  xxxxxxxxxxxx2868 ON 10-02"

22        B. "CHECK CRD PURCHASE 07/03 TNT FIREWORKS #BBB0142SAN
             BERNARDIN CA 446024XXXXXX5000 193740007099671 ?MCC=5999
23           121042882DA"

24        C. "ATM WITHDRAWAL - 10/06 MACH ID WCAD5985 *HOLLYWOOD
             BOWLBANK OF AMHOLLYWOOD CA 6509"
25

_____

26   [5]    Wells Fargo is primarily concerned with when a transaction *posts* to a customer's
     account, not when the transaction was initiated by the customer. Transaction posting dates are
27   the dates listed in customers' account statements, and those same posting dates are the dates
     regularly stored by the BMG database for account analysis.
28

D. "HARLAND CHECKS CHECK/ACC. 031207 000051675488021 ERIN V WALKER"

E. "POS PURCHASE - 08/11 MACH ID 000000 ARCO PAYPOINT ARCO PAYPOFONTANA CA 5509"

Although I can determine the transaction initiation dates (A. 10/02/06; B. 07/03/07; C. 10/06/06; D. 03/12/07; E. 08/11/06) from a manual review of these TSDs in context, the BMG database does not have the ability to extract these dates from the TSD datafields.[6]

19. After determining (from a manual review of the TSDs) which transactions for a particular account occurred on which specific day, I would then need to determine the available balance of that account at the end of each specific day (the time specified by Professor Mandell). For transactions before January 2006, I would need to review the Authorization Report for each day in question to see what debit and credit amounts were authorized to the particular account on that day, and match them up with the transactions that I know took place that day from my review of the TSDs. I would calculate an estimate of the target day's available balance by adding the authorized credits and subtracting the authorized debits shown on the Authorization Report to/from the previous day's ledger balance. I would then continue to add or subtract these authorized transaction amounts from the available balance each following day until the transactions actually posted to the account (which I would know from my review of the TSDs for these transactions) or until the memo-hold/posting rules instructed me to stop my ongoing accounting of the transactions from the Authorization Report.[7] Each following day, I would account for the new transactions listed in that day's Authorization Report and continue my running calculations until I had an estimated available balance for all of the days at issue. This would be a time-consuming process requiring days of work for even a single customer's account.

---

[6]     The transaction dates shown in Paragraphs 46-59 and Exhibits J, M, and N of the Zimmerman Declaration were identified through this kind of manual review of TSDs.

[7]     The memo-hold/posting rules are described in Paragraphs 15-27 of the Zimmerman Declaration.

20. These available balance calculations would only be estimates of a customer's actual available balance, as it would not be possible to match up all of the items in the Authorization Report with all of the individual TSDs. This is because not all transactions that are submitted for authorization ultimately post (leading to stray items in the Authorization Reports that do not match up with TSDs) and not all transactions that post were initially submitted for authorization (leading to stray TSDs that do not match up with items in the Authorization Reports).

21. In January 2006, Wells Fargo began storing memo-hold information in XR-MEMO Reports. This means that to determine the end-of-the-day available balances for an account since January 2006, I would open the XR-MEMO Report for each day in question to see what memo holds and credits were applied to the particular account on that day. I would add any listed credit amounts and subtract any memo holds from the previous day's ledger balance, which would give me an estimate of the available balance at the end of the target day. Again, this calculation would only provide an estimate of a customer's actual available balance, as not all memo holds will ultimately result in posted transactions, and not all posted transactions are initially the subject of a memo hold (because they are not submitted by the merchant for authorization).

22. It is my understanding that one of plaintiffs' claims in this case is that customers should not be charged overdraft fees when their available balances are sufficient to cover their debit-card purchases *at the time of their transactions*. If Professor Mandell intends to suggest that "end-of-the-day" available balance can be used as a proxy for "time-of-the-transaction" available balance, it is important to recognize that the two are not the same thing. A customer with a negative time-of-the-transaction available balance can still end up with a positive end-of-the-day available balance by making an interim deposit to his account. Conversely, a customer with a positive time-of-the-transaction available balance can still end up with a negative end-of-the-day available balance by making an interim withdrawal from his account.

23. Determining an estimated "time-of-the-transaction" available balance for each transaction would require the added layer of reviewing the Authorization or XR-Memo Reports to determine the order in which transactions were initiated, and then taking this transaction order into account in an item-by-item calculation. However, debit-card transactions that were not submitted by the merchant for authorization at the time of the transaction could not be included in such calculations, as the Bank does not have time records for these transactions, and so it could not accurately place them in the order in which they occurred.

## IV. Identifying Overdraft Transactions in Accounts with Positive End-of-the-Day "Real" Balances

24. Professor Mandell has further opined that Wells Fargo could write an algorithm to determine which customers "have been charged overdraft fees for transactions on a date when at the end of the day, the account would have stated a positive real balance." Mandell Dec. ¶ 4b. The term "real balance" is not a term of art in the banking industry, nor is it a term used by Wells Fargo. I do not know with any certainty what Professor Mandell means by "real balance," although it is likely he means either (i) the current balance if all credit and debit transactions that the customer has initiated are taken into account or (ii) the current balance if all such credit or debit transactions other than outstanding paper checks, ACH transactions, and prescheduled transfers are taken into account. In any event, based on my knowledge of Wells Fargo's systems, databases, and reports, the algorithm theorized by Professor Mandell is not possible.

25. From a broad perspective, neither of the above definitions of "real balance" make any real-world sense. Even setting aside paper checks and ACH transactions, there are many instances in which the Bank will not know the final amount of a debit transaction initiated by the customer until the transaction is presented to the Bank for settlement. These include (i) any debit-card purchase for a merchant service that includes a gratuity after authorization (such as at a restaurant); (ii) any debit-card purchase with a merchant that routinely pre-authorizes for less than the final transaction amount (such as a gas station); (iii) any debit-card purchase with a merchant that routinely pre-authorizes for more than the final purchase amount (such as a hotel); and (iv) any debit-card purchase with a merchant that does not authorize transactions at all

1    (sometimes typical of smaller businesses selling low-priced goods).  Professor Mandell's

2    opinion about "real" balances seems to be based on the notion that Wells Fargo is somehow able

3    to know about and account for the existence and final dollar amount of all debit-card

4    transactions on the day of authorization, which is simply not true.

5             26. In any event, using 20-20 hindsight to estimate the total number and amount

6    of a customer's debit-card transactions initiated on specific days (by analyzing the various data

7    and reports discussed above), I could calculate historical daily "real" balances that would

8    include all transactions initiated by the customer up to that specific day (either with or without

9    outstanding paper checks, ACH transactions, and prescheduled transfers).[8]  However, this

10   analysis would require the same kind of manual, account-by-account review of transaction

11   information as would be required for the "available" balance analysis described above.  I would

12   need to pull the relevant transaction dates, one-by-one, from the individual TSD datafields.  If

13   the order of the transactions within a day needed to be taken into account, I would then also

14   have to review the Authorization and XR-Memo Reports for each day to determine the

15   transaction order.  However, debit-card transactions that were not submitted for authorization

16   could not be placed in order, as they would not show up on the Authorization or XR-Memo

17   Reports.

**V.    Determining Whether Customers Would Have Been Better Off If the Bank Posted
       All Transactions on the Date They Were Initiated**

             27. Professor Mandell has further opined that, for those customers identified

through his theorized "available" and "real" balance algorithms, Wells Fargo could write

another algorithm to compare the number of overdraft fees these customers actually received

with the number of overdraft fees they hypothetically would have received if they were not

charged for overdraft transactions when they had either "a positive 'available' balance or

---

[8]    These "real" balances would have to be for days far enough in the past so that I could be
certain that all relevant transaction information had been submitted to the Bank for posting.  It
would be impossible to calculate a current – or even a recent – "real" balance for a deposit
account, as the Bank does not have reliably complete information about recently-initiated debit-
card transactions.

1    positive or 'real' balance at the end of the day the overdraft transaction was authorized."

2    Mandell Dec. ¶ 4c.  Based on my knowledge of Wells Fargo's systems, databases, and reports,

3    the computerized algorithm that Professor Mandell suggests here is not possible.

4        28.   It appears that what Professor Mandell is attempting to do here is to suggest

5    that it would be possible, using a computerized algorithm, to conduct an aggregate review of all

6    Wells Fargo deposit account customers in California since November 2004 to determine who

7    would have been better off if transactions posted on the date they occurred instead of the date

8    they settled.  In connection with this litigation, I was asked to make such a determination for

9    each of the plaintiffs by conducting a review of their relevant account histories to determine the

10   number of overdrafts each plaintiff would have had during the statement periods containing

11   their challenged transactions if Wells Fargo had possessed the ability to post each of their

12   transactions on the original transaction date and had done so.  This required an individualized,

13   manual review and reordering of each of plaintiffs' relevant account histories – it could not be

14   accomplished through the use of an automated electronic search query.

15       29. First, I manually reviewed the TSDs for each of plaintiffs' respective

16   transactions during the relevant periods to determine the dates on which they were initiated.

17   Using these dates, I recalculated plaintiffs' respective ledger balances by manually "posting"

18   each of their transactions on the day it occurred (instead of the date the transaction was received

19   by the Bank for settlement).[9]  My results showed that, under a transaction-date posting practice

20   for the statement cycle in question, (i) plaintiff Gutierrez would have received four fewer

21   overdrafts, (ii) plaintiff Walker would have received six more overdrafts, and (iii) plaintiff

22   Smith would have received one more overdraft.  These results are set out in Exhibits J, M, and

23   N of the Zimmerman Declaration.

24

25

---

26   [9]    For this calculation, I used transaction dates instead of settlement dates for posting

27   purposes, but otherwise followed the Bank's standard order-of-posting rules to determine in
     what order transactions would be posted to the accounts on each day.  These rules are set forth
     in more detail in Paragraphs 25-27 of the Zimmerman Declaration.

28

## VI.    Project Time Estimate

30. Based on my direct personal knowledge from my analysis of the transaction histories of plaintiffs' accounts in connection with this litigation and from my experience with Wells Fargo's systems, databases, and reports, I believe that it would take an analyst approximately four full eight-hour days per customer to calculate (i) the customer's daily end-of-the-day "available" balances since November 2004; (ii) the customer's daily end-of-the-day "real" balances (as I understand that term) since November 2004; and (iii) the number of total overdraft fees the customer would have received since November 2004 under plaintiffs' alternative fee-assessment theory (approximately one analyst day per year of customer transactions).

31. It is impossible to determine from the plaintiffs' class definitions how many customers are in their proposed classes. However, approximately REDACTED transactions each year result in posted overdraft fees on California consumer checking accounts. Assuming that there would be in the neighborhood of REDACTED separate accounts at issue, the full analysis of the points Professor Mandell identifies for the past four years would take approximately REDACTED REDACTED analyst days to complete – or approximately REDACTED analyst years. This estimate does not take into account the additional time required to determine available balances at the time of a transaction, to identify transactions authorized in amounts less than those intra-day available balances, to determine whether overdraft fees were incurred for those transactions, or to identify the causes of those overdrafts. Nor does this estimate include the time required to manually review records (or to consider other evidence plaintiffs might offer, given the lack of records) to make correlations with possible communications of available balances. All of these tasks (where even possible) would require further individual account-by-account and transaction-by-transaction analysis.

## VII.    Communication of Available Balances to Customers

32. Professor Mandell does not expressly state that it is possible to construct an algorithm to correlate the dates and times that customers checked their available balances with the dates and times that Wells Fargo authorized transactions that resulted in overdrafts. He

1  does, however, assert (without citation or explanation) that records showing the relation

2  between (i) the dates and times of customers' online banking sessions, ATM transactions,

3  automated 800-number calls to Wells Fargo, and branch transactions and (ii) the dates and times

4  that Wells Fargo authorized an "overdraft transaction" are in the "possession and control" of the

5  Bank.  Mandell Dec. ¶¶ 3g-3j.  This is incorrect.

6      33. Online Banking:  Wells Fargo has records of customer online banking

7  sessions from 2004-2005, but they do not contain any customer identification codes that would

8  allow an analyst to match up a particular session with a particular customer.  These records were

9  kept only for purposes of monitoring levels of online traffic, not for individualized transaction

10 analysis.  In January 2006, Wells Fargo began retaining individualized records about customers'

11 online banking sessions from which the Bank can determine when a specific customer logged

12 in, and whether that customer accessed a webpage during the session that would have displayed

13 her available balance (along with other information).  These records do not, however, indicate

14 the amount that the Bank listed as the customer's available balance.[10]

15      34. Phone Bank:  Wells Fargo archives data files of the time and date that

16 customers call the Bank's automated 800-number (along with the codes entered by customers in

17 response to the automated telephone menu) for a rolling six-month period.  From these files, the

18 Bank can determine which customers telephonically checked their available balances using the

19 automated 800-number over the past six months.  However, no information is retained by the

20 Bank on what the customers were actually told were the amounts of their current available

21 balances during these calls, and no information about these calls is available after six months.

22 The Bank does not retain any records of telephonic balance inquiries made by customers to live

23 bank representatives.

24

25 [10]  Wells Fargo maintains screenshots of customers' online banking sessions for the last 10
   days on a rolling basis in a data file called "Tea Leaf," which is designed to aid in
26 troubleshooting glitches that arise with the Bank's online banking service.  Depending on the
   webpages that a customer visited during a session, these screenshots could show the customer's
27 available balance at the time of the session.  However, the information in these screenshots is
   stored in a fixed "pdf" format, and is not retrievable after 10 days.
28

35. <u>ATM Transactions</u>: If a customer initiates a transaction at a Wells Fargo ATM (e.g., though a deposit, withdrawal, or transfer), that transaction will be recorded by the Bank in its regular transaction records. The customer is generally not informed of his available balance unless he requests an ATM receipt, which would contain a statement of his current available balance. Wells Fargo retains information on which customers requested an ATM receipt for a rolling six-month period, at which point the information needs to be discarded because of storage limitations. Therefore, information about the time and date that customers received statements of their available balances from Wells Fargo ATMs is available for the last six months. However, no record is maintained as to what available balance figures were provided by the ATMs on the customers' receipts.[11]

36. <u>In-Branch Transactions</u>: Wells Fargo does not maintain records of customers checking their available balances in a branch. If a customer initiates an in-branch transaction (e.g., through a deposit, withdrawal, or transfer), that transaction will be recorded by the Bank in its regular transaction records. However, no record is maintained as to whether the customer was informed of his available balance at the time of the transaction or, if so, what figure was provided.

37. Even where some information about the time and date that customers may have checked their available balances is available in the Bank's records (i.e., for some online banking sessions and for recent automated Phone Bank and ATM records), this information cannot be processed by a computerized algorithm to determine which "overdraft transactions" were authorized close in time to customer available-balance inquiries. The data files containing the limited information about available-balance inquiries cannot interface with the Authorization Reports or the XR MEMO Reports containing transaction authorization information to allow for any automated aggregate analysis. These are independent files and

---

[11]    When a customer agrees to pay a fee to check his available balance at a non-Wells Fargo ATM, Wells Fargo will have a record of the time and date of the transaction in the Authorization or XR-Memo Reports. The Bank will have no record of the available balance amount that was reported to the customer.

1    reports, and any comparative analysis of the information they respectively contain would need

2    to be done through a manual, account-by-account review of the data.

3    **VIII.    Various Ways a Bank Customer Can Incur an Overdraft Fee on a Debit-Card Transaction.**

4            38.        There are numerous ways a customer can incur an overdraft fee on a

5    debit-card transaction. The plaintiffs themselves – along with other class members identified by

6    the plaintiffs – present examples of some of these scenarios. The "available balances" contained

7    in the real-life examples described below were calculated using the manual, account-by-account

8    review methodology discussed above, and the "transaction dates" were derived from manual

9    reviews of TSD entries. (The account statements of the customers for the periods discussed

10   here are attached in Exhibit F.)

11           A.    Insufficient Available Funds and No Covering Deposit: A customer can

12   incur an overdraft fee if there are insufficient funds at the time of a debit-card transaction and

13   the customer does not make an intervening deposit before the debit-card transaction posts. For

14   example, at the beginning of the day on September 20, 2007,    **REDACTED**    (identified as

15   **REDACTED**
     Witness No.    in Plaintiffs' Initial Disclosures) had a ledger balance of $-8.52. During the

16   course of that day, he made check card purchases of $42.81 and $18.57 for which there were

17   insufficient funds in his account (and in his available balance) at the time the transactions were

18   initiated. Both of these purchases eventually posted into overdraft – one on September 21 and

19   one on September 24 – and Mr. **REDACTED** was charged overdraft fees for those transactions.

20   Had Mr. **REDACTED** made a covering deposit before his September 20 transactions had posted, he

21   would not have incurred any overdraft fees for those transactions.

22           B.    Reversed Deposit: A customer can incur an overdraft fee if a deposit is

23   reversed for non-payment of a check or other instrument, leaving insufficient funds to cover a

24   previously-initiated debit-card transaction when it is submitted for settlement. For example,

25   former named plaintiff Claudia Sanchez made an ATM deposit on January 18, 2008, of $860.00

26   that was later reversed on February 1, 2008. In between the time of the deposit and its reversal,

27   Ms. Sanchez made several debit-card transactions, including a purchase at Shell on January 31

28   for $5.37. Although at the time of the Shell transaction, Ms. Sanchez's ledger and available

1   balances were greater than the amount of the transaction, the intervening deposit reversal

2   created a negative balance in her account, causing the Shell transaction to create an overdraft

3   when it posted on February 1.

4              C.   Later-Occurring Debit Transaction:  A customer can incur an overdraft

5   fee for a debit-card transaction that was less than the customer's contemporaneous available

6   balance if a later-occurring debit transaction authorized by the bank (notwithstanding an

7   insufficient "available" balance) settles before the transaction at issue, thereby depleting funds

8   in the account.  In this scenario, the Bank charges an overdraft fee on the earlier transaction

9   instead of the later one.  To offer a hypothetical example, assume a customer has $50 in his

10  account (which is also his available balance).  On Day 1, the customer makes a $45 debit-card

11  purchase, for which the Bank reduces his available balance to $5 while it is "pending."  On Day

12  2, the customer makes another debit-card purchase of $30, which the Bank authorizes (which it

13  has discretion to do).  The $30 transaction is submitted for settlement that evening, and although

14  there are insufficient funds in the available balance to cover it, the ledger balance (disregarding

15  memo holds) is still $50, so the bank charges no overdraft fee.  The ledger balance is then $20.

16  Then, on Day 3, the $45 transaction is submitted to the Bank for settlement and posts to the

17  customer's account, resulting in an overdraft of $25 and the assessment of an overdraft fee.

18             D.   Posting of Debit-Card Transaction That Was Not Pre-Authorized:  A

19  customer can incur an overdraft fee for a debit-card transaction that was less than the customer's

20  contemporaneous available balance if the merchant does not obtain authorization for the

21  transaction (and the Bank is therefore unaware of it), and a later-initiated transaction settles first,

22  thereby depleting the funds in the customer's account.  For example, at the end of the day on

23  May 29, 2007, plaintiff Erin Walker had a ledger balance of $53.05.  She had several pending

24  transactions so her available balance would have been less than $53.05.  On May 30, she made a

25  debit-card purchase of $6.85 at Coffee Bean & Tea Leaf that was not submitted for

26  authorization.  Since the Bank had no knowledge of this transaction until it posted, it would not

27  have been reflected in Ms. Walker's available balance.  On May 31, the Coffee Bean & Tea

28  Leaf transaction posted into overdraft, along with two other debit-card transactions.  (Ms.

1   Walker did not ultimately incur overdraft fees on these transactions, however, because a

2   covering deposit made on May 31 after cut-off was nonetheless credited to her account on May

3   31 by the Bank.)

4          E.    "Token" Authorization Amount from Merchant:  If a merchant seeks

5   authorization for a debit-card transaction for only a token amount (such as a $1 pre-

6   authorization from a gas station), it will usually settle for a greater amount, which can cause a

7   later-initiated debit-card transaction that was within the customer's contemporaneous available

8   balance to result in an overdraft.  For example, at the end of the day on April 24, 2007, REDACTED

9   REDACTED (identified as Witness No.    in Plaintiffs' Initial Disclosures) had a ledger balance

10  of $55.52.  On April 25, she made a debit-card purchase at Chevron for $60.02, exceeding both

11  her ledger and available balances.  Chevron, like many gas stations, sought authorization of only

12  $1.  Because the Bank did not know the full amount of the transaction, it could not know that

13  Ms. REDACTED 's actual available balance – as known only by Ms.  REDACTED – was now

14  negative.  Later on April 25, Ms. REDACTED  made another debit card purchase of $1.25 at

15  Coyote Express (which, given the information then known to the Bank, was within her current

16  available balance).  On April 26, the Chevron, Coyote Express, and an earlier debit-card

17  purchase all posted into overdraft on her account.  (Notably, had all of these and her other

18  transactions during this period posted on their transaction dates, Ms. REDACTED  would have

19  incurred eight overdraft fees instead of three.)

20         F.    Approximate Authorization Amount from Merchant:  A customer can

21  incur an overdraft for a debit-card transaction that is less than the customer's contemporaneous

22  available balance if the merchant seeks authorization in the approximate amount of the

23  transaction, but the final transaction amount is greater, and a later-initiated transaction settles

24  first.  For example, at the end of the day on Thursday, September 28, 2006,    REDACTED

25  REDACTED (identified as Witness No.    in Plaintiffs' Initial Disclosures) had a ledger and available

26  balance of $104.55.  On September 29, she made an online transfer of $5.00, reducing her

27  ledger balance to $99.55.  Over the course of the weekend (Friday to Sunday), Ms. REDACTED made

28  several debit card transactions,            **REDACTED**            .  The

1   authorization sought for all three transactions was less than the final settlement amount (REDACTED

2   **REDACTED**                                    ). By the end of the weekend, Ms.

REDACTED

3   's available balance (calculated by the Bank based on the authorization amounts) would

4   have been $39.29, but her actual available balance (as known only to her) was only $6.29.

5          G.   Routine Excess Authorization Amount from Merchant:  A customer can

6   incur an overdraft for a debit-card transaction that is less than the customer's contemporaneous

7   available balance if the merchant is in a category ( REDACTED ) that routinely seeks authorization

8   in an amount in excess of the final transaction amount (              **REDACTED**

9       **REDACTED**                       ), and a later-initiated transaction settles first.

10

11

12

13

14                  **REDACTED**

15

16

17

18

19          H.   Posting of a Check:  A customer can incur an overdraft for a debit-card

20   transaction that is less than the customer's contemporaneous available balance when an

21   outstanding check previously written by the customer settles first.  For example, at the end of

22   the day on October 4, 2006, plaintiff Veronica Gutierrez had a ledger balance of $367.44.

23   Between October 5 and October 9, Ms. Gutierrez made nine debit-card transactions, all of which

24   were within her current available balance.  However, unknown to the Bank, Ms. Gutierrez had

25   previously written a check for $65.  She also made an online transfer of $80 out of her account

26   on October 10.  The night of October 10, eight of the debit-card transactions, the check, and the

27   transfer all came in for settlement, causing Ms. Gutierrez to incur four overdraft fees.

28

I.  ACH Transaction:  Similarly, a customer can incur an overdraft for a debit-card transaction that is less than the customer's contemporaneous available balance if an ACH transaction authorized by the customer (of which the Bank would be previously unaware) settles first.  For example,  REDACTED  (identified as Witness No. REDACTED in Plaintiffs' Initial Disclosures) had a ledger balance of $40.47 at the end of the day on November 26, 2007.  On November 27, two transactions posted to his account:  an ACH electronic check debit for $32.05, and a debit-card purchase made on November 26 for $19.82.  The ACH transaction (of which the bank had no prior knowledge) posted first, causing the November 26 transaction to incur an overdraft fee.  (Had these two transactions posted on their respective transaction dates, the November 26 debit-card transaction would not have caused an overdraft, but the ACH transaction posting on November 27 would have, resulting in the same number of overdraft fees – one – overall.)  Similarly, former plaintiff Timothy Fox incurred overdraft fees on multiple occasions as a result of large ACH transactions to "GMAC" for what appears to have been a car loan.

J.  Unusual Delay in Settlement by the Merchant:  A customer can also receive an overdraft fee for a debit-card transaction that is less than the customer's contemporaneous available balance if the merchant delays for an unusually long period of time before submitting the transaction for settlement, and later-occurring transactions settle first.  For example, plaintiff William Smith made a check card purchase at TNT Fireworks on July 3, 2007, which was not submitted by the merchant for settlement until July 12, 2007.  Mr. Smith did not have sufficient funds to cover this transaction on July 12, and it, along with another debit-card transaction, posted into overdraft.  Had all of the transactions in Mr. Smith's account during that statement period posted on the day they were initiated, the TNT Fireworks transaction would not have resulted in an overdraft fee, but three later debit-card transactions (posted July 10, 11, and 12) would have incurred overdraft fees.

## IX.  Ways a Customer Can Benefit From the Bank's Current Posting Practice

39.  A customer can benefit from the "float" on debit-card transactions by making a deposit to cover previously initiated debit-card transactions that would have otherwise

1    resulted in overdrafts.  For example, at the end of the day on Friday, February 2, 2007, REDACTED
     REDACTED

2    REDACTED(identified as Witness No.    in Plaintiffs' Initial Disclosures) had a ledger balance of

3    $6.92 and an available balance of $-91.23.  He did not make any additional debit-card purchases

4    over the weekend, but on Monday, February 5, three of his debit-card transactions from the

5    previous week, totaling $102.77, posted.  Also on February 5 – although after cut-off – Mr.

6    REDACTED made a deposit of $1257.00.  Although this deposit did not post until February 6, the

7    Bank considered it in deciding not to charge Mr. REDACTED any overdraft fees.  Had the Bank

8    eliminated the debit-card "float" by posting Mr. REDACTED's transactions during this period on the

9    dates they were initiated, Mr. REDACTED would have incurred four overdraft fees.  Instead, he was

10   able to avoid incurring any overdraft fees by making a covering deposit late in the day on

11   February 5.

12           40.    A second way a customer can benefit from the "float" on debit-card

13   transactions is when a large debit-card purchase that would take an account into overdraft

14   "floats" to a later date for posting, allowing other smaller transactions to post first against a

15   positive ledger balance, thereby avoiding multiple overdraft fees.  To offer a hypothetical

16   example, assume that at the outset of Day 1, a customer has a ledger and available balance of

17   $200.  During that day, the customer makes debit-card purchases (in order) of $200, $20, $15,

18   $10, and $5.  (The last four transactions are approved despite an insufficient available balance,

19   as is within the Bank's discretion.)  The four smaller transactions post on Day 1, reducing the

20   customer's ledger balance to $150.  The $200 transaction, however, has "floated" to Day 2

21   before it is submitted for settlement, at which time it posts, creating an overdraft and resulting in

22   one overdraft fee.  If all five transactions had posted on Day 1 (the day they were initiated), the

23   $200 transaction would have posted first, reducing the account balance to zero, and the four

24   smaller transactions would have then resulted in four overdraft fees.

25

26

27

28

1        I declare under penalty of perjury under the laws of the State of California and

2    the United States of America that the foregoing is true and correct.

3        Executed in Concord, California on July 28, 2008.

4

5

6    Mark Lentz

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28