```
 1                UNITED STATES DISTRICT COURT
 2            FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                         ---oOo---
 4
 5   VERONICA GUTIERREZ, TIM FOX,    )
     ERIN WALKER and WILLIAM SMITH,  )
 6   as individuals, and on behalf   )
     of all others similarly         )
 7   situated,                       )
                                     )
 8              Plaintiff,           )
                                     )
 9        vs.                        )No. CV-07-5923 WHA
                                     )
10   WELLS FARGO & COMPANY; WELLS    )
     FARGO BANK, N.A.; and DOES 1    )
11   through 125,                    )
                                     )
12              Defendants.          )
     _____)
13
14
15                      CONFIDENTIAL
16        30(b)(6) DEPOSITION OF JOHN AHRENDT
17     Held at the Law Offices of Covington & Burling
18           One Front Street, 35th Floor
19             San Francisco, California
20        Wednesday, July 2nd, 2008, 10:25 a.m.
21                       ---oOo---
22
23
24
25   REPORTED BY MONICA LEPE-GEORG, CSR NO. 11976
```

BARKLEY

1   A.   Not anymore.
2   Q.   Were you at one time?
3   A.   At one time I had limited programming skills,
4   yes.
5   Q.   Did you ever work as a programmer?
6   A.   No, I did not.
7   Q.   Who is the technical person that works under
8   you?
9   A.   I have several.
10  Q.   Who is the highest level of manager that is a
11  technical person working under you?
12  A.   There are three or four people, one is a
13  systems architect.  There is also an ETL development
14  manager.  There's a data architecture manager, a
15  service delivery manager.
16       Those are some of the positions that are
17  technical.
18  Q.   What is ETL?
19  A.   Stands for extract transformation and load.
20  Q.   Does the Internet services group have its own
21  database or does it borrow from other systems within
22  Wells Fargo?
23  A.   The particular database in this document is
24  one that we manage and maintain.
25  Q.   And you're referring to Exhibit 75?

12

BARKLEY

1   A.  That's correct.
2   Q.  What is the name of that database or system?
3   A.  The overall system is called C2T.  The
4   particular database that is referred to here -- I
5   believe there are two of them, correct me if I'm
6   wrong, David, one of them is BEV, B-E-V and the other
7   one is called Tealeaf, T-e-a-l-e-a-f.  Sorry for all
8   the acronyms.
9   Q.  I need to make sure I understand that.  The
10  first thing --
11  A.  C2T.
12  Q.  What is the C2T?
13  A.  That describes a data warehouse and a set of
14  associated analytical applications that contain
15  customer and Internet data.
16  Q.  Where does that -- where does the underlying
17  data that is stored in that data warehouse come from?
18  A.  From about 50 different sources, a
19  combination of Internet systems as well as other bank
20  systems of record.
21  Q.  Is the Hogan system one of those?
22  A.  Yes.
23  Q.  Does it also draw from the settlement system?
24  A.  No, it does not.
25  Q.  And the BEV, what is the BEV?

13

```
 1        A.  BEV stands for business events.  It captures
 2   online banking activity, customers that login, view
 3   their balances, transfer money, those kinds of
 4   transactions.
 5        Q.  And Tealeaf, what is that?
 6        A.  Tealeaf is essentially a session recorder, so
 7   it will record an online banking session screen by
 8   screen and then you can replay it back and essentially
 9   see the same screens a particular customer saw.
10        Q.  How long has the BEV system been in
11   existence?
12        A.  I don't know the exact time, but it was in
13   existence before I joined Wells Fargo.
14        Q.  And I guess I never got to that.
15            When did you start with Wells Fargo?
16        A.  August of 2002.
17        Q.  Had you had banking experience before
18   starting with Wells Fargo?
19        A.  Yes.
20        Q.  What other banks had you worked for?
21        A.  Bank of America, Security Pacific, CitiBank
22   and also E*TRADE.
23        Q.  Did you work in the online group for each of
24   those banks?
25        A.  Within E*TRADE, yes.
```

1  Q. Who is that person?
2  A. David O'Callahan.
3  Q. Prior to when the Tealeaf session recording
4  system started, was there any documentation of when
5  people logged on or off the Wells Fargo website?
6  A. Yes.
7  Q. What was that?
8  A. Within the BEV system it would capture
9  someone logging in and logging off.
10 Q. But the difference is that it wouldn't
11 capture what they were doing when they were in the
12 system?
13 A. It captures events, so to give you an
14 example, if you look at the account summary screen it
15 would say there was an event for looking at the event
16 summary screen. If you transferred money from one
17 account to the next, it would tell you you did a
18 transfer. Those are what we call events, but it
19 doesn't tell me what the customer saw as far as the
20 screen. It's just data that captures that particular
21 event and a few facts about that particular event.
22 Q. So on -- I think it's the account activity
23 screen, there's an account balance that is
24 highlighted, you can click on it and it gives you some
25 description; are you familiar with that?

17

1    A.  Yes.

2    Q.  Prior to the Tealeaf, if I had clicked on the
3 account balance in order to see what the description
4 of it was, would the system have recorded that I did
5 that?

6    A.  No.

7    Q.  But as I understand it, sometime two years or
8 maybe a little bit more, under the Tealeaf system it
9 now would record that I did that?

10    MR. JOLLEY:  Vague and ambiguous as to "now
11 would record."

12 BY MR. McCUNE:

13    Q.  If I went on to my Wells Fargo account as we
14 sat here and I clicked on that and you went back to
15 your office tomorrow and had one of the technical
16 people look to see would there be something that shows
17 that I clicked on the available balance?

18    A.  I don't know specifically.  I know for sure
19 that we would see the screen that you saw, but the
20 data that we're capturing is the data that exists in
21 our server that we present to you.

22        So, for example, if there was a screen with a
23 drop-down menu and on your browser you clicked on the
24 drop-down menu we likely wouldn't see, you know, the
25 drop down in the replay.  If when you click on the

18

1  link that you just described there was another screen
2  that displayed that, then yes, you would see that, but
3  I don't know that for sure because I've never looked
4  at that specific example.
5      Q.  Is that sort of a -- is that captured, the
6  video of the screen, or is it some sort of digital
7  capture?
8          MR. JOLLEY:  Objection.  Vague and ambiguous.
9          You can answer to the extent you know.
10         THE WITNESS:  I'm not as familiar with what
11 it actually looks like behind the screens.  My belief
12 is it's capturing an image of the screen.
13         Your term "digital" is a bit confusing
14 because an image is digital but that's not necessarily
15 something I can access other than to just view it
16 again using the same technology that presented the
17 media in the first place.
18 BY MR. McCUNE:
19     Q.  Do you have any understanding as to whether
20 if you went to look and said, okay, one of the screens
21 is the description of what is available -- what is the
22 available balance, are you aware of any way of
23 searching that customer to see how many times that
24 screen has been accessed by customers?
25     A.  Let me think.

19

JOHN AHRENDT - CONFIDENTIAL             BARKLEY

1          Ask that again to make sure I understand the
2     question.
3          Q.   Sure.
4               There's a screen that provides a description
5     of what is the available balance, you have to click on
6     the words "available balance" and then some
7     description comes up.
8          A.   Uh-hm.
9          Q.   Is there any way, at the present time, to say
10    over the last three months let's search our systems
11    and see how many times customers have accessed that
12    particular screen?
13         A.   Not that I'm aware of, no.
14              MR. JOLLEY:  Before we go too far down the
15    road and things get confusing, I would suggest we put
16    on the record of how far back this Tealeaf data goes
17    and current retention because you may be getting a
18    false impression of what Tealeaf is currently.  I just
19    want to make sure that the record is clear.
20              MR. McCUNE:  Okay.  No false impressions.
21         Q.   How long do you keep the Tealeaf data?
22         A.   The images are retained for ten days.
23         Q.   Then what happens to them?
24         A.   They are purged.
25         Q.   Why are they kept ten days?

1    A.   The primary reason is the storage requirement
2 is very voluminous.  It's huge amounts of data and the
3 way in which it is used, they don't need data that's
4 older than ten days.
5    Q.   Why is it needed in the first place?
6    A.   Its original purpose was to research customer
7 problems and to research system problems such that you
8 could go back in, if a particular customer or a
9 particular function was having difficulty, and replay
10 the session to see what occurred.  It helps
11 programmers to sort of trace and diagnosis within the
12 application where a problem may have occurred.
13    Q.   How long is the information from a BEV system
14 kept?
15    A.   We have data back to January of 2006.
16    Q.   What happened to the data before that?
17    A.   It was not retained.
18    Q.   Was it actively purged or was it written over
19 or what happens?
20    A.   It is purged.  It is deleted essentially.
21    Q.   It is deleted from what system?
22    A.   From the C2T system.  That's the current
23 system.  There was a system prior to 2006 that had a
24 different name.
25    Q.   What was the name of the prior system?

21

1  A. Web House.

2  Q. Was the information retained in some form
3  from the Web House system?

4  A. Not prior to 2006.

5  Q. Did you quit using the Web House system prior
6  to January of '06?

7  A. It actually was in the first quarter of 2007
8  and we retained all of the history that it had back
9  until January of 2006. It had not retained any data
10 prior to that.

11 Q. Do you know if there are any backup copies,
12 such as emergency back ups, prior to January of '06
13 that would reflect log ons?

14 A. Not that I'm aware of.

15 Q. Is that something that you think you would be
16 aware of if it was there?

17 A. Possibly. The tapes get reused, so the data
18 is cleaned and the tapes are reused for another
19 purpose and then at some point they are destroyed.

20 Once they get to a certain age they are no
21 longer reliable and I believe they are destroyed, but
22 that happens within the tape operations within a data
23 center and I'm not responsible for that so I can't
24 speak to their specific procedures.

25 Q. Do you know who the -- do you know any person

22

JOHN AHRENDT - CONFIDENTIAL                    BARKLEY

```
 1   in there that you would ask that question of?
 2       A.   Not by name, no.
 3       Q.   How about position?
 4       A.   Yes, we could find the person.
 5       Q.   How would you go about finding the person?
 6       A.   I would look on the team directory or ask one
 7   of my managers who they work with directly.
 8       Q.   So let's go back.
 9            From January of 2006 to the present, that's
10   the relevant time period for the current system?
11       A.   That's correct.
12       Q.   What information is retained as to online
13   sessions for customers?
14            MR. JOLLEY:  I'm sorry, vague and ambiguous
15   as to which of the systems we're talking about.  I
16   assume it's BEV, but I wasn't clear on the question.
17            MR. McCUNE:  BEV, yes.
18            THE WITNESS:  Could you repeat the question?
19   BY MR. McCUNE:
20       Q.   For online sessions where customers --
21   excluding the Tealeaf system, what information about
22   online sessions is retained by Wells Fargo from
23   January '06 to the present?
24       A.   The typical type of data that is in BEV would
25   contain the -- a customer identifier.  It would
```

BARKLEY

```
 1   include an event identifier which is like a
 2   transaction code which describes what type of event
 3   the customer performed, and on some of those events it
 4   includes some detail about the event itself.  There's
 5   date stamps, time stamps, other data like that.
 6       Q.   One of the set of documents produced in this
 7   case -- let me show you.  It's a grouping of documents
 8   I think for a couple of different customers that have
 9   been marked 7658 to 7666.
10       A.   Thank you.
11            MR. McCUNE:  If I could have the court
12   reporter mark this as next in order.
13            (Whereupon, Exhibit No. 76 was marked for
14   identification.)
15   BY MR. McCUNE:
16       Q.   I'll ask you to take a look at this
17   collection of documents, please.
18       A.   Okay.
19       Q.   Do you recognize this document?
20       A.   Yes.
21       Q.   Can you tell me what it is?
22       A.   This is the result of a database query that
23   was done by an analyst in the Internet group pulling
24   these specific data elements for certain customers.
25       Q.   Let's start at the top where it says,
```

24

```
 1   11:20 a.m. till 11:25 a.m.)
 2           MR. McCUNE:  Back on the record.
 3       Q.  Does the online group do its own marketing or
 4   is there a separate marketing group?
 5           MR. JOLLEY:  Objection.  Scope.
 6           THE WITNESS:  There is a sales and marketing
 7   group of which I am a part of the Internet group, yes.
 8   BY MR. McCUNE:
 9       Q.  How about market research?
10       A.  There also is a market research team within
11   the Internet group.
12       Q.  Are you part of that?
13       A.  No, I am not.
14       Q.  If we go back to where we started here, which
15   was Exhibit 75, I believe, you will notice on section
16   A we talked about all hardware and software sources
17   that you are familiar with that would provide
18   information as to the time and/or date customers
19   access the Wells Fargo website from 2003 to the
20   present.
21       A.  The only database we haven't spoke about is a
22   different database called EBIZ, but it does not
23   capture -- I shouldn't say it that way, it primarily
24   captures page view information off of wellsfargo.com,
25   which would include some event data that is also
```

44

JOHN AHRENDT - CONFIDENTIAL

BARKLEY

```
 1   captured in the BEV system, so it's essentially
 2   redundant of what is captured in BEV, but what it
 3   captures that BEV does not is page views within the
 4   public site, the nonsecured portion of wellsfargo.com,
 5   like the home page, as an example.
 6        Q.   Does the customer that is logged in, as part
 7   of the logged-in session, have the ability to go to
 8   the public Wells Fargo site where Wells Fargo would
 9   track that view as part of the online session?
10            MR. JOLLEY:  Objection.  Vague and ambiguous.
11   Objection, scope.
12            THE WITNESS:  They can navigate two different
13   places on wellsfargo.com, yes.
14   BY MR. McCUNE:
15        Q.   Within the online session?
16        A.   I don't know specifically.
17            If you're referring to within the logged-in
18   session --
19        Q.   Yes.
20        A.   -- yes, I believe they can, but again, I
21   don't know that I've done that personally so I don't
22   know how that works.
23        Q.   As I understand it, a customer who is looking
24   at their account, that information would not be
25   recorded in the EBIZ database; is that correct?
```

45

JOHN AHRENDT - CONFIDENTIAL



```
 1       A.   It has some of the same BEV event data in it.
 2  It has less than what BEV has, but for example, you
 3  could go into there and see a login but you would not
 4  get the same level of detail that you saw over here in
 5  this other report.
 6       Q.   Where does EBIZ pull its information from on
 7  login from?
 8       A.   From BEV.
 9       Q.   Do you know what the document retention
10  program is of EBIZ?
11       A.   We have data back to January 2004.
12       Q.   Would all of the logins for a customer from
13  January 2004 be recorded in EBIZ?
14       A.   Probably.
15       Q.   Does the EBIZ record that the customer has
16  looked at their account summary page, for instance?
17       A.   I don't know what level of event detail it
18  contains.  It has a subset of the BEV events within
19  it.  I don't know exactly which ones it has and does
20  not have.
21       Q.   Other than you know that it has the login
22  information?
23       A.   It definitely has the login information.
24       Q.   Other than the EBIZ and the other systems
25  that we've talked about today, any other systems you
```

1  can think of that are responsive to Category No. A?
2      A.  No.
3      Q.  How about Category No. B?
4      A.  No.  The only thing that I am aware of that
5  records screens in an online session is Tealeaf.
6      Q.  One second, please.
7          Are you aware of any market research as to --
8  that specifically looks at overdraft charges for
9  online customers?
10         MR. JOLLEY:  Objection.  Scope.
11         THE WITNESS:  I'm not involved in that at
12 all, no.
13         Could I clarify my answer on EBIZ from a
14 couple of questions ago?  You asked if a customer's
15 login would be recorded in EBIZ, the answer is yes,
16 but it does not contain, you know, customer
17 identifying information so I couldn't tell for sure
18 that it was you logging in because it's not the same
19 as BEV that contains that customer ID that identifies
20 that it was in fact you.  I wanted to clarify that.  I
21 wanted to clarify that, so that when you are within
22 the public site you are essentially anonymous.  We
23 don't have specific identifying information to say who
24 you are at that point.
25 BY MR. McCUNE:

47

BARKLEY

1  Q.  So I -- okay.
2      So the purpose of EBIZ is to monitor general
3  traffic that the website is getting?
4  A.  Yes.
5      I guess for further clarification, I can
6  identify the computer to the homesite but not to the
7  individual, so if someone was sharing a computer at a
8  cafe I couldn't make that distinction.
9  Q.  Okay.
10     Does the Wells Fargo online record computers
11 used by the customer to login or does it recognize
12 specific computers?
13     MR. JOLLEY:  Objection.  Vague and ambiguous.
14     THE WITNESS:  It doesn't necessarily
15 recognize a specific computer.  There is a cookie
16 that -- if you are familiar with the concept of a
17 cookie --
18     MR. McCUNE:  Just generally.
19     THE WITNESS:  Cookies are usually associated
20 with a computer, so if you logged into online banking
21 there, there would be a cookie associated with that
22 computer.  If you logged in there, there would be a
23 cookie associated with that particular computer, so in
24 that sense yes, but other than that you don't know
25 because cookies get deleted or wiped out, things like

1  that, so it's not the most reliable way.
2          MR. McCUNE:  Thank you.  Those are all the
3  questions that I have for you.
4          MR. JOLLEY:  I've just got one quick
5  follow-up for some clarification.
6          MR. McCUNE:  Okay.
7
8                      EXAMINATION
9  BY MR. JOLLEY:
10     Q.  We talked about earlier, in response to
11 Mr. McCune's questions, transaction data that the
12 online group receives and he was asking where
13 transaction data comes from.  I think that if we limit
14 it we may get a better answer in terms of
15 understanding where things come from.
16         Limiting it to transaction data relating to
17 consumer deposit accounts, where are you aware that
18 that information comes from?
19     A.  From Hogan.
20     Q.  Are you aware that it comes from any other
21 source other than Hogan?
22     A.  No, I am not.
23     Q.  If transaction data relating to consumer
24 deposit accounts is not available on Hogan is that
25 information going to be received by online banking?

BARKLEY

```
 1                DEPOSITION OFFICER'S CERTIFICATE

 2

 3   STATE OF CALIFORNIA        }
                                }   ss.
 4   COUNTY OF SAN FRANCISCO    }

 5

 6           I, Monica Lepe-Georg, hereby certify:

 7           I am a duly qualified Certified Shorthand

 8   Reporter in the State of California, holder of

 9   Certificate Number CSR 11976 issued by the Court

10   Reporters Board of California and which is in full force

11   and effect. (Fed. R. Civ. P. 28(a)).

12           I am authorized to administer oaths or

13   affirmations pursuant to California Code of Civil

14   Procedure, Section 2093(b) and prior to being examined,

15   the witness was first duly sworn by me. (Fed. R. Civ.

16   P. 28(a), 30(f)(1)).

17           I am not a relative or employee or attorney or

18   counsel of any of the parties, nor am I a relative or

19   employee of such attorney or counsel, nor am I

20   financially interested in this action. (Fed. R. Civ. P.

21   28).

22           I am the deposition officer that

23   stenographically recorded the testimony in the foregoing

24   deposition and the foregoing transcript is a true record

25                            / / /
```

51

BARKLEY

```
1   of the testimony given by the witness.  (Fed. R. Civ. P.
2   30(f)(1).)
3           Before completion of the deposition, review of
4   the transcript [XX] was [ ] was not requested.  If
5   requested, any changes made by the deponent (and
6   provided to the reporter) during the period allowed, are
7   appended hereto.  (Fed. R. Civ. P. 30(e).)
8   Dated:  07/08/08          ,
```

*[Signature]*