```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3

 4   VERONICA GUTIERREZ, TIM    )
     FOX, ERIN WALKER and       )
 5   WILLIAM SMITH, as          )
     individuals, and on        )
 6   behalf of all others       )
     similarly situated,        )
 7                              )  No.   CV-07-5923 WHA
              Plaintiffs,       )
 8                              )
     vs.                        )
 9                              )
     WELLS FARGO & COMPANY;     )
10   WELLS FARGO BANK, N.A.;    )
     and DOES 1 through 125,    )
11                              )
              Defendants.       )
12                              )
                                )
13   _____)

14

15         CONFIDENTIAL DEPOSITION OF DAWN AVRECH

16              Held at the Law Offices of

17                   Covington & Burling

18      One Front Street, San Francisco, California

19          Wednesday, July 9, 2008, 10:24 a.m.

20

21

22

23

24

25   REPORTED BY:  ELAINA L. BULDA, RPR, CSR #11720
```

BARKLEY

1    A.    Yes.
2         MR. JOLLEY:  I'm sorry, objection, to the
3    form of the question.  Objection, calls for a legal
4    conclusion, but you can answer and you did.
5    BY MR. McCUNE:
6    Q.    Okay.  Going back to the -- to the
7    computer systems, you told me about the HP tandem.
8    What software program or system runs that?
9         MR. JOLLEY:  Objection.  Vague and
10   ambiguous.
11        You can answer.
12        THE WITNESS:  Are you asking -- I guess
13   you need to clarify.  The machine itself or the
14   application?
15   BY MR. McCUNE:
16   Q.    I won't do very good with computer speak
17   all day today, so I will stumble through the best I
18   can.
19        The -- the -- the applications, can you
20   tell me what an application is?
21   A.    It's a collection of software that runs on
22   the tandem system.
23   Q.    And what is the collection of software
24   that -- that provides the system for authorization
25   of point of sale?

11

1  MR. JOLLEY: Objection, vague and
2  ambiguous.
3  BY MR. McCUNE:
4  Q. Let me -- your look indicates to me I have
5  asked a question you don't understand. So let me
6  try it a different way.
7  When a sale -- when somebody is at a
8  machine, at a grocery store, and is seeking
9  authorization for a debit card sale, it's my
10 understanding that your group supports the mechanism
11 or the computer system that either approves or
12 denies that sale; is that correct?
13  MR. JOLLEY: Objection, vague and
14 ambiguous.
15  You can answer.
16  THE WITNESS: Okay. That's correct.
17 That's the application software.
18 BY MR. McCUNE:
19  Q. Okay. And so what application software is
20 involved in that process of approving or denying
21 that requested sale?
22  A. That would be the RDS application.
23  Q. What does RDS stand for?
24  A. Retail delivery system.
25  Q. And do you use any -- strike that.

```
 1              Is that system one that is administered by
 2   Wells Fargo as opposed to a third party?
 3         A.   Yes.
 4         Q.   And is that a commercial software program
 5   or is that one developed in house by Wells Fargo?
 6         A.   Developed in house.
 7         Q.   Is it built on some other platform or a
 8   platform?
 9         A.   The platform is a tandem system.
10         Q.   And does it work with other Wells Fargo
11   computer systems in order to provide the
12   authorization?
13              MR. JOLLEY:  Objection, vague and
14   ambiguous.
15              THE WITNESS:  I guess the answer is that
16   we interface to the account authorization system.
17   BY MR. McCUNE:
18         Q.   And is that the Hogan system?
19         A.   Yes.
20         Q.   Any other systems that RDS interfaces
21   with?
22         A.   The settlement systems.
23         Q.   Any others?
24         A.   Not for authorizations.
25         Q.   Does the RDS system do anything other than
```

13

```
 1  authorizations?
 2      A.   There is a component for pin
 3  authentication.
 4      Q.   And through the pin authentication, does
 5  it communicate or interface with other systems?
 6      A.   No.
 7      Q.   Anything else the RDS system does other
 8  than pin and authorizations?
 9      A.   Right -- no, just to clarify.  The pin
10  authorization, the pin is part of RDS application.
11      Q.   What -- if we go back to my simplistic
12  example at a store, and I put my card in and it goes
13  through the little machine and goes, I assume, to
14  the RDS system, what does the RDS system do with
15  that requested authorization; what is the process?
16           MR. JOLLEY:  Objection, vague and
17  ambiguous.  Objection, incomplete hypothetical.
18           You can answer.
19           THE WITNESS:  Okay.  When we receive the
20  transaction, we will go and look at information for
21  the card to make sure that it's a valid card number.
22  It's not lost, stolen, expired, things like that.
23  Also, that the card did not exceed daily dollar
24  limits.  And then we send it to Hogan for -- and I
25  refer to it as account authorization.
```

14

BY MR. McCUNE:

Q. And is the information as to whether the card is valid stored within the RDS system or does it have to interface with some other system to make that determination?

A. No, it's within the RDS system.

Q. And the same is true with the daily limit?

A. Right.

Q. How about a determination as to whether there is sufficient funds to cover the charge?

A. That comes from Hogan.

Q. And if Hogan system comes back and says that the transaction is authorized, then what happens?

A. Then we log the transaction.

Q. When you say log the transaction, what do you mean?

A. We actually have a physical file that has the transactions. It gives you basically the disposition of the transaction.

Q. Would that include the date and time that the requested authorization came through?

A. It's the date and time of the transaction.

Q. And what is considered the transaction?

A. The time that it hits our system.

15

1  Q.  So when it hits your system is when you're
2  first notified by the vendor there is a request for
3  a transaction?
4  A.  Right.
5  Q.  And what information is kept on that
6  transaction?  We have the date and time, what other
7  information?
8  A.  You have the card number, the type of
9  transaction, transaction amount, merchant
10 information, and the available balance at the time
11 of the memo post.
12 Q.  What is the memo post?
13 A.  That's our authorization that gets applied
14 in Hogan.
15 Q.  Is that the available balance before or
16 after the transaction is debited to the account?
17 A.  I'm not the best one to answer that
18 question.  That's probably a Hogan question for how
19 they calculate it.
20 Q.  Do you know if it is the available balance
21 at the time that the transaction hits the system or
22 is that after the system has been authorized, the
23 transaction?
24       MR. JOLLEY:  Objection, asked and
25 answered.

1           MR. JOLLEY:  Objection, vague and
2   ambiguous as to negative balance.
3           You can answer.
4           THE WITNESS:  Yeah, I'm not sure what the
5   rules are.  That's really a Hogan question.
6   BY MR. McCUNE:
7       Q.  Then once the RDS sends back the
8   authorization to the merchant, what further
9   involvement does RDS have in the transaction, if
10  any?
11      A.  Well, once the transaction is completed,
12  then this is where we interface with the settlement
13  system.  They actually pick up those transactions
14  for the processing.
15      Q.  And so all of that information on the
16  transaction you just relayed to me is forwarded on
17  to the settlement system?
18      A.  Yes.
19      Q.  Any other systems it's forwarded on to?
20      A.  No.
21      Q.  Then what does the RDS system do with the
22  information that it has on the transaction?  Does it
23  store it?
24      A.  Well, we keep -- the logs are set up for
25  two logical business days.

                        20

| | |
|---|---|
| 1 | Q.  And then what happens? |
| 2 | A.  After we finish processing because we hand |
| 3 | it off to settlement, so when we get to the next set |
| 4 | up we always keep current, business day, next |
| 5 | business day.  So when we are on the next, which now |
| 6 | becomes current, then we roll over, purge out the |
| 7 | older file, and set that up for the next business |
| 8 | day. |
| 9 | Q.  So if I wanted to do a search of all the |
| 10 | transactions that were either approved or denied |
| 11 | yesterday, we could do that, but if I wanted a week |
| 12 | from now, that information has been purged from the |
| 13 | RDS? |
| 14 | A.  That's correct. |
| 15 | Q.  Is part of the transaction information |
| 16 | that is forwarded to the settlement system the |
| 17 | available balance information? |
| 18 | A.  Yes. |
| 19 | Q.  And I assume that everything we have |
| 20 | talked about is purged once the second day rolls |
| 21 | around? |
| 22 | A.  (Witness nods head). |
| 23 | Q.  That's correct? |
| 24 | A.  Yes. |
| 25 | Q.  What happens if a week later there is a |

21

BARKLEY

```
 1   dispute as to whether the transaction was properly
 2   authorized?  Is there any information kept with RDS
 3   that can speak to that?
 4           MR. JOLLEY:  Objection, vague and
 5   ambiguous.  Objection, scope.
 6           You can answer if you have personal
 7   knowledge.
 8           THE WITNESS:  Basically, we go back to
 9   settlement to ask for the record.
10   BY MR. McCUNE:
11       Q.  And that's the only way you would have to
12   verify that your system did this correctly?
13           MR. JOLLEY:  Same objection.
14           THE WITNESS:  Right.
15   BY MR. McCUNE:
16       Q.  Is there any place other than the
17   settlement system that you are aware of, where the
18   information that is recorded by the RDS is retained?
19           MR. JOLLEY:  Objection, scope.
20           THE WITNESS:  I guess I'm not really sure.
21   Our interface is to settlement.
22           MR. McCUNE:  Okay.  Thank you.  Those are
23   all the questions I have.
24           MR. JOLLEY:  I have no questions.
25           (Deposition was concluded at 10:44 a.m.)
```

```
 1              DEPOSITION OFFICER'S CERTIFICATE
 2
 3   STATE OF CALIFORNIA    }
                            }  ss.
 4   COUNTY OF SACRAMENTO   }
 5
 6        I, ELAINA L. BULDA, hereby certify:
 7        I am a duly qualified Certified Shorthand
 8   Reporter in the State of California, holder of
 9   Certificate Number CSR 11720 issued by the Court
10   Reporters Board of California and which is in full force
11   and effect.  (Fed. R. Civ. P. 28(a)).
12        I am authorized to administer oaths or
13   affirmations pursuant to California Code of Civil
14   Procedure, Section 2093(b) and prior to being examined,
15   the witness was first duly sworn by me.  (Fed. R. Civ.
16   P. 28(a), 30(f)(1)).
17        I am not a relative or employee or attorney or
18   counsel of any of the parties, nor am I a relative or
19   employee of such attorney or counsel, nor am I
20   financially interested in this action.  (Fed. R. Civ. P.
21   28).
22        I am the deposition officer that
23   stenographically recorded the testimony in the foregoing
24   deposition and the foregoing transcript is a true record
25                            / / /
```

24

1  of the testimony given by the witness.  (Fed. R. Civ. P.
2  30(f)(1)).
3        Before completion of the deposition, review of
4  the transcript [XX] was [ ] was not requested.  If
5  requested, any changes made by the deponent (and
6  provided to the reporter) during the period allowed, are
7  appended hereto.  (Fed. R. Civ. P. 30(e)).

9  Dated:  07/11/08

*[Signature]*

25