1           UNITED STATES DISTRICT COURT

2       FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5  VERONICA GUTIERREZ, TIM    )
   FOX, ERIN WALKER and       )
6  WILLIAM SMITH, as          )
   individuals, and on        )
7  behalf of all others       )
   similarly situated,        )
8                             )No.  CV-07-5923 WHA
              Plaintiffs,     )
9                             )
   vs.                        )
10                            )
   WELLS FARGO & COMPANY;     )
11 WELLS FARGO BANK, N.A.;    )
   and DOES 1 through 125,    )
12                            )
              Defendants.     )
13                            )
                              )
14 _____  )

15           CONFIDENTIAL DEPOSITION OF

16                PAUL WILLIAMSON

17           Held at the Law Offices of

18              Covington & Burling

19   One Front Street, San Francisco, California

20        Wednesday, July 9, 2008, 12:59 p.m.

21                    - - - -

22

23

24

25 REPORTED BY:  ELAINA L. BULDA, RPR, CSR #11720

                         2

                 PAUL WILLIAMSON - CONFIDENTIAL            BARKLEY

```
 1        A.   I wanted to see what data they stored
 2   to -- in their database.
 3        Q.   Let's start with talking about what data
 4   is stored in the settlement group relating to a
 5   transaction.  I took the deposition here an hour and
 6   a half ago of somebody from RDS and they talked
 7   about some things.
 8             So when a transaction that goes through
 9   the authorization process by RDS is authorized, is
10   that information then provided to the settlement
11   database or settlement system?
12             MR. JOLLEY:  Objection.  Vague and
13   ambiguous.
14             You can answer.
15             THE WITNESS:  Yes, the settlement system.
16   BY MR. McCUNE:
17        Q.   Okay.  And what information is delivered
18   from RDS to the settlement system?
19             MR. JOLLEY:  Objection.  Vague and
20   ambiguous.
21             You can answer.
22             THE WITNESS:  Transactional-related
23   information.
24   BY MR. McCUNE:
25        Q.   Do you know the specifics of what that
```

```
 1        A.   Yes.
 2        Q.   Once that information comes from RDS to
 3   the settlement system, what does the settlement
 4   system do with the information?
 5        A.   We take the transaction, the log
 6   information, and we create the customer postings.
 7   We settle either the ATM or the switch where it's
 8   coming from.  We do some reporting and we provide
 9   data to downstream applications.
10        Q.   And what do you mean by downstream
11   applications?
12        A.   Well, there are other applications that
13   take our data and do other things to it.
14        Q.   What groups are those?
15        A.   Well, the downstream application, one of
16   them is for our customer posting records.  It goes
17   into an application that does some checking to make
18   sure that the files are balanced and whatnot before
19   they provide it to another application.  There's
20   deposits, ATM deposits.  They go to another area
21   that does verification of deposits.  That kind of
22   thing.
23        Q.   Okay.  How about the -- I forget what the
24   name is, I think it's business marketing group?
25             MR. JOLLEY:  Modeling.
```

16

```
 1            MR. McCUNE:  Modeling group, thank you.
 2       Q.   Where Mr. Lentz works --
 3       A.   Yeah, we also provide a file of all
 4  transaction information.
 5       Q.   To that group?
 6       A.   Uh-huh.
 7       Q.   That's a yes?
 8       A.   Yes, sorry.
 9       Q.   And that file that you are describing
10  would include all the information that we just
11  talked about from RDS?
12       A.   It has -- yes.
13       Q.   And would it include more than that?
14       A.   Yes.
15       Q.   So it would also include some information
16  generated through the settlement system?
17       A.   No.
18       Q.   What other information?
19       A.   Well, there is other data on the log.
20  It's extraneous data, but everything that you talked
21  about there, I believe, is on that file.  But we
22  don't take everything from the log and create that
23  file.  So certain information that we don't ever
24  care about is dropped before we create that file.
25       Q.   Okay.  Just to make sure that there is no
```

17

```
 1   misunderstanding, I am going to bore you with going
 2   through the list again.  So RDS would send to the
 3   BMGP --
 4           MR. JOLLEY:  Sorry, he's not RDS, so --
 5           MR. McCUNE:  Sorry.
 6      Q.   The settlement group would send to this
 7   business modeling group information as to the
 8   authorization code being whether it was authorized
 9   as a normal operation or under overdraft?
10      A.   Yes.
11      Q.   Settlement group also would send the
12   information to this BM -- I don't know why I have a
13   such a hard time -- BMGP group on transaction
14   amount?
15      A.   Uh-huh, yes.
16      Q.   It would also send the information on
17   merchant information?
18      A.   Yes.
19      Q.   Also send the information to the BMGP
20   group on date and time of transaction?
21      A.   Yes.
22      Q.   And by date and time of transaction, is
23   that your understanding that that is the time that
24   the transaction came into the system for
25   authorization?
```

18

1       A.   Yes.
2       Q.   And does the settlement group send to the
3  BMGP group the available balance information?
4       A.   If it is on the log record we send it.
5       Q.   Okay.  As a normal course, putting aside
6  sending the information downstream, how long does
7  the settlement system keep that transaction
8  information?
9       A.   180 days.
10      Q.   What happens to it then?
11      A.   It falls off the system.  It's scratched.
12      Q.   And what is the procedure for sending the
13 information downstream to the BMGP group?
14      A.   We create a file, a daily file, and they
15 pick it up.
16      Q.   Through your discussions with these four
17 employees, do you have an understanding of BMGP's
18 policy in keeping that data?
19      A.   I did not ask them what their policy was,
20 no.
21      Q.   Do you have any understanding?
22      A.   It would be a guess.  I don't know.
23           MR. JOLLEY:  I think there may be a
24 misunderstanding on the question, so...
25           MR. McCUNE:  Okay.

19

```
 1        A.    This was an old pneumonic, again, for
 2   telephone banking.  I don't know what it stands for.
 3        Q.    So did the CZ replace the EE?
 4        A.    Yes.
 5        Q.    Do you know when that was?
 6        A.    It was roughly around 2002.
 7              MR. JOLLEY:  Rich, can we go off the
 8   record for a second?
 9              (Whereupon, a brief discussion off the
10   record.)
11   BY MR. McCUNE:
12        Q.    During the break you had a little time to
13   look at what has previously been marked as
14   Exhibit 71?
15        A.    Yes.
16        Q.    After having a little time to review it,
17   certain portions of that document, do you recognize?
18        A.    Yes.
19        Q.    Which portions are those?
20        A.    Under the tran detail, while the last
21   3 quarters of the page 1 and the subsequent 2 pages.
22        Q.    And where do you recognize that from?
23        A.    From a document that I reviewed with Mark
24   Lentz.
25        Q.    It was a different document than that?
```

1    A.   I don't know.  I looked at it so quickly,
2 I remember these field names in here but honestly, I
3 didn't spend a whole lot of time looking at it, so
4 it looks the same.  It looks the same.
5    Q.   And why were you looking that over with
6 Mark Lentz?
7    A.   To find out if -- what data he loads to
8 his database.
9    Q.   And after the two of you were looking at
10 that, did you come to the conclusion that the
11 transaction date and time was loaded into the
12 database?
13    A.   No, we did not talk about transaction date
14 and time from this.  We were looking at a different
15 field.
16    Q.   What field were you looking at?
17    A.   Available balance or balance of the time
18 of authorization.  I think it's available balance.
19    Q.   Do you know where that is?
20    A.   It is not on here because they don't load
21 it to their database, is what I found out.  It's on
22 my file I send them, but he doesn't load it.
23    Q.   So the available balance information, in
24 talking with Mr. Lentz, the conclusion was the
25 available balance information is not stored in the

24

1  database?

2  A.  In his database, correct.

3  Q.  And how did the two of you go about

4  determining that?

5  A.  I looked on my file and said, I get this

6  field and I pass it to you.  He looked at what I

7  passed to him and says, yes, it's there, however,

8  it's not a field that I load to the database.  They

9  don't load everything on my file.

10  Q.  Was there discussion as to what happened

11  to the information that came into his system but was

12  not loaded into the database?

13  A.  No.

14  Q.  Do you know whether it's --

15  A.  They don't load it, it's just destroyed

16  or, you know, it's not used.  They take -- it's my

17  understanding that they take my data, they load it

18  to their database, and this gets scratched.  The

19  file that I send them is deleted.  It gets

20  scratched.  They are only loading their database

21  once.  That's my understanding, but I am not the

22  expert.

23  Q.  Was it your understanding that each of

24  these fields that we see in this first three pages

25  are loaded, though?

25

```
 1        A.   Yes, that's my understanding, but I didn't
 2   go through any of these fields with him.
 3        Q.   Did either of you bring in a technical
 4   person or a programmer to ask them?
 5        A.   I didn't.  I don't know what his
 6   background is.  I have never spoke to him before.  I
 7   assume he's a programmer but I could be wrong.
 8        Q.   It was just the two of you going through
 9   this process?
10        A.   I was looking at my file and I know what
11   is on my file and I said, this is what is on my
12   file, I send it to you, do you get it?  Yes, I get
13   it, but I don't load it.  That's about the whole
14   conversation.
15        Q.   Okay.  And was he looking at a document
16   like Exhibit 1?
17        A.   It was on the phone.  I don't know what he
18   was looking at.
19        Q.   Okay.
20             MR. JOLLEY:  Can we go off the record.
21             (Whereupon, a brief discussion off the
22   record.)
23   BY MR. McCUNE:
24        Q.   Okay.  Then I think -- let's talk about
25   available balance a little bit.
```

26

```
 1              Mr. Lentz told you that his group didn't
 2   have it.  Did you check with the other groups?
 3      A.   Yes, I did.
 4      Q.   And who did you speak with at ATM ops?
 5      A.   Tim Ward.
 6      Q.   What did Mr. Ward tell you?
 7      A.   He does not load it either.
 8      Q.   Did he indicate to you what he did load?
 9      A.   No, I did not ask him.
10      Q.   And then did you speak with somebody from
11   risk?
12      A.   Yes, and that would be Jim Adkins.
13      Q.   And what did Mr. Adkins -- what was the
14   first name?
15      A.   Jim.
16      Q.   What did Mr. Adkins tell you as to whether
17   they saved the available balance information?
18      A.   They do not load it to their database
19   either.
20      Q.   And the other one I have written down is
21   MIS?
22      A.   Alex Inker.
23      Q.   And what did Mr. Inker say?
24      A.   He does not load it either.
25      Q.   So as far as you know, the only available
```

```
 1  balance information related to transactions would be
 2  for the last 180 days?
 3      A.  Correct.
 4      Q.  But you verified on your system that it's
 5  information you have and you forwarded it to MIS,
 6  risk, ATM ops, and BMGP?
 7          MR. JOLLEY:  BMG.
 8          THE WITNESS:  Correct.
 9          MR. McCUNE:  Let me just double check, but
10  I think that's all I have for you.
11      Q.  Actually, I do have another question.
12          Do you have some sort of printout or some
13  documentation of all the fields that you forward to
14  these various groups?
15      A.  Yes.
16      Q.  And what is the name of that document?
17      A.  It would be -- you know, it's going to be
18  our ATDB layout.
19      Q.  I'm sorry?
20      A.  ATDB.
21      Q.  Okay.
22      A.  And then layout.  I assume that's what it
23  is.  I don't remember the name of it on our shared
24  drive, but that's basically what it is.  The layout
25  means -- it tells you the fields that are on there.
```

28

1    Q.    And does it also tell you where those
2 fields are forwarded?
3    A.    No.
4    Q.    Is there some document that would tell you
5 that?
6    A.    The fields don't go anywhere that are
7 files.  Everybody who gets this file gets the same
8 data.  It's one file and they come and look at it
9 or, you know, load it, whatever they need.  So...
10    Q.    Is there some system to monitor what other
11 groups within Wells Fargo are pulling from this
12 data?
13    A.    There is security access by the file name.
14 Only those with security access can access the data.
15    Q.    Would -- do you know whether that would
16 tell you specific types of data?
17    A.    No, it would not.  It just tells you the
18 file name.
19    Q.    Did -- was there any paperwork that you
20 could find that would tell you that you are sending
21 all this transaction data to ATM ops?
22         MR. JOLLEY:  Objection, misstates
23 testimony in that he doesn't send it, but you can
24 answer it if you understand.
25         THE WITNESS:  Yeah, I don't -- I create a

29

PAUL WILLIAMSON - CONFIDENTIAL

BARKLEY

```
 1   file and it sits out on the mainframe.  The other
 2   areas get access to that file name.  I don't really
 3   send it to anybody.  I create it and then they go
 4   pick it up and do what they need to with it.
 5   BY MR. McCUNE:
 6       Q.  So of all these fields, any of these
 7   groups, they have access -- they have security
 8   access to come in and take what or copy what they
 9   think is relevant to them?
10       A.  Correct.  They can pick and choose.
11       Q.  Okay.  And if I understand your testimony
12   correctly, you don't have a system that monitors
13   what they are picking and choosing?
14       A.  Correct, I do not.
15           MR. McCUNE:  Okay, thanks.  That's all the
16   questions I have.
17           MR. JOLLEY:  I have nothing.
18           (Whereupon, the deposition was concluded
19   at 1:35 p.m.)
20
21
22
23
24
25
```

30

BARKLEY

```
 1              DEPOSITION OFFICER'S CERTIFICATE
 2
 3   STATE OF CALIFORNIA        }
                                }  ss.
 4   COUNTY OF SACRAMENTO       }
 5
 6         I, ELAINA L. BULDA, hereby certify:
 7         I am a duly qualified Certified Shorthand
 8   Reporter in the State of California, holder of
 9   Certificate Number CSR 11720 issued by the Court
10   Reporters Board of California and which is in full force
11   and effect.  (Fed. R. Civ. P. 28(a)).
12         I am authorized to administer oaths or
13   affirmations pursuant to California Code of Civil
14   Procedure, Section 2093(b) and prior to being examined,
15   the witness was first duly sworn by me.  (Fed. R. Civ.
16   P. 28(a), 30(f)(1)).
17         I am not a relative or employee or attorney or
18   counsel of any of the parties, nor am I a relative or
19   employee of such attorney or counsel, nor am I
20   financially interested in this action.  (Fed. R. Civ. P.
21   28).
22         I am the deposition officer that
23   stenographically recorded the testimony in the foregoing
24   deposition and the foregoing transcript is a true record
25                              / / /
```

32

BARKLEY
Court Reporters

1  of the testimony given by the witness.  (Fed. R. Civ. P.
2  30(f)(1)).

3  Before completion of the deposition, review of
4  the transcript [XX] was [ ] was not requested.  If
5  requested, any changes made by the deponent (and
6  provided to the reporter) during the period allowed, are
7  appended hereto.  (Fed. R. Civ. P. 30(e)).

9  Dated: 07/10/08

   *[Signature]*

33