

Comptroller of the Currency
Administrator of National Banks

Washington, DC 20219

May 22, 2001

**Interpretive Letter #916
12 USC 24(7)
12 CFR 7.4002(a)
12 CFR 7.4002(b)
12 CFR 7.4002 (b)(1-4)**

Dear [           ]:

    This responds to your letter of February 21, 2001, in which you request the concurrence of this office that a decision by [                              ] (the Bank) to change the order of check posting is a pricing decision authorized by 12 U.S.C. § 24(Seventh) and 12 C.F.R. § 7.4002. You also request our concurrence with your view that the process followed by the Bank in deciding to change the order of check posting is consistent with the safety and soundness considerations of 12 C.F.R. § 7.4002(b).

    Based on our review of your letter and supporting materials and the relevant considerations set forth in our regulations, we agree that the Bank may establish a given order of posting as a pricing decision pursuant to section 24(Seventh) and section 7.4002. We further agree that the process the Bank used in deciding to change the order of check posting, as described in your submissions, is consistent with section 7.4002. The bases for these conclusions are described below.

## I. Background

    You have submitted materials[1] stating that the Bank charges customers a fee (referred to in this letter as a not-sufficient funds (NSF) fee) if they write checks against insufficient funds in their deposit accounts. The amount of the NSF fee will vary, based on (a) whether the Bank

---

[1] The Bank has requested confidential treatment of the submission, based on the Bank's conclusion that the submission includes information that is exempt from disclosure under the Freedom of Information Act (FOIA), 12 U.S.C. § 552(b). The FOIA exempts matters constituting "trade secrets and commercial or financial information obtained from a person and privileged or confidential."

**EXHIBIT 10**

pays the check or returns it unpaid and (b) the total number of items presented against insufficient funds in the same account during the preceding 12-month period.

The Bank would like to change its current check-posting practice to post checks so that the largest check to be paid from an account would be paid first in a given 24-hour cycle.  As a consequence, the available balance in any account will be depleted more quickly than if the items were posted in another order.  The Bank has offered several reasons for this decision, including the benefits of a standardized approach across the [              ] Group and the effect that the "high-to-low" check posting order would have on the Bank's revenues.

The Bank, which is doing business in California, has provided a copy of a provision in the California Commercial Code that states, in relevant part, "items may be accepted, paid, certified, or charged to the indicated account of its customer *in any order*."  Cal. Com. Code § 4303(b) (West Cum. Pocket Part 2001) (emphasis supplied).  The Bank notes, however, that the California Code Commentary (Commentary) to that section states –

> The only restraint on the discretion given to the payor bank under subsection (b) [of § 4303] is that the bank act in good faith.  For example, the bank could not properly follow an established practice of maximizing the number of returned checks for the sole purpose of increasing the amount of returned check fees charged to the customer.  On the other hand, the bank has the right to pay items for which it is itself liable ahead of those for which it is not.  (1992 Senate Daily Journal 7350).[2]

This Commentary has prompted the Bank to seek the OCC's views on whether the decision to post checks in a particular order is a pricing decision authorized by Federal law.

## II. Authority to Charge a Fee

Section 24(Seventh) authorizes a national bank to engage in activities that are part of, or incidental to, the business of banking[3] as well as to engage in certain specified activities listed in the statute.  Pursuant to section 24(Seventh) and the OCC's regulations, a national bank may charge its customers a fee.  The relevant section of the OCC regulation states:

---

[2] We note that, while this Commentary does not have the force of law, it provides persuasive evidence of legislative intent.

[3] The powers clause of section 24(Seventh) provides that a national bank may "exercise by its board of directors or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking...."  12 U.S.C. § 24(Seventh).  *See NationsBank v. Variable Annuity Life Ins. Corp.*, 513 U.S. 251 (1995) (the "business of banking" is not limited to the list of powers enumerated in section 24(Seventh)).

EXHIBIT 10

> (a) *Customer charges and fees.* A national bank may charge its customers non-interest charges and fees, including deposit account service charges. For example, a national bank may impose deposit account service charges that its board of directors determines to be reasonable on dormant accounts. A national bank may also charge a borrower reasonable fees for credit reports or investigations with respect to a borrower's credit. All charges and fees should be arrived at by each bank on a competitive basis and not on the basis of any agreement, arrangement, undertaking, understanding, or discussion with other banks or their officers.

12 C.F.R. § 7.4002(a).

The bank's authority in this, as in all other, areas must be exercised in a manner that is consistent with safe and sound banking practices. Paragraph (b) of section 7.4002 sets out the factors that the bank should consider to ensure that its process for setting its fees and charges is consistent with safety and soundness:

> (b) *Considerations.* The establishment of non-interest charges and fees, and the amounts thereof, is a business decision to be made by each bank, in its discretion, according to sound banking judgment and safe and sound banking principles. A bank reasonably establishes non-interest charges and fees if the bank considers the following factors, among others:
>
> (1) The cost incurred by the bank, plus a profit margin, in providing the service;
>
> (2) The deterrence of misuse by customers of banking services;
>
> (3) The enhancement of the competitive position of the bank in accordance with the bank's marketing strategy; and
>
> (4) The maintenance of the safety and soundness of the institution.

If a bank uses a decisionmaking process that takes these factors into consideration, then there is no supervisory impediment to the bank exercising its discretionary authority to charge customers non-interest fees and charges pursuant to section 7.4002(a).[4]

A bank's authorization to establish fees pursuant to 12 C.F.R. 7.4002(a) necessarily includes the authorization to decide how they are computed. Here, according to the

---

[4] The OCC has recently proposed amendments to section 7.4002 that would eliminate certain ambiguities in the text of the regulation. *See* 66 Fed. Reg. 8178 (January 30, 2001) (the NPRM). As indicated in the preamble to the NPRM, however, these amendments would not affect the substance of the regulation or the way it operates.

**EXHIBIT 10**

information the Bank has submitted, the amount of the NSF fee the Bank charges depends on, among other factors, the number of items presented against insufficient funds in the same account during the preceding 12-month period. The number of items presented against insufficient funds is determined by the order of posting a bank uses. For example, the high-to-low posting order that the Bank wishes to use will result in the Bank's payment of the depositor's largest checks first. If the depositor has written a number of checks against insufficient funds that are presented on the same day, the high-to-low posting order may result in a greater number of checks being presented against insufficient funds than if the Bank used a different posting order. Thus, posting order is one component that affects the Bank's NSF fee-setting computation.

On this point, Federal law governing national bank fees, as embodied in section 7.4002(a), is consistent with the check-posting provision of the California Commercial Code cited by the Bank, which permits the Bank to post checks "in any order." The Commentary to the California provision glosses this provision with the application of a "good faith" standard. While this letter does not address the applicability to the Bank of the California Commercial Code check-posting provision or the standard articulated in the Commentary, we note that a relevant factor in evaluating good faith would be whether a bank's actions were inconsistent with the practices it had represented to its customers that it would follow. Based on the materials submitted, such is not the case here.

### III. The Bank's Consideration of the Section 7.4002(b) Factors

The Bank has provided analysis and supporting documentation demonstrating that the Bank has considered each of the four factors listed in § 7.4002(b)(1)-(4) in its process of deciding to change the order of check posting.

The Bank's submission contains projections showing that revenue is likely to increase as a result of adopting a high-to-low order of check posting. The Bank also notes that the decision to use a high-to-low order of posting will standardize the Bank's practices in the affected parts of the Bank, thereby removing inefficiencies that currently exist.

The Bank also has considered the deterrent effect that a high-to-low order of posting likely will have on its customers. The Bank's submission contains a discussion of the Bank's experience in the aftermath of decisions made by its competitors to adopt a high-to-low order of posting. The Bank concludes that it needs to adopt the high-to-low order of posting so that customers who frequently write checks against insufficient funds do not do business with the Bank primarily because the Bank's fee for checks presented against insufficient funds is lower than its competitors'.

The Bank has considered the impact that the change in the order of check posting will have on the quality of service for its customers. The Bank suggests that it is more difficult for its employees to handle customer interactions about overdraft processing if there is more than one order of posting. The Bank concludes that standardization will simplify this task. This

**EXHIBIT 10**

5

would improve the service the Bank provides, thereby enhancing the competitive position of the Bank.

The Bank also has considered the impact that the high-to-low order of posting would have on the maintenance of the Bank's safety and soundness. The Bank states its belief that a high-to-low order of posting is consistent with the majority of its customers' preferences. The Bank surmises that the intended order, which will result in a customer's largest bills being paid first, will have the consequence of the customer's most important bills (such as mortgage payments) being paid first. The Bank thus concludes that a high-to-low order is aligned with the majority of its customers' priorities and preferences.[5]

Given the factors considered by the Bank noted above, we conclude that the Bank's process for deciding the order of check posting is consistent with the safety and soundness considerations set forth in section 7.4002(b) and that the Bank may therefore post checks in the order it desires pursuant to the authority vested in the Bank by section 7.4002(a) and section 24(Seventh) of the National Bank Act.[6]

Sincerely,

-signed-

Julie L. Williams
First Senior Deputy Comptroller and Chief Counsel

---

[5] While not required by any Federal law, specific disclosure of the chosen order of check posting minimizes customer confusion and helps to address assertions that a bank has acted unfairly.

[6] We note that the authority of the Bank and other national banks to charge fees is not conditioned on obtaining an individual confirming opinion, since national banks are authorized to charge non-interest fees and charges as an inherent element of their authority to conduct the business of banking.

**EXHIBIT 10**