

RICHARD D. MCCUNE, JR.
DAVID C. WRIGHT
KRISTY M. AREVALO
EDDIE JAE K. KIM
MICHELE M. VERCOSKI*

*Also Admitted in New Jersey & New York

August 22, 2008

*Via Electronic Filing
& Personally Delivery*

The Honorable William Alsup
United States District Court
Courtroom 9, 19th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

    Re:    Gutierrez v. Wells Fargo/Case No.: C-07-05923

Dear Judge Alsup:

### Purpose of the Letter Brief

    The Court requested a letter brief by the Defendant supporting the position that the regulations and advisory letters it relies upon were adopted pursuant to legislative authority. Defendant has now filed a letter brief reciting general Federal law on the OCC's authority to issue regulations. The Defendant then, goes on to essentially file a supplemental reply on the cases it contends support preemption under the facts presented in this case. Plaintiffs hereby submit their response.

### Were these Regulations "Legislative" Regulations?

    There is no question that the OCC has the authority to issues regulations within the scope of its authority. The OCC's authority to promulgate regulations, however, is irrelevant to the legislative branch adopting these regulations. Defendant has put forward no evidence that these three regulations (12 C.F.R. §§ 7.4002, 7.4007, and 7.4009) and certainly the advisory letters it relies upon were in fact approved by the legislation prior to enactment.

    Wells Fargo assertion that these OCC regulations had undergone a notice-and-comment process, (relying on Federal Register, Vol. 69) is a meaningless assertion. The notice-and-comment process is a nonbinding process that only gives members of the legislature and other interested parties, the right to comment on the proposed rule. It does not require any action on the part of the legislative branch for a regulation from the executive branch to go into effect. 5 U.S.C. § 553(c).[1]

2068 ORANGE TREE LANE
SUITE 216
REDLANDS, CA 92374

T: 909/557-1250
F: 909/557-1275

WWW.MWTRIALLAWYERS.COM

---

[1] "After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making process through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose."

August 22, 2008
Page -2-

The legislative response to these regulations made clear that the legislature did not approve these regulations prior to their enactment:

> As the Chairwoman of the Financial Services Committee on Oversight and Investigations, I wrote to the OCC on December 1, 2003 asking the agency to delay the rules being finalized until Congress can hold hearings to review the agency's proposal and signal our intent. *The OCC went ahead and finalized the rules without the necessary review.* This was an action that I believe demonstrates a lack of respect for Congress and for this committee.

(Congresswoman Sue Kelley, Congressional Review of OCC Preemption, January 28, 2004, Serial No. 108-65, at pp. 1-2, (emphasis added),[2] excerpts of which are attached hereto as Attachment "1.")

**Contrary to Defendant's Position taken in the Letter Brief, 12 C.F.R. §§ 7.4007 is Explicit that State Preemption does not Apply to Tort and Contract Claims**

As the Court knows, Plaintiff contends that Defendants practice of taking overdraft fees from customers on transactions that occurred on days when there is no overdraft, while at the same time representing to their customer that their was "available balance" to cover the transactions on that day, raises issues of misrepresentation, fraud and conversion. The very regulation that Defendant relies upon, 12 C.F.R. §§ 7.4007(c), explicitly exempts from Federal Preemption, State tort and contracts laws. Further, action taken by the OCC at the time to justify other issues of preemption makes clear that it was serious about not preempting State tort and contract claims. (OCC Quarterly Journal Vol. 23, No. 1, March 2004, at pp. 68, 89[3], excerpts of which is attached as attachment "2.") This same intention to save state laws on torts and contracts from preemption was emphasized in the very Federal Registrar that Wells Fargo cites to support its assertion that these regulations have undergone the notice-and-comment process. 69 Fed. Reg. 1905 (2004).

Defendants' cases cited in the letter brief do not invalidate the clear and express regulation, and are not on point for different reasons as discussed in depth in *Jefferson v. Chase Home Finance*, 2008 WL 1883484 (N.D. Cal., April 29, 2008). As made clear in *White v. Wachovia Bank, N.A.*, 2008 WL 2635640 (N.D.Ga., July 2, 2008), because State tort law apply

---

[2] The full 411 page transcript of the hearing is available at the House of Representatives website (http://house.gov) at: http://financialservices.house.gov/media/pdf/108-65.pdf.

[3] "*What types of state laws will* not *be preempted under the final rule?* The final rule also sets out examples of the types of state laws that are *not* preempted and would be applicable to national banks to the extent that they only incidentally affect the lending, deposit-taking, or other operations of national banks. These include laws on contracts ... and torts." (Italics and emphasis in original.) This volume of the Quarterly Journal may be accessed through OCC's website (http://www.occ.treas.gov) at: http://www.occ.treas.gov/qj/qj23-1/QJ23-1.pdf.

August 22, 2008
Page -3-

equally to all businesses, as opposed to State laws directed at regulating banks, preemption does not apply.

        Respectfully submitted,

        Very truly yours,

        McCUNE & WRIGHT

        Richard D. McCune

RDM:ams
Attachments as Stated

cc. Sonya Winner, Esq. (by electronic mail)

# CONGRESSIONAL REVIEW OF OCC PREEMPTION

# HEARING

BEFORE THE

SUBCOMMITTEE ON
OVERSIGHT AND INVESTIGATIONS

OF THE

COMMITTEE ON FINANCIAL SERVICES
U.S. HOUSE OF REPRESENTATIVES

ONE HUNDRED EIGHTH CONGRESS

FIRST SESSION

JANUARY 28, 2004

Printed for the use of the Committee on Financial Services

## Serial No. 108-65



ATTACHMENT 1

# CONGRESSIONAL REVIEW OF OCC PREEMPTION

---

### Wednesday, January 28, 2004

U.S. HOUSE OF REPRESENTATIVES,
SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS,
COMMITTEE ON FINANCIAL SERVICES,
*Washington, D.C.*

The subcommittee met, pursuant to call, at 10:10 a.m., in Room 2128, Rayburn House Office Building, Hon. Sue Kelly [chairwoman of the subcommittee] presiding.

Present: Representatives Kelly, Garrett, Murphy, Oxley (ex officio), Barrett, Gutierrez, Inslee, Moore, Crowley, Maloney, Davis, and Frank. Also present was Mr. Ney

Chairwoman KELLY. [Presiding.] The Subcommittee on Oversight and Investigations will come to order.

Today the Subcommittee on Oversight and Investigations will conduct a review of two regulations that were finalized earlier this month by the Office of the Comptroller of the Currency. The regulations preempt State laws that currently apply to national banks and they restrict the authority of States and other agencies to examine or take actions against these entities. When they take effect on February 12, these regulations will effectively prevent a State from determining and enforcing its own banking laws.

Preemption of any State law is an extremely serious issue, with significant consequences for all Americans. The preemption of state banking regulation is even more serious because it has critical implications for consumer protections and the overall dual banking system which has served our country very well for decades. A decision of this magnitude requires considerable review by Congress to ensure that consumer protections are not being undermined and that the balance of the dual banking system is not disrupted. The OCC is tasked with interpreting congressional intent. In terms of these regulations, the intent of Congress is unclear.

The correspondence of several dozen Members of Congress from both sides of the aisle, however, demonstrates that Congress has many unanswered questions and concerns that need to be thoroughly reviewed before these changes are implemented. As the Chairwoman of the Financial Services Committee on Oversight and Investigations, I wrote to the OCC on December 1, 2003 asking the agency to delay the rules being finalized until Congress can hold hearings to review the agency's proposal and signal our intent. The OCC went ahead and finalized the rules without the necessary review. This was an action that I believe demonstrates a lack of respect for Congress and for this committee.

(1)

2

I am concerned that an agency tasked with interpreting the laws passed by Congress has strayed from its obligation to protect consumers. The OCC is supposed to be an independent agency. Its actions have led many of us to question whether or not they are also independent of the people's best interests. Unfortunately, this is not the first time that Congress has had difficulty working with the OCC, which indicates to me that there may be a larger systemic problem at that agency. Congress must and will take all necessary steps to ensure that the interests of the American people come first, even if it means a culture of change at the OCC.

The American people expect and deserve real leadership and accountability when an action which could potentially jeopardize crucial consumer protections goes forward. We are going to see to it that consumers get these assurances. It may have been the agency's decision to move forward without congressional review, but this committee's ability to protect consumers and to provide oversight will not be inhibited.

We will begin the investigation today, and it will continue until all questions are answered, and the committee determines an appropriate course of action. I have personally spoken with Comptroller Hawke and he has promised to testify before the committee when he returns from his medical leave. I have also asked Mr. Hawke to take the necessary steps to delay the implementation of these regulations until we complete our review. The Comptroller of the Currency is a Presidential appointed and Senate confirmed position, and these regulations should not be implemented without a direct explanation from the Comptroller himself.

This request presents the OCC with a tremendous opportunity to display to Congress and the consumers that this is an agency that takes the review seriously and is willing to address concerns with the regulations. In terms of the substance of these new regulations, my colleagues and I hope many questions can be answered today. I recognize that we live in a different world today, with an advanced financial services sector in which companies utilize technology and other resources to offer better and less costly products and services.

In principle, I also understand that there is need for more uniformity in regulation, and that we need to investigate whether a patchwork of laws may impede progress that is beneficial to consumers. In fact, this committee has held several hearings on reforms in insurance and securities regulation, with the intent that changes could be made by Congress through a legislative process. However, for a regulator to single-handedly preempt a State's ability to both determine and enforce laws without public debate or explicit direction from Congress is not only troublesome, but I believe it is careless. The American people deserve better. The American people deserve a voice in these decisions.

I am certain that many Members have questions today specifically on the issue of predatory lending. While this is one of the significant laws preempted, I caution that we not focus solely on this issue. Given the overreaching nature of these regulations, which appears to be much larger than just this one issue, I hope my colleagues in the Subcommittee on Housing and Financial Institutions

ATTACHMENT 1

3

will continue their own investigations into predatory lending to address these specific concerns.

I want to remind Members this hearing is to collect facts to see if Congress needs to further clarify its intent to the OCC. As usual, the committee's 5-minute rule will be observed, and I ask staff to remind their Members of that if the Members are not here at this time. I would like to thank the witnesses for their attendance here today, and I look forward to working with you on these important issues.

The Chair notes the presence of Members of the full committee and welcomes all of you. I ask unanimous consent that all Members present today will have their statements, questions and the answers to those questions included in the record. Without objection, so ordered.

One of our first opening statements will come from my Ranking Member, Mr. Gutierrez.

[The prepared statement of Hon. Sue W. Kelly can be found on page 52 in the appendix.]

Mr. GUTIERREZ. Thank you very much, Madam Chair, for holding this timely hearing. These rules were issued on January 7 before we returned from recess. I commend you for arranging this meeting as quickly as you have.

I share a number of your procedural and substantive concerns about the OCC's proposed rules. As most of us are aware, Federal preemption occurs in one of three ways: Congress expressly preempts State law; Congress establishes a framework of regulation that occupies the field and leaves no room for much state action or any state action; or State law conflicts with Federal law. For as long as I have served here, and for sometime before that, it has been clearly the intent of Congress that State laws should apply to national banks in a number of areas, including consumer protection and fair lending, unless Congress expressly preempts those State laws.

Congress never intended the OCC to preempt the field of lending. In response to the OCC's overreaching in the past, the Riegle-Neal interstate banking law sought to clarify the limits of the OCC's authority and establish certain notice and comment procedures to be observed on the rare occasion when State laws impede the ability of national banks to conduct the business assigned to them by Congress. The OCC's standard of "obstruct, impair or condition," articulated in this rule is a major departure from congressional intent and established precedent, inconsistent with some of the OCC's previously articulated preemption positions and at the very least of fair-weather Federalism.

State legislatures have long functioned as incubators of innovation because they have been able to act quickly and creatively to respond to changes locally in the marketplace. Frequently, their excellent product proves its merit beyond its borders and becomes the basis for a change in Federal law. I am deeply troubled that the OCC's action could stifle this innovation. In other instances, State law improves upon Federal laws. In fact, a number of laws written by this committee indicate that State laws are not inconsistent with Federal laws if they provide greater protection to consumers. If the consumer does better at a State level, this committee and

# Special Interest—On Preemption and Visitorial Powers

SPECIAL INTEREST—ON PREEMPTION AND VISITORIAL POWERS

tion and transfer of property, and taxation, zoning, criminal, and tort law."[6] Application of these laws to national banks and their implementation by state authorities typically does not affect the content or extent of the federally authorized business of banking conducted by national banks, but rather establishes the legal infrastructure that surrounds and supports the ability of national banks—and others—to do business.[7] In other words, these state laws provide a framework for a national bank's ability to exercise powers granted under federal law; they do not obstruct or condition a national bank's exercise of those powers.[8]

The argument that the proposed amendments generally amount to an impermissible "field preemption" is also misplaced. First, the regulatory proposal and the final regulation would not have the effect of preempting substantive state laws, but rather would clarify the appropriate agency for enforcing those state laws that are applicable to national banks. Concerns about "field preemption" are misplaced since the rule pertains only to state laws that would provide for state "visitation" of national banks. The proposal and this final rule interpret the text of a federal statute, 12 USC 484, that expressly confines the scope of permissible supervision over national banks to what is provided in federal law, including the limited exception for state inspection of certain records that is contained in section 484. Thus, Congress has spoken to the issue. Our amendments to our visitorial powers rule seek to define the terms used in the statute in order to provide greater certainty to affected parties with regard to the specific issue of visitation.

### 2. No presumption against preemption applies in the case of the national banking laws, a conclusion that is confirmed by the Riegle–Neal Act.

Commenters also argued that the amendments in the proposal are inconsistent with the presumptive application of state law to national banks, which they assert was specifically endorsed by Congress in the Riegle–Neal Act.[9]

However, case law, whether decided before or after Riegle–Neal was enacted, is consistent in holding that there is no presumption against preemption in the national bank context. The Su-

---

[6] *Bank of America v. City & County of San Francisco*, 309 F.3d 551, 559 (9th Cir. 2002).

[7] The OCC is publishing in the *Federal Register* today a final rule amending parts 7 and 34 of the OCC's regulations to clarify that these state "infrastructure" statutes would generally not be preempted by federal law.

[8] *See Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 33–34 (1996).

[9] Commenters rely on the legislative history of the Riegle–Neal Act as support for their assertions. This history demonstrates that Congress intended that the Riegle–Neal Act would *not* disrupt the application of traditional principles of federal preemption to questions involving national banks. We note, however, that under well-established principles of statutory construction, it is not necessary to resort to legislative history to determine the meaning of a statute unless the text of the statute is ambiguous, which is not the case here. *See, e.g., Burlington Northern R.R. Co. v. Oklahoma Tax Commission*, 481 U.S. 454, 461 (1987) (unless there are exceptional circumstances, judicial inquiry into the meaning of a statute is complete once the court finds that the terms of the statute are unambiguous.) (citation omitted); *see also* 2A Norman J. Singer, Sutherland, *Statutes and Statutory Construction* § 48.01, at 410 (6th ed. 2000) ("Generally, a court would look to the legislative history for guidance when the enacted text was capable of two reasonable readings or when no one path of meaning was clearly indicated.").

ATTACHMENT 2

SPECIAL INTEREST—ON PREEMPTION AND VISITORIAL POWERS

terms of credit, permissible rates of interest, escrow accounts, and disclosure and advertising. For deposit-taking (in addition to laws dealing with disclosure requirements and licensing and registration requirements), they include laws that address abandoned and dormant accounts, checking accounts, and funds availability. These lists reflect OCC opinions, court decisions, comparable rules applicable to federal thrifts, and the application of traditional, judicially recognized standards of preemption. These lists are not intended to be exhaustive—the OCC may identify, and address on a case-by-case basis, other types of state laws that are preempted.

In addition, with regard to bank operations, the final rule states that except where made applicable by federal law, state laws that obstruct, impair, or condition a national bank's exercise of powers granted under federal law do not apply to national banks. This provision applies to any national bank power or aspect of a national bank's powers that is not covered by another OCC regulation specifically addressing the applicability of state law.

### What types of state laws will not be preempted under the final rule?

The final rule also sets out examples of the types of state laws that are *not* preempted and would be applicable to national banks to the extent that they only incidentally affect the lending, deposit-taking, or other operations of national banks. These include laws on contracts, rights to collect debts, acquisition and transfer of property, taxation, zoning, crimes, and torts. In addition, any other law that the OCC determines to only incidentally affect national banks' lending, deposit-taking, or other operations would not be preempted under the final rule.

### What changes have been made in the final rule that differ from the proposal?

The final rule makes several changes to the anti-predatory-lending standard. First, the final rule revises the anti-predatory-lending standard so that it expressly prohibits national banks from engaging in unfair and deceptive trade practices under Section 5 of the Federal Trade Commission (FTC) Act in making any loans. In addition, the final rule revises the anti-predatory-lending standard to clarify that it applies to consumer loans only (those for personal, family, and household purposes). Finally, it clarifies that the anti-predatory-lending standard is not intended to prohibit legitimate collateral-based loans, such as reverse mortgages, where the borrower understands that it is likely or expected that the collateral will be used to repay the debt.

The final rule states that except where made applicable by federal law, state laws that "obstruct, impair, or condition" a national bank's exercise of powers granted under federal law do not apply to national banks. These terms, which are drawn directly from Supreme Court precedents, differ somewhat from the wording in the proposal, but the substantive effect—which is to encapsulate the preemption standards used by the Supreme Court—is the same.

The lists of the types of state laws that are and are not preempted in the final rule are substantially the same as the lists in the proposal.

ATTACHMENT 2