**United States District Court**
For the Northern District of California

1

2

3

4

5

6              IN THE UNITED STATES DISTRICT COURT

7              FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9

10   VERONICA GUTIERREZ, ERIN WALKER            No. C 07-05923 WHA
     and WILLIAM SMITH, as individuals and on
11   behalf of all others similarly situated,

12               Plaintiffs,                        **ORDER DENYING
                                                    DEFENDANT'S MOTION
13        v.                                        FOR SUMMARY JUDGMENT
                                                    AND GRANTING IN PART
14   WELLS FARGO BANK, N.A., and DOES 1            AND DENYING IN PART
     through 125,                                   PLAINTIFFS' MOTION FOR
15                                                  CLASS CERTIFICATION
                 Defendants.
16   _____/

17

18                        **INTRODUCTION**

19        This action challenges the practice of Wells Fargo Bank, N.A., to post multiple daily

20   debits against a checking account in a revised sequence that maximizes overdraft penalties

21   against the customer rather than in the actual sequence in which the charges were incurred,

22   among other alleged practices.  Defendant Wells Fargo, N.A., now moves for summary

23   judgment on a federal preemption defense and plaintiffs move for class certification.  For the

24   reasons stated below, defendant's preemption motion is **DENIED** and plaintiffs' certification

25   motion is **GRANTED IN PART AND DENIED IN PART**.

26                        **STATEMENT**

27        Wells Fargo Bank, N.A., is one of the nation's largest banks and financial institutions.

28   In conjunction with its banking services, Wells Fargo issues debit cards to checking-account

**United States District Court**
For the Northern District of California

1    customers.  Such a card allows a customer electronic access to his or her checking-account

2    funds when the card is used to pay a bill or make a purchase from a merchant.  As with a check,

3    when a customer uses a debit card, the transaction typically does not settle immediately

4    (Zimmerman Decl. ¶ 11).  Rather, an authorization query is first sent from the merchant.

5    Authorization queries typically include the number of the debit card being used and the

6    amount for which authorization is sought.  Upon receipt of an authorization query, Wells Fargo

7    conducts a series of verification steps to determine if sufficient funds are available.  If the

8    verification process is approved — *i.e.*, there appears to be sufficient funds in the account —

9    Wells Fargo sends an authorization back to the merchant.  But authorization queries are

10   sometimes incomplete.  For example, when a debit card is used at a gas station, the

11   authorization query is frequently for only one dollar because the total amount of the transaction

12   is still unknown.  A merchant may then later send notice to Wells Fargo of the final transaction

13   amount to settle the transaction.  Accordingly, Wells Fargo may not be able to fully settle a

14   transaction until the merchant sends its final notice.

15        "Available balance" information is at center stage in this litigation.  Every Wells Fargo

16   customer, of course, receives a monthly account statement that includes information regarding

17   all the transactions that took place during the month, the beginning account balance, and the

18   ending account balance.  Customers who sign up for online banking, however, have access to

19   more up-to-date information regarding their accounts.  These customers can access their

20   account online at anytime to view their most recent account activity, pending transactions,

21   and Wells Fargo's current calculation of the "available balance" in the account.  As defined by

22   Wells Fargo on its website, "available balance" means (McCune Decl. ¶ 8):

23        The most current picture of funds you have available for
          withdrawal.  It reflects the latest balance based on transactions
24        recorded to your account today including deposited funds, paid
          checks, withdrawals and point-of-sale purchases.  (Please note that
25        some transaction activity may not be immediately recorded to your
          account and will then not be reflected in the available balance.
26        The first $100 of ATM deposits will be included the same day in
          your available balance; the remaining funds will be added as items
27        are processed and any holds are removed.  Availability of branch
          deposits may vary; complete details on funds availability are
28        reflected in our Funds Availability Policy.)

2

**United States District Court**
For the Northern District of California

1    One of the advantages of using a debit card for a transaction (as opposed to a normal check)

2    is that the transaction is typically recorded much faster in the available-balance information.

3    A customer may also check the available-balance information by calling into Wells Fargo's

4    toll-free number or by visiting a branch store.

5    An "overdraft" occurs when a debit is posted for which there is insufficient money in the

6    account. If the bank determines that an overdraft has occurred, it must first decide whether or

7    not to pay the item or return it for insufficient funds. If the bank decides to pay the overdraft

8    transaction, an overdraft fee is typically assessed. Such a fee is charged each time a transaction

9    is posted that results in an overdraft. (If the item is rejected, a non-sufficient funds fee is

10   typically assessed.) A customer may link a separate account, such as a savings account, to

11   provide for overdraft protection when the customer's main account does not have sufficient

12   funds to settle the transaction.

13   When an account is opened with Wells Fargo, the customer receives a copy of a

14   standardized Consumer Account Agreement. That lengthy agreement contains the following

15   language (Zimmerman Exh. A at 26):

16   **Overdraft and Insufficient Funds**. The Bank may, as its option,
     pay or refuse to pay any Item if it would create an overdraft on

17   your Account, without regard to whether the Bank may have
     previously established a pattern of honoring or dishonoring such

18   an Item. The Bank may take the following actions if the Bank
     receives an Item (including an ATM or POS Item) drawn against

19   your Account and there are insufficient available funds in your
     Account to cover the Item without prior notice to you:

20
     **Cover the Item** in accordance with the terms of any
21   written overdraft protection plan that you and the Bank
     have established.
22
     **Pay the Item** and create an overdraft to your Account.
23
     **Return the Item**. The bank may return the Item . . . if the
24   Item would create an Overdraft on your Account.

25   At pages 23 and 49 is the following (emphasis added):

26   When a Transaction is Posted. The time required to debit or credit
     your Account after the Card is used will depend on the location of
27   the ATM or [merchant] and the type of transaction.

28                           *              *              *

3

**United States District Court**
For the Northern District of California

> **Order of Posting**. The Bank may post items presented against the Account in any order the Bank chooses, *unless the laws governing your Account either requires or prohibits a particular order*. For example, the Bank *may*, if it chooses, post items in the order of the highest dollar amount to the lowest dollar amount. The Bank may change the order of posting items to the Account at any time without notice. If more than one item is presented to the Bank for payment on a day the Bank determines there are sufficient funds to pay one or more but not all of the items, the number of items paid and the overdraft and returned item fees assessed may be affected by the order the Bank chooses to pay those items. . . . For example, if the Bank pays items in the order of highest to lowest dollar amount, the total number of overdraft and returned item fees you are charged may be larger than if the bank were to pay the items in the order of lowest to highest dollar amount.

Customers are also given the fee schedule for bank services (including overdraft fees) when they sign up for an account.

This action challenges two bank practices that penalize customers. The first is the bank's practice of re-sequencing multiple daily posting of debits *from largest to smallest* so as to use up the account as fast as possible and thus impose as many overdraft fees as possible. The second is the practice of first including a debit to lower the available balance and reversing out the debit approximately three days later only to post it yet again when the item arrives for final payment. The intermediate step of reversing out the item is said to mislead customers into believing they have more to spend than is the case and thus to induce overdraft penalties.

                    *          *          *

Plaintiffs Veronica Gutierrez, William Smith, and Erin Walker were each customers of Wells Fargo during the relevant limitations period. Gutierrez opened a checking account in October 2002 when she was eighteen. She also opened a savings account for overdraft protection. According to Gutierrez, she would regularly check her statements to make sure they were in line with her own records of her transactions, but she had difficulty because her records often did not match the balance given to her by Wells Fargo. She also frequently checked her available-balance information online, at local branch stores, or when she withdrew money at an ATM. For four years, she maintained her account without incurring any overdraft fees. On October 5, 2006, her available balance indicated she had more than $300. That same day, she made five debit card purchases totaling $87.79. Each of these transactions was authorized

4

United States District Court

For the Northern District of California

by Wells Fargo. She then made three debit card purchases totaling $58.61 on October 6, leaving her, she thought, with a balance of over one hundred dollars. Then, on October 10, a check Gutierrez had written but forgotten about was presented along with the debit items between October 5 and 10. Even granting that the check should be deducted first, only one penalty would have been incurred had the bank debited the purchases in the order actually made. By reversing and altering the order, Wells Fargo deducted the larger items first, using up the account faster, and thus generated four overdraft penalties. In other words, Wells Fargo was able to assess four overdraft charges when only a single overdraft had actually occurred. *Significantly, Wells Fargo acknowledges that its practice is to post items presented for final settlement in a sequence that will maximize the number of overdrafts and thereby penalize customers to the maximum extent possible*.[1]

Turning to the second practice, plaintiff William Smith was a Wells Fargo customer since the early 1990s. He had five separate accounts for both his business and his individual needs. The account in question was opened in 1999. After he enrolled in online banking, Smith maintains that he monitored daily his available-balance information online. On July 3, 2007, Smith contends his available balance showed was roughly three hundred dollars. He then spent $68.65 on fireworks using his debit card. The transaction, according to Smith, was posted shortly thereafter as a pending transaction online and deducted from his available balance. On July 12, he checked his available balance online and noted that he had about fifty dollars. At the time, he thought that all of his debit card transactions had already posted to his account and were accurately reflected in his available-balance information. He then purchased groceries for $24.76. *Smith was unaware that Wells Fargo had removed the fireworks transaction from his available balance appearing online and thus thought he had more money available than was really the case*. The online number indicated Smith had fifty dollars but his actual account balance was really a negative number because the fireworks purchase was deleted three days after it posted. Smith was then charged two overdraft charges: one for the groceries charge and

---

[1] Gutierrez does not have a specific recollection of checking her available-balance information between October 5–10, but she claims it was her regular practice to do so and that she was likely to have thought the debit transactions during that time-frame were within her available account balance.

1   one for the fireworks charge.  Wells Fargo admits that it reverses "holds" after three business

2   days: (Zimmerman Decl. ¶ 16):

>   For most signature-based transactions, the Bank's policy is to keep
>   the memo hold in place until the earlier of (1) receipt and posting
>   of the final settlement information for the transaction or (2) three
>   business days.  The Bank must limit a memo hold to three business
>   days to comply with VISA rules, which recognize that after three
>   business days there is an increased possibility that either (a) the
>   transaction will never be submitted for settlement or (b) the
>   transaction has been submitted and posted but has not "matched"
>   with the memo hold (for example, because of a difference in the
>   final transaction amount).  For transactions less than $5, the memo
>   hold will be kept in place for one business day.

9   Wells Fargo, however, does not disclose this practice to its customers.  Smith claims that had he

10  known the fireworks transaction was no longer reflected in his available balance he would have

11  transferred additional funds into his account to ensure he had sufficient funds for his groceries

12  purchase.

13          Plaintiff Erin Walker was seventeen when she opened her account with Wells Fargo.

14  She chose Wells Fargo because there were several Wells Fargo ATMs at the school she would

15  be attending for college.  Her mother was a co-signor on the account.  After receiving several

16  account statements and finding the information contained therein confusing, Walker began using

17  the available-balance information shown online.  She also regularly checked her available

18  balance after withdrawing money from an ATM.  She then mentally deducted her debit

19  transactions from her available balance to make sure she had sufficient funds for transactions.

20  On May 29, 2007, Walker made a purchase using her debit card which she thought was within

21  her available-balance information as of that date.  She then made several more debit card

22  transactions over the next week, each of which was approved by Wells Fargo.  On June 5,

23  Walker was charged eight overdraft fees (each $34) for all debit transactions occurring from

24  May 29 to June 4.  On Walker's account statement, the transactions for that period are all listed

25  as occurring on June 4 from the highest amount to the lowest amount (as opposed to

26  chronological order).

27          Smith and Walker testified that they did not read any of the lengthy disclosures

28  contained in the CAA discussed above or the definition for available balance published online.

United States District Court

For the Northern District of California

Gutierrez testified to having only read the available-balance definition online and other non-pertinent sections of the CAA.

*         *         *

Plaintiffs filed their complaint on November 21, 2007, alleging Wells Fargo had improperly assessed customers overdraft charges for insufficient funds on debit card transactions when there were sufficient funds in the accounts at the time of the transactions (Compl. ¶ 3). Defendant is also alleged to have published inaccurate "available-balance" information thereby increasing the likelihood that overdraft charges would be applied to customers.

Pre-certification, Wells Fargo now moves for summary judgement on the grounds that plaintiffs' claims are preempted by the National Bank Act, 12 U.S.C. 24, and that each representative plaintiff lacks standing to bring suit. For their part, plaintiffs move for class certification.

**ANALYSIS**

**1.    SUMMARY JUDGMENT.**

Summary judgment is granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FRCP 56(c). A district court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there is any genuine issue of material fact. *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 873 (9th Cir. 2007). A genuine issue of fact is one that could reasonably be resolved based on the factual record in favor of either party. A dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).[2]

The moving party "has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F. 3d 1099, 1102 (9th Cir. 2000). When the moving party meets its initial burden, the burden then shifts to the party opposing judgment to "go beyond the pleadings and by [its]

---

[2] Unless indicated otherwise, internal citations are omitted from all quoted authorities.

7

own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## A.     Preemption.

Wells Fargo is a national bank under the National Bank Act.  National banks are "instrumentalit[ies] of the federal government, created for a public purpose, and . . . subject to the paramount authority of the United States."  *Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299, 308 (1978).  As such, the Supreme Court has "repeatedly made clear that federal control shields national banking from unduly burdensome and duplicative state regulation."  "States are permitted to regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank's or the national bank regulator's exercise of its federal powers.  But when state prescriptions significantly impair the exercise of authority, enumerated or incidental under the Act, the state's regulations must give way."  *Watters v. Wachovia Bank, N.A.*, 127 S.Ct. 1559, 1567 (2007).

The Act, 12 U.S.C. 24 (Seventh), confers upon national banks the authority (emphasis added):

> To exercise . . . all such *incidental powers* as shall be necessary to carry on the *business of banking*; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes . . . .

The term "business of banking" extends beyond those events specifically enumerated by the Act. *See NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 258 n.2 (1995).  Congress has delegated to the Office of the Comptroller of the Currency specific rulemaking powers, including the power to issue legislative rules preempting state law. 12 U.S.C. 43 states in relevant part:

> (a)  Notice and opportunity for comment required.
> Before issuing any opinion letter or interpretive rule, in response to a request or upon the agency's own motion, that concludes that Federal law preempts the application to a national bank of any State law regarding community reinvestment, consumer protection, fair lending . . . the appropriate Federal banking agency (as defined in section 1813 of this title) shall —

8

> (1)  publish in the Federal Register notice of the preemption or discrimination issue that the agency is considering (including a description of each State law at issue);
>
> (2)  give interested parties not less than 30 days in which to submit written comments; and
>
> (3)  in developing the final opinion letter or interpretive rule issued by the agency, or making any determination under section 36(f)(1)(A)(ii) of this title, consider any comments received.

Accordingly, the OCC may authorize additional banking activities beyond those expressly enumerated so long as they are a reasonable interpretation of 12 U.S.C. 24 (Seventh). This means the incidental powers of a bank are not limited to only those that are necessary to the business of conducting banking, but extends to those that are closely related to and useful to the business of banking. *See Bank of America v. City and County of San Francisco*, 309 F.3d 551, 562 (9th Cir. 2002).

Pursuant to the procedure set forth under 12 U.S.C. 43, the OCC issued 12 C.F.R. 7.4007 and 12 C.F.R. 7.4002.  Under 12 C.F.R. 7.4007(b):

> (1)  Except where made applicable by Federal law, state laws that obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized deposit-taking powers are not applicable to national banks.
>
> (2)  A national bank may exercise its deposit-taking powers without regard to state law limitations concerning:
>
> > (i)  Abandoned and dormant accounts;
> >
> > (ii)  Checking accounts;
> >
> > (iii)  Disclosure requirements;
> >
> > (iv)  Funds availability;
> >
> > (v)  Savings account orders of withdrawal;
> >
> > (vi)  State licensing or registration requirements (except for purposes of service of process); and
> >
> > (vii)  Special purpose savings services;

But 12 C.F.R. 7.4007 goes on to state:

> (c)  State laws that are not preempted.  State laws on the following subjects are not inconsistent with the deposit-taking powers of

9

United States District Court

For the Northern District of California

> national banks and apply to national banks to the extent that they only *incidentally affect* the exercise of national banks' deposit-taking powers:
>
> > (1) *Contracts;*
> >
> > (2) *Torts*;
> >
> > (3) Criminal law;

12 C.F.R 7.4002 also expressly authorizes imposition of fees and charges by a national bank to its customers:

> A national bank may charge its customers non-interest charges and fees, including deposit account service charges.

It then goes on to list a set of considerations that should be used to determine whether any charge or fee is appropriate. The regulation later emphasizes that "[t]he OCC applies preemption principles derived from the United States Constitution, as interpreted through judicial precedent, when determining whether State laws apply that purport to limit or prohibit charges and fees described in this section." 12 C.F.R 7.4002(d).

### B.     The Record Does Not Support Preemption.

Federal preemption is invoked by Wells Fargo to immunize its overdraft practices from judicial scrutiny. To make it fit the preemption mold, Wells Fargo contends that plaintiffs are fundamentally challenging Wells Fargo's core policy of imposing overdraft charges when an account has insufficient funds. Plaintiffs reply that they do not challenge that policy at all. Rather, this action challenges two specific practices that allow Wells Fargo to multiply the number of overdraft penalties.

Although no specific regulation expressly addresses the use of overdraft fees, the OCC has recently issued an advisory letter on the topic which is heavily relied on by Wells Fargo. That letter recites (emphasis added):

> The process by which a bank honors overdraft items is typically part of the Bank's administration of a depositor's account. Creating and recovering overdrafts have long been recognized as elements of the discretionary deposit account services that banks provide. *Where a customer creates debits on his or her account for amounts in excess of the funds available in that account, a bank may elect to honor the overdraft and then recover the overdraft amount as part of its posting of items and clearing of the*

1

*depositor's account.* These activities are part of or incidental to the business of receiving deposits.

2

3

A bank's authority to provide products or services to its customers necessarily encompasses the ability to charge a fee for the product or service.

4

OCC Interp. Letter No. 1083 at 3 (2007). This letter does not have the full force of law. It is

5

merely interpretive rather than legislative. At all events, the letter does not address the specific

6

practices here challenged. Preemption would likely apply if a customer were challenging a

7

bank's fundamental right to employ an overdraft fee at all. But here, the issue is whether

8

Wells Fargo has been manipulating — indeed downright altering — customers' transaction

9

records so as to maximize overdraft penalties imposed on customers.

10

From the viewpoint of customers, the facts must seem particularly alarming.

11

Wells Fargo's business strategy is to maximize overdraft penalty revenue at their expense

12

by sequencing debits so as to use up the available balance as quickly as possible and thus

13

artificially increase the number of overdrafts. Gutierrez's own facts illustrate the problem.

14

Gutierrez made seven debit card purchases from October 5 to October 7. On October 5, she

15

made four purchases for $3.23, $11.27, $17.23, and $47.99 respectively. On October 6, she

16

made two purchases for $8.10 and $26.51 respectively. And on October 7, she made a purchase

17

for $74.39. These transactions were all initially authorized but the merchants did not send in

18

their notices to finally settle the transactions until October 10. That same day, October 10, a

19

check Gutierrez had written for $65 (but forgotten about) was presented to Wells Fargo.

20

Before any of the transactions were posted for October 10, Gutierrez had $230.13 in her account.

21

*Wells Fargo then reordered all of the transactions (including the written check) so that they*

22

*would post from highest to lowest.* The running balance appeared as follows:

23

24

| Date of Transaction | Transaction Amount | Running Balance |
|---|---|---|
| October 7 | -74.39 | 155.74 |
| Check | -65.00 | 90.74 |
| October 5 | -47.99 | 42.75 |
| October 6 | -26.51 | 16.24 |

25

26

27

28

**United States District Court**
For the Northern District of California

11

| | | |
|---|---|---|
| October 5 | -17.23 | -0.99 |
| October 5 | -11.27 | -12.26 |
| October 6 | -8.10 | -20.36 |
| October 5 | -3.23 | -23.59 |

*Wells Fargo was thus able to charge four overdraft fees on the account.* Had Wells Fargo posted them as they occurred chronologically, the running balance would have appeared as follows, even if the check was listed first.[3]

| Date of Transaction | Transaction Amount | Running Balance |
|---|---|---|
| Check | -65.00 | 165.13 |
| October 5 | -47.99 | 117.14 |
| October 5 | -17.23 | 99.91 |
| October 5 | 11.27 | 88.64 |
| October 5 | -3.23 | 85.41 |
| October 6 | 26.51 | 58.90 |
| October 6 | -8.10 | 50.80 |
| October 7 | -74.39 | -23.59 |

No matter when the check was posted, had the other items been posted chronologically, Gutierrez would have only been charged *one* overdraft fee as opposed to the *four* she was charged under Wells Fargo's challenged practice. Again, this holds true even if Wells Fargo was free to debit the check off the top.

    If a customer has twenty dollars in his account and then has four transactions for two, five, ten, and twenty dollars, in that order, the customer should arguably only have to pay one overdraft fee because he or she had sufficient funds for the first three transactions (*i.e.*, 20 - 2 - 5 - 10 = 3). *But when the sequence is altered so as to debit the highest amount first, the customer ends up paying three overdraft fees, not one.* It appears that Well Fargo routinely waits until the end of the business day and then posts the items received for settlement that day in an artificial sequence that will maximize its penalty revenue at the expense of the customer rather

---

[3] Because it is impossible for Wells Fargo to know when a check was written, this order will assume that Wells Fargo can post a check transaction in any order it wishes on the day of settlement.

United States District Court
For the Northern District of California

than in the sequence most generous to the customer or in the chronological sequence the items were actually incurred (which true sequence is known to the bank).  It is alleged that this predatory practice violates California law.

*          *          *

Smith and Walker's claims are based on the allegedly inaccurate "available balance" information Wells Fargo disseminates to its customers.  More specifically, Wells Fargo has a practice whereby certain items are at first reflected in a customer's available-balance information (to thus lower the balance) but then deleted (to increase the balance), misleading customers into overestimating their account balance and inducing them to incur overdraft penalties. For example, Smith purchased fireworks using his debit card on July 3, 2007, for $68.85. He noted shortly thereafter that the transaction appeared as pending and had been subtracted from his available-balance information online.  Without notice, the bank then removed the item from his balance a few days later, increasing the apparent available balance. This was done on or about July 6 or 7.  On July 12, he checked his online available balance and noted that it had roughly fifty dollars.  That same day he purchased groceries for $24.76, *not knowing that the available-balance information no longer reflected the fireworks purchase*.  When the fireworks purchase finally settled and was posted, Smith was charged two overdraft fees:  one for the fireworks and one for the groceries.  Smith would have transferred additional funds into his account to cover the purchases had he known that the fireworks transaction had been deleted. That is, he relied on the fifty-dollar available balance in purchasing the groceries only to learn later that the fifty dollar balance was inaccurate.

To be clear, the only viable claim concerning the available-balance information concerns Wells Fargo's practice of including but then deleting transactions without adequate notice. The mere fact that the available balance appearing online or at an ATM is sometimes not fully accurate is not, by itself, enough to state a claim.  One reason is that the bank has no way of knowing the extent of unpresented checks and the extent of debit transactions that will turn out

13

United States District Court

For the Northern District of California

1    to be more than what was initially authorized.  The definition published online for "available

2    balance" itself states:

3            (Please note that some transaction activity may not be immediately
             recorded to your account and will then not be reflected in the
4            available balance . . . .)

5    Therefore, with respect to the available-balance information, only plaintiffs' claims as related to

6    Wells Fargo's practice of including items and then deleting them without adequate notice,

7    thereby deceiving customers into thinking they have a larger balance and inducing them to go

8    into overdraft situations, will move forward.

9                                *            *            *

10           This order holds that on this record, preemption has not been established.  *First*, nothing

11   in 12 C.F.R. 7.4007 or 12 C.F.R. 7.4002 expressly preempts plaintiffs' state-law claims.  In fact,

12   12 C.F.R. 7.4007 expressly recites that state-law claims based on contracts, torts, or criminal law

13   are *not* preempted as long as they are not inconsistent with and only incidentally affect federally

14   authorized deposit-taking powers (emphasis added):

15           (c)  State laws that are not preempted.  State laws on the following
             subjects are not inconsistent with the deposit-taking powers of
16           national banks and apply to national banks to the extent that they
             only *incidentally affect* the exercise of national banks'
17           deposit-taking powers:

18                   (1)  *Contracts;*

19                   (2)  *Torts*;

20                   (3)  Criminal law;

21   In addition, while 12 C.F.R. 7.4002 does authorize national banks to issue fees and charges on

22   customer accounts, nowhere does it remotely suggest that the specific practices described herein

23   are authorized.

24           Significantly, Wells Fargo's motion makes no attempt to even address the substantive

25   state laws at issue.  The record sheds no light on the state laws in question and whether such laws

26   only incidentally affect federal-banking law.  Wells Fargo must be deemed to concede, at least

27   for purposes of this motion, that the asserted state laws have in fact been violated.  In that case,

28

**United States District Court**
For the Northern District of California

1    however, Wells Fargo must face its own contract language.  To return to the Consumer Account

2    Agreement (Zimmerman Exh. A at 23) (emphasis added):

> **Order of Posting**.  The Bank may post items presented against the
> Account in any order the Bank chooses, *unless the laws governing*
> *your Account either requires or prohibits a particular order.*
> For example, the Bank *may*, if it chooses, post items in the order of
> the highest dollar amount to the lowest dollar amount.

6    Thus, the bank's own standardized form agreement underscores that any reordering of items *is*

7    *subject to governing law* — not federal law but "the laws governing your Account."  Wells

8    Fargo cannot concede that its practices violate state law but escape accountability under the veil

9    of preemption when its own contract language states that the very practices will be subject to

10    governing law.  The governing law on bank deposits is normally state law, such as the Uniform

11    Commercial Code and state contract law.  *See Perdue v. Crocker National Bank*, 38 Cal.3d 913,

12    932, 943–44 (1985), *appeal dismissed*, 475 U.S. 1001 (1986).[4]

13            *Second*, the disclosure quoted above is arguably inadequate.  It is buried deep within the

14    lengthy statement.  It only says the bank *might* post items presented against the account in any

15    order the bank chooses (unless the law requires otherwise).  It uses the word "may" rather than

16    "will," leading the customers to believe, in the context of the statement, that reordering is not

17    automatic but merely an exception — whereas reordering is a secret daily routine aimed solely

18    at maximizing penalty revenue for the bank at the expense of the customer.

19            Turning to the deletion of previously authorized items, there is no disclosure at all.

20    It seems likely that this practice will regularly mislead customers into overdraft situations (and

---

[4]  In a footnote on page twenty of its brief, Wells Fargo does state that "causation of injury is a required
element for each of plaintiffs' six claims."  Otherwise, its brief ignores all state-law questions.  Wells Fargo
argues that there is a presumption of preemption in the field of federal regulation of national banks.  For
support, Wells Fargo cites to *Barnett Bank of Marion County, N.A. v. Nelson*, 512 U.S. 25, 32 (1996)
("That history is one of interpreting grants of both enumerated and incidental 'powers' to national banks as
grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law") and *Watters
v. Wachovia Bank, N.A.*, 127 S.Ct. 1559, 1567 ("We have 'interpret[ed] grants of both enumerated and
incidental 'powers' to national banks as grants of authority not normally limited by, but rather ordinarily
pre-empting, contrary state law'").  This order does not read those decisions as removing the burden on
Wells Fargo to establish preemption.  The express language by the Supreme Court only recognizes that state
laws that are *contrary* to federal law have typically been found to be preempted — not that there is a simple
presumption.  Wells Fargo still must bear its burden to show that the state law is *contrary* to federal law and
thereby preempted.  This order does not hold that plaintiffs have yet established any violation of state law, but it
does hold that defendant has not even attempted to establish the contrary.

15

more penalty fees) by leading them to believe they have more money available than they really do. Wells Fargo has not adequately explained the practice and any supposed need for the practice, much less why such practice goes undisclosed.[5] This order is unwilling to categorically bless these seemingly predatory practices without a complete record of how they work, their justification, and how they square with the reasonable expectations of consumers.

*Third*, the OCC interpretive letters actually militate against preemption. In Advisory Letter AL 2002-3, the OCC warned federal banks of the ramifications of engaging in unfair or deceptive practices that were in part violations of state law:

> Generally, a deceptive act or practice involves a representation or omission that is likely to mislead a reasonable consumer in some material way. Whether particular conduct constitutes an unfair act or practice would depend on the particular facts and circumstances presented, but generally would involve acts or practices that are unscrupulous, unconscionable, or contrary to public policy, and that harm consumers.

> The consequences of engaging in practices that may be unfair or deceptive under federal or state law can include litigation, enforcement actions, monetary judgments, and harm to the institution's reputation.

The letter went on to state, "[a] number of state laws prohibit unfair or deceptive acts or practices, and such laws may be applicable to insured depository institutions" (*ibid*.). While Wells Fargo argues this letter was only meant to warn federal banks of potential action taken by the *OCC itself*, it does at the least show that certain unfair and deceptive practices would be subject to state law.

In another advisory letter dated May 21, 2007, the OCC responded to a California bank's request to clarify whether or not its practice of posting checks in any order during a 24-hour period was in line with the following California Code Commentary, 1992 Senate Daily Journal 7350, on the Uniform Commercial Code (emphasis added):

> The only restraint on the discretion given to the payor bank under subsection (b) [of § 4303] is that the bank act in *good faith*. For example, the bank could not properly follow an established

---

[5] Wells Fargo claims that it is required to delete certain transactions after they have already posted because of "VISA rules." Wells Fargo, however, provides no such rule. Nor does it provide any adequate justification why VISA would have such a rule. Nor does it explain how a private organization like VISA could force Wells Fargo to engage in a misleading practice.

16

United States District Court
For the Northern District of California

1
2
3

> practice of maximizing the number of returned checks for the sole
> purpose of increasing the amount of returned check fees charged to
> the customer. On the other hand, the bank has the right to pay items
> for which it is itself liable ahead of those for which it is not.

After reviewing the reasons given by the bank for instituting the policy and the factors outlined

in 12 C.F.R. 7.4002, the OCC found "[f]ederal law governing national bank fees, as embodied in

section 7.4002(a), is consistent with the check-posting provision of the California Commercial

Code cited by the Bank, which permits the Bank to post checks 'in any order.'"  Implicit in this

analysis was the OCC's effort to reconcile the activity proposed by the bank with the relevant

state law.  Nowhere in the letter did the OCC state that the California law could be ignored or not

complied with because it would be preempted.

The only other decision that has addressed this specific issue, *White v. Wachovia Bank,

N.A.*, --- F.Supp.2d ----, 2008 WL 2635640 (N.D. Ga. 2008), has also declined to apply

preemption.  There, the plaintiffs challenged practices similar to those presented here under

Georgia law.  The defendant moved to dismiss the complaint in part based on the argument that

the plaintiffs' claims were preempted by the Act.  Based on much of the reasoning discussed

above, the decision declined to dismiss the plaintiffs' claims emphasizing that the plaintiffs'

claims were fundamentally based on contract and tort and were not in tension with the activities

regulated by the Act.  Although *White* was decided in the Rule 12 context, the fundamental

reasoning of the decision applies under Rule 56, at least on the present record.

Wells Fargo cites *Silvas v. E*Trade Mortg. Corp.*, 514 F.3d 1001 (9th Cir. 2008).

In *Silvas*, a group of mortgage applicants alleged that the defendant had violated California's

Unfair Competition Law by misrepresenting its loan policies and applicable loan fees.

The district court dismissed the claims because they were preempted by federal law.  The Ninth

Circuit affirmed.  At issue there was a regulation enacted by the Office of Thrift Supervision

pursuant to the power vested to it by the Home Owners' Loan Act.   That regulation, 12 C.F.R.

560.2(a), stated in relevant part:

> OTS hereby occupies the entire field of lending regulation for
> federal savings associations.  OTS intends to give federal savings
> associations maximum flexibility to exercise their lending powers
> in accordance with a uniform federal scheme of regulation.
> Accordingly, federal savings associations may extend credit as

17

> authorized under federal law, including this part, without regard to
> state laws purporting to regulate or otherwise affect their credit
> activities, except to the extent provided in paragraph (c) of this
> section . . . .

Section 560.2(b) went on to provide specific types of state laws that would be preempted, two of
which the Ninth Circuit found to be directly on point to the plaintiffs' claims.  The OTS had also
issued a rule identifying the proper analysis that should be undertaken in order to determine
whether a state law was preempted:

> When analyzing the status of state laws under § 560.2, the first
> step will be to determine whether the type of law in question is
> listed in paragraph (b).  If so, the analysis will end there; the law is
> preempted.  If the law is not covered by paragraph (b), the next
> question is whether the law affects lending.  If it does, then, in
> accordance with paragraph (a), the presumption arises that the law
> is preempted.  This presumption can be reversed only if the law
> can clearly be shown to fit within the confines of paragraph (c).
> For these purposes, paragraph (c) is intended to be interpreted
> narrowly.  Any doubt should be resolved in favor of preemption.

OTS, Final Rule, 61 Fed.Reg. 50951, 50966-67 (Sept. 30, 1996).  Applying the analysis
promulgated by the OTS, the Ninth Circuit found the claim at issue directly related to a specific
type of law listed in Section 560.2(b) thereby ending the preemption analysis — *i.e.*, only the
first step on the analysis was reached.

  *Silvas*, however, is inapplicable here.  Wells Fargo only relies on three exclusions listed
in 12 C.F.R. 7.4007(b) to support its preemption argument — "Checking Accounts," "Disclosure
Requirements," and "Funds Availability."  On its face, 12 C.F.R. 7.4007 only relates to a bank's
deposit-taking powers.  None of the exclusions cited by Wells Fargo relate to a bank's ability to:
(1) reorder transactions in order to maximize overdraft fees or (2) artificially inflate an account
balance by adding and later subtracting a transaction from the available balance.  The surviving
claims do not implicate those three areas.  In addition, the regulations and rules issued by the
OTS are dissimilar to those here.  The language employed by the OCC in its regulations and
interpretive letters evidences that application of a more narrow preemption analysis is more
appropriate than that applied in *Silvas* (where the OTS had specifically defined a proper
preemption test to be employed).  Here, the OCC itself has attempted to reconcile banking
practices with state law in an interpretive letter.

United States District Court

For the Northern District of California

1    Accordingly, at least at this stage, this order finds that plaintiffs' claims are not

2    preempted by the Act.

3         **2.    PLAINTIFFS HAVE STANDING**

4    Wells Fargo next attacks each representative plaintiffs' standing. *First*, Wells Fargo

5    argues that Walker lacks standing because she did not check her available balance during the

6    relevant time period. In her declaration Walker stated (Walker Decl. ¶ 2–3):

7         After receiving several account statements and finding the
          information in the account statements confusing, I begin [sic]
8         using the "available balance" information provided to me by Wells
          Fargo online and ATM machines for my balance information. I
9         would regularly check the balances online or at the ATM, and
          would mentally deduct from the available balance the amount of
10        the transactions I was making on an ongoing basis.

11        I was unaware that even though purchases were made within the
          available balance, I could be assessed overdraft charges for those
12        transactions if I overdrafted my account sometime in the future.
          If I had known this prior to the June 2007 overdraft charges, I
13        would have avoided the overdraft fees because I would have
          ceased using the Wells Fargo account and changed banks, as I did
14        after having been assessed the subject overdraft charges.

15   While Walker's declaration does not state that she specifically and affirmatively checked her

16   available-balance information during the period she was charged overdraft charges, it does state

17   that she regularly checked and relied on available-balance information. A reasonable jury

18   could infer that she likely checked her available-balance information during the relevant period.

19   On this record, summary judgment on standing with respect to Walker would be inappropriate.

20        *Second*, Wells Fargo challenges Gutierrez's standing on the ground that her overdraft

21   fees were only charged because a check she had written (and later forgot about) was finally

22   cashed. This may be true, but irrelevant. It is undisputed that Gutierrez had sufficient funds in

23   her account at the time she made her first debit card transactions. It is also undisputed that Wells

24   Fargo reordered the transactions on her statement so that the highest charge appeared first and

25   the lowest charge appeared last. The cashing of the check would have only resulted in one

26   overdraft fee had the transactions been listed in chronological order. Instead, Gutierrez was

27   charged four overdraft fees. Accordingly, if Wells Fargo did not engage in this practice,

28   Gutierrez would have been charged fewer overdraft fees. In short, Gutierrez has standing.

19

United States District Court

For the Northern District of California

1    *Third*, Wells Fargo argues that Smith lacks standing because he knew from a previous

2    occasion that a transaction could drop off the available balance.  Smith admits that he had been

3    victimized by Wells Fargo's practice in the past (Smith Decl. ¶ 5).  This "admission," however,

4    is a matter of defense.  The record does not show that Smith knew of the precise parameters that

5    would lead to a reversed-out transaction or how the circumstances surrounding Smith's previous

6    experience relate to those identified in the complaint.

7        **3.    CLASS CERTIFICATION.**

8        In determining whether class certification is appropriate, "the question is not whether the

9    plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather,

10   whether the requirements of Rule 23 are met."  *Eisen v Carlisle & Jacquelin*, 417 U.S. 156,

11   177–78 (1974).  Although a district judge may not investigate the likelihood of prevailing on the

12   merits, he or she is at liberty to consider evidence relating to the merits if such evidence also

13   goes to the requirements of Rule 23.  The party seeking class certification bears the burden of

14   showing that each of the four requirements of Rule 23(a) and at least one of the requirements

15   of Rule 23(b) are met.  *See Hanon v. Data Products Corp.*, 976 F.2d 497, 508–09 (9th Cir.

16   1992).

17       For class certification, the district court must find:  (i) numerosity of the class;

18   (ii) common questions of law or fact predominate; (iii) the named plaintiff's claims and

19   defenses are typical; and (iv) the named plaintiff can adequately protect the interests of the class.

20   Certification under Rule 23(b)(3), as here requested, requires that a district court find "that

21   questions of law or fact common to the members of the class predominate over any questions

22   affecting only individual members, and that a class action is superior to other available methods

23   for the fair and efficient adjudication of the controversy."

24       Plaintiffs request certification of two classes: an "available balance" class and a

25   "sufficient funds" class.  The "available balance" class would consist of "[a]ll Wells Fargo's

26   California customers with consumer checking accounts, who from November 2004 to the present

27   incurred overdraft fees on debit card transactions as a result of being provided inaccurate

28   available-balance information by Wells Fargo" (Br. 11).  The "sufficient funds" class would be

comprised of "[a]ll Wells Fargo's California customers with consumer checking accounts, who from November 2004 to the present incurred overdraft fees on debit card transactions when there was sufficient funds at the end of the day the transaction occurred to cover the transaction amount" (*ibid.*).  Both proposed class definitions are overbroad and unhelpful.  Instead, this order will focus on the two specific practices discussed above:  (a) Walker and Smith's challenge to the specific practice of including and then deleting transactions from the available-balance information and (b) Gutierrez's challenge to the specific practice of posting from highest to lowest.

### A.    Including and Deleting Class.

#### (1)    Numerosity.

Given the large number of checking account customers at Wells Fargo, the numersoity requirement is met.

#### (2)    Commonality and Predominance.

A class has sufficient commonality under Rule 23(a)(2) if "there are questions of law or fact which are common to the class."  Rule 23(a)(2) does not require each member in a class to have identical factual and legal issues surrounding his or her claim.  "The existence of shared legal issues with divergent factual predicates is sufficient" to meet the requirements of Rule 23(a)(2).  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

The analysis under Rule 23(b)(3) "presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a)( 2)."  In contrast to the less stringent standard of Rule 23(a)(2), class certification under Rule 23(b)(3) is proper when common questions present a significant portion of the case and can be resolved for all members of the class in a single adjudication.  *Hanlon*, 150 F.3d at 1019–22 (9th Cir. 1998).

The common complaint is that Wells Fargo customers relied on inaccurate available-balance information (due to the earlier inclusion and later deletion of transactions) when making electronic debit card transactions.  Because Wells Fargo led them to believe that they had more in their accounts than they did, these customers were led to write overdrafts and thus to incur excessive numbers of overdraft charges.

21

United States District Court

For the Northern District of California

1    Defendant argues that individualized questions predominate, such as:  whether each class

2  member was provided available-balance information before making a challenged transaction;

3  what knowledge the customer had about what was or was not included in his or her available

4  balance; what was the available balance provided to the customer and whether it was accurate;

5  whether the inaccuracies were material; whether the customer actually relied on the available

6  balance when initiating subsequent transactions; and whether the overdraft fee was triggered by

7  the transaction initiated after communication of the available balance.

8    This argument is unconvincing.  Since the whole point of the available-balance

9  information is to show what funds are available, a jury might reasonably infer that customers

10  regularly relied on Wells Fargo's dissemination of this information.

11    *(3)    Typicality.*

12    The typicality requirement of Rule 23(a)(3) is satisfied when "the claims or defenses of

13  the representative parties are typical of the claims or defenses of the class."  A plaintiff's claims

14  are typical if they "are reasonably co-extensive with those of absent class members; they need

15  not be substantially identical."  *Hanlon*, 150 F.3d at 1020.

16    Smith and Walker's claims are typical.  *First*, Smith reasonably relied on his

17  available-balance information online, not knowing that the fireworks transaction which was

18  once reflected in the available balance had been somehow deleted.  Based on his reliance on the

19  inaccurate information, Smith made a debit card purchase which overdrafted his account and was

20  charged yet another fee.

21    *Second*, Walker relied on the available-balance information online and from ATM

22  machines and continued to engage in debit card transactions.  She would mentally deduct from

23  the available balance the amount of transactions she made on an ongoing basis.  Ms. Walker was

24  unaware of Wells Fargo's practice of first reflecting a pending charge and then dropping it, only

25  to post it to the account days later.  As a result, she incurred overdraft charges for those

26  transactions when they were posted in the future.

27

28

**United States District Court**
For the Northern District of California

*(4)*    ***Adequacy.***

The last requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Determining whether the representative parties adequately represent a class involves two inquiries: (i) does the named plaintiff and their counsel have any conflicts of interest with other class members and (ii) will the named plaintiff and her counsel act vigorously on behalf of the class? *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978). The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. "[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977).

Plaintiffs have provided enough evidence that Walker, Smith, and their counsel will act vigorously on behalf of the class. This order thus holds that both Walker and Smith are adequate representatives.

Defendant argues that there are fundamental conflicts of interest among proposed class members. "A conflict is 'fundamental' when it goes to the specific issues in controversy, or where . . . some plaintiffs claim to have been harmed by the same conduct that benefitted other members of the class, preventing the named representatives from 'vigorously prosecut[ing] the interests of the class through qualified counsel.'" *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group*, 247 F.R.D. 156, 177 (C.D. Cal. 2007) (Pfaelzer, M.). Defendant says that some class members actually benefit from Wells Fargo's practice of not immediately adjusting the available balances to reflect all transactions. For example, a customer could charge or withdraw more money than his or her account contained, but as long as a covering deposit was made before the charge is posted to the account, he or she does not incur an overdraft fee. They say that Walker was one such customer who benefitted from the delay in posting.

This argument is unpersuasive. Plaintiffs are not challenging the practice of allowing some delay before an electronic transaction is incorporated into the available balance, which may benefit some class members. Instead, plaintiffs challenge the practice of first including the

United States District Court

For the Northern District of California

transaction as a pending charge (so it appears and is incorporated into the available balance), then *removing* the pending charge so that the available balance seems artificially high, and finally reincorporating it days later when it is posted as part of a settlement. This curve ball renders the available balance unreliable for bank customers. There is, therefore, no conflict in arguments with the other proposed class members.

Defendant next contends that Smith should be disqualified because he is the husband of the long-time assistant to plaintiffs' counsel, Attorney Richard McCune. There is no evidence, however, on this record that either Smith or his wife would profit (other than Smith's class share) from any verdict or settlement. Indeed, both Smith and his counsel have the same incentive to obtain the highest possible settlement or verdict for the class. It is in both their interests to do so. The possibility that Smith would somehow approve a low settlement with an unjustifiable amount of attorney's fees is simply too attenuated to be credited at this stage. "[T]he existence of minor conflicts alone will not defeat a party's claim to class certification: the conflict must be a 'fundamental' one going to the specific issues in controversy." *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003).

### *(5)    Ascertainability.*

In addition to the explicit requirements of Rule 23, "[a]n implied prerequisite to certification is that the class must be sufficiently definite." *Lamumba Corp. v. City of Oakland*, 2007 WL 3245282, *3 (N.D. Cal. 2007) (Patel, M.). Defendant says that ascertaining who belongs to the "available balance" class is too difficult because plaintiffs would have to show a class member incurred overdraft fees *as a result* of being provided inaccurate available-balance information, that the customer relied on this information when making a purchase, and that the customer actually received this information in the first place.

This order disagrees. As stated, a jury could reasonably infer reliance from the very purpose of the available-balance information. It seems reasonable that a computer program can be fashioned and applied against the bank's database to track when customers accessed their available-balance information, determine the available balance displayed, and verify whether an overdraft fee was charged. Presumably, the program could also determine whether a transaction

1    was included in the available balance and later deleted.  Plaintiffs have satisfied the

2    ascertainability requirement.

3           Therefore, this order certifies the "including and deleting" class to be defined as "all

4    Wells Fargo California customers with consumer checking accounts from November 15, 2004, to

5    June 30, 2008, who incurred overdraft fees on debit card transactions after dissemination by

6    Wells Fargo of available-balance information that once reflected and later deleted a debit card

7    transaction."

8                        **B.      The Re-Sequencing Class.**

9           This class will consist of all Wells Fargo California customers from November 15, 2004,

10   to June 30, 2008, who incurred overdraft fees on debit card transactions as a result of the bank's

11   practice of re-sequencing transactions from highest to lowest.

12                          *(1)      Numerosity.*

13          Again, neither party disputes that plaintiffs have fulfilled the numerosity requirement.

14   Plaintiffs have satisfied Rule 23(a)(1).

15                     *(2)      Commonality and Predominance.*

16          The challenged practice is a standardized one applied on a routine basis to all customers.

17   Possibly, there will be some individual issues — such as giving Wells Fargo the benefit of the

18   forgotten check in Gutierrez's case — but these individual variations will not predominate over

19   the pervasive commonality of the highest-to-lowest method and its adverse impact on hundreds

20   of thousands of depositors.

21          Wells Fargo argues that plaintiffs have not shown that common evidence could prove

22   injury to the proposed class.  *See Allied Orthopedic Appliances*, 247 F.R.D. at 175.  In their

23   moving papers, plaintiffs had proffered the testimony of finance and economics expert Lewis

24   Mandell, who stated that a program could be written and applied against the bank's database to

25   determine which customers had been charged overdraft fees for transactions that occurred on

26   days when the customers had positive account balances.  For these customers, the program could

27   compare the number and amount of overdraft charges they received with the number and amount

28

United States District Court

For the Northern District of California

1   they would have received had they not been charged on the days with positive account balances.[6]

2   Defendant says that Expert Mandell's testimony is too conclusory to sustain any showing of

3   injury to class members.  Given the bank's large wealth of computerized account information,

4   this order is confident and so finds that software will be designable to extract the vital elements

5   needed to assess damages and causation.

6          Defendant says, even if plaintiffs could provide a common factual and legal theory, they

7   would have to show that an individual customer suffered injury *overall*.  Some customers

8   allegedly were actually beneficiaries of this practice.  For example, say a customer exceeded his

9   account balance for the day.  But then he made a covering deposit before the bank posted the

10   transaction.  This argument was rejected above.  The practice in question is different.  There is

11   no way the challenged practice could ever benefit the customer.

### *(3)      Typicality.*

13          Gutierrez is a "typical" member of the "re-sequencing" class.  Because of Wells Fargo's

14   practice of re-sequencing transactions from highest to lowest, she was charged *four* overdraft

15   fees as opposed to the *one* she would have been charged had the transactions been ordered

16   chronologically.  This is true even assuming that the bank could post the forgotten check in

17   whatever order it desired.

### *(4)      Adequacy.*

19          Gutierrez does not have any conflicts of interest.  She and her counsel will act

20   vigorously on behalf of the class.  Wells Fargo implies that Gutierrez may be inadequate

21   because she became involved with the litigation following publication through the radio by

22   plaintiffs' counsel, citing *Bodner v. Oreck Direct, LLC*, 2007 WL 1223777, *3 (N.D. Cal. 2007)

23   (Patel, M.), where the district court denied class certification after criticizing plaintiff's counsel

24

25

---

26          [6]  Defendant objects to the declaration, saying that Expert Mandell failed to disclose the basis and
reasons for his opinions, he relied on false factual assumptions, he used ambiguous terms such as the "end of the

27   day" to describe when customer balances would be calculated, and the testimony was irrelevant.  This objection
is overruled without prejudice to it being raised later at trial.  Expert Mandell based his testimony on his

28   experience in the banking field and a review of the materials produced in this case (including Wells Fargo's
discovery responses and deposition transcripts of Wells Fargo employee witnesses).

**United States District Court**
For the Northern District of California

for having constructed the lawsuit before it had a plaintiff. *Bodner* is distinguishable, however, because plaintiff's counsel there acted more egregiously. The district court noted that:

> [The lawsuit was] borne out not only by plaintiff's own admissions, but by plaintiff's counsel's previous abortive attempt to bring a seemingly identical lawsuit in another district. Indeed, counsel himself admitted at the hearing that he or his firm had the research performed on the product at issue and had a theory about the product's deficiencies. Then, armed with that information they went in search of a plaintiff, never mind the lack of a fitting plaintiff or the lack of ethical scruples. The instant action is nothing more than [plaintiff's counsel] bringing its show to the Northern District and continuing its practice of selecting stand-in plaintiffs, even ones who are inappropriate.

*Ibid*. In the instant action, even though Gutierrez was eventually added to this action following publication of the suit, she was not otherwise inappropriate. The lawsuit already had other plaintiffs as well. So far, Gutierrez has been an active and fitting litigant. This order finds that she can adequately represent the class.

### *(5)    Ascertainability.*

Once again, this order is confident that the bank's own computerized records can be mined efficiently to ascertain which customers were victimized by the challenged practice.

This order certifies the "re-sequencing" class to be defined as "all Wells Fargo California customers from November 15, 2004, to June 30, 2008, who incurred overdraft fees on debit card transactions as a result of the bank's practice of sequencing transactions from highest to lowest."

### CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is **DENIED** and plaintiffs' motion for class certification is **GRANTED IN PART AND DENIED IN PART**. Within **TEN CALENDER DAYS**, counsel should submit an agreed-on form of class notice and a plan of dissemination. The Court is concerned that the discovery cutoff date (and follow-on dates) may be too imminent to complete all appropriate discovery and requests input from counsel whether

1   the dates should be extended.  Please submit this input by the same ten-day deadline.  A case

2   management conference will be held at **11:00AM ON SEPTEMBER 25, 2008**.

3

4   **IT IS SO ORDERED.**

5

6   Dated:  September 11, 2008.

7   _____
    WILLIAM ALSUP
    UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28