1   Richard D. McCune, SB # 132124
    rdm@mwtriallawyers.com
2   Jae (Eddie) K. Kim, SB # 236805
    jkk@mwtriallawyers.com
3   McCUNE & WRIGHT, LLP
    2068 Orange Tree Lane, Suite 216
4   Redlands, CA 92374
    Telephone:    (909) 557-1250
5   Facsimile:    (909) 557-1275

6   Mitchell M. Breit, Esq. (Admitted *Pro Hac Vice*)
    mbreit@wdklaw.com
7   WHATLEY DRAKE & KALLAS, LLC
    1540 Broadway, 37th Floor
8   New York, NY 10036
    Telephone: (212) 447-7070
9   Facsimile: (212) 447-7077

10  Brian J. Panish, Esq. SB # 116060
    panish@psandb.com
11  Adam K. Shea, Esq. SB # 166800
    shea@psandb.com
12  PANISH, SHEA & BOYLE
    11111 Santa Monica Blvd., Suite 700
13  Los Angeles, CA 90025-3341
    Telephone: (310) 477-1700
14  Facsimile: (310) 477-1699

15  Attorneys for Plaintiffs, VERONICA GUTIERREZ, ERIN WALKER
    and WILLIAM SMITH, on behalf of themselves and all others similarly situated
16

17                    UNITED STATES DISTRICT COURT

18               FOR THE NORTHERN DISTRICT OF CALIFORNIA

19

20  VERONICA GUTIERREZ, ERIN WALKER and )   Case No.:  C 07-05923 WHA (JCSx)
21  WILLIAM SMITH, as individuals, and on behalf )
    of all others similarly situated,            )   CLASS ACTION
22                                               )
                    Plaintiffs,                  )   [REDACTED] PLAINTIFFS' OPPOSITION
23                                               )   TO DEFENDANT'S MOTION FOR
            v.                                   )   PARTIAL SUMMARY JUDGMENT
24                                               )
    WELLS FARGO & COMPANY; WELLS                 )   Judge Assigned:  Hon. William H. Alsup
25  FARGO BANK, N.A.; and DOES 1 through 125,    )   Complaint Filed:  November 21, 2007
                                                 )
26                  Defendants.                  )   Date:  March 19, 2009
                                                 )   Time:  2:00 p.m.
27                                               )   Courtroom:  9
                                                 )
28

REDACTED VERSION

-i-

# TABLE OF CONTENTS

Page

I. INRODUCTION.................................................................1

II. FACTUAL BACKGROUND.......................................................3

   A. In 2001-2002, Wells Fargo Engaged in Corporate and Executive Greed in Targeting its Most Financially Vulnerable Customers for Additional Overdraft Fees.........................................................................3

   B. Wells Fargo Engaged in a Systematic Pattern of Misrepresenting to the Target Group the Order it Sequenced Debit Card Transactions...........................5

     1. Wells Fargo Explicitly and Falsely Represented that When Using a Debit Card, the Funds are Immediately Withdrawn From the Account.......................................................................6

     2. Wells Fargo Implicitly Falsely Represented That When Using a Debit Card, the Funds Are Immediately Withdrawn From the Account.......................................................................9

     3. Wells Fargo's Disclosures Regarding Re-Sequencing Were Grossly Inadequate in Light of Its Practice and Misrepresentations About the Practice.................................................................11

   C. Wells Fargo Engaged in a Systematic Pattern of Misrepresentation Regarding the Accuracy of Available Balances that Caused Customers to Overdraft Their Accounts...............................................................12

III. SUMMARY OF ARGUMENT....................................................14

IV. ARGUMENT.................................................................14

   A. Wells Fargo Attempts to Rehash Resolved Issues By Reasserting For the Third Time Its Failed Attack on Plaintiffs' Standing to Bring Claims.....................14

   B. The Class Representatives Have Standing to Bring Misrepresentation and Nondisclosure Claims Under the Requirements of Proposition 64.........................16

     1) Plaintiff Gutierrez Has Standing to Pursue Misrepresentation and Nondisclosure Claims With Regards to Wells Fargo's Practice of Re-Sequencing the Posting of Transactions..........................................................17

     2) Plaintiff Walker Has Standing to Pursue Misrepresentation and Nondisclosure Claims With Regards to Wells Fargo's Practice of Including and then Deleting the Posting of Authorized Transactions, Resulting in an Inflated Available Balance.........................................................18

-ii-

3)  **Plaintiff Smith Has Standing to Pursue Misrepresentation and Nondisclosure Claims With Regards to Wells Fargo's Practice of Including and then Deleting the Posting of Authorized Transactions, Resulting in an Inflated Available Balance**..................................................................................19

C.  **The Classes Easily Meet Their Burden for Establishing Reliance and Damages**..................................................................................20

V. CONCLUSION..................................................................................22

[Redacted] Plaintiffs' Opposition to Defendant's Motion for Partial Summary Judgment
Case No.: C 07-05923 WHA (JCSx)

# **TABLE OF AUTHORITIES**

*Page*

**Federal Cases**

City Solutions, Inc. v. Clear Channel Communications, 365 F.3d 835, 840 (9th Cir. 2004)    18

Falk v. General Motors Corp., 496 F. Supp. 2d 1088, 1094-97 (2007)    18

Golden Gate Hotel Ass'n v. City & County of San Francisco, 18 F.3d 1482, 1485 (9th Cir. 1994)    15

Ins. Co. of North America, 238 F.R.D. 482, 492 (C.D. Cal. 2006)    22

Preaseau v. Prudential Ins. Co. of America, 591 F.2d 74, 79 (9th Cir. 1979)    15

Securities Litigation, 54 F.R.D. 443, 451 (S.D. Cal. 1974)    22

**State Cases**

Alliance Mortgage Co. Rothwell, 10 Cal. 4th 1226, 1239, 900 P.2d 601, 608-09 (1995)    17, 18

Blankenheim v. E.F. Hutton & Co., Inc., 217 Cal. App. 3d 1463, 1475, 266 Cal. Rptr. 593 (1990)    18

Gray v. Don Miller & Associates, Inc., 35 Cal. 3d 498, 503, 198 Cal. Rptr. 551, 674 P.2d 253 (1984)    18

Guido v. Koopman, 1 Cal. App. 4th 837, 843, 2 Cal. Rptr. 2d 437 (1991)    18

Hall v. Time Inc., 158 Cal. App. 4th 847, 854 (2008)    17

Lazar v. Superior Court, 12 Cal.th 631, 738, 909 P.2d 981 (1996)    18

Limandri v. Judkins, 52 Cal.App.4th 326, 337, 60 Cal.Rptr.2d 539 (1997)    18

Miller v. National American Life Ins. Co., 54 Cal. App. 3d 331, 338-39, 126 Cal. Rptr. 731 (1976)    23

Mirkin v. Wasserman, 5 Cal.4th 1082, 1093, 23 Cal. Rptr. 2d 101 (1993)    18

[Redacted] Plaintiffs' Opposition to Defendant's Motion for Partial Summary Judgment
Case No.: C 07-05923 WHA (JCSx)

1

**I**

2

**INTRODUCTION**

3   This is the second time Defendant Wells Fargo Bank, N.A. (hereinafter referred to as "Wells

4   Fargo") has brought a motion for summary judgment challenging the standing of the named class

5   representatives. In doing so, it uses almost the same language and case citations it used the first time it

6   brought a motion for summary judgment. Apparently dissatisfied with the Court's prior ruling, it again

7   seeks to dismiss the named Plaintiffs' claims related to false advertising and misrepresentations. In

8   doing so, Defendant ignores the reality that the Court has already ruled on this issue as to the named

9   Class Representatives. It also ignores the overwhelming evidence demonstrating Wells Fargo's uniform

10   and pervasive scheme of misconduct, misrepresentation and non-disclosure, which results in Plaintiffs

11   meeting all the elements of its claims, including reliance, for both the class claims and the named class

12   representatives that serves to defeat this motion.

13   The evidence shows unequivocally that [                    REDACTED

14

15

16

17

18

19

20   ]

21   |                         REDACTED

22

23

24   ] **Prior to 2001, Wells Fargo sorted debit card transactions before checks and automated**

25   **clearing house (hereinafter referred to as "ACH") charges and sequenced them from lowest to**

26   **highest**. |                 REDACTED

27

28

[Redacted] Plaintiffs' Opposition to Defendant's Motion for Partial Summary Judgment
Case No.: C 07-05923 WHA (JCSx)

REDACTED

]

REDACTED

[

] Wells Fargo actively, systematically and intentionally misrepresented to its customers how it sequenced debit card transactions.  Worse, those misrepresentations were directed specifically at the overdraft target customers.  Throughout its marketing material, online material and most sinisterly, its financial education program, Wells Fargo misrepresented that <u>when using a debit card, funds were</u> <u>*immediately* withdrawn from the account</u>, instead of what actually occurred, which was Wells Fargo waiting until the middle of the night, grouping all the transactions together, and re-sequencing them from highest to lowest.

[                                               REDACTED

]

Finally, Wells Fargo intentionally and systematically misrepresented <u>"available balance" as the</u> <u>most current picture Wells Fargo had of current and past transactions, which included all debit card</u> <u>transactions for the customer from the last 60-90 days</u>.  It is undisputed that this representation is false.

[                                               REDACTED

]

1        Related to the effect of these misrepresentations, Plaintiffs have submitted a report from a highly

2    reputable and qualified expert, Dr. Lewis Mandel, that the class has been damaged by these

3    misrepresentations because they have the tendency to deceive a reasonable consumer.  Defendant

4    apparently does not intend to dispute this element of Plaintiffs' claim as it did not file a report from an

5    expert on the subject.   As to the individual class members, as the following will demonstrate, they

6    easily meet the threshold test for reliance and damages.  Therefore, this motion is totally without merit

7    and should be denied for all the same reasons this challenge was unpersuasive in the first motion, and

8    because of the additional reasons set forth by the evidence learned in discovery as discussed below.

9                                                 **II**

10                                   **FACTUAL BACKGROUND**

11   **A.**                                          REDACTED

12                                                 REDACTED

13       [

14

15

16                                                                                        ] Point

17   of sale debit card use comprises the greatest percentage of overdraft fees (FDIC Study of Bank

18   Overdraft Programs November 2008 (hereinafter referred to as "FDIC Study"), Ex. 2 at v, ¶ 7.) [

                                                 REDACTED

19

20

21                           ]

22                                                 REDACTED

23       [

24

25       ] (April 2001 Statement of Eugenia Espinosa, Ex. 3; [              REDACTED

26                    ] When Wells Fargo changed this practice to group charges and then order the

27   transactions from highest to lowest, it served to increase the number of overdraft transactions when there

28   was an overdraft of the account, because on average the charges for debit card transactions are much

     lower than the charges for checks and ACH charges. (FDIC Study, Ex. 2 v, ¶ 8.)  After Wells Fargo

                                                 -3-

1    merged with Norwest in late 1998 (Wells Fargo November 2, 1998 News Release, Ex. 5), and the

2    former top Norwest executives, Richard Kovacevich and Leslie Biller began running Wells Fargo

3    (Deposition of Leslie Biller, Ex 6, 9:3 -10:13.), [                                REDACTED

4

5

6

7

8

9                                                                              ] Not

10   surprisingly, customers who are the most susceptible to overdrawing their account are those with the

11   least means and/or who are the most financially unsophisticated.  Federal studies and Wells Fargo's own

12   research show that customers who overdraft their accounts fall largely into one or more of the following

13   categories:  1) low to moderate income (FDIC Study, Ex 2 at v, ¶ 5&6); young customers aged 18-25

14   years old (FDIC Study Ex. 2 at v, ¶ 10); [                         REDACTED

15         ]

16         In targeting this financially vulnerable sub-set of customers for even more profit from overdraft

17   fees than they were already incurring, Wells Fargo's motivation was pure greed.  It certainly was not

18   necessary to its reasonable business operations, profit, or return on shareholder investment.  [

19                                      REDACTED                                        ] it

20   boasted having a record first quarter profit, recording net income being up 12% from the year before.

21   (April 17, 2001 Wells Fargo News Release, Ex. 10.)

22         Wells Fargo's executives were also already being well compensated without the need to pad their

23   income from increasing overdraft fee income from the target overdraft customers.  Wells Fargo's CEO

24   Richard Kovacevich, (formerly of Norwest) had a cash compensation package of over $13 million for

25   1999 and 2000, plus $329,000 in 401(k) benefits, $280,000 in other compensation (2002 Proxy

26

27

28

-4-

1   Statement, Ex. 11, at p. 23), as well as the use of the corporate jet(s)[1].  That was in addition to the $66

2   million in exercisable options that Mr. Kovacevich held, and the 646,300 option shares granted to him in

3   2000 that, based on projections established by the SEC of what they would be worth when they could be

4   exercised, were valued at between $13 and $34 million.  (2002 Proxy Statement, Ex. 11, p. 25.)  Other

5   than the pure greed of Wells Fargo and its executives, there was no valid reason to target its most

6   financially vulnerable customers to generate hundreds of millions of dollars of additional overdraft fees.

7        It is worth noting that Wells Fargo did not spread these increased fees over all of its customers

8   through account service fees.  Its more sophisticated customers would never have stood for it.  So

9   instead, in what can only be described as corporate and executive cowardliness and greed, Wells Fargo

10  embarked on a secret manipulative scheme to target those least able to defend themselves from the

11  unscrupulous practices, [                    REDACTED                    ] that would

12  directly benefit Wells Fargo's executives.  As will be shown below, not only were those practices

13  standing alone unfair and illegal under California's consumer protection statutes, Wells Fargo has and

14  continues to make specific and intentional misrepresentations regarding those practices to its target

15  group of low-income, young adults and new customers.

16  **B.    Wells Fargo Engaged in a Systematic Pattern of Misrepresenting to the Target Group the
        Order it Sequenced Debit Card Transactions**

17       One of Plaintiffs' claims ("re-sequencing" claim) is that Wells Fargo intentionally increased the

18  number of transactions for which overdraft fees were assessed by artificially re-sequencing debit card

19  transactions from the order in which they occurred and had been approved by Wells Fargo, to a highest

20  to lowest order when calculating overdraft fees at the time of posting.  The result of this re-sequencing

21  was to increase the number of transactions that would be assessed an overdraft fee when the account was

22  overdrafted, as illustrated by what happened to Class Representative Veronica Gutierrez.  (Order

23  Denying Defendant's Motion for Summary Judgment and Granting in Part and Denying in Part

24  Plaintiffs' Motion for Class Certification, 11:24 – 12:16.)

25

26

27

28  [1] The current Executive V.P. of Community Banking who directly reports to the CEO, acknowledges
    executive access to the corporate jets but could not recall exactly how many jets Wells Fargo owns.
    (Deposition of Carrie Tolstedt, Ex 12, 49:16 – 25.)

[Redacted] Plaintiffs' Opposition to Defendant's Motion for Partial Summary Judgment
Case No.: C 07-05923 WHA (JCSx)

1   For this inherently unfair practice to be legal, Wells Fargo would have had to have in place clear

2   and prominent disclosures.  However, not only did Wells Fargo not provide any adequate disclosures,

3   Wells Fargo intentionally and systematically misrepresented this practice in its marketing, and

4   educational material by either explicitly or implicitly representing that when customers use debit cards,

5   the funds are *immediately* withdrawn from the account.  If that statement were true, then the number of

6   overdraft transactions would be based on a chronological order of posting rather the high to low posting

7   order employed by Wells Fargo.

### 1)   Wells Fargo Explicitly and Falsely Represented that When Using a Debit Card, the Funds are Immediately Withdrawn From the Account

8
9       The most egregious example of the false information that Wells Fargo provided to its customers

10  was the educational program Wells Fargo developed for the young, inexperienced and low-income

11  customers to "teach" them about checking accounts.   In what should have been a worthy project,

12  starting in 2003, Wells Fargo dispatched 50 employees to develop an educational program it called

13  "Hands on Banking" in order to educate customers and potential customers about financial issues

14  involved with consumer banking.   It created the program in both English and Spanish. (Wells Fargo's

15  2007 Corporate Citizenship Report (hereinafter referred to as "Citizen Report), Ex. 13, p. 29.)

16
17      The program was developed in a way where it would be provided to young adults as well as

18  school-aged children.  It was produced so that it could be presented as a video presentation, in written

19  form, or viewed online.  Wells Fargo created CD's of video instructions and written curriculum

20  designed for teachers to assist them in teaching young people about checking accounts.  In 2006 and

21  2007, it distributed over 400,000 of these CD's to schools.  In the same two year period, it trained

22  11,000 Wells Fargo employees to go out and teach students in schools about how checking accounts

23  work. (Citizen Report, Ex. 13, p. 29.)  While there has not been a record kept, with 400,000 CD's sent

24  to teachers over just a two year period, presumably tens of millions of students who comprise the

25  overdraft target "young and inexperienced" groups have been taught in their schools about how debit

26  cards work using the *Hands on Banking* program.

27      The program was also developed so that young, inexperienced, and low-income customers could

28  access the information online.  Pamela Erwin, the creator and Wells Fargo employee responsible for

    creating and maintaining the *Hands On Banking* program, confirmed that Wells Fargo, through its

-6-

foundation created and maintained the *Hands on Banking* site (Deposition of Pamela Erwin (hereinafter referred to as "Erwin"), Ex. 14, 43:9-11), and then heavily promoted it to its target overdraft customers. Virtually almost anywhere that Wells Fargo provided either marketing or educational information to low-income, young adult or new customers, it referred them to *Hands on Banking*. This included marketing brochures to teens (Teen Checking Brochure, Ex. 15; Wells Fargo – Your Child Age 13-17, Ex. 16), those with poor credit (Get Back Into Checking With The Wells Fargo Opportunity Package, Ex. 17), college students, (Wells Fargo Mobile Marketing Brochure, Ex. 18), and throughout its website where it was attempting to "educate" customers or prospective customers on how Wells Fargo checking accounts work. This includes prominent placement on its website in the Financial Education section (About Wells Fargo – Financial Education webpage, Ex. 19), the student loan section (Wells Fargo Student Loans - Managing Your Money webpage, Ex. 20), the student loan administrators section (Wells Fargo Student Loans – Student Loan Services for Administrators, Ex. 21), and subprime mortgage customers. (Wells Fargo Home Mortgage – Steps to Success webpage, Ex. 22.) Over 250,000 unique website visitors were provided information about how debit cards worked through *Hands on Banking*. (Citizenship Report, Ex. 13, p. 29.)

The *Hands on Banking* program consisted of both video and written instructions to customers about how debit cards work. In the various media, the information provided to these young and inexperienced customers was false and untrue. In the written materials provided to the adult customers and used by teachers, it stated:

> **"Debit cards**
>
> **...remember that whenever you use your debit card, the money is *immediately* withdrawn from your checking account."**

(Hands on Banking; Adults Teachers Guide, Ex. 23, p. 47 (emphasis in original).)

To the young adults, Wells Fargo stated:

> **"Remember, the money comes right out of your checking account the minute you use your debit card."**

(Hands on Banking, Young Adults Teacher Guide, Ex. 24, p.32.)

-7-

1   In the video, where the instructor provides verbal information supported by written text, Wells

2   Fargo, even more effectively, provides the same false information to the tens of millions of students and

3   web site viewers:



(*Hands on Banking*, Screen Capture, Ex. 25.)

There is no dispute that these statements are false. (Deposition of Kenneth Zimmerman

(hereinafter referred to as "Zimmerman"), Ex. 26, 128:5-8.) To the extent Wells Fargo claims that this

was just an innocent mistake, the facts do not support such a position. The Wells Fargo employee who

created the *Hands on Banking* program, Pamela Erwin, worked for the Wells Fargo foundation. (Erwin,

Ex. 14, 8:10-14.) She testified that Wells Fargo assigned a Consumer Deposit Group employee to

oversee the text contained in *Hands on Banking* related to Wells Fargo's product and services. (Erwin,

Ex. 14, 20:23 – 22:10.) The Consumer Deposit Group is the group responsible for consumer checking

accounts. (Zimmerman, Ex. 26 13:22 – 15:3.) The Consumer Deposit Group was provided and

-8-

1    specifically approved false statements found in the text related to debit card transactions being

2    immediately withdrawn from the checking account and that purchases would not be approved if there

3    were insufficient funds in the account. (Erwin, Ex. 14, 24:10 – 22.) Rather incredibly, the legal

4    department also approved the false representations. (Erwin, Ex. 14, 24:25 – 25:3.)

5         The Consumer Deposit Group and legal department were not given just one chance to review

6    and approve the text. Approximately every 12-16 months, or when there were changes to the content,

7    the text would be reviewed for updates. These misrepresentations were approved each time by both the

8    Consumer Deposit Group and legal department. (Erwin, Ex. 14, 29:16 – 31:2.) From 2005 (and

9    possibly since 2003) to December 31, 2008 (Erwin, Ex. 14, 31:8 – 32:12), Wells Fargo has consistently

10   and knowingly provided false information to customers about the sequencing of debit card transactions

11   through the *Hands on Banking* financial education program.

12        These misrepresentations in *Hands on Banking* are not isolated instances of providing false

13   information to the target group of young, inexperienced and low-income customers on this subject.

14   Wells Fargo had this same false language on its website in the section entitled "Managing Your Money"

15   (until 2005), where it stated:

16        **Debit Cards**. **Debit cards can be used wherever Visa and Mastercard debit cards are
         accepted. They differ from credit cards in that the <u>money is immediately withdrawn from
17       your account.</u> Debit cards can be an effective way to manage your finances, because you
         <u>can't spend more than you have.</u>**
18

19   ( "Managing Your Money" (2005) webpage; Ex. 27 (underline added).)

20        **2) Wells Fargo Implicitly Falsely Represented That When Using a Debit Card, the Funds
            Are Immediately Withdrawn From the Account**
21

22        In addition to the explicit misrepresentations regarding immediate withdrawal, Wells Fargo made

23   widespread and consistent implied representations that with debit card use, the funds are immediately

24   withdrawn from the account. The example that was the most wide-spread and damaging to the class was

25   the immediate withdrawal sequence order Wells Fargo portrayed to its online customers. Wells Fargo's

26   records show that [                    REDACTED                    ] who overdraw their account

27   each year utilize online banking. (WF SI No's 2, 6, Ex. 1.) These online customers access their account

28   and are provided with "pending transaction" information by Wells Fargo. For transactions not yet

-9-

1   posted, the customer is shown the listed pending transactions in chronological order.  Further, the

2   available balance is reduced for each listed pending charge.  (William Smith's July 16, 2007 Account

3   Activity online print-out, Ex. 28.)  What this tells the customer implicitly if not explicitly, is that not

4   only are the funds processed in chronological order, the funds are immediately withdrawn from the

5   account.

6          Wells Fargo has consistently made these same misrepresentations in its marketing materials.

7   Every new account holder receives a marketing jacket when they open an account that provides

8   information on the checking account (Wells Fargo Response to Plaintiffs' Request for Admissions No.

9   1, Ex. 29.)  That jacket houses the account agreement and fee schedule that is given to each new

10   customer.

11          The language used in the jacket to describe debit cards most likely came from the Deposit Group

12   (Deposition of Brenda Yost (hereinafter referred to as "Yost"), Ex. 30, 35:18 – 36:1), which is the same

13   Group that approved the "immediately withdrawn" language in *Hands on Banking*.  Also, like the

14   language in *Hands on Banking*, the language used was first approved by the legal department.  (Yost,

15   Ex. 30, 35:9 – 17.)  The jacket, in describing the check card ("debit card" and "check card" are used

16   interchangeably by Wells Fargo), stated:

17          **Each purchase is *automatically* deducted from your primary checking account**

18   (Wells Fargo New Customer Jacket, Ex. 31 (emphasis added).)

19          Wells Fargo's Senior Vice-President of Debit Card Marketing, Ms. Brenda Yost, who has the

20   responsibility for marketing the debit cards, admitted in deposition, what is obvious in reading the

21   statement: *Automatically* deducted implies *immediately* withdrawn.  (Yost Ex. 30, 35:18 – 36:18.)

22          This jacket, given to new customers, was not the only place that this misrepresentation of

23   automatically deducted transactions was presented to Wells Fargo customers.  In marketing messages

24   that go out to customers with their statements, Wells Fargo regularly promoted the use of debit cards to

25   the target overdraft customers, by describing the debit cards as having funds "automatically deducted"

26   from the checking account.  (Debit Card Message Request, Ex. 32; Check Card Brochure, Ex. 33; *Get*

27   *Back into Checking with the Wells Fargo Opportunity Package* brochure, Ex. 17; and *Check, Savings &*

28   *More Brochure*, Ex. 34.)  Despite the acknowledgement by a senior Wells Fargo executive that the term

-10-

is misleading, the term "automatically deducted" continues to be used to describe how debit card funds are deducted from checking accounts.  (Wells Fargo "How do Wells Fargo's Check Cards Work" webpage, Ex. 35.)

### 3) Wells Fargo's Disclosures Regarding Re-Sequencing Were Grossly Inadequate in Light of Its Practice and Misrepresentations About the Practice

Buried deep in the Consumer Account Agreement, and part of a lengthy and dense statement, Wells Fargo indicates that the bank *may* post items in any order the Bank chooses unless the law governing the account prohibits a particular order; that it *may* if it chooses post items in order of the highest dollar amount to the lowest dollar amount; and that the Bank *may* change the order of posting without notice.  (2005 Consumer Account Agreement, Ex. 36 at p. 27.)

Those statements indicate what the Bank might do, not what the Bank is doing, leading the customer to believe that sequencing from highest to lowest is not what the Bank is doing at the present time. It certainly does not indicate that Wells Fargo has, for over [ REDACTED ], had an automated secret daily routine of artificially re-sequencing debit card transactions from highest to lowest to increase the number of overdraft fees when the customer has overdrafted their account.

The evidence of how meaningless this language is as disclosure language, is that Wells Fargo used identical language indicated that it *may* post from highest to lowest in its 1999 Account Agreements (1999 Consumer Account Agreement And Safe Deposit Box Lease Terms, Ex. 37, at p.22-23), when its actual practice was to sequence transactions from *lowest to highest*.  When the exact same language is used to disclose two polar opposite ways of posting, it can hardly be stated that the disclosure is adequate to explain to customers how Wells Fargo sequences the posting order.

The disclosure language found in other parts of the account agreements covering the class period also conflict with the language stating the Bank *may* post from highest to lowest.  For instance, on page 26 of the agreement, it states:

> **The Bank may debit your Account on the day an *Item* is presented by any means, including without limitation electronically, or at an earlier time based on notification received by the Bank that an Item drawn on you your Account will be presented for payment or collection.**

(2005 Consumer Account Agreement, Ex. 36 at p. 26.)

1    This language would suggest that debit card transactions are posted when the Bank authorizes the

2    transaction, rather than at some later date, which is consistent with Wells Fargo's other representations

3    that when a customer uses a debit card, the funds are immediately withdrawn from the account.

4         While it is possible to interpret the confusing and conflicting disclosure language in a number of

5    different ways, if its intent was to notify customers that Wells Fargo had a practice of re-sequencing

6    debit card transactions in the middle of the night, at which time it would change the processing or

7    posting from a chronological order to a highest to lowest order, it certainly did not serve that function.

8    Wells Fargo completely fails to indicate how the posting or sequencing actually works.  In light of the

9    express and implied representation that when customers use the debit card, funds are immediately

10   withdrawn from the account, these disclosures are meaningless and useless.

11   **C.    Wells Fargo Engaged in a Systematic Pattern of Misrepresentation Regarding the
         Accuracy of Available Balances that Caused Customers to Overdraft Their Accounts**

12

13        Plaintiffs' second claim ("including then deleting" class claims) is that through marketing and

14   providing false and inflated account balance information, Wells Fargo induced customers to overdraft

15   their accounts.  It is undisputed that the "available balance" figure provided to customers does not

16   include all pending debit card charges.  For check cards purchases, only 8% of those transactions are

17   posted within one business day. (Deposition of Stacey Pinkerd, Ex. 38, 14:15 - 17:16.)   In spite of this

18   fact, for Wells Fargo's customers' [                    REDACTED

19

20

21

22                                                   ]

23        Because of the obvious concern with using the term "available balance" when that figure is often

24   inflated and inaccurate, Wells Fargo would need significant disclosures to charge overdraft fees on

25   transactions where Wells Fargo provided inflated available balance information.  Yet Wells Fargo did

26   the opposite.  [                    REDACTED

27                        ] (Zimmerman, Ex. 26 77:1 – 78:21.)

28

-12-

1    Further, and even more sinisterly, Wells Fargo actively misrepresented the available balance to

2    customers:

3    **"Why are my available balance and ending balances different?**
     **Your available balance is the most current information regarding the funds you**

4    **have available for withdrawal, ATM or Check Card purchases, or writing checks.**

5    • **It reflects the latest balance based on transactions recorded to your**
     **account today, including direct deposits, paid checks, withdrawals,**

6    **and point-of-sale purchases."**

7    (Wells Fargo's Account Activity Questions webpage, Ex. 39.)

8    In another webpage, Wells Fargo made clear that the "current information" includes all pending

9    transactions when:

10   **"The Account Activity screen shows <u>all</u> of your recent and pending transactions for the last**

11   **60-90 days"**

12   (Wells Fargo Online Statements Questions, Ex. 40, (underline added).)

13   There can be no dispute that this statement is false and an express and intentional

14   misrepresentation.  There can also be no dispute that Wells Fargo heavily promoted and marketed the

15   use of available balance both online and in print advertisements.  (Print Advertisements, Ex. 41.)

16   [                                    REDACTED

17

18

19

20

21

22

23                                                          ]   (Deposition of Karen Moore, Ex. 43,

24   37:21 - 39:7.)

25   Wells Fargo intentionally misrepresented this [        REDACTED        ] by falsely stating in

26   financial literacy and education materials that:

27   **"If you do not have enough money in your account to cover the withdrawal, your purchase**
     **won't be approved."**

28

     (Hands on Banking Adult Teaching Guide, Ex. 22, p.47.)

                                              -13-

1   While this practice is not being directly challenged in this case because of a very suspect

2   "settlement" of such a claim by Wells Fargo and other plaintiffs' counsel in San Diego County Superior

3   Court, it is directly relevant to this action because it results in an increase of overdraft fees for both the

4   "including and deleting" class members and "re-sequencing" class members.

5   Under these set of facts, where it is clear Wells Fargo has engaged in a systematic and wide-

6   spread campaign to at best conceal the true facts from its customers, and in many cases, actively plot to

7   confuse or deceive them,  it is clear that there is overwhelming evidence to support Plaintiffs' claims,

8   including reliance and damages.

9   ## III

10   ## SUMMARY OF ARGUMENT

11   Plaintiffs respectfully submit that the Motion of Defendant Wells Fargo Bank, N.A. for Partial

12   Summary Judgment on Plaintiffs' Misrepresentation Claims should be denied based on the following

13   grounds:

14   (1)   This motion by Wells Fargo presents no new law or facts, and is simply a rehashing of

15   arguments that the Court has already twice rejected.

16   (2)   The Class Representatives have standing to bring the misrepresentation and

17   nondisclosure claims on behalf of the Classes.

18   (3)   It is Undisputed that Well Fargo's systematic and pervasive scheme had the tendency to

19   mislead Wells Fargo customers, providing overwhelming evidence that the Certified

20   Classes will be able to establish all the necessary elements to prevail on their claims.

21   ## IV

22   ## ARGUMENT

23   **A.   Wells Fargo Attempts to Rehash Resolved Issues By Reasserting For the Third Time Its Failed Attack on Plaintiffs' Standing to Bring Claims**

24

25   After the denial of an earlier summary judgment motion, the moving party may later renew the

26   motion by showing a different set of facts or law, or by showing exceptional circumstances justifying

27   renewal of the motion. *See Preaseau v. Prudential Ins. Co. of America*, 591 F.2d 74, 79 (9th Cir. 1979);

28   *Golden Gate Hotel Ass'n v. City & County of San Francisco*, 18 F.3d 1482, 1485 (9th Cir. 1994).

-14-

1    However, that is not what Wells Fargo has done.  It raises the same arguments, using the same language,

2    and, relying on the same law and facts that it did in the original motion for summary judgment.  Its

3    position was without merit then, and is without merit now.

4         Defendant attempts to distinguish this motion from the previous motion for summary judgment,

5    by first acknowledging that it is raising the same issues raised in the first motion for summary judgment

6    (in fact a review of the two motions shows almost identical language), but attempts to justify the re-

7    filing through a vague reference to the Court having overlooked the issue when making its ruling.

8    (Motion, Footnote, 4: 27.)

9         However, Defendant is wrong. The Court spent considerable time in its Order denying the

10   Motion for Summary Judgment, and explaining the basis for the denial of the Defendant's claim.  The

11   Court found for the "including and then deleting" class that Plaintiffs had evidence there were no

12   disclosures at all (Court's Order, at pp. 15-16.)  The Court further found that Plaintiffs' had evidence

13   that this practice was deceptive because there is no adequate notice provided to customers when the

14   included items are deleted, with the potential to deceive customers into thinking they have a larger

15   balance and inducing them to go into overdraft situations.  (Court's Order, at p. 14.)

16        With respect to the practice of re-sequencing the posting of debit card transactions from

17   chronological order to highest-to-lowest, the Court found that Plaintiffs' had evidence that the disclosure

18   was inadequate.  It is buried deep within the lengthy statement.  It only says the bank *might* post items

19   presented against the account in any order the bank chooses (unless the law requires otherwise).  It uses

20   the word "may" rather than "will," leading the customer to believe, in the context of the statement, that

21   reordering is not automatic but merely an exception – whereas reordering is a secret daily routine aimed

22   solely at maximizing penalty revenue for the bank at the expense of the customer. (Court's Order, at p.

23   15.)

24        The Court further ruled that all three putative Class Representatives have standing to bring all

25   claims, rejecting Wells Fargo's attack on named Plaintiffs' standing to bring the misrepresentation and

26   nondisclosure claims. (Court's Order, at pp. 19-20.) The Court has already considered and rejected this

27   claim.  However, the Court has not only considered Defendant's claims once, but again considered them

28   in the opposition to the Motion for Class Certification, where Defendant claimed that the putative Class

-15-

1    Representatives could not establish reliance, causation, and actual injury.  (Wells Fargo's Opposition to

2    Plaintiffs' Motion for Class Certification. at pp. 12-13.)

3         Now for the third time, Wells Fargo challenges the standing of the Class Representatives to the

4    certified class, using the same language, facts, arguments and law as it has the prior two times.  No

5    matter how many times Defendant ignores the facts to make this same argument, it does not change the

6    fact that the certified Class and the Class Representatives can easily establish reliance and injury.

7    **B.     The Class Representatives Have Standing to Bring Misrepresentation and Nondisclosure
           Claims Under the Requirements of Proposition 64**

8

9         Wells Fargo asserts that the Class Representatives have not seen each and every

10   misrepresentation it made to the Certified Class, so therefore, they do not meet Proposition 64's

11   requirement of actual reliance and injury.  That is a clear misunderstanding of the threshold

12   requirements imposed by Proposition 64.  Such a holding will have the very undesirable effect of

13   encouraging defendants, when they were embarking on a course of deception, to engage in deception in

14   as many different ways as possible, insuring that no victim would be able to state that they were victims

15   of each of the misrepresentatives.

16        There is substantial evidence that the Class Representatives have been exposed to, and have

17   relied upon, certain of the misrepresentations and nondisclosures which are a part of Wells Fargo's

18   systematic and pervasive scheme of deception.  That is enough to meet their requirements both

19   individually and as Class Representatives. The intent behind Proposition 64 was to discourage abusive

20   class action litigation by requiring that named plaintiffs have valid claims, not to provide a defense to a

21   case brought by a real consumer who was actually harmed by Defendant's conduct. *Hall v. Time Inc.*,

22   158 Cal. App. 4th 847, 854 (2008).

23        Reliance is a question of fact to be left to the jury:  the California Supreme Court has explained

24   that "[r]eliance exists when the misrepresentation or nondisclosure was an immediate cause of the

25   plaintiff's conduct which altered his or her legal relations, and when without such misrepresentation or

26   nondisclosure he or she would not, in all reasonable probability, have entered into the contract or other

27   transaction." *Alliance Mortgage Co. Rothwell*, 10 Cal. 4th 1226, 1239, 900 P.2d 601, 608-09 (1995).

28   Under California law, it is not necessary that a plaintiff's reliance upon the truth of the fraudulent

     misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct; it is

-16-

1   enough that the representation has played a substantial part, and so has been a substantial factor, in

2   influencing his decision. *City Solutions, Inc. v. Clear Channel Communications*, 365 F.3d 835, 840 (9th

3   Cir. 2004) (*citing Engalla v. Permanente Med. Croup, Inc.*, 15 Cal. 4th 951, 976-77, 64 Cal. Rptr. 2d

4   843 (1997)).

5        The California Supreme Court, in *Alliance*, also established that "[e]xcept in the rare case where

6   the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a

7   plaintiff's reliance is reasonable is a *question of fact.*"  10 Cal. 4th at 1239, 900 P.2d at 609 (*quoting*

8   *Blankenheim v. E.F. Hutton & Co., Inc.*, 217 Cal. App. 3d 1463, 1475, 266 Cal. Rptr. 593 (1990); *Gray*

9   *v. Don Miller & Associates, Inc.*, 35 Cal. 3d 498, 503, 198 Cal. Rptr. 551, 674 P.2d 253 (1984)

10  ["[w]hether reliance is justified is a question of fact for the determination of the trial court"]; *Guido v.*

11  *Koopman*, 1 Cal. App. 4th 837, 843, 2 Cal. Rptr. 2d 437 (1991) ("the reasonableness of the reliance is

12  ordinarily a question of fact")) (emphasis added.)

13       Under common law fraud and negligent misrepresentation, the plaintiff must establish justifiable

14  reliance and resulting damages. *Lazar v. Superior Court*, 12 Cal.th 631, 738, 909 P.2d 981 (1996).  For

15  fraud based on concealment or nondisclosure, the plaintiff must instead establish a duty to disclose,

16  which can be done by showing: 1) that the defendant had exclusive knowledge of material facts not

17  known to plaintiff, 2) that the defendant actively conceals a material fact from plaintiff, and 3) that the

18  defendant makes partial representations but also suppresses some material fact. *Falk v. General Motors*

19  *Corp.*, 496 F. Supp. 2d 1088, 1094-97 (2007); *Limandri v. Judkins*, 52 Cal.App.4th 326, 337, 60

20  Cal.Rptr.2d 539 (1997).  In order for non-disclosed information to be material, a plaintiff must show that

21  "had the omitted information been disclosed, one would have been aware of it and behaved differently."

22  *Mirkin v. Wasserman*, 5 Cal.4th 1082, 1093, 23 Cal. Rptr. 2d 101 (1993).

23       Here, all three Class Representatives have seen and relied on Wells Fargo's misrepresentations;

24  were victims of Wells Fargo's nondisclosure of its practices; and were thereby damaged by being

25  assessed unwarranted, expensive overdraft fees. This is established using the evidence that was entirely

26  available to Wells Fargo when it submitted its first motion for summary judgment.

27

28

[Redacted] Plaintiffs' Opposition to Defendant's Motion for Partial Summary Judgment
Case No.: C 07-05923 WHA (JCSx)

1

       1)   **Plaintiff Gutierrez Has Standing to Pursue Misrepresentation and Nondisclosure Claims With Regards to Wells Fargo's Practice of Re-Sequencing the Posting of Transactions**

Plaintiff Gutierrez, the Class Representative for the Re-Sequencing Class, believed based on the materials she had reviewed from Wells Fargo, and the statement messages received by Wells Fargo, and most importantly, from the misleading and deception way that Wells Fargo sequenced pending transactions in a chronological order as pending charges online.   As discussed in Ms. Gutierrez' declaration to the first motion for summary judgment, (Gutierrez Declaration, Ex. 44), Ms Gutierrez was enrolled in online banking (Gutierrez Deposition (hereinafter referred to "Gutierrez'), Ex. 47, 46:13-20.) She regularly reviewed her Account Activity page online, which listed her pending debit card transactions in chronological order, and she believed that her debit card transactions would be posted on her account the moment she swiped her card.  (Gutierrez, Ex. 47, 49:9-15; 47:20-25).

She did not know how there can be sufficient funds when a transaction is approved, but there might not be sufficient funds anymore by the time that transaction gets posted on her account. (Gutierrez, Ex. 47, 96:12-23).  The mechanism for this is the re-sequencing of her debit card transactions from chronological order to highest to lowest result sin additional overdraft fees when there is a mistake and an overdraft, a practice which was never adequately disclosed to her or any other customers by Wells Fargo.

As a result of this combination of deception in how pending charges were portrayed in chronological order combined with the non-disclosure and concealment, Gutierrez entered into transactions on October 5 and 6, 2006, which resulted in more overdraft fees than she would have been assessed had Wells Fargo not re-sequenced her transactions.  Had she known that she could be charged multiple overdraft charges as a result of Well Fargo's practice of re-sequencing her transactions from chronological order to highest to lowest prior to October 5, 2006, then she would have insured that there was always a higher minimum balance in the account to cover this contingency. (Gutierrez Declaration, Ex. 47.)

In light of the above facts, it is evident that Class Representative Gutierrez reasonably relied on Wells Fargo's misrepresentations and non-disclosures with respect to the practice of re-sequencing her debit card transactions, and that such reliance caused her to be damaged.

-18-

### 2) Plaintiff Walker Has Standing to Pursue Misrepresentation and Nondisclosure Claims With Regards to Wells Fargo's Practice of Including and then Deleting the Posting of Authorized Transactions, Resulting in an Inflated Available Balance

Plaintiff Erin Walker, a Class Representative for the Including and Deleting Class, was exposed to and read the Welcome to Wells Fargo Jacket prior to signing up for her account, which implicitly extols the reliability of the online account balance information. (Deposition of Erin Walker (hereinafter referred to as "Walker"), Ex.48, 20:5—21:4.)   As outlined in her declaration filed in the first motion for summary judgment (Walker Decl., Ex. 45), as well as her deposition, she regularly checked her account online to check her "available balance" information in order to keep track of her transactions. (Walker, Ex. 48, 27:9—21; 29:15-19; 33:20-25).

Wells Fargo never disclosed to her or any other customer its practice of including and then deleting the posting of certain debit card transactions, which results in inflated "available balance" information.   Therefore, she never knew that she could be charged an overdraft fee for a transaction when at the time of the transaction; her available balance information indicated to her that she had sufficient funds in her account to cover the transaction. (Walker Decl., Ex. 45.)  Walker believed that "available balance" meant money that was actually available, and that the available balance included her recent purchases. (Walker, Ex. 48, 34:14-18).

In July of 2006, Walker relied on the available balance information, was assessed a number of overdraft fees.  Had she known about Wells Fargo's practice which caused her to incur additional overdraft fees prior to June, 2007, she would have ceased using her Wells Fargo account and changed banks, which she did after having been assessed the subject overdraft fees. (Walker Decl.)

In light of the above facts, it is evident that Class Representative Erin Walker reasonably relied on Wells Fargo's misrepresentations and non-disclosure with respect to "available balance", and that such reliance caused her to be damaged.

### 3) Plaintiff Smith Has Standing to Pursue Misrepresentation and Nondisclosure Claims With Regards to Wells Fargo's Practice of Including and then Deleting the Posting of Authorized Transactions, Resulting in an Inflated Available Balance

As outlined in William Smith's declaration in opposition to the first motion for summary judgment, Plaintiff William Smith, a Class Representative for the Including and Deleting Class, heavily

-19-

1    relied on "available balance" information on Wells Fargo's website to monitor his accounts. (Smith

2    Decl., Ex. 46.) Although he was aware from a previous incident that it was possible for a transaction to

3    fall off the available balance, even though it had already been listed as a pending charge, Wells Fargo

4    never disclosed to him how, why or when that could happen. (Smith Decl, Ex. 46.) He believed that the

5    available balance was the liquid balance he could use for any purpose, and that he could trust his

6    available balance information. (Deposition of William Smith, Ex. 49, 33:11-17; 31:25—32:5.)

7        On July of 2007, Mr. Smith relied on his inflated available balance information provided to him

8    online by Wells Fargo, and because it was inflated, specifically caused him to overdraft from his

9    account. (Smith Decl., Ex. 46.) Had the "available balance" information provided by Wells Fargo been

10    accurate, as he had believed, then he would have avoided both overdraft charges by transferring more

11    money into this account. (Smith Decl., Ex. 46.).

12        Based on these facts, it is clear that William Smith also reasonably relied on Wells Fargo's

13    misrepresentations and non-disclosure with respect to the practice of including and then deleting debit

14    card transactions from his available balance, and that such reliance caused him to be damaged.

15    Consequently, all three Class Representatives have standing to bring the misrepresentation and

16    nondisclosure-based claims, just as the Court has already ruled in its prior Order.

17        Furthermore, the intent of Proposition 64 supports a finding that these Class Representatives

18    have standing to bring these claims as these are substantial, valid claims brought by actually injured

19    plaintiffs; this is not a sham class action and there is absolutely no evidence of abuse of the class action

20    vehicle. Therefore, the Court should deny the Motion of Wells Fargo Bank, N.A. for Partial Summary

21    Judgment on Plaintiffs' Misrepresentation Claims in its entirety.

22   **C.**     **The Classes Easily Meet Their Burden for Establishing Reliance and Damages**

23        Although Wells Fargo only attacks the Class Representatives on standing in its motion for partial

24    summary judgment, it does so attempting to escape it obvious liability for misrepresentations to the

25    Certified Class. But as set forth in the facts, Wells Fargo had in place an intentional, systematic and

26    pervasive scheme of misrepresentation and nondisclosure, which had a tendency to deceive a reasonable

27    Wells Fargo consumer (Declaration of Dr. Lewis Mandell), and resulted in tremendous damages to the

28

[Redacted] Plaintiffs' Opposition to Defendant's Motion for Partial Summary Judgment
Case No.: C 07-05923 WHA (JCSx)

1  members of the Classes and enormous profits to Wells Fargo. That easily provides reliance, intent to

2  defraud, and damages for the class claims.

3       As the CLRA, UCL, FAL, and common law fraud and negligent misrepresentation claims

4  involve a similar test for class-wide reliance of whether the actions had a tendency to deceive, the

5  satisfaction of reliance and damage with any of these causes of action insures reliance and damage for

6  each of the causes of action. Accordingly, the causes of action will be discussed as a group relating to

7  the issue of reliance and damages.

8       A class action may be pursued based on an overarching fraudulent scheme involving both

9  misrepresentation and nondisclosures. *Negrete v. Allianz life Ins. Co. of North America*, 238 F.R.D.

10  482, 492 (C.D. Cal. 2006); *see also In re U.S. financial Securities Litigation*, 54 F.R.D. 443, 451 (S.D.

11  Cal. 1974) (in a class action involving a common scheme of deception directed at large number of

12  investors, a case for fraud may lie based on affirmative misrepresentations or nondisclosure.)

13       As discussed in detail in the fact section, this case involves a systematic and pervasive scheme

14  by Wells Fargo to explicitly and implicitly misrepresent its practices through statements made in all

15  available medium, including brochures, commercials, disclosure materials, account terminology,

16  educational programs, and websites (all intended to entice new customers or misinform current

17  customers), and to conceal material information as to the subject practices. Therefore, Plaintiffs' claims

18  are based on an overarching scheme involving both misrepresentation and concealment.

19       Based on the facts presented in the fact section of this method, including the pervasiveness and

20  force of the language of the misrepresentations, that Wells Fargo intentionally concealed material

21  information as to their actual practices, and the counter-intuitive and non-common sense nature of these

22  practices, bolstered by the unopposed (Declaration of Richard D. McCune, ¶51) declaration of a highly

23  qualified expert, Dr. Lewis Mandell, who declares the misrepresentations and non-disclosures had a

24  tendency to deceive Wells Fargo customers, Plaintiffs have demonstrated that the members of the

25  Classes were not aware of the mechanisms of the practices that caused them to artificially incur

26  additional expensive overdraft fees and have relied on the misrepresentations.

27       Under California law, since direct proof of fraudulent intent is often an impossibility, because the

28  real intent of the parties and the facts of a fraudulent transaction are peculiarly in the knowledge of those

1   sought to be charged with fraud, proof indicative of fraud may come by inference from circumstances

2   surrounding the transaction, the relationship, and interest of the parties.  *Miller v. National American*

3   *Life Ins. Co., 54 Cal. App. 3d 331, 338-39, 126 Cal. Rptr. 731 (1976).*  Here, as Wells Fargo's own

4   documents show that Wells Fargo unfairly profited enormously by its conduct at the expense of the

5   class, and that it intentionally concealed information and dispersed misrepresentations, both the intent to

6   defraud and damages elements have easily been met for the class.  Consequently, Plaintiffs have

7   established classwide claims for fraud based on misrepresentation and concealment, as well as violations

8   of the UCL, CLRA, FAL and negligent misrepresentation.

9                                              **V**

10                                      **CONCLUSION**

11          Based on the foregoing, Plaintiffs respectfully requests that the Court deny the Motion of

12   Defendant Wells Fargo Bank, N.A. for Partial Summary Judgment on Plaintiff's Misrepresentation

13   Claims in its entirety.

14   DATED:  February 26, 2009.

                                                    MCCUNE & WRIGHT LLP

16                                        BY: _____

17                                              Richard D. McCune
                                                Attorney for Plaintiffs