Sonya D. Winner, SB # 200348
Lawrence A. Hobel, SB # 73364
David M. Jolley, SB # 191164
Margaret G. May, SB # 234910
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111
Telephone:  (415) 591-6000
Facsimile:  (415) 591-6091
E-mail:  swinner@cov.com

Attorneys for Defendant
WELLS FARGO BANK, N.A.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| VERONICA GUTIERREZ, *et al.*,<br><br>              Plaintiffs,<br><br>     v.<br><br>WELLS FARGO & COMPANY, *et al.*,<br><br>              Defendants. | Civil Case No.:  CV-07-5923 WHA (JCSx)<br><br>**NOTICE OF MOTION AND MOTION OF DEFENDANT WELLS FARGO TO DECERTIFY CLASSES**<br><br>Date:   April 23, 2009<br>Time:   8:00 a.m.<br>Dept.:  Courtroom 9<br><br>Honorable William H. Alsup |

**[PUBLIC REDACTED VERSION]**

**TABLE OF CONTENTS**

NOTICE OF MOTION ................................................................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................... 1

I.      INTRODUCTION AND SUMMARY OF ISSUES TO BE DECIDED ...................... 1

II.     FACTUAL AND PROCEDURAL BACKGROUND ................................................. 3

      A.      The Court's Class Certification Order and the Class Definitions .......................... 3

      B.      Plaintiffs' Evidence on Class Identification, Injury, and Damages ...................... 4

            1.      Including and Deleting Class ................................................................. 6

            2.      Re-Sequencing Class ........................................................................... 10

      C.      Plaintiffs' Final Interrogatory Responses ........................................................... 12

      D.      Plaintiffs' Evidence of Dissemination of Challenged Advertising and
           Other Statements .................................................................................................. 12

III.    ARGUMENT ............................................................................................................. 13

      A.      Decertification Is Appropriate Where Plaintiffs Fail to Develop the
           Required Common Proof of Necessary Elements of Their Claims. .................... 13

      B.      The Including and Deleting Class Should Be Decertified. ................................... 15

            1.      Plaintiffs Have Failed to Present a Methodology that Makes the
                   Class Ascertainable and Permits Injury to Class Members to Be
                   Established Through Common Proof. ..................................................... 15

            2.      The Interests of the Class Conflict on Plaintiffs' Challenge to
                   Wells Fargo's Methodology for Calculating Available Balances. .......... 19

            3.      Common Evidence Does Not Exist to Permit Assessment of
                   Questions of Mitigation, Waiver, and Voluntary Payment. ................... 20

      C.      The Re-Sequencing Class Should Be Decertified. .............................................. 22

            1.      Plaintiffs Have Failed to Present a Methodology that Makes the
                   Class Ascertainable and Permits Injury to Class Members to Be
                   Established Through Common Proof. ..................................................... 22

            2.      Common Proof Does Not Exist to Permit Assessment of
                   Questions of Mitigation, Waiver, and Voluntary Payment. ................... 23

            3.      The Interests of the Class Diverge. ....................................................... 24

      D.      To the Extent Any Misrepresentation Claims Survive, Such Claims
           Cannot be Established Through Common Proof. ................................................. 24

IV.     CONCLUSION .......................................................................................................... 25

## TABLE OF AUTHORITIES

**FEDERAL CASES**                                                      **PAGE(S)**

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*,
    247 F.R.D. 156 (C.D. Cal. 2007)...........................................................16, 17, 20, 22

*Anderson v. Boeing Co.*,
    2006 WL 2990383 (N.D. Okla. Oct. 18, 2006) ...................................................14

*Binder v. Gillespie*,
    184 F.3d 1059 (9th Cir. 1999) ...............................................................................14

*Deitz v. Comcast Corp.*,
    2007 WL 2015440 (N.D. Cal. 2007) ........................................................15, 22, 25

*Dukes v. Wal-Mart, Inc.*,
    509 F.3d 1168 (9th Cir. 2007) ...............................................................................14

*Dunnigan v. Metro. Life Ins. Co.*,
    214 F.R.D. 125 (S.D.N.Y. 2003) ...........................................................................15

*General Tel. Co. of Southwest v. Falcon*,
    457 U.S. 147 (1982)................................................................................................13

*Gonzalez v. Proctor & Gamble Co.*,
    247 F.R.D. 616 (S.D. Cal. 2007) ..........................................................................24

*In re Hotel Tel. Charges*,
    500 F.2d 86 (9th Cir. 1974) ............................................................................16, 18

*In re Methionine Antitrust Litig.*,
    2003 WL 22048232 (N.D. Cal. Aug. 26, 2003) ..................................14, 15, 17, 22

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
    522 F.3d 6 (1st Cir. 2008)......................................................................................14

*In re Northern Dist. of Cal. Dalkon Shield IUD Prods. Liab. Litig.*,
    693 F.2d 847 (9th Cir. 1982) .................................................................................22

*In re Safety-Kleen Corp. Bondholders Litig.*,
    2004 WL 3115870 (D.S.C. Nov. 1, 2004).............................................................14

*Molski v. Gleich*,
    318 F.3d 937 (9th Cir. 2003) .................................................................................16

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    259 F.3d 154 (3d Cir. 2001) ..................................................................................16

*Pickett v. Iowa Beef Processors,*
  209 F.3d 1276 (11th Cir. 2000) .................................................20, 24

*Pierce v. County of Orange,*
  526 F.3d 1190 (9th Cir. 2008) .................................................14

**STATE CASES**

*Guido v. Koopman,*
  1 Cal. App. 4th 837 (1991) .................................................19

*Mirkin v. Wasserman,*
  5 Cal. 4th 1082.................................................16, 19, 24

*Thrifty-Tel, Inc. v. Bezenek,*
  46 Cal. App. 4th 1559 (1996) .................................................21

*United States Fid. & Guar. Co. v. Am. Employer's Ins. Co.,*
  159 Cal. App. 3d 277 (1984) .................................................16

**STATE STATUTES**

Cal. Bus. & Prof. Code § 17204 .................................................16

Cal. Bus. & Prof. Code § 17535 .................................................16

Cal. Civ. Code § 1780(a) .................................................16

**RULES**

Fed. R. Civ. P. 23.................................................1, 3, 13, 25

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that on April 23, 2009, at 8:00 a.m. in the courtroom of the Honorable William H. Alsup, United States District Court for the Northern District of California, San Francisco Division, 450 Golden Gate Ave., Courtroom 9, 19th Floor, San Francisco, California, or at such date and time as the Court may otherwise direct, defendant Wells Fargo Bank, N.A. ("Wells Fargo") will move and hereby does move the Court for an order decertifying both of the classes previously certified by the Court in this action.

This motion is made pursuant to Fed. R. Civ. P. 23 on the grounds that: (a) plaintiffs have failed to follow through on their representation to the Court that they would present a methodology that permits injury to the members of the classes to be established through common proof and that makes the classes ascertainable, (b) there are conflicts of interest within the classes, and (c) common evidence does not exist to permit assessment of substantial questions relating to waiver, voluntary payment, and mitigation.

The motion is based on this notice, the memorandum of points and authorities set out below, and the accompanying Declarations of David M. Jolley, John Ahrendt, Christopher M. James, Itamar Simonson, Todd Menenberg, and Steven Visser, as well as the previously filed declaration of Kenneth Zimmerman (Dkt. No. 41), together with such further argument and evidence as the Court shall permit.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION AND SUMMARY OF ISSUES TO BE DECIDED**

In granting class certification in this case, the Court relied heavily on plaintiffs' representation, presented through an expert, Professor Mandell, that it would be possible to develop an "algorithm" through which the classes could be made ascertainable and injury and damages established through common proof.[1]  Fact discovery has now closed, and expert

---

[1]      *See* Order Denying Defendant's Motion for Summary Judgment and Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification, at 24, 27 (September 11, 2008) (Dkt. No. 98) ("Class Order"); Declaration of Lewis Mandell (Dkt. No. 36-23).

reports have been exchanged.  No expert report from Professor Mandell on any such "algorithm" has been presented.  Instead, plaintiffs have presented reports from two different experts who between them have purported to estimate aggregate damages (in the form of excessive assessments of overdraft fees) suffered by each of the two certified classes during the class period.  Plaintiffs have developed and identified no other evidence on these issues.

Plaintiffs' experts do not address ascertainability.  They neither identify class members nor present a methodology through which such identification could be accomplished.

Even more importantly, neither expert addresses actual injury to class members.  Their methodology does not (and cannot) demonstrate that any particular class member (much less all class members) suffered actual injury as a result of the challenged practices.  Instead, they were told to *assume* the existence of injury and to prepare aggregate estimates of damages for each class as a whole.  Yet it is beyond dispute – indeed, effectively admitted by plaintiffs' experts – that a significant percentage of class members did not actually pay the fees at issue and therefore suffered no injury.

Moreover, plaintiffs' purported measure of damages are not tailored to the actual claims in this case.  In its Class Order, the Court provided class definitions that embodied and delineated the claim that each class was entitled to pursue.  Plaintiffs' experts to a large extent ignored those definitions.  Instead of measuring damages suffered by the classes the Court had identified, plaintiffs' methodologies do no more than (at most) provide generalized estimates of damages suffered by *different* collections of people based on scenarios that are fundamentally inconsistent with the Court's class definitions.

Thus, plaintiffs are left with classes consisting of unidentified (and unidentifiable) groups of people, without any way of determining who within those amorphous classes actually suffered any injury from the challenged practices.  Plaintiffs have also failed to come forward with common evidence through which their misrepresentation claims (to the extent such claims survive Wells Fargo's previously filed Motion for Partial Summary Judgment) could be proven.

Having failed to make good on their promise to provide common proof on critical elements of their claims, plaintiffs cannot pursue this suit as a class action.  Both classes should be decertified pursuant to Fed. R. Civ. P. 23(c)(1)(C).

## II.        FACTUAL AND PROCEDURAL BACKGROUND

### A.        The Court's Class Certification Order and the Class Definitions

In their motion for class certification, plaintiffs sought certification of an "available balance" class of Wells Fargo customers who incurred overdraft fees "as a result of being provided inaccurate available balance information by Wells Fargo."  Motion for Class Certification (Dkt. No. 36) at 11.  They also sought certification of a "sufficient funds" class of customers who incurred overdraft fees on debit-card transactions for which there were "sufficient funds" in their accounts at the time they made the purchases.  *Id.*

The Court granted plaintiffs' motion for class certification in part and denied it in part in its Class Order.  The Court found plaintiffs' class definitions to be "overbroad and unhelpful."  Class Order at 21.  The Court instead certified two narrower classes, an "Including and Deleting Class" and a "Re-Sequencing" class.

With respect to the "Including and Deleting" class, the Court stated:

> "To be clear, the only viable claim concerning the available-balance information concerns Wells Fargo's practice of including but then deleting transactions without adequate notice.  The mere fact that the available balance appearing online or at an ATM is sometimes not fully accurate is not, by itself, enough to state a claim."

*Id.* at 13.[2]  The Court accordingly defined the "Including and Deleting" class as

> "[A]ll Wells Fargo California customers with consumer checking accounts from November 15, 2004, to June 30, 2008, who incurred overdraft fees on debit card transactions after dissemination by Wells Fargo of available-balance information that once reflected and later deleted a debit card transaction."

*Id.* at 25.

---

[2]        The Court observed that "the bank has no way of knowing the extent of unpresented checks and the extent of debit transactions that will turn out to be more than what was initially authorized," and that the bank clearly disclosed the fact that some transaction activity might not be reflected in the available balance.  *Id.* at 13-14.

The Court substantially revised plaintiffs' other proposed class definition as well, defining the "Re-Sequencing" class as:

> "[A]ll Wells Fargo California customers from November 15, 2004, to June 30, 2008, who incurred overdraft fees on debit card transactions as a result of the bank's practice of sequencing transactions from highest to lowest."

*Id.* at 27.

In discussing the claims of the Re-Sequencing class, the Court stressed that the claim of that class focused only on the sequencing of debit card transactions. The Class Order accepted Wells Fargo's right to post other types of transactions in any order it chose and provided an example of a posting order in which transactions were posted, after checks, in chronological order by day. Class Order at 12 & n.3.

### B.    Plaintiffs' Evidence on Class Identification, Injury, and Damages

A major point of contention on the original motion for class certification was plaintiffs' assertion that the classes were ascertainable and that injury to class members and damages could be demonstrated through common proof without the need for individualized analysis. Plaintiffs submitted a declaration from an expert, Professor Mandell (Dkt. No. 36-23), who opined that "algorithms" could be generated and applied to Wells Fargo's computerized transaction records to identify class members, prove injury, and measure damages. The Court accepted this representation in certifying the classes. Class Order at 24, 27.

Although plaintiffs have now served an expert report from Professor Mandell, it does not address algorithms, ascertainability, proof of injury, or damages. Jolley Dec. ¶ 25. (Professor Mandell has instead now become plaintiffs' proposed expert on consumer perception and financial literacy. *Id.*) Plaintiffs' evidence on those issues consists solely of analyses set out in reports from a computer analysis expert, Art Olsen, and a statistician, Charles Cowan.[3]

---

[3]    Copies of the reports from Olsen and Cowan are attached as Exhibits 25-32 to the Declaration of David Jolley. There are a wide variety of methodological and other problems with the reports of these experts; the discussion here focuses only on those that are particularly significant to the issues raised in this Motion. Wells Fargo has not yet taken the depositions of these experts, and after it does so it expects to file *Daubert* motions concerning both of them.

During fact discovery, plaintiffs asked Wells Fargo to produce a download of all account transaction data for one month for a random sample of 10,000 customers. Wells Fargo produced all of the computerized data that plaintiffs requested, without exception. Jolley Dec. ¶ 26, Ex. 24. Olsen performed a computerized analysis of that data (discussed further below) to calculate the amounts of overdraft fees assessed against the sample accounts under a variety of scenarios. Cowan then extrapolated Olsen's results to provide damages estimates for the full class period.

Cowan admits that his calculations cannot be used to prove injury; instead, he was told to *assume* that injury would be established by "others." Jolley Dec. Ex. 30 at 1.

Plaintiffs have acknowledged in responses to Requests for Admission that no member of either class suffers injury from overdraft fees that were assessed on their accounts but "were subsequently waived, forgiven, refunded, or otherwise not paid." Jolley Dec. Ex. 6, Nos. 24-25. It is undisputed that approximately 20 percent of overdraft fees assessed against customers' accounts are subsequently waived (*e.g.*, at the request of the customer) or charged off (when the customer effectively abandons the account with a negative balance). *See* Jolley Dec. Ex. 1 at 93-94. Both can occur long after the fee is originally assessed.[4]

Plaintiffs' experts do not dispute that 20 percent of assessed overdraft fees are never actually paid. However, they did nothing to identify customers who actually paid fees; instead Cowan just made an *aggregate* reduction of 20 percent in calculating a global damages figure for each class. Menenberg Dec. ¶ 14. Thus, Olsen and Cowan have offered no analysis that purports to identify individual class members who actually suffered injury from the challenged practices. Nor is their methodology capable of doing so. *Id.* ¶¶ 4, 13-14.

Other pertinent specifics of Olsen's and Cowan's methodologies for the two classes are as follows:

---

[4]   For example, plaintiff Walker received waivers for several of her challenged fees more than a month after her overdrafts occurred. *See* Jolley Dec. Exs. 15 at 92-95, 98; 19.

1.      **Including and Deleting Class**

Cowan's methodology for calculating damages for the Including and Deleting ("I/D") class is based on extrapolation from a figure calculated by Olsen from the 10,000-customer sample. As discussed above, Olsen made no effort to ascertain whether any fee assessed to a customer in that sample was actually paid. Instead, Cowan made an aggregate 20 percent reduction in calculating a damages figure for the entire class.

Olsen's methodology for this class sought to identify fees assessed against the accounts of customers in the sample following the series of events embodied in an "including and deleting" scenario. However, the algorithm he used was not tethered to that scenario (or to the class definition) and failed to include elements that plaintiffs have admitted must exist for a customer to be a member of the class and suffer injury.

The theory of the "Including and Deleting" claim is that a customer can be led to overspend his account when he (1) checks his available balance with Wells Fargo and is given a number that "includes" a subtraction for a pending debit-card transaction, (2) checks his available balance again later and is given a new available balance from which that pending debit has been dropped, (3) does not realize that the change in his available balance is the result of the dropping of a debit that remains pending, and then (4) believing his available balance is higher than it really is, overspends his account and incurs an overdraft. *See* Class Order at 13. Injury under this scenario thus requires the following steps (as plaintiffs have conceded in responses to Requests for Admission), which must occur in the following order:

a.      The scenario begins when the customer uses his debit card for a transaction (the "I/D transaction"). The merchant authorizes the transaction with Wells Fargo, but the transaction does not settle immediately. The bank's system puts in place a "memo hold" on the customer's account in the amount that was authorized.[5]

---

[5]      These procedures are discussed in the Declaration of Kenneth Zimmerman (Dkt. No. 41), filed on July 10, 2008. ("Zimmerman Dec.").

b.      The customer checks his available balance, which "includes" the I/D transaction (i.e., the balance has been reduced by the amount of the memo hold).  Jolley Dec. Ex. 6 No. 21.

c.      The bank drops the memo hold, causing the available balance to increase, even though the transaction has not yet posted.

d.      After the hold is dropped, the customer again checks his available balance and sees a figure that has the pending transaction "deleted" (*i.e.*, no longer subtracted from the balance).  *Id.*, No. 21.

e.      The customer then relies on this second available balance in using his debit card for one or more new transactions that are collectively less than what he believes his available balance is – but more than his available balance would have been had the I/D transaction still been included.  *Id.*, No. 20.[6]

f.      The "deleted" transaction then posts, reducing the balance back to its "real" level.  *Id.*, No. 19-20.

g.      The subsequent transaction posts and creates an overdraft.

Olsen's methodology omits some of these elements.  He does not, for example, include a requirement that the customer first see an available balance that "includes" the I/D transaction.  Instead, his methodology captures all customers who had access to their available balances when the I/D transaction was "deleted," regardless of whether there had been a prior check of an "included" balance.  Menenberg Dec. ¶ 5.  This effectively writes out of the scenario the customer's supposed reliance on a belief that all of the transactions included in a prior balance are still included in the second balance he sees.  *See* Class Order at 13.

Further, Olsen did not base his calculations on the actual amount by which the available balance actually changed because of "including and deleting."  For many types of transactions, such as those made at gasoline stations and restaurants, the amount that is

---

[6]      To put it another way, the amount by which the customer overdrafts the account must be less than the amount by which the available balance changed because of the "including and deleting" of the earlier transaction.  *Id.*

1   authorized (and for which Wells Fargo adjusts the available balance) is considerably less than

2   the final transaction amount.  For example, when a debit card is used to buy gasoline, the gas

3   station          **REDACTED**          .  Wells Fargo maintains a memo hold **REDACTED**

4   **REDACTED**          .  The bank does not even find out the final transaction amount until

5   settlement.   Zimmerman Dec. ¶ 17.  Thus, any "including and deleting" of that transaction in

6   the customer's available balance results in a swing     **REDACTED**     .  Instead of making his

7   calculation on that basis, Olsen instead assumed – counterfactually – that the amount "included"

8   and then "deleted" from the available balance in such situations was the final transaction

9   amount.  Menenberg Dec ¶ 5.  Thus, for example, for a $45 gasoline purchase, his calculation

10  would assume that the "including and deleting" change in the available balance was $45, when

11  in fact it was **REDACTED** .

12          This caused Olsen's analysis to identify as injurious "including and deleting"

13  instances situations in which the subsequent transaction that led to an overdraft fee was more

14  than the actual "included and then deleted" amount – even though plaintiffs readily admit that a

15  class member incurs no injury in such a situation.  Menenberg Dec. ¶ 5; *see* Jolley Dec. Ex. 6 at

16  20.[7]  This aspect of Olsen's methodology also ignores the Court's express finding that a class

17  claim could not be pursued merely because an available balance was "inaccurate" – for

18  example, because it failed to include a transaction for which the bank did not know the final

19  amount.  Class Order at 13.

20          Plaintiffs' methodology also had to account for the requirement that the customer

21  must have relied on the second available balance in making the subsequent transaction for

22  which an overdraft fee is incurred.  Plaintiffs intend to argue that such reliance may be inferred

23  based solely on the proximity in time between the balance check and the subsequent transaction.

24  Jolley Dec. Ex. 7 at 12.  But rather than measuring such proximity in terms of a few hours, or

25

_____

26  [7]      Thus, in the example of a $45 gasoline purchase, Olsen would capture the fee for a
     subsequent overdraft transaction of $30 as "damages" even though the customer could not
27   possibly have been misled by **REDACTED** in her available balance into thinking that she
     had $30 extra to spend.
28

1   even a day or two, Olsen included situations in which the time gap between the two events was

2   as much as a full week.   Menenberg Dec. ¶ 7.

3              Wells Fargo has submitted a report from a consumer perception expert, Professor

4   Simonson, who explains that Olsen's assumption of continued reliance over a period as long as

5   a week is inconsistent with basic principles of consumer psychology.  Simonson Dec. ¶ 4.

6   Although plaintiffs served a report from Professor Mandell addressing consumer perception

7   issues, it was conspicuously silent on this point.  Moreover, Professor Mandell's opinions on

8   other subjects stressed his belief that financial literacy is very low among class members.  As

9   Professor Simonson has explained, this belief is inconsistent with the proposition that a

10  consumer would memorize an account balance and then carefully calculate the impact of all of

11  his subsequent transactions in the course of a week to carefully attune his spending to a precise

12  amount matching that balance.  *Id.* ¶4 & Ex. A.   Plaintiffs have offered no rebuttal on this point.

13             Finally, Olsen's methodology does not demonstrate that customers in the sample

14  actually *saw*, much less relied on, their available balances.  The premise of the "including and

15  deleting" claim is that a customer *sees* her available balance and then relies on that information.

16  But Olsen had no direct proof of which customers actually checked their available balances.

17  Instead, he counted as "balance checks" every single occasion when a customer engaged in any

18  conduct in which she *could have* seen an available balance figure.  Thus, for Olsen's purposes

19  every teller transaction, every ATM withdrawal, and every occasion when a customer signed

20  onto her account online, counted as a "balance check."  Menenberg Dec. ¶ 6.  Plaintiffs have

21  presented no evidence that these activities routinely result in a customer even looking at her

22  available balance, much less memorizing that balance and relying on it for as long as a week.

23             The causal link assumed by plaintiffs is clearly absent in those situations in

24  which the balance check occurred on the same day as the overdraft transaction, because Olsen's

25  analysis did not require that the balance check actually occur first.  Menenberg Dec. ¶7.  He thus

26  calculated damages from supposed "reliance" on information that the customer did not yet have.

27             In responding in their rebuttal reports to the criticisms offered by Wells Fargo's

28  experts on the points described above, Olsen and Cowan did not dispute that all of these points

1   accurately identify elements (or omissions) in their analyses.  Instead, they asserted that their

2   only task had been to implement the instructions of plaintiffs' counsel.  Jolley Dec. Exs. 27, 30.

3              **2.**         **Re-Sequencing Class**

4          Cowan's report (Jolley Dec. Ex. 29) offers several different damages figures for

5   the Re-Sequencing class, using three general damages calculation methods.  His first method is

6   based on a 2001 document produced by Wells Fargo that contains a figure he interprets as a

7   projection of the "lift" in revenues expected from a change in posting order.  However, as even

8   Cowan acknowledges, this "lift" measurement was not based on a comparison between the

9   bank's current posting order and a "chronological" posting order of the kind plaintiffs claim was

10  required (and which the class definition assumes).  Rather, it compared the bank's current

11  posting order to a *different* order that had no chronological component.  Jolley Dec. Ex. 30 at 2;

12  Menenberg Dec. ¶ 12.  Cowan uses this "lift" number to derive a per-quarter revenue amount

13  that he then extrapolates to the whole class period using a variety of factors to generate

14  aggregate measures of damages.  None of these measures have been – or could be –

15  disaggregated to identify individual class members or to assess whether any particular

16  individual was in fact injured.  Menenberg Dec. ¶ 13-14.

17         Cowan's second method is the one on which he principally relies.  Both that

18  method and his third method (the differences between them do not matter for purposes of this

19  motion) rely on extrapolations from analyses performed by Olsen on the transaction data of

20  10,000 customers for one month.  Olsen first extracted from that sample the transactions of the

21  much smaller number of customers who were assessed overdraft fees during the one-month

22  period.  He developed a set of algorithms to re-sequence those transactions under various

23  posting scenarios and calculated the overdraft fees that he inferred would result for each

24  customer under each scenario.  He then compared the results to the overdraft fees actually

25  assessed on the same accounts for the same period.  *Id.* ¶ 9-10; *see* Jolley Dec. Ex. 25.

26         Once again, although Olsen's methodology began with individual customer

27  transaction data, it ultimately did not purport to determine whether any particular customer was

28  actually a member of the class or suffered injury.  Olsen and Cowan did not attempt to compare

the fees generated under the various alternative scenarios to those actually *paid* by these customers.  Instead, they only compared amounts of fees *assessed.*

Moreover, this analysis was again not tailored to the class definition.  Olsen re-sequenced the transactions of each customer in the sample according to 8 different posting scenarios, all of which included artificial components unrelated to the sequencing upon which the class definition is based.  Menenberg Dec. ¶ 10.  All of the scenarios separated out debit-card transactions and posted them before checks and ACH transactions.  *Id.* ¶ 11.  This goes well beyond the theory of "re-sequencing" upon which the class definition is based.  Indeed, it conflicts with the Court's discussion of this claim in the Class Order.  *See* Class Order at 12 & n.3 (describing and providing example of "but for" world in which debit-card transactions are posted in chronological order *after* checks).  Some of the scenarios also sequenced at least some debit-card transactions, not in "chronological" order (as the claim requires) but from lowest amount to highest.  *Id.*  Nothing in the logic of the underlying claim supports this.[8]  In their rebuttal reports, Olsen and Cowan again protested that they did not choose these scenarios, which were instead provided to them by counsel.  Jolley Dec. Exs. 27, 30.

Cowan's methodology also fails to take account of the fact that a full comparison between the actual world and an appropriate "but for" scenario requires consideration of both *decreases* and *increases* in overdraft fees.[9]  For one customer with one set of transactions posting on a given day, a particular alternative posting order might yield fewer overdraft fees

---

[8]  Even apart from its conflict with the Court's Order, plaintiffs have identified no principled theory for why this methodological choice is appropriate.  While many debit-card transactions are initiated on dates earlier than their settlement dates, many others post the same day.  Plaintiffs have identified no basis to assume that customers would reasonable expect such same-day transactions to post before checks and ACH transactions, especially given that the customer will have typically written or authorized the latter days *earlier.*

[9]  In its Class Order (at 26), the Court suggested that a high-to-low posting order could never have such differential effects.  This logical conclusion applies only for a "pure" high-to-low order – *i.e.*, one in which all debits are processed in a single group from highest amount to lowest.  But that is not the order Wells Fargo uses.  Rather, it posts credits first, followed by a group consisting of cash transactions (teller and ATM withdrawals and online transfers), and then another group consisting of checks, ACH, and debit-card purchases.  Zimmerman Dec. ¶ 27.  Because this posting order is more complex than a pure high-to-low order, comparing it to other posting scenarios yields varying results, depending on the nature and amounts of the transactions posting to a given account on a given day.  Menenberg Dec. ¶ 15.

1  than Wells Fargo actually assessed for that account on that day.  But that same posting order,

2  applied to a different set of transactions on a different day, might yield *more* fees than the

3  customer was actually assessed.  Cowan freely admit that it is "[t]rue" that such differential

4  impacts exist.  Jolley Dec. Ex. 30.  Yet his methodology does not take them into account.  *Id.*;

5  *see* Menenberg Dec. ¶ 15.  Instead, he simply extrapolates to the *entire* population for the *entire*

6  class period the results of Olsen's analysis of a single month's worth of transactions for a small

7  subset of the sample of customers.[10]  This choice of methodology makes it impossible to

8  determine whether a particular posting scenario yielded more or fewer overdraft fees *over time*

9  even for a customer within the sample*.  Id.*

10           **C.     Plaintiffs' Final Interrogatory Responses**

11                Wells Fargo served on plaintiffs a final set of interrogatories seeking, *inter alia*,

12  identification of the "algorithms" promised in plaintiffs' class certification motion that would

13  specifically identify the classes, as well as the actual damages sought by plaintiffs.  In their

14  responses, served at the very close of fact discovery, plaintiffs acknowledged that they had not

15  identified any specific class members, but asserted that their experts' methodology could be

16  applied to the wider set of customers to identify who was in the class.  Jolley Dec. Ex. 8 No. 21.

17  Plaintiffs also acknowledged that they had nothing to add on the issue of damages to what was

18  set out in their experts' reports.  *Id.*

19           **D.     Plaintiffs' Evidence of Dissemination of Challenged Advertising and Other
                      Statements**

20

21                In their Complaint and interrogatory answers, plaintiffs identified certain

22  advertisements and other statements that they alleged contained misleading statements that

23  (plaintiffs asserted) had some bearing on their class claims.  On February 12, 2009, Wells Fargo

24  moved for partial summary judgment on these misrepresentation claims, pointing to the

---

25    [10]      Menenberg Dec. ¶ 9-10.  The vast majority of the 10,000 customers in the sample (like
26  the majority of customers in general) did not overdraft their accounts, and many who did were
    assessed only a single overdraft fee (and hence could not have been affected by posting
27  sequence).  *Id.* ¶ 9.  Plaintiffs' experts considered only the impacts on customers who were
    assessed received multiple overdraft fees during the one-month period of the sample.  They did
    not consider effects of their alternative scenarios on others.  *Id.*

28

plaintiffs' admissions that none of them had seen or relied on any of those statements – indeed, that plaintiffs lacked evidence that *any* class member had seen and relied on *any* allegedly misleading statement by Wells Fargo.  *See* Dkt. No. 176 at 5-8.

If and to the extent the Court denies the motion for partial summary judgment, plaintiffs will have the burden of showing, *inter alia*, that injury resulting from each challenged statement can be shown through common proof.  The record shows that class members were not consistently exposed to the statements that plaintiffs seek to challenge.  The *only* materials that were disseminated to all class members were the account agreement and related items supplied to customers at the time of account opening.  *See* Zimmerman Dec. ¶ 35.  There is no evidence that customers consistently read those materials – indeed, the evidence is to the contrary.[11]

Most of plaintiffs' arguments about alleged "misrepresentations" focus on statements that were disseminated to, at most, certain limited subgroups within the classes.  For example, plaintiffs make much of a statement that Wells Fargo previously made that a debit-card transaction is posted "immediately" to a customer's account.  Plaintiffs have only claimed that this statement appeared in two places.  One was an old website page from which the language was removed less than three months into the class period and was viewed only rarely. Ahrendt Dec. ¶ 3-4.   The other was a brief reference in a several-hundred-page teacher's guide for the "Hands on Banking" financial literacy program sponsored by the non-profit Wells Fargo Foundation.  There is no evidence that all (or even most) customers viewed those materials.

## III.   ARGUMENT

### A.   Decertification Is Appropriate Where Plaintiffs Fail to Develop the Required Common Proof of Necessary Elements of Their Claims.

Federal Rule of Civil Procedure 23(c)(1)(C) provides that a court may decertify a class at any time before final judgment.  *See General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982) (certification order, particularly where entered early in a case, is "inherently

---

[11]     As shown in Wells Fargo's opening and reply papers on the motion for partial summary judgment, none of the named plaintiffs claims to have read and relied on these items.  *See* Dkt. No. 176 at 5-6, Dkt. No. 185 at 7-8.

1   tentative") (internal marks and citation omitted).  Thus, for example, "[i]f later evidence

2   disproves [p]laintiffs' contentions that common issues predominate, the district court can at that

3   stage modify or decertify the class." *Dukes v. Wal-Mart*, *Inc.*, 509 F.3d 1168, 1176 (9th Cir.

4   2007); *see also Pierce v. County of Orange*, 526 F.3d 1190, 1200 (9th Cir. 2008) (affirming

5   decertification of class on basis of inadequate methodology for proof of damages); *Binder v.*

6   *Gillespie*, 184 F.3d 1059, 1064-65 (9th Cir. 1999) (affirming decertification of class where

7   class-wide presumption of reliance not supported by evidence).

8           In certifying the classes in this case, the Court relied on plaintiffs' representation

9   that they would be able to develop algorithms that would make each class ascertainable, would

10  provide common proof of injury, and would present an adequate common method of providing

11  damages.  *See* Class Order at 24, 27.  A court retains discretion, in considering class

12  certification early in the case, to give plaintiffs the "benefit of the doubt" on the basis of a

13  "colorable" showing that appropriate class-wide proof can be developed.  *See, e.g.*, *Anderson v.*

14  *Boeing Co.*, 2006 WL 2990383, at *4 (N.D. Okla. Oct. 18, 2006); *In re Methionine Antitrust*

15  *Litig.*, 2003 WL 22048232, at *3 (N.D. Cal. Aug. 26, 2003).  But where, as here, it becomes

16  plain, following discovery and full development of the record, that plaintiffs do not in fact have

17  an adequate method of proving required elements of their claim through common proof, the

18  court must revisit the issue and decertify the class.  *Pierce*, 526 F.3d at 1200; *Anderson*, 2006

19  WL 2990233 at *4-5; *In re Methionine Antitrust Litig.*, 2003 WL 2248232, at *4.[12]

20          Judge Breyer's decision in *In re Methionine Antitrust Litigation* demonstrates

21  this principle.  In that case, Judge Breyer had granted class certification based on a finding that

22  the plaintiffs' expert had described a "colorable" method of proving injury and damages on a

23  class-wide basis through a multiple regression analysis.  2003 WL 22048232, at *3.  However,

24  as pretrial proceedings came to a close, it became clear that the plaintiffs' expert had not carried

25  _____

26  [12]     *See also In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 28-30 (1st
    Cir. 2008) (remanding to determine whether plaintiffs' methods and formulas continued to
    support class certification, where plaintiffs had been given plenty of time to develop their
27  proof); *In re Safety-Kleen Corp. Bondholders Litig.*, 2004 WL 3115870, at *6-8 (D.S.C. Nov. 1,
    2004) (decertifying class upon finding that plaintiffs had inadequate common proof of reliance).

28

1   through on his promise of collecting the necessary data and performing the regression analysis

2   upon which Judge Breyer had relied in granting certification.  Finding that the methodology that

3   the expert did present did not appropriately measure actual impact on class members of the

4   challenged conduct, he decertified the class.  *Id.* at *4-5.

5            In this case, we are now similarly at the close of pretrial proceedings, and

6   plaintiffs have had every opportunity to develop their promised methodology for proving

7   ascertainability, impact, and damages.  They have failed to do so, and the classes should

8   accordingly be decertified.

9        **B.    The Including and Deleting Class Should Be Decertified.**

10           **1.    Plaintiffs Have Failed to Present a Methodology that Makes the Class
                Ascertainable and Permits Injury to Class Members to Be

11              Established Through Common Proof.**

12           Plaintiffs seek to rely on Olsen's and Cowan's analyses to satisfy three separate

13   requirements in this case:  ascertainability (a manageable method for determining who is

14   actually in the class), injury, and damages.  Even leaving aside the severe flaws in these

15   analyses as proof of damages, they clearly fail to provide a basis for establishing ascertainability

16   and proving injury to all class members.

17           The Court's Class Order recognized that an important requirement of class

18   certification "is that the class must be sufficiently definite."  Class Order at 24 (quoting

19   *Lamumba Corp. v. City of Oakland*, 2007 WL 3245282, at *3 (N.D. Cal. 2007)).  This means

20   that, among other things, certification is improper where determination of class membership

21   would require "answer[ing] numerous individualized fact-intensive questions."  *Deitz v.*

22   *Comcast Corp.*, 2007 WL 2015440, at *8 (N.D. Cal. 2007).  Some courts have characterized

23   this instead as an issue of manageability.  *See, e.g.*, *Dunnigan v. Metro. Life Ins. Co.*, 214 F.R.D.

24   125, 136 (S.D.N.Y. 2003) (finding that class was technically ascertainable but denying

25   certification on ground of unmanageability because determination of whether a particular

26   individual was a class member would require individualized proof).

27

28

In addition, all of plaintiffs' causes of action require proof that all class members suffered injury from the challenged conduct.[13]   This requirement is distinct from the required proof of damages.  While the existence of individualized *damages* issues does not necessarily preclude class certification, a plaintiff must nonetheless establish the availability of class-wide proof as to *fact of injury*.  *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 180, 187-88 (3d Cir. 2001) (class treatment improper where actual injury could not be established through common proof); *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*, 247 F.R.D. 156, 165 (C.D. Cal. 2007) (same).  Similarly, while class plaintiffs may in some instances be permitted to prove the quantification of class-wide damages through statistical estimation, the Ninth Circuit has stressed that such methods may *not* be used to circumvent the requirement of proof of actual injury to all members of the class.  *In re Hotel Tel. Charges*, 500 F.2d 86, 90 (9th Cir. 1974) (class treatment improper on theory based on "allowing gross damages by treating unsubstantiated claims of class members collectively" as that would alter "substantive rights" in a manner not authorized under Rule 23); *see also Molski v. Gleich*, 318 F.3d 937, 954 (9th Cir. 2003) (same).

In its Class Order, the Court found the classes to be ascertainable based on plaintiffs' representation that algorithms could be developed and applied to Wells Fargo's computerized records to identify class members and prove injury.  However, in the end plaintiffs have made no effort to present such an analysis.   Regardless of its merits as a statistical analysis of *damages* (an issue this motion leaves for another day)*,* the Cowan/Olsen analysis did not even attempt either to identify the members of the class or to prove that all class members suffered actual injury.  Indeed, plaintiffs' experts have done nothing to demonstrate actual injury even to the individuals in their sample, much less to all members of the class.  Nor could their methodology be used for this purpose, for several reasons:

---

[13]     *See* Cal. Civ. Code § 1780(a); Cal. Bus. & Prof. Code § 17204; Cal. Bus. & Prof. Code § 17535; *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1089 n.2, 1092 (1993); *United States Fid. & Guar. Co. v. Am. Employer's Ins. Co.*, 159 Cal. App. 3d 277, 285 (1984), *overruled on other grounds by J.C. Penney Casualty Ins. Co. v. M.K.*, 52 Cal. 3d 1009 (1991).

1    *First*, the Cowan/Olsen analysis is not tailored to the class definition.  As shown

2    above, Olsen's algorithm (upon which Cowan relied) ignored and omitted key undisputed

3    elements of any "including and deleting" scenario, including the initial balance check by a

4    customer in which the available balance "includes" the I/D transaction.  It also improperly

5    identifies relevant transactions based on the final transaction amount of the I/D transaction

6    rather than the actual (often very much lower) authorized amount that was actually "included"

7    and then "deleted" from the available balance.  In short, even if Olsen's methodology could be

8    used to identify the members of *some* theoretical class, it cannot be used to identify or prove

9    injury to members of the "Including and Deleting" class – the only group that, the Court has

10   held, can have a viable claim based on allegedly "inaccurate" available balance information.[14]

11   *See Allied Orthopedic Appliances, Inc.*, 247 F.R.D. at 165-75 (class could not be certified based

12   on expert methodology that did not properly reflect "but for" world); *In re Methionine Antitrust*

13   *Litig.*, 2003 WL 22048232, at *4-5.

14   *Second*, neither Olsen nor Cowan have provided any information on the fees

15   actually *paid* by any customer.  They measured only fees that were *assessed*.   But it is

16   undisputed that 20 percent of the fees Wells Fargo assesses on customer accounts are never

17   paid.  While Cowan adjusts for this in his calculation of *aggregate* damages, that correction

18   does nothing to address the fact that plaintiffs' methodology does nothing to prove actual injury

19   to any particular class member.  Indeed, Cowan's adjustment concedes that, on average, 20

20   percent of the instances of supposed "injury" Olsen identified are not injury at all.

21   Take, for example, the case of  plaintiff Erin Walker.  Plaintiffs' experts do not

22   even mention Walker's alleged injury or damages.  Nor have plaintiffs otherwise identified any

23   particular amount of damages incurred by Walker through any "including and deleting" event.

24   However, in earlier interrogatory answers Walker acknowledged that, of the overdraft fees she

25   
---

[14]    Wells Fargo's damages experts are able to make partial corrections to Olsen's analysis
26   for some of these errors, but it was impossible to correct for them fully.  Menenberg Dec. ¶ 8.
Nor did Olsen even attempt to demonstrate, in his rebuttal report, that such corrections were
27   possible.  Instead, on these points he simply asserted that he had followed the instructions
provided by counsel.  Jolley Dec. Ex. 27.
28

1   challenges, four were waived by the bank.[15]   If her "excess" overdraft fees resulting from any

2   "including and deleting" were four or fewer, she would not have suffered actual injury, but the

3   Cowan/Olsen methodology would still have counted her as an injured class member.  Similarly,

4   plaintiff William Smith testified that when he experienced an "including and deleting" event on

5   his business account, Wells Fargo waived the resulting fees.  Jolley Dec. Ex. 10 at 51-52.

6   Smith does not challenge the fees assessed on that occasion – his claim focuses on a subsequent

7   overdraft event – but the Cowan/Olsen methodology would have included it.

8            By seeking to measure damages "collectively" without seeking to show that all

9   class members were actually injured, plaintiffs have sought to bypass a substantive element of

10  their required proof.  This they cannot do.  *See In re Hotel Tel. Charges*, 500 F.2d at 90.

11           *Third*, the methodology of plaintiffs' experts does not provide a reasonable basis

12  for demonstrating the reliance element of this claim.  In its Class Order (at 24), the Court stated

13  that reliance might be subject to inference given proof of appropriate facts.  The scenario the

14  Court clearly had in mind (and the one promoted in plaintiffs' certification motion) was one in

15  which a customer checks his account balance, is given a number that is higher than the number

16  he saw previously, and then goes out later that day and makes a debit card purchase in reliance

17  on the new figure, not realizing that the increase in his balance was due to the "deleting" of a

18  charge that remains pending.  *See* Class Order at 13.  But the Cowan/Olsen methodology

19  includes a huge number of transactions that are vastly removed from that situation.

20           Perhaps the ultimate proof of the unreliability of the inference of reliance upon

21  which plaintiffs' experts' analysis depends is the fact that they are not even able to offer

22  assurance that the balance checks Olsen identified always *preceded* the transactions that yielded

23  overdrafts.  One obviously cannot infer that a customer undertook an overdraft transaction in

24  reliance on information that had not yet been conveyed.

25  _____

26  [15]     Jolley Dec. Ex. 9 No. 7.  Walker's interrogatory answer asserts that she should have only
    been assessed two overdraft fees, because her overdrafts occurred on two days.  *Id.*  This does
27  not correspond to any of plaintiffs' current damages theories or to the claims of either of the
    certified classes.  Walker has never supplemented this interrogatory answer to identify the
28  amount of fees she believes were caused by the specific practices challenged by these classes.

At the same time, Olsen was instructed to include in his algorithm an assumption that reliance could extend as much as *seven days* after the customer was potentially exposed to available balance information.  Plaintiffs have identified no evidence of any kind indicating that it is reasonable to infer that a customer who is exposed to her available balance on one day will still be relying on that balance a full week later.  The *only* evidence in the record is to the contrary.  (*See* pp. 8-9 above.)

Further, Cowan and Olsen do not purport to opine that the data Olsen used to identify balance "checks" in fact represented occasions when customers actually saw their available balances.  Nor have plaintiffs supplied any other evidence demonstrating that all (or even most) of those occasions involved a customer actually seeing, and paying attention to, her available balance.  They have offered no evidence, for example, that customers who withdraw cash from ATMs always elect to receive receipts on which their available balances are printed – much less that they read that information on any receipts they do choose to obtain.

Reliance is ordinarily treated as an issue of fact – but not where there is insufficient evidence to permit a reasonable finder of fact to conclude that it exists.  *See Guido v. Koopman*, 1 Cal. App. 4th 837 (1991).  No reasonable finder of fact could conclude that every customer who had even an opportunity to see his available balance actually (a) saw that balance and (b) relied on it for a full week.  And certainly no reasonable fact-finder could infer that a customer relied in the morning on an available balance that he did not even see until that afternoon.  *Mirkin*, 5 Cal. 4th at 1094 (inference of reliance not proper where class members not exposed to challenged representations).  Because plaintiffs' experts' analyses depend on such unsupportable assumptions, they cannot be used to prove actual injury to all class members.

### 2. The Interests of the Class Conflict on Plaintiffs' Challenge to Wells Fargo's Methodology for Calculating Available Balances.

Plaintiffs assert that if the full details of the complex series of events that could lead to an "including and deleting" scenario cannot be disclosed to customers in such a way that they fully understand it, then the bank must maintain its memo holds for pending transactions for at least 30 days.  Jolley Dec. Ex. 7 No. 14.

As discussed in detail in Wells Fargo's Motion for Summary Judgment on All Causes of Action, also filed today (and incorporated here by reference), the bank's practices on dropping memo holds have their basis in policies of the Visa network and the bank itself that are designed to benefit customers. Even if one accepts plaintiffs' assertion that changing those policies would in some instances reduce the likelihood of a customer receiving an overdraft, it is beyond reasonable dispute that there are many other situations in which changing the practice would cause customers to be inappropriately denied access to funds in their accounts.

Accordingly, were Wells Fargo to abandon this rule and keep holds in place for up to 30 days, any such outcome would be injurious to many class members. Plaintiffs routinely characterize members of this class as people who are living close the edge, financially speaking. To reduce such customers' access to their funds might provide a net benefit to a few in saved overdraft fees, but would clearly create a hardship for others. James Dec. ¶ 8.

It is axiomatic that a plaintiff may not pursue a class action to challenge a practice that affirmatively benefits some members of the class. *Allied Orthopedic Appliances, Inc.*, 247 F.R.D. at 177; *see also Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) ("a class cannot be certified when its members have opposing interests or when it consists of members who benefit from the same acts alleged to be harmful to other members of the class"). Since this claim falls into that category, it may not be pursued on a class basis.

### 3. Common Evidence Does Not Exist to Permit Assessment of Questions of Mitigation, Waiver, and Voluntary Payment.

The Cowan/Olsen methodology also provides no basis for addressing issues such as mitigation, waiver, and the voluntary payment doctrine as to any customer.

It is undisputed that there are some customers who *know* that their available balances can be affected by "including and deleting." Plaintiff William Smith, for example, knew at the time he entered into the transaction that led to his overdraft fee that the available balance on which he chose to rely could be inaccurate because of an "included and deleted transaction" that remained pending. He knew this because exactly the same thing had happened before. On that occasion, he called the bank to complain and the facts were explained to him. Jolley Dec. Ex. 10 at 51-53. He continued thereafter to rely on his available balance, not out of

1   any ignorance of its potential inaccuracy, but because it was more convenient for him to do so.

2   *Id.* at 53-56. Regardless of whether the Court finds these facts to bar Smith's individual

3   claim,[16] basic principles of mitigation of damages dictate that there surely must be *some* level of

4   knowledge and experience that would bar a customer from continuing to ignore facts of which

5   he is fully aware and "relying" on an available balance he knows may be inaccurate. *See*

6   *Thrifty-Tel, Inc. v. Bezenek*, 46 Cal. App. 4th 1559, 1568 (1996) ("A plaintiff has a duty to

7   mitigate damages and cannot recover losses it could have avoided through reasonable efforts.").

8   The Cowan/Olsen model provides no basis for assessing this issue on a class-wide basis.

9          Nor does the Cowan/Olsen analysis provide any basis for identifying customers

10  who have waived their claims through waiver and voluntary payment.[17] As discussed above, for

11  example, plaintiffs make no effort to identify which customers actually *paid* the fees assessed on

12  their accounts. Similarly, for those customers who actually paid *some* fees, they have identified

13  no basis for identifying customers who complained about their fees to the bank and waived any

14  claim on the subject in return for a fee waiver or other consideration.

15          Erin Walker, for example, effectively settled her dispute with the bank over the

16  fees she challenges here. After ignoring multiple notices from the bank about her overdrafts,

17  she ultimately visited a branch and entered into an agreement through which the bank waived

18  four overdraft fees and four continuing overdraft fees (for a total of $156). She in return made a

19  deposit into her account to cover her overdraft and the remaining fees. Jolley Dec. Ex. 15 at 91-

20  96, 99-101. Plaintiffs have identified no common methodology through which situations like

21  these can be identified and assessed on a class-wide basis.

22          It would be no answer for plaintiffs to protest that issues such as voluntary

23  payment and mitigation are affirmative defenses. Class certification is improper if any issues

24  _____

[16]       Although the Court rejected this argument in its Class Order, the Court's discussion of
25  the "including and deleting" claim focused heavily on the bank's failure to disclose the
possibility that an "including and deleting" event could occur. Class Order at 13. A customer,
26  like Smith, who had actual knowledge could not pursue a claim based on such nondisclosure.
At most, this presents an issue of fact requiring individualized analysis.
27  [17]       The law applicable to these issues is discussed at pp. 23-24 of Wells Fargo's Motion for
Summary Judgment on All Causes of Action, filed today.
28

1   material to a claim are not susceptible to class-wide proof, regardless of who has the burden of

2   proving them.  *In re Northern Dist. of Cal. Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d

3   847, 853 (9th Cir. 1982); *Deitz*, 2007 WL 2015440 at *5.  Simple due process requires nothing

4   less:  plaintiffs cannot avoid legitimate defenses simply by presenting their claims through a

5   class mechanism that effectively precludes such defenses from being proven.

6       **C.      The Re-Sequencing Class Should Be Decertified.**

7           **1.      Plaintiffs Have Failed to Present a Methodology that Makes the Class
                   Ascertainable and Permits Injury to Class Members to Be
8                  Established Through Common Proof.**

9               As with the "Including and Deleting" class, plaintiffs have failed to make good

10  on their promise of a reliable methodology for proving ascertainability and injury as to the Re-

11  Sequencing class.

12              *First*, the Cowan/Olsen methodology is not tailored to the class definition.  By

13  artificially assuming posting sequences that yield fewer overdraft fees than would be yielded by

14  the sequence contemplated by the Class Order, plaintiffs' experts fails to identify which

15  customers are *actually* in the class and were in fact injured based on the specific posting practice

16  upon which the class definition is based.   Absent a methodology that makes the class – as

17  defined by the Court – ascertainable and appropriately demonstrates injury to all class members,

18  these claims cannot be pursued on a class basis.  *In re Methionine Antitrust Litig.*, 2003 WL

19  22048232 at *4; *Allied Orthopedic Appliances, Inc.*, 247 F.R.D. at 165-75.

20              *Second*, once again, plaintiffs have proffered no methodology for ascertaining

21  which customers *paid* overdraft fees as a result of the challenged posting sequence.  It is beyond

22  reasonable dispute that, even within the sample they examined, a substantial percentage of the

23  individuals who were assessed "excess" fees did not pay them and were not injured.

24              *Third*, plaintiffs' sampling methodology, which looks at only one month of

25  transactions, fails to take into account the fact that a posting sequence that yields more overdraft

26  items fees on one day may yield fewer fees on another.  As a result, even if a given customer

27  incurred more overdraft fess under the bank's posting order in the sample month, that same

28  customer might still have incurred fewer such fees *over time*.  Plaintiffs' "snapshot"

methodology, even if corrected to take into account the posting practice that is actually at issue here, could provide no way to determine this as to any particular customer.

### 2. Common Proof Does Not Exist to Permit Assessment of Questions of Mitigation, Waiver, and Voluntary Payment.

The majority of multiple overdraft fees are incurred by a small number of customers who incur them on repeated occasions.  Menenberg Dec. ¶ 9.  Plaintiffs' experts' methodology simply treats all "excess" overdrafts measured according to their scenarios as damages, failing to take into account the fact that many of these customers had occurred multiple overdrafts "caused" by the same posting practices in the past – perhaps many times in the past – and had chosen not to adjust their behavior so as to mitigate their damages.

This fact is illustrated by comparing the experience of two members of this class. The class representative, Veronica Gutierrez, testified that after she incurred multiple overdraft fees on a single day, she became more careful so as to avoid having the same thing happen again.  Jolley Dec. Ex. 13 at 101-02.  But another class member, Maria Galindo, freely admitted that, although she was quite sophisticated about the bank's posting practices, she preferred to try to game the system and was willing to run the risk of incurring more overdraft fees.  Jolley Dec. Ex. 31 at 53-54.   Neither of these customers chose to close her account; instead, both voluntarily made deposits into their accounts to cover their overdraft fees.

Voluntary payment and mitigation are particularly important issues for this class, because the bank's posting order is not a secret.  Even leaving aside disputes about the adequacy of the bank's formal disclosure on the subject, it is undisputed that the bank provides every customer an account statement every month that shows the order in which the customer's transactions were posted that month.  Zimmerman Dec. ¶ 7; *see* James Dec. ¶ 7.  So any customer who does not know about the bank's posting order can readily figure it out – especially if he has reason to do so after receiving unexpected overdraft fees.  Thus, any customer who might be caught unaware on one occasion by overdraft fees associated with this practice surely has no basis to make a similar claim the second, third, fourth, or fifth time it happens.  Olsen's and Cowan's methodology – which is limited to a single month – does not permit any significant assessment of this issue.  *See* Menenberg Dec. ¶ 16.

Nor do Olsen's and Cowan's methodologies permit quantification of the extent to which individual class members voluntarily made deposits to cover their overdraft fees, perhaps (as in the case of class member Erin Walker) in return for agreement by the bank to waive some of the fees assessed against them.

### 3.    The Interests of the Class Diverge.

Any proper analysis of class impact that is faithful to the class definition will yield results that include reduced overdraft fees for some customers but higher fees for others. *See* Menenberg Dec. ¶ 14.   This means that there is a high likelihood that at least some members of the Re-Sequencing class would actually be *worse off* than they were in the real world under Wells Fargo's actual posting order. (*See* pp. 11-12 above.)   Plaintiffs' own expert freely admits this to be the case.  Jolley Dec. Ex. 30.  This creates a fatal conflict of interest within the class. *See Pickett v. Iowa Beef Processors*, 209 F.3d at 1280.

### D.    To the Extent Any Misrepresentation Claims Survive, Such Claims Cannot be Established Through Common Proof.

Even if the Court denies, in whole or in part, Wells Fargo's pending Motion for Partial Summary Judgment on Plaintiffs' Misrepresentation Claims, those claims may not be pursued on a class basis, because plaintiffs cannot demonstrate that the statements they seek to challenge were distributed uniformly to class members.

Plaintiffs have no evidence of actual reliance by class members on the challenged statements and have announced that they intend instead to seek to rely on an inference of reliance.  But the law is clear that such an inference may be sought only where it can be shown that all class members were uniformly exposed to the statements at issue.  *Mirkin*, 5 Cal. 4th at 1094 (limiting inference of reliance to cases where defendants had made identical representations to each class member); *Gonzalez v. Proctor & Gamble Co*., 247 F.R.D. 616, 624-25 (S.D. Cal. 2007) (denying inference of reliance to class of consumers who "may have seen all, some, or none of the advertisements that form the basis of Plaintiff's suit").  Because such uniform exposure cannot be demonstrated here, no inference of class-wide reliance is possible, and these misrepresentation claims may not proceed on a class basis.

1    To invoke such an inference, plaintiffs must also show that at least one named

2 plaintiff actually relied on each challenged statement. *Deitz v. Comcast Corp.*, 2007 WL

3 2015440, at *5 n.4. As shown in Wells Fargo's Motion for Partial Summary Judgment, this

4 element is also absent.

5    Moreover, plaintiffs have proffered no evidence through which injury and

6 damages could be proven with respect to any particular challenged misrepresentation. The

7 damages calculations of Cowan and Olsen do not even attempt to measure impact on any

8 particular subset of customers in either class who were exposed to a particular alleged

9 misrepresentation. They simply calculated an estimate of aggregate damages to the class as a

10 whole. Because there is no evidence of uniform exposure to either class to any alleged

11 misrepresentation, plaintiffs lack *any* competent evidence of injury or damages associated with

12 any such misrepresentation.

13    Finally, if and to the extent that plaintiffs take the position (as they appeared to

14 do in opposing Wells Fargo's Motion for Partial Summary Judgment) that the misrepresentation

15 claims of the two classes are intertwined with their claims relating to the practices associated

16 with "including and deleting" and "re-sequencing," the inability of the named plaintiffs to

17 pursue such misrepresentation claims would provide another ground requiring decertification of

18 *all* of the class claims, not simply those relating to alleged misrepresentations.

19 **IV.    CONCLUSION**

20    For the reasons set out above, the Court should decertify the classes previously

21 certified in this action pursuant to Fed. R. Civ. P. 23(c)(1)(C).

22

23 DATED: March 19, 2009                         Respectfully submitted,

24                                              COVINGTON & BURLING LLP

25

26                                        By:    /s/
                                                David M. Jolley
27                                              Attorneys for Defendant
                                                WELLS FARGO BANK, N.A.
28