1  Richard D. McCune, SB # 132124
rdm@mwtriallawyers.com
2  Jae (Eddie) K. Kim, SB # 236805
jkk@mwtriallawyers.com
3  McCUNE & WRIGHT, LLP
2068 Orange Tree Lane, Suite 216
4  Redlands, CA  92374
Telephone: (909)      557-1250
5  Facsimile: (909)      557-1275

6  Mitchell M. Breit, Esq. (Admitted *Pro Hac Vice*)
mbreit@wdklaw.com
7  WHATLEY DRAKE & KALLAS, LLC
1540 Broadway, 37th Floor
8  New York, NY  10036
Telephone:  (212) 447-7070
9  Facsimile:  (212) 447-7077

10  Brian J. Panish, Esq. SB # 116060
panish@psandb.com
11  Adam K. Shea, Esq. SB # 166800
shea@psandb.com
12  PANISH, SHEA & BOYLE
11111 Santa Monica Blvd., Suite 700
13  Los Angeles, CA   90025-3341
Telephone:  (310) 477-1700
14  Facsimile:  (310) 477-1699

15  Attorneys for Plaintiffs, VERONICA GUTIERREZ, ERIN WALKER
and WILLIAM SMITH, on behalf of themselves and
16  all others similarly situated,

17

|  | PUBLIC VERSION REDACTED PURSUANT TO PROTECTIVE ORDER |
|---|---|

18            UNITED STATES DISTRICT COURT

19         FOR THE NORTHERN DISTRICT OF CALIFORNIA

20

21  VERONICA GUTIERREZ, ERIN WALKER and  )   Case No.:  C 07-05923 WHA (JCSx)
WILLIAM SMITH, as individuals, and on behalf  )
22  of all others similarly situated,                        )        CLASS _____ ACTION
                                                                          )
23                          Plaintiffs,                         )   **[REDACTED] PLAINTIFFS' OPPOSITION**
                                                                          )   **TO DEFENDANT WELLS FARGO'S**
24    v.                                                             )   **MOTION FOR SUMMARY JUDGMENT ON**
                                                                          )   **ALL CAUSES OF ACTION**
25  WELLS FARGO & COMPANY; WELLS         )
FARGO BANK, N.A.; and DOES 1 through 125, )   **Date:  April 30, 2009**
26                                                                      )   **Time: 8:00 a.m.**
      Defendants.                                            )   **Dept:  Courtroom 9**
27                                                                      )
                                                                          )   Judge Assigned:  Hon. William H. Alsup
28                                                                      )   Complaint Filed:  November 21, 2007
      _____ )

## TABLE OF CONTENTS

Page

I INTRODUCTION ................................................................................................................. 1

II FACTUAL        BACKGROUND ............................................................................................. 2

    A.    The Re-Sequencing Class ....................................................................................... 2

        1.    The Product and Service at Issue Are Debit Card Transactions ........................... 2

        2.    The Re-Sequencing Practice ................................................................................. 2

        3.    The History of the Re-Sequencing Practice .......................................................... 3

        4.    How the Practice of Re-Sequencing Damaged Plaintiff Class Representative Veronica Gutierrez ............................................................................................... 4

        5.    How The Practice of Re-Sequencing Has Damaged the Class ............................. 5

        6.    How Wells Fargo Misled the Class about the Re-Sequencing Practice ................ 7

            a.    Wells Fargo Presented Debit Cards Transactions as Being Immediately Withdrawn from the Account ............................................... 7

            b.    In Financial Education and Marketing Materials, Wells Fargo Told Customers Debit Card Transactions Are Immediately Withdrawn from the Account ................................................................................... 8

            c.    Wells Fargo Failed to Disclose this Practice in Its Account Agreement .... 8

        7.    How Wells Fargo Misled Plaintiff Veronica Gutierrez About the Re-Sequencing Practice ..................................................................................... 10

    B.    The Including and Deleting Class ......................................................................... 10

        1.    The Including and Deleting Practice .................................................................... 10

        2.    How the Including and Deleting Practice Caused Damaged to the Class Representatives ................................................................................................... 11

        3.    How the Including and Deleting Class Was Damaged By the Practice ............... 12

III SUMMARY        OF ARGUMENT .................................................................................... 12

IV ARGUMENT ................................................................................................................. 13

    A.    Defendant Must Establish That There Are No Issues of Disputed Facts ......................... 13

-i-

1

TABLE OF CONTENTS, cont.

2

3   B.   There are Genuine Issues of Disputed Material Facts on Each of Plaintiffs Causes of

4        Action....................................................................................................... 13

5        3.   Plaintiffs Have Provided Facts Supporting Concealment.................................... 15

6        5.   Plaintiffs Have Provided Facts Supporting Intent ................................................. 17

7        6.   Plaintiffs Have Provided Facts Supporting Damage ........................................... 18

8   C.   Defendant's Defense to These Claims Cannot Be Decided as a Matter of Law .............. 18

9        1.   The California Commercial Code Does Not Sanction the Re-Sequencing

10            Practice or How it Was Presented to Customers .................................................... 19

11            a. California       Commercial Code Does Not Apply to Debit Card

12            Transactions ......................................................................................... 19

13       2.   Plaintiffs Have Not Consented to the Illegal Taking of Their Property

14            From the Re-Sequencing Practice.......................................................................... 21

15       3.   Waiver and Voluntary Payment Are Not Valid Defenses .................................... 22

16       4.   Conversion is a Proper Cause of Action on a Finding of a Wrongful Act ........... 23

17       5.   CLRA Applies to Plaintiffs Claims ....................................................................... 25

18   V CONCLUSI      ON....................................................................................................... 25

19

20

21

22

23

24

25

26

27

28

TABLE OF AUHTORITIES

**Cases**                                                                           *Page(s)*

*Alliance Mortgage Co. v. Rothwell,*
    10 Cal. 4th 1226, 900 P.2d 601 (1995) ................................................................ 16

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ............................................................................................... 13

*Baldwin v. Trailer Inns, Inc.,*
    266 F.3d 1104 (9th Cir. 2001) ............................................................................... 13

*Bardin v. Daimlerchrysler Corporation,*
    136 Cal. App. 4th 1255, 39 Cal. Rptr. 3d 634 (2006) ........................................... 16

*Blackie v. Barrack,*
    524 F.2d 891 (9th Cir. 1975) ................................................................................. 14

*Broberg v. Guardian Life Ins. Co. of America,*
    171 Cal. App. 4th 912, 90 Cal. Rptr. 3d 225 (2009) ............................................. 21

*Consumer Advocates v. Echostar Satellite Corp.,*
    113 Cal. App. 4th 1351, 8 Cal. Rptr. 3d 22 (2003) ............................................... 16

*Decatur Auto Ctr. v. Wachovia Bank, N.A.,*
    276 Ga. 817, 583 S.E.2d 6 (2003) ......................................................................... 24

*Engelken v. Justice Court of Eden Tp.,*
    50 Cal. App. 157, 195 P. 265 (1920) ..................................................................... 22

*Falk v. General Motors Corp.,*
    496 F. Supp. 2d 1088 (2007) ........................................................................... 15, 16

*First Union Nat'l Bank of Ga. v. Davies-Elliott, Inc.,*
    215 Ga. App. 498, 452 S.E.2d 132 (1994) ............................................................ 24

*Flores v. Transamerican Homefirst, Inc.,*
    93 Cal. App. 4th 846 (2002) .................................................................................. 21

*Great W. Res., LLC v. Bank of Ark., Nat'l Ass'n,* No. 05-5152,
    2006 WL 626375 (W.D. Ark. Mar.13, 2006) ....................................................... 24

*Hauk v. JP Morgan Chase Bank USA,*
    552 F.3d 1114 (9th Cir. 2009) ............................................................................... 25

*Hernandez v. Hilltop Fin. Mortgage, Inc.,*
    2007 WL 3101250 (N.D. Cal. Oct. 22, 2007) ....................................................... 25

*Hood v. Santa Barbara Bank & Trust,*
    143 Cal. App. 4th 526, 49 Cal. Rptr. 369 (2006) .................................................. 24

*In re American Continental Corp./Lincoln Savings & Loan Securities Litigation,*
    140 F.R.D. 425 (D. Ariz. 1992) ............................................................................ 14

TABLE OF AUHTORITIES, cont.

*Page(s)*

*In re First Alliance Mrtg. Co.,*
    471 F.3d 977 (9th Cir. 2006) .................................................................... 14

*Jefferson v. Chase Home Finance,*
    2008 WL 1883484 (N.D. Cal. April 29, 2008) .................................... 24, 25

*Kinney v. United Healthcare Services, Inc.,*
    70 Cal. App. 4th 1322 (1999) ..................................................................... 21

*Limandri v. Judkins,*
    52 Cal. App. 4th 326, 60 Cal. Rptr. 2d 539 (1997) .................................... 15

*Lopez v. Washington Mutual Bank,*
    302 F.3d 900 (9th Cir. 2002) ..................................................................... 23

*Manaco v. Bear Stearns Residential Mrtg. Corp..,*
    544 F. Supp. 2d 1034 (C.D. Cal. 2008) ...................................................... 21

*McMillan v. Vischer,*
    14 Cal. 232 (1859) ..................................................................................... 22

*Papers Savers, Inc. v. Nasca,*
    51 Cal. App. 4th 1090, 59 Cal. Rptr. 2d 547 (1996) .................................. 21

*Sangster v. Paetkau,*
    68 Cal. App. 4th 151, 80 Cal. Rptr. 2d 66 (1988) ...................................... 16

*Shum v. Intel Corp.,*
    2008 WL 4414722 (N.D. Cal. September 26, 2008) ................................... 18

*Smith v. Wells fargo Bank, N.A.,*
    135 Cal. App. 4th 1463, 38 Cal. Rptr. 3d 653 (2005) ................................ 25

*T.C. Jefferson v. Chase Home Finance,*
    2008 WL 1883484 (N.D. Cal. April 29, 2008) ........................................... 16

*White v. Wachovia Bank, N.A.,*
    563 F. Supp. 2d 1358 (N.D. Ga. 2008) ...................................................... 24

**Statutes**

Cal. U. Com. Code § 11504(a) ..................................................................... 18

Cal. U. Com. Code § 4303 ............................................................................ 20

**Rules**

Fed. R. Civ. P. 56(c) (2004) ......................................................................... 13

[Redacted] Plaintiffs' Opposition to Def Wells Fargo's Motion for Summary Judgment on All Causes of Action
Case No.:  C 07-05923 WHA (JCSx)

# I

# INTRODUCTION

The Defendant has so badly, and seemingly intentionally, misconstrued the facts surrounding Plaintiffs' claims, that rather than focus on the dozens of ways Wells Fargo has misconstrued the facts, Plaintiffs will largely just focus on the facts it intends to present at trial before turning to the host of "defenses" raised by Defendant. Wells Fargo raises these defenses with seeming disregard for whether the positions are consistent with the findings the Court has already made regarding disputed issues of fact; whether the positions inaccurately claim disputed facts as undisputed fact; whether it is taking inconsistent positions; or whether the positions it is taking are credible.

Two examples illustrate the lengths to which Wells Fargo has gone to attempt to confuse the issues and hope to escape a jury evaluating their practices. First, in its motion Wells Fargo contends that the CLRA does not apply to practices that involve extending credit, and as such, Plaintiffs cannot bring a claim under the CLRA. Putting aside that Wells Fargo's position is not supported by case law, Wells Fargo has publicly and in this litigation taken the position that honoring overdraft transactions is not extending credit, and thus overdraft fees should not be regulated as interest. Here, however, it takes precisely the opposite position if that will allow it to escape liability.

Second, Wells Fargo contends in its motion that when a customer deposits his payroll check that he or she worked hard for 80 hours to earn, it becomes Wells Fargo's money and is no longer the customer's money the instant it is deposited. It is unlikely that Wells Fargo would have many customers if it broadcasted that position to customers. It is that attitude, however misplaced, that explains the actions of Wells Fargo. Because Wells Fargo treats its depositors' money as belonging to it, it is not surprising that Wells Fargo sees nothing wrong with devising schemes to directly take that money from customers. That position, which directly contradicts the account agreement and common sense, is simply not credible.

Resolution of this case requires a jury to resolve a number of disputed facts. The affirmative defenses raised by Defendant in this motion do not change that fact. Therefore, this motion should be denied in its entirety for the reasons set forth below.

-1-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# II

# FACTUAL BACKGROUND

**A.     The Re-Sequencing Class**

**1.     The Product and Service at Issue Are Debit Card Transactions**

This re-sequencing claim only involves debit card transactions.   Debit card transactions can be used in several ways.  They can be used to obtain cash from ATM machines, and to make purchases. For the younger generation, debit cards have all but replaced both cash and checks.  However, debit cards have also found a significant place for all generations.  Debit card use has continued to trend up, and now the number of debit card transactions greatly exceeds the number of checks that are written. (2008 FDIC Report, Ex. 1, at v, ¶ 7.)  Because of the nature of debit card purchases, debit card transactions are on average about one-third the amount of checks or Automated Clearing House ("ACH") charges.  (*Id.* at v., ¶ 8.)

The advantage of the debit card, besides convenience, is that as an electronic transaction, it provides the bank with advance knowledge of a transaction, providing it the option to reject the charge if there are insufficient funds before the debit card transaction ever occurs.  For the customer, there is the benefit that those transactions are almost immediately listed online as a pending charge and the transaction amount removed from the available balance, providing the customer with close to real-time record of the account.

**2.     The Re-Sequencing Practice**

The re-sequencing practice is how Wells Fargo manipulates the posting of transactions so as to post the smaller and more numerous debit card transactions after larger checks and ACH charges in order to increase the number of transactions that Wells Fargo will deem an overdraft transaction when there has been an overdraft of the account.  The way that it does this is by ignoring when the debit card transactions were approved and processed in the customers account, and instead, when posting often days later, first grouping the earlier occurring debit card transactions with the later occurring checks and ACH charges, and then re-sequencing the entire group from highest to lowest. (Def.'s Resp. to Pls.' Special Interrog. No. # 17, Ex. 2.)

[Redacted] Plaintiffs' Opposition to Def Wells Fargo's Motion for Summary Judgment on All Causes of Action
Case No.:  C 07-05923 WHA (JCSx)

Unfortunately, this neat little profit scheme has a victim, and that is the low-income customers who are assessed overdraft fees on debit card transactions, even though those transactions occurred day(s) earlier; had been approved by Wells Fargo; and most importantly, there was sufficient funds in the account to cover the transactions when they occurred.

**3.      The History of the Re-Sequencing Practice**

Prior to 2001, when a customer overdrafted their account, Wells Fargo would calculate the number of transactions considered an overdraft transaction by processing debit card charges before checks and ACH, and then sequencing each group from lowest to highest. (Consumer Account Statement, Ex. 3.) This was the posting order that generated the fewest overdraft fees from customers. (Zimmerman Dep., Ex. 4, at 30:22-31:10.) Despite the fact that Wells Fargo was already enjoying record profits, (Wells Fargo News Release re Quarterly Earnings, April 17, 2001, Ex. 5), and its CEO had received compensation over the last two years between $40 and $80 million, (Wells Fargo Proxy Statement, March 20, 2001, Ex. 6), it changed this practice in 2001-02, as part of a [      REDACTED      ] to increase overdraft fees, (Service Charges on Deposits Update, February 2002, Ex. 7).

[            REDACTED            ] directly relate to the re-sequencing class. In April 2001, Wells Fargo began sequencing all debit transactions from highest to lowest instead of lowest to highest. (Consumer Account Statement, Ex 3.) In November 2001, it changed debit card charges from being grouped before checks and ACH, which mirrored the order in which they occurred, to grouping debit cards with checks and ACH charges, then sequencing the entire group from highest to lowest. (Wells Fargo Mass Market Deposit Business Letter, November 2001, Ex. 8.)

By grouping lower average debit card charges with higher average checks and ACH charges, and then sequencing the entire group from high to low, the number of transactions that would be considered overdraft transactions would substantially increase. Prior to making these changes, Wells Fargo projected that through this practice, it could increase by approximately [ REDACTED ] the number of transactions it could consider an overdraft transaction when there was an overdraft of the account, (ODRI Initiative Tracking, April 2002, Ex. 9, at 8), without adding any additional appreciable risk, (*Id.* at 12), inasmuch as it did not increase the amount the account had been overdrafted. Wells Fargo anticipated that it could generate more than [ REDACTED ] million a year from just this practice (Ex. 7). Further, and most telling of its

-3-

motive, Wells Fargo made a specific decision that it would not inform customers of this significant change of practice.  (E-mail from Stuart Peterson to Karen Moore, January 23, 2001, Ex. 10, at 1.)

### 4.   How the Practice of Re-Sequencing Damaged Plaintiff Class Representative Veronica Gutierrez

The Court has appointed Plaintiff Veronica Gutierrez as class representative for the Re-Sequencing Class.  (Order Den. Def.'s Mot. for Summ. J. and Granting in Part and Den. in Part Pls.' Mot for Class Certification ("Order"), Doc. 98.)  Veronica Gutierrez opened a checking account that included a debit card at the Wells Fargo Fontana, California branch in October 2002 when she was 18 years old.  (Decl. of Veronica Gutierrez ("Gutierrez Decl."), ¶ 1.)

Ms. Gutierrez worked and went to school full time.  (*Id.* at ¶ 2.)  During this time she was completing her education requirements to become a teacher.  She was a new financial consumer when opening the account, and following her mother's advice, was careful with her account.  She would occasionally write a check, but the vast majority of purchases were made using the debit card.  She would keep her receipts and review her account statement transaction to make sure that the receipts matched her statements.

She did have difficulty keeping her account balance accurate, because her check registry never seemed to match the balance given to her by Wells Fargo.  (*Id.* at ¶ 2.)  She decided it was just safer to use the Wells Fargo balance.  She would regularly check her account online, by telephone, as well as at branch office and ATM machines.  On October 10, 2006, for the first time in the four years she had this account with Wells Fargo, she made a mistake and overdrafted her account by $23.59 when a $65 check she had forgotten to record was paid by Wells Fargo.  (Gutierrez Account Statement, October 10, 2006, Ex. 11.)  That was her mistake and so she should have been responsible for the $22 overdraft fee as a result of that mistake.  However, as a result of the re-sequencing practice, that is not what happened.

Instead, on October 11, 2006, Wells Fargo did not consider the check that was paid on October 10, 2006 to be the overdraft, but as the Court noted, by grouping a number of small debit card transactions that occurred on October 5 and 6, 2006, with the check and other larger transactions and then re-sequencing the group from high to low, it turned that one overdraft caused by the check into four overdraft transactions by which it could extract another $66 from Ms. Gutierrez for the overdraft of $23.59.  (Order, at 11:24-12:20.)  For a struggling student, that is a lot of money.  Of course, Wells

-4-

1  Fargo was paid back in a matter of days by allowing it to charge Veronica Gutierrez over 1,000%

2  interest on that small mistake.  The damage to Ms. Gutierrez is being assessed three additional overdraft

3  fees.

4  **5.  How The Practice of Re-Sequencing Has Damaged the Class**

5  What was missing from Wells Fargo's giddy analysis of increasing overdraft fees by re-

6  sequencing was the moral and ethical issue of how unfair and detrimental this practice was to its most

7  financially vulnerable customers.   It was the low balance customers that Wells Fargo targeted for this

8  practice.  Not surprisingly, these are low to moderate income customers, (FDIC Report, Ex. 1, at v, ¶¶ 5-

9  6.); young adult customers aged 18-25 years old, (*Id.* at v, ¶ 10); and new customers, (E-mail from

10  Kenneth A. Zimmerman, May 2, 2002, Ex. 12).

11  The result of this change of practice could and did have a significant effect on low income

12  customers.  First, it is important to recognize that overdrafting an account is not an outlier activity as

13  [ REDACTED ] of Wells Fargo's California customers have at least one overdraft transaction each year.   (Def.'s

14  Response to Pls.' Special Interrog. Nos. 1-2, Ex. 2.)  Many of these customers suddenly found that

15  instead of being assessed one overdraft fee, Wells Fargo had taken two, three, four, or five overdraft fees

16  of $34 each by deeming debit card transactions that had occurred day(s) earlier when there was money

17  in the account to cover the transaction, to be overdraft transactions.

18  For these financially strapped customers, suddenly having $100+ simply disappear from their

19  account was significant as illustrated by a review of a sampling of customer complaints that referenced

20  damage to credit, (Customer Complaint, Ex. 13); becoming defendants in lawsuits, (Customer

21  Complaint, Ex. 14); loss of vacation time, (Customer Complaint, Ex. 15); emotional distress, (Customer

22  Complaint, Ex. 16); mental anguish caused by the lack of funds during the Christmas holiday,

23  (Customer Complaint, Ex. 17); loss of grocery money and inability to purchase food for children,

24  (Customer Complaint, Ex. 18); inability to pay for medicine, utilities, rent and food, (Customer

25  Complaint, Ex. 19); loss of time from work, (Customer Complaint, Ex. 20); and incurring late fees on

26  mortgage payments and car payments, (Dep. Tr. of Eugene Adams, Ex. 21, at 77:25-78:13).

27  In fact the response from customers demonstrates how serious this was to low-income customers.

28  In discovery, Plaintiffs requested from Wells Fargo all complaints from customers relating to overdrafts.

-5-

1   Plaintiffs also took the deposition of Wells Fargo's Rule 30(b)(6) witness about the procedures in

2   documenting customer complaints.  What was learned is that at Wells Fargo, the vast majority of

3   complaints are not documented.  The normal procedure where the customer goes into the branch and

4   complains to the bank teller, supervisor or manager about overdrafts is not documented.  (Dep. Tr. of

5   Julie A. Gray, May 28, 2008, Ex. 22, at 33:9-35:25.)  When the customer calls the phone banker (the

6   term Wells Fargo uses for the telephone customer representative) on the toll free number given to them

7   to register complaints, those calls are not documented.  (*Id.* at 30:18-32:20.)  When the customer insists

8   on talking to the supervisor of the phone banker, those complaints are not documented.  (*Id.*)  When the

9   customer sends an e-mail complaint to online customer service, it is not documented.  (*Id.* at 37:7.)

10       The only complaints that are retained are written letters or those complaints that went higher than

11   the bank branch manager, phone supervisors and online supervisor level.  (*Id.* at 39:1-40:25.)  In

12   addition, complaints that make their way to the executive offices, or that were sent to the Better

13   Business Bureau or regulatory body are documented.  (*Id.* at 45:10-46:3.)  So it is only the very few

14   customers that have the time and inclination to wade through the bureaucracy and numerous

15   management levels of Wells Fargo that have their complaints documented.  Despite this small

16   percentage of complaints that were documented, Wells Fargo produced complaints from over 4,000

17   customers relating to overdraft fees they were assessed.  (Decl. of Richard D. McCune, at ¶ 50.)  It is

18   clear that this is not an isolated problem or an inconsequential one for Wells Fargo's customers.

19       That calculation of damages demonstrates the financial seriousness of this re-sequencing

20   practice.  As more fully discussed in the damage section and the Motion to Decertify the Class, Wells

21   Fargo's own calculation at the time they changed their practice was that the re-sequencing practice

22   would increase by approximately [ REDACTED ] the number of transactions deemed overdraft transactions

23   following the overdraft.  (ODRI Initiative Tracking, April 2002, Ex. 9, at 8.)  Plaintiffs' damage experts

24   have confirmed that number is even slightly higher now with increased debit card use.  Wells Fargo

25   generated more than [ REDACTED ] in overdraft fees from California consumers during the class period.

26   (Def.'s Supplemental Resp. to Pls.' Special Interrog. No. 5, Ex. 23.)  Plaintiffs' expert has calculated

27   conservatively, that [ REDACTED ] of the [ REDACTED ] was the result of the re-sequencing practice.

28   (Supplemental Expert Report of Dr. Charles Cowan, Ex. 24, at 18-19.)

-6-

### 6.    How Wells Fargo Misled the Class about the Re-Sequencing Practice

Plaintiffs retained Dr. Lewis Mandell, an expert on banking and financial literacy, (C.V. of Lewis Mandell, Ex. 25), for the purpose of evaluating the re-sequencing practice, and the information Wells Fargo provided about that practice, in light of the known financial literacy of the class of financial consumers.  As detailed in the report of Dr. Mandell, and discussed below, the re-sequencing practice and how it was presented to Wells Fargo customers, had the tendency to deceive, mislead and confuse reasonable consumers about its actual practices. (Expert Report of Dr. Lewis Mandell, Ex. 26, at 1-3.)

### a.    Wells Fargo Presented Debit Cards Transactions as Being Immediately Withdrawn from the Account

Wells Fargo uniformly presented to the class, including each of the class representatives, that when using a debit card, funds were immediately withdrawn from her account (chronological order).  It did this by: 1) upon authorizing a debit transaction when the customer was at point of sale, immediately including it as activity in the account and processing it as a pending debit card; 2) listing the debit card transactions in *the chronological order in which the transactions occurred*; and 3) immediately removing the amount of the pending debit charge from available balance.

For online customers, who comprise [ᴿᴱᴰᴬᶜᵀᴱᴰ] of all customers who overdraft their account, (Def.'s Resp. to Pls.' Special Interrog. Nos. 7-8, Ex. 2), and ATM users, this presentation was by showing the pending debit card transactions in chronological order.

**Transactions - All Activity with Balances**

Show    All Activity with Balances               ⁱ    View

        Advanced Search

| Date ∇ | Description | Amount | Balance |
|---|---|---|---|
|  |  |  | **Newest** |
| 07/16/07 | ATM/POS ACTIVITY | $25.00 (pending) |  |
| 07/16/07 | CHECKCARD ACTIVITY | $103.00 (pending) |  |
| 07/16/07 | ONLINE TRANSFER REF #IBETBNCYPS | +$100.00 (pending) |  |
| 07/16/07 | ATM/POS ACTIVITY | $7.32 (pending) |  |
| 07/16/07 | ATM/POS ACTIVITY | $21.53 (pending) |  |
| 07/16/07 | ATM/POS ACTIVITY | $107.71 (pending) |  |
| 07/16/07 | RECURRING TRANSFER REF #OPEJMHPH5G | $25.00 (pending) |  |
| 07/16/07 | ATM/POS ACTIVITY |  | **Oldest** |

(Online Activity Statement of William Smith, Ex. 27).

-7-

1   For telephone users, it presented the same information to callers audibly, and for those using service

2   representatives, it could involve either showing the customer or telling the customer the information.

3       **b.    In Financial Education and Marketing Materials, Wells Fargo Told
             Customers Debit Card Transactions Are Immediately Withdrawn from the
4            Account**

5       In a series of marketing materials that span over time, which target customers and promote

6   banking products, Wells Fargo told customers that for debit cards, the funds are immediately withdrawn

7   from the account, which of course was telling customers the debit cards were processed in chronological

8   order.  It did this early on by directly stating it to customers, (Wells Fargo Web Page – Managing Your

9   Money, Ex. 28), more recently inferring it by stating that when using debit cards, the funds are

10  *automatically* withdrawn, (Wells Fargo Welcome Brochure, Ex. 29; Wells Fargo Debit/Credit Card

11  Message Requests, Ex. 30; Wells Fargo Brochure - Using Your Check Card, Ex. 31; Wells Fargo

12  Brochure – Checking, Savings, & More, Ex. 32; Wells Fargo Brochure – Opportunity Package, Ex. 33),

13  and through advertisement campaigns that imply it, (Wells Fargo Advertising Campaign, Ex. 34).

14      The vice-president for debit card marketing admitted that "automatically" implies "immediately

15  withdrawn" for customers that could confuse customers.  (Dep. Tr. of Brenda Yost, Ex. 35, at 35:18-

16  36:18.)  This vice-president also testified that this language had been approved by the consumer

17  checking group as well as the legal group.  (*Id.* at 35:18-36:1, 35:9-17.)

18      In financial education materials, Wells Fargo directly stated that when using a debit card, the

19  funds are immediately withdrawn from the account.  (Hands on Banking Web Page, Ex. 36.)  Again this

20  false information was approved both by the consumer checking group and the legal group.  (Dep. Tr. of

21  Pamela Erwin, Ex. 37, at 24:10-25:3.)

22      **c.    Wells Fargo Failed to Disclose this Practice in Its Account Agreement**

23      Wells Fargo contends its account agreement provides it a defense for the actions it has taken in this

24  litigation because it discloses that it may post debit charges from high to low.  The account agreement

25  was 64 pages in small and dense print, containing difficult to understand legalese.  Its table of contents

26  had over 100 different line items, with many different ones that potentially could provide information on

27  this practice, including 1) *Funds Availability Policy,* 2) *Determining Your Account Balance, 3) Order of*

28  *Posting, Overdrafts and Insufficient Funds,* 4) *Bank Fees,* 5) *Contract Language,* 6) *Electronic Banking*

-8-

1   *Services, 7) ATM Cards and Check Cards,* 8) *POS Purchases,* 9) *Available Funds,* 10) *Certain Items*

2   *Affect the Account Total Balance,* and 11) *When a Transaction is Posted.*  (2005 Consumer Account

3   Agreement, Ex. 38.)

4            Further diluting the effectiveness of the Account Agreement is that Wells Fargo provided

5   information in the Account Agreement that supports that the funds *may* be *immediately withdrawn* when

6   Wells Fargo learns of a pending transaction, thus implying the transactions are chronologically

7   processed, by stating:

8                 **The Bank may debit your Account on the day an *Item* is presented by
                  any means, including without limitation electronically, or <u>at an earlier</u>**

9                 **<u>time based on notification received by the Bank that an Item drawn</u>
                  <u>on your Account will be presented for payment or collection.</u>**

10  (*Id.* at p. 26 (underline added).)

11           Wells Fargo ignores this conflicting language to its actual practice, and points to a section where

12  it states that it *may* order transactions from highest to lowest.  As the Court pointed out in the Order

13  denying the first motion for summary judgment, that statement implies that Wells Fargo is doing

14  something differently now and that reordering is the exception. (Order, at 15:13-16:5.)  The absurdity of

15  characterizing the "*may*" language as real disclosure language is illustrated by the fact that this is the

16  identical language used by Wells Fargo in 1999 and 2000, when it processed debit cards before checks

17  and ACH and sequenced each group from **low to high**.  (1999 Consumer Account Agreement and Safe

18  Deposit Box Lease Terms, Ex. 39, at 22-23.)  The use of this identical language when it was not

19  engaging in the re-sequencing practice strongly supports that this language was intended to convey that

20  the reordering was the exception to its general practice.

21           Whatever the intent of the language, it does not provide real disclosure of the practice.  Nowhere

22  in the Account Agreement does it disclose Wells Fargo's actual practice.  It does not disclose that when

23  using a debit card, that funds are not immediately withdrawn.  It does not disclose how it groups

24  different types of transactions before posting them.  It also does not disclose that it has a practice of

25  charging overdraft fees for debit card transaction that can occur days or weeks before the account went

26  into overdraft and for which there were funds in the account at the time of the debit card purchases.

27

28

7.     **How Wells Fargo Misled Plaintiff Veronica Gutierrez About the Re-Sequencing Practice**

Plaintiff Veronica Gutierrez was misled by Wells Fargo's practice of presenting pending debit card charges to her in chronological order both online and through the automated telephone system. Combined with the fact that debit card purchases are pre-authorized by Wells Fargo, and then the funds are immediately removed from her available balance, it reasonably led her to believe what Wells Fargo was explicitly and implicitly telling all customers – that funds for debit card charges were immediately deducted from the account, and therefore were processed in chronological order. (Gutierrez Decl., at ¶ 5.)

In addition, Wells Fargo also provided to Ms. Gutierrez a checking account brochure that stated that when using a debit card, the funds are automatically withdrawn from the account. (Wells Fargo Brochure – Checking, Savings & More, Ex. 40.) To be clear, when asked three years later whether she read that particular section, Ms. Gutierrez did not recall reading the specific section of the document. (Dep. Tr. of Veronica Gutierrez, Ex. 41, at 24:1-25:21.) But it was provided to her by Wells Fargo and she did read at least portions of the document.

**B.     The Including and Deleting Class**

1.     **The Including and Deleting Practice**

Wells Fargo markets and publishes an account balance to customers that is different and apart from the ledger balance called "Available Balance." As the name implies, it is supposed to be the most current picture the bank has of the amount of money the customer has left to spend after including posted and pending debits and credits. (Wells Fargo Account Activity Questions, Ex. 42.) Of course, the available balance could not include debits the bank was unaware of such as checks that had been written but not presented for payment.

Debit card charges are different than checks because debit cards are authorized by Wells Fargo before the transaction takes place, and Wells Fargo's practice is to immediately deduct the amount of the authorized charge from the available balance after the debit card charge is authorized. The practice that Plaintiffs complain of is not that the debit card charges are listed as pending charges and the amount of the charge deducted from available balance, but rather, that despite calling it "available balance," Wells Fargo, without warning or notice, first includes but then removes the transactions [     **REDACTED**

-10-

REDACTED ] (depending on the type of transaction) from the available balance before later including the debit card transactions back into the account when Wells Fargo is posting the account.

This practice results in the customer being provided an inflated available balance during the time between when Wells Fargo removed the debit card charge from available balance and when it finally posted the charge. When the customer relies on the available figure as Wells Fargo encourages, the customer then overdrafts their account because of the inflated balance.

It is undisputed that Wells Fargo does not disclose this practice. In fact, Wells Fargo freely admits that it has deliberately and intentionally elected not to disclose to customers that pending debit card charges are deleted from the account and available balance within [      REDACTED      ] depending on the type of transaction (Zimmerman Dep., Ex. 4, at 77:13-78:12)

## 2. How the Including and Deleting Practice Caused Damaged to the Class Representatives

The Court has already concluded there are triable issues of fact relating to the including and deleting class representatives. However, there is some illustrated value in restating what happened to class representative William Smith.

Plaintiff William Smith is a sophisticated financial consumer who has been banking with Wells Fargo since the early 1990's and online since approximately 2003. (Decl. of William Smith, Ex. 43, ¶ 1.) He heavily relied on "available balance" information on the website to monitor his accounts. His daily monitoring of this account, as well as the other accounts, would involve his confirming that transactions were posted as pending transactions, so he would know he could rely on the available balance information. If necessary, he could transfer money between accounts online when an account balance would get low. This convenience of having online information of the most current picture of his funds was important. (*Id.* at ¶ 2.)

On July 3, 2007, Mr. Smith checked his online balance and noted he had about $300 of available balance. Mr. Smith then bought fireworks for $68.85 using his debit card. Shortly thereafter, he saw that charge was listed on his account as a pending charge and that the charge had been deducted from his available balance. Over the next nine days he monitored his available balance information with the belief that the "available balance" information provided to him by Wells Fargo included past debit card purchases. (*Id.* at ¶ 3.)

-11-

Unknown to Mr. Smith, Wells Fargo removed the fireworks charge after several days without any notification to Mr. Smith.  On July 12, 2007, Mr. Smith checked his available balance and noted he had about $50 in the account.  He then bought groceries for $24.76.  (*Id.* at ¶ 4.)  That night, nine days after the fireworks charge was listed on his account and after it had dropped off the account and available balance figure without notification to Mr. Smith, Wells Fargo processed the fireworks charge. The $68.85 fireworks charge not only caused an overdraft for the fireworks charge, it caused the $24.76 grocery charge that Mr. Smith had made after specifically checking his "available balance" to be an overdraft transaction.  (Bank Statement of William Smith, June 16-July 17, 2007, Ex 44.)  Wells Fargo then unilaterally took $68 (two $34 overdraft charges) from his checking account without Mr. Smith having an opportunity to contest or dispute those charges.

### 3.    How the Including and Deleting Class Was Damaged By the Practice

As supported by Dr. Lewis Mandell (Expert Report of Lewis Mandell, Ph.D., Ex 26, at pp. 12-13), the including and deleting practice has the tendency to mislead and deceive a reasonable consumer. The term "available balance" is uniformly provided to all class members, and a practice that provides an available balance that has deleted known pending debit card charges without notice to the consumer, thereby providing an inaccurate and inflated available balance is improper.

As set forth in detail in the opposition to the motion to decertify the class, and incorporated herein, Plaintiffs damage expert has calculated $148 million in overdraft fees assessed to the class for overdraft amounts that were less than the amount the available balance was inflated when last accessed by the customer (providing the customer accessed the account within seven days of the overdraft).

## III

## SUMMARY OF ARGUMENT

1.  Defendant has the burden to establish that there are no genuine issues of disputed material facts.

2.  There are genuine issues of disputed material facts that support each of Plaintiffs causes of action.

3.  There are genuine issues of disputed material facts on each of Defendant's Affirmative Defenses

-12-

# IV

# ARGUMENT

**A.      Defendant Must Establish That There Are No Issues of Disputed Facts**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be entered only if the moving party can establish by proper evidence that there is no genuine dispute regarding the material facts of the case and the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(c) (2004); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986).  The Court must evaluate a party's motion for summary judgment construing the alleged facts with all reasonable inferences favoring the nonmoving party.  *See Baldwin v. Trailer Inns, Inc.,* 266 F.3d 1104, 1117 (9th Cir. 2001).

**B.      There are Genuine Issues of Disputed Material Facts on Each of Plaintiffs Causes of Action**

Defendant has throughout the motion contended that that there were not genuine disputes regarding material facts on each of Plaintiffs' causes of action.  Defendant's position is almost identical no matter which cause of action it is challenging.  Defendant contends that: 1) there was nothing unfair about the practices; 2) Wells Fargo did not misrepresent the practices to the class representatives; 3) Wells Fargo did not conceal the practices to the class representatives; 4) Plaintiffs cannot establish intent; 5) Plaintiffs cannot establish reliance for either the class representatives or the class; and 6) Plaintiffs cannot establish damages.  Plaintiffs will briefly summarize the facts supporting each of these contested issues.

**1.     Plaintiffs are Able to Present Material Facts Sufficient to Support a Finding that the Re-Sequencing Practice Had the Tendency to Mislead, Confuse and Deceive Customers**

Plaintiffs have presented facts sufficient for a jury to find the re-sequencing practice was improper and had a detrimental effect on class members.  As discussed in the fact section, Wells Fargo's own documents show that the intention of the practice was to generate additional overdraft fees from low-income customers when they overdrafted their account  (Wells Fargo Service Charges on Updates, February 2002, Ex. 47.), and to do so without notification to these customers.  It applied the practice uniformly to the class.  As discussed above, it is undisputed that this practice caused Plaintiff Veronica Gutierrez to incur $66 in more overdraft charges than if the debit card charges were immediately

-13-

1   withdrawn, i.e. posted in chronological order.  Plaintiffs' qualified experts will testify that this practice

2   has damaged class members in a similar and significant way.

3         Plaintiffs have also presented evidence for a jury to find the including and deleting practice was

4   improper and had a detrimental effect on class members.  Defendant admits that it includes debit card

5   transactions in available balance for [     **REDACTED**     ] days before removing the debit card

6   transaction, resulting in the available balance being inflated.  (Zimmerman Dep., Ex. 4, at 87:3-16.)

7   Defendant admits that it does not disclose this fact to customers.  (*Id.* at 77:13-78:12.)  The result of this

8   practice is that customers who rely on available balance are tricked into overdrafting their account

9   because of an inflated available balance, as happened to class representative William Smith.  It is

10  undisputed that Wells Fargo's practice was uniform as applied to each customer.  Plaintiffs' qualified

11  experts will testify that this practice has damaged class members in a similar and significant way.

12      **2.   Plaintiffs are Able to Present Material Facts Sufficient to Support Misrepresentation**

13        The Ninth Circuit implements a "common course of conduct standard" in determining the degree

14  of uniformity required among misrepresentations to class members.  *In re First Alliance Mortg. Co.*, 471

15  F.3d 977 (9th Cir. 2006); *see Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975) ("Confronted with a

16  class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have

17  taken the common sense approach that the class is united by a common interest in determining whether a

18  defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight

19  differences in class members' positions"); *In re American Continental Corp./Lincoln Savings & Loan

20  Securities Litigation*, 140 F.R.D. 425, 430-31 (D. Ariz. 1992) (the court focused on the evidence of a

21  "centrally orchestrated strategy" and the "underlying scheme" in finding that the "center of gravity of

22  the fraud transcends the specific details of oral communications").

23        In regards to the re-sequencing class, Defendant's partial motion for summary judgment focused

24  on the issue of Plaintiff Veronica Gutierrez not being provided specific documents that described debit

25  cards transaction as being either immediately or automatically withdrawn from the account.  While

26  Plaintiff Gutierrez was not exposed to each of the ways that Wells Fargo misrepresented this practice, as

27  discussed in the fact section, Wells Fargo did misrepresent the re-sequencing practice to her by

28  presenting pending debit card charges to her in chronological order both online and when she inquired

-14-

1    about account activity through Wells Fargo's automated telephone system.  (Gutierrez Decl., ¶ 5.)

2    That at the very least raises a triable issue of fact relating to misrepresentation.

3         The same representations made to Plaintiff Gutierrez were made to online bank users ([<sup>REDACTED</sup>] of

4    the class members), as well as the remaining class members that accessed their accounts by automated

5    telephone, ATM machines or through their branch store.  Any place a class member assessed their

6    account, they would be provided the pending debit card transactions in chronological order and the

7    amount of the pending debit card transaction would be shown to have been immediately removed from

8    the available balance. This misrepresentation was consistent with the broad scheme of misrepresenting

9    the re-sequencing practice in various forms.  The common theme with whichever form and medium was

10   exactly the same misrepresentation as made to Plaintiff Gutierrez, and that was funds for debit card

11   transactions are immediately withdrawn and thus processed in chronological order.

12        For the including and deleting class, each class member was provided the misrepresentation

13   through the use of term "available balance," which implies that for account activity of which Wells

14   Fargo is aware, the balance shown is available for withdrawal without overdrafting the account.  This

15   misrepresentation was made to both class representations William Smith and Erin Walker.  It was also

16   the same representation made to class members as a whole.  It was part of the scheme to mislead and

17   conceal this practice, whether by use of the term "available balance" or through misrepresentations

18   made to the class online and in marketing material that falsely defined available balance consistent with

19   its common meaning as being the most current picture of available funds that included all pending

20   transactions.

21        **3.    Plaintiffs are Able to Present Material Facts Sufficient to Support Concealment**

22        Fraud based on concealment or nondisclosure requires a showing of one of the following in order

23   to establish a duty to disclose information: 1) that the defendant had exclusive knowledge of material

24   facts not known to plaintiff, 2) that the defendant actively conceals a material fact from plaintiff, or

25   3) that the defendant makes partial representations but also suppresses some material fact.  *Falk v.*

26   *General Motors Corp.,* 496 F. Supp. 2d 1088, 1094-97 (2007); *Limandri v. Judkins*, 52 Cal. App. 4th

27   326, 337, 60 Cal. Rptr. 2d 539 (1997).

28

-15-

1   Plaintiffs can show concealment on behalf of the class representatives and each of the classes on

2   each of the three showings.  For the re-sequencing class, it is undisputed that Wells Fargo had the

3   exclusive knowledge of material facts as it was the only party that knew its practice was to wait until

4   debit cards were presented for payment, sometimes days or weeks after a transaction took place, before

5   grouping debit cards with checks and ACH and then sequencing the group from high to low.

6   It concealed that information by deliberately deciding not to provide customers the information

7   in the account agreement, (E-mail from Peterson to Moore, Ex. 10), and not disclosing the true practice

8   anywhere online or in marketing brochures, while at the same time representing to Plaintiff Gutierrez

9   and the other class members that debit card transactions are processed in chronological order and that

10   the funds for debit card transactions are immediately withdrawn as discussed in the prior section.

11   For the including and deleting class, Defendant does not dispute that it has deliberately kept from

12   customers information about its practice of including and deleting transaction.  (Zimmerman Dep., Ex.

13   4, at 77:13-78:12.)  In combination with the use and definition of "available balance" as discussed

14   above, the decision to intentionally not disclose and suppress its including and deleting practice raises

15   triable issues of fact relating to concealment.

16   **4.  Plaintiffs are Able to Present Material Facts Sufficient to Support Reliance**

17   Reliance may be established on the basis of circumstantial evidence showing the alleged

18   fraudulent misrepresentation or concealment *substantially influenced* the party's choice, even though

19   other influences may have operated as well.  *Sangster v. Paetkau*, 68 Cal. App. 4th 151 170, 80 Cal.

20   Rptr. 2d 66 (1988).  Reliance is a question of fact to be left to the jury.  *Alliance Mortgage Co. v.*

21   *Rothwell*, 10 Cal. 4th 1226, 1239, 900 P.2d 601, 608-09 (1995).   Materiality of the representation, and

22   therefore reliance, in CLRA and UCL class actions may be shown if representations are "likely to

23   deceive" a reasonable consumer.  *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal. App. 4th

24   1351, 1358-60, 8 Cal. Rptr. 3d 22 (2003); *Falk v. General Motors Corp.*, 496 F. Supp. 2d 1088, 1095

25   (N.D. Cal. 2007); *T.C. Jefferson v. Chase Home Finance*, 2008 WL 1883484, *15 (N.D. Cal. April 29,

26   2008); *Bardin v. Daimlerchrysler Corporation*, 136 Cal. App. 4th 1255, 1261, 39 Cal. Rptr. 3d 634

27   (2006).

28

-16-

1    Regarding the re-sequencing class, Defendant contends that Plaintiff Gutierrez could not have

2    relied on misrepresentations on the basis that she did not rely on the seven specific statements Wells

3    Fargo identified in the partial motion for summary judgment.  As Plaintiffs want to make sure it is clear

4    to the Court, that it is true that Plaintiff is not asserting that Plaintiff Gutierrez relied on those seven

5    specific documents.  However, as discussed above, while she did not rely on those specific

6    misrepresentations, Plaintiff Gutierrez did rely on the misrepresentations Wells Fargo provided online

7    and through the automated telephone system that conveyed the same false statements that debit cards

8    transactions are immediately withdrawn from the account and are processed in the order the transactions

9    occur.  (Gutierrez Decl., ¶ 5.)

10    For the re-sequencing class, Dr. Lewis Mandell, an expert in banking and financial literacy, has

11    provided his opinion that will be offered at trial, that Wells Fargo's misrepresentations and omissions

12    relating to its re-sequencing practice had a tendency to mislead and deceive a reasonable consumer,

13    which provides proper support for class wide reliance.  (Expert Report of Dr. Lewis Mandell ("Mandell

14    Report"), Ex. 26, at pp. 2, 5-10.)

15    For the including and deleting class, Class Representatives Smith and Walker provided

16    testimony that they relied on the inflated available balance provided to them by Wells Fargo.  (Smith

17    Decl., Ex. 43; Walker Decl., Ex. 45.)  As the Court discussed in the first motion for summary judgment

18    related to both Class Representatives Smith and Walker, there are triable issues of fact supporting

19    reliance. (Order, 22:16-26.)

20    As relates to reliance for the including and deleting class, Dr. Lewis Mandell has also reviewed

21    the issues of misrepresentation and omissions relating to the including and deleting class, and has

22    provided the opinion that Wells Fargo's actions had a tendency to mislead and deceive a reasonable

23    customer, which provides proper support for class wide reliance.  (Mandell Report, Ex. 26, at pp.10-13.)

24    **5.    Plaintiffs are Able to Present Material Facts Sufficient to Support Intent**

25    "Fraud cases by their nature require the fact finder to determine the state of mind of both the

26    asserted victim and the accused offender," such as determining whether the offender has the necessary

27    scienter and intent to defraud and whether the victim act in reliance.  *Shum v. Intel Corp.*, 2008 WL

28

-17-

1   4414722, *12 (N.D. Cal. September 26, 2008).  Given the standards for summary judgment, "it is

2   frequently true that these cases are not amenable to resolution by summary judgment." *Id.*

3            For the re-sequencing class, as discussed in the fact section, there are clearly genuine issues of

4   that fact that would support that Wells Fargo's intent with this practice was solely to extract more

5   overdraft fees from low-income customers without disclosing to customers its practice.  That alone

6   provides facts sufficient to support intent.  When combined with additional marketing materials and

7   financial education programs that had been reviewed and approved by both Wells Fargo's consumer

8   deposit group and legal group, that stated that debit card transaction funds are immediately or

9   automatically withdrawn from the account, there clearly is sufficient information to support a finding of

10  intent for the re-sequencing class.

11           For the including and deleting class, Defendant has admitted they have intentionally withheld

12  information from customers of their practice of including and deleting transactions, (Zimmerman Dep.,

13  Ex 4, at 77:13-78:21.)  That admission, in conjunction with the fact that it have made large profits from

14  this deceptive practice, also supports a finding of intent, no matter the number of times Defendant claims

15  there is not a "scintilla of evidence" to describe the overwhelming evidence supporting intent.

16           **6.        Plaintiffs are Able to Present Material Facts Sufficient to Support Damage**

17           As Defendant has essentially relied on a position that Plaintiffs cannot carry their burden of

18  proof on damages as a basis for the concurrent motion to decertify the class, Plaintiffs have addressed

19  that contention in some detail in the opposition to the motion to decertify the class.  As discussed in that

20  opposition in the motion to decertify, use of aggregated damages to establish class damages is perfectly

21  proper, and Plaintiffs have and can use Wells Fargo's databases to ascertain class members that have

22  incurred damage and the amount of that damage, at the time of distribution of the aggregated damages.

23  **C.      Defendant's Defense to These Claims Cannot Be Decided as a Matter of Law**

24           In its motion, Defendant completely ignores Plaintiffs claim of re-sequencing of debit cards, and

25  instead pretends like this is a claim complaining of the posting order of checks from high to low.  It is

26  not.  The facts of this case simply do not support the following affirmative defenses.

27

28

-18-

1   **1.   The California Commercial Code Does Not Sanction the Re-Sequencing Practice or How it Was Presented to Customers**

Defendant contends in the motion that California Uniform Commercial Code § 11504(a) sanctions its manipulation of the posting order of debit card transactions in order to turn transactions that were not overdrafts into overdraft transactions and thereby increase overdraft fees from customers.  It is wrong.

**a.   The California Commercial Code Does Not Apply to Debit Card Transactions**

After almost one and one-half pages of citing the California Uniform Commercial Code for the proposition that it sanctions re-sequencing of the type complained of in the subject action, and that "every single case" Wells Fargo knows about, including a case it cites in a footnote that the court specifically stated it "is not designated for publication and may not be cited," supports its position, Defendant finally and timidly acknowledges that "**as a technical matter, Section 4303 does not apply to debit-card transactions.**"  (Def.'s Mot. for Summ. J., at 6:15 (emphasis added).)  Defendant did not even acknowledge that each of the cases it cited that comprised "[e]very single case of which Wells Fargo is aware," (*Id.* at 6:5), each involved an allegation relating to the order of posting *checks*, not debit cards.

There is a fundamental difference between checks and debit cards.  Unlike checks, debit card transactions provide Defendant with specific time information as to when the transaction occurred and provides for pre-authorization of the transaction.  Wells Fargo has this information long before it posts the debit card transactions, and it is displayed in chronological order to the customer before posting.

A check shares none of those features.  A batch of checks come in at one time without the bank knowing they were outstanding; without an opportunity to accept or reject the transaction before it took place; and without knowing the order in which they were written.  In addition, unlike debit card transactions, checks are never presented in any order to the customer until they are posted.  These differences make application of a Commercial Code aimed at check posting order inapplicable for the re-sequencing of debit card claims.

However, even if the California Uniform Commercial Code that is limited to check posting order had relevance to debit card transactions, it would not provide a defense as a matter of law.  Here there

-19-

1   clearly are disputed facts as to whether Defendant employed deceit by misleading, misrepresenting or

2   concealing material facts in how it presented this practice to its customers.  A finding of deceit, whether

3   by misrepresentation or concealment, is actionable whether or not the underlying practice is legal.

4          Finally, even if this Commercial Code that is limited to checks did apply, there still would be

5   issues of disputed facts that would preclude summary judgment, for this section actually provides for

6   restraint on the bank, requiring that the *bank must act in good faith*.  Cal. U. Com. Code § 4303, Cmt. 7.

7   As discussed in the fact section, there is evidence that the jury could reasonably interpret that Wells

8   Fargo's only motivation in changing its practice was to increase the number of overdraft transactions

9   and overdraft fees.

10         Good faith is a question of fact, and Wells Fargo's contemporaneous documents reveal that

11  profit was the motivation for this change in practice that resulted in the re-sequencing. (Wells Fargo –

12  Service Charges on Deposits Update, February 2002, Ex. 47; E-mail from Kenneth A. Zimmerman to

13  Karen Moore, May 2, 2002, Ex. 12.)  It is quite telling that Wells Fargo needs to use experts to support

14  its position, instead of its own records that documented the process when it was occurring.  This is

15  exactly the type of factual dispute to be decided by the trier of fact.

16         While industry standard is not relevant to this lawsuit, Plaintiffs cannot help but address the

17  repeated misstatement by Wells Fargo and its counsel that it is simply doing what every other bank is

18  doing.  It is certainly true a number of banks are engaged in this same unethical behavior, and not

19  surprisingly, apparently most of the largest national banks.  But that is not what the Defendant has told

20  this Court.  In oral argument at the first motion for summary judgment, Defense Counsel stated: "High-

21  to-low.  And that is what—all banks do that (sic) these days."  (Tr. of Hr'g on Mot. for Summ. J.,

22  8/21/08, Ex. 48, at 14:3-4.)  That statement, with a little subtle wiggle room, is essentially made again in

23  this motion.  (Def.'s Mot. for Summ. J., at 9:1-4.)  However, it is not accurate according the FDIC.  The

24  FDIC recently completed a study that showed that only ***24.7%*** of the 1,171 FDIC  banks surveyed

25  posted largest to smallest, while 47.2%, posted from smallest to largest.  (FDIC Report, Ex. 1, at 11.)  At

26  any rate, the fact that competitors engage in the same unlawful practice does not make the practice

27  lawful.

28

-20-

### 2. Plaintiffs Have Not Consented to the Illegal Taking of Their Property From the Re-Sequencing Practice

Defendant contends that Plaintiffs have consented to the re-sequencing as a matter of law, because there is language in the account agreement that states it *may* post from high to low and another section where it states it can post in any order it chooses. Defendant cannot make this argument without acknowledging that the Court has already considered and rejected this argument as providing a defense as a matter of law. (Order, Doc. 98, at 15:18.)

The language in the agreement does not serve as a defense, because it is buried deep in the dense account agreement; is capable of an interpretation of what it expects to do rather than what it is doing; is in conflict with other sections; and is the exact same language used with Wells Fargo was posting low to high. Ambiguous and conflicting language in an agreement that are in conflict, along with other representations and actions that are inconsistent with the disclosure language, does not support a finding that both parties consented to a specific meaning of the agreement terms. *Manaco v. Bear Stearns Residential Mrtg. Corp..*, 544 F. Supp. 2d 1034, 1040 & n.9, 1041 (C.D. Cal. 2008) ("Despite Defendants' urging, the Court will not read 'may' to mean 'will,'" thereby precluding a finding of mutual agreement).

Furthermore, leaving aside the inadequacies and inconsistencies of the disclosure language, it is no defense to a consumer fraud scheme of misrepresentations and concealment that an agreement provides accurate information. Wells Fargo is liable for its misrepresentation of the effects of the Agreement, even if there is no dispute about the meaning of the words of the Agreement itself. *See Broberg v. Guardian Life Ins. Co. of America*, 171 Cal. App. 4th 912, 90 Cal. Rptr. 3d 225 (2009); *Papers Savers, Inc. v. Nasca*, 51 Cal. App. 4th 1090, 1102, 59 Cal. Rptr. 2d 547 (1996)

Finally, to the extent that Defendant relies on the language found in the agreement that states it can post or process in any order it chooses, no matter how arbitrary or contrary to law, then Defendant is barred from enforcing such a provision on the basis of unconscionability. Such a provision would meet the threshold requirements of being both procedurally and substantively unconscionable. The provision is procedurally unconscionable because the account agreement is a contract of adhesion, imposed by Wells Fargo upon the Plaintiffs, without the ability of the customer to negotiate the terms. *See Flores v. Transamerican Homefirst, Inc.*, 93 Cal. App. 4th 846, 853 (2002). The provision would be

-21-

1    substantively unconscionable because the term leads to unreasonable, unjustified and one-sided results.

2    *See, e.g., Kinney v. United Healthcare Services, Inc.*, 70 Cal. App. 4th 1322 (1999).

3          **3.      Waiver and Voluntary Payment Are Not Valid Defenses**

4          In what appears to be a bizarre and circular argument, Defendant contends that despite the fact

5    that Wells Fargo's acknowledged practice is to assess and then unilaterally withdraw overdraft fees from

6    a customer's account, that a customer is barred from making a claim that the overdraft fees are illegal if

7    the customer does not close the account and refuse to pay the overdraft fees.

8          This, of course, ignores the fact that if the customer actually does that, that customer will not

9    have a checking account for a time that could have automatic payments and deposits flowing in and out

10   of it; that Wells Fargo will turn the customer over to collection; that the customer will be reported to the

11   credit bureaus and will have their credit ruined; that Wells Fargo adds $5 per day per overdraft while the

12   overdraft fee is unpaid; and that Wells Fargo will inform other banks through their network that the

13   customer refused to make good on an overdrafted account that will keep the customer from being able to

14   open an account at other banks. That is hardly voluntary payment.

15         As to the Plaintiffs, and certainly William Smith and Veronica Gutierrez, their voluntary actions

16   were to make a normal deposit into the account to cover an overdraft condition; not satisfying a

17   contested debt.  There is no showing, nor could there be, that the Class Representatives were aware

18   when making their deposits after learning of the overdraft, that the overdraft fees were illegal and

19   actionable.   That is, at the very least, a showing that Defendant would have to make to advance this

20   position.  They may have thought they were unfair, but in light of the heavy weight of Wells Fargo

21   about to come down on them that would ruin their credit and ability to bank, that is not the voluntary

22   payment of a contested and known illegal debt.

23         The California Supreme Court established the long-standing standard for determining whether a

24   payment is voluntary or involuntary in *McMillan v. Vischer*, 14 Cal. 232, 235 (1859).  The mere power,

25   accompanied with an apparent intent of exercising it over the property of another, irrespective of the

26   character of the property endangered, is sufficient to make the payment involuntary.  *Id.*  "A voluntary

27   payment means one made without compulsion and one made on an illegal claim with knowledge of its

28   illegality or groundlessness.  *Engelken v. Justice Court of Eden Tp.*, 50 Cal. App. 157, 158, 195 P. 265

-22-

1    (1920).  When payment is made under compulsion it is not voluntary.  *Id.*  Whether payment of a

2    judgment is voluntary or not depends on the facts of each particular case as indicating an intention on

3    the part of the payor to waive his legal rights.  *Id.*

4           Wells Fargo relies primarily on *Lopez v. Washington Mutual Bank*, 302 F.3d 900 (9th Cir. 2002),

5    to assert that when a consumer is charged a fee and voluntarily pays that fee in an ongoing contractual

6    relationship, he may not later challenge the payments made.   However, the facts here are critically

7    distinguishable from the facts in *Lopez*.  In *Lopez*, the class representatives were fully aware of and

8    apparently intended to use the overdraft as a line of credit.  Most importantly, the defendant in that case

9    did not manipulate the account to create additional overdraft transactions.  Here, none of the three Class

10   Representatives are complaining that Wells Fargo charges overdraft fees when an account is

11   overdrafted; the complaint is the actions that led to the overdraft, whether for William Smith and Erin

12   Walker it was providing them inflated available balance information or Veronica Gutierrez where the

13   posting was manipulated in order to make non-overdraft transactions into overdraft transactions.  *Lopez*

14   does not change 150 year old precedent under the facts of this case.

15          **4.      Conversion is a Proper Cause of Action on a Finding of a Wrongful Act**

16          Defendant starts with the proposition that because Plaintiffs cannot establish a wrongful act,

17   there is no claim for conversion.  Defendant is correct only to the extent that the jury finds that there is

18   no taking.  However, conversely, if there is a finding of a wrongful act, then conversion is a proper

19   cause of action.  Accordingly, Defendant's argument rests on whether the Court finds there are disputed

20   issues of material fact on the issue of wrongful acts and deceit.  For the reasons discussed above, there

21   are clearly facts that would support a jury finding that Wells Fargo acted improperly in both the

22   practices and presentation of re-sequencing and including and deleting.

23          Defendant then takes the position that there really could be no taking, inasmuch as the hard-

24   earned money that the class representatives and class members entrusted to Wells Fargo was no longer

25   theirs the second they made the deposit, and it was now Wells Fargo to do with as it wanted.  According

26   to Wells Fargo, deposit customers are limited to a breach of contract case against Wells Fargo if it or its

27   employees decide to convert the money for their own uses.

28

1    However, numerous cases have held that an action for conversion may be based on the

2  assessment of overdraft fees.  *See, e.g., White v. Wachovia Bank, N.A.,* 563 F. Supp. 2d 1358, 1371

3  (N.D. Ga. 2008) (a claim for conversion under Georgia law is properly alleged in a situation where the

4  bank imposed overdraft fees when their account was not actually overdrawn); *Decatur Auto Ctr. v.*

5  *Wachovia Bank, N.A.,* 276 Ga. 817, 821, 583 S.E.2d 6, 9 (2003) ("Conversion is ... available for ...

6  overdrafts charged by a bank on existing accounts."); *First Union Nat'l Bank of Ga. v. Davies-Elliott,*

7  *Inc.,* 215 Ga. App. 498, 506, 452 S.E.2d 132, 140 (1994) (affirming denial of motion to dismiss

8  conversion claim as to improper overdraft fee because "if the payment of the check was improper, the

9  overdraft charges were improper").  Courts have also upheld claims for conversion against banks based

10  on the assessment of other types of fees.  *See e.g., Jefferson v. Chase Home Finance*, 2008 WL 1883484

11  (N.D. Cal. April 29, 2008); *Hood v. Santa Barbara Bank & Trust*, 143 Cal. App. 4th 526, 49 Cal. Rptr.

12  369 (2006); *Great W. Res., LLC v. Bank of Ark., Nat'l Ass'n,* No. 05-5152, 2006 WL 626375 (W.D. Ark.

13  Mar.13, 2006).

14    To the extent Wells Fargo is serious about this position, their contract language does not comport

15  with their position.  It does not comport with the account agreement sections discussing form of account

16  *ownership,* (2005 Consumer Account Agreement, Ex. 38, at 32), and is in direct conflict with the

17  account agreement section dealing with reliance on bank ownership to determine ownership where it

18  states:

19      **"The bank may presume that any person named in addition to you in its records for
       your account, <u>owns the funds in your Account with you as co-owner</u>"**

20  (*Id.* at 35 (emphasis added).)

21    Defendant then continues to throw mud against the wall by stating that the claim is one of

22  overcharge and that is not conversion.  Defendant is again wrong.  Plaintiffs are not stating that they

23  thought the fee was $33 and it turned out to be $34.  The Plaintiffs are claiming that Defendants charged

24  overdraft fees for transactions that were not overdraft transactions.  That does not have anything to do

25  with overcharging.  Conversion is clearly a proper cause of action if a jury finds for Plaintiffs on the

26  wrongful acts that resulted in Wells Fargo unilaterally taking money it falsely claimed it was due for

27  overdraft fees directly from customers' accounts.

28

-24-

1

**5.**     **CLRA Applies to Plaintiffs Claims**

2

    Out of an abundance of caution, plaintiffs address a claim that even Defendant does not seem to

3

take very seriously. Wells Fargo claims that the CLRA does not specifically apply to activities *solely*

4

related to credit, so therefore it is inapplicable to overdraft fees. What it interesting about this position is

5

how hard Wells Fargo has fought in this case, the legislature and the Courts to take the position that

6

honoring overdraft items is not extending a line of credit. (Dep. Tr. of Karen Moore, Ex. 49, at 38:3 –

7

39:7.) The reason is simple. If overdrafts are considered lines of credit, then Wells Fargo would be

8

subject to all the regulation related to lines of credit, including disclosure of the APR associated with the

9

line of credit. It does not want to have to do that, because informed customers are much more likely to

10

revolt against interest rates that would be in the 1,000's of percent APR. This is a complete red herring,

11

and the dozens of California cases cited by both parties on different issues support that, as most involved

12

money and unchallenged claims that the CLRA applied to the conduct.

13

    CLRA claims are permitted for issues related to bank accounts. *Hernandez v. Hilltop Fin.*

14

*Mortgage, Inc.*, 2007 WL 3101250, at *6 (N.D. Cal. Oct. 22, 2007) held that financial institution

15

transactions are actionable under CLRA, because they involve services unrelated to credit. (Citing

16

*Jefferson v. Chase Home Finance*, 2008 WL 1883484 (N.D. Cal. April 29, 2008) and other cases, which

17

reject *Berry v. American Express Publishing, Inc.* 147 Cal. App. 4th 224 (2007) and *McKell v.*

18

*Washington Mutual, Inc.,*142 Cal. App. 4th 1457 (2006)). Other courts have also held that CLRA

19

claims were valid in cases involving consumer accounts fees. *See, e.g., Smith v. Wells Fargo Bank, N.A.*

20

135 Cal. App. 4th 1463, 38 Cal. Rptr. 3d 653 (2005); *Hauk v. JP Morgan Chase Bank USA*, 552 F.3d

21

1114 (9th Cir. 2009)

22

**V**

23

**CONCLUSION**

24

    For the foregoing reasons, Plaintiffs respectfully submit that the Court should deny Defendant

25

Wells Fargo's Motion for Summary Judgment.

26

DATED: April 9, 2009.         McCUNE         & WRIGHT, LLP

27

28

        BY:   /s/

                    Richard D. McCune

                    Attorney for Plaintiffs

-25-