1  Richard D. McCune, SB # 132124
   rdm@mwtriallawyers.com
2  Jae (Eddie) K. Kim, SB # 236805
   jkk@mwtriallawyers.com
3  McCUNE & WRIGHT, LLP
   2068 Orange Tree Lane, Suite 216
4  Redlands, CA  92374
   Telephone:     (909) 557-1250
5  Facsimile:     (909) 557-1275

6  Mitchell M. Breit, Esq. (Admitted *Pro Hac Vice*)
   mbreit@wdklaw.com
7  WHATLEY DRAKE & KALLAS, LLC
   1540 Broadway, 37th Floor
8  New York, NY  10036
   Telephone:  (212) 447-7070
9  Facsimile: (212) 447-7077

10 Brian J. Panish, Esq. SB # 116060
   panish@psandb.com
11 Adam K. Shea, Esq. SB # 166800
   shea@psandb.com
12 PANISH, SHEA & BOYLE
   11111 Santa Monica Blvd., Suite 700
13 Los Angeles, CA  90025-3341
   Telephone:  (310) 477-1700
14 Facsimile:  (310) 477-1699

15 Attorneys for Plaintiffs, VERONICA GUTIERREZ, ERIN WALKER
   and WILLIAM SMITH, on behalf of themselves and
16 all others similarly situated,

17

                    **PUBLIC VERSION**
                    **REDACTED PURSUANT**
                    **TO PROTECTIVE OREDER**

18                 UNITED STATES DISTRICT COURT

19            FOR THE NORTHERN DISTRICT OF CALIFORNIA

20 VERONICA GUTIERREZ, ERIN WALKER and    ) Case No.:  C 07-05923 WHA (JCSx)
   WILLIAM SMITH, as individuals, and on behalf )
21 of all others similarly situated,            )        CLASS ACTION
                                                )
22                          Plaintiffs,         ) **[REDACTED] PLAINTIFFS' OPPOSITION**
                                                ) **TO DEFENDANT WELLS FARGO'S**
23              v.                              ) **MOTION TO DECERTIFY CLASSES**
                                                )
24 WELLS FARGO & COMPANY; WELLS               ) **Date:  April 30, 2009**
   FARGO BANK, N.A.; and DOES 1 through 125,   ) **Time: 8:00 a.m.**
25                                              ) **Dept:  Courtroom 9**
                          Defendants.          )
26                                              ) Judge Assigned:  Hon. William H. Alsup
                                                ) Complaint Filed:  November 21, 2007
27                                              )
                                                )
28 _____ )

# TABLE OF CONTENTS

**Page**

I       INTRODUCTION ...................................................................................................... 1

II      FACTS ...................................................................................................................... 2

    A.      Plaintiffs Method of Calculating Damage ........................................................ 2

        1.      Re-Sequencing Class ........................................................................ 2

            a.      How Plaintiffs Obtained Re-Sequencing Damage for a Sample of 10,000 Customers ................................................................................ 2

            b.      How Plaintiffs Used the Sample Data Damage Figure to Calculate Class Damages .................................................................................. 4

            c.      Dr. Cowan's Confirmation that Use of the Sampling Data Was Appropriate ................................................................................. 5

            d.      The Sample Data Also Corresponded with Wells Fargo's Own Non-Litigation Financial Analysis Done in 2002 ............................... 6

        2.      Plaintiffs Method of Calculating Damages for the Including and Deleting Class ............................................................................... 6

            a.      How Plaintiffs Obtained Re-Sequencing Damage for a Sample of 10,000 Customers ................................................................................ 6

            b.      How Plaintiffs Used the Sample Data Damage Figure to Calculate Class Damages .................................................................................. 7

        3.      It Would Have Been Improper for Plaintiffs to Provide Only One Damage Amount for the Two Classes .................................................. 7

III     ARGUMENT ............................................................................................................. 7

    A.      Plaintiffs Have Developed a Methodology for Ascertaining Individual Class Damages... 7

    B.      Defendants Arguments Relating to Damages Are Not Proper Challenges to Certification or Ascertainability ....................................................................... 10

        1.      Defendant's Challenge to the Re-Sequencing Class Ascertainment Methodology ................................................................................ 10

**TABLE OF CONTENTS, cont.**

**Page**

2.  Defendant's Challenge to the Including and Deleting Class Ascertainment Methodology ................................................................................. 11

3.  Defendant's General Challenges to Both Classes Regarding Waiver, Duty to Mitigate, and Voluntary Payment Are Not Appropriate Challenges to Class Certification ................................................................................. 12

   a.  Defendant's Due Process Challenge Based on Waiver of Fees is Misplaced ................................................................................. 12

   b.  Duty to Mitigate Is a Question of Fact for the Jury ................................. 13

   c.  Voluntary Payment Does Not Provide a Defense to Wells Fargo's Practices ................................................................................. 13

   d.  Plaintiffs Damage Calculations Include Damages From Each Cause of Action ................................................................................. 14

C.  Plaintiffs' Calculation of Aggregate Damages Accurately Demonstrates that the Members of Both Classes Have Been Damaged ............................................. 14

IV  CONCLUSION ................................................................................. 16

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Bell v. Farmers Ins. Exchange,*
    115 Cal. App. 4th 715, 9 Cal. Rptr.3d 544 (2004)......................................... 12, 15

*Bruno v. Superior Court,*
    127 Cal. App. 3d 120, 179 Cal. Rptr. 342 (1981) ............................................. 14

*Daar v. Yellow Cab Co.,*
    67 Cal.2d 695, 62 Cal. Rptr. 724 (1967) .......................................................... 14

*Dukes v. Wal-Mart, Inc.,*
    509 F.3d 1168 (9th Cir. 2007) ........................................................................... 15

*Group Health Plan, Inc. v. Philip Morris, Inc.,*
    621 N.W.2d (Minn.2001) .................................................................................. 15

*Hilao v. Estate of Marcos,*
    103 F.3d 767 (9th Cir. 1996) ............................................................................. 15

*In re Agent Orange Product Liability Litigation,*
    597 F. Supp. 740 (E.D.N.Y.1984) ..................................................................... 12

*In re Live Concert Antitrust Litig.,*
    247 F.R.D. 98 (C.D. Cal. 2007) ......................................................................... 10

*In re Rubber Chemicals Antitrust Litig.,*
    232 F.R.D. 346 (N.D. Cal. 2005) ....................................................................... 10

*In re Static Random Access (SRAM) Antitrust Litig.,*
    2008 WL 4447592 (N.D. Cal. Sept. 29, 2008) .................................................. 15

*In re Sugar Industry Antitrust Litigation,*
    1976 WL 1374 (N.D. Cal. May 21, 1976) ......................................................... 14

*In re Wal-Mart Stores, Inc. Wage and Hour Litig.,*
    2008 WL 413749 (N.D. Cal. February 13, 2008) ........................................... 9, 11

*Salas by Salas v. Wang,*
    846 F.2d 897 (3rd Cir. 1988) ............................................................................. 14

*Schwab v. Phillip Morris USA, Inc.,*
    449 F. Supp. 2d 992 (E.D. N.Y. 2006) .............................................................. 14

*State of California v. Levi Strauss & Co.,*
    41 Cal.3d 460, 224 Cal. Rptr. 605 (1986) ......................................................... 14

*WM. T. Thompson Co. v. General Nutrition Corp.,*
    593 F.Supp. 1443 (C.D. Cal. 1984) ..................................................................... 9

iii

**TABLE OF AUTHORITIES, cont.**

**Treatises**

Manual for Complex Litigation (Fourth) § 11.422 ........................................................ 14

Manual for Complex Litigation (Fourth) § 11.493 (2004) ........................................... 15

*Newberg on Class Actions* § 10.05 .............................................................................. 15

# I

## INTRODUCTION

Defendant has filed this motion to decertify the class claiming that Plaintiffs have demonstrated an inability to make good on its promise that it could use Wells Fargo information to ascertain the identify of customers that were damaged by Re-Sequencing and Including and Deleting.  The stated basis for that position was that Plaintiffs' damage experts provided an aggregate class damage figure, instead of listing each customer that was harmed and the amount each customer was harmed, so therefore it must not have a method of ascertaining damaged class members and calculating individual class damages.

This is a quite the misdirection on the part of the Defendant.  As the Defendant knows, the way Plaintiffs' experts were able to arrive at the aggregate number, was by taking a random sample of 10,000 California Wells Fargo customers, and writing a script or an algorithm that identified each customer who would have received less overdraft fees if Wells Fargo had posted debit card transactions in their chronological order rather than the Re-sequencing order.  The script then calculated the number of fewer fees for each of those affected customers, and then totaled the fees for all of the customers.  Ascertaining individuals that were affected and the amount they were affected by an alternate chronological order is precisely what Plaintiffs' expert did in this analysis.

This is also not news to Defendant, as they and their computer expert were provided the script or algorithm that showed that Plaintiffs' database expert wrote that script.  Defendant has repeatedly throughout this litigation misstated the capabilities of the data it holds to ascertain class members and determine damages from an alternate posting of debit card transactions that would be in chronological order.

From the data currently in the possession of Wells Fargo, it is now been established by Plaintiffs experts that they can do an alternate chronological debit card posting by day, which allows either Party to ascertain class members and individual class member damage through a computerized process should Plaintiffs prevail and the aggregate damages need to be distributed to the class members.  The only limitation on a true chronological order by both date and time rather than just date, is that Defendant has

1  destroyed the data it had that contained the data related to the time each debit card transaction was

2  authorized.  However, that does not preclude Plaintiffs from ascertaining class members and damages.

3  That is the only matter properly before the Court at this time related to the motion for

4  decertification.  The balance of Defendants motion complains of how Plaintiffs arrived at their damage

5  figures.  Those attacks have no place in a decertification motion.  They belong in either a *Daubert*

6  challenge or a motion in limine that should have been brought with the other motions in limine.

7  Notwithstanding that fact, Plaintiff has addressed the challenges in this opposition by laying out how

8  Plaintiffs experts arrived at their damage calculations.  To the extent Defendant has found some nitpicky

9  problem with the Plaintiffs' damage experts' analysis, those go to weight and not admissibility.

10  At the end of the day, if Defendant is concerned whether Plaintiffs damage experts have it right

11  on the monetary effect of Re-sequencing, all it needs to do is to pull out its documents from 2002 where

12  it calculated the effect of the Re-sequencing for all of the California customers by comparing the 1st

13  quarter of 2001 before it began re-sequencing, to the 1st quarter of 2002 after it began re-sequencing.

14  (Exhibit 7 to the companion Plaintiffs Opposition to the Motion for Summary Judgment)  There it will

15  find from its own real world calculation, that re-sequencing increased by almost [ REDACTED ] the number of

16  overdrafts transactions when there is an overdraft, corresponding closely with the figures calculated by

17  Plaintiffs' expert.

18  **II**

19  **FACTS**

20  **A. Plaintiffs        Method of Calculating Damage**

21  **1.        Plaintiffs Method of Calculating Damages for the Re-Sequencing Class**

22  **a.        How Plaintiffs Obtained Re-Sequencing Damage for a Sample of 10,000
                Customers**

23

24  Plaintiffs' primary method of calculating damages, was to calculate the amount of additional fees

25  caused by re-sequencing for a large random sample of 10,000 customers, and after validating the

26  reliability of those numbers in several different ways, including Wells Fargo's own financial data,

27  extrapolating those numbers to the class.

28  The specifics of the process were that Plaintiffs obtained from Wells Fargo all transaction data
for 10,000 random Wells Fargo California consumer customers for the time period of May 14, 2008

[Redacted] Plaintiffs' Opposition to Defendant Wells Fargo's Motion to Decertify Classes
Case No.:  C 07-05923 WHA (JCSx)

through June 13, 2008.  The 10,000 customer sample was generated by Wells Fargo utilizing Wells Fargo's existing marketing program algorithm that Wells Fargo uses for internal random sampling.

Plaintiffs retained a computer database expert, Art Olsen, to analyze the data.  (*See* C.V. of Art Olsen, Ex. 1.)  As set forth in the expert report of Art Olsen (Olsen Report, Ex. 4) and the attached declaration of Art Olsen, the data was obtained from Wells Fargo from several different databases and tables and then loaded into a Microsoft SQL database. The data contained fields of for both the date and time of authorizations of debit card transaction. The data was then "cleaned up" to be utilized, which does not involve modifying data, but essentially created a view over the data that allows the programmer to convert the data into usable searchable data.   This instruction script is not more involved and complicated whether dealing with the 10,000 customers or 10,000,000 customers.

Included in the data were the number of overdrafts and amount of overdraft fees for each customer for each day within the sample period.  A code was then written by Mr. Olsen to order the transactions in the same order as sequenced by Wells Fargo for each customer for each day.  A code was then written for an alternate sequence of chronological ordering (as well as a number of other different possible sequencing orders) for each customer for each day.  The code first looked to see if the customer incurred any fewer overdraft charges as a result of the alternate sequencing.  If the customer did receive fewer overdraft charges under the alternate sequencing then the re-sequencing, then the code determined that difference in the amount of overdrafts for each customer, and then totaled or aggregated the amount of overdraft fees for all the customers who received fewer overdrafts under the alternate chronological sequencing.  These factors were precisely tailored to identify only those customers who belong to the Re-Sequencing Class and then to calculate their damages collectively through totally the individual damages.

That analysis showed that under the re-sequencing order utilized by Wells Fargo ("Re-sequence Order"), the actual amount of overdraft fees for the 10,000 customer sample for the 30 day period was [ **REDACTED** ].  In contrast, by processing the debit card transactions, checks, and ACH charges chronologically ("Chronological Order"), it would have resulted in fees of [ **REDACTED** ].  A similar analysis was done utilizing Wells Fargo's pre-2001 order of sequencing debit card transactions before

3

checks and ACH, and then sequencing each group from lowest to highest ("Prior Practice Order").  This

analysis showed an even greater reduction in fees to [ **REDACTED** ].

While the code generated total figures, it was simply a result of the process of totaling the

individual analysis.  It would a minor matter of slightly modifying the code to generate output data

listing each customer who would have been charged fewer overdraft fees, as well as the amount of the

difference under the alternative sequencing, that were totaled to get the aggregate.  The same code used

to generate both the individual customer damage under the alternate chronological scenario for the

sample data would be applied to the entire class.  The code stays the same, only the numbers would

change.

> **b.      How Plaintiffs Used the Sample Data Damage Figure to Calculate Class Damages**

Mr. Olsen provided the calculations of the different scenarios to Dr. Charles Cowan.  Dr. Cowan

has a Ph.D. in Mathematical Studies, M.A. in Economics and B.A. in Economics.  He was employed as

the chief statistician for the National Center for Education Statistics for the U.S. Department of

Education from 1986-1989.  He was the chief statistician for the Opinion Research Corporation from

1989-1991.  **He was the chief statistician for the FDIC from 1991-1996**, and has been involved in

private and public consulting in statistics, economics and damages since 1997.  (C.V. of Charles Cowan,

Ex. 2.)

Dr. Cowan first made a preliminary judgment on the appropriateness of using the 10,000 sample

to extrapolate their percentage change to the number of transactions that became overdraft transactions

when comparing a re-sequencing and chronological order.  Dr. Cowan concluded that it was a large

statistical sample and acceptable to use pending further analysis.  Based on the figures provide by Mr.

Olsen, Dr. Cowan determined that for the 10,000 customer sample, Wells Fargo would have assessed

[ **REDACTED** ]% less in overdraft fees if it had sequenced debit card charges in Chronological Order and

[ **REDACTED** ]% less in overdraft fees if it had sequenced in Prior Practice Order.

Through discovery, Wells Fargo disclosed that the total amount of overdraft fees assessed to

California consumers during the class period was [ **REDACTED** ] billion dollars.  Dr. Cowan then applied the

[ **REDACTED** ]% increase in overdraft transactions caused by the re-sequencing to the total overdraft fees for

the class period to arrive at total additional overdraft fees assessed by Wells Fargo from re-sequencing.

1  Dr. Cowan then reduced that figure by 20% to reflect uncollectable or waived overdraft (that figure

2  taken from Defendant), and calculated the total damage for the re-sequencing class based on the

3  sampling data to be [ REDACTED ] million.  (Supplemental Report of Dr. Charles Cowan, Ex. 3.)

4          **c.**       **Dr. Cowan's Confirmation that Use of the Sampling Data Was Appropriate**

5  As discussed in Dr. Cowan's report (Ex. 3), Dr. Cowan did not just accept that the percentages

6  obtained from the sample data were appropriate for use.  He recognized that changes in consumer

7  spending and behavior had the potential to skew results taken from a 2008 sample and applied to the

8  2004-2008 class period.  Accordingly, Dr. Cowan tested by two ways the validity of the sample data.

9  The first method performed by Dr. Cowan to test the validity of the sample results was to compare the

10  results he received with Wells Fargo's forecasted calculations made in 2001 on the additional "lift" or

11  profit it would receive from changing from the Prior Practice Order to the Re-sequence order.

12  Based on a forecasted lift of [ REDACTED ] million from the Re-Sequencing Order, Dr. Cowan attributed

13  [ REDACTED ] million a quarter of the lift to California.  Dr. Cowan then used a variety of total account

14  information such as deposits, non-interest income and net operating revenue that Wells Fargo had

15  reported to the FDIC.  Dr. Cowan analyzed the growth of those reported categories, and applied a ratio

16  of that growth of numbers to the forecasted lift.  The calculations applying this ratio resulted in a range

17  of numbers that encompassed the damage number arrived at by extrapolating the sample data damage

18  figure to the class, providing additional validation for use of the sample data.

19  In addition, Dr. Cowan calculated damages a third way to further test the accuracy of the sample

20  data.  Using a 2008 FDIC report on the relationship of NSF fees to deposit measures and revenue

21  measures, Dr. Cowan applied these ratios to the Wells Fargo call report that it provides to the FDIC on a

22  quarterly basis, and then calculated fees for each quarter.  Combining this information with the sample

23  data results, Dr. Cowan provided a third methodology for calculating damages.

24  Finally, Dr. Cowan performed a distribution of the different methods of calculating damages and

25  found that total damage figure using the sample data fell within the range of these other two methods of

26  calculating class damage, validating that the extrapolation of the sample data damage result provided a

27  reliable estimate of damages for the Re-Sequencing Class.

28

[Redacted] Plaintiffs' Opposition to Defendant Wells Fargo's Motion to Decertify Classes
Case No.:  C 07-05923 WHA (JCSx)

### d. The Sample Data Also Corresponded with Wells Fargo's Own Non-Litigation Financial Analysis Done in 2002

That percentage of increased overdraft transactions caused by re-sequencing obtained from the sample data is further confirmed as reasonable for use when comparing the results to Wells Fargo's own results and analysis in 2002. After making the re-sequencing changes, Wells Fargo undertook an analysis in 2002 to compare the first quarter results for all California consumer customers between 2001, when it was utilized the Prior Practice Order, and the first quarter of 2002, when it implemented the Re-Sequencing Order. What Wells Fargo found was that the number of overdraft transactions per overdraft increased from [ REDACTED ] to [ REDACTED ] or [ REDACTED ]% of the re-sequencing percentage. (Ex. 9 to the Companion Plaintiffs Opposition to Defendant's Motion for Summary Judgment) For the sample data used by Plaintiffs experts, that percentage was very similar at [ REDACTED ]%. That slight discrepancy is also expected.

### 2. Plaintiffs Method of Calculating Damages for the Including and Deleting Class

### a. How Plaintiffs Obtained Re-Sequencing Damage for a Sample of 10,000 Customers

Mr. Olsen, using the same database of 10,000 customers, wrote a script to ascertain the customers in the sample who were affected by the including and deleting practices. The computer script code assumptions made for those calculations were that the customer overdrafted their account by an amount less than the amount their account was inflated because of the including and deleting practice when the customer had last accessed their account online, at an ATM, or in a branch store, providing that access had been within 7 seven days prior to the day the account was overdrafted. These factors were specifically tailored to identify members of this class and the amount of their damages. This analysis was performed using the same computer coding code and utilizing the transaction codes held by Wells Fargo on the sample class as will be applied to the entire class.

The results of the analysis was that [ REDACTED ]% of the overdraft fees incurred by the including and deleting class were on an account that was overdrafted by less than the amount the available account balance was inflated when the customer last accessed his or her account information.

b.   **How Plaintiffs Used the Sample Data Damage Figure to Calculate Class Damages**

Having already concluded that the sample data was appropriate to use to extrapolate to the class as a whole, Dr. Cowan applied the [ REDACTED ]% figure to the aggregate overdraft fees charged by Wells Fargo, and then reduced that number by [ REDACTED ]% to account for fees that the sample showed were waived.  In so doing, Dr. Cowan calculated that the class was damaged by the assessment of [ REDACTED ] million of improper overdraft fees.  As with the damages of the Re-Sequencing Class, this number requires further reduction by 12-20% to reflect overdraft fees that were uncollectible or waived by Wells Fargo.

3.   **It Would Have Been Improper for Plaintiffs to Provide Only One Damage Amount for the Two Classes**

Defendant is critical of Plaintiffs' damage experts for providing separate damage figures for the re-sequencing class and the including and deleting class.  Defendant's complaint is that there are overdraft fees for customers that are included in both of those classes.  Defendant's complaint is misplaced.  These are two separate claims.  It is entirely possible that the jury will award damages to one class and not the other, and accordingly, each class needs to have calculated a separate damage award.  If the jury awards damages on both claims, then a post-trial reduction of overlapping damages would be appropriate and easy to accomplish from the existing sample database.

**III**

**ARGUMENT**

A.   **Plaintiffs Have Developed a Methodology for Ascertaining Individual Class Damages**

Defendant asserts in this motion, as well as the motion for summary judgment, that Plaintiffs' experts have failed to make good on Plaintiffs' contention at class certification that Wells Fargo had the information available to it that would enable Plaintiffs to run an algorithm to ascertain individual class member's damages.  As the Court will remember, this was a contested issue because Wells Fargo incredulously contended first that it did not have information about individual transactions that provided the date and time of transactions, (Dep. Tr. of Mark Lentz ("Lentz Dep."), Ex 12 at 52:25-53:6); the date of transactions were not in a format that was searchable, (Lentz's Decl. in support of Wells Fargo's

1  Oppo to Class Cert, ¶¶ 17-18:, Ex. 7);  and Wells Fargo did not record the transactions that were the

2  overdraft transactions, (Lentz Dep. 71:18-72:5).

3        Based on his vast experience with bank operations, Plaintiffs' banking expert, Dr. Mandell,

4  expected that each of these assertions made by Wells Fargo in the hope of defeating class certification

5  were false.  The only information Plaintiffs do not have to perform such an analysis was access to

6  Defendants records.  However, as discussed above, Plaintiffs computer database expert, Art Olsen, did

7  analyze a random sample of 10,000 California customer data from Wells Fargo's Hogan database and its

8  Settlement database.  (Decl. of Art Olsen ("Olsen Decl."), at ¶ 4.)

9        In the Hogan database, Wells Fargo has sufficient information to allow Plaintiffs to determine

10  the date of each transaction; the identity of each customer who was assessed overdraft charges on a

11  posted day; and each transaction that was considered an overdraft transaction for that day.  (*Id.* at ¶ 4.)

12  In the settlement database, Wells Fargo stores the date and time it authorizes each debit card transaction.

13  (*Id.* at 4)  By combining information from these two databases, it is relatively simple to chronologically

14  post current and past transactions by date and time.  (*Id.* at ¶ 4.).

15        In fact, as discussed above, this was exactly the methodology performed by Art Olsen to

16  calculate aggregate damages for the sample.  Mr. Olsen programmed an algorithm that determined for

17  each customer the number of overdraft fees that Wells Fargo assessed on each day and for each

18  customer that was assessed more overdrafts in the Re-Sequencing Order than the Chronological Order,

19  the amount of the difference.  Then the program summed those results for the individuals in the sample.

20  This is exactly the same process that would be utilized for the class as a whole.

21        In addition, Plaintiffs have revealed through discovery conducted since the class certification

22  hearing, that while Wells Fargo was contending in motions to this Court that it could not post debit card

23  transactions in chronological order because of the limitations of its computer system, it has been doing

24  exactly that in [                    **REDACTED**                    ].  (Overdrafts: Order of Posting

25  for Different States, Ex. 8.)

26        As it turns out, with the Hogan database system that has been preserved throughout the class

27  period, there is no limitation to determining by an algorithm for each class member the number of

28  overdraft transactions they received versus the number of transactions they would have received if debit

[Redacted] Plaintiffs' Opposition to Defendant Wells Fargo's Motion to Decertify Classes
Case No.:  C 07-05923 WHA (JCSx)

1   card transactions were calculated either in chronological order by day or from lowest to highest.  (Olsen

2   Decl. at ¶ 4).

3          There is, however, a limitation to further refining that calculation to chronological by time during

4   the day, but that is not a function of Wells Fargo not having the information.  Rather, it is a matter of

5   Wells Fargo not having preserved the information.  Since 2004, Wells Fargo has been continuously

6   involved in an active class action alleging on behalf of California consumers that Wells Fargo has

7   engaged in wrongdoing by not determining debit card transactions by their chronological order.

8   (*Correia v. Wells Fargo Bank, N.A.,* Superior Court of San Francisco Complaint, Ex. 9.)  As such, Wells

9   Fargo knew that it was required to preserve data that would provide the date and time of each

10  transaction.  The law in the Ninth Circuit requires that:

11              While a litigant is under no duty to keep or retain every document in its

12              possession once a complaint is filed, it is under a duty to preserve what it

13              knows, or reasonably should know, is relevant in the action, is reasonably

14              calculated to lead to the discovery of admissible evidence, is reasonably

15              likely to be requested during discovery, and/or is the subject of a pending

16              discovery request.

17  *WM. T. Thompson Co. v. General Nutrition Corp.,* 593 F.Supp. 1443, 1445 (C.D. Cal. 1984).

18         Instead, Wells Fargo carried out a policy of overwriting and destroying the date and time

19  information after six months.  (Williamson Dep., Ex. 6 at 19:5-9.)  As a result there is date information

20  for each transaction that would allow chronological posting by date, but there would have to be a rule

21  regarding how to post within a day, whether that be highest to lowest, lowest to highest, random or some

22  other system.  However, with that rule, the analysis already run on the sample would apply to the class

23  and would provide lists of which customers were affected and the amount each customer was affected.

24  Where a defendant company has a duty to preserve accurate electronic databases that are necessary for

25  ascertaining class membership and damages, "the failure to maintain adequate records would not serve as

26  a bar to class certification."  *See In re Wal-Mart Stores, Inc. Wage and Hour Litig.*, 2008 WL 413749, *9

27  (N.D. Cal. February 13, 2008).

28  //

**B.     Defendants Arguments Relating to Damages Are Not Proper Challenges to Certification or Ascertainability**

Defendants raise a host of arguments that it contends weaken Plaintiffs damage arguments. Some of them may prove effective on cross-examination and some may not. However, each of those arguments go only to the weight of the evidence, and not to the issue of class certification or ascertainability of damages. Furthermore, Defendant's primary attacks on Plaintiffs' experts' methodology are more appropriate for a motion in limine than for a motion for class decertification. The class certification of litigation is not the proper forum in which to resolve a battle of the experts on calculating and ascertaining damages. *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 353 (N.D. Cal. 2005); *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98 (C.D. Cal. 2007).

**1.     Defendant's Challenge to the Re-Sequencing Class Ascertainment Methodology**

First, Defendant contends that it was improper to group checks and ACH charge transactions and post them after debit transactions in the various scenarios under the Court's prior Order. However, Plaintiffs' theories are demonstrated in scenario #1, which orders all transactions, whether debit cards, checks, or ACH, in chronological order straight through. As checks and ACH transactions are processed in the middle of the night, debits card transactions necessarily always occur prior to that moment.

Second, Defendant contends that it was improper to sequence low-to-high under some of the scenarios. The transactions to which Defendant is referring are a miniscule percentage of transactions (less than 10%) that did not have a time stamp and, therefore, could not be ordered chronologically, requiring that an alternative method must be used. To be fair, Plaintiffs had their expert submit a scenario when these transactions were ordered high-to-low as well as low-to-high. Plaintiffs did not cherry pick and will leave it up to the jury to determine which order is appropriate for this small percentage of transactions.

Third, Defendant contends that under some of the scenarios, some customers would be assessed more overdraft fees than the current order. However, under Plaintiffs' theory, represented by Scenario #1, no customer could be assessed more overdraft fees than under the order currently used by Defendant. Wells Fargo has never produced a single example of how that could possibly occur under Scenario #1.

### 2. Defendant's Challenge to the Including and Deleting Class Ascertainment Methodology

First, Defendant contends that the failure to account for customers who had seen the available balance when a debit card transaction is included prior to being "deleted" "writes out of the scenario the customer's supposed reliance on a belief that all of the transactions included in a prior balance are still included in the second balance he sees.    However, as it was Wells Fargo's practice to list debit card transactions as pending almost immediately after they occur and include the transaction amount in the available balance calculation, consumers could only reasonably expect that such a hypothetical situation would occur in situations that ultimately involved an Including and Deleting scenario resulting in an overdraft charge.  It is seeing the later *inflated* available balance *after* the deletion of the transaction that customers rely on in being induced to overdraft from their accounts.

Second, Defendant asserts that the algorithms do not account for gas and restaurant charges where the amounts authorized are much less than the financial transaction amount.  What Plaintiffs have done is look at what transactions would have been included and then deleted when the customer last looked at the available balance, and then totaled the amount of those transactions to see if they were more or less than the amount overdrafted.  This is a consistent, class-wide approach to ascertainment.  Defendants are simply suggesting tweaks to Plaintiffs' expert's calculation without being able to claim that such suggestions could not be carried out class wide.  Therefore, this contention does not bar class certification and it is more a matter for a motion in limine, and any suggestions as to a different formula go to the weight of the evidence at trial.  *See In re Wal-Mart Stores, Inc. Wage and Hour Litig.*, 2008 WL 413749 (N.D. Cal. Feb. 13, 2008) (contentions by the defendant's expert witness that some of plaintiffs' expert witness's calculations are faulty do not preclude class certification).

Third, Defendant challenges Art Olsen's methodology for hypothetically including a situation which a balance check occurs on the same day as the overdrafting transaction, but after the transaction is entered into.  This is not a viable challenge.  When customers check their available balance to manage their account, it is there option not only whether to do or not do a transaction, but also whether to deposit or transfer money into that account (e.g., William Smith would have transferred money into his account had he known that a deleted item would reappear, causing him to overdraft his account).  Therefore, no matter when customers see the inflated available balance as a result of information on that day, if the

1    deleted item had not disappeared, customers could have chosen to refrain from making certain size

2    transactions or transfer or deposit money into the account to prevent the overdraft.

3          Fourth, Defendant claims that placing a longer memo hold will result in denying funds for some

4    class members during the "deleted" period who want use of those funds, and therefore, these class

5    members have opposing interests to those who want longer memo holds.  However, Defendant is

6    completely misconstruing Plaintiffs' claims.  Plaintiffs require that Wells Fargo provide accurate

7    available balance information where transactions are not deleted from the available balance calculations

8    without warning or notice to the customer.  This claim has absolutely nothing to do with whether Wells

9    Fargo wants to deny customers access to their money.  Therefore, all of the class members share the

10   same interests in not being induced to overdraft their account.

11        **3.    Defendant's General Challenges to Both Classes Regarding Waiver, Duty to
             Mitigate, and Voluntary Payment Are Not Appropriate Challenges to Class
12           Certification**

13              **a.    Defendant's Due Process Challenge Based on Waiver of Fees is Misplaced**

14        With regard to waiver of fees for certain class members or for accounts that were abandoned

15   without paying off overdraft fees, this can and has been accounted for in Plaintiffs' expert's calculations.

16   One way to deal with this is to simply adjust the algorithm to account for waivers.  Defendant

17   documents waivers and abandoned accounts, so those records may be used to adjust the algorithm.

18   Alternatively, Plaintiffs' expert has already calculated the aggregate damages for which Defendant is

19   liable, taking into account a reduction based on the percentage of such accounts as represented by

20   Defendant.  Thus, upon a plaintiffs' verdict at trial, the plan for distributing the aggregate damages to

21   individuals may be tailored to account for waivers and abandoned accounts in accordance with

22   Defendant's records.  In this way, Defendant would not be held liable for an aggregate amount of

23   damages greater than it should be liable for, so there is no due process challenge.

24        Due process challenge is only relevant to the aggregate amount of damages for which Defendant

25   is liable; defendant has no valid objection so long as it is "liable for no more than the aggregate loss

26   fairly attributable to its tortuous conduct."  *Bell v. Farmers Ins. Exchange*, 115 Cal. App. 4th 715, 752, 9

27   Cal. Rptr.3d 544 (2004) (quoting *In re Agent Orange Product Liability Litigation*, 597 F. Supp. 740, 839

28   (E.D.N.Y.1984)).  Defendant's aggregate liability is not affected by the method of determining

individual entitlements to members of the class; therefore, plan of distribution cannot be attacked on due process grounds. *Id.* at 758-59.

### b. Duty to Mitigate Is a Question of Fact for the Jury

With regard to class members' duty to mitigate upon being victims of either practice in multiple instances, a jury may reasonably conclude that even if a customer is victim to these schemes more than once, that a reasonable consumer may still not discover the exact mechanisms of either practice so as to be able to avoid such damages in the future.  This is because the specifics of the practices are both concealed and misrepresented by Defendant in such a way as to induce customers to fall victim to them over and over again.  It is even extremely difficult to determine the mechanism of these practices that result in the assessment of overdraft fees from examining a monthly statement, as the information in the monthly statement that is relevant to deciphering the mechanism is confusingly separated throughout multiple pages.  Such an examination is extremely tedious and time consuming and also essentially requires the use of a calculator and spread sheet.  At any rate, whether mitigation has any bearing on class members' damages is a question of fact for the jury, and if not, the algorithms need not take mitigation into account.

### c. Voluntary Payment Does Not Provide a Defense to Wells Fargo's Practices

Defendant raises this same issue in the motion for summary judgment and Plaintiffs incorporate their opposition to this issue that is now improperly in a motion to decertify the class.  With regard to Defendant's voluntary payment defense, Plaintiffs explain in the opposition to Defendant's motion for summary judgment as to all causes of action why no class member could have voluntarily paid overdraft fees resulting from these practices.  Because the money is already directly taken out of their account, the class members were never adequately informed of this practice, and thus, never voluntarily consented to being assessed overdraft fees as a result of being victims of these practices.  Furthermore, it was under duress and coercion that class members deposited money to bring their account back to positive balance, otherwise they would be assessed continuous fees and could not close their account or open an account at another bank without having done so.  As a result, the algorithms need not take voluntary payment into account.

d.  **Plaintiffs Damage Calculations Include Damages From Each Cause of Action**

Defendant also contends that Plaintiffs fail to prove damages based on each of Defendant's separate misrepresentation.  However, the measure of damages for Plaintiffs' misrepresentation, concealment, and conversion claims are all the same.  This is because Defendant's Re-Sequencing and Including and Deleting practices involve both the wrongful taking of class members' money through the assessment of overdraft fees as well as fraudulently inducing class members into incurring those same overdraft fees.  In the "but for" worlds under each cause of action and for each practice, class members would not have been assessed the overdraft fees that constitute the damages in this class action.

**C.  Plaintiffs' Calculation of Aggregate Damages Accurately Demonstrates that the Members of Both Classes Have Been Damaged**

Finally, Defendant contends that Plaintiffs' "snapshot" single month analysis does not consider that a posting sequence may result in more overdrafts in one month but less in another month.  However, Plaintiffs' expert's calculation of aggregate damages through the use of statistical sampling is the appropriate method for calculating damages in a class action as large as this case.

Damages sustained by a proposed consumer class may be determined by either an aggregate class-wide approach or through individualized evidence based on reliable and accepted statistical methods.  *In re Sugar Industry Antitrust Litigation*, 1976 WL 1374 (N.D. Cal. May 21, 1976).  Due process does not prevent calculation of damages on a classwide basis.  *Bruno v. Superior Court*, 127 Cal. App. 3d 120, 129, 179 Cal. Rptr. 342 (1981).  In many cases, such an aggregate calculation will be far more accurate than summing all individual claims.  *Id.*  The California Supreme Court has assumed the use of such a method.  *Daar v. Yellow Cab Co.*, 67 Cal.2d 695, 706, 714, 716, 62 Cal. Rptr. 724 (1967).

Aggregating a defendant's damage liability (and then affording class members to collect their individual shares) ensures that defendants are not permitted to "retain ill gotten gains simply because their conduct harmed large numbers of people in small amounts."  *State of California v. Levi Strauss & Co.*, 41 Cal.3d 460, 472, 224 Cal. Rptr. 605 (1986).  Expert testimony is admissible as to show aggregate damages because serves goals of federal rules; helpful to jury; and expert may testify as to ultimate issues.  *Salas by Salas v. Wang*, 846 F.2d 897, 904-05 (3rd Cir. 1988).

14

The court in *Schwab v. Phillip Morris USA, Inc.*, 449 F. Supp. 2d 992 (E.D. N.Y. 2006), thoroughly explains the substantial merits and prevalent and increasingly frequent use of statistical sampling to determine issues in federal cases:

> Sampling and survey techniques are well-accepted alternatives for the trial judge facing crippling discovery and evidentiary costs. *See* Manual for Complex Litigation (Fourth) § 11.422 (when it is necessary to limit discovery, "statistical sampling techniques [may be used] to measure whether the results of the discovery fairly represent what unrestricted discovery would have been expected to produce"), § 11.493 ("The use of acceptable sampling techniques in lieu of discovery and presentation of voluminous data from the entire population, may produce substantial savings in time and expense.")
>
> ....
>
> In some cases sampling techniques may "provide the only practicable means to collect and present relevant data." Manual for Complex Litigation (Fourth) § 11.493 (2004). [Citiation.]  No special or unique rules of evidence are involved when aggregate proof of damages is used on behalf of a class. *Newberg on Class Actions* § 10.05.
>
> ....
>
> Greater reliance on statistical methods is required by the profound evolution in our economic communication and data compilation and retrieval systems in recent decades. [Citation.]
>
> ....
>
> State legislatures, courts, and commentators have recognized that tools for aggregation are especially helpful in the context of consumer fraud, when the relatively low value of specific claims or the litigation advantages of a well-financed defendant can discourage individuals from pressing their claims in court.  Particularly incisive is the statement in *Group Health Plan, Inc. v. Philip Morris, Inc.,* 621 N.W.2d 2, 15 (Minn.2001): "[W]e reject the view ... that our misrepresentation in sales laws require proof of individual reliance in all actions seeking damages. To impose a requirement of proof of individual reliance in the guise of causation would reinstate the strict common law reliance standard that we have concluded the legislature meant to lower for these statutory [consumer fraud] actions." (citations omitted).

*Schwab*, 449 F. Supp. 2d at 1244-48.

Numerous Ninth Circuit cases and California cases have embraced the use of statistical sampling and aggregating the results to determine central issues in class actions such as damages.  *See e.g., Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1180 (9th Cir. 2007) (court may rely on plaintiffs' expert statistician's use and interpretation of statistical data in evaluating the "commonality" requirement for class

[Redacted] Plaintiffs' Opposition to Defendant Wells Fargo's Motion to Decertify Classes
Case No.:  C 07-05923 WHA (JCSx)

1  certification); *Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996) (the Ninth Circuit permitted the

2  use of a statistical sample of class claims in determining compensatory damages where an expert

3  testified that the examination of a random sample would achieve a high probability that the results of the

4  sample would reflect the totality of claims filed); *In re Static Random Access (SRAM) Antitrust Litig.*,

5  2008 WL 4447592, at *6 (N.D. Cal. Sept. 29, 2008) (the court accepted plaintiff's three proffered

6  methodologies for calculating damages on a class-wide basis while holding that the validity of those

7  methods "will be adjudicated at trial based upon economic theory, data sources, and statistical

8  techniques that are entirely common to the class"); *Bell v. Farmers Ins. Exchange*, 115 Cal. App. 4th

9  715, 746-58, 9 Cal. Rptr. 3d 544 (2004) (the court permitted the use of statistical methodology of

10  random sampling and extrapolation for the determination of aggregate class-wide damages).

11  Here, it was appropriate for Plaintiffs to use a statistical sampling method to determine the total

12  amount of damages to the Classes for which Defendant is liable and is wholly consistent with the

13  damage approach approved by the Ninth Circuit and California courts.

**IV**

**CONCLUSION**

16  For the foregoing reasons, Plaintiffs respectfully submit that Defendant Wells Fargo's Motion to

17  Decertify the Class should be denied.

19  DATED:  April 9, 2009.                                    McCUNE & WRIGHT, LLP

21                                    BY:   __/s/_____

                                          Richard D. McCune
                                          Attorney for Plaintiffs

[Redacted] Plaintiffs' Opposition to Defendant Wells Fargo's Motion to Decertify Classes
Case No.:  C 07-05923 WHA (JCSx)