Sonya D. Winner, SB # 200348
David M. Jolley, SB # 191164
Margaret G. May, SB # 234910
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111
Telephone:  (415) 591-6000
Facsimile:  (415) 591-6091
E-mail:  swinner@cov.com

Attorneys for Defendant
WELLS FARGO BANK, N.A.

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

VERONICA GUTIERREZ, *et al.*,

                    Plaintiffs,

          v.

WELLS FARGO & COMPANY, *et al.*,

                    Defendants.

Civil Case No.:  CV-07-5923 WHA (JCSx)

**NOTICE OF MOTION AND MOTION OF DEFENDANT WELLS FARGO, N.A. FOR SUMMARY JUDGMENT AND/OR TO DECERTIFY CLASS**

Date:   March 25, 2010
Time:   8:00 a.m.
Dept.:  Courtroom 9

Honorable William H. Alsup

## **TABLE OF CONTENTS**

I.    INTRODUCTION AND SUMMARY OF ISSUES TO BE DECIDED ......................... 1

II.   FACTUAL AND PROCEDURAL BACKGROUND ...................................... 3

    A.    The Court's Class Certification Order and the Class Definition ......................... 3

    B.    Plaintiffs' Original Evidence on Class Identification, Injury, and Damages ..................................................................................... 4

    C.    Olsen's New Report ........................................................................ 6

        1.    Plaintiffs' Alternative Scenarios .......................................... 7

        2.    Reversals ........................................................................ 12

        3.    Increased Costs to Customers Not Considered......................... 14

        4.    Plaintiffs' Evidence of Damages Incurred by Persons Exposed to Challenged Advertising and Other Statements................................... 15

III.  ARGUMENT.................................................................................. 16

    A.    Olsen's Calculations Are Not Admissible as Measures of Either Actual Injury or Quantification of Damages. ................................................ 17

    B.    The Scenarios Olsen Was Instructed to Apply Did Not Reflect Material Differences in the "But For" World. ................................. 20

    C.    The Court Should Enter Summary Judgment For Wells Fargo............................. 22

        1.    Plaintiffs Have Acknowledged that Class Misrepresentation Claims Cannot be Established Through Common Proof......................... 22

        2.    The Court Should Grant Summary Judgment on Plaintiffs' Sole Remaining Claim Under the UCL. ......................................... 23

    D.    Alternatively, and at a Minimum, the Court Should Decertify the Class.......................................................................................... 24

IV.   CONCLUSION............................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Aetna Inc. v. Express Scripts, Inc.*,
   261 F.R.D. 72 (E.D. Pa. 2009)................................................................................18

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*,
   247 F.R.D. 156 (C.D. Cal. 2007).............................................................................25

*Anderson v. Boeing Co.*,
   2006 WL 2990383 (N.D. Okla. Oct. 18, 2006) ......................................................16

*Boca Raton Comm. Hosp., Inc. v. Tenet Health Care Corp.*,
   582 F.3d 1227 (11th Cir. 2009) .........................................................................18, 19

*Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.*,
   246 F.3d 1336 (Fed. Cir. 2001) ..............................................................................20

*Daubert v. Merrell Dow Pharms., Inc.*,
   43 F.3d 1311 (9th Cir. 1995) ............................................................................17, 18

*Deitz v. Comcast Corp.*,
   2007 WL 2015440 (N.D. Cal. July 11, 2007) ........................................................24

*Dunnigan v. Metro. Life Ins. Co.*,
   214 F.R.D. 125 (S.D.N.Y. 2003) ............................................................................24

*Elcock v. Kmart Corp.*,
   233 F.3d 734 (3d Cir. 2000) ...................................................................................18

*General Tel. Co. of the Southwest v. Falcon*,
   457 U.S. 147 (1982)................................................................................................16

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
   185 F.3d 1341 (Fed. Cir. 1999) ..............................................................................20

*Hill v. San Francisco BART Dist.*,
   2006 WL 132089 (N.D. Cal. Jan. 17, 2006)...........................................................16

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) ................................................................................19

*In re Methionine Antitrust Litig.*,
   2003 WL 22048232 (N.D. Cal. Aug. 26, 2003) ................................................16, 25

*Jespersen v. Harrah's Operating Co.*,
   392 F.3d 1076 (9th Cir. 2004) ................................................................................16

*Johnson Elec. N. Am., Inc. v. Mabuchi Motor Am. Corp.*,
   103 F. Supp. 2d 268 (S.D.N.Y. 2000) ....................................................................19

*Johnson v. GMRI, Inc.*,
   2007 WL 2009808 (E.D. Cal. July 6, 2007) .....................................................23, 24

*McGlinchy v. Shell Chem. Co.*,
   845 F.2d 802 (9th Cir. 1988) ...............................................................................24

*Naton v. Bank of California*,
   649 F.2d 691 (9th Cir. 1981) ...............................................................................20

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   259 F.3d 154 (3d Cir. 2001) ...............................................................................25

*Paper Converting Mach. Co. v. Magna-Graphics Corp.*,
   745 F.2d 11 (Fed. Cir. 1984) ...............................................................................20

*Pierce v. County of Orange*,
   526 F.3d 1190 (9th Cir. 2008) .............................................................................16

*Rickards v. Canine Eye Registration Found.*,
   704 F. 2d 1449 (9th Cir. 1983) ...........................................................................24

*Stoebner Holdings, Inc. v. Automobili Lamborghini S.P.A.*,
   2007 WL 4230878 (D. Haw. Nov. 30, 2007) .....................................................19

*Toomey v. Nextel Comms.*,
   2004 WL 5512967 (N.D. Cal. Sept. 23, 2004) .............................................19, 20

*Van der Valk v. Shell Oil Co.*,
   2004 WL 5486643 (C.D. Cal. Nov. 15, 2004) ...................................................19

**STATE CASES**

*Bank of the West v. Superior Court*,
   2 Cal. 4th 1254 (1992) .........................................................................................23

*Colgan v. Leatherman Tool Group, Inc.*,
   135 Cal. App. 4th 663 (2006) ..............................................................................24

*Day v. AT&T Corp.*,
   63 Cal. App. 4th 325 (1998) .........................................................................23, 24

*Gerwin v. S.E. Calif. Ass'n of Seventh Day Adventists*,
   14 Cal. App. 3d 209 (1971) .................................................................................20

*Kids' Universe v. In2Labs*,
   95 Cal. App. 4th 870 (2002) ................................................................................20

*Miller v. Bank of America, N.T. & S.A.*,
   46 Cal. 4th 630 (2009) ...................................................................................21

*Mirkin v. Wasserman*,
   5 Cal. 4th 1082 (1993) ..................................................................................24

*Pichon v. PG&E Co.*,
   212 Cal. App. 3d 488 (1989) .........................................................................20

STATUTES

Cal. Bus. & Prof. Code § 17204 .......................................................................24

Cal. Bus. & Prof. Code § 17535 .......................................................................24

Cal. Civ. Code § 1719.......................................................................................14

Cal. Com. Code § 4303, cmt. 7.........................................................................21

Cal. Penal Code § 476a.....................................................................................14

OTHER AUTHORITIES

73 Fed. Reg. 28,904 (May 19, 2008) .................................................................21

74 Fed. Reg. 59,033 (Nov. 17, 2009) ................................................................21

74 Fed. Reg. 5498 (Jan. 29, 2009).....................................................................22

Fed. R. Civ. P. 23(c)(1)(C) .........................................................................3, 4, 16

Fed. R. Civ. P. 56..............................................................................................3

Fed. R. Evid. 702..............................................................................................17

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on March 25, 2010, at 8:00 a.m. in the courtroom of the Honorable William H. Alsup, United States District Court for the Northern District of California, San Francisco Division, 450 Golden Gate Ave., Courtroom 9, 19th Floor, San Francisco, California, or at such date and time as the Court may otherwise direct, defendant Wells Fargo Bank, N.A. ("Wells Fargo") will move and hereby does move the Court for an order granting summary judgment on all remaining claims of the "Re-Sequencing" class previously certified by the Court and/or decertifying that class.

This motion is made pursuant to Fed. R. Civ. P. 23 and 56 and as provided in the Court's Order Granting Plaintiffs' Unopposed Motion to Modify Schedule, dated October 6, 2009 (Dkt. No. 282), on the ground that plaintiffs lack adequate evidence of injury to the members of the class.  The motion is based on this notice, the memorandum of points and authorities set out below, and the accompanying Declarations of David McGoveran, Alan J. Cox, and David M. Jolley, as well as the previously filed declaration of Kenneth Zimmerman (Dkt. No. 41), together with such further argument and evidence as the Court shall permit.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.       INTRODUCTION AND SUMMARY OF ISSUES TO BE DECIDED**

Nearly a year ago, Wells Fargo moved for summary judgment on plaintiffs' class claims (or, in the alternative, for class decertification) on the ground, *inter alia*, that plaintiffs lacked competent evidence through which to prove actual injury and damages to members of the "Re-Sequencing" class previously certified by the Court.  The Court readily agreed that plaintiffs' evidence of class injury and damages was inadequate as a matter of law.  However, rather than granting Wells Fargo the relief mandated under Rules 23 and 56, the Court instead afforded plaintiffs the extraordinary opportunity to start over in preparing an entirely new analysis as evidence on these issues.

Many months later, after two lengthy extensions of the deadline for the production of their new analysis, plaintiffs produced a new report from their computer expert, Arthur Olsen.  That report came unsupported by any opinions from a damages expert; rather,

1    Olsen took his direction solely from plaintiffs' counsel, without any independent evaluation of

2    his own.  Olsen offers no opinion as to whether the methodology he applied properly fits the

3    claims in this case or accurately measures injury or damages to class members.  Nor is such an

4    opinion offered by any other witness.  In fact, this new analysis once again fails to meet the

5    minimal legal standard for proof of injury and damages, for at least the following reasons:

6            1.    The required "fit" between plaintiffs' methodology and the legal claims in this

7    case is absent.  Plaintiffs claim that Wells Fargo violates California law by failing to process

8    debit-card transactions in "chronological" order – the order in which a customer initiated such

9    transactions with merchants – when posting those transactions to the customer's account, but

10   instead posts those transactions from highest amount to lowest within each posting day.  The

11   measure of "injury" for this practice should be relatively straightforward, based on the

12   difference (if any) between the number of overdraft fees that a class member paid and the

13   number of fees that class member would have paid had his or her debit-card transactions been

14   posted in chronological order.  But that is not what Olsen has measured.  Instead, plaintiffs'

15   counsel instructed Olsen to base his calculations on three alternative scenarios that do not

16   actually post debit-card transactions in genuine chronological order, yet *do* adjust *other* aspects

17   of Wells Fargo's processing in a manner that artificially inflates the results.

18           2.    Plaintiffs have paid lip-service to the Court's direction that they treat the

19   reversals of overdraft fees – instances in which assessed fees were forgiven or otherwise not

20   paid – on a customer-specific basis rather than making a single aggregate reduction from their

21   total damages figure.  However, the methodologies used to apply such reversals – which were,

22   again, dictated solely by counsel – neglect to take proper account of situations in which class

23   members never actually paid the fees that Olsen has counted as "harm."  Even apart from the

24   other flaws in Olsen's analysis, therefore, plaintiffs have once again failed accurately to identify

25   which class members were injured by actually *paying* the allegedly excess overdraft fees.

26           3.    Olsen's analysis of the three scenarios provided by plaintiffs' counsel fails to

27   reflect the full impact to customers in the alternative "but for" worlds.  A properly framed "but

28   for" analysis considers *all* material differences that would exist had the defendant acted as

1   plaintiffs claim it should have acted.  (Thus, for example, a claim for "lost profits" requires

2   adjustments for changes in a plaintiff's costs as well as his revenues.)  An analysis that fails to

3   take account of such differences is insufficient as a matter of law.

4            These are not debatable matters going merely to the weight of Olsen's testimony.

5   They are, rather, fundamental failings that preclude the admission of Olsen's calculations as

6   evidence of injury and damages – which, in the absence of any other evidence on these issues,

7   entitles Wells Fargo to summary judgment on the remaining class claims in this case.

8            Finally, plaintiffs possess no class evidence whatsoever of injury and damages

9   for any misrepresentation-based claim.  The Court's May 2009 orders left open only limited

10  (and varying) *individual* misrepresentation claims for the named plaintiffs, yet plaintiffs'

11  witness and exhibit lists for trial were heavily dominated by evidence that they apparently

12  intended to offer in support of misrepresentation claims for the class as a whole.  In any event,

13  plaintiffs have now conceded that they have not attempted to quantify the amount of damages or

14  restitution resulting from any classwide misrepresentation-based claims and that they do not

15  intend to seek such relief.

16           As a matter of law, having failed for a second time to develop competent proof

17  on critical elements of their claims, plaintiffs cannot prevail on the class claims of the Re-

18  Sequencing Class.  Wells Fargo is accordingly entitled to summary judgment on the claims of

19  the Re-Sequencing Class pursuant to Fed. R. Civ. P. 56 and/or to decertification of that class

20  pursuant to Fed. R. Civ. P. 23(c)(1)(C).

21  **II.      FACTUAL AND PROCEDURAL BACKGROUND**

22       **A.      The Court's Class Certification Order and the Class Definition**

23           In their motion for class certification, plaintiffs sought certification of a

24  "Sufficient Funds" class of customers who incurred overdraft fees on debit-card transactions for

25  which there were "sufficient funds" in their accounts at the time they made the purchases.

26  Motion for Class Certification (Dkt. No. 36) at 11.

27           The Court found plaintiffs' class definition to be "overbroad and unhelpful."

28  Order Denying Defendant's Motion for Summary Judgment and Granting in Part and Denying

in Part Plaintiffs' Motion for Class Certification ("Class Order") (Dkt. No. 98) at 21. The Court

instead certified a narrower "Re-Sequencing" class, defined as:

> [A]ll Wells Fargo California customers from November 15, 2004,
> to June 30, 2008, who incurred overdraft fees on debit card
> transactions as a result of the bank's practice of sequencing
> transactions from highest to lowest.

*Id.* at 27. The Court observed that the claims of this class focus on the number of overdraft fees

class members paid in the real world compared to the number of fees that "would have been

incurred had the bank debited the purchases in the order actually made." *Id*. at 5; *see also id.* at

12 (describing alleged injury as difference between Wells Fargo's actual posting order and an

alternative order in which debit-card transactions were "posted chronologically").[1] Indeed, this

fundamental chronological component was inherent in the title – "Re-Sequencing" – that the

Court gave the class. In order for Wells Fargo to have "re-sequenced" anything, there had to

have been some identifiable "natural" sequence to start with. In this case, that supposed natural

sequence was the chronological order in which the customer initiated each transaction.

### B. Plaintiffs' Original Evidence on Class Identification, Injury, and Damages

In granting class certification in September 2008, the Court relied on a

declaration from an expert retained by plaintiffs, Lewis Mandell, who opined that software

could be written and applied against Wells Fargo's transaction databases to determine precisely

which customers paid overdraft fees as a result of the bank's posting of debit-card transactions

in a high-to-low order within each posting day rather than in chronological order. Class Order

at 25. But no such analysis from Mandell was ever provided. Instead, in February 2009,

plaintiffs submitted expert reports on injury and damages from a computer expert, Art Olsen,

and a statistician, Charles Cowan. Despite plaintiffs' earlier representations, these reports did

not attempt to identify who was allegedly injured as a result of Wells Fargo's non-chronological

posting order, but rather presented a "short-cut" method of proof based on estimating aggregate

---

[1]     The Court stressed that the "Re-Sequencing" claim focused only on the sequencing of
debit-card transactions and accepted Wells Fargo's right to post other types of transactions (such
as checks) in any order it chose. *Id*. at 5, 12 & n.3. The class definition is explicitly limited to
customers who were affected by the sequencing of debit-card transactions.

damages through sampling.  Order on Motion Challenging Damages Study and Seeking Class

Decertification ("Decertification Order") (Dkt. No. 245) at 4.[2]

On March 19, 2009, Wells Fargo moved for summary judgment on multiple

grounds, including the ground that plaintiffs' proof of injury and damages was inadequate as a

matter of law (Dkt. No. 199).  In the alternative, Wells Fargo also moved for decertification of

both classes that had previously been certified by the Court (Dkt No. 200).

In an order issued May 5, 2009, the Court held that "actual injuries and damages

for each absent class member are required elements of substantive proof."  Decertification Order

at 4.  Finding that plaintiffs had failed to provide any method to make this showing as to each

class member, the Court held that their expert analysis "does not come even close to a proper

damages study."  *Id.* at 8.[3]  The Court decertified a separate "Including and Deleting" class that

had been certified to pursue another set of claims.  As to the Re-Sequencing Class, the Court

ordered additional briefing on whether it would be appropriate (a) to proceed with trial on

common liability issues only, leaving injury and damages (if any) to be determined on an

individualized basis, or (b) to permit plaintiffs to go back to the drawing board and try again to

develop competent evidence on these issues.  *Id.* at 10.  The Court cautioned that if it did permit

plaintiffs to conduct a new analysis, they "would be well advised to address all of the bank's

myriad other objections to the study," which the Court did not at that point need to address.  *Id.*

At a subsequent status conference, the Court announced, over Wells Fargo's

objection, that it would give plaintiffs a second try at conducting a proper damages analysis.

---

[2]     In addition to providing an extrapolation of Olsen's results, Cowan also offered
estimates of aggregate damages through two other methods, one of which also relied upon
Olsen's sample results.  The other relied upon an internal Wells Fargo estimate of the aggregate
revenue impact of a completely different change in posting order that had nothing to do with
chronological ordering.  Cox Dec. ¶¶ 23, 24.  Even Cowan admitted he had made a fundamental
error in that calculation.  *See* Jolley Dec. Ex. 7 at 115; Cox Dec. ¶ 24.  In any event, Cowan's
report was rejected as inadequate along with Olsen's.  Decertification Order at 8.  Plaintiffs have
provided no new report from Cowan.  Jolley Dec. ¶ 2.

[3]     In separate orders issued the same day (Dkt. Nos. 246, 247), the Court granted in part
and denied in part Wells Fargo's motions for summary judgment but did not address Wells
Fargo's request for summary judgment on the issues of injury and damages.  Those issues were
instead discussed solely in the Decertification Order.

5/13/09 Minute Entry (Dkt. No. 262); Jolley Dec. Ex. 1 ("5/13/09 Tr.") at 16-17.  The Court

acknowledged that this was unusual and outside "the normal rules requiring [a party] to present

evidence for trial."  5/13/09 Tr. at 14; *see also id.* at 12 ("[I]f this was a private case, and not a

class action, I would say you're [plaintiffs' counsel] just out of luck.").[4]

### C.    Olsen's New Report

On November 20, 2009, after two lengthy extensions (*see* Dkt. Nos. 278, 282),

plaintiffs submitted a new report from Olsen.  In that report, Olsen stated that his assignment

was to identify each customer during the class period who "would have been assessed fewer

overdraft fees if Wells Fargo had used one of three alternative sequencing orders" and then to

calculate "the amount of additional overdraft fees resulting from Wells Fargo's posting order

compared to the alternative sequencing posting orders."  [New] Expert Report of Arthur Olsen

("New Olsen Report") (Dkt. No. 285-1) at 8.[5]

Although Olsen's new report purports to offer opinions about the "harm" and

"degree of harm" suffered by potential class members, he does not claim to be an expert on

damages or any associated field, such as economics.  Jolley Dec. Ex. 6 (hereafter "Olsen Dep.")

at 17-18.  Olsen expressly disclaims any opinion about whether the scenarios he used

constituted appropriate measures of injury or damages in light of the claims in this case.  *Id.* at

174-75.  Rather, he simply followed the instructions of plaintiffs' counsel, who were wholly

responsible for the resequencing scenarios he used.  *Id*. at 174, 177, 209-10.  His knowledge of

the facts of the case and of the issues in dispute came almost entirely from plaintiffs' counsel.

*Id.* at 168-74.  He never even read the Court's Decertification Order.  *Id.* at 176.

---

4    The Court directed plaintiffs' counsel to associate additional counsel with class action experience.  *Id.* at 3, 6.  Lawyers from the firm of Lieff Cabraser subsequently entered appearances and were involved in plaintiffs' new analysis of injury and damages.  *See* Jolley Dec. Ex. 6 at 164, 268-69.

5    Although doing so was neither requested by the Court nor consistent with the Federal Rules, plaintiffs filed a copy of Olsen's new report with the Court in November 2009.  To avoid duplicative filings, Wells Fargo has not re-filed the report with this Motion but will submit a copy of the earlier filing with the Court's courtesy copy.

### 1.    Plaintiffs' Alternative Scenarios

Olsen described the three alternative sequencing orders plaintiffs' counsel instructed him to use as follows:

> "<u>Sequencing Order #1</u>:  Sequence all the transactions in group 50040 [debit-card transactions, ACH transactions, and checks] from low to high.
>
> <u>Sequencing Order #2</u>:  Group the debit and check card transactions before the check and ACH transactions and then sequence the debit card transactions in chronological order where I had the date and time of the transaction; and where I did not, sequence those debit card transactions from low to high.
>
> <u>Sequencing Order #3</u>:  Group the debit and check card transactions before the check and ACH transactions and then sequence the debit card transactions in chronological order where I had the date and time of the transaction; and where I did not, sequence those debit card transactions from high to low."

New Olsen Report at 9-10.

As Olsen himself readily admits, Sequencing Order 1 has nothing to do with posting in chronological order.  Olsen Dep. at 206-07.[6]  And, although Olsen characterizes his Sequencing Orders 2 and 3 as sequencing debit-card transactions in "chronological order," that is not what those scenarios actually do.  Rather, all he did was to sequence subsets of debit-card transactions in approximate relative chronological order within each posting day on which merchants happened to submit such transactions to the bank for payment.  *Id.* at 210-12 (acknowledging that scenarios did not sequence transactions in genuine chronological order).

For 20 percent of the debit-card transactions, moreover, Olsen acknowledges that he was not even able to order them in this relative "approximate" chronological order, as he did not have "timestamps" for those transactions.  *See* Olsen Dep. at 221; *see also* Cox Dec. ¶ 9.  Instead, he assigned those transactions a random time of midnight (arbitrarily sequencing them at the beginning of each transaction day) and ordered them either low to high (Sequencing Order

---

[6]    Indeed, using his Sequencing Order 1, Olsen even calculated "harm" for William Smith, the class representative of the former "Including and Deleting" class.  Cox Dec. ¶ 11.  Plaintiffs have freely admitted that Smith is not a member of the Re-Sequencing Class at all.  Jolley Dec. Ex. 5 at 4.

2) or high to low (Sequencing Order 3).  Olsen Dep. at 186-87, 216-17; Cox Dec. ¶ 9.  In fact, the total number of transactions for which Olsen did not have genuine transaction times was *higher* than 20 percent, because the data often did not permit Olsen accurately to "match" a debit-card authorization to a subsequently posted transaction.  Olsen employed a matching methodology to identify transaction times that was, at best, hit-or-miss (and at worst – by his own admission – purely random).  Olsen Dep. at 219-21.[7]

Therefore, none of plaintiffs' alternative scenarios sequence debit-card transactions in the order they were made by the customer.  Instead, each scenario simply results in a different non-chronological order.  For example, assume a customer made a series of debit-card purchases in the following order:

| No. | Transaction Type | Day and Time of Transaction by Customer | Amount | Day Submitted to Wells Fargo for Settlement/Payment |
|---|---|---|---|---|
| 1. | Debit-card purchase | Monday 9:05 am | $55 | Thursday |
| 2. | Debit-card purchase | Monday 1:45 pm | $32 | Wednesday |
| 3. | Debit-card purchase | Monday 6:30 pm | $80 | Thursday |
| 4. | Debit-card purchase | Tuesday 10:22 am | $73 | Wednesday |
| 5. | Debit-card purchase | Tuesday 3:12 pm | $15 | Thursday |
| 6. | Debit-card purchase | Tuesday 4:35 pm  [transaction not submitted by merchant to bank for authorization] | $8 | Wednesday |

---

[7]      There is no direct way to routinely "match" authorized transactions to those subsequently submitted by the merchant for settlement and posting.  Olsen performed his "matching" by looking for authorized transactions within one day of the transaction date that had the same dollar amount as a transaction he was seeking to place in sequence.  For 20 percent of the transactions, he was able to find no match at all and so assigned a random time of midnight.  *Id.* at 221.  Conversely, in many cases he found multiple matches, *i.e.*, transactions with the same dollar amounts.  In those situations, his algorithm simply selected a "match" at random.  *Id.* at 219-21.  This would not be a significant problem were it not for the fact that he performed this random selection independently for each transaction, without eliminating transaction times that had already been "matched."  Thus, for example, if two $5 transactions were authorized on two consecutive days (*e.g.*, for a daily recurring purchase), his algorithm could easily have assigned the time of the first transaction to both.  *Id.* at 220; *see* McGoveran Dec. ¶ 6.

1      If Wells Fargo were required to post debit-card transactions chronologically in

2  the order initiated by the customer, the resulting order here would have been **1-2-3-4-5-6**.

3      Olsen, however, never attempted to calculate a measure of damages based on

4  such a genuine chronological posting order.  Olsen Dep. at 212.  Under his Sequencing Order 1,

5  he simply sorted transactions in low-to-high order for each posting date (the date the merchant

6  submitted the transaction to the bank for payment).  Under Sequencing Orders 2 and 3, he again

7  sorted transactions only by posting date, this time putting them in relative chronological order

8  within each posting date according to the date and time when the transaction was initiated – but

9  only when he had the time of the transaction.  For the 20 percent of transactions for which there

10  were no transaction times available – as with transaction #6 above –  he simply assigned an

11  arbitrary time of midnight the previous night.  New Olsen Rep. at 9-10; Olsen Dep. at 186-88.[8]

12      Thus, in the above example, Olsen would have ordered the transactions as

13  follows (assigning Transaction No. 6 the arbitrary time of midnight):

14      Sequencing Order 1:  **6-2-4-5-1-3**

15      Sequencing Orders 2 and 3:  **6-2-4-1-3-5**

16      This is, of course, not "chronological" at all – either across the board or even

17  within individual posting dates.

18      But this is only the tip of the iceberg in terms of the artificial manipulation that

19  plaintiffs' counsel instructed Olsen to make.  Customers have other types of transactions that

20  post to their accounts, including checks and ACH transactions.  Instead of putting those in

21  chronological order – or at least leaving them where the bank would otherwise have put them

22  under its existing posting protocols – plaintiffs' counsel instructed Olsen to manipulate those

23  transactions in the posting order through changes that had nothing whatever to do with

24  chronological ordering.

---

[8]      For transactions that are not submitted for authorization by the merchant, or for which
the transaction is authorized in one amount but finalized in a different amount (a common
occurrence, especially for gasoline purchases), there is no data on the transaction time.  *See*
Zimmerman Dec. ¶¶ 14, 17.  Olsen speculated, probably correctly, that many of the transactions
for which he could find no time "match" fell in these categories.  Olsen Dep. at 222-23.

Consider the following example set of transactions.  (For sake of simplicity, all of the transactions listed here can be assumed to settle and post on a single date, March 13.)

| No. | Transaction Type | Day and Time of Transaction by Customer | Amount |
|-----|------------------|------------------------------------------|--------|
| 1. | Check | March 2 | $24 |
| 2. | Check | March 5 | $100 |
| 3. | Debit-card purchase | March 11, 9:00 a.m. | $ 23 |
| 4. | Debit-card purchase | March 11, 2:00 p.m. [not submitted by merchant for authorization] | $125 |
| 5. | Debit-card purchase | March 12, 10:00 p.m. | $25 |
| 6. | Deposit | March 13, 11:00 a.m. | $150 |

The chronological order for these transactions would be **1-2-3-4-5-6**.  Under Wells Fargo's current protocols, the March 13 deposit, although last in time, would have been posted first, thus giving the customer the benefit of a "float" on all of his other transactions. The remaining transactions, both checks and debit-card purchases, would have been sorted together from highest amount to lowest.  The result would have been an order of **6-4-2-5-1-3**.

Unsurprisingly, all three of plaintiffs' scenarios keep the last-occurring of these transactions – the deposit – at the beginning of the line, as that benefits them.  But they do not sort the remaining transactions in chronological order either.  Instead, for Sequencing Order 1, Olsen was instructed to sort debit-card transactions and checks together, from lowest to highest. Then, for Sequencing Orders 2 and 3, he was instructed to sort debit-card transactions in the partial quasi-chronological order described above – but then to place all checks (as well as ACH and Bill Pay transactions) at the *end of the line*.  *See* Olsen Dep. at 174, 209-10.  The result was that his ordering for the above example would be as follows:

Sequencing Order 1:  **6-3-1-5-2-4**

Sequencing Orders 2 and 3:  **6-4-3-5-1-2**[9]

Once again, this is far removed from chronological ordering.  Even the debit-card transactions are not in real chronological order.  And since the checks that post on a given day were typically written by the customer long before the debit-card transactions posting that same day, counsel's decision to instruct Olsen to put all checks at the end is completely contrary to the logic of plaintiffs' claims.  As shown below, this significantly distorted the results.

The vast majority of debit-card transactions post within three days, with most posting in two days or less.  *See* Jolley Dec. Ex. 9 at 15-17 (Visa witness).  Simple logic and common experience confirm that checks typically take a longer period to clear.  *See, e.g.*, Jolley Dec. ¶ 5 & Exs. 2, 3.  To verify this, Wells Fargo's damages expert, Alan Cox, reviewed a random sample of checks drawn on class members' accounts and confirmed that the typical time to clear was indeed longer than for debit-card transactions.  Cox Dec. ¶ 8 & Ex.1.

Plaintiffs may seek to argue that, although the customer knows he has written a check earlier, the bank does not.  But Olsen conceded that for approximately 20 percent of debit-card transactions, the bank similarly does not have any actual knowledge of a debit-card transaction and its amount until the date of posting (Olsen Dep. at 221-23), yet his scenarios attribute all of those transactions to the dates on which the customers initiated them, rather than when the bank became aware of them.  Plaintiffs cannot have it both ways.

In an effort to measure the materiality of at least some of the flaws in plaintiffs' ordering sequences, Wells Fargo's experts re-ran Olsen's scenarios on a random sample, making only two modifications to posting order.  In one set of scenarios, Cox examined the impact of moving checks and ACH transactions *ahead* of debit-card purchases, instead of *after* them – an ordering that would be more logically consistent with a "chronological" theory of posting.  In a second set of scenarios, Cox examined the impact of ordering *all* transactions in

---

[9]     For the reasons described above, Olsen would have assigned transaction number 4 an arbitrary time of midnight (before all other March 11 transactions), causing it to be placed ahead of the earlier-occurring transaction number 3.

1   chronological order within each posting day.  The first adjustment reduced the total impact

2   measured in Olsen's calculations by approximately 60 percent; the second adjustment reduced

3   the total by approximately 66 percent.  Cox Dec. ¶¶ 13-15.[10]  This affected not simply the

4   quantification of damages, but the identification of which individuals were actually injured at

5   all.  *Id.* ¶ 16.

6           Because – as Olsen readily concedes (Olsen Dep. at 211-13) – sequencing debit-

7   card transactions in genuine chronological order would be a truly immense task, Cox did not

8   attempt to measure the impact of Olsen's failure to sequence on that basis.  However, because

9   such a sequencing order would eliminate the "float" on transactions across days – *i.e.*, the ability

10  of a customer to "cover" a purchase made on an earlier day with a deposit made on a later day,

11  as in the second example above – it would logically also lead to results very different from what

12  Olsen generated.  Cox Dec. ¶ 12.

13          In short, Olsen did not calculate the difference in overdraft fees between Wells

14  Fargo's actual debit-card posting order and a chronological posting order.  Instead, he simply

15  measured the difference between Wells Fargo's real-world posting order and three different

16  (and largely arbitrary) non-chronological posting orders.

17                  **2.      Reversals**

18          Many overdraft fees that are assessed are never paid by the customer but are

19  instead reversed.  *See* Zimmerman Dec. ¶ 34.  One previous flaw for which Olsen tried to

20  correct in his new calculations was his failure to credit fee reversals against the "excess"

21  overdraft fees he calculated.  However, neither Olsen nor any other expert made any

22  independent evaluation of the appropriate methodology to be used for this purpose.  Instead,

23  Olsen again simply implemented instructions from plaintiffs' counsel.  Olsen Dep. at 175, 226.

24  And once again they instructed Olsen to use methods that inflated his calculation of injury.

25

26  _____

27  [10]       Cox performed several statistical calculations to develop a more precise measure of the
    difference.  *Id.*  The important point here, however, is merely that these manipulations that
28  counsel instructed Olsen to make had a significant impact on his results.

1    Counsel instructed Olsen to use two alternative methods for allocating fee

2    reversals to overdraft fees.  New Olsen Report at 14.  The first was a "last in first out" method in

3    which he assigned each fee reversal to the most recent overdraft fee incurred by the customer

4    under *any* circumstances, regardless of whether it was a fee that Olsen had identified as

5    "damages."  The result was that a substantial proportion of the reversals customers received

6    after days on which he found "excess" fees were assigned to clearly legitimate overdraft fees

7    with which plaintiffs have no quarrel.

8    For example, plaintiff Walker challenges several overdraft fees she incurred on

9    June 4, 2007.  Depending whether Scenario 2 or Scenario 3 is applied, Olsen calculates that she

10   should have incurred either 1 or 3 fewer overdraft fees than she actually incurred that day.  Cox

11   Dec. ¶ 10.  Walker discovered she had incurred the fees shortly after they were assessed, but she

12   did not do anything about it until July 9, when she visited a Wells Fargo branch to complain

13   about the multiple fees from June 4 and was given a credit for four of those fees.  Jolley Dec.

14   Ex. 8 at 98 (Walker Dep.).  Olsen would have credited *none* of these reversals against the 1-4

15   fees he identifies as "damages" for her.  This is because she had incurred four additional

16   overdraft fees on the days following June 4 – fees that plaintiffs do not challenge and that it is

17   clear were *not* the ones to which the reversals were in fact directed.[11]

18   Common sense suggests that this pattern would have been common.  On every

19   day for which Olsen measured "excess fees" for overdrafts, the customer's account by definition

20   ended with a negative balance.  Absent an intervening deposit, any debits posting the next day

21   would *all* post against a negative balance and generate additional overdraft fees, *none* of which

22   Olsen would count as damages.  *See* Olsen Dep. at 227-30.  Yet it is to these later unchallenged

23   fees that any subsequent reversals would have been assigned under his LIFO approach.

24   Plaintiffs' second approach for reversals applied as an offset any reversals the

25   customers received within 30 days following a challenged overdraft fee.  It is apparent from

26   ───────────────

[11]    *See* Jolley Dec. ¶ 6 & Ex. 4.  Two of these fees were incurred on days when Walker had
27   a single overdraft.  Two others occurred on days when her starting balance was negative, with
     no deposits.  Thus, none occurred on days on which the order in which her transactions were
28   posted had any impact on the number of fees incurred.  *Id.*; *see* Olsen Dep. at 227-30.

Olsen's results that this method captures a larger proportion of reversals than his LIFO method. However, by artificially limiting the period reviewed for potentially applicable reversals to 30 days, Olsen again excluded reversals that should have been applied against the alleged "harm." Thus, for example, under this approach, he once again would not have taken into account the reversals of the fees plaintiff Walker incurred in June 2007 – even though it was for exactly those fees that her reversals were granted.  *See* Jolley Dec. Ex. 8 at 98 (Walker Dep.).

Thus, neither of plaintiffs' methods of assigning reversals to allegedly excess overdraft fees would have correctly captured the clearly relevant reversals granted to the class representative.  As Walker is supposed to be typical of the class – and nothing suggests she is unusual in this respect – it is clear that neither of the methods Olsen used to handle reversals is reliable.  Plaintiffs have offered no evidence supporting the methods used.

### 3. Increased Costs to Customers Not Considered

Each of the alternative scenarios that plaintiffs' counsel instructed Olsen to use considered only *reductions* in overdraft fees associated with each of their scenarios.  They did not consider any *increases* in costs borne by customers under those scenarios.

For example, plaintiffs' scenarios include no adjustment for increased costs customers would incur as a result of an increased incidence of checks being returned unpaid ("bounced") by the bank.  For each customer, the bank applies a certain level of overdraft tolerance in determining whether to pay transactions into overdraft instead of returning them unpaid.  *See* Zimmerman Dec. ¶ 30.  The bank charges the customer a similar fee whether it pays such a transaction or not.  *Id.* ¶ 31.  However, this choice still can make a very significant difference to the customer, because a returned item can make the customer liable for a variety of civil, contractual, and even criminal penalties.[12]

If debit-card transactions and checks were treated the same way in this respect, the issue of increased "returns" would be immaterial here.  However, debit-card transactions differ from checks in that, if they have been pre-authorized by the bank (as the majority are),

---

[12]       *See* Cox Dec. ¶ 19; *see also* Cal. Civ. Code § 1719; Cal. Penal Code § 476a.

1    they *cannot* be returned unpaid even if the customer's overdraft tolerance is exceeded.

2    Zimmerman Dec. ¶ 32.  As a result, when Olsen re-sequences transactions so as to place checks

3    at the end of the line, he increases the likelihood that checks will not be paid and that customers

4    will incur added costs from merchants and others.  *See* Cox Dec. ¶¶ 17-20.

5           Olsen confirmed that he was aware of this issue, which had been identified as a

6    criticism of his original analysis, but he ultimately did not include any "overdraft tolerance"

7    effect in his analysis.  Olsen Dep. at 235-36.  When plaintiffs made their request for data to be

8    used in Olsen's new calculations, they asked for information that would permit him to calculate

9    the pertinent overdraft tolerance limits, and Wells Fargo supplied the formula to make the

10   calculation based on data that were otherwise provided to Olsen.  Jolley Dec. ¶ 4.  After

11   reviewing the formula, Olsen told plaintiffs' counsel that he did not understand the

12   documentation he had been given.  Olsen Dep. at 200-01.  When asked whether he had asked

13   plaintiffs' counsel to seek clarification, he responded:

14
      A. … I told him [plaintiffs' counsel] that if he wanted me to use it, he
15           needed to provide me with more information.…

16
      Q. But after you told him that if he wanted you to use it, you would
          need to get more information, what did he say to you?

17       A. I don't recall.  I never got any more information, so –

18   *Id*. at 200-01.  Plaintiffs' counsel never sought any such additional information.  Jolley Dec. ¶ 4.

19           Wells Fargo's experts did examine this question and confirmed that, using

20   Olsen's re-sequencing scenarios (with no adjustments), a significant number of checks would in

21   fact have been returned unpaid.  Cox Dec. ¶¶ 21-22.  These included checks for important items

22   such as housing, payments to financial institutions, and the like – items for which substantial

23   costs would have been incurred by customers beyond any fees paid to Wells Fargo.  *Id.* ¶ 21.

24         **4.**     **Plaintiffs' Evidence of Damages Incurred by Persons Exposed to**
                 **Challenged Advertising and Other Statements**
25

26           Plaintiffs' counsel have expressly acknowledged that Olsen did not attempt to

27   quantify the amount of damages or restitution resulting from any classwide misrepresentation-

28   based claims and that they do not intend to seek such relief at trial.  Jolley Dec. Ex. 11.  Nor do

   plaintiffs have any other evidence on this subject.

## III.    ARGUMENT

It is black-letter law that, when a party is unable to present evidence to sustain a necessary element of his or her claim, summary judgment is appropriate.  *See Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1081-82 (9th Cir. 2004); *Hill v. San Francisco BART Dist.*, 2006 WL 132089, at *4-5 (N.D. Cal. Jan. 17, 2006).  Plaintiffs' failure to come forward with admissible evidence of injury and damages in the spring of 2009 entitled Wells Fargo to summary judgment on their class claims at that time.  The Court nonetheless afforded plaintiffs the extraordinary opportunity to have a second chance at developing admissible evidence on these issues.  Having failed once again to come forward with evidence sufficient to carry their burden on these essential elements, plaintiffs cannot avoid summary judgment a second time.

At a minimum, the Court should confirm that these claims cannot proceed on a class basis.  Federal Rule of Civil Procedure 23(c)(1)(C) provides that a court may decertify a class at any time before final judgment.[13]  In certifying this class, the Court relied on plaintiffs' representation that they would be able to develop algorithms that would make each class member ascertainable, would provide common proof of injury, and would present an adequate common method of calculating damages.  *See* Class Order at 24, 27.  Where, as here, it becomes plain that plaintiffs do not have an adequate method of proving their claim through common proof, class certification cannot be maintained.  *Pierce*, 526 F.3d at 1200; *Anderson v. Boeing Co.*, 2006 WL 2990383, at *4-5 (N.D. Okla. Oct. 18, 2006); *In re Methionine Antitrust Litig.*, 2003 WL 22048232, at *4-5 (N.D. Cal. Aug. 26, 2003).

The Court has gone out of its way – imposing, along the way, tremendous expense and other burdens on Wells Fargo – to afford plaintiffs every opportunity (and then some) to develop their promised methodology for proving ascertainability, injury, and damages.  They have failed to do so.  This proceeding should be brought to a close.

---

[13]    *See General Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 160 (1982) (certification order where entered early in a case is "inherently tentative") (internal marks and citation omitted); *Pierce v. County of Orange*, 526 F.3d 1190, 1200 (9th Cir. 2008) (affirming decertification on basis of inadequate methodology for proof of damages).

**A.      Olsen's Calculations Are Not Admissible as Measures of Either Actual Injury or Quantification of Damages.**

In order for an expert's testimony to be admissible, the expert must have "applied … principles and methods reliably to *the facts of the case*."  Fed. R. Evid. 702 (emphasis added).  This aspect of Rule 702 incorporates the requirement, under *Daubert v. Merrell Dow Pharms., Inc.*, that expert testimony have the proper "fit" to make it relevant to the "determin[ation of] a fact in issue."  509 U.S. 579, 591-92 (1993).

Expert testimony does not "fit" unless it "logically advances a material aspect of the proposing party's case."  *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995).  This requirement of "fit" applies in full measure to expert testimony concerning injury and damages, and where that "fit" does not exist, the expert testimony is not admissible.  For example, in *Baker v. Urban Outfitters, Inc.*, a photographer sued the defendant for using his stock photograph in its picture frames without permission.  254 F. Supp. 2d 346, 348 (S.D.N.Y. 2003).  While the relevant measure of damages sought by the plaintiff was "what a reasonable license fee would have been for Urban's use of the already-existing photograph," the plaintiff's expert instead measured damages based on what the photographer's fee would have been "were he commissioned by Urban to produce the [photograph] from scratch."  *Id.* at 354.  The court rejected this "apples and oranges comparison" as irrelevant.  *Id.*

The scenarios plaintiffs' counsel instructed Olsen to apply here do not "fit" as a measure of the actual impact on class members of Wells Fargo's allegedly wrongful conduct.  This lack of "fit" has multiple components.

*First*, none of plaintiffs' three "Sequencing Orders" sequences debit-card transactions in chronological order – the specific sequencing order upon which plaintiffs' claim is based.  Sequencing Order 1 has no chronological component whatever.  Sequencing Orders 2 and 3 purport to be chronological, but they are not, in multiple respects:

- Olsen made no effort to sequence transactions across days in chronological order.  Thus, for example, if a customer made three debit-card purchases on Monday and three on Tuesday, his algorithm would not have placed all of the Monday transactions before all of the

Tuesday transactions unless the merchants happened by coincidence to submit all of the Monday transactions for settlement before any of the Tuesday transactions.

- For at least 20 percent of debit-card transactions – Olsen admits to that figure but the real number is higher – Olsen did not have timestamps, meaning that he had no basis for sorting debit-card transactions (even just within a given posting date) in their true chronological order. Where he did not have a specific time for a transaction, he could still assign it a date but otherwise his placement of the transactions in the order was random. This flaw causes Olsen's results to fail the basic *Daubert* test of "reliability" more generally. His results do not just fail to "fit" the underlying claim; they do not even "fit" what he himself was claiming to measure.[14]

Thus, although the claim in this case is that Wells Fargo should have posted debit-card transactions in the order they were initiated by the customer, none of plaintiffs' scenarios actually measures the fees that would have been assessed in that situation. This "apples and oranges comparison" does not satisfy the required standard of "fit."

*Second,* in their measurement of injury and damages, plaintiffs' counsel and Olsen have improperly made changes to the bank's posting order on aspects that they do not challenge and that are actually *inconsistent* with their underlying "chronological order" theory. A similar situation was presented in *Boca Raton Comm. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1234 (11th Cir. 2009), in which the Eleventh Circuit affirmed the exclusion of expert testimony that measured injury and damages resulting from activity that was not unlawful under the plaintiffs' theory of the case. In that case, Boca alleged that Tenet violated RICO by manipulating the Medicare system through certain specific types of "overcharges." *Id.* at 1230-31. While "[u]nder Boca's liability theory, it [was] not unlawful for hospitals to overcharge" in all situations, Boca's expert measured the injury and damages stemming from both unlawful and lawful overcharging. *Id.* at 1233. This lack of "fit" required exclusion of the testimony:

---

[14]     *See, e.g., Elcock v. Kmart Corp.*, 233 F.3d 734, 756 n.13 (3d Cir. 2000) (an expert "should not depend on fictional or random data when rendering an opinion about the quantum of economic harm in a particular plaintiff's case"); *cf. Aetna Inc. v. Express Scripts, Inc.*, 261 F.R.D. 72, 80 (E.D. Pa. 2009) (finding expert opinion reliable where expert "fill[ed] in certain missing data … based upon prior reliable data and not … out of thin air").

> Having tailored a trim-fitting liability theory for the body of its case against Tenet, Boca cannot hang a baggy injury and damages theory on it.  Whatever expert opinion Boca provided had to be suitably proportioned.  And because Boca's injury and damages opinion was not confined to charges that its liability theory would consider unlawful, it was too broad.  It was ill-fitting.

*Id.* at 1233-34.  Similarly, in *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1223-24 (9th Cir. 1997), the Ninth Circuit remanded for a new trial where the plaintiffs' expert report did not differentiate between damages based on lawful and unlawful conduct.[15]

Plaintiffs' damages analysis fails this test of "fit" as well:

- A substantial proportion of the impact Olsen measured came from his re-ordering, not of debit-card transactions, but of checks, ACH debits, and other transactions.  Plaintiffs' claims do not apply to those at all, so he should have left them undisturbed.  To the extent that was not possible, he should at a minimum have been instructed to treat those transactions in a manner that was logically consistent with plaintiffs' "chronological order based on the customer's action" theory of the case.  This would have required checks to be sequenced *before* rather than *after* debit-card transactions.  Instead, Olsen was instructed to place all such transactions after all debit-card transactions.

- The methodology Olsen was instructed to use in tying fee reversals resulted in a finding of "injury" and "damages" in situations in which it is beyond any dispute that the customer suffered no actual harm from any wrongful conduct.  The record is clear that Wells Fargo reversed and re-credited to customers' accounts large numbers of fees assessed under the situation that plaintiffs' challenge – as it did in the case of plaintiff Walker.  And, as in Walker's case, the methodology Olsen was instructed to use measured "injury" where no injury associated with any challenged conduct actually occurred.[16]

---

[15]     *See also Johnson Elec. N. Am., Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 280-81 (S.D.N.Y. 2000) (finding expert's opinions "fatally flawed" and "simply irrelevant" to the extent they computed damages for conduct not at issue in the case); *Stoebner Holdings, Inc. v. Automobili Lamborghini S.P.A.*, 2007 WL 4230878, at *5 (D. Haw. Nov. 30, 2007) (same); *Van der Valk v. Shell Oil Co.*, 2004 WL 5486643, at *4 (C.D. Cal. Nov. 15, 2004) (same); *Toomey v. Nextel Comms.*, 2004 WL 5512967, at *10-11 (N.D. Cal. Sept. 23, 2004) (same).

[16]     In its Decertification Order (at 8), the Court suggested that plaintiffs might be able to account for reversals on a "last-in-first-out" basis.  The Court was clearly suggesting that (continued…)

**B.    The Scenarios Olsen Was Instructed to Apply Did Not Reflect Material Differences in the "But-For" World.**

A proper measure of damages reflects the position the plaintiff would have been in absent the challenged conduct – including both in how he would have been better off and in how he would have been worse off.  Thus, for example, when a plaintiff claims lost profits, he cannot simply recover lost revenues, but must reduce those revenues for the additional costs he would have also incurred.[17]  The same basic principle applies in other contexts as well.  Thus, for example, when assessing the impact of patent infringement, a patent owner must account for "alternative actions the infringer foreseeably would have undertaken had he not infringed." *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350-51 (Fed. Cir. 1999). This is because a "fair and accurate reconstruction" of the but-for world must deal with the likelihood that the infringer would "offer an acceptable noninfringing alternative, if available, to compete with the patent owner rather than leave the market altogether." *Id.* at 1351.  Similarly, for a claim of damages from price suppression, a "credible economic analysis" must account for "the effect of [a] higher price on demand for the product," resulting in fewer sales.  *Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.*, 246 F.3d 1336, 1357 (Fed. Cir. 2001).[18]

Here, a proper measure of damages must take account of the additional costs class members would have incurred, or benefits they would have foregone, had Wells Fargo sequenced transactions in the manner presented in plaintiffs' scenarios.  This is hardly a trivial

---

reversals be assigned to "the most recent spate of charges" containing challenged fees.  *Id.* There was certainly no directive from the Court to employ a LIFO methodology that would methodically avoid tying reversals to the fees that caused the customer to seek the reversals in the first place.

[17]    *See, e.g.*, *Kids' Universe v. In2Labs*, 95 Cal. App. 4th 870, 884 (2002) (damages consist of "loss of net pecuniary gain, not just loss of gross revenue"); *Gerwin v. S.E. Calif. Ass'n of Seventh Day Adventists*, 14 Cal. App. 3d 209, 222 (1971) (finding plaintiff had not established lost profits based on rental income he would have earned absent a breach of contract, where he did not deduct associated costs); *Paper Converting Mach. Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 22 (Fed. Cir. 1984) (damages must adjust lost revenues for amount of costs avoided).

[18]    *See also Naton v. Bank of California*, 649 F.2d 691, 699-700 (9th Cir. 1981) (employment discrimination award of lost earnings reduced by amount collected in unemployment insurance that would not have been received had plaintiff not been fired); *Pichon v. PG&E Co.*, 212 Cal. App. 3d 488, 501 (1989) (deducting worker's compensation benefits).

matter, especially given plaintiffs' choice to sequence returnable items, including checks, at the tail end of the order.  The undisputed evidence shows that this approach would yield a significantly higher incidence of checks being returned rather than paid into overdraft.  These would include large-dollar checks for rent, mortgage, credit-card payments, car-loan payments, tax payments, and other transactions for which the net costs to a customer of a returned item could dwarf the overdraft fees the customer might "save" under plaintiffs' re-sequencing.

The impact of transaction ordering on the costs customers incur for returned items has been broadly recognized.  As the California Supreme Court recently recognized in *Miller v. Bank of America, N.T. & S.A.*, 46 Cal. 4th 630, 640 (2009), "an overdraft may be the result of the bank honoring, rather than bouncing, a rent or utility payment….  Requiring banks to dishonor checks can harm the customer's credit rating, result in the customer's incurring fees, and affect the customer's relationship with merchants."  A similar concern is expressed in the comment to the UCC provision on posting order, which points out that it is impossible to identify a posting order that would benefit the customer in all circumstances, and that rejection of important checks, such as payments to the IRS, could have severe consequences.  Cal. Com. Code § 4303, cmt. 7.

Federal banking agencies have recently revisited this issue in the context of transaction posting order.  In May 2008, the Federal Reserve Board and other banking agencies sought comment on possible new regulations requiring banks to give customers the ability to opt out of certain automatic overdraft protection services.  73 Fed. Reg. 28,904, 28,947-48 (May 19, 2008).[19]  The agencies also solicited public comment on whether regulations should be promulgated to address posting order.  *Id*. at 28,933.  In January 2009, after conducting further analysis, the agencies elected to retain the traditional rule that banks have complete discretion with respect to the order of posting debits.  *See* 74 Fed. Reg. 5498, 5547-48 (Jan. 29, 2009).  In so doing, the agencies endorsed, among other things, the UCC comment's observation that

---

[19]   In November 2009, the Board adopted a final rule of *prospective* application (as of July 2010) implementing such an opt-out requirement.  74 Fed. Reg. 59,033 (Nov. 17, 2009).  That regulation does not purport to restrict, even prospectively, banks' decisions on posting order.

"(1) it is impossible to state a rule that would be fair in all circumstances, and (2) a drawer should have sufficient funds on deposit at all times, he or she should thus be indifferent as to posting order." *Id.* The agencies concluded:

> [I]t would be difficult to set forth a bright-line rule that would clearly result in the best outcome for all or most consumers. For example, requiring institutions to pay smaller dollar items first may cause an institution to return unpaid a large dollar nondiscretionary item, such as a mortgage payment, if there is an insufficient amount of overdraft coverage remaining to cover the large dollar item after the smaller items have been paid.

*Id.* at 5548.

There can accordingly be no doubt that in a "but for" world in which checks were placed at the end of the queue, and were hence returned unpaid in greater numbers, there would be significant adverse impacts on class members. Plaintiffs' damages methodology makes no effort whatever to take this into account. Olsen's only explanations for this failing were (a) that he did not understand the documentation he had been given on how to apply the bank's overdraft tolerance formula and (b) plaintiffs' counsel did not instruct him to do anything. Obviously, neither of these provides an excuse for this fundamental flaw in plaintiffs' analysis.

### C.   The Court Should Enter Summary Judgment For Wells Fargo.

#### 1.   Plaintiffs Have Acknowledged that Class Misrepresentation Claims Cannot be Established Through Common Proof.

In an order entered May 5, 2009, the Court denied Wells Fargo's motion for partial summary judgment on plaintiffs' misrepresentation-based claims only as to certain individual claims of plaintiffs Walker and Gutierrez relating to a very small number of discrete items that each of those plaintiffs might be able to prove, via inference, that she had read. Order re Motion for Partial Summary Judgment (Dkt. No. 247) at 9-10. As plaintiffs' new counsel conceded in arguing to the Judicial Panel on Multidistrict Litigation, the Court "threw out" the class-wide claims.[20]

---

[20]   Jolley Dec. Ex. 10 at 6. Plaintiffs had offered no evidence, in opposing that motion, of class-wide distribution of any specific alleged misrepresentations, much less that the class as a whole was actually injured by any item or group of items.

In a recent email, plaintiffs' counsel confirmed:

> We agree that Mr. Olsen has not attempted to quantify the amount of damages or restitution resulting from classwide misrepresentation-based claims, and we do not intend to seek such damages at the upcoming trial.  Accordingly, it is not necessary for your motion to preclude the recovery of classwide, misrepresentation-based damages based on Mr. Olsen's failure to perform such calculations.

Jolley Dec. Ex. 11.

Accordingly, if and to the extent that there may be any doubt that class claims might still exist for fraud, negligent misrepresentation, or false advertising, or under the "fraud" prong of the UCL, summary judgment should be confirmed on any such claims.

### 2.     The Court Should Grant Summary Judgment on Plaintiffs' Sole Remaining Claim Under the UCL.

The only claims plaintiffs presented in this case that did *not* depend on a claim of deception were their claim for conversion and their statutory claims under the CLRA and the "unfair" prong of the UCL.  In its May 2009 Orders, the Court granted summary judgment on the first two of these in their entirety.  Order re Motion for Summary Judgment (Dkt. No. 246) at 15.  Accordingly, the only claim left is plaintiffs' claim that Wells Fargo's practice of posting debit-card transactions from highest amount to lowest on each posting date (instead of posting those transactions in chronological order) is "unfair" under the UCL.

Damages are not an available remedy under the UCL.  *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1272 (1992).  A plaintiff *may* receive an award of restitution under appropriate circumstances upon prevailing on a UCL claim, but the standard for such awards is strict.  A restitution award under the UCL may not be based on an estimate.  *Johnson v. GMRI, Inc.*, 2007 WL 2009808, at *4 (E.D. Cal. July 6, 2007); *Day v. AT&T Corp.*, 63 Cal. App. 4th 325, 338-40 (1998).  Rather, the loss must be a specific measurable amount, and the measurement of the loss must be supported by substantial evidence, without approximations.  *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal. App. 4th 663, 698-700 (2006).

For the reasons set out above, the analysis designed by plaintiffs' counsel and calculated by Olsen falls far short of this standard.  And plaintiffs have no other evidence to support an award of restitution.  Plaintiffs are therefore not entitled to (and Wells Fargo is

entitled to summary judgment on) any restitution-based monetary recovery.  *Colgan*, 135 Cal. App. 4th at 700; *Day*, 63 Cal. App. 4th at 340; *Johnson*, 2007 WL 2009808, at *4-5.

Even if plaintiffs were entitled to an award of damages, their analysis would still be insufficient.  Regardless of the remedy provided, proof of actual injury is a necessary element of *liability* for each of plaintiffs' causes of action.[21]  And, as the Court has already stressed, such injury must be demonstrated through competent proof as to every class member.  Plaintiffs lack such proof.  Nor do they have competent evidence of the actual quantification of damages.  *See McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 808-09 (9th Cir. 1988) (summary judgment appropriate where plaintiff provides no competent evidence from which damages could be fairly quantified); *Rickards v. Canine Eye Registration Found.*, 704 F. 2d 1449, 1452-53 (9th Cir. 1983) (same).  Summary judgment is accordingly appropriate on this ground as well.

### D.   Alternatively, and at a Minimum, the Court Should Decertify the Class.

As this Court has recognized, an important requirement of class certification "is that the class must be sufficiently definite."  Class Order at 24 (citation omitted).  Certification may not be maintained where determination of class membership would require "answer[ing] numerous individualized fact-intensive questions," *Deitz v. Comcast Corp.*, 2007 WL 2015440, at *8 (N.D. Cal. July 11, 2007), or where such issues render the class claims unmanageable.  *See, e.g.*, *Dunnigan v. Metro. Life Ins. Co.*, 214 F.R.D. 125, 136 (S.D.N.Y. 2003).

As stated above, all of plaintiffs' causes of action require proof that all class members suffered injury from the challenged conduct.  While the existence of individualized *damages* issues requiring separate trials does not necessarily preclude class treatment, a plaintiff must nonetheless possess class-wide proof as to *fact of injury*.  *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 180, 187-88 (3d Cir. 2001) (class treatment improper where actual injury could not be established through common proof); *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*, 247 F.R.D. 156, 165 (C.D. Cal. 2007) (same).  Having now been given multiple bites at the apple, plaintiffs have repeatedly failed to satisfy

---

[21]   *See* Cal. Bus. & Prof. Code § 17204; Cal. Bus. & Prof. Code § 17535; *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1089 n.2, 1092 (1993).

this requirement.  Olsen's new calculations once again fail to identify which customers are actually in the class and were injured under plaintiffs' theory of the case.  Absent a methodology that makes the class – as defined by the Court – ascertainable and that demonstrates injury to all class members, plaintiffs' claims cannot be pursued on a class basis.  *In re Methionine Antitrust Litig.*, 2003 WL 22048232, at *4; *Allied Orthopedic Appliances, Inc.*, 247 F.R.D. at 165-75.

## IV.    CONCLUSION

For the reasons set out above, the Court should grant summary judgment to Wells Fargo and/or decertify the "Re-Sequencing" Class.


DATED:  February 18, 2010                       COVINGTON & BURLING LLP


                                                By:    /s/
                                                       David M. Jolley
                                                       Attorneys for Defendant
                                                       WELLS FARGO BANK, N.A.