Richard M. Heimann (State Bar No. 063607)
E-mail:  rheimann@lchb.com
Barry R. Himmelstein (State Bar No. 157736)
E-mail:  bhimmelstein@lchb.com
Michael W. Sobol (State Bar No. 194857)
E-mail:  msobol@lchb.com
Jordan Elias (State Bar No. 228731)
E-mail:  jelias@lchb.com
Mikaela Bernstein (State Bar No. 261301)
E-mail:  mbernstein@lchb.com
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Richard D. McCune (State Bar No. 132124)
E-mail:  rdm@mwtriallawyers.com
Jae (Eddie) K. Kim (State Bar No. 236805)
E-mail:  jkk@mwtriallawyers.com
McCUNE & WRIGHT, LLP
2068 Orange Tree Lane, Suite 216
Redlands, CA  92374
Telephone:  (909) 557-1250
Facsimile:  (909) 557-1275

*Attorneys for Plaintiffs and the Class*
*(Additional Counsel for Plaintiffs Listed Below)*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERONICA GUTIERREZ, ERIN WALKER, and WILLIAM SMITH, as individuals and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO & CO.; WELLS FARGO BANK, N.A.; and DOES 1 through 125,<br><br>Defendants. | Case No. C 07-05923-WHA (JCSx)<br><br>**PLAINTIFFS' OPPOSITION TO MOTION OF WELLS FARGO, N.A. FOR SUMMARY JUDGMENT AND/OR TO DECERTIFY CLASS**<br><br>The Honorable William H. Alsup<br>Date:  March 25, 2010<br>Time:  8:00 a.m.<br>Courtroom 9, 19th Floor |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................. 1

II.   RELEVANT BACKGROUND ................................... 1

    A.   Plaintiffs' Original Damage Analysis ....................... 1

    B.   Mr. Olsen's New Report ................................... 2

    C.   Wells Fargo's New Expert Reports........................... 2

III.  PLAINTIFFS' DAMAGES ANALYSIS FITS THEIR CLAIMS......................... 3

    A.   Plaintiffs' Scenario 1 Provides An Acceptable Measure of Restitution ................................... 3

    B.   Mr. Olsen Harvested the Available Authorization Times for Debit Card Transactions ................................... 4

    C.   Plaintiffs' Scenarios 2 and 3 Are Chronological Insofar As Possible ........ 5

IV.   MR. OLSEN PROPERLY ACCOUNTED FOR REVERSALS........................... 6

    A.   Mr. Olsen Used the LIFO Method Ordered By the Court ......................... 6

    B.   Plaintiffs' Alternative Reversal Methodology Is Even More Conservative................................... 7

V.    WELLS FARGO'S CALCULATION OF RETURNED ITEM RATES IS UNRELIABLE AND INADMISSIBLE................................... 9

    A.   Wells Fargo's Experts Have No Idea Whether Mr. Olsen's Scenarios Would Result In a Greater or Lesser Number of Items Being Returned Unpaid................................... 9

    B.   Wells Fargo's Experts Have No Memory Or Record Of The Criteria Used To Select The Ten Days Of Transactional Data They Analyzed Out Of The 1,435 Day Class Period ......................... 10

    C.   Dr. Cox's "Examples" Are Based On Overdraft Tolerance Data Wells Fargo Refused to Provide to Plaintiffs........................... 11

VI.   PLAINTIFFS MAY SEEK INJUNCTIVE RELIEF ON THEIR MISREPRESENTATION-BASED CLAIMS ................................... 14

VII.  CONCLUSION ................................................. 14

# TABLE OF AUTHORITIES

**Page**

## CASES

*Adel v. Greensprings of Vermont, Inc.*,
  363 F. Supp. 2d 683 (D. Vt. 2005)............................................................................................ 3

*Aetna Inc. v. Express Scripts, Inc.*,
  261 F.R.D. 72 (E.D. Pa. 2009)................................................................................................. 4

*City of Owensboro v. Kentucky Utilities Co.*,
  2008 WL 4542674 (W.D. Ky. Oct. 8, 2008) .......................................................................... 13

*Gutierrez v. Wells Fargo & Co.*,
  2009 WL 1247040 (N.D. Cal. May 5, 2009) ................................................................. 1, 2, 4, 6

*Gutierrez v. Wells Fargo & Co.*,
  622 F. Supp. 2d 946 (N.D. Cal. 2009) ..................................................................................... 3

*In re Linerboard Antitrust Litigation*,
  497 F. Supp. 2d 666 (E.D. Pa. 2007) .............................................................................. 3, 4, 8

*Maxwell v. Angel-Etts of California*,
  2001 WL 34133507 (C.D. Cal. Jul. 9, 2001) ........................................................................... 4

*Olson v. Montana Rail Link, Inc.*,
  227 F.R.D. 550 (D. Mont. 2005)............................................................................................. 13

*U.S. ex rel. Tyson v. Amerigroup Illinois, Inc.*,
  488 F. Supp. 2d 719 (N.D. Ill. 2007) ................................................................................... 5, 8

*U.S. v. 68.94 Acres of Land,*,
  918 F.2d  389 (3d Cir. 1990)................................................................................................... 13

*U.S. v. Sosa*,
  2006 WL 166557 (E.D. Pa. Jan. 20, 2006) .............................................................................. 3

## I.   INTRODUCTION

Regardless of the label affixed to Wells Fargo's pending motion for summary judgment and/or decertification (Dkt. No. 292), it is, in substance, a *Daubert* motion.  Indeed, at the May 13, 2009 status conference, the Court expressly *precluded* Wells Fargo from filing any other type of motion:

> **MS. WINNER:**  The other thing, Your Honor, obviously, you know, we would want an opportunity to file a motion to challenge whatever they come up with, because I still think there are going to be important substantive issues that Your Honor has not so far been required to rule on. . . .
>
> **THE COURT:**  Well, I guess I have to say "okay" to that, *as long as it's really a true methodology defect.  It goes to the weight of it, but it's a* <u>*Daubert*</u> *disqualifying methodology.*

Transcript of Proceedings, May 13, 2009, at 20:6-17 (emphasis added).

Although Wells Fargo manages to fill 25 pages with its motion, its points are few and repeated.  Ignoring the Court's admonition, its criticisms go to the weight, not the admissibility, of Plaintiffs' damages analysis, which closely tracks the claims asserted by Plaintiffs in this case.

## II.   RELEVANT BACKGROUND

### A.   Plaintiffs' Original Damage Analysis

As the Court will recall, Plaintiffs' original damage analysis proceeded as follows:

> [D]uring fact discovery, plaintiffs requested and Wells Fargo provided transaction data for 10,000 customers within the one-month period between May 14 and June 13, 2008. . . . [¶]  With respect to the "re-sequencing claim" class, Computer Expert Art Olsen analyzed the data to calculate the amount of overdraft fees for actual versus different hypothetical scenarios. . . . [¶]  Olsen provided his calculations to Expert Statistician Charles Cowan who then extrapolated from the thirty-day to the 43-month [class] period.

*Gutierrez v. Wells Fargo & Co.*, 2009 WL 1247040, *1-*2 (N.D. Cal. May 5, 2009).  The Court held that "plaintiffs have not justified the use of an aggregate class-wide method of proving fluid-recovery damages," and gave Plaintiffs the option, which they accepted, to "[p]ostpone the trial and allow plaintiffs' counsel to mine the bank data for all of the damage analysis practicable, submit new reports, and entertain a new round of motions in limine."  *Id.* at *6.

### B.   Mr. Olsen's New Report

Pursuant to the scheduling orders entered by the Court, Mr. Olsen's new report was provided to Wells Fargo on November 20, 2009 (the "Olsen Report").[1]  *See* Order Granting Plaintiffs' Unopposed Administrative Motion to Modify Schedule (Dkt. No. 282), at 1.  The Court's description of Mr. Olsen's prior work is equally applicable to his current report:

> With respect to the "re-sequencing claim" class, Computer Expert Art Olsen analyzed the data to calculate the amount of overdraft fees for actual versus different hypothetical scenarios.  Olsen wrote software code to put the transactions in the order as sequenced by Wells Fargo for each customer each day (i.e., the challenged re-sequencing practice of highest to lowest).  He also wrote a code to alternatively sequence the transactions in chronological order in addition to other possible sequencing orders.  When a customer received less overdraft charges as a result of the alternate chronological sequencing, then the code determined the difference in the amount of overdraft fees.  Finally, the overdraft fees for all customers who received less overdrafts under the alternate chronological sequencing were totaled.

2009 WL 1247040, at *1.  As the Court had recommended in its Order, Plaintiffs made certain adjustments to their damages analysis to address criticisms levied by Wells Fargo's designated experts.  *See* 2009 WL 1247040, at *6 (in connection with the submission of new expert reports, Plaintiffs' "counsel would be well advised to address all of the bank's myriad other objections to the study, at least as an alternative branch of analysis").  Specifically, Plaintiffs "exclude[ed] customers who were not harmed because of reversals, uncollectibles, or because they opted-out of the class."  Olsen Report, at 8.

### C.   Wells Fargo's New Expert Reports

Rather than having its previously-designated experts, Messrs. Visser and Menenberg, respond to Mr. Olsen's new report, Wells Fargo produced the reports of two entirely *new* experts, neither of which had been previously designated:  David McGoveran, a database expert, and Alan J. Cox, Ph.D., an economist with National Economic Research Associates (NERA) specializing in antitrust and intellectual property.  *See* Expert Report of David McGoveran ("McGoveran Report"); Expert Report of Alan J. Cox, Ph.D. ("Cox Report").

---

[1] A copy of Mr. Olsen's report, which Plaintiffs were required to file under seal, was lodged with the Court on November 25, 2009.  *See* Dkt. Nos. 286, 289, 290.

1   Neither of Wells Fargo's new, previously undesignated experts possess or claim any expertise in

2   banking regulation, practices, or procedures.

3   **III.     PLAINTIFFS' DAMAGES ANALYSIS FITS THEIR CLAIMS**

4           Defendants' principal complaint is that Plaintiffs' damages analysis does not "fit"

5   Wells Fargo's self-serving interpretation of the claims asserted in this case.  "In assessing 'fit,' a

6   court must 'examine the expert's conclusions in order to determine whether they could reliably

7   flow from the facts known to the expert and the methodology used.'"  *U.S. v. Sosa*, 2006 WL

8   166557, *3 (E.D. Pa. Jan. 20, 2006) (emphasis added) (quoting *In re Paoli Railroad Yard*

9   *Litigation*, 35 F.3d 717, 744 (3d Cir.1994)).  "The fit of the facts and methodology to the

10  conclusion does not have to be exact."  *Adel v. Greensprings of Vermont, Inc*., 363 F. Supp. 2d

11  683, 686 (D. Vt. 2005).  A plaintiff does not "have to demonstrate to the judge by a

12  preponderance of the evidence that the assessments of their experts are correct, they only have to

13  demonstrate by a preponderance of evidence that their opinions are reliable and fit the facts of the

14  case…..Plaintiffs must be free to select their own…damages theories as long as they are

15  supported by a reasonable foundation."  *In re Linerboard Antitrust Litigation*, 497 F. Supp. 2d

16  666, 673-674 (E.D. Pa. 2007).

17           **A.     Plaintiffs' Scenario 1 Provides An Acceptable Measure of Restitution**

18          Wells Fargo argues that "Sequencing Order 1 [sequence all transactions in group

19  50040 from low to high] has nothing to do with posting in chronological order."  Motion, at 7.

20  However, that is the sequence Wells Fargo posted transactions in immediately prior to switching

21  to the "high to low" sequence that constitutes the unfair business practice at issue in this case.

22  *See Gutierrez v. Wells Fargo & Co*., 622 F. Supp. 2d 946, 952 n.3 (N.D. Cal. 2009) ("plaintiffs

23  assert that the bank's documents reveal that profit was the motivation for the challenged posting

24  order and point to bank documents from which a jury could reasonably conclude that profit

25  maximization was the true motive. . . . For example, plaintiffs cite a document entitled "OD/NSF

26  System Enhancement Time line" that shows the bank expected $40 million from "sort

27  order/processing changes" (Opp. Exh. 7).  Accordingly, while this scenario is not based on a

28  chronological posting order, it is based on the last *actual* posting order used by Wells Fargo

before it decided to maximize its profits at its customers' expense by moving to a "high to low"

processing order.  Wells Fargo cites no authority for the proposition that restitution cannot be

awarded based on the *status quo ante*, *i.e.*, prior to Wells Fargo's imposition of an unfair business

practice on its customers.  Accordingly, Scenario 1 provides both relevant and admissible

evidence on the proper amount of restitution.

### B.    Mr. Olsen Harvested the Available Authorization Times for Debit Card Transactions

Wells Fargo complains that Mr. Olsen was only able to come up with

authorization times for 80% of the debit card transactions, but Wells Fargo has not explained how

any additional timestamps could be obtained.  *See* Motion, at 7-12.  This portion of its motion is

not based on any alleged error by Mr. Olsen, but on Wells Fargo's failure to preserve its

transactional data.  As the Court itself has already held:

> One circumstance where it appears the [Ninth] circuit would relax
> this requirement is where a defendant has not preserved its records
> so as to allow a more precise calculation of damages.  Such a
> defendant cannot complain of an inability of plaintiffs to do a more
> accurate analysis.

*Gutierrez v. Wells Fargo & Co.*, 2009 WL 1247040, *3 (N.D. Cal. May 5, 2009) (citing *Bigelow

v. RKO Radio Pictures*, 327 U.S. 251 (1946)).  *See also Maxwell v. Angel-Etts of California*,

2001 WL 34133507, *7 (C.D. Cal. Jul. 9, 2001) (rejecting *Daubert* challenge where there was

missing data from defendant and expert's damages calculation was based on best available

evidence under the circumstances); *Aetna Inc. v. Express Scripts, Inc.*, 261 F.R.D. 72, 80 (E.D.

Pa. 2009) (rejecting *Daubert* challenge and finding that damages expert properly filled in gaps

left by missing data).

Moreover, the principal effect of the omission of 20% of debit card transactions on

the reordering process is to artificially *limit*, not exaggerate, class members' damages.

Accordingly, this provides no basis for exclusion.  *See In re Linerboard Antitrust Litigation*, 497

F. Supp. 2d 666, 675 (E.D. Pa. 2007) (rejecting defendant's argument that plaintiffs' damages

expert's testimony should be excluded because he made improper assumption where such

assumption was conservative and, if anything, caused him to undervalue damages); *U.S. ex rel.*

1   *Tyson v. Amerigroup Illinois, Inc.*, 488 F. Supp. 2d 719, 733-34 (N.D. Ill. 2007) (rejecting

2   *Daubert* challenge to damage expert testimony based on allegedly improper deductions in

3   methodology where deductions were made to provide a "more conservative damages estimate"

4   and favored the challenging party).[2]

5          **C.**     **Plaintiffs' Scenarios 2 and 3 Are Chronological Insofar As Possible**

6           Of the transaction types at issue, only debit card transactions have time stamps,

7   i.e., a specific date and time the instrument was presented to the merchant and approved for

8   payment.  ACH and Bill Pay transactions are scheduled to occur on a certain day, without regard

9   to time, and checks are merely presented for payment with no prior notice to Wells Fargo.

10  Accordingly, Plaintiffs sequenced these debit card transactions chronologically, followed by the

11  transaction types with no associated time.  This is fully consistent with Plaintiffs' theory of the

12  case, although Wells Fargo persists in attempting to require Plaintiffs to do the impossible:

13          Olsen made no effort to sequence transactions across days in
14          chronological order.  Thus, for example, if a customer made three
            debit-card purchases on Monday and three on Tuesday, his
            algorithm would not have placed all of the Monday transactions
15          before all of the Tuesday transactions unless the merchants
            happened by coincidence to submit all of the Monday transactions
16          for settlement before any of the Tuesday transactions.

17  Motion, at 17-18.  It is true that an earlier-authorized debit card transaction that settles before a

18  later-authorized debit card transaction will not post in strict chronological order, but the unfair

19  business practice complained of is Wells Fargo's practice of re-sequencing later-initiated debit

20  card transactions that do settle on the same day before earlier-initiated transactions for the

21  purpose of maximizing overdraft fee revenue.  There is no daylight between Plaintiffs' damages

22  analysis and their theory of the case.

23

24  _____

25  [2] Wells Fargo also complains that where class members authorized two debit card transactions *in
    the same amount on the same day*, Mr. Olsen's program would randomly select the matching time
    from either transaction.  *See* Motion at 8 & n.7.  Logic suggests that this would affect only an
26  exceedingly small number of transactions.  Wells Fargo makes no effort whatsoever to quantify
    the effect of this purported error, because, as Wells Fargo states, "[t]here is no direct way to
27  routinely 'match' authorized transactions to those subsequently submitted by the merchant for
    settlement and posting."  Motion, at 8 n.7.  Again, Wells Fargo would set Mr. Olsen an
28  impossible task, and then complain of his inability to complete it.

IV.    **MR. OLSEN PROPERLY ACCOUNTED FOR REVERSALS**

A.    **Mr. Olsen Used the LIFO Method Ordered By the Court**

Wells Fargo criticizes Mr. Olsen's use of "a 'last in first out' method [for allocating reversals to overdraft fees] in which he assigned each fee reversal to the most recent overdraft fee incurred by the customer . . . ." Motion, at 13.  This method is not Mr. Olsen's, it is *the Court's*, which has already rejected Wells Fargo's argument:

> [T]wo bank arguments have no merit.  [¶]  First, with respect to the issue of how to account for after-the-fact waivers by the bank of overdraft charges, the answer is simple. They could reasonably be accounted for on a last-in-first-out [LIFO] basis, meaning that waivers should be applied to erase the most recent penalty charges first, and then working backwards in time. This presumption is entirely reasonable given that normally it would be the most recent spate of charges that would bring a customer into the bank to seek a waiver.  *If the bank wishes to prove some other specific individualized agreement by a specific customer on how to allocate a waiver across a history of charges, the bank would be permitted to try to rebut the presumption on an individualized basis, provided it has timely disclosed the evidence under Rule 26.*

*Gutierrez v. Wells Fargo & Co.*, 2009 WL 1247040, *5 (N.D. Cal. May 5, 2009) (emphasis added).

Wells Fargo relegates the Court's ruling to a footnote, complaining that:

> In its Decertification Order (at 8), the Court suggested that plaintiffs might be able to account for reversals on a "last-in-first-out" basis. The Court was clearly suggesting that reversals be assigned to "the most recent spate of charges" containing challenged fees.  *Id.* There was certainly no directive from the Court to employ a LIFO methodology that would methodically avoid tying reversals to the fees that caused the customer to seek the reversals in the first place.

Motion, at 19-20 n.16.

Plaintiffs agree that there was "no directive from the Court to employ a LIFO methodology *that would methodically avoid tying reversals to the fees that caused the customer to seek the reversals in the first place*" (*id.*, emphasis added); there was simply a "directive from the Court to employ a LIFO methodology" (*id.*), "meaning that waivers should be applied to erase the most recent penalty charges first, and then working backwards in time" (2009 WL 1247040, *5), and that is the methodology Mr. Olsen employed.

Wells Fargo argues—without citation to either Mr. Olsen's or its own expert

reports—that "[t]he result [of the application of the LIFO methodology] was that a substantial

proportion of the reversals customers received after days on which he [Olsen] found 'excess' fees

were assigned to clearly legitimate overdraft fees . . . ."  In fact, it is just as likely that the LIFO

approach would result in *understating* damages, by giving Wells Fargo credit for reversing an

allegedly improper overdraft charge, when the reversal in fact pertained to an uncontested

overdraft charge that was not included in Plaintiffs' pre-reversal damage calculation.

Far from supporting Wells Fargo's "substantial proportion" argument (*id.*), Dr.

Cox testified that he made no effort whatsoever to quantify the impact of this alleged

methodological defect on Mr. Olsen's damage calculations, and that "since the reversals are not

tied to particular transactions, I couldn't do that."  Cox Depo. at 13:3-15:21.  As neither logic nor

Wells Fargo's own experts support its argument, the argument should be rejected.

### B.   Plaintiffs' Alternative Reversal Methodology Is Even More Conservative

Out of an abundance of caution, Mr. Olsen was directed to calculate, and did

calculate, the adjustments to his damages calculations that would occur if the reversal of *any*

overdraft charge within 30 days of an allegedly improper charge were credited against the

corresponding class member's damages, *i.e.*, giving Wells Fargo the benefit of any doubt as to the

overdraft to which the reversal pertains.[3]  Dr. Cox criticizes this alternative, "backup" approach

because "it could miss reversals that were done later."  Cox Report, at 12 (second bullet point).

Once again, Dr. Cox made no effort whatsoever to quantify the impact of this supposed

"problem" on Mr. Olsen's damages calculations.[4]

By giving Wells Fargo credit for *any* reversals within 30 days of an improper

overdraft charge, even when there are numerous intervening overdraft charges, this alternative

---

[3] *See* Olsen Report, at 22-23 (showing, under Sequencing Order #1, net damages of $332,687,565.89 using LIFO (Damage Calculation 1.d.) and $317,981,211.33 using 30 day reversals (Damage Calculation 1.f.), a decrease of 4.4% ), 24 (showing, under Sequencing Order #2, net damages of $214,185,676.96 using LIFO (Damage Calculation 2.d.) and $203,002,626.86 using 30 day reversals (Damage Calculation 2.f.), a decrease of 5.2% ), 25-26 (showing, under Sequencing Order #3, net damages of $195,015,357.30 using LIFO (Damage Calculation 3.d.) and $184,604,919.21 using 30 day reversals (Damage Calculation 3.f.), a decrease of 5.3% ).

[4] "Q.  So at this point, you have no idea -- approximately, exactly, or any other way -- what the amount of damages should -- that you think should be deducted from Mr. Olsen's figures based on this particular problem that you've identified?  THE WITNESS:  No."  Cox Depo. at 16:-17:3.

almost certainly leaves money "on the table" by giving Wells Fargo credit against damages for reversals of *uncontested* charges.  Dr. Cox neglected to even *consider* this side of the equation:

> Q.  As you sit here today, can you say one way or another whether the 30-day reversal method, as we'll call it, leads to more overcounting of damages because of reversals that happened after 30 days, or undercounting of damages because Mr. Olsen is giving credit for overdrafts that, you know, he shouldn't be giving credit for, if we could tie each overdraft to each reversal?
>
> A.  Either way, there would be a speculation on that, and . . . I'm not prepared to speculate on that now.

Cox Depo. at 25:15-26:2.  Because Plaintiffs' alternative, "30-day" method of accounting for reversals is conservative, and more likely to understate damages than overstate them, it is admissible.  *See In re Linerboard Antitrust Litigation*, 497 F. Supp. 2d 666, 675 (E.D. Pa. 2007) (rejecting defendant's argument that plaintiffs' damages expert's testimony should be excluded because he made improper assumption where such assumption was conservative and, if anything, caused him to undervalue damages); *U.S. ex rel. Tyson v. Amerigroup Illinois, Inc*., 488 F. Supp. 2d 719, 733-34 (N.D. Ill. 2007) (rejecting *Daubert* challenge to damage expert testimony based on allegedly improper deductions in methodology where deductions were made to provide a "more conservative damages estimate" and favored the challenging party).

Remarkably, in his companion report, Mr. McGoveran states that:  "At Dr. Cox's direction and approval, Mr. Olsen's 30-day reversal and write-off methodology was adopted for reversals and write-offs."  McGoveran Report, at 23.  Consistent with Dr. Cox's direction to his co-expert to use the method he now criticizes, at his deposition, when asked whether he had "a better idea how to account for reversals and write-offs," Dr. Cox had none.  *See* Cox Depo. at 20:20-23 ("I haven't had time to think about how I would do it.").  If Dr. Cox, with the full resources of Wells Fargo behind him, is unable to come up with "a better idea how to account for reversals and write-offs" (*id*.), the only alternative is *not to account for them at all*.  Mr. Olsen has also provided these calculations.  *See* Olsen Report, at 22-25 (showing, for each scenario, "Damages before reversals and after uncollectibles").

**V.     WELLS FARGO'S CALCULATION OF RETURNED ITEM RATES IS
UNRELIABLE AND INADMISSIBLE**

Wells Fargo argues that Mr. Olsen failed to account for "any increases in costs
borne by customers under [Plaintiffs' alternative] scenarios," taking into account the daily
"overdraft tolerance" limit for each account.  Motion, at 14-16.  Specifically, Wells Fargo argues
that "plaintiffs' scenarios include no adjustment for increased costs customers would incur as a
result of an increased incidence of checks being returned unpaid ('bounced') by the bank."  *Id.* at
14.  *See also id.* at 20-22.  The only support for this argument is Wells Fargo's contention that its
"experts . . . confirmed that, using Olsen's re-sequencing scenarios (with no adjustments), a
significant number of checks would in fact have been returned unpaid."  Motion, at 15.  In fact,
they did no such thing.

**A.     Wells Fargo's Experts Have No Idea Whether Mr. Olsen's Scenarios Would
Result In a Greater or Lesser Number of Items Being Returned Unpaid**

Summing up this portion of his report, Dr. Cox states that:  "[f]inally, I also asked
staff at Wells Fargo to determine the proportion and total number of transactions that would have
been returned by the Bank under Mr. Olsen's Re-Sequencing scenarios for the ten day sample.
The results of this analysis are provided in Exhibit 2.4a."  Cox Report, at 32.  At his deposition,
Dr. Cox admitted that the resulting numbers were essentially meaningless, because he performed
no "net" calculations:

> Q.  So now, there's another side to this equation.  There's the
> transactions that actually were returned by Wells Fargo that they
> didn't pay, but that, under Mr. Olsen's scenario, would have been
> paid.  Did you account for those?
>
> A.  I'm not sure that I understand the premise. . . .
>
> Q.  Well, let's say his first scenario reorders everything low to high.
> The bank ran those transactions high to low.  Some of them were
> rejected as overdrafts.  But if you reorder them from low to high
> and use the first dollars in the account to pay what would have been
> the last debit under Wells Fargo's scenario, which would have
> bounced, because we're dealing with overdrafts, isn't it true that
> there are debits that were not paid by Wells Fargo but that under
> Mr. Olsen's let's say Scenario No. 1 would have been paid by Wells
> Fargo?

A.  I guess there are some circumstances in which that might have happened, yes.

Q.  And did you come to a net calculation showing not only the transactions that would have been returned by Wells Fargo under Mr. Olsen's scenarios, but also the transactions that were returned by . . . Wells Fargo that would not have been returned by Wells Fargo under Mr. Olsen's scenarios?

A.  . . . I don't have any reason to believe that if a net calculation is appropriate, that it was done.

Q.  Okay.  So sitting here, you really have no idea, do you, whether Mr. Olsen's scenarios would result in a greater or lesser number of items returned unpaid by Wells Fargo, do you?

THE WITNESS:  Could you read it back one more time? [Question read.]  I don't have an answer to that question, that's correct.

Cox Depo. at 118:24-123:16.  Because Dr. Cox has "no idea . . . whether Mr. Olsen's scenarios would result in a greater or lesser number of items returned unpaid by Wells Fargo" (*id*.),[5] this purported issue does nothing to undermine the integrity of Mr Olsen's damages analysis.

**B.     Wells Fargo's Experts Have No Memory Or Record Of The Criteria Used To Select The Ten Days Of Transactional Data They Analyzed Out Of The 1,435 Day Class Period**

At his deposition, Dr. Cox, the expert who supposedly developed and will vouch at trial for the development and implementation of Wells Fargo's sampling strategy,[6] neither produced, nor was able to recall the criteria used to select the sample.  Indeed, he testified that as far as he knew, *no record of how the sample was selected even exists*:

Q.  What are the cutoff numbers that you used to separate Strata 1, 2, and 3 and then the remaining 69 days?  How did you numerically determine what falls into what bucket?

---

[5] "Q.  Did you make any effort to determine on some sort of aggregate basis the impact of this issue?  A.  Well, we did look, for instance, at the 500 accounts, or the checks that we drew from 500 accounts, and did find instances amongst them where this would have happened.  Q.  You found instances, but did you make any effort to quantify somehow the overall impact on the class?  A.  Not myself, no, though one could.  Q.  Did anyone do it that you're aware of?  A.  No. We did not."  Cox Depo. at 62:20-63:6.

[6] *See* McGoveran Depo. at 61:17-62:7 ("Q. In terms of the question of whether a selection of 10 days out of a 4-year class period could provide you with a statistically valid sample which would -- from which confidence intervals, et cetera, could be calculated, did you rely entirely on Dr. Cox . . . for that portion of the work?  A. Yes, that's right.  Q. So he's the one who came up with the sampling approach.  A. He's the one who specified the method, and, to the best of my knowledge, the 10 days, and – in discussion with the team.").

1     A.  What -- we didn't have -- I don't recall what the exact cutoff is.
      I do remember looking at the data and seeing the overdraft activity
2     on different types of days and developing the strata on the basis of
      that information. . . . .
3
      Q.  Where in all of your exhibits and your report is there a table or
4     some numerical information that shows the days, you know, the
      dates, some characteristic associated with the date that you used to
5     classify in strata 1, 2, or 3, and then that classification?  Where in
      your papers is that?
6
      A.  It's not in here.
7
      Q.  Where is it?
8
      A.  Well, I don't have it any more.  I don't think I ever actually did
9     have it.  I saw it at Wells Fargo, but I didn't –

10    Q.  So Wells Fargo did it, not Navigant – I mean, not NERA?

11                              * * *

12    A.  Well, I developed a criteria based on what I saw in the data.

13    Q.  What are the criteria?

14    A.  Well, I can't -- I testified already that I can't remember what
      they were.
15
      Q.  You can't remember it, so they must be written down
16    somewhere.  Where are they?

17    THE WITNESS:  I don't know where they are.

18    Cox Depo. at 40:25-42:21.

19            Although Dr. Cox is being put forward to vouch for the statistical validity of

20    numerous calculations contained in his report based on a 10-day sample—including all of Wells

21    Fargo's purported exemplars of additional returned items—he has no knowledge or record of how

22    the 10-days out of 1,435 were selected.  As Wells Fargo's expert cannot vouch for the

23    calculations upon which Wells Fargo's argument is based, his work does nothing to undermine

24    the integrity of Mr. Olsen's calculations.

25    C.      **Dr. Cox's "Examples" Are Based On Overdraft Tolerance Data Wells Fargo
              Refused to Provide to Plaintiffs**
26

27            Not only did Dr. Cox fail to determine whether any of Plaintiffs' scenarios would,

28    in fact, result in a greater or lesser number of items returned unpaid, every one of Dr. Cox's

1    purported examples are based on overdraft tolerance limit data that Well's Fargo *refused* to

2    provide to Plaintiffs.  Specifically, on June 25, 2009, Plaintiffs requested "data on the overdraft

3    tolerance limits for the class members," and on July 1, 2009, counsel for Wells Fargo responded

4    that "the bank is inclined to agree to this request and produce overdraft tolerance data generated

5    within the defined class period."  Himmelstein Decl., Ex. D, at 1-2 (letter from David Jolley).[7]

6    However, instead of providing Plaintiffs with the requested "overdraft tolerance data," on August

7    14, 2009, Wells Fargo produced to Plaintiffs a six-page narrative document describing various

8    formulas used by Wells Fargo to calculate each account holder's daily ovcrdraft tolerance limit.

9    *See* Himmelstein Decl., Ex. H (email from David Jolley); First Declaration of Barry R.

10   Himmelstein in Support of Plaintiffs' Motion to Exclude Testimony of Wells Fargo's Damages

11   Experts, ("First Himmelstein Decl"), Ex. A.[8]

12            At his deposition, Mr. McGoveran[9] testified that while Wells Fargo provided

13   Plaintiffs with only an inscrutable document that could not be used to calculate daily overdraft

14   tolerances, he requested and was provided with the actual numerical overdraft limits:

15            Q.    You were able to calculate for each account for each day an
                    actual numerical overdraft limit.  Is that correct?
16
17            A. I did not do that, no.

18            Q. Who did it?

19            A.  The risk department. . . . [W]e made a request for the overdraft
                  limit data pertaining to these 10 days, and a set of flat files were
20                delivered to us.

21            Q. And did those files contain for each account and each posting
                  day an actual, you know, dollar limit?
22
              A.  Yes.  Yes.
23
                                          * * *
24

25   [7] The Himmelstein Declaration and exhibits were previously filed as Dkt No. __ in support of
     Plaintiffs' *Daubert* motion.

26   [8] This declaration was previously filed as Dkt. No. __

27   [9] *See* Cox Depo. at 111:22-112:3 ("Q. So you were given a data set that had for each account and
     each day a dollar – specific dollar value overdraft tolerance?  A.  I wasn't given that.  I asked Mr.
     McGoveran and his team to do this calculation, and they had I think overdraft tolerance
28   information for the days that we're talking about in this report.").

1

2

Q.  Were there any other materials that you were given . . . that pertained to overdraft tolerance as you've used that phrase in your report?

3

4

A.  At one time, there was a document that I saw that sort of went through how Wells Fargo computed overdraft tolerance.  But I didn't use that.

5

Q.  Why not?

6

7

A.  First of all, it's -- *it depends on a lot of detail with which neither I nor the team are familiar.  And I don't think that given the time frame, that we would have been able to reproduce that.*

8

\* \* \*

9

10

MR. HIMMELSTEIN:  Q.  Referring you to what's been marked as McGoveran Exhibit 6, is this the document that you were referring to earlier that you were shown that had the general description of the formulas?

11

12

A.  I believe it is, yes.

13   McGoveran Depo. at 79:21-81:7 (emphasis added).  The document that Mr. McGoveran testified

14   was insufficient to enable "the team"—which included numerous Wells Fargo IT employees and

15   the full IT resources of one of the country's largest banks—to calculate daily overdraft limits, is

16   exactly the same document Wells Fargo provided to Plaintiffs.  *See* First Himmelstein Decl., Ex.

17   A (McGoveran Depo. Exh. 6, filed under seal);[10] Himmelstein Decl., Ex. H ("Attached is a

18   document concerning the calculation of Wells Fargo's overdraft tolerance limits during the class

19   period.  The document is Bates-labeled WFB-G 41032-41037.").

20            As all of Dr. Cox's purported "Examples of Wells Fargo's Customers Made Worse

21   Off Under Mr. Olsen's Re-Sequencing Scenarios" (Cox Report, at 30) are based on overdraft

22   tolerance data that Wells Fargo provided to its experts but declined to provide to Plaintiffs, all

23   such testimony should be excluded.  *See, e.g., U.S. v. 68.94 Acres of Land,*, 918 F.2d  389, 396-

24   397 (3d Cir. 1990); *City of Owensboro v. Kentucky Utilities Co.*, 2008 WL 4542674, *2-3 (W.D.

25   Ky. Oct. 8, 2008); *Olson v. Montana Rail Link, Inc.*, 227 F.R.D. 550, 551-553 (D. Mont. 2005).

26

27

---

28

[10] Wells Fargo has designated this document "HIGHLY CONFIDENTIAL – FOR ATTORNEYS' EYES ONLY," pursuant to the protective order entered in this case.

VI.   **PLAINTIFFS MAY SEEK INJUNCTIVE RELIEF ON THEIR MISREPRESENTATION-BASED CLAIMS**

Wells Fargo is correct that Plaintiffs have not, in Mr. Olsen's latest report, attempted to quantify classwide damages on their misrepresentation-based claims.  However, Plaintiffs may still seek injunctive relief based on these claims.  Accordingly, summary judgment is inappropriate.

VII.   **CONCLUSION**

For the foregoing reasons, Wells Fargo's motion should be denied.

Respectfully submitted,

Dated: March 4, 2010                    LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP


By:_____/s/ *Barry R. Himmelstein*_____
                    Barry R. Himmelstein

Richard M. Heimann (State Bar No. 063607)
Barry R. Himmelstein (State Bar No. 157736)
Michael W. Sobol (State Bar No. 194857)
Jordan Elias (State Bar No. 228731)
Mikaela Bernstein (State Bar No. 261301)
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Richard D. McCune (State Bar No. 132124)
Jae (Eddie) K. Kim (State Bar No. 236805)
McCUNE & WRIGHT, LLP
2068 Orange Tree Lane, Suite 216
Redlands, CA  92374
Telephone:  (909) 557-1250
Facsimile:  (909) 557-1275

*Attorneys for Plaintiffs and the Class*