1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

VERONICA GUTIERREZ, ERIN
WALKER, and WILLIAM SMITH, as
individuals and on behalf of all others
similarly situated,

        Plaintiffs,

  v.

WELLS FARGO & COMPANY,
WELLS FARGO BANK, N.A., and
DOES 1 through 125,

        Defendants.
_____/

No. C 07-05923 WHA

**CLASS ACTION**

**ORDER ON MOTION FOR
SUMMARY JUDGMENT AND/OR
CLASS DECERTIFICATION**

**INTRODUCTION**

      In this certified consumer class action involving allegedly unlawful overdraft practices by

one of the nation's largest banking institutions, defendant Wells Fargo Bank, N.A., moves for

summary judgment and/or decertification of the remaining "re-sequencing" class.  Echoing a

similar flurry of motions filed ten months prior, defendant concentrates its fire on the

methodology underlying plaintiffs' revised damages study, claiming that the damages model

doesn't "fit" the legal claims, individual issues pertaining to actual harm and damages

predominate, and that the class is simply not ascertainable.  Defendant also seeks clarification on

whether any class-wide claims based upon misrepresentation remain in this action, and if so,

move for summary judgment on those claims as well.

For the reasons set forth below, defendant's motion to exclude plaintiffs' revised damages study is **GRANTED IN PART** and **DENIED IN PART**.  Defendant's motion for summary judgment and/or class certification, however, is **DENIED**.

**STATEMENT**

Plaintiffs commenced this litigation on November 21, 2007, alleging that defendants Wells Fargo & Company and Wells Fargo Bank, N.A. improperly assessed overdraft charges on their customers' debit card transactions.  Six claims were alleged in the complaint: (1) violation of the Customer Legal Remedies Act, Cal. Civ. Code § 1750; (2) violation of the Unfair Business Practices Act, Cal. Bus. & Prof. Code. § 17200; (3) violation of the Unfair Business Practices Act, Cal. Bus. & Prof. Code § 17500; (4) fraud; (5) negligent misrepresentation; and (6) conversion.

These claims pertained to two separate practices allegedly employed by defendants:  (1) the publication, in the "online banking" section of the Wells Fargo Bank website, of inaccurate available-balance information to their customers, and (2) the re-sequencing of debit card transactions from highest to lowest value — rather than in the order in which purchases were completed — prior to being posted against a customer's account.  Plaintiffs alleged that the former practice was employed to increase the likelihood that customers would incur overdraft charges, while the latter was employed to maximize the number of overdraft charges defendants could assess against their customers.  Defendants, of course, denied these allegations.  A few months into the dispute, defendant Wells Fargo & Company was voluntarily dismissed from the action, leaving only Wells Fargo Bank — hereinafter simply "Wells Fargo" — holding the check.

On September 11, 2008, two classes were certified:  the "including and deleting" class, represented by plaintiffs William Smith and Erin Walker, and the "re-sequencing" class, represented by plaintiff Veronica Gutierrez (Dkt. No. 98):

> The "including and deleting" class was defined as "all Wells Fargo California customers with consumer checking accounts from November 15, 2004 to June 30, 2008, who incurred overdraft fees on debit card transactions after dissemination by Wells Fargo of available-balance information that once reflected and later deleted a debit card transaction"

2

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                  \*            \*            \*

> The "re-sequencing" class was defined as "all Wells Fargo customers from November 15, 2004 to June 30, 2008, who incurred overdraft fees on debit card transactions as a result of the bank's practice of sequencing transactions from highest to lowest."

With respect to the "re-sequencing" class, the certification order stated — relying upon representations made by plaintiffs' finance and economics expert Lewis Mandell — that "[g]iven the bank's large wealth of computerized account information, this order is confident and so finds that software will be designable to extract the vital elements needed to assess damages and causation" (*ibid.*). The undersigned expressed similar confidence that Wells Fargo's computerized records could "be mined efficiently [by plaintiffs] to ascertain which customers were victimized by the challenged practice" (*ibid.*).

Foreshadowing the instant motion, following the close of discovery, in February and March 2009, defendant Wells Fargo moved for summary judgment against plaintiffs' individual and class-wide claims, while simultaneously seeking class decertification. As part of their assault, defendant focused its attention on plaintiffs' proffered damages study, which sought to extrapolate 43 months of class-wide damages — amounting to hundreds of millions of dollars — based upon an analysis of *a single month* of transaction data for Wells Fargo customers in California.

In three separate orders filed on May 5, 2009, the Court granted in part and denied in part defendant's motions for summary judgment and class decertification (Dkt. Nos. 245–47). Plaintiffs' claims for conversation and violation of the Customer Legal Remedies Act did not survive defendant's assault (Dkt. No. 246 at 13–15). Summary judgment as to remaining class-wide claims, however, was denied (*id.* at 6–13, 15–16; Dkt. No. 247 at 11). As part of these holdings, the "including and deleting" class — due to the emergence of "hopelessly individualized question[s]" surrounding proof of reliance — was decertified in its entirety (Dkt. No. 245). The same order also found plaintiffs' damages study underlying the class-wide claims to be woefully inadequate, as plaintiffs had not demonstrated "extraordinary circumstances" to "justif[y] the use of an aggregate class-wide method of proving fluid-recovery damages" rather than "calculat[ing] damages on a member-by-member basis" (*ibid.*).

1    Despite these failures, the order declined to decertify the "re-sequencing" class.  Instead,

2  the undersigned proposed the following two alternatives to counsel (*ibid.*):

3          *Alternative One*: Proceed to trial and if the [re-sequencing] class
           prevails on liability, invite class members to submit individual
4          claims, allowing trials as necessary as to disputed claims, but as to
           injury and as to amount.

5
           *Alternative Two*: Postpone the trial and allow plaintiffs' counsel to
6          mine the bank data for all of the damage analysis practicable,
           submit new reports, and entertain a new round of motions in
7          limine.  Were this allowed, counsel would be well advised to
           address all of the bank's myriad other objections to the study, at
8          least as an alternative branch of analysis.  This order addresses
           only the main flaws and, those being sufficient, finds it
9          unnecessary to reach the other attacks.

10    Plaintiffs favored the second alternative, while defendant voiced strong opposition to both

11  approaches.  After considering the viewpoints of both sides and the interests of absent class

12  members, the undersigned, at a hearing held on May 13, 2009, ordered that the trial be postponed

13  and a new damages study — covering transaction data over the full class period — be conducted.

14  At the close of the hearing, the following colloquy ensued between defense counsel and the Court

15  (Dkt. No. 263 at 20):

16          **Ms. Winner:** . . . [O]bviously, you know, we would want an
           opportunity to file a motion to challenge whatever they come up
17          with, because I still think there are going to be important
           substantive issues that [the Court] has not so far been required to
18          rule on.

19          But we will have to see what — no, I mean not liability issues.
           I'm talking about issues with whatever they come up with.
20
           **The Court:** Well, I guess I have to say "okay" to that, as long as
21          it's really a true methodology defect.  It goes to the weight of it,
           but it's a *Daubert* disqualifying methodology.
22
           **Ms. Winner**: We understand the distinction, your honor.
23
                         *              *              *
24
25    True to counsel's word, on February 18, 2010, defendant filed the instant motion for

26  summary judgment and class decertification (Dkt. No. 292).  Defendant's arguments, as in their

27  motions filed almost a year ago, target the methodology of plaintiff's "new and improved"

28  damages study prepared by Computer Expert Arthur Olsen.  Specifically, defendant argues that
   the new report fails in three respects:  (1) it fails to make each class member ascertainable, (2) it

4

United States District Court

For the Northern District of California

1  fails to provide adequate proof of injury due to lack of "fit" between the methodology used and

2  the legal claims, and (3) it fails to present an adequate common method of calculating damages

3  (Br. 16).  As such, defendant concludes that class certification cannot be maintained, and —

4  assuming the damages study is found inadmissible under *Daubert* — summary judgment on all

5  remaining class-wide claims is warranted.

## ANALYSIS

7        Summary judgment is granted when "the pleadings, the discovery and disclosure materials

8  on file, and any affidavits show that there is no genuine issue as to any material fact and that the

9  movant is entitled to judgment as a matter of law."  FRCP 56.  A district court must determine,

10  viewing the evidence in a light most favorable to the nonmoving party, whether there is any

11  genuine issue of material fact.  *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 872 (9th

12  Cir. 2007).  A genuine issue of fact is one that could reasonably be resolved, based on the factual

13  record, in favor of either party.  A dispute is "material," however, only if it could affect the

14  outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

15  248–49 (1986).

16        This, however, is not a typical summary judgment motion.  With the exception of a few

17  arguments directed at class-wide misrepresentation claims, the instant motion is premised solely

18  upon the admissibility of plaintiffs' new damages study, which is the *only* evidence plaintiffs

19  have put forth to ascertain class members and prove certain essential elements of the "re-

20  sequencing" class claims.  In other words, defendant's motion is a *Daubert* motion that —

21  depending on its merits — may dictate whether summary judgment is appropriate.  *See Nissan*

22  *Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000) (a party moving for

23  summary judgment who does not have the ultimate burden of persuasion at trial may meet its

24  initial burden by showing that the non-moving party does not have enough evidence of an

25  essential element to carry its ultimate burden of persuasion at trial).

26        **1.    DETAILS OF PLAINTIFF'S REVISED DAMAGES STUDY**

27        Expert Arthur Olsen — who performed data calculations for plaintiffs' first damages

28  study — was asked to perform calculations covering all Wells Fargo consumer customers in

5

California for the time period of November 15, 2004, to June 30, 2008 (Dkt. No. 285, Exh. A at

8).  His assignment was to use the data provided by Wells Fargo to perform three tasks (*ibid*.):

### 1.    Identify Harmed Customers

Identify each customers that would have been assessed fewer overdraft fees if Wells Fargo had used one of three alternative sequencing orders in posting the group that contained debit and check card, ACH, and check transactions, specifically excluding customers who were not harmed because of reversals, uncollectibles, or because they opted-out of the class.

### 2.    Determine Amount of Harm

For those customers who were harmed, calculate the amount of additional overdraft fees resulting from Wells Fargo's posting order compared to the alternative sequencing posting orders after reducing for reversals and uncollectibles.

### 3.    Calculate Summary Data

Extract summary calculations from the database, including calculations of the aggregate number of harmed customers and the aggregate amount of harm under the alternative sequence posting orders.  Perform summary overdraft related calculations on the entire group of customers, as well as on those customers who overdrafted their accounts.

To put plaintiffs' revised damages study (and defendant's *Daubert* challenges) in context,

a brief description of Wells Fargo's allegedly unlawful re-sequencing practice is provided.

### A.    Wells Fargo's Accused "Re-Sequencing" Practice

An "overdraft" occurs when a transaction is posted to a bank account in which there are

insufficient funds to cover the transaction.  If the bank determines that an overdraft has occurred,

it must first decide whether or not to pay the item or return it for insufficient funds.  If the bank

decides to pay the overdraft transaction, an overdraft fee is typically assessed.  If the item is

rejected, then a separate penalty called a non-sufficient funds (NSF) fee is imposed.  Overdraft

fees are charged *every time* a transaction is posted that results in an overdraft.  In other words,

even if an account balance is already negative, an additional transaction — if paid and not

returned by the bank — is assessed an overdraft fee.  A customer may link a separate account,

such as a savings account, to provide for overdraft protection when the customer's main checking

account does not have sufficient funds to settle the transaction.  Additionally, Wells Fargo may

reverse an overdraft fee in certain circumstances.

United States District Court

For the Northern District of California

The time order in which these charges are posted can make a *significant* difference in the number of overdraft fees a bank can assess. Targeted by this litigation is Wells Fargo's practice of re-sequencing debit charges that post in a single day from largest to smallest so as to deplete an account as fast as possible (and thus impose as many overdraft fees as possible). Plaintiff Veronica Gutierrez's own bank transactions illustrate this effect clearly. Gutierrez made seven debit card purchases from October 5 to October 7. On October 5, she made four purchases for $3.23, $11.27, $17.23, and $47.99 respectively. On October 6, she made two purchases for $8.10 and $26.51 respectively. On October 7, she made a purchase for $74.39. These transactions were all initially authorized by the merchants, but — as is common with debit card purchases — the merchants did not present the charges to Wells Fargo for settlement (*i.e.*, payment) until October 10. On the day of settlement, a forgotten check that Gutierrez had written for $65.00 was presented to Wells Fargo. Before any of these transactions were posted on October 10, Gutierrez had $230.13 in her account. Wells Fargo — using the re-sequencing practice challenged by plaintiffs — ordered all of the transactions (including the written check) from highest to lowest dollar amount and posted them to the account in that order. The running balance appeared as follows:

| Date of Transaction | Transaction Amount | Running Balance |
|---------------------|--------------------|-----------------|
| October 7           | -$74.39            | $155.74         |
| Check               | -$65.00            | $90.74          |
| October 5           | -$47.99            | $42.75          |
| October 6           | -$26.51            | $16.24          |
| October 5           | -$17.23            | -$0.99          |
| October 5           | -$11.27            | -$12.26         |
| October 6           | -$8.10             | -$20.36         |
| October 5           | -$3.23             | -$23.59         |

As seen above, by ordering the transactions from largest to smallest, Wells Fargo was able to assess *four* separate overdraft fees — each fee being $34 — on Gutierrez (Compl. ¶ 16). By contrast, were the debit card transactions posted to Gutierrez's account in the order in which she

7

made her purchases (which is information that Wells Fargo ordinarily has), the account balance would have been depleted as follows:

| Date of Transaction | Transaction Amount | Running Balance |
| --- | --- | --- |
| Check | -$65.00 | $165.13 |
| October 5 | -$47.99 | $117.14 |
| October 5 | -$17.23 | $99.91 |
| October 5 | -$11.27 | $88.64 |
| October 5 | -$3.23 | $85.41 |
| October 6 | -$26.51 | $58.90 |
| October 6 | -$8.10 | $50.80 |
| October 7 | -$74.39 | -$23.59 |

As shown, instead of four separate overdraft fees, only *one* overdraft fee would be assessed.  This would be true even if the $65.00 check was posted after, rather than before, the debit card transactions.[1]

**B.      Methodology of Plaintiffs' Damages Study**

To conduct his revised damages study, Olsen was provided access to Wells Fargo files that contained, for every California customer transaction occurring between November 1, 2004 and July 31, 2008, the date posted, order posted, transaction amount, transaction code (identifying the type of transaction), authorization date and time (for most, but not all, debit and check card transactions), and both ledger and collected balance after the posting of each transaction (Dkt. No. 275, Exh. A at 8–9).  Olsen was also provided with Wells Fargo documents identifying "posting groups," since Wells Fargo — based upon Olsen's analysis of the data — apparently posted transactions in the following three-step process: (1) Wells Fargo grouped certain types of transactions together into posting groups; (2) Wells Fargo then determined the sequence that

---

[1] Data for debit card transactions generally contain an "authorization date" *in addition to* a "posting date."  When a purchase is made using a debit card, the merchant first obtains authorization from the bank.  The actual settlement of the transaction — when the merchant collects his payment — may occur days later.  The "authorization date" can be used to determine the order in which the account holder made his or her purchases.  For other types of transactions, however, Wells Fargo only allegedly stores a "posting date."  Check payments are an example of such transactions.

United States District Court

For the Northern District of California

transactions would post *within* each posting group; and (3) Wells Fargo then determined the posting order of the groups themselves.

Olsen was told to limit his analysis of "harm" to the re-sequencing of a particular posting group — "Group 50040" (*ibid.*). Based on the information he was provided, Olsen ascertained that Group 50040 contained all debit and check card transactions, ACH transactions (a banking term that means "automated clearing house," which is the system behind direct deposit, some bank transfers, and some online bill payments), and check transactions. This is supposedly the very posting group targeted by Wells Fargo's accused high-to-low re-sequencing practice. According to documentation provided to Olsen, Group 50040 was always posted *after* the posting of overdraft fees from the previous day, deposits/credits, and cash debits (*ibid*). Olsen's model supposedly reflected all of these observations.

Plaintiffs' counsel instructed Olsen to identify harmed customers and calculate damage figures under three alternative scenarios (*id.* at 9–10):

> **Sequencing Order #1**
> Sequence all the transactions in group 50040 from low to high.
>
> **Sequencing Order #2**
> Group the debit and check card transactions before the check and ACH transactions[,] and then sequence the debit card[] transactions in chronological order where I had the date and time of the transaction; and where I did not, sequence those debit card transactions from low to high.
>
> **Sequencing Order #3**
> Group the debit and check card transactions before the check and ACH transactions, and then sequence the debit card transactions in chronological order where I had the date and time of the transaction; and where I did not, sequence those debit card transactions from high to low.

The last two sequencing orders assumed that Wells Fargo could continue to post check and ACH transactions in high to low order, as they currently do.

> i.      *Identifying Harmed Customers*

For each of these alternative scenarios, Olsen was instructed to compare — on a customer-by-customer basis — the amount of overdraft fees *actually* assessed by Wells Fargo with the fees that would have been *hypothetically* assessed using the alternative posting sequence. If there was a difference, that customer was preliminarily identified by Olsen's computer algorithm as

"harmed."[2]  The difference between the fee amounts was deemed the "gross harm" to the

customer (*id.* at 14).

### ii.      Accounting for Overdraft Fee Reversals

During the class period, Wells Fargo "reversed" overdraft fees for many of its customers.

In other words, after initially assessing an overdraft fee, Wells Fargo would *sometimes* refund the

fee to the customer.  For these reversals, the data provided to Olsen by Wells Fargo contained (1)

the posting date of the fee reversal and (2) the reversal amount.  What the data did *not* contain,

however, is *which* specific overdraft fee had been waived/reversed.  Since Olsen's damage study

was limited to overdraft fees incurred due to Group 50040 transactions *only*, it was possible that

certain fee reversals were made to offset overdraft transactions from *other* posting groups.  In

other words, the data did not clearly show whether a particular reversal should be used to offset a

customer's "gross harm."

Given this ambiguity, Olsen was instructed by plaintiffs' counsel to account for overdraft

fee reversals in two alternative manners (*ibid.*):

> **Alternative Reversal Scenario #1** [LIFO Method]
> I was to assume that each reversal fee is tied to the last overdraft
> fee that occurred before the reversal.  Only those reversals that
> were tied to overdraft fees included in the harm analysis would
> reduce the amount of harm.
>
> **Alternative Reversal Scenario #2**
> I was to assume that all reversals in the 30 days after the harm
> occurred should offset the harm.

For both approaches, "if the reversals equaled or exceeded the [customer's] harm[,] that

customer was excluded as a harmed customer" (*ibid.*).  Otherwise, the harm for that customer was

simply reduced by the amount of reversals calculated under each scenario.

### iii.      Accounting for Uncollectibles

In situations where a Wells Fargo customer's account was closed due to a negative

balance, and the negative balance was "written off" by Wells Fargo, Olsen was instructed by

plaintiffs' counsel to assume that the negative balance amount was "uncollectible."  In other

---

[2]  The term "preliminarily" is used because Olsen would further determine whether
the customer had "opted-out" of the class, or whether fee reversals or uncollectibles
(discussed next) negated any "harm" caused by the accused re-sequencing practice.

United States District Court

For the Northern District of California

1    words, the customer never paid it, and therefore, was never "harmed" by those overdraft charges.

2    If the uncollectible amount equaled or exceeded the customer's harm, that customer was excluded

3    as a harmed customer.  Otherwise, the harm for that customer was simply reduced by the

4    uncollectible amount.

5            2.       **DEFENDANT'S *DAUBERT* CHALLENGE**

6            At the hearing held on May 13, 2009, defendant was expressly permitted to bring this

7    motion to challenge plaintiffs' new damages study, so long as it was directed at "a true

8    methodology defect" under *Daubert* (Dkt. No. 263 at 20).  As explained above, while defendant's

9    motion is couched as a summary judgment motion, the heart of the motion hinges upon whether

10   Olsen's report is admissible as evidence.

11           It is the trial court's responsibility to ensure "that an expert's testimony both rests on a

12   reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharm., Inc.*,

13   509 U.S. 579, 597 (1993).  In making this determination, the judge must make "a preliminary

14   assessment of whether the reasoning or methodology underlying the testimony is . . . valid" and

15   "whether that reasoning or methodology properly can be applied to the facts in issue."  *Id.* at

16   592-93.  It must emphasized, however, that "the test under *Daubert* is not the correctness of the

17   expert's conclusions but the soundness of his methodology."  *Primiano v. Cook*, --- F.3d ----,

18   2010 WL 788906, at *4 (9th Cir. 2010); Fed. R. Evid. 702.  Thus, a court should focus on

19   whether "(1) the [expert] testimony is based upon sufficient facts or data, (2) the testimony is the

20   product of reliable principles and methods, and (3) the witness has applied the principles and

21   methods reliably to the facts of the case."  FRE 702.  When an expert meets this threshold, "the

22   expert may testify and the [fact-finder] decides how much weight to give that testimony."  *Ibid.*

23           Wells Fargo puts forth a three-pronged attack on why the methodology of Olsen's new

24   report fails to apply "reliably to the facts of the case," and therefore cannot be used to prove class-

25   wide injury and damages (Br. 2–3):

26           1.       The three sequencing scenarios used by Olsen to identify "harmed" customers and

27                    measure damages fail to "fit" the class-wide claims of the "re-sequencing" class;

28

**United States District Court**
For the Northern District of California

2.      The two methods used by Olsen to account for fee reversals fail to prove "actual harm" suffered by individual Wells Fargo customers; and

3.      Olsen's report fails to account for increased "bounced check" costs that Wells Fargo customers would have incurred under the three sequencing scenarios used.

Each of Wells Fargo's arguments is addressed in turn.

**A.     "Fit" Between Alternative Sequences & Legal Claims**

The legal claims brought by the "re-sequencing" class were directed at defendant's allegedly improper re-ordering of checks, ACH, and debit and check card transactions from largest to smallest dollar amount prior to posting against a customer's bank account (*see* Compl. ¶¶ 16, 30–31). In determining "harm," the key question is what the posting sequence *should have been* had Wells Fargo not re-sequenced the transactions as alleged. Based upon the complaint, it is clear that plaintiffs expected that debit card (or check card) purchases would be posted to their accounts in the chronological order in which they were made (*see ibid.*).

Wells Fargo argues that "Sequencing Order #1" in the Olsen report, which orders transactions in posting group 50040 from smallest to largest dollar amount (*i.e.*, the *reverse* of the challenged practice), is untethered from *any* of the legal claims brought by the "re-sequencing" class (Br. 7, 9, 17). In other words, this ordering doesn't even attempt to "chronologically" order the transactions in dispute. As such, damage calculations for this scenario should be excluded, at least for proof of causation, actual injury, and damages.

This order agrees. Even plaintiffs readily admit that the ordering of transactions from low-to-high has nothing to do with chronological posting (Opp. 3–4). Instead, plaintiffs argue that damages under "Sequencing Order #1" provide proper evidence for restitution, because it supposedly reflects the *status quo ante — i.e.*, how Wells Fargo posted transactions prior to switching to the accused high-to-low method (Opp. 4). Plaintiffs, however, cited to no evidence in their opposition brief to support their assertion that "Sequencing Order #1" was actually defendant's prior practice! At the hearing on this motion, plaintiffs were ordered to bring and present evidence supporting their assertion that the low-to-high sequencing underlying "Sequencing Order #1" represented Wells Fargo's prior practice. Wells Fargo was given an

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  opportunity to respond to the evidence presented by plaintiffs through supplemental briefing.

2  Having considered the submissions from both sides, this order finds that plaintiffs have *not*

3  provided a sufficient evidentiary basis for their assertion that "Sequencing Order #1" provides a

4  proper measure of restitution.  Specifically, Wells Fargo has shown — using plaintiffs' own

5  evidence — that it did *not* post debit-card transactions, checks, and ACH transactions from low-

6  to-high.  Rather, Wells Fargo's prior practice involved the following two steps: (1) Wells Fargo

7  grouped debit-card transactions and cash withdrawals together, and posted those from low-to-

8  high, and (2) Wells Fargo grouped checks and ACH transactions together before posting them

9  from low-to-high.  This is *not* the same approach modeled by "Sequencing Order #1."  As such,

10  having no discernable (and, hence, reliable) relation to the facts or theories in this case, this

11  sequencing approach is inadmissible under *Daubert* as a damages theory.[3]

12      The second and third sequencing alternatives, however, *are* grounded upon the premise

13  that debit-card transactions should have been posted chronologically.  On these alternatives,

14  Wells Fargo argues that both sequences fail to produce a genuine (or close to genuine)

15  chronological posting order of the disputed transactions (Br. 8–9).  Plaintiffs fire back by

16  explaining that ambiguities in the data provided by Wells Fargo make it *impossible* to order the

17  transactions in perfect chronological order — a reality that even defendant admits (Opp. 4–5; Br.

18  8).  In other words, both sides readily admit that the data lacks sufficient information to sequence

19  the transactions in *perfect* chronological order.  Rather, the battle is over how far from

20  "perfection" plaintiffs' damages study may stray and still be admissible under *Daubert*.

21      As a preliminary matter, this order notes that unlike plaintiffs' prior damages study,

22  Olsen's new report is *not* premised on theories of fluid recovery and aggregate damages (Dkt. No.

23  245).  Rather, the object of the methodology employed by Olsen was to identify individual

24  customers of Wells Fargo in California who were actually harmed by the accused re-sequencing

25  practice, and measure the harm on a customer-by-customer basis (Dkt. No. 285, Exh. A at 8).

26  The data provided by Wells Fargo, however, did *not* allow customer transactions to be sequenced

27

28      [3]  Since, however, the case will now proceed as a bench trial, the Court will allow the
scenario into evidence, not as a measure of damages *per se*, but as a way of demonstrating
the impact that re-sequencing transactions can have on the bank's bottom line.

13

in perfect chronological order.  Both sides admit this.  This is because at least 20% of debit card

(and check card) transactions either lacked authorization time-stamps or could not be matched

with 100% certainty to a corresponding authorization (Br. 7–8; Opp. 4–5).[4]  For these

transactions, Olsen was instructed to order them from smallest to largest amount prior to posting

(Sequencing Order #2), or order them from largest to smallest amount (Sequencing Order #3).

In its brief, Wells Fargo attacks the reliability of these assumptions by craftily illustrating

alleged deficiencies of plaintiffs' second and third sequencing alternatives.  For example,

defendant sets forth the hypothetical transactions below (Br. 8):

| No. | Transaction Type | Transaction Day/Time | Amount | Day of Settlement |
|-----|------------------|----------------------|--------|-------------------|
| 1 | Debit card purchase | Monday at 9:05 a.m. | $55.00 | Thursday |
| 2 | Debit card purchase | Monday at 1:45 p.m. | $32.00 | Wednesday |
| 3 | Debit card purchase | Monday at 6:30 p.m. | $80.00 | Thursday |
| 4 | Debit card purchase | Tuesday at 10:22 a.m. | $73.00 | Wednesday |
| 5 | Debit card purchase | Tuesday at 3:12 p.m. | $15.00 | Thursday |
| 6 | Debit card purchase | Tuesday at 4:35 p.m.* | $8.00 | Wednesday |

*\* not submitted to the bank for authorization*

Under the second and third sequencing alternatives, Wells Fargo argues that the above

transactions would have been posted in the following order:  6, 2, 4, 1, 3, and 5.  Plaintiffs do not

dispute this.  Since this is not a chronological posting order (*e.g.*, the transactions were not posted

in the order 1, 2, 3, 4, 5, and 6), defendant concludes that plaintiffs' damages model is unreliably

flawed.  In making this argument, however, Wells Fargo completely ignores the fact that the

above transactions are settled over *two different* days.  By contrast, the legal claims of the "re-

sequencing" class are directed at chronological posting of transactions settled *on the same day*

---

[4]  The latter ambiguity can be explained by the following.  One might expect that an authorization request for a debit card purchase would be given a unique identifying number, such as "Authorization #12345," when stored in Wells Fargo's database.  Then, when the purchase was presented to the bank for settlement by the merchant, the bank would know it pertained to "Authorization #12345," and match the two together.  Not so.  Olsen apparently had to match particular authorizations with settlements based upon transaction amount and other similarities, rather than a unique identification number.  Because of this, it might not be possible to accurately match a settlement request with an earlier purchase authorization for a customer who routinely bought the same cup of coffee every morning with his debit card.

14

United States District Court

For the Northern District of California

(Opp. 5).  When the above hypothetical is examined in this light, it is clear that when Wedesnday and Thursday are examined independently, the posting order is "chronological."[5]  As such, this argument is a non-starter, and is certainly not sufficient to warrant exclusion under *Daubert*.

Defendant separately attacks plaintiffs' choice to post checks and ACH transactions *after* posting all debit card transactions settled in a given day (Br. 9–12).  Here, Wells Fargo's argument is that "[s]imple logic and common experience confirm that checks typically take a longer period to clear" than debit-card transactions (*id*. at 11).  In other words, defendant asserts that plaintiffs' sequencing alternatives should have posted checks *before* posting debit card transactions, because it is more likely that they were *written* by the customer prior to any of the debit card purchases.  According the Wells Fargo's damages expert, Dr. Alan Cox, who performed an analysis of a *very* small subset of customer transactions, posting checks before the debit-card transactions would have resulted in a 60% or more *decrease* in the aggregate amount of plaintiffs' calculated "damages" (Cox Decl. ¶¶ 13–16).[6]  Additionally, the number of "harmed" Wells Fargo customers would have decreased significantly.  In rebuttal, plaintiffs respond simply by stating that their methodology properly focuses on what Wells Fargo *knew* at the time it posted these various transactions — namely, that debit-card transactions typically have timestamp information, while checks do not.  As such, there is nothing inherently unreliable about choosing to post debit card transactions before checks and ACH transactions.

On this particular issue, defendants' argument is compelling.  That said, the posting of checks and ACH transactions after debit-card transactions does *not* — without more — render the study so unreliable as to warrant exclusion as a damages theory.  In other words, plaintiffs' decision to post checks *after* debit-card transactions is not one that falls "outside the range where experts might reasonably differ."  *See Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999) (quoting *Daubert*, 509 U.S. at 596).  Where experts may reasonably differ as to the proper

---

[5]  For example, transactions settled on Thursday posted in *perfect* chronological order (1, 3, and 5).  As for Wednesday, since transaction six had no "timestamp," plaintiffs' damages model assumed that it would post first.  Taking this into account, the remaining transactions, 2 and 4, both posted chronologically, as intended.

[6]  In a companion order, plaintiffs' motion to exclude the testimony of Wells Fargo's damages experts was denied without prejudice to being raised again at trial.

United States District Court

For the Northern District of California

1    calculation of damages or harm, "[v]igorous cross-examination" and "presentation of contrary

2    evidence" are the "traditional and appropriate means" of attacking their opinions. *Daubert*, 509

3    U.S. at 596.

4          Given that both sides concede that the data does not allow for "perfect" chronological

5    ordering, this order finds that the methodology underlying plaintiffs second and third sequencing

6    alternatives meets the reliability threshold set forth in FRE 702 and *Daubert*.  As such, damages

7    based upon these two sequencing alternatives will *not* be excluded on the grounds raised by

8    defendant.[7]

9          **B.    Overdraft Fee Reversals**

10         Wells Fargo's next assault focuses on plaintiffs' two alternative methods of accounting for

11   overdraft fee reversals:  (1) the last-in-first-out (LIFO) method, and (2) the 30-day  approach.  As

12   described earlier, Wells Fargo — at its discretion — occasionally reverses (*i.e.*, waives) overdraft

13   fees imposed on its customers.  When these reversals are granted, however, they are simply

14   posted to the customer's account, and are not linked in any clearly ascertainable way (at least,

15   from a database standpoint) to the particular overdraft fees they are intended to reverse.

16         To illustrate this ambiguity (as well as to frame defendant's arguments), assume a Wells

17   Fargo customer is charged four overdraft fees on Monday.  Assume also that three of these

18   overdraft fees are treated as "harm" under plaintiffs' damages study.  Assuming no intervening

19   deposits are made, if additional transactions are then posted against the customer's account on

20   Tuesday and Wednesday, the customer would be assessed additional overdraft fees on those two

21   days as well.  The overdraft fees incurred on Tuesday and Wednesday, however, would *not* be

22   counted as "harm" under plaintiffs' damages model.  This is because on those days, the account

23   balance was already negative.  In other words, whether transactions were posted chronologically

24   or from largest to smallest, the overdraft fees assessed on Tuesday and Wednesday would be

25   identical.  Assume finally that the customer went to her local Wells Fargo branch on Thursday to

26

27

28         [7]  As noted at the end of this order, however, the Court is ordering plaintiffs to
     supplement their damages study to model the "harm" that would result if checks and ACH
     transactions were posted *before* the debit-card transactions.

1    complain about the Monday overdraft fees, and the bank agreed to reverse two of the fees

2    assessed on Monday.

3         Under plaintiffs' LIFO method for crediting overdraft fee reversals, the two Friday fee

4    reversals would be credited against the Tuesday and Wednesday overdraft fees, and *not* the

5    Monday fees.  There would be no offset, therefore, against any of the "harm" attributed to the

6    Monday overdraft fees, despite the supposed fact that the fee reversals were directed at them.

7    Wells Fargo finds analogous (but admittedly less severe) fault with the 30-day approach, noting

8    that while it *does* credit a larger proportion of reversals against calculated "harm" than the LIFO

9    method, it nevertheless fails to accurately and reliably apply fee reversals to overdraft fees on a

10   customer-by-customer basis (Br. 12–14).  To support both of its arguments, defendant points to

11   situations where overdraft fees were assessed and then reversed for named plaintiff Walker, but

12   neither of plaintiffs' methods credited the reversal against plaintiff Walker's "harm."  As such,

13   Wells Fargo argues that neither method for handling fee reversals is reliable under *Daubert.*

14        While Wells Fargo is correct that neither methodology is perfect, the rules of evidence do

15   not demand perfection.  Rather, a court need only determine whether the reasoning and methods

16   underlying the expert testimony are reliable, and whether they have been properly applied to the

17   facts.  *See Daubert*, 509 U.S. at 592-93; FRE 702.  Here, even Wells Fargo's own damages

18   expert, Dr. Cox, freely admits that "[fee] reversals are not tied to particular transactions" (Cox

19   Dep. at 13–15).  Given this reality, Wells Fargo cannot cry "foul" when plaintiffs' damages study

20   fails to account for the subjective intent behind each and every fee reversal granted by their

21   banks.  Stated differently, plaintiffs cannot be expected to determine, with 100% accuracy, the

22   exact overdraft charge associated with a particular fee reversal when defendant's *own data system*

23   did not capture and store this information.  Indeed, even if the claims were brought individually

24   rather than on a class-wide basis, the same ambiguities in transaction data would be present for

25   each individual customer.  In sum, defendant *cannot* object to a damage study that is as close to

26   the best possible using its own data, especially if class-wide methods of proof would be no less

27   imprecise than individual methods of proof.  *See, e.g., Bigelow v. RKO Radio Pictures*, 327 U.S.

28   251 (1946).

1    In light of this analysis, this order declines to exclude either method used by plaintiffs to

2    account for overdraft fee reversals.  Given the data available for their damages study, both

3    methods — to varying degrees — employ reasonable inferences necessitated by the facts and

4    circumstances of this case.  Neither defendant nor its expert, Dr. Cox, knew of or presented any

5    better alternatives to account for reversals, either individually or on a class-wide basis (Opp. 8).

6    Moreover, Wells Fargo gave no indication of the magnitude of "inflated" damages produced by

7    either method.  Under *Daubert*, plaintiffs have met the threshold of reliability.

8        **C.**    **Increased "Bounced Check" Costs to Customers**

9        Wells Fargo's final attack on plaintiffs' damages report targets the supposed failure by

10   Olsen to consider whether any of the alternative sequencing methods would have imposed greater

11   costs on customers due to a supposed increase in the number of bounced checks.  This argument

12   is based upon the premise that since checks are posted *after* debit card transactions in plaintiffs'

13   damages study, and debit card transactions *must* be honored if they have been previously

14   authorized, Wells Fargo would have returned a higher amount of unpaid checks under plaintiffs'

15   alternative sequencing scenarios (Br. 14–16).  In other words, individual customers would face

16   increased "bounced check" fees from third-party merchants.

17       This order rejects defendant's argument that plaintiffs' failure to consider all possible

18   third-party costs associated with "returned check" fees renders their damages methodology

19   unreliable under *Daubert*.  These incidental costs are simply too tangential to the measurable

20   harms stemming directly from defendant's allegedly unlawful re-sequencing practice to be fatal to

21   the admissibility of Olsen's report.  If defendant's wish to attack plaintiffs' study on this alleged

22   deficiency, "[v]igorous cross-examination" and "presentation of contrary evidence" shall be their

23   tools at trial.  *Daubert*, 509 U.S. at 596.

24       **D.**    **Qualifications of Expert Olsen**

25       While not a central argument in its motion, Wells Fargo points out, both in its opening

26   brief and reply, that Olsen is a *computer* expert, not a damages expert (Br. 1–2; Reply 3).  Neither

27   side disputes this.  Indeed, it is clear — based upon the description of Olsen's assignment — that

28   he was *not* asked to employ any qualifications beyond those required to "mine" Wells Fargo's

**United States District Court**
For the Northern District of California

18

database and quantify the "harm" suffered by individual customers under various clearly-defined scenarios.  Given this non-discretionary assignment, this order will *not* exclude plaintiffs' damages study on qualification grounds directed at Expert Olsen.  He did exactly what he was asked to do, and was clearly qualified to perform those tasks.

*          *          *

For the reasons set forth above, defendant's motion to exclude plaintiffs' damages study with respect to the "low-to-high" ordering of transaction**s** must be **GRANTED**.  While it remains admissible to illustrate the impact that transaction re-sequencing can have on fee revenue, it is inadmissable as a damages theory.  Defendant's motion to exclude the remaining portions of plaintiffs' damages study — specifically, calculations and conclusions associated with the second and third sequencing approaches and the two methods used to account for overdraft reversal fees — is **DENIED.**

### 3.   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

While defendant's reply brief harps repeatedly on plaintiffs' "failure to set forth specific facts showing a genuine issue for trial," this argument presupposes that Wells Fargo has met *its* burden on summary judgment (*see, e.g.*, Reply at 1, 15).  Indeed, this it has not done.  As explained above, plaintiffs' revised damages study will be admissible to prove the essential elements of class-wide claims, including actual injury of each class member.  Given this determination, Wells Fargo has not met its *initial* burden of showing a lack of triable issues to warrant summary judgment.  *See Nissan Fire*, 210 F.3d at 1102.  As such, summary judgment as to the "unfair" Section 17200 class-wide claim must be **DENIED.**

To clarify a point of confusion raised by defendant, the prior orders issued on May 5, 2009, did *not* grant Wells Fargo's motion for summary judgment on class-wide claims based upon misrepresentation (*see* Dkt. No. 247 at 11).  In those orders, the undersigned stated that counsel would be allowed "to try to prove the class relied on misrepresentations in Wells Fargo's materials," despite granting summary judgment with respect to certain aspects of individual claims brought by the named plaintiffs (*ibid.*).  In other words, class-wide claims for fraud,

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   negligent misrepresentation, false advertising under Section 17500, and "fraud" claims under

2   Section 17200, survived defendant's summary judgment motions last year.

3          Finally, Wells Fargo correctly points out that Section 17200 is equitable in nature, and

4   therefore remedies are limited to restitution or injunctive relief. *See Korea Supply Co. v.*

5   *Lockheed Martin Corp.*, 29 Cal.4th 1134, 1152 (2003). This order disagrees, however, with

6   defendant's assertion that the revised study conducted by plaintiffs fails to present an adequate

7   measurement of restitution "supported by substantial evidence, without approximations," and that

8   summary judgment is warranted (Reply 23). As explained above, Olsen's report is aimed at

9   determining the amount of overdraft fees Wells Fargo allegedly unfairly assessed on individual

10  customers. The calculations were based upon *all* the data, and where approximations were made,

11  they were *necessitated* by insufficient detail in defendant's own record-keeping process. As such,

12  this order declines to find that Olsen's report is inadmissible to prove restitution.

13          **4.      DEFENDANT'S MOTION FOR CLASS DECERTIFICATION**

14          Counsel have been reminded on various occasions that the presence of individualized

15  issues is not fatal to class actions brought under Rule 23 (*see, e.g.*, Dkt. No. 245 at 9). Rather, the

16  rule tolerates *some* individualized issues, so long as "questions of law or fact common to the

17  members of the class predominate over any questions affecting only individual members." FRCP

18  23(b)(3). Rule 23 also requires a court to be ever cognizant of whether the class action device "is

19  superior to other available methods for the fair and efficient adjudication of the controversy."

20          The legal claims of the "re-sequencing" class target the alleged overcharging of overdraft

21  fees for over a million different Wells Fargo customers (Dkt. No. 285, Exh. A at 37–38). All

22  members of the "re-sequencing" class were charged overdraft fees due to defendant's accused

23  high-to-low posting of transactions. The fees themselves, however, were only around $34 each.

24  Given this backdrop, it cannot be disputed that a denial of class-certification would close the door

25  of justice to a staggering amount of claimants. The deterrent value of class litigation and the

26  desirability of providing recourse for the injured consumer who would otherwise be financially

27  incapable of bringing suit clearly render the class action a viable and important mechanism in

28  challenging an alleged fraud on the public. This is *especially* important here, where the allegedly

United States District Court

For the Northern District of California

1    unlawful practice disproportionately gouges those who maintain, due to choice or (more likely)

2    financial hardship, a shallow amount of funds in their checking accounts.

3            On the other hand, this order must give full consideration to whether plaintiffs' revised

4    damages study is sufficient to establish class-wide proof of actual injury and/or damages for each

5    absent class member.  Otherwise, Rule 23 would be used to truncate the required substantive

6    elements of proof by each claimant in violation of the Rules Enabling Act, 28 U.S.C. 2071-77.

7    Having considered the various limitations inherent in Wells Fargo's transaction data (discussed in

8    detail by this order), and the fact that proving actual injury if suits were brought individually

9    would *still* require the same types of assumptions made by Olsen in his report, this order finds

10   that plaintiffs have presented sufficient class-wide proof of actual injury to survive defendant's

11   motion for decertification.  Given this showing, there is no question that common questions

12   predominate in this action.  As such, defendant's motion for class decertification is **DENIED**.

13           **5.      FURTHER DAMAGES ANALYSIS**

14           An additional damages analysis where checks and ACH transactions are processed

15   *before* debit-card transactions would greatly assist the fact-finder in the upcoming bench trial.

16   Counsel is hereby **ORDERED** to complete this additional analysis promptly enough to allow Wells

17   Fargo a fair opportunity to review the analysis and respond prior to trial.  Plaintiffs may also,

18   without prejudice to further objections by defendant, attempt to correct the damages analysis for

19   "Sequencing Order #1" if it can be completed in time to give Wells Fargo a fair opportunity to

20   review the analysis and respond prior to trial.

21                                        **CONCLUSION**

22           For the reasons set forth above, defendant's motion to exclude plaintiffs' revised damages

23   study under FRE 702 and *Daubert* is **GRANTED IN PART** and **DENIED IN PART**.  Defendant's

24   motion for summary judgment and class decertification, however, is **DENIED**.

25

26           **IT IS SO ORDERED.**

27

28   Dated:  March 26, 2010.
                                        _____
                                        WILLIAM ALSUP
                                        UNITED STATES DISTRICT JUDGE