1  Richard M. Heimann (State Bar No. 063607)
   *E-mail: rheimann@lchb.com*
2  Michael W. Sobol (State Bar No. 194857)
   *E-mail: msobol@lchb.com*
3  Barry R. Himmelstein (State Bar No. 157736)
   *E-mail: bhimmelstein@lchb.com*
4  Jordan Elias (State Bar No. 228731)
   *E-mail: jelias@lchb.com*
5  Mikaela Bernstein (State Bar No. 261301)
   *E-mail: mbernstein@lchb.com*
6  LIEFF, CABRASER, HEIMANN &
   BERNSTEIN, LLP
7  275 Battery Street, 29th Floor
   San Francisco, CA  94111-3339
8  Telephone:  (415) 956-1000
   Facsimile:  (415) 956-1008
9
   Richard D. McCune (State Bar No. 132124)
10 *E-mail: rdm@mwtriallawyers.com*
   Jae (Eddie) K. Kim (State Bar No. 236805)
11 *E-mail: jkk@mwtriallawyers.com*
   McCUNE & WRIGHT, LLP
12 2068 Orange Tree Lane, Suite 216
   Redlands, CA  92374
13 Telephone:  (909) 557-1250
   Facsimile:  (909) 557-1275
14
   *Attorneys for Plaintiffs and the Class*
15

16              UNITED STATES DISTRICT COURT

17            NORTHERN DISTRICT OF CALIFORNIA

18

19 VERONICA GUTIERREZ, ERIN          | Case No. C 07-05923-WHA (JCSx)
   WALKER, and WILLIAM SMITH, as     |
20 individuals and on behalf of all others | **DECLARATION OF RICHARD D.**
   similarly situated,               | **MCCUNE IN SUPPORT OF PLAINTIFFS'**
21                                    | **MOTION IN LIMINE NO. 1**
              Plaintiffs,            |
22                                    | The Honorable William H. Alsup
   v.                                | Trial Date:  April 26, 2010
23                                    |
   WELLS FARGO & CO.; WELLS FARGO    |
24 BANK, N.A.; and DOES 1 through 125, |
                                      |
25            Defendants.            |

26

27

28

1    I, Richard D. McCune, hereby declare and state:

2           1.      I am an attorney licensed to practice law before all of the courts of the State of

3    California and I am a partner of McCune & Wright, LLP, counsel of record for Plaintiffs.  The

4    following facts are within my personal knowledge or based on records and files at my law firm,

5    and, if called upon as a witness, I could and would testify competently thereto.  I make this

6    declaration in support of Plaintiffs' Motion in Limine No. 1.

7           2.      Attached hereto as **Exhibit A** is a true and correct copy of excerpts from the FDIC

8    Study of Bank Overdraft Programs, dated November 2008.

9           3.      Attached hereto as **Exhibit B** is a true and correct copy of the Expert Report of

10   Christopher James, dated February 20, 2009.

11          4.      Attached hereto as **Exhibit C** is a true and correct copy of the Expert Report of

12   Paul Carrubba, dated March 6, 2009.

13          5.      Attached hereto as **Exhibit D** is a true and correct copy of excerpts from the

14   Expert Report of Alan J. Cox, Ph.D., dated January 27, 2010.

15          6.      Attached hereto as **Exhibit E** is a true and correct copy of experts from the

16   transcript of the deposition in this case of Kenneth A. Zimmerman, dated November 10, 2008.

17

18          I declare under penalty of perjury that the foregoing is true and correct.  Executed at

19   Redlands, California, this 29th day of March, 2010.

20

21                                      */s/ Richard D. McCune*
                                        Richard D. McCune

22

23

24

25

26

27

28

DECLARATION  OF RICHARD D. MCCUNE ISO PLS'
MOTION IN LIMINE NO. 1
CASE NO. C 07-05923 WHA (JCSX)

# EXHIBIT A

# FDIC Study of Bank Overdraft Programs

Federal Deposit
Insurance Corporation

**FDIC**

November 2008

### III.3. Transaction Processing Practices

Surveyed institutions were asked how transactions were processed, including the method used to batch-process transactions and the order in which transactions were processed if transaction types were ranked before payment.

In batch processing, multiple transactions are bundled into one unit and processed together at some point in the day. All institutions do some level of batch processing, regardless of other primary processing methods used.[11] The general batch-processing methods are by check number, by presentation order, by size largest-to-smallest, and by size smallest-to-largest. The order in which transactions are processed can affect overdraft activity, since paying large transactions first could increase the number of overdrafts.[12]

While 47.2 percent of institutions batch processed transactions by size smallest-to-largest, a sizable share (24.7 percent) batch processed largest-to-smallest (see Table III-9). In particular, more than one-half (53.7 percent) of the large banks in the study batch processed transactions starting with the largest, compared with about a quarter (25.8 percent) of medium banks and a fifth (20.7 percent) of small banks.

Among study population institutions with an automated program, the largest share (34.5 percent) batch processed transactions largest-to-smallest, while 30.2 percent processed them smallest-to-largest. A sizable share (27.1 percent) processed by check number. In comparison, the majority (58.6 percent) of institutions that did not operate an automated program batch processed transactions smallest-to-largest.

Institutions also process transactions based on type. The different types of transactions processed include ACH, in-house ATM, cash, POS/debit, online payments, on-us checks, and other transactions. Among study population banks, 621 (53.0 percent) processed transactions primarily by type. Of

Table III-9

| Batch-Processing Methods | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Number of Study Population Banks[a]**<br>**Percent of Column Total** | | By Asset Size | | | By Overdraft Programs Offered | | | By Type of Automated Program | |
| *For those items that are batch processed, which method best describes the order in which transactions were typically paid by your institution?* | **All** | **Less than $250 Million** | **$250 Million to Less than $1 Billion** | **Greater than $1 Billion** | **Has Automated** | **Linked and/or LOC Only** | **No Formal Program** | **Non-promoted** | **Promoted** |
| By check number | 213 | 134 | 59 | 19 | 128 | 79 | 5 | 12 | 116 |
|  | 18.2 | 15.8 | 28.0 | 17.6 | 27.1 | 14.8 | 3.3 | 12.2 | 31.1 |
| By order of presentation | 89 | 73 | 10 | 7 | 35 | 44 | 18 | 2 | 33 |
|  | 7.6 | 8.6 | 4.5 | 6.5 | 7.3 | 6.9 | 10.9 | 2.0 | 8.7 |
| By size, largest-to-smallest | 289 | 176 | 55 | 58 | 164 | 96 | 29 | 48 | 116 |
|  | 24.7 | 20.7 | 25.8 | 53.7 | 34.5 | 18.0 | 17.9 | 47.8 | 31.0 |
| By size, smallest-to-largest | 553 | 449 | 87 | 18 | 143 | 313 | 97 | 34 | 109 |
|  | 47.2 | 52.7 | 40.9 | 16.7 | 30.2 | 58.9 | 58.6 | 33.9 | 29.2 |
| Other | 27 | 19 | 2 | 6 | 4 | 7 | 15 | 4 | 0 |
|  | 2.3 | 2.3 | 0.8 | 5.6 | 0.8 | 1.4 | 9.3 | 4.0 | 0.0 |
| Total study population banks | 1,171 | 851 | 212 | 108 | 474 | 532 | 165 | 100 | 374 |
|  | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

[a] Figures do not always reconcile to totals due to the rounding of survey institutions weighted to represent the population.

[11]  For example, even if an institution always processes checks first, before other transactions, rules need to be established for how a group of checks that come in at the same time are processed.

[12]  For example, if a customer has an account with a $50 balance and a total of five items (one item at $100 and four items at $10) are presented against it, the customer will have five overdrawn items in a largest-to-smallest batch process and only one overdrawn item in a smallest-to-largest batch process.

GUT001107



# EXHIBIT B

**CONFIDENTIAL**

**Expert Report of Christopher M. James**

**February 20, 2009**

**Veronica Gutierrez et. al. v. Wells Fargo Bank, N.A.
ND CA Case No. C 07-05923 WHA**

## I.   QUALIFICATIONS

I am the William H. Dial/SunBank Eminent Scholar and Professor of Finance at the University of Florida. I am currently a scholar in residence at the Federal Reserve Bank of San Francisco. Prior to joining the faculty of the University of Florida, I taught at the University of Oregon and the University of Michigan. I have also held positions at the Office of the Comptroller of the Currency ("OCC"), Federal Reserve Board of Governors and the Federal Deposit Insurance Corporation. My academic research has been in the areas of financial institutions, corporate finance, and securities valuation. I have published numerous articles on issues concerning the safety and soundness of financial institutions and bank product pricing. While at the OCC, I was in charge of evaluating the economic consequences of regulation changes for bank safety and soundness. I currently serve on the editorial boards of four scholarly journals including the Journal of Financial Economics. I served as an associate editor of the Journal of Finance and as an editor of the Journal of Financial Intermediation from 1988 through 1999. I also served on the academic advisory board of the Turnaround Management Association from 1992 to 2002, on the Board of Directors of SunTrust Bank of Florida from 1989 through 2002, and on the Advisory Board of SunTrust Bank from 2002 through 2005. I have served as an expert witness in cases involving securities banking practices, bank product pricing, accountant liability, securities valuation offerings, and antitrust violations. A copy of my curriculum vitae is attached as Exhibit 1 and a list of my prior testimony is attached as Exhibit 2. I am being compensated for my time and services on an hourly basis. I am charging my regular hourly rate of $750.

## II.   ASSIGNMENT

I have been asked by counsel for Wells Fargo Bank, N.A. ("Wells Fargo") to opine on whether the changes demanded by plaintiffs in this matter would more than incidentally affect Wells Fargo's exercise of deposit-taking powers. A list of documents I have relied on in forming my opinions is included in Exhibit 3. In addition to these materials, I also conducted an interview with Mr. Kenneth A. Zimmerman, manager of the Consumer Deposits Group at Wells Fargo.

III.   **SUMMARY OF OPINIONS**

A.   The operational changes demanded by plaintiffs would more than incidentally affect Wells Fargo's exercise of deposit-taking powers.

B.   The disclosure changes demanded by plaintiffs (as an alternative to some of plaintiffs' operational change demands) could have a greater than incidental impact on Wells Fargo's exercise of deposit-taking powers.

C.   Wells Fargo's current sequencing order for posting transactions (including its practice of posting certain debit transactions from largest-to-smallest) is consistent with establishing and calculating overdraft fees in accordance with safe and sound banking principles.

IV.   **BACKGROUND AND CHANGES DEMANDED BY PLAINTIFFS**

Plaintiffs have challenged both the sequence by which Wells Fargo posts certain debits to its customers' checking accounts, and the way in which Wells Fargo calculates customers' available balances.  Plaintiffs claim that the current posting sequence used by Wells Fargo "impose[s] as many overdraft fees as possible" and the available balance calculation "mislead[s] customers into believing they have more to spend than is the case and thus...induce[s] overdraft penalties."[1]

Wells Fargo processes customer transactions in batch mode after the end of each business day.[2]  Wells Fargo's general practice is to post all credits to the account first, thus benefiting the customer regardless of when the credits occurred.[3]  Debits are typically processed after credits.  Certain debit transactions (including ATM transactions and cash transfers to other accounts) are given priority – these debits are grouped together, sorted from highest to lowest within the group, and then posted to the account.[4]  I understand that "[t]hen the remaining debit transactions, including all debit card transactions,

---

[1] Order Denying Defendant's Motion for Summary Judgment and Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification, 9/11/08, p. 4.
[2] Declaration of Kenneth A. Zimmerman, 7/9/08, ¶ 21.
[3] Declaration of Kenneth A. Zimmerman, 7/9/08, ¶ 25.
[4] Declaration of Kenneth A. Zimmerman, 7/9/08, ¶ 27.

personal checks, and ACH [Automated Clearing House] transactions, are combined and sorted together from highest to lowest and posted."[5]  Transactions are not necessarily posted to the account the same business day on which they occurred because, by federal regulation, Wells Fargo cannot post transactions to the account until it receives full settlement information.[6]

Customers' Wells Fargo available balance information can be obtained online, over the telephone, at a bank branch, or through an ATM.[7]  I understand that Wells Fargo calculates a customer's available balance as

> the amount that is available, according to the bank's records, to pay new transactions and is based on the most recent ledger balance, which is adjusted:  (a) upward for deposits and transfers into the account that have not yet posted [net of holds], and (b) downward for pending (not yet posted) debits to the account, including ATM withdrawals, electronic transfers made after the daily cut-off time, and most pending debit-card transactions for which the bank has not yet paid and settled the transaction.  The available balance does not reflect pending debits about which the bank is completely unaware…or pending transactions for which the Bank does not have a hold in place…[8]

I understand that the specific aspect of the available balance calculation challenged by plaintiffs is the way in which Wells Fargo uses memo holds.  For pending debits about which Wells Fargo is aware and that have not yet been posted to the account, Wells Fargo places a memo hold in the amount of the authorization request to subtract the pending debit from the account balance.[9]  The memo hold is in place for one business day for transactions less than $5 and PIN-based transactions, and at most three business days for signature-based debit transactions.[10]  For certain signature-based debit transactions,

---

[5] Declaration of Kenneth A. Zimmerman, 7/9/08, ¶ 27.
[6] Consistent with my understanding of industry practice, Mr. Zimmerman states, "The Bank usually receives the full settlement information needed to post a PIN-based debit-card transaction or an ATM transaction in time to post the transaction in its batch posting the same business day.  The Bank usually (but not always) receives the settlement information needed to post a signature-based transaction within one to three business days.  Checks, ACH transactions, and deposits – for which there is no prior authorization step – nearly always post the same business day that they are received by the Bank."  Declaration of Kenneth A. Zimmerman, 7/9/08, ¶ 22.
[7] Declaration of Kenneth A. Zimmerman, 7/9/08, ¶ 6.
[8] Declaration of Kenneth A. Zimmerman, 7/9/08, ¶ 5.
[9] Declaration of Kenneth A. Zimmerman, 7/9/08, ¶ 15.
[10] Wells Fargo Bank, N.A.'s Response to Plaintiff Erin Walker's Special Interrogatories (Set One) [Nos. 1-23], 5/8/08, pp. 22-3.

the maximum memo hold is less than three days. For example, for signature-based debit transactions submitted by hotels and other businesses "that regularly obtain authorizations for amounts in excess of the final transactions, the Bank only holds the funds for one business day."[11] Memo holds for signature-based debit purchases of gasoline are also in place for only one business day. For these purchases, the authorization is typically submitted before the final transaction price is known, and the authorization (and one-business day hold) is for $1.[12] A memo hold is released when the memo hold expires or when the complete settlement information is received by Wells Fargo, whichever occurs first.[13] The transaction is posted to the account when Wells Fargo receives the full settlement information, which may occur after the memo hold has expired. The Court has referred to this practice of including pending debits in the available balance calculation but removing those debits if full settlement information is not received before the expiration of the memo hold as "including and deleting."[14]

The Court has certified two classes: a "re-sequencing" class and an "including and deleting class."[15] I understand that plaintiffs are demanding two changes to Wells Fargo's operations. First, plaintiffs demand that Wells Fargo change the order by which certain debit items are posted to customers' accounts in California. Second, plaintiffs demand changes to the way memo holds are applied to customers' accounts, which would affect available balance calculations. I also understand that plaintiffs challenge the

---

[11] Wells Fargo Bank, N.A.'s Response to Plaintiff Erin Walker's Special Interrogatories (Set One) [Nos. 1-23], 5/8/08, p. 23.

[12] Wells Fargo Bank, N.A.'s Response to Plaintiff Erin Walker's Special Interrogatories (Set One) [Nos. 1-23], 5/8/08, p. 23. Other merchants also submit authorizations for less than the transaction amount. "For example, restaurants typically submit authorization requests only for the initial check amount, pre-gratuity." Declaration of Kenneth A. Zimmerman, 7/9/08, ¶ 11.

[13] Wells Fargo Bank, N.A.'s Response to Plaintiff Erin Walker's Special Interrogatories (Set One) [Nos. 1-23], 5/8/08, p. 23.

[14] Order Denying Defendant's Motion for Summary Judgment and Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification, 9/11/08, pp. 21, 25.

[15] The re-sequencing class consists "of all Wells Fargo California customers from November 15, 2004, to June 30, 2008, who incurred overdraft fees on debit card transactions as a result of the bank's practice of re-sequencing transactions from highest to lowest. The including and deleting class is "all Wells Fargo California customers with consumer checking accounts from November 15, 2004, to June 30, 2008, who incurred overdraft fees on debit card transactions after dissemination by Wells Fargo of available-balance information that once reflected and later deleted a debit card transaction." Order Denying Defendant's Motion for Summary Judgment and Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification, 9/11/08, p. 25.

adequacy of Wells Fargo's disclosures about both the order by which debit items are posted to customers' accounts and the available balance calculation.[16]

With respect to order of posting, my understanding is that plaintiffs propose posting debit card transactions in chronological order by "date (and time if available) of when the transaction took place, irrespective of whether the transaction is authorized by Wells Fargo or whether the amount of the transaction is different than the amount of an authorized transaction."[17]  I further understand that plaintiffs propose posting checks and ACH transactions last, after debit card transactions are posted.[18]  Plaintiffs also propose "[t]o the extent that Wells Fargo is unable to determine the order in which the debit card transactions occurred, debit card transactions should be processed before checks and ACH and ordered lowest to highest."[19]

What plaintiffs propose with respect to memo hold procedures is less clear.  My understanding is that plaintiffs propose calculating and making available to customers an alternative measure of available balance whereby memo holds placed on an account as a result of debit card transactions remain in place until either the transaction settles or 30 days have elapsed (whichever comes first), as opposed to dropping off after one to three days under current practices.[20]

---

[16] With respect to the disclosures about the available balance calculation, plaintiffs claim that "[i]f in the future, Wells Fargo were to disclose in a meaningful, clear, and understandable way that customers cannot rely on available balance because it is not accurate, and is in fact inflated, because transactions are first included then removed from available balance, and then disclosed in a meaningful, clear and understandable way the circumstances of when and under what circumstances items are first included then removed, then Plaintiffs do not contend that Wells Fargo is required to change its existing practice." Plaintiffs' Amended Responses to Special Interrogatories from Wells Fargo Bank, N.A. [Set Three] (Nos. 9-14), 12/24/08, p. 7.

[17] Plaintiffs' Amended Responses to Special Interrogatories from Wells Fargo Bank, N.A. [Set Three] (Nos. 9-14), 12/24/08, pp. 4, 5.

[18] Plaintiffs' Amended Responses to Special Interrogatories from Wells Fargo Bank, N.A. [Set Three] (Nos. 9-14), 12/24/08, p. 4.

[19] Plaintiffs' Amended Responses to Special Interrogatories from Wells Fargo Bank, N.A. [Set Three] (Nos. 9-14), 12/24/08, p. 4.

[20] Plaintiffs' Amended Responses to Special Interrogatories from Wells Fargo Bank, N.A. [Set Three] (Nos. 9-14), 12/24/08, p. 7.

## V.  OPERATIONAL CHANGES DEMANDED BY PLAINTIFFS WOULD HAVE A MORE THAN INCIDENTAL IMPACT ON WELLS FARGO'S EXERCISE OF ITS DEPOSIT-TAKING POWERS

The sequence of transaction posting is part of bank operations and basic to a bank's exercise of its deposit-taking powers.  Indeed, the OCC has advised that

> The process by which a bank honors overdraft items is typically part of the Bank's administration of a depositor's account.  Creating and recovering overdrafts have long been recognized as elements of the discretionary deposit account services that banks provide.[21]

Similarly, in my opinion the calculation of available balance is central to a bank's administration of a depositor's account and more than incidental to a bank's deposit-taking powers.

### A.  Re-Sequencing Claim

I understand that plaintiffs claim that California state law necessitates that Wells Fargo alter the order by which Wells Fargo posts debit items to customers' accounts in California.  Such a change would have a more than incidental impact on Wells Fargo's exercise of its deposit-taking powers.

The impacts that would arise from the changes demanded by the re-sequencing class include:

- a lengthy and costly implementation process (if the demanded changes are possible to implement at all) during which time errors in processing might arise;

- increased risk of returned checks, and the accompanying risk that merchants will be reluctant to accept Wells Fargo checks;

---

[21] OCC Interpretive Letter #1082, 5/17/07, p. 3.

- increased operating costs and negative impact on customer service (if there are different procedures in place in California versus other states); and

- interference with the bank's ability to manage its operating loss exposure.

## 1.   Lengthy and Costly Implementation Process

According to Mr. Zimmerman, changing the posting sequence so that, for example, debits are posted in chronological order, and debits without time stamps were posted in low to high order would require new systems that could take at least 10 to 12 months to develop, implement, test, and install.[22] Even this estimate of time to make the change may be optimistic. For example, Wells Fargo has implemented alternative posting sequences via pilot programs in New Mexico and Washington. These pilot programs represent smaller changes than what plaintiffs propose, but even after 2 to 3 years, Wells Fargo is still working to resolve the issues involved with implementing those pilot programs.[23] For example, a February 2008 presentation described a "code error" that was to be corrected during "Phase 2" of the Transaction Original Date ("TOD") pilot program in Washington and New Mexico.[24] Similar code errors might arise if Wells Fargo were to attempt to implement plaintiffs' proposed changes to the posting sequence.

## 2.   Increased Risk of Returned Checks

I understand that plaintiffs propose that checks and ACH transactions be posted to a customer's account after debit card transactions.[25] These transactions are returnable items, and thus the bank may return these items if the transactions exceed available funds and any linked overdraft protection funds.[26] Plaintiffs' proposed sequencing order means, on days that checks or ACH transactions post to a customer's account, the last debit item posted will always be a returnable item for which the bank may refuse

---

[22] Interview with Kenneth A. Zimmerman, 2/16/09.
[23] Interview with Kenneth A. Zimmerman, 2/16/09.
[24] Consumer Deposit Group Presentation, "Transaction Origination Date (TOD) Pilot – Confidential," February 2008, WFB-G 07883–905.
[25] Plaintiffs' Amended Responses to Special Interrogatories from Wells Fargo Bank, N.A. [Set Three] (Nos. 9-14), 12/24/08, p. 4.
[26] Declaration of Kenneth A. Zimmerman, 7/9/08, ¶ 30.

payment and return. The result may be a higher volume of returned checks, which may make merchants reluctant to accept Wells Fargo checks.

### 3.    Increased Costs and Potential Negative Impact on Customer Service

Support for a different sequencing order in California would be operationally complex, and may harm customer service and/or increase costs. For example, currently, as a way to keep servicing costs lower, phone calls placed to Wells Fargo's customer service go to a unified phone system that services the whole franchise.[27] If Wells Fargo is required to implement a sequencing procedure in California that is different from the sequencing procedure in other states, then employees and customer service representatives would have to be well-versed in the different systems to be able to accurately answer customer questions related to transaction sequencing.[28] A standard approach simplifies such a task (and makes a unified phone bank more feasible), thereby improving the bank's customer service and lowering its service costs.

In addition, sequencing changes could have a negative impact on some customers. There is no one sort order that is beneficial to all customers. For example, customers who write checks or authorize ACH debits for their most important purchases (mortgage payments, rent payments, or credit card payments) may be more likely to have those items returned unpaid if plaintiffs' proposed sequencing order (which posts checks and ACH transactions last) were implemented.

### 4.    Impact on Ability to Manage Risk

Wells Fargo manages its operating loss exposure via models that analyze its data.[29] For example, Wells Fargo uses a proprietary algorithm to determine electronically how far it will allow each account to be overdrawn.[30] If Wells Fargo were to implement a significant change in its posting sequence, as plaintiffs propose, then Wells Fargo lacks

---

[27] Interview with Kenneth A. Zimmerman, 2/16/09.
[28] Indeed, an internal Wells Fargo email noted that having more than one system that processed overdrafts in different ways created a "confusing situation," which may have made consistent and accurate communications with customers more difficult. Email from K. Zimmerman to C. Conkling, 10/16/00, WFB-G 08452–3 at WFB-G 08452.
[29] Interview with Kenneth A. Zimmerman, 2/16/09.
[30] Wells Fargo Bank, N.A.'s Response to Plaintiff Erin Walker's Special Interrogatories (Set One) [Nos. 1-23], 5/8/08, p. 42; Deposition of Kenneth A. Zimmerman, 11/10/08, pp. 88-9.

sufficient data to model expected outcomes depending on how it treats overdraft items under plaintiffs' proposed sequencing order.[31]  Such a change could negatively impact the bank's safety and soundness if its algorithms are too generous to customers who overdraft their account, or could negatively impact customer banking experiences if its algorithms are too stinting.

## B.      Including and Deleting Claim

To the extent that the claims of the including and deleting class affect the methodology used to calculate available balances, this methodology is integral to a bank's deposit-taking powers and altering the calculation of customers' available balances would more than incidentally affect Wells Fargo's exercise of these powers.  For example, if plaintiffs demand that Wells Fargo apply memo holds until the earlier of a transaction's settlement date or 30 days, then such a policy change would restrict funds availability for customers with authorized transactions that took longer than 3 business days to settle, with authorized transactions that never clear, and/or with authorized transactions for which the bank is unable to establish an accurate match at settlement between a memo hold and a settlement file.[32]  Because about 8 percent of authorized Visa debit card transactions never clear,[33] these transactions would (under plaintiffs' proposed policy) result in memo holds that lasted 30 days.  Customer service and customer satisfaction would be negatively affected by such a change.[34]

## VI.    DISCLOSURE CHANGES DEMANDED BY PLAINTIFFS COULD HAVE A MORE THAN INCIDENTAL IMPACT ON WELLS FARGO'S EXERCISE OF ITS DEPOSIT-TAKING POWERS

Plaintiffs have proposed that as an alternative to changing Wells Fargo's memo hold policy, that they would be satisfied:

---

[31] Interview with Kenneth A. Zimmerman, 2/16/09.
[32] The bank may not be able to match a memo hold to a settlement file if, for example, the final transaction amount does not match the hold amount.  Wells Fargo Bank, N.A.'s Response to Plaintiff Erin Walker's Special Interrogatories (Set One) [Nos. 1-23], 5/8/08, p. 23; see also Deposition of Stacey Pinkerd, 2/10/09, pp. 21-2, 39.
[33] Deposition of Stacey Pinkerd, 2/10/09, p. 37.
[34] Deposition of Stacey Pinkerd, 2/10/09, pp. 20-2, 37-9.

> [i]f in the future, Wells Fargo were to disclose in a meaningful, clear, and
> understandable way that customers cannot rely on available balance
> because it is not accurate, and is in fact inflated, because transactions are
> first included then removed from available balance, and then disclosed in a
> meaningful, clear and understandable way the circumstances of when and
> under what circumstances items are first included then removed...[35]

Plaintiffs have not described what constitutes "meaningful, clear and understandable"
disclosures on available balance and memo holds, given the possible scenarios.[36]  To the
extent that plaintiffs propose disclosures that are not practical or are too complex, it could
lead to a greater than incidental impact on the bank's practices at issue here.

I understand that plaintiffs have also indicated that they believe Wells Fargo's disclosures
with respect to posting order for debit card transactions are inadequate.  To the extent that
plaintiffs demand complex changes to disclosures about the posting order for debit card
transactions, or a sequencing order in California that is different from the sequencing
order in other states requires different disclosures for California accounts, then this could
also have a greater than incidental impact on Wells Fargo's deposit-taking powers.

## VII.   WELLS FARGO'S CURRENT PRACTICES ARE CONSISTENT WITH SAFE AND SOUND BANKING PRINCIPLES

The order of posting debits is an operational decision about how to maintain customer
satisfaction while balancing operating loss exposure.  It is also a decision about how to
price overdrafts and the method used to calculate overdraft fees.  Sequencing order can
affect the number of overdrafts a customer is charged for and therefore will affect the
volume of overdraft items.  As a result, the sequence of posting is a business decision on
fees and pricing and subject to Wells Fargo's discretion in accordance with safe and
sound banking principles.

---

[35] "Plaintiffs' Amended Responses to Special Interrogatories from Wells Fargo Bank, N.A. [Set Three] (Nos. 9-14), 12/24/08, p. 7.
[36] Even if it were possible to write disclosures that met plaintiffs' standards, doing so might have a negative impact on the bank's safety and soundness since such disclosures might provide too much insight into how Wells Fargo's available balance and memo hold procedures could be abused.

Title 12 of the Code of Federal Regulations § 7.4002 grants national banks the authority to "charge its customers non-interest charges and fees, including deposit account service charges."[37]. 12 C.F.R 7.4002 goes on to guide that

> [a] national bank establishes non-interest charges and fees in accordance with safe and sound banking principles if the bank employs a decision-making process through which it considers the following factors, among others: (i) The cost incurred by the bank in providing the service; (ii) The deterrence of misuse by customers of banking services; (iii) The enhancement of the competitive position of the bank in accordance with the bank's business plan and marketing strategy; and (iv) The maintenance of the safety and soundness of the institution.

Wells Fargo's current sequencing order for posting transactions is consistent with each of the four factors outlined by the OCC, which must all be balanced by Wells Fargo. I go into each of these factors in more detail below.

## A.   Cost Incurred by Wells Fargo

While overdraft fees do represent revenue for Wells Fargo, it is also true that overdrafts "result in significant operating loss exposure to Wells Fargo."[38] When Wells Fargo authorizes a transaction, it commits to paying that transaction.[39] Thus, if sufficient funds are not available in a customer's account at time of settlement, then the bank must cover the authorized expense and there is some possibility it will never be collected and the customer account will need to be charged off.[40] If the transaction was not authorized, then Wells Fargo can exercise its discretion in deciding whether to pay the debit item, or return it.[41] Wells Fargo's current practice of co-mingling debit card transactions with checks and ACH transactions (which are returnable items), for example, comes at a cost

---

[37] Moreover, the OCC has noted that "[a] bank's authorization to establish fees pursuant to 12 C.F.R. 7.4002(a) necessarily includes the authorization to decide how they are computed." OCC Interpretive Letter #916, 5/22/01, p. 3.
[38] Deposition of Kenneth A. Zimmerman, 11/10/08, p. 93.
[39] Declaration of Kenneth A. Zimmerman, 7/9/08, ¶ 9.
[40] Mr. Zimmerman testified that about 20 percent of assessed overdraft fees are not collected, but about half of these are not collected because the bank waives the overdraft fee. Deposition of Kenneth A. Zimmerman, 11/10/08, pp. 93-4.
[41] Declaration of Kenneth A. Zimmerman, 7/9/08, ¶ 30.

of increased operating risk exposure, but may contribute to Wells Fargo's competitive position.

This cost is likely reduced by the high-to-low sort applied to debit transactions. This is because when debit card transactions come in for settlement, it is more likely that a large transaction will have been authorized than a small transaction.[42]  Therefore, posting from high to low increases the likelihood authorized transactions are posted before non-authorized transactions and reduces the amount of potential charge-offs.

## B.     Deterrence of Misuse by Some Customers

Applying multiple overdraft fees in a day is likely to have a larger deterrent effect on misuse by some customers of banking services or any attempted gaming of their account. For example, one of the named plaintiffs, Erin Walker, overdrew her Wells Fargo account in March 2007, but did not notice it at the time.[43]  On June 5, 2007, she was charged eight overdraft fees,[44] and according to Ms. Walker, June 2007 was the first time she noticed she had overdrawn her account.[45]

Indeed, in an Interpretive Letter approving a Bank's decision to post checks in order of highest to lowest, the OCC noted that deterrence of customer misuse of banking services was a consideration in the posting order:

> The Bank also has considered the deterrent effect that a high-to-low order of posting likely will have on its customers. ...The Bank concludes that it needs to adopt the high-to-low order of posting so that customers who frequently write checks against insufficient funds do not do business with the Bank primarily because the Bank's fee for checks presented against insufficient funds is lower than its competitors'.[46]

---

[42] Interview with Kenneth A. Zimmerman, 2/16/09.  See also Declaration of Mark Lentz, 7/28/08, ¶ 25: "...a merchant that does not authorize transactions at all (sometimes typical of smaller businesses selling low-priced goods)."
[43] Ms. Walker testified that she only noticed she had overdrawn her account in March 2007 a few days before her deposition, as she was reviewing her bank statements.  Deposition of Erin Walker, 6/13/08, pp. 53-4.
[44] Order Denying Defendant's Motion for Summary Judgment and Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification, 9/11/08, p. 6.
[45] Deposition of Erin Walker, 6/13/08, pp. 52-3.
[46] OCC Interpretive Letter #916, 5/22/01, p. 4.

## C.    Enhancement of Competitive Position

I understand that the overdraft fees set by Wells Fargo are consistent with industry norms.  A 2007 survey by Wachovia of ten large banks among Wells Fargo's primary competitors (Citigroup, Bank of America, Chase, Wachovia, U.S. Bancorp, Sun Trust, National City, BB&T, Fifth Third, and Washington Mutual), found that nearly all posted transactions from high to low.[47]  Therefore, Wells Fargo's practice of posting debit items from high-to-low places it on even footing with its principal competitors.  In addition, this practice also supports the maintenance of the safety and soundness of Wells Fargo because Wells Fargo must avoid setting overdraft fees so low as to attract customers that are likely to misuse deposit accounts by incurring a significant number of overdraft items.[48]

For some customers, Wells Fargo's practice of posting debit items from high-to-low is likely a desirable feature that enhances its competitive position in comparison to any competitors that follow a different approach.  Research by Norwest before it merged with Wells Fargo, "supported a consumer preference for a high to low [sorting order], as it increased the likelihood that the more important transactions that a customer had—for example, their mortgage check—would be made and not returned."[49]

Another aspect of Wells Fargo's posting order that affects overdraft fees, its practice of posting deposits before debits,[50] is a consumer-friendly policy that enhances Wells Fargo's competitive position relative to banks that do not follow such a practice.[51]

---

[47] The exceptions were Citigroup, which posts checks in order of smallest to largest in Texas, and Washington Mutual, which has a "discretionary" posting order.  Table, 7/17/07, WFB-G 39001.

[48] "One of the considerations in where fees are set and how they are established is what the prices are in the marketplace for comparable activity.  And so one of the important considerations in establishing fees in this regard is ensuring that you don't have the lowest fees and the most generous practices with respect to overdrafts because it leads to an adverse selection process, whereby you become the bank that people who overdraft like to bank at.  And it changes the risk profile of the bank and exposes the shareholder to an untenable level of operating loss exposure if your practices are considerably more generous to customers."  Deposition of Kenneth A. Zimmerman, 11/10/08, p. 149.

[49] Deposition of Kenneth A. Zimmerman, 11/10/08, p. 32.  See also Deposition of Leslie S. Biller, 1/9/09, pp. 22-3, 39-41.

[50] Declaration of Kenneth A. Zimmerman, 7/9/08, ¶ 25.

[51] Other features that may enhance Wells Fargo's competitive position include its multiple overdraft protection options, its practice of not assessing overdraft fees "if the debit items that put the account into overdraft could have

Wells Fargo's funds availability policies, which "are in some respects more favorable to the customer than federal regulations require,"[52] also enhance its competitive position relative to competitors that do not follow similar practices. In addition, some customers likely find Wells Fargo's practice of limiting memo holds to one to three business days at most (depending on the type of transaction) to be a valuable funds availability feature. If Wells Fargo did not follow such a practice, then customers with authorized transactions that did not settle within three business days would not have access to those funds that had been authorized for the pending but not settled transaction until the hold was released.

**D.    Maintenance of Safety and Soundness of the Institution**

The safety and soundness of a banking institution is the overarching criteria by which regulatory agencies assess banking institutions and their operations. This broad criteria encompasses, but is not limited to, risk management, capital adequacy, and profitability.[53] As described above, the practice of posting high-to-low is likely to result in a lower level of charge-offs than certain alternative methods of posting. A smaller exposure to potential operational loss is consistent with safe and sound banking practices, as is deterring misuse of banking services by customers.

---

been paid by available funds if the Bank had not adjusted the available balance for pending debit transactions subject to memo holds," and its practice of not charging fees on fees. See "Wells Fargo Consumer Account Agreement," Effective 10/28/04, WFB-G 00391–454 at WFB-G 00418–9; and Declaration of Kenneth A. Zimmerman, 7/9/08, ¶ 33.

[52] Declaration of Kenneth A. Zimmerman, 7/9/08, n. 3; see ¶ 26 for a description of some of these funds availability policies.

[53] The Uniform Financial Institutions Rating System, which "assists Congress in following safety and soundness trends," evaluates financial institutions on the basis of capital adequacy, management, the quality and level of earnings, the adequacy of liquidity, and the sensitivity to market risk. The management component includes "[t]he capability of the board of directors and management, in their respective roles, to identify, measure, monitor, and control the risks of an institution's activities and to ensure a financial institution's safe, sound, and efficient operation in compliance with applicable laws and regulations." The earnings component includes "not only the quantity and trend of earnings, but also factors that may affect the sustainability or quality of earnings." FDIC, *DSC Risk Management Manual of Examination Policies*, http://www.fdic.gov/regulations/safety/manual/manual_examinations_full.pdf, accessed 2/18/09, pp. 1.1-2, 1.1-5, 1.1-6.

*Confidential*

I reserve the right to amend my report and opinions in response to additional materials or
testimony I review, reports or testimony by the plaintiffs' experts, legal decisions, additional
facts that may come to light, or testimony at the time of trial.

Executed:  February 20, 2009

Christopher M. James

# Exhibit 1

## VITA

**NAME:**  Christopher M. James

**CURRENT POSITION:**  William H. Dial/SunBank Eminent Scholar in Finance and Economics, University of Florida

Visiting Scholar for the San Francisco Federal Reserve Bank

**ADDRESS:**  Department of Finance, Insurance, and Real Estate, Graduate School of Business, University of Florida, PO Box 117168, Gainesville, FL 32611-7168

E-mail: christopher.james@cba.ufl.edu

**TELEPHONE:**
Office:  352-392-3486
Home:  352-336-2765

**EDUCATION:**
B.A.  Michigan State University, 1973
M.B.A.  University of Michigan (Finance), 1977
Ph.D.  University of Michigan (Economics: Industrial Organization, Finance), 1978

**RESEARCH/ TEACHING INTERESTS:**  Corporate Finance, Private Equity and Financial Institutions

**TEACHING/ RESEARCH EXPERIENCE:**  William H. Dial/SunBank Eminent Scholar in Finance and Economics, University of Florida, 1989-present

Visiting Professor, University of New South Wales, 1995

Consultant, FDIC, 1988-1991

U.S. Bank/ John B. Rogers Professor of Finance, University of Oregon, 1984-1989

Visiting Scholar, Federal Reserve Bank of San Francisco, 1987-1988

Visiting Professor of Finance, University of Michigan, 1986

Associate Professor of Finance, University of Oregon, 1982-1984

Assistant Professor of Finance, University of Oregon, 1978-80

Instructor, University of Michigan, 1978

Senior Economic Advisor, Comptroller of the Currency, Department of Treasury, 1980-1982

**PAPERS AND
PUBLICATIONS:**

"The Technology of Risk and Return," <u>American Economic Review</u>, June, 1981.

"Self-Selection and the Pricing of Bank Services, An Analysis of the Market for Bank Loan Commitments and the Role of Compensating Balance Requirements," <u>Journal of Financial and Quantitative Analysis</u>, December, 1981.

"An Analysis of Bank Loan Rate Indexation," <u>Journal of Finance</u>, June, 1982.

"An Analysis of the Impact of Deposit Rate Ceilings on the Market Values of Thrift Institutions," (with L.Y. Dann), <u>Journal of Finance</u>, December, 1982.

"Pricing Alternatives for Loan Commitments: A Note," <u>Journal of Bank Research</u>, Winter, 1983.

"An Analysis of Intra-Industry Differences in the Effect of Regulation: The Case of Deposit Rate Ceilings," <u>Journal of Monetary Economics</u>, August, 1983.

"Is Illiquidity a Bar to Buying Small Cap Stocks?" (with R.O. Edmister), <u>Journal of Portfolio Management</u>, Summer, 1983.

"The Relation Between Common Stocks Returns, Trading Activity and Market Value," (with R.O. Edmister), <u>Journal of Finance</u>, September, 1983.

"Regulation and the Determination of Bank Capital Changes: A Note," (with J.K. Dietrich), <u>Journal of Finance</u>, December, 1983.

"An Analysis of the Effect of State Acquisition Laws on Managerial Efficiency: The Case of Bank Holding Company Acquisitions," <u>Journal of Law and Economics</u>, April 1984, Abstracted in <u>Regulation</u> as "Do Corporate Takeovers Keep Managements Lean?" May/June, 1984.

"The Effect of Interest Rate Changes on the Common Stock Returns of Financial Institutions," (with M.J. Flannery), <u>Journal of Finance</u>, September, 1984.

"Market Evidence on the Effective Maturity of Bank Assets and Liabilities," (with M.J. Flannery), <u>Journal of Money, Credit and Banking</u>, November, 1984, Presented at the American Finance Association meetings in San Francisco, December, 1983.

"The Effects of Government Regulatory Agencies on Organizations in High Technology and Woods Products Industries," (with G. Ungson and B. Spicer), <u>Academy of Management Journal</u>, 1985.

"A VARMA Analysis of the Causal Relations Among Stock Returns, Real Output and Nominal Interest Rates," (with S. Koreisha and M. Partch), Journal of Finance, December, 1985.

"Access to Deposit Insurance, Insolvency Rules and the Stock Returns of Financial Institutions," (with J. Brickley), Journal of Financial Economics, July, 1986.

"The Takeover Market, Corporate Board Composition, and Ownership Structure: The Case of Banking," (with J. Brickley), Journal of Law and Economics, April, 1987.

"Returns to Acquirers and Competition in the Acquisition Market: The Case of Banking," (with P. Wier), Journal of Political Economy, April, 1987.

"An Analysis of FDIC Failed Bank Auctions," (with P. Wier), Journal of Monetary Economics, July, 1987.

"Some Evidence on the Uniqueness of Bank Loans," Journal of Financial Economics, December, 1987.

"The Use of Loan Sales and Standby Letters of Credits by Commercial Banks," Journal of Monetary Economics, November, 1988.

"Empirical Evidence on Implicit Guarantees of Bank Foreign Loan Exposure," Carnegie Rochester Conference Series on Public Policy, April, 1989.

"Heterogeneous Creditors and the Market Value of Bank LDC Loan Portfolios," Journal of Monetary Economics, December, 1990.

"Borrowing Relationships, Intermediation and the Cost of Issuing Public Securities," (with P. Wier), Journal of Financial Economics, November, 1990.

"The Losses Realized in Bank Failures," Journal of Finance, September, 1991.

"Relationship-Specific Assets and the Pricing of Underwriter Services," Journal of Finance, December, 1992.

"Management and Organizational Changes in Banking: A Comparison of Regulatory Intervention with Private Creditor Actions in Nonbank Firms," (with J. Houston), Carnegie Rochester Conference Series on Public Policy, 1993.

"The Information Content of Distressed Restructurings involving Public and Private Debt Claims," (with D. Brown and B. Mooradian), Journal of Financial Economics, February, 1993.

"Asset Sales by Financially Distress Firms," (with D. Brown and R.M. Mooradian), Journal of Corporate Finance, April, 1994.

"When Do Banks Take Equity in Debt Restructurings?" <u>Review of Financial Studies</u>, Winter, 1995.

"CEO Compensation and Bank Risk:   Is Compensation Structured in Banking Structured to Promote Risk-Taking?" (with J. Houston), <u>Journal of Monetary Economics</u>, November, 1995.

"Bank Debt Restructurings and the Composition of Exchange Offers in Financial Distress," <u>Journal of Finance</u>, June, 1996.

"Bank Information Monopolies and the Mix of Private and Public Debt Claims," (with J. Houston), <u>Journal of Finance</u>, December, 1996.

"Capital Market Frictions and the Role of Internal Capital Markets in Banking," (with J. Houston and D. Marcus), <u>Journal of Financial Economics</u>, November, 1997.

"Do Bank Internal Capital Markets Promote Lending?" (with J. Houston), <u>Journal of Banking and Finance</u>, November, 1998.

"Where Do Merger Gains Come From?  Bank Mergers from the Perspective of Insiders and Outsiders," (with J. Houston and M. Ryngaert), <u>Journal of Financial Economics</u>, May, 2001.

"Do Relationships Have Limits?   Banking Relationships, Financial Constraints and Investment," (with J. Houston), <u>Journal of Business</u>, July, 2001.

"Do Banks Provide Financial Slack?" (with C. Hadlock), <u>Journal of Finance</u>, June, 2002.

"What a Difference a Month Makes:  Stock Analyst Valuations Following Initial Public Offerings," (with J. Karceski and J. Houston), <u>Journal of Financial and Quantitative Analysis</u>, March 2006, Presented at Hong Kong Corporate Finance Conference, December, 2003.

"The Strength of Analyst Coverage Following IPO's," (with J. Karceski), <u>Journal of Financial Economics</u>, October 2006,  Presented at 2005 American Finance Association Meetings.

"Investor Monitoring and Differences in Mutual Fund Performance," (with J. Karceski), <u>Journal of Banking and Finance</u>, 2006, Presented at 2001 American Finance Association Meetings.

"Banks and Bubbles:  How Good are Bankers at Spotting Winners?" (with L. Gonzalez), <u>Journal of Financial Economics</u>, October 2007.

**CURRENT
RESEARCH:**

"The Information Content of Bank Loan Covenants", (with C. Demiroglu) to be presented at American Finance Association Meetings 2008.

"Lender Control Rights and the Role of Private Equity Group Reputation in Buyout Financing", (with C. Demiroglu), working paper.

"Dogs that Bark: Why are Bank Loan Announcements News Worthy", (with J. Houston and L. Gonzalez), working paper.

"Liquidity and the Value of Private Equity Investments", (with C. Demiroglu), working paper.

"The Effects of Leverage on Operating Performance:  An Analysis of Firms' Responses to Poor Performance," (with M. Ryngaert and D. Brown), working paper.

**OTHER PAPERS AND
PUBLICATIONS:**

"Are Banks Still Special?  New Evidence in the Corporate Capital-Raising Process," (with D. Smith), Journal of Applied Corporate Finance, Winter, 2000.

"Why Are Value Enhancing Mergers In Banking So Hard to Find?  A Discussion of 'Is the Bank Merger Wave of the 90's Efficient?  Lessons from Nine Case Studies,'" Kaplan, Steven (ed.), Mergers and Productivity, University of Chicago Press, Chicago, IL, 1999.

"Comment on Esty, Narasimhan, and Tufano," Journal of Banking and Finance, 23, 1999, 286-290.

"Using Internal Capital Markets to Lower Capital Costs in Banking," (with J Houston), Journal of Applied Corporate Finance, Summer, 1998.

Discussion of "Financial Institutions and Regulations:  The Dilemma in a Deregulated World," Proceedings from Riksbank Conference:  Forces for and Implications of Structural Changes in the Financial Sector, June, 1997.

"Evolution of Extinction:  Where are Banks Headed," (with J. Houston), Journal of Applied Corporate Finance, Summer, 1996.

"RAROC at Bank of America:  From Theory to Practice, Journal of Applied Corporate Finance, Summer, 1996.

"Bank Equity Positions in Distressed Firms," Saunders, Anthony and Ingo Walter (ed.), Universal Banking:  Financial System Design Reconsidered, (Irwin), 1996.

"The Use of Index Amortizing Swaps by Banc One," (with C. Smith), Journal of Applied Corporate Finance, Fall, 1994.

"Private Versus Public Creditor Experience in Distressed Firm Debt Restructurings," (with D. Brown and M. Mooradian), Altman, Edward (ed.), Bankruptcy and Distressed Restructurings: Analytical Issues and Investment Opportunities, (Business One Irwin), 1994.

"Banc One's Index Amortizing Swap Strategy," (with C. Smith), Journal of Applied Corporate Finance, 1994.

"Studies in Financial Institution," (with C. Smith), Commercial Banks, 1994.

Statement of Christopher James, Professor, College of Business, The University of Florida at Gainesville at Hearing before the Senate Committee on Banking, Housing and Urban Affairs – 102nd Congress, 4/26/91 (BIF Recapitalization).

"Off-Balance Sheet Activities and the Under Investment Problem in Banking," Journal of Accounting, Auditing, and Finance, Spring, 1989.

"The Incidence of Mispriced Deposit Insurance," Presented at 1989 American Economic Association Meetings.

"Are Bank Loans Different? Some Evidence From the Stock Market," (with P. Wier), Journal of Applied Corporate Finance, Summer, 1988.

"Acquisitions in Banking," Weekly Letter, Federal Reserve Bank of San Francisco.

"Off-Balance Sheet Banking," Weekly Letter, Federal Reserve Bank of San Francisco.

"Are Bank Loans Special?" Weekly Letter, Federal Reserve Bank of San Francisco.

"Off-Balance Sheet Banking," Economic Review, Federal Reserve Bank of San Francisco, Fall, 1987.

Discussion of "The Search for Financial Stability: The Past Fifty Years," Proceedings from the Federal Reserve Bank of San Francisco Conference on the Search for Financial Stability, June, 1985.

"An Analysis of FDIC Failed Bank Auction Procedures," (with P. Wier), Proceedings of a Conference on Bank Structure and Competition, May, 1985.

"Bank Holding Company Acquisitions and Managerial Efficiency," Proceedings of a Conference on Bank Structure and Competition, May, 1984.

"Market Based Measures of Risk for Banks and Savings and Loan Associations," Report prepared for the Federal Home Loan Bank Board, May, 1987.

"An Economic Analysis of Interindustry Acquisitions of Thrift Institutions," Report prepared for the Office of the Comptroller of the Currency, February, 1982.

"Loan Rate Indexation and the Allocation of Bank Credit," Proceedings of a Conference on Bank Structure and Competition, May, 1980.

**SERVICE ACTIVITIES:**

Editor: Journal of Banking and Finance, 2007-present.

Editorial Board:  Federal Reserve Bank of New York:  Economic Review, 1997-present.

Associate Editor:  Journal of Financial Economics, 1993-present.

Associate Editor:  Journal of Financial Services Research, 1989-present.

Associate Editor:  Journal of Managerial and Decision Economics, 1988-present.

Academic Board:  Turnaround Management Association, 1990-2002.

Associate Editor:  Journal of Banking and Finance, 1999-2001

Associate Editor:  Journal of Finance, 1988-2000.

Co-Editor:  Journal of Financial Intermediation, 1988-1999.

Associate Editor:  Journal of Financial and Quantitative Analysis, 1982-1984.

Reviewer:  Journal of Finance; Journal of Money, Credit and Banking; Journal of Financial Economics; Journal of Financial Management; Journal of Banking and Finance; Journal of Business and Economics; Journal of Monetary Economics; American Economic Review; Journal of Political Economy; Review of Financial Studies; Journal of Corporate Finance; Journal of Law and Economics; Journal of Accounting and Economics.

Program Committee:  Financial Management Association, Western Finance Association, American Finance Association, European Finance Association and Utah Winter Finance Conference.

**CONSULTING/EXECUTIVE EDUCATION ACTIVITIES:**

Board of Directors/Chairman, ID$^2$, Inc.

Advisory Board and Board of Directors, SunTrust Banks of Florida 1989-2006.

Independent Distribution Consultant, Janus Funds

Advisory Board Big Brothers Big Sisters of North Central Florida 2000-present.

Consultant, Federal Reserve Bank of New York, 1997, 2004.

Consultant, Federal Reserve Board of Governors, 1995, 1998.

Research Director, Garn Institute of Finance, Salt Lake City, Utah, 1987-1989.

Instructor, Pacific Coast Banking School: Commercial Lending, Financial Markets, Workout Lending.

Instructor, Bank Board of Directors School: Workout Lending.

Instructor, Swiss National Bank, Gerzensee, Switzerland, Bank Safety and Soundness Regulation.

Executive Seminars on bank deregulation, valuation, venture capital, strategic management, lender liability, and asset and liability management.

Expert Witness: Cases involving antitrust, portfolio management, securities valuation, bank management, valuation, and regulatory matters.

Consultant: Product pricing, valuation, portfolio management, utilities regulation, valuation of securities, mergers and acquisitions, and risk management.

Consultant to the Office of the Comptroller of the Currency, 1982-1983: Bank and Thrift Mergers.

Consultant to the Investment Company Institute, 1983: Bank Offerings of Mutual Funds.

Consultant to the FDIC, Costs of Resolving Bank and Thrift Failures.

Recipient of a grant from MidAmerica Institute to study management compensation in banking, 1992.

Recipient of grant from Federal Home Loan Bank Board to study the information content of savings and loan accounting information.

Member: Research Committee: Garn Institute of Finance, 1989-1992.

Research Associate at the Business Regulation Study Center, 1980.

**AWARDS:**     Valedictorian, Michigan State University, 1973.

Harry R. Jacobs, Professional Service Award, University of Oregon, 1985.

Outstanding Teaching Award: MBA Association, University of Oregon, 1985.

Outstanding Teaching Award: MBA Association, University of Florida, 1994, 1996, 1998, 1999, 2000.

# Exhibit 2

## Prior Testimony of Dr. Christopher M. James
## In the Previous Five Years

*LaSalle Talman Bank, F.S.B., v. United States of America*, No. 92-652C, United States Court of Federal Claims, deposition and trial testimony, 1998-1999, 2004.

*PSINet Consulting Solutions Holdings, Inc., et al.*, No. 01-14916, United States Bankruptcy Court for the Southern District of New York, deposition, 2003, trial testimony, 2004.

*AT&T Corp. Securities Litigation*, No. 01-CV-1883, United States District Court for the District of New Jersey, deposition, 2004.

*RaboBank vs. Coopers & Lybrand*, No. 312318, Superior Court of the State of California County of San Francisco, deposition, 2004.

*Citizens Federal Bank, FSB, et al., v. United States*, No. 92-656C, United States Court of Federal Claims, deposition and trial testimony, 2004.

*Marriott International, Inc.*, No. 50-T-168-00171-2, International Centre for Dispute Resolution American Arbitration Association, arbitration testimony, 2004.

*James Marcelli v. Bank One Trust Company*, AAA Case No. 77 148 00154 03 DEAR, arbitration testimony, 2004.

*Texas First National bank v. Kenneth Wu*, et al,. No. H-01-2661, United States District Court for the Southern District of Texas, Houston Division, deposition and trial testimony, 2004.

*Hechinger Investment Company of Delaware v. Chase Manhattan Bank*, No. 00-840-RRM, United States District Court for the District of Delaware, deposition, 2004.

*American Capital Corporation and Transcapital Financial Corporation, v. U.S.*, No. 95-523C, United States Court of Federal Claims, deposition and trial testimony, 2004.

*Wyeth Pharmaceuticals*, No. C-1-01-704, United States District Court for the Southern District of Ohio Western Division, deposition, 2004.

*WorldCom Securities Litigation*, No. 02 Civ. 3288 (DLC), United States District Court Southern District of New York, deposition, 2004.

*Furstenau, et al. v. AT&T Corp., et al.*, No: 02-CV-5409, United States District Court for the District of New Jersey, deposition, 2005.

*Truserv Corporation v. Ernst & Young LLP*, American Arbitration Association, No. 51-Y-181-01333-02, deposition, 2004, arbitration testimony, 2005.

*Allegheny Health, Education and Research Foundation v. PriceWaterhouseCoopers*, No. 00-684, United States District Court for the Western District of Pennsylvania, deposition, 2005.

*Torchmark Corporation, v. KPMG Peat Marwick LLP, et al.*, No. CV-03-3315, Circuit Court of the Tenth Judicial Circuit, in and for Jefferson County Alabama, deposition, 2005.

*Cisco Systems, Inc.*, No. C-01-20418-JW(HRL), United States District Court Northern District of California San Jose Division, deposition, 2006.

*Williams Securities Litigation*, No. 02-CV-72-SPF-FHM, United States District Court for the Northern District of Oklahoma, deposition, 2006.

*Asche Transportation Services v. Ernst & Young, LLP*, No. 51-107-Y-01237 04, American Arbitration Association, arbitration testimony, 2006.

*Granite Management Corporation v. United States of America*, No. 95-515C, United States Court of Federal Claims, trial testimony, 2006.

*Adams Golf, Inc. Securities Litigation*, C.A. No. 99-371 KAJ, United States District Court District of Delaware, deposition, 2006.

*Enron Corporation Securities Litigation*, MDL Docket No. 1446, United States District Court, Southern District of Texas, Houston Division, deposition, 2006.

*Regents of the University of California, et al. vs. Parsons, et al.*, LA Super. Ct. No. BC293848, deposition, 2007.

*California Public Employees' Retirement System vs. AOL Time Warner, Incorporated*, Sacramento Super. Ct. No. 03AS04015, deposition, 2007.

*California State Teachers' Retirement System, vs. AOL Time Warner, Incorporated*, S.F. Super. Ct. No. CGC-03-422609, deposition, 2007.

*Water and Power Employees' Retirement System, et al. v. AOL Time Warner Inc.*, et al., L.A. Super. Ct. No. BC346081, deposition, 2007.

*Ohio Public Employees' Retirement System, et al. vs. Richard D. Parsons, R.E. Ted Turner, et al.*, In the Common Pleas Court of Franklin County, Ohio, Case No. 03CVHO7-7932, deposition, 2007.

*J. Gregg Pritchard, as Trustee of the D.I.C. Creditors' Trust, vs. Ernst & Young LLP*, Case No. 71 107 Y 00572 05, deposition, 2007.

*AIG Retirement Services, Inc. (formerly known as SunAmerica Inc.), Plaintiff, vs. Altus Finance S.A., et al., Defendants*. No. CV 05-1035-JRW (CWx), United States District Court, Central District of California, deposition, 2007.

*Genzyme Corporation, et al.,* No. 03 Civ. 4014, United States District Court, Southern District of New York, deposition, 2007.

*Jerry Ryan v. Flowserve Corporation, et al.,* No. 3:03-CV-01769-B, United States District Court, Northern District of Texas Dallas Division, deposition, 2007.

*Sterling Savings Association, Sterling Financial Corporation v. United States of America,* No. 95-829C, United States Court of Federal Claims, deposition, 2001, 2002, and 2004, trial testimony, 2007.

*In re: Oracle Corporation Securities Litigation,* No. C001-0988-MJJ, United States District Court, Northern District of California, San Francisco Division, deposition, 2007.

*In the Matter of Arbitration Between Mike Kreidler, Insurance Commissioner of the State of Washington, as Receiver for Western United Life Assurance Company, and Ernst &Young, LLP,* Superior Court, State of Washington, County of Spokane, No. 04204737-9, trial testimony, 2007.

*Keri Evans vs. John F. Akers, et al; Lawrence W. Bunch, et al, vs. W.R. Grace & Co., et al,* Consolidated Case No. 04-11380-WGY, United States District Court for the District of Massachusetts, deposition, 2007.

*In re: Employee Retirement System of Texas Litigation,* No. 6N503755, District Court of Travis County, Texas, 200th Judicial District, deposition, 2007.

*In re: Joel S. Ario, Insurance Commissioner of the Commonwealth of Pennsylvania,* in her capacity as Liquidator of Reliance Insurance Company, No. 734 MD 2002, In the Commonwealth Court of Pennsylvania, deposition, 2007.

*American Express Travel Related Services Company, Inc., v. Visa U.S.A., Inc., et al.,* No. 04CV08967 (BSJ) (DFE), *Discover Financial Services, LLC, v. Visa U.S.A., Inc., et al.,* No. 04CV07844 (BSJ) (DFE), United States District Court, Southern District of New York, deposition, 2007.

*In re: EPDM Antitrust Litigation,* MDL 1542 and *In re Polychloroprene Antitrust Litigation,* MDL 1642, deposition testimony, 2008.

*Morton P. Levine, as Trustee for the Estate of Flooring America, Inc. and Related Debtors, et al.,* In the Superior Court of Fulton County State of Georgia, No. 2002CV54331, deposition, 2008.

*ASARCO LLC et al. v. Americas Mining Corp.,* In the United States District Court for the Southern District of Texas Brownsville Division, Civil Action No. 1:07-cv-00018, deposition, 2008.

*Molecular Diagnostics Laboratories v. Hoffmann-LaRoche, Inc.,* United States District Court for the District of Columbia, Civil Action No. 1:04CV01649, deposition, 2008.

3

*Accredo Health, Inc. Securities Litigation,* United States District Court Western District of Tennessee Western Division, Civil Action No. 03-2216-BP, deposition, 2008.

*The Estate of George E. Batchelor and The Batchelor Foundation, Inc. v. Deloitte & Touche, LLP,* In the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, Case No. 02-07135-CA-04, deposition, 2008.

*Alfred T. Giuliano, as Trustee of Nextcard, Inc. v. Ernst & Young, LLP,* AAA Arbitration San Francisco, CA., AAA No. 74 107 1248 05JRJ, deposition and trial testimony, 2008.

*Metropolitan Creditors' Trust v. Ernst & Young, LLP,* CPR File No. G-06-62N, deposition, 2008.

*Beverly Kanawi, et al. v. Bechtel Corporation, et al.,* United States District Court Northern District of California, Case No. C 06-5566 CRB (EDL), deposition, 2008.

*Saint Francis Medical Center v. C.R. Bard, Inc.,* United States District Court for the Eastern District of Missouri Southeastern Division, Case No. 1:07-CV-0031, deposition, 2008.

*Healthsouth Corporation Securities Litigation,* United States District Court Northern District of Alabama Southern Division, Case No. CV-03-BE-1500-S, deposition, 2008, 2009.

# Exhibit 3
# Documents Relied Upon by Christopher M. James, Ph.D.

| Document Title, Bates Numbers | Document Date |
|---|---|
| Order Denying Defendant's Motion for Summary Judgment and Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification | September 11, 2008 |
| Declaration of Kenneth A. Zimmerman in Support of Wells Fargo Bank, N.A.'s Motion for Summary Judgment | July 9, 2008 |
| Declaration of Mark Lentz | July 28, 2008 |
| Wells Fargo Bank, N.A.'s Response to Plaintiff Erin Walker's Special Interrogatories (Set One) [No. 1-23] | May 8, 2008 |
| Plaintiffs' Amended Responses to Special Interrogatories from Wells Fargo Bank, N.A. (Set Three) [Nos. 9-14] | December 24, 2008 |
| Deposition of Kenneth A. Zimmerman | November 10, 2008 |
| Deposition of Stacey Pinkerd | February 10, 2009 |
| Deposition of Erin Walker | June 13, 2008 |
| Deposition of Leslie S. Biller | January 9, 2009 |
| Wells Fargo Consumer Account Agreement *WFB-G 00391-454* | October 28, 2004 |
| Table *WFB-G 39001* | July 17, 2007 |
| Email from K. Zimmerman to C. Conkling, *WFB-G 08452-3* | October 16, 2000 |
| Consumer Deposit Group Presentation, "Transaction Origination Date (TOD) Pilot - Confidential," *WFB-G 07883-905* | February, 2008 |
| OCC Interpretive Letter #916 *http://www.occ.gov/interp/oct01/int916.pdf* | May 22, 2001 |
| OCC Interpretive Letter #1082 *http://www.occ.treas.gov/interp/jun07/int1082.pdf* | May 17, 2007 |
| FDIC, DSC Risk Management Manual of Examination Policies, *http://www.fdic.gov/regulations/safety/manual/manual_examinations_full.pdf* | |
| Code of Federal Regulations – Title 12:  Banks and Banking, Section 12 C.F.R. 7.4002 *http://edocket.access.gpo.gov/cfr_2004/janqtr/pdf/12cfr7.4002.pdf* | January 1, 2004 |
| Code of Federal Regulations – Title 12:  Banks and Banking, Section 12 C.F.R. 7.4007 *http://cfr.vlex.com/vid/19620756* | December 2005 |

# EXHIBIT C

# CONFIDENTIAL

**Responsive Expert Report of Paul Carrubba**

**March 6, 2009**

**Veronica Gutierrez et. al. v. Wells Fargo Bank, N.A.
Case No. C 07-05923 WHA**

# EXHIBIT "C"

## I.   QUALIFICATIONS.

I started my banking career at Deposit Guaranty National Bank in Jackson, MS where I worked for over twenty years. At the time of my departure, I was Senior Vice President and Manager of Operations. I served as Chairman of the Board of Directors of the Southern Financial Exchange, I was a member of the Executive Committee and Board of Directors of the National Automated Clearing House Association (NACHA), a member of the Bank Administration Institute's Council for Educational Services and the Operations and Technology Commission and Chairman of the Operations and Automation Committee of the Mississippi Bankers Association. I am the author of six books including: <u>Revised UCC Article 3 and 4, A Banker's Guide to Checks, Principles of Banking,</u> and <u>Remote Deposit Capture Practical Considerations.</u>

I am currently a Partner in the law firm of Adams and Reese LLP. My primary focus is on banking law and legal and operational issues dealing with financial payment systems and bank operations issues. I am a frequent speaker at industry trade organization events, vendor user conferences and Webinars on banking and banking law issues. I serve as a litigation consultant and expert witness in matters dealing with banking procedures. Before starting the practice of law, I was Executive Vice President and Managing Director of Carreker Corp., Dallas Texas. In this position, I had responsibility for the management of the software business units. Prior to joining Carreker, I started a consulting firm and provided bank operations consultation to banks in the U.S., litigation support and expert testimony, and legal services to financial institutions.

A copy of my curriculum vitae is attached as Exhibit I and a list of my prior testimony within the last five years is attached as Exhibit II.

CONFIDENTIAL                    2

## II.   ASSIGNMENT

I have been asked by counsel for Wells Fargo Bank, N.A. to review various documents, expert reports and deposition testimony concerning the processes and procedures used by Wells Fargo as they relate to the posting sequence of transactions to deposit accounts, placing of holds on accounts, and the release of holds on accounts and to opine on the reasonableness of those processes and procedures.   I have also been asked to provide an overview of how checking accounts operate, how balances are calculated, how debit card transactions are processed, and, where applicable, to respond to issues raised by plaintiffs' experts Dr. Lewis Mandell and Dr. Marshall Schminke.   The opinions contained in this report are based on the review of the items listed in Exhibit III, as well as my 37 years of experience in the banking industry as a Bank Operations Manager, a consultant, a banking law attorney, and the author of bank operations books and publications.

## III.   SUMMARY OF OPINIONS

A.   The posting sequence used by Wells Fargo Bank is in accordance with reasonable commercial standards within the banking industry and, contrary to the assertions of plaintiffs' experts, this posting sequence does not maximize overdrafts and overdraft fees.

B.   It is in line with prudent banking practices for Wells Fargo to employ a posting order that is consistent with that of its major competitors so as not to attract any undue proportion of high-risk customers who overdraft repeatedly and are less likely to repay the overdrafts.   The fact that Wells Fargo waives/reverses a substantial portion of the overdraft fees it assesses is also consistent with prudent banking practices, as discretionary waivers and reversals provide a valuable customer relations tool.

C.   Bank customers are aware of the concept of float and take advantage of float when using a debit card for making purchases.

D. The provisions of the Wells Fargo Consumer Account Agreement are consistent with the types of disclosures made by other banks similar to Wells Fargo and are consistent with reasonable banking practices and industry standards.

## IV.   INTRODUCTORY INFORMATION ABOUT CHECKING ACCOUNTS

### A. Description of the Operation of a Checking Account

A checking account is a demand deposit account subject to withdrawal of funds by check.[1]   A demand deposit is a deposit of funds that can be withdrawn without advance notice.[2]  For the purpose of this report, a reference to a Wells Fargo account will mean a checking account, although debit card transactions may also apply to other types of accounts.

Although an account may be opened without a deposit, a checking account is typically opened with an initial deposit.  The new customer is typically given a new account kit of checks at the time that the account is opened and may also request that a debit card be issued.   Typically, all of the disclosures required by banking regulations, other disclosures about the account and other bank services and products, and the account agreement are provided to the new customer at the time of the account opening and overdraft protection is usually offered to the customer.   After the new account opening process is completed, the customer is allowed to use the checking account in accordance with the disclosures and account agreement.

In very basic terms, the following is an explanation of how a checking account works.  A customer may make deposits to an account in a number of different ways discussed below.   A deposit (also referred to as a credit) increases the balance in the checking account.  A debit (also referred to as a withdrawal)

---

[1] Dictionary of Bank Terms and Phrases from the OCC, http://www.helpwithmybank.gov/dictionary/index.html (last visited March 3, 2009).
[2] *Id.*

CONFIDENTIAL                                    4

reduces the balance in the a checking account.  The credit and debits ("transactions") are typically received by the bank in "batches," and are processed by the bank after some established cut-off time (during what is commonly known as "batch processing").  Transactions received before the cut-off are processed on the day of receipt and transactions received after the cut-off time are processed on the next business day for the bank.  There are two types of balances at issue resulting from processing the transactions: the "ledger balance" and the "available balance."  The ledger balance is the balance reflected in an account after all the deposits have been added and all the checks and other debits have been charged to the account after posting.  The available balance is the balance of an account less any hold, uncollected funds, and restrictions against the account.[3]  The available balance does not and cannot reflect outstanding checks written by the customer and debit card debits and other debits of which the bank is not aware.  This is basically the same definition of available balance used by Wells Fargo with the exception that Wells Fargo does not subtract total uncollected funds to arrive at the available balance.  For deposits, Wells Fargo only nets out the amount of holds for the amount of deposits that the bank is not certain will be paid.[4]

Deposits can be made by the customer, the bank, or a third party.  The customer may deposit an item in person at a branch, via an ATM, or by mail.  A customer may even deposit an item electronically by converting the original item to an image or an ACH entry and transmitting the image of the item or the ACH entry to the bank.  A customer may also use Internet banking or mobile banking to transfer funds from one account to another account.  Deposits may also be made by the customer's bank.  For example, the bank may pay interest earned on that account or another account by making a deposit (credit) to the account.  Deposits may be made electronically to the account via direct deposit by the customer's employer, a government agency

---

[3] *Id.*
[4] Declaration of Kenneth A. Zimmerman 7/9/08 ¶ 5.

CONFIDENTIAL                    5

or other third party. Without regard to the origin of the deposit, the deposit will increase the balance in the account. The availability of the funds deposited will be based on the type of deposit that is made and the bank's availability schedule. There are regulations that govern the extent to which a bank may put a hold on a deposit before it makes the funds available.[5] Wells Fargo's policy of making all or a portion of the vast majority of deposits available immediately is more favorable to customers than is required by these legal requirements, a fact that tends to reduce overdrafts and overdraft fees.[6]

Debits to a customer's account can be initiated by the customer or by a third party authorized by the customer or by the bank. Customer initiated debits include, but are not limited to checks, withdrawal slips, remotely created checks, ACH debits, ATM withdrawals, electronically created debits via the Internet or mobile banking, telephone, debit card, or funds transfer. Debits may be initiated by the bank in the form of service charge, fees, chargebacks, adjustments, or legal process (e.g., set-off, garnishment, levy).

**B. The Process of Posting**

A bank receives debits (e.g., checks, ACH, debit card transactions) from a number of different sources. These items may be received over the counter, internally from the bank, or from other financial institutions, the Federal Reserve Bank, or networks via cash letters, ACH files, and Debit Card files. Likewise, as previously discussed, credits are received from a number of sources. It is my experience that most commercial banks accumulate these entries throughout the day and post the transactions to the checking account after an established cut-off in a process referred to as "batch posting." Wells Fargo uses batch posting to post transactions.[7] After all of the transactions are captured and the entire system is balanced, the bank will sort

---

[5] 12 C.F.R. 229 ("Regulation CC").
[6] Declaration of Kenneth A. Zimmerman 7/9/08 ¶ 26.
[7] Declaration of Kenneth A. Zimmerman 7/9/08 ¶ 4.

CONFIDENTIAL                    6

the transactions in a predetermined sequence and post the transactions to the accounts.   While transactions may be posted in a number of different ways, it is my experience that the main categories of sorting the transactions are first based on the type of transactions and then follow a sub-sequence within those types or categories of transactions.

It is my experience that most banks and a substantial majority of the large banks in the United States sort and post transactions in the following order:

- Post deposits and other credits first
- Post a selected category of transactions (wire transfers, certain other internal debits) second
- Sort and post all other transactions (checks, ATM debits, debit cards) in a sequence of the largest transaction to the smallest transaction.

This sequence of posting is also in line with the results of a survey conducted by Wachovia Bank[8] wherein several of the largest banks in the United States post debits in the sequence of largest to smallest.  In responding to a question asked by a consumer about the sequence of posting, the OCC responded:

> You may write your checks in numerical order, but that doesn't mean the bank will post them that way.  The same is true with point-of-sale or other electronic transactions: They don't necessarily post in the order in which you made the purchases.
>
> When several items come to the bank for clearing, it can choose to debit them form your account in several ways. Many national banks are opting to post the largest dollar items first instead of posting the checks in numerical order. Often the largest check represents payment for rent, mortgage, car payments, or insurance premiums.[9]

---

[8] WFB-G 39001.
[9] Overdraft Fees and Protection Answers From the OCC, http://www.helpwithmy bank.gov/faqs/banking_overdraft.html (last visited Mar.3, 2009).

CONFIDENTIAL                    7

Wells Fargo is typical in this regard. It posts deposits first, followed by certain other limited categories of debits, and then all other debits are posted from the highest to the lowest amount.[10] In my opinion the posting sequence used by Wells Fargo Bank is in accordance with reasonable commercial standards within the banking industry. Contrary to the assertions of plaintiffs' experts, this posting sequence does not maximize overdrafts and overdraft fees.[11] To the contrary, a posting practice that sought to achieve such maximization of overdrafts would (among other things) (a) employ a funds availability policy that was no more generous than the law requires, (b) not permit customers to "play the float" with covering deposits made after a transaction was initiated, (c) sort all debits in a single group from highest to lowest, and (d) charge fees for all overdrafts, regardless of amount or type of transaction.[12]

Another method of posting transactions that was used by small savings and loan associations is a method referred to as "real time" posting wherein transactions are posted throughout the day as the transactions are received. I know of no large commercial banks that use "real time" posting for posting all of their checking account transactions. I agree with Kenneth Zimmerman's conclusion that it is not feasible for a bank the size of Wells Fargo to use "real time" posting to post an average of 32 million transactions per day.[13]

## V.   DEBIT CARDS/CREDIT CARDS

Debit cards are machine-readable, magnetically encoded plastic cards that may be used to make purchases and can be used to access ATMs. A debit card can typically be used in many businesses where a customer could

---

[10] Declaration of Kenneth A. Zimmerman, 7/9/08, ¶ 27.
[11] Expert Report of Lewis Mandell, 2/20/09, at 6; Expert Report of Marshall Schminke, 2/20/09, at 5.
[12] Wells Fargo does not charge fees on overdrafts of less than $1 or where the overdraft item itself is a fee. 11/10/08 Deposition of Kenneth Zimmerman at p. 146; Declaration of Kenneth A. Zimmerman, 7/9/08, ¶ 33.
[13] Declaration of Kenneth A. Zimmerman, 7/9/08, ¶ 4.

CONFIDENTIAL                          8

otherwise use a check to make the purchase. Debit cards can be used for an in-person purchase at a point of sale ("POS") and can also be used in transactions that are not face-to-face such as purchases made via the telephone, the Internet or by mail. Debit cards can also be used for pre-authorized recurring payments such as monthly phone bills, cable service, and other subscription payments. Like a check, the payment for the goods or services is made from the cardholder's checking account. The payment is automatic in that after swiping the card or using it as a signature based transaction and obtaining the proper authorizations, the debit card transaction will be presented to the cardholder's bank for payment without any additional action on the part of the cardholder.

Credit cards are also machine-readable, magnetically encoded plastic cards that may be used to make purchases. Like a debit card, the credit card can be used to make the same type of purchases as can be made with a debit card. Additionally, the approval and settlement processes are similar. However, that is where the similarity ends. The use of the credit card is not automatic in that the settlement or payment for the goods or services is not made from a checking account without any additional action from the cardholder. Rather, the settlement or payment is made from a credit card loan account with the card issuer. The credit card account is an extension of credit. It is a loan that must be separately repaid by the cardholder.

## VI.   TYPES OF DEBIT CARD TRANSACTIONS

There are basically two types of debit card transactions. One type is referred to as a PIN based transaction and the other is referred to as a signature based transaction.

## A.  PIN Based Transactions

In a typical PIN based debit card transaction, the merchant enters the amount of the purchase in a terminal and the cardholder swipes the debit card through a card reader that reads the cardholder's bank identification number and the customer's bank account information.  The customer then enters his/her personal identification number and the transaction is routed through a debit card processor, a debit card network, potentially through another processor, and to the cardholder's bank.  Typically, PIN based transactions are "single message transactions," meaning that the authorization request and the data associated with the presentment for settlement are communicated to the bank together at one time.  The customer's card and the PIN are authenticated and the amount of the transaction is verified to ensure that sufficient funds are available to pay the transaction.  The amount of the transaction typically is not posted to the account at that time, but rather the bank will place a hold for the amount of the transaction on the account.  It is my experience that holds on PIN based transactions typically last no more than one day because such transactions usually settle on a same-day basis.

## B.  Signature Based Transactions

In a signature based or offline transaction, the merchant enters the amount in the terminal, the debit card is swiped but the cardholder does not enter a PIN number.  As in the case of the PIN based transaction, the signature based transaction must be authorized.  The difference is that the transaction will be routed through the credit card (VISA) network.  The transaction follows the same channel as the authorization for settlement.  Signature based transactions typically take longer to settle than PIN based transactions.  This is because signature based transactions are not "single message transactions" – instead, the authorization request and the settlement information are sent separately, sometimes days apart.  For this reason, holds on signature based transactions

CONFIDENTIAL                    10

typically remain in place for a longer period than those for PIN based transactions. Under the VISA rules, a signature based transaction can be held no longer than three business days so as to avoid excess holds on funds for transactions that may never settle or for which it is not possible to match the settlement file with the previous authorization.[14]

Without regard as to the length of the hold period, the customer's available balance will no longer reflect a prior transaction after the hold is released unless the actual transaction has posted to the account. The customer is generally informed that he or she needs to maintain a check register to ensure the accuracy of the funds in his/her account, as only the customer is aware of all the transactions he or she has initiated. In response to a question by a consumer to the OCC dealing with this issue, the OCC responded:

> Many transactions are processed overnight. These transactions may not be reflected in an available balance, such as an ATM balance, that you see during the day.
>
> This is why it's important to keep a current and accurate check/transaction register and balance it to your monthly statement. A bank's online, telephone, or ATM balances are for information purposes only–they do *not* replace your check/transaction register.[15]

Maria Galindo found this statement to be very true. When asked in her deposition about what she had done to keep track of her transactions, she stated:

A. I started using the register, check register I started using it for all my transactions.
Q. And how did that help?
A. Helped me manage my money better and avoid those overdraft fees.[16]

---

[14] 2/10/09 Deposition of Stacy Pinkerd p. 20.
[15] Overdraft Fees and Protection Answers From the OCC, http://www.helpwithmy bank.gov/faqs/banking_overdraft.html (last visited Mar.3, 2009).
[16] 1/29/09 Deposition of Maria Galindo at p. 88.

CONFIDENTIAL                    11

## VII.   CHARGEOFFS AND REVERSALS OF OVERDRAFT FEES

Overdrafts represent a serious risk of loss to a bank.  A substantial percentage of overdrafts are never repaid and must be charged off.  (Wells Fargo has to charge off approximately 10% of the overdrafts on its consumer accounts.)[17] A prudent bank manager must determine its fee pricing and posting order so as not to attract any undue proportion of high-risk customers who overdraft repeatedly and are less likely to repay the overdrafts (as well as customers who may even incur overdrafts deliberately in an effort to defraud the bank). It is therefore in line with prudent banking practices for Wells Fargo to employ a posting order that is consistent with that of its major competitors.

Wells Fargo also waives/reverses a substantial portion of the overdraft fees it assesses.[18]  This is also consistent with prudent banking practices. Discretionary waivers and reversals provide a valuable customer relations tool to permit adjustments in fees where individual circumstances make such adjustments appropriate: for example, for a good long-time customer who made a simple mistake or where a reversal can serve to resolve a dispute with a customer.  Of the plaintiffs here, both Erin Walker and William Smith were beneficiaries of this reversal policy.[19]

## VIII.   FLOAT AND DEBIT CARDS

The term "float" relates to the period between the initiation of a transaction by a customer (e.g., when he writes a check and delivers it to the payee) and the deduction of the transaction funds from the customer's account (e.g., when the check is presented to the bank, is paid, and is posted to the customer's account).    Float is not only applicable to checks, but is present in any

---

[17] 11/10/08 Deposition of Kenneth Zimmerman at pp. 93-94.
[18] 11/10/08 Deposition of Kenneth Zimmerman at pp. 93-94.
[19] 6/13/08 Deposition of Erin Walker at p. 98; 6/18/08 Deposition of William Smith, Jr. at p. 52.

CONFIDENTIAL                    12

transaction that is outstanding and in the process of collection. As previously discussed, PIN based transactions are typically settled within one day. However, if a PIN based transaction is made after the cut-off time for the network, the transaction is not submitted until the next business day. Therefore, a customer may use a debit card after the cut-off time and have an additional day to use the funds before the transaction is presented for payment. In the case of signature based debit card transactions, the collection time is extended by one or two days. Some customers are aware of this fact and take advantage of this float time, as was evidenced by Maria Galindo when she stated in her deposition that she, at times, knowingly spent more than she had in her account to try to take advantage of the delay in posting.[20]

IX.     FORMS OF DISCLOSURES TO CUSTOMERS

Banks communicate with their customers and make disclosures through a number of methods. Typically, at the account opening, the required regulatory disclosures are given to the customer along with other product descriptions. The customer is also given the agreement that governs the deposit account, which includes a number of practices and procedures followed by the bank as well as obligations and responsibilities of the customer. After the account is opened, the bank will provide information to the customer on the customer's bank statement. The statement sets out in detail each transaction processed on the account that month and shows when and in what order. Other information may also be contained on the statement, such as reconcilement procedures, or information may be printed on the statement or included as an enclosure. The bank may also provide a customer with information about an account, service, or product via the Internet. These communications obviously cannot cover every imaginable situation or circumstance that may occur with the customer's account or the manner in which it may occur. For example, the Wells Fargo Consumer Account

---

[20] 1/29/09 Deposition of Maria Galindo at p. 53.

Agreement,[21] effective 10/28/04, contains a provision for the order of posting. That provision states, in part:

> The Bank may post *Items* presented against the Account in any order the Bank chooses, unless the laws governing your Account either requires or prohibits a particular order. For example, the Bank may, if it chooses, post *Items* in the order of the highest dollar amount to the lowest dollar amount.

This language, which is consistent with that used by most other banks, closely parallels the provision of the Uniform Commercial Code on posting order.[22] The purpose of this provision in the Consumer Account Agreement is to let the customer know that the bank will select the order in which *Items* will be posted to the account and it may select highest to lowest as the posting order. The term *Item* is defined in the Agreement as:

> An *Item* includes a check, substitute check, purported substitute check, electronic item, draft, demand draft, remotely created item, remotely created consumer item, image replacement document, indemnified copy, preauthorized draft, or other order or instruction for the payment, transfer, or withdrawal of funds (including a withdrawal slip or Bill Payment instruction), automatic transfer, and electronic transaction (including ACH, ATM and POS) or a photocopy of any of the foregoing. *Item* also includes any written document created or authorized in your name that would be a check or draft but for the fact that it has not been signed. An *Item* may also include a cash-in ticket or a deposit adjustment.[23]

It is clear from this definition that *Item* includes not only checks but a number of other items including electronic items such as a debit card transaction. It would not be appropriate or prudent for the bank to provide the specific sequence of posting of the transactions. The sequence will not matter to customers who do not spend more than they have in their accounts, and the

---

[21] WFB-G 00391 - 00454.

[22] Uniform Commercial Code § 4-303(b) ("[I]tems may be accepted, paid, certified, or charged to the indicated account of its customer in any order.").

[23] WFB-G 00391 - 00454.

CONFIDENTIAL                    14

bank appropriately focuses instead on cautioning customers to keep track of their transactions so as to avoid overspending and on encouraging customers to sign up for overdraft protection services.  If a customer wants to know the order in which his transactions have posted, he can view the list of posted transactions online, review his account statement, or simply call the bank to ask.

Other provisions of Wells Fargo's Consumer Account Agreement warn that the timing of posting for debit card transactions is uncertain, disclose that the bank retains discretion to authorize and pay transactions into overdraft, and explain how overdrafts may be incurred and fees assessed.[24]

In my opinion, therefore, all of these provisions of the Consumer Account Agreement are consistent with the types of disclosures made by other banks similar to Wells Fargo and are consistent with reasonable banking practices and industry standards.

---

[24] WFB-G 004391 - 00454.  Many of these same warnings and disclosures are communicated to customers in a variety of other ways as well.  See Declaration of Kenneth A. Zimmerman, 7/9/08, ¶¶ 40-43.

I reserve the right to amend my report and opinions in response to additional materials or testimony I review, reports or testimony by the plaintiffs' experts, legal decisions, additional facts that may come to light, or testimony at the time of trial.

Executed:  March 6, 2009

*Paul Carrubba*

Paul Carrubba

CONFIDENTIAL

**EXHIBIT I**

**VITA OF PAUL A. CARRUBBA**

Adams and Reese LLP
Paul.Carrubba@arlaw.com
(601) 292-0788

**CURRENT POSITION**

Partner in the law firm of Adams and Reese LLP. Primary focus is on Banking Law and
legal issues dealing with payment system laws and regulations and issues dealing with
bank operations. Listed in The Best Lawyers in America in the specialty of Banking
Law.

**PREVIOUS POSITIONS**

Shareholder in the law firm of Watkins Ludlam Winter & Stennis, P.A. in The Regulated
Industries Group. (2003 – 2005)

Executive Vice President and Managing Director of the Global Payments Group of
Carreker Corp., Dallas Texas. (1995 – 2003). In this position, had responsibility for the
management of the P&L for the software business units. Major responsibilities included
software Product Management, implementation and project management of software
installation, providing consultation to major banking organizations in the U.S., Australia,
the U.K. and South Africa on issues dealing with bank operations, fraud reduction, and
the laws and regulations surrounding the payment system, and providing expert testimony
and litigation support.

Private Practitioner and Bank Consultant  (1992 – 1995). Provided bank operations
consultation to banks in the U.S., litigation support and expert testimony, legal services to
financial institutions. Provided training seminars on issues related to banking and
banking law to banks, bank associations, and other bank organizations. Of Counsel to the
law firm of Heidelberg, Woodliff, and Franks.

Senior Vice President and Manager of Operations for Deposit Guaranty National Bank,
Jackson, MS (1972 -1992). Responsible for all operational functions within the bank
including Proof Encoding, Capture, Transit, Courier and Transportation, Float
Management, Bookkeeping, Customer Service, Check Fraud Detection, Return Items,
Central Information File, Account Reconcilement, Cash Management Operations, ATM
Operations, and the Cash Vault. Developed systems for detection of new account fraud
and check kiting. Served as Chairman of the Board of Directors of the Southern
Financial Exchange, a member of the Executive Committee and Board of Directors of the
National Automated Clearing House Association (NACHA), a member of the Bank

Administration Institute's Council for Educational Services and the Operations and Technology Commission and Chairman of the Operations and Automation Committee of the Mississippi Bankers Association.

## EDUCATION

University of Southern Mississippi (B.S. in Banking and Finance 1972)
Mississippi College School of Law (J.D. 1979 Cum Laude)

## TEACHING

Taught courses for the Bank Administration Institute on Principles of Banking, Demand Deposits, Savings Deposits, Trust Services, and Money and Banking.  Conducted training seminars on numerous banking topics including, Introduction to Check Processing, Float Management, Check Fraud Detection, Electronic Check Presentment, UCC Articles 3 & 4, UCC Article 4A, Return Items, ACH Processing, Check Clearing for the 21st Century, Federal Reserve Regulations CC and E, Risk Management, and FFIEC Examination Procedures.

Served as a member of the faculty of the Alabama  School of Banking, the BAI's Graduate School of Bank Operations and Technology, and the Mississippi School of Banking.

## PUBLICATIONS

A Practical Guide to UCC Article 4A-Funds Transfer- This book provides bankers with a comprehensive review of the provisions of UCC Article 4A dealing with funds transfers.  The book was written specifically for bankers to assist them in understanding the law surrounding funds transfers including, but not limited to ACH and Wire Transfers.

The Bank Operations Consolidation Manual- This book was co-authored with Michael K. Harris and Leonard Wink.  Written during a period of many bank mergers, this book was intended to provide bankers with issues that should be considered in the consolidation of back office functions.  The book is an outline of a step-by-step process that bankers can use when consolidating operational functions.

Revised UCC Article 3 and 4, A Banker's Guide to Checks, Drafts, and Other Negotiable Instruments- This book was written for bankers to provide an easy-to-read and understand guide to the law of negotiable instruments and the relationship between a bank and its customers and a bank and other banks in the chain of collection.  The book contains an analysis of the law and court cases and also contains many practical examples to which bankers can relate.

Principles of Banking – This textbook was published by the American Bankers Association and is used in teaching courses offered by the American Institute of Banking, the ABA's education organization.  The text was developed to introduce students who are

CONFIDENTIAL                        18

new to banking to both basic principles and current issues. It takes a practical approach and presents an overview of commercial banking from colonial times to the present day, leading students from the fundamentals of negotiable instruments to the contemporary issues and developments critical to an understanding of banking today.

**Expedited Funds Availability Regulation CC Compliance Manual** – As a contributing author, I provided an analysis and comparison of UCC Articles 3 & 4 to Federal Reserve Regulation CC. The main text of the book deals with the provisions of Regulation CC and how banks could ensure that they were complying with the regulation.

**Remote Deposit Capture – Practical Considerations** - This book is a three part series of books co-authored with Dan Fisher dealing with all aspects of remote deposit capture. This book provides the reader with a firm understanding of legal, risk, operational, and compliance issues related to remote deposit capture.

**EXHIBIT II**

List of cases for which Paul A. Carrubba has given trail or deposition testimony within the last five years:

*Colonial Insurance Company v. City National Bank, et al.*
Case No. 97-2115
United States District Court
Western District of Arkansas
Fort Smith Division

*Minnesota Life Insurance Company and Ascend Financial Services v. Union Planters Bank, National Association and Union Planters Bank of Southern Mississippi*
Civil Action No. 3:99CV479WN
United States District Court for the Southern District of Mississippi, Jackson Division
Trial Testimony

*A1 Aluminum Co. Inc. DBA Sealcraft v. Commercial National Bank*
Case No. 414680
First Judicial District Court
Caddo Parish, Louisiana
Trial Testimony

*William B. Allen Supply Co. Inc. v. Betty K. Martin, et al.*
Civil Action No. 01-0963
Section "B" Magistrate (3)
United States District Court
Eastern District of Louisiana

*Federal Insurance Co. v. Bank of America, N.A. Sung Ho Jo, et al.*
Case No. CIV 215700
Superior Court of the State of California
County of Ventura-Main Courthouse-Unlimited Civil

*Powis Corporation v. Commerce Bank, N.A., et al.*
Case No. 03CV204766
Circuit Court of Jackson County, Missouri At Independence

*In re the Guardianship of Albert Jermaine Duckett, et al.*
No. 12,551
Chancery Court of Tishomingo County, Mississippi
Trial Testimony

CONFIDENTIAL                    20

*GeoLogistics Americas Inc. v. Bank of America N.A.*
Case No. 05CC05398
Superior Court of The State of California
For the County of Los Angeles

*Sage V Foods, LLC v. Wells Fargo Bank, N.A.*
Case No. SC 083 176
Superior Court of the State of California
For the County of Los Angeles
West District – Santa Monica Courthouse

*Hartwell Medical v. Wells Fargo Bank N.A.*
Arbitration Before Herbert B. Hoffman, Judge of the California Superior Court, Retired
Sand Diego California
Trial Testimony

*L&B Real Estate v. Wells Fargo Bank N.A.*
Case No. BC 252 316
Superior Court of the State of California
For the County of Los Angeles
Trial Testimony

*Wells Fargo Bank, N.A., Successor by assignment to Wells Fargo bank Northwest, N.A. v. Gregory J. Rhineer, et al.*
Civil No. 030928984
Third Judicial District Court of Salt Lake County, State of Utah

*Effective Shareholder Solutions, Inc. v. National City Corporation*
Case No. A0603767
Court of Common Please, Hamilton County, Ohio
Trial Testimony

*Sally Ho v. Wells Fargo Bank*
Case No. BC329026
Superior Court of the State of California
For the County of Los Angeles
Central District
Trial Testimony

*Tax Biz, Inc. and Anthony Bryant v. Tyrone Cannon, Jovon Simmons, and U.S. Bank National Association, F/K/A Firstar Bank*
Case No. 03L12070
Circuit Court of Cook County, Illinois

*Mitchell C. Chaney vs. John J. Woodard, Jr., First National Bank, Competition-RGV, LTD., and Harlingen Imports, INC.*
Cause NO. 2006-07-3466-A
Cameron County, Texas
107th Judicial District
Trial Testimony

## EXHIBIT III

### RESPONSIVE EXPERT REPORT OF PAUL CARRUBBA

**I.   Pleadings and Court Documents**

    1.    [Adjusted] First Amended Class Action Complaint

    2.    Order Denying Defendant's Motion for Summary Judgment and Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification

    3.    Declaration of Kenneth A. Zimmerman in Support of Wells Fargo Bank, N.A.'s Motion for Summary Judgment, July 9, 2008

**II.   Discovery Documents**

    1.    Wells Fargo Bank, N.A.'s Responses to Walker's Special Interrogatories (Set One) Nos. 1-23

**III.   Depositions**

    1.    Veronica Gutierrez Deposition Transcript (June 12, 2008)

    2.    Erin Walker Deposition Transcript (June 13, 2008)

    3.    William Smith, Jr. Deposition Transcript (June 18, 2008)

    4.    Kenneth Zimmerman Deposition Transcript (November 11, 2008)

    5.    Maria Galindo Deposition Transcript (Jan. 29, 2009)

    6.    Stacey Pinkerd Deposition Transcript (Feb. 10, 2009)

**IV.   Produced Documents**

    1.    2004 Consumer Account Agreement [WFB-G 00391 - WFB-G 00454]

    2.    Chart [WFB-G 39001]

**V.   Other Documents**

    1.    Dictionary of Bank Terms and Phrases from the OCC
*http://www.helpwithmybank.gov/dictionary/index.html*

    2.    Overdraft Fees and Protection Answers From the OCC
*http://www.helpwithmy bank.gov/faqs/banking_overdraft.html*

    3.    12 C.F.R. § 229 (Regulation CC)

    4.    U.C.C. § 4-303

    5.    Cal. Comm. Code § 4303

    6.    Expert Report of Lewis Mandell (Feb. 20, 2009)

    7.    Expert Report of Marshall Schminke (Feb. 20, 2009)

CONFIDENTIAL        23

# EXHIBIT D

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

# EXPERT REPORT

## OF

## ALAN J. COX, PH.D.

**ALAN J. COX**
**SENIOR VICE PRESIDENT**

**In Connection with**

*Gutierrez et al. v. Wells Fargo*

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
Contains References to Documents Designated as
"Highly Confidential" Pursuant to the Protective Order

# NATIONAL ECONOMIC
# RESEARCH ASSOCIATES

ONE FRONT STREET, SUITE 2600
SAN FRANCISCO, CA 94111
TELEPHONE: 415.291.1000   FACSIMILE: 415.291.1020
INTERNET: HTTP://WWW.NERA.COM

**JANUARY 27, 2010**



HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Evidence also indicates that high-to-low sequencing is valued by some customers. Indeed, it appears that the Board reported that the participants in consumer testing that it commissioned "indicated that they would prefer to have their checks paid into overdraft, because those transactions represented important bills."[29]  The Federal Reserve Bank of Philadelphia makes a similar point:

> Testing revealed that consumers found overdraft fees acceptable in the context of checks because if they opted out of the check service, the check would not be paid, yet they still would be charged an insufficient funds fee that is generally equivalent to an overdraft fee.[30]

According to the 2007 Federal Reserve Payments Study, the average value of returned checks increased from $731 in 2003 to $1,124 in 2006.[31]  Wells Fargo's actual practice of high-to-low sequencing reduces the likelihood that high value checks will be returned, while Mr. Olsen's scenarios increase this likelihood.  According to the ABA, 85 percent of consumers who paid an overdraft fee in 2008 said that they were glad that their payment was covered and not rejected or returned.[32]  This percentage grew to 96 percent in 2009.[33]

Finally, evidence also indicates that high-to-low sequencing is valued by some of Wells Fargo's customers:

> Q.  And was there a determination through consumer research as to which order the consumer preferred?
>
> A.  The Norwest research supported a consumer preference for high to low, as it increased the likelihood that the more important transactions that a customer had -- for example, their mortgage check --would be made and not returned.[34]

---

[29] 59034 Federal Register / Vol. 74, No. 220 / Tuesday, November 17, 2009 / Rules and Regulations.

[30] "Final Rules on Credit Card and Overdraft Practices," Federal Reserve Bank of Philadelphia. [http://www.philadelphiafed.org/bank-resources/publications/consumer-compliance-outlook/2009/first-quarter/q1_04.cfm].

[31] The 2007 Federal Reserve Payments Study:  Noncash Payment Trends in the United States: 2003-2006, *Federal Reserve*, 10 December 2007.

[32] "80 Percent of Consumers Paid No Overdraft Fees in Past Year, Says ABA Survey," ABA News Release, 8 August 2008.  [http://www.aba.com/Press+Room/080808OverdraftFeeSurvey.htm].

[33] "ABA Survey: More Consumers Avoid Overdraft Fees," ABA News Release, 9 September 2009. [http://www.aba.com/Press+Room/090909ConsumerSurveyOverdraftFees.htm].

[34] "Deposition of Kenneth A. Zimmerman," November 10, 2008, p. 32.

# EXHIBIT E

**Page 2**

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3
 4   VERONICA GUTIERREZ, TIM FOX, )
     ERIN WALKER and WILLIAM SMITH,)
 5   as individuals, and on behalf )
     of all others similarly       )
 6   situated,                     )
                                   )
 7             Plaintiffs,         )
                                   )
 8       vs.                       )Case No. C 07-05923 WHA
                                   )
 9   WELLS FARGO & COMPANY; WELLS  )
     FARGO BANK, N.A.; and DOES 1  )
10   through 125,                  )
                                   )
11             Defendants,         )
                                   )
12   _____)
13
14
15          *** C O N F I D E N T I A L ***
16
17     DEPOSITION OF KENNETH A. ZIMMERMAN
18        Held at Covington & Burling
19             One Front Street
20         San Francisco, California
21        Monday, November 10, 2008
22          9:10 a.m. - 3:18 p.m.
23
24
25   Reported by: Rick Galten, CSR No. 13202
```

**Page 4**

```
 1                  --oOo--
 2            INDEX OF EXAMINATION
 3   Page
 4     6     Examination by Mr. McCune
 5
 6            INDEX OF EXHIBITS
 7               --oOo--
 8
 9   Plaintiff's
10   Exhibit No.      Description           Page
11    1    Initial Disclosure by Wells Fargo   19
12    2    Declaration in Support of Motion    64
13    3    Wells Fargo Ad, Color Photo (one page)  102
14    4    Marketing Message Included in Statement 111
15    5    Screenshot from Wells Fargo's Website  113
16    6    Corporate Social Responsibility     119
17    7    Community Outreach Program          119
18    8    207 Corporate Citizen Report        120
19    9    Screenshot of Title Screen of Hands on
          Banking                             124
20
21   10    Screenshot of Adult Teachers Guide  129
22   11    Excerpts from "Young Adults" Section
          on Hands on Banking                 133
23   12    Wells Fargo Ad, Color Photo (one page)  157
24   13    Wells Fargo Company Ethics Program  160
25
```

**Page 3**

```
 1   APPEARANCES:
 2       For the Plaintiffs:
 3           McCune & Wright, LLP
             2068 Orange Tree Lane
 4           Suite 216
             Redlands, CA  92374
 5           BY:  Richard D. McCune, Esq.
             and Eddie J. K. Kim, Esq.
 6
 7       For the Defendants:
 8
 9           Covington & Burling LLP
             Attorneys at Law
10           One Front Street
             San Francisco, California  94111
11           BY:  Sonya D. Winner, Esq.
12       Videographer:
13           Michael Barber
             Barkley Court Reporters
14           (415) 433-5777
```

**Page 5**

```
09:10-09:11
 1   SAN FRANCISCO, CALIFORNIA; MONDAY, NOVEMBER 10th, 2008
                    9:10 A.M.
 2                   --oOo--
 3
        (The oath was administered to the deponent,
 4
 5      KENNETH A. ZIMMERMAN, as follows:)
 6
 7      VIDEOGRAPHER: Good morning.  My name is Michael
 8   Barber.  I'm a videographer associated with Barkley
 9   Court Reporters located at 222 Front Street, Suite 600
10   in San Francisco, California, 94111.  The date is
11   November 10th, 2008.  The time is 9:10 a.m.  this
12   deposition is taking place at Covington Burling LLP, One
13   Front Street, San Francisco, California, 94111 in the
14   matter of Veronica Gutierrez et al versus Wells Fargo
15   and Company et al, Case Number C 0705923 WHA.  This is
16   the video taped deposition of Kenneth Zimmerman being
17   taken on behalf of the Plaintiff.
18      Counsel, would you please identify yourselves
19   for the record and state whom you represent.
20      MS. WINNER: Sonya Winner representing Defendant
21   Wells Fargo Bank and the witness.
22      MR. McCUNE: And Richard McCune and Eddie Kim
23   representing the Plaintiffs.
24      VIDEOGRAPHER: Thank you.  Would the court
25   reporter please swear in the witness.
```

Kenneth A. Zimmerman - Confidential
November 10, 2008

Veronica Gutierrez v.
Wells Fargo & Company

---

**09:48-09:49**       Page 30

1   A.   Not to my recollection.
2   Q.   And was there a financial analysis done as to
3  the fees that would be generated by Wells Fargo under
4  each of these three scenarios?
5       MS. WINNER: Objection.  Vague and ambiguous.
6  And again, are you talking about nationally?  California
7  in a particular area?
8       MR. McCUNE: Q.   Nationally?
9   A.   It would have been routine for us to have
10  completed a financial analysis associated with such a
11  change.
12  Q.   And would it have been routine for you to have
13  reviewed that in discussing the option with management?
14  A.   Yes, that would have been routine, as well.
15  Q.   And which of the three alternatives under a
16  financial analysis would generate more fees for Wells
17  Fargo?
18       MS. WINNER: Objection.  Are you talking about
19  any particular kind of fees?
20       MR. McCUNE: Same ones we're talking about.
21       MS. WINNER: Or all the fees?
22       MR. McCUNE: I'll be glad to restate it.
23  Q.   In deciding which alternative on sorting and
24  posting alternatives for checks for '99 -- lowest to
25  highest, highest to lowest or serial number -- which of

---

**09:49-09:51**       Page 31

1  those three alternatives was projected to generate more
2  fees for Wells Fargo?
3       MS. WINNER: Same objection.  Also object as to
4  "generate" as argumentative.
5       THE WITNESS: It would have been high to low.
6       MR. McCUNE: Q.   Which of those three
7  alternatives would generate the fewest fees for Wells
8  Fargo?
9       MS. WINNER: Same objection.
10       THE WITNESS: Low to high.
11       MR. McCUNE: Q.   What considerations or--
12  strike that.
13      What factors were considered in deciding which
14  order for checks to sort and post?
15  A.   I don't recall specific conversations, but with
16  respect to the subject, the factors that would typically
17  be considered in such an evaluation would not only be
18  the financial impacts, but would also be the necessity
19  to have a consistent methodology, as consistent a
20  methodology as possible, across all of our branching
21  markets to facilitate customer services, as well as
22  systems operations.
23      There was also a consideration of which strategy
24  would lead to the highest volume of return items, as
25  returned items are a -- both a significant cost driver

---

**09:51-09:52**       Page 32

1  for the enterprise, as well as a significant adverse
2  customer impact.  And those higher return volumes would
3  have resulted if we had instead chose a sort order that
4  was low to high.
5  Q.   Was there any consumer research performed prior
6  to making the decision as to which sorting order to do?
7  A.   I did not participate in any customer research,
8  but there had been previous research conducted by
9  Norwest.
10  Q.   And did you review that research?
11  A.   I have seen it.  I saw it at some point when
12  that consideration was being made.
13  Q.   And was there a determination through consumer
14  research as to which order the consumer preferred?
15  A.   The Norwest research supported a consumer
16  preference for high to low, as it increased the
17  likelihood that the more important transactions that a
18  customer had -- for example, their mortgage check --
19  would be made and not returned.
20  Q.   Was there any consideration given as to giving
21  the customer a choice as to which sorting order?
22  A.   Supporting customer choice at an individual
23  account level was not feasible, given our system's
24  architecture.
25  Q.   Was it considered and then rejected for that

---

**09:52-09:55**       Page 33

1  reason?
2  A.   It simply wasn't an option.
3  Q.   When did Wells Fargo first begin processing
4  debit cards from highest to lowest?
5       MS. WINNER: Debit cards?
6       MR. McCUNE: Debit card transactions.
7       THE WITNESS: I don't recall.
8       MR. McCUNE: Q.   Was it at the same time that
9  the checking account decision was made?
10       MS. WINNER: Objection as to "checking account
11  decision."
12       MR. McCUNE: Q.   Was it at the same time that
13  the order of checks was decided?
14  A.   I am -- I am not aware of how -- what order
15  debit card transactions were sorted by Wells Fargo prior
16  to my employment at Wells Fargo.  It's possible that
17  those transactions were sorted high to low prior to my
18  employment.
19  Q.   Do you have any information from any source that
20  while checks were sorted from lowest to highest, debit
21  card transactions were sorted from -- well, let me
22  strike that.
23      Do you have any information from any source that
24  while checks were sorted by Wells Fargo from lowest to
25  highest, debit card transactions were sorted from

---

Barkley Court Reporters

Min-U-Script®