1    Richard M. Heimann (State Bar No. 063607)
     *E-mail: rheimann@lchb.com*
2    Barry R. Himmelstein (State Bar No. 157736)
     *E-mail: bhimmelstein@lchb.com*
3    Michael W. Sobol (State Bar No. 194857)
     *E-mail: msobol@lchb.com*
4    Roger Heller (State Bar No. 215348)
     *E-mail: rheller@lchb.com*
5    Mikaela Bernstein (State Bar No. 261301)
     *E-mail: mbernstein@lchb.com*
6    LIEFF, CABRASER, HEIMANN &
     BERNSTEIN, LLP
7    275 Battery Street, 29th Floor
     San Francisco, CA 94111-3339
8    Telephone: (415) 956-1000
     Facsimile: (415) 956-1008
9
     Richard D. McCune (State Bar No. 132124)
10   *E-mail: rdm@mwtriallawyers.com*
     Jae (Eddie) K. Kim (State Bar No. 236805)
11   *E-mail: jkk@mwtriallawyers.com*
     McCUNE & WRIGHT, LLP
12   2068 Orange Tree Lane, Suite 216
     Redlands, CA 92374
13   Telephone: (909) 557-1250
     Facsimile: (909) 557-1275
14
     *Attorneys for Plaintiffs and the Class*
15

16             UNITED STATES DISTRICT COURT

17          NORTHERN DISTRICT OF CALIFORNIA

18

19   VERONICA GUTIERREZ, ERIN        Case No. C 07-05923-WHA (JCSx)
     WALKER, and WILLIAM SMITH, as
20   individuals and on behalf of all others      **PLAINTIFFS' PROPOSED FINDINGS OF**
     similarly situated,                         **FACT AND CONCLUSIONS OF LAW**
21
                Plaintiffs,
22                              Judge Assigned:   Hon. William H. Alsup
     v.                                 Trial Date:        April 26, 2010
23
     WELLS FARGO & COMPANY; WELLS
24   FARGO BANK, N.A.; and DOES 1
     through 125,
25
               Defendants.
26

27

28

Plaintiffs Veronica Gutierrez, Erin Walker, and William Smith respectfully submit the following proposed findings of fact and conclusions of law.  Plaintiffs reserve the right to amend or supplement their proposed findings and conclusions to conform to the evidence adduced at trial.

## I.      PLAINTIFFS' PROPOSED FINDINGS OF FACT

### A.      Facts Common to the Class

1.      Defendant Wells Fargo Bank, N.A. ("Wells Fargo") is a national bank chartered by the federal government under the National Bank Act.  Wells Fargo is a subsidiary of Wells Fargo & Co.  Wells Fargo conducts business and maintains branch offices throughout the State of California.

2.      In 1998 Norwest Corporation acquired Wells Fargo & Co.  Since that time, the combined company has been known as Wells Fargo & Co.

3.      Wells Fargo's principal place of business is in San Francisco, California.

4.      Wells Fargo provides banking and consumer finance services to individuals in the State of California.  One of the banking services Wells Fargo provides to individuals in the State of California is a debit card which can be used to access funds in deposit accounts.  Wells Fargo has millions of checking account customers in California who are provided with such a debit card.

5.      Throughout the Class Period, it was Wells Fargo's practice to provide each of its California checking account customers with a debit card, which they can use to access funds at ATM machines and to make point-of-sale purchases.

6.      Wells Fargo's checking account customers may engage in several types of transactions which result in debits to their accounts, including: checks, debit card transactions (also known as point-of-sale or POS transactions), ATM withdrawals, ACH (Automated Clearing House) transactions, and electronic transfers.

7.      Prior to April 2001, it was Wells Fargo's practice and policy in California to group and post its customers' debit transactions that posted each calendar day in the following order: 1) Cash withdrawals and debit card transactions in the order of lowest amount to highest

1    amount; 2) Checks and ACH transactions in the order of lowest amount to highest amount.

2            8.      From approximately April 2001 to November 2001, it was Wells Fargo's

3    practice and policy in California to group and post its customers' debit transactions that posted

4    each calendar day in the following order: 1) Cash withdrawals in the order of highest amount to

5    lowest amount; 2) Debit card transactions in the order of highest amount to lowest amount; 3)

6    Checks in the order of highest amount to lowest amount; 4) ACH transactions in the order of

7    highest amount to lowest amount.

8            9.      Wells Fargo did not notify its California checking account customers that

9    its method of grouping and posting their debit transactions changed in approximately April 2001.

10           10.     For both its-pre April 2001 sequencing policy and the sequencing policy it

11   used from approximately April 2001 to November 2001, Wells Fargo posted cash withdrawals

12   and debit card transactions first because these were "non-recourse" items—i.e., once Wells Fargo

13   had authorized such a debit card transaction, it was required to pay the merchant the authorized

14   amount, even if the account against which the funds were to be drawn no longer had sufficient

15   funds to "cover" the item at the time of settlement, while checks could be decline for insufficient

16   funds and ACH transfers could simply not be made.

17           11.     From approximately December 1, 2001 to the present, it has been Wells

18   Fargo's practice and policy in California to group and post its customers' debit transactions that

19   posted each calendar day in the following order: 1) Cash withdrawals in the order of highest

20   amount to lowest amount; 2) All other debit transactions in the order of highest amount to lowest

21   amount.

22           12.     Wells Fargo did not notify its California checking account customers that

23   its method of grouping and posting debit transactions changed on approximately December 1,

24   2001.

25           13.     Wells Fargo did not, and does not, disclose to its customers the manner or

26   sequence in which it Wells Fargo groups and posts customers' debit transactions.  Wells Fargo

27   does not disclose to its customers that it reorders their debit transactions from highest-to-lowest in

28   dollar amount when it posts transactions each calendar day.

PLS. PROPOSED FINDINGS AND CONCLUSIONS
CASE NO. C 07-05923 WHA (JCSX)

14.     Prior to and throughout the Class Period, Wells Fargo's Consumer Account Agreement was a single-spaced document that is approximately 64 pages long.  Customers are not required to read or sign the Consumer Account Agreement in order to open a checking account with Wells Fargo.

15.     Wells Fargo's Consumer Account Agreement contains a section that discusses the ordering of debit transactions.  This section is buried deep within the lengthy Consumer Account Agreement.  This section does not disclose the manner or sequence in which Wells Fargo groups and orders customers' debit transactions, but rather constituted vaguely worded mumbo jumbo that failed to communicate any meaningful information.

16.     Likewise, Wells Fargo's monthly bank statements failed to provide Plaintiffs or other typical customers with adequate information sufficient to determine Wells Fargo's debit reordering practices.

17.     Ordering customers' debit transactions posted on a single calendar day from highest amount to lowest amount results in more instances of overdrafts than if the same transactions were posted each day in the order of lowest amount to highest amount.

18.     Ordering debit transactions posted on a single calendar day from highest amount to lowest amount results in more overdraft fee revenue for Wells Fargo than if the same transactions were posted each day in the order of lowest amount to highest amount.

19.     Ordering debit transactions posted on a single day from highest amount to lowest amount results in more instances of overdrafts than if the same transactions were posted each day in chronological order, based on the date and time that Wells Fargo authorized the transactions.

20.     Ordering debit transactions posted on a single calendar day from highest amount to lowest amount results in more overdraft fee revenue for Wells Fargo than if the same transactions were posted each day in chronological order, based on the date and time that Wells Fargo authorized the transactions.

21.     The method that Wells Fargo used in California during the Class Period to group and post Class members' debit transactions has resulted in more instances of overdrafts,

1   and more overdraft revenue for Wells Fargo, than if Wells Fargo had used, during the same

2   period, the method that it used to group and post customers' debit transactions prior to April

3   2001.

4         22.    The method that Wells Fargo used in California during the Class Period to

5   group and post Class members' debit transactions has resulted in more instances of overdrafts,

6   and more overdraft revenue for Wells Fargo, than if Wells Fargo had, during the same period,

7   posted debit transactions posted each calendar day chronologically, based on the date and time

8   that Wells Fargo authorized the transactions.

9         23.    Beginning in approximately April 2001, Wells Fargo developed and

10  implemented a multi-phased scheme to increase its overdraft revenue.  This involved, first,

11  changing the manner in which Wells Fargo grouped and posted customers' debit transactions

12  from a low-to-high ordering to a high-to-low ordering (i.e., the switch to the manner Wells Fargo

13  used from approximately April 2001 to November 2001).

14        24.    Wells Fargo consciously and deliberately did not provide its customers

15  with notice of this change.  Moreover, the language of Wells Fargo's Consumer Account

16  Agreement was not modified to reflect this change.

17        25.    The reason why Wells Fargo changed its manner of grouping and posting

18  customers' debit transactions to a high-to-low ordering was to increase the number of overdrafts

19  by its customers and, thus, increase its overdraft revenue.

20        26.    A second phase of Wells Fargo's multi-phased scheme to increase its

21  overdraft revenue was to further "refine" the manner in which it posted customers' debit

22  transactions (i.e., the change to the manner Wells Fargo has used from approximately December

23  1, 2001 to the present).  Wells Fargo referred internally to this phase as "Sort Order

24  Optimization."  The effect of this change was that all debit card transactions and checks/ACH

25  transactions are now grouped together as part of a single group (and sorted high-to-low), rather

26  than in separate groups (sorted, within each group, from high-to-low).

27        27.    Wells Fargo consciously and deliberately did not provide its customers

28  with notice of this change.  Moreover, the language of Wells Fargo's Consumer Account

1    Agreement was not modified to reflect this change.

2         28.    Like the prior April 2001 change to its posting policies, the reason why

3    Wells Fargo changed its manner of grouping and posting debit transactions on approximately

4    December 1, 2001 was to increase the number of overdrafts by its customers and, thus, increase

5    its overdraft revenue.

6         29.    Wells Fargo made projections about the financial impact of the changes to

7    its method of grouping and posting customers' debit transactions.  Wells Fargo further engaged

8    an outside consultant, Carreker Corporation, to analyze the potential financial impact of the

9    changes.  Wells Fargo projected that it would make tens of millions of dollars, annually, in

10   additional revenue by implementing these changes.

11        30.    A third phase of Wells Fargo's multi-phase plan to increase its overdraft

12   revenue was what Wells Fargo referred to internally as the "POS [Point-of-Sale] Shadow-line

13   Extension" and "ATM Shadow-line Extension," pursuant to which Wells Fargo would authorize

14   debit card and ATM transactions that exceeded a customer's available account balance by a

15   predetermined amount.  These amounts were determined separately for each account each posting

16   day, based on a series of formulas designed to minimize the bank's risk of non-payment.  This

17   phase was implemented beginning in approximately May 2002.

18        31.    Wells Fargo implemented these "shadow lines" of credit in order to induce

19   customers to overdraw their accounts on debit card purchases and ATM transactions, as

20   customers continued to believe that they had sufficient funds in their accounts to "cover" such

21   transactions.

22        32.    Prior to May 2002, Wells Fargo did not voluntarily pay any debit card

23   transactions into overdraft.  Specifically, if a customer did not have sufficient funds in their

24   account at the time authorization was requested, a debit card transaction would be declined at the

25   point-of-sale.

26        33.    Prior to May 2002, the only way a debit card transaction would be paid by

27   Wells Fargo into overdraft was if the customer had sufficient funds to "cover" the transaction

28   when authorization was requested, but insufficient funds when the item was presented for

- 5 -

1    settlement.

2             34.     This practice, and the corresponding experience of Wells Fargo's

3    customers, confirmed and/or reinforced their common sense belief that money is deducted from

4    their checking account immediately upon approval of a debit card transaction.  Wells Fargo

5    deliberately fostered this belief, in widely-disseminated educational and promotional materials,

6    informing the public that money is deducted "immediately" or "automatically" from their account

7    at the time the merchant obtains authorization.  These materials included the "Checking, Savings

8    & More" brochure, provided to prospective depositors to provide basic information about the

9    different types of accounts available, and in Wells Fargo's "Hands on Banking" guide, which is

10   provided to, and accessed by, millions of consumers and is designed specifically for young

11   consumers.

12            35.     Students, other young consumers, and consumers in low income areas are,

13   in general, more likely than other consumers to maintain low balances, and are thus more

14   vulnerable than other consumers to incurring overdrafts.

15            36.     Students, other young consumers, and consumers in low income areas

16   represent a disproportionately high percentage of the Class.

17            37.     Wells Fargo had knowledge that students, other young consumers, and

18   consumers in low income areas were more vulnerable than other consumers to incurring

19   overdrafts, and that such consumers, in fact, incurred a disproportionate amount of the overdraft

20   charges assessed by Wells Fargo.

21            38.     Wells Fargo distributed educational materials, primarily to young

22   consumers, including its "Hands on Banking" guide (available online and in print), that stated that

23   when customers make debit card transactions, the money for such transaction comes out of their

24   account "immediately" or "automatically."

25            39.     Wells Fargo actively promoted its "Hands on Banking" guide, particularly

26   to students and other young consumers.

27            40.     Hundreds of thousands of people have received Wells Fargo's "Hands on

28   Banking" guide.

41.     There have been millions of online visitors to Wells Fargo's "Hands on Banking" website.

42.     Wells Fargo's practice of reordering its customers' debit transactions from highest-to-lowest is unfair.

43.     Wells Fargo's failure to disclose to its customers it's policy and practice of reordering their debit transactions from highest-to-lowest is unfair and fraudulent.

44.     Wells Fargo's failure to disclose to its customers it's policy and practice of reordering their debit transactions from highest-to-lowest is unfair and deceptive, whether or not it is intentional.

45.     The fact that Wells Fargo had a policy and practice of reordering customers' debit transactions from high-to-low in dollar amount was material information, in that a reasonable consumer would attach importance to its existence or nonexistence in determining his choice of action.

46.     Wells Fargo's failure to adequately disclose its reordering practices to Plaintiffs and the Class was deliberate.  Well Fargo concealed material information concerning its posting practices from Plaintiffs and the Class.  Plaintiffs and the Class relied to their detriment on Wells Fargo to treat them fairly in its debit posting practices

47.     Wells Fargo's representations to Plaintiffs and the Class that when they make debit card purchases the funds are deducted from their accounts "immediately" or "automatically" were material, in that a reasonable consumer would attach importance to such representations in determining his choice of action.

48.     Plaintiffs and the Class were likely to be deceived about Wells Fargo's manner of grouping and posting debit card transactions, given the nature of the practice.

49.     Plaintiffs and the Class were likely to be deceived about Wells Fargo's manner of grouping and posting debit card transactions, given Wells Fargo's failure to disclose the practice to consumers, whether or not such failure to disclose was intentional.

50.     Plaintiffs and the Class were likely to be deceived about Wells Fargo's manner of grouping and posting debit card transactions, given Wells Fargo's widely-disseminated

1    representations that when customers make debit card purchases the funds are deducted from their

2    accounts "immediately" or "automatically."

3            51.     As a result of Wells Fargo's unfair and deceptive reordering practices, its

4    failure to disclose such practices (whether or not intentional), and its misrepresentations related to

5    such practices, Plaintiffs and the Class paid Wells Fargo $351,494,698.49 more in overdraft

6    charges than they would have paid had Wells Fargo posted their debit transactions in the manner

7    in which Wells Fargo posted customers' debit transactions prior to April 2001.

8            52.     As a result of Wells Fargo's unfair and deceptive reordering practices, its

9    failure to disclose such practices (whether or not intentional), and its misrepresentations related to

10   such practices, Plaintiffs and the Class paid Wells Fargo $214,379,710.68 more in overdraft

11   charges than they would have paid had Wells Fargo posted their debit transactions that posted on

12   each calendar day chronologically, based on the date and time that Wells Fargo authorized the

13   transactions.

14           53.     Wells Fargo continues to engage in its unfair and deceptive reordering,

15   non-disclosure, and misrepresentation practices.  As a result, numerous Wells Fargo checking

16   account customers continue to be harmed.

17           54.     The statement in Wells Fargo's "Checking, Savings and More" brochure,

18   under the heading "ATM & Check Card," that "Purchase amounts are automatically deducted

19   from your primary checking account" was untrue, misleading, and was known by Wells Fargo, or

20   in the exercise of reasonable care should have been known by Wells Fargo, to be untrue and

21   misleading.

22           55.     The statement in Wells Fargo's "Checking, Savings and More" brochure,

23   under the heading "ATM & Check Card," that "Purchase amounts are automatically deducted

24   from your primary checking account" was material, in that a reasonable consumer would attach

25   importance to such representation in determining his choice of action.

26           56.     The statement in Wells Fargo's "Checking, Savings and More" brochure,

27   under the heading "ATM & Check Card," that "Purchase amounts are automatically deducted

28   from your primary checking account" was detrimentally relied upon by Plaintiffs and the Class.

1

2

3        **B.**      **Facts Concerning Plaintiff Gutierrez**

4       57.     On October 25, 2002, when she was 18 years old, Plaintiff Gutierrez

5 opened a checking account at a Wells Fargo branch in San Bernardino County, California.

6 Plaintiff Gutierrez is a current Wells Fargo checking account customer.

7       58.     At the time she opened her Wells Fargo checking account, Plaintiff

8 Gutierrez was provided a debit card that she could use to make point-of-sale purchases and to

9 withdraw funds at ATMs.

10       59.     For approximately four years, Plaintiff Gutierrez maintained her account

11 without incurring any overdraft fees.

12       60.     From October 5 through October 9, 2006, Plaintiff Gutierrez used her

13 Wells Fargo debit card to make several purchases, ranging in amount from $3.23 to $74.39.  At

14 the time she made these transactions, the available balance in her account was sufficient to cover

15 these transactions.  Wells Fargo electronically approved each of these transactions before the

16 transaction was completed.  Wells Fargo posted these transactions to Plaintiffs Gutierrez's

17 account on October 10, 2006.  In connection with these transactions, Wells Fargo charged

18 Plaintiff Gutierrez with four (4) overdraft fees of $22.00 each, for a total of $88.00.  These

19 overdraft charges were posted to Plaintiff Gutierrez's account on October 11, 2006.  Wells Fargo

20 posted the debit transactions posted to her account on October 10, 2006 in order of  highest-to-

21 lowest in dollar amount.

22       61.     Some of the overdraft charges that Plaintiff Gutierrez incurred on October

23 11, 2006 would not have been incurred had Wells Fargo posted her debit transactions that were

24 posted to her account on October 10, 2006 either: (a) in chronological order of the date and time

25 the transactions were presented to Wells Fargo for authorization; or (b) in the manner in which

26 Wells Fargo grouped and posted California customers' debit transactions prior to April 2001.

27       62.     Plaintiff Gutierrez was harmed as a result of Wells Fargo's method of

28 posting her debit card transactions, in that she was charged with overdraft fees she would not

1  otherwise have incurred.

2      63.     At the time she incurred the overdraft charges in question in October 2006,

3  Plaintiff Gutierrez was not aware that it was Wells Fargo's policy to post debit transactions from

4  highest-to-lowest in dollar amount, or that Wells Fargo would do so with respect to her

5  transactions.  Had Wells Fargo adequately disclosed that it would post her debit transactions from

6  highest to lowest in dollar amount, she would not have made the transactions for which the

7  additional overdraft fees were charged.

8      64.     Plaintiff Gutierrez reviewed Wells Fargo "Welcome to Your New

9  Account" jacket and read parts of Wells Fargo's Consumer Account Fee and Information

10  Schedule.

11      65.     Plaintiff Gutierrez read Wells Fargo's "Checks, Savings & More"

12  brochure, which stated, under the heading "ATM & Check Card," that "Purchase amounts are

13  automatically deducted from your primary checking account."

14  **C.     Facts Concerning Plaintiff Walker**

15      66.     On July 15, 2006, when she was seventeen years old, Plaintiff Walker

16  opened a checking account at a Wells Fargo branch in Culver City, California.

17      67.     At the time she opened her Wells Fargo checking account, Plaintiff Walker

18  was provided a debit card that she could use to make point-of-sale purchases and to withdraw

19  funds at ATMs.

20      68.     After receiving several account statements from Wells Fargo, and finding

21  such statements to be confusing, Plaintiff Walker began regularly checking the "available

22  balance" information that Wells Fargo provided online.  She regularly checked her online

23  "available balance" online and also regularly checked her available balance after withdrawing

24  money from an ATM.  She would then mentally deduct her debit transactions from her available

25  balance to make sure she had sufficient funds to cover her transactions.

26      69.     On May 29, 2007, Plaintiff Walker made a purchase using her debit card

27  which she thought was within her available balance as of that date.  She then made several more

28  debit transactions over the next week, ranging from approximately $1.09 to $22.16, each of which

1    was electronically approved by Wells Fargo at the time of the transaction. On June 5, 2007,

2    Wells Fargo charged Plaintiff Walker with eight (8) overdraft fees of $34.00 each, for a total of

3    $272.00, all for debit card transactions occurring from May 29 to June 4, 2007. Wells Fargo

4    posted these debit transactions in the order of highest-to-lowest in dollar amount.

5            70.    Some of the overdraft charges that Plaintiff Walker incurred on June 5,

6    2007 would not have been incurred had Wells Fargo posted her debit transactions that were

7    posted in the prior days either: (a) in chronological order of the date and time the transactions

8    were presented to Wells Fargo for authorization; or (b) in the manner in which Wells Fargo

9    grouped and posted California customers' debit transactions prior to April 2001.

10            71.    Plaintiff Walker was harmed as a result of Wells Fargo's method of posting

11   her debit card transactions, in that she was charged with overdraft fees she would not otherwise

12   have incurred.

13            72.    At the time she incurred the overdraft charges in question in October 2006,

14   Plaintiff Walker was not aware that it was Wells Fargo's policy to post debit transactions from

15   highest-to-lowest in dollar amount, or that Wells Fargo would do so with respect to her

16   transactions. Had Wells Fargo adequately disclosed that it would post her debit transactions from

17   highest to lowest in dollar amount, she would not have made the transactions for which the

18   additional overdraft fees were charged.

19            73.    Plaintiff Walker read Wells Fargo's "Welcome to Your New Account"

20   jacket.

21            74.    Plaintiff Walker was not aware that the "available balance" information

22   that Wells Fargo provided, online and at ATM machines, was not completely accurate or current.

23   In fact, Plaintiff Walker read one document that Wells Fargo provided to her when she opened

24   her account—the "Welcome to Your New Account" jacket—that indicated that she could check

25   her current account balances online. Relying on Wells Fargo's representations, including the

26   "available balance" information provided by Wells Fargo, Plaintiff Walker believed that the

27   "available balance" information that Wells Fargo provided online and at ATM machines was

28   accurate and current.

1    75.    Plaintiff Walker was harmed as a result of Wells Fargo's

2  misrepresentations regarding her "available balance" in that she engaged in transactions based on

3  her false understanding—caused by Wells Fargo's representations—that her available balance

4  was sufficient to cover such transactions, and thus incurred overdraft charges she would not have

5  otherwise incurred.

6    76.    Had Wells Fargo adequately disclosed its method of calculating the

7  "available balance" information provided online and at ATM machines, Plaintiff Walker would

8  not have incurred these additional overdraft charges.

9    **D.**    **Facts Concerning Plaintiff Smith**

10    77.    Plaintiff William Smith first became a Wells Fargo checking account

11  customer in the early 1990s.

12    78.    Plaintiff Smith opened the account at issue in this case in February, 1999 at

13  a Wells Fargo branch office in San Bernardino County, California.

14    79.    At the time he opened his Wells Fargo checking account, Plaintiff Smith

15  was provided a debit card that he could use to make point-of-sale purchases and to withdraw

16  funds at ATMs.

17    80.    Plaintiff Smith regularly monitored his "available balance" information

18  that Wells Fargo provided online.

19    81.    On July 3, 2007, Plaintiff Smith checked his "available balance" online.

20  According to the information that Wells Fargo provided, his "available balance" was

21  approximately $300.00.  Plaintiff Smith then made a purchase Fargo with his debit card, that

22  same day, for an amount of $68.65.  The transaction was posted shortly thereafter as a pending

23  transaction online and the amount of the transaction was deducted from his "available balance."

24  Plaintiff Smith checked his "available balance" online again on July 12, 2007, and noted that his

25  "available balance" was approximately $50.00.  At the time, he thought that all of his previous

26  debit card transactions had already posted to his account and were accurately reflected in his

27  "available balance" information provided by Wells Fargo.  Then, that same day,  he made a

28  purchase with his debit card for an amount $24.76.  Plaintiff Smith was unaware that although he

1   had made the $68.65 debit card purchase on July 3, 2007 and that amount had been subtracted

2   from his online "available balance" that same day, Wells Fargo effectively reversed this

3   transaction out after a few days, causing his "available balance" to appear artificially high when

4   he viewed it online on July 12, 2007, prior to making the $24.76 purchase with his debit card.  On

5   July 13, 2007, Wells Fargo charged Plaintiff Smith with two (2) overdraft fees of $34.00 each, for

6   a total of $68.00.

7           82.    Wells Fargo posted Plaintiff Smith's debit card transactions that posted on

8   July 12, 2007 in the order of highest-to-lowest in dollar amount, causing Plaintiff Smith to be

9   charged with more overdraft fees than he would have incurred had Wells Fargo instead posted the

10   transactions in the manner in which Wells Fargo grouped and posted California customers' debit

11   transactions prior to April 2001.

12           83.    Plaintiff Smith was harmed as a result of Wells Fargo's method of posting

13   his debit card transactions, in that he was charged with overdraft fees he would not otherwise

14   have incurred.

15           84.    At the time he incurred the overdraft charges in question in July 2007,

16   Plaintiff Smith was not aware that it was Wells Fargo's policy to post debit transactions from

17   highest-to-lowest in dollar amount, or that Wells Fargo would do so with respect to his

18   transactions.  Had Wells Fargo adequately disclosed that it would post his debit transactions from

19   highest to lowest in dollar amount, he would not have made the transactions for which the

20   additional overdraft fees were charged.

21           85.    Plaintiff Smith was not aware that the "available balance" information that

22   Wells Fargo provided online was not completely accurate or current.  Rather, Plaintiff Smith

23   believed that the "available balance" information that Wells Fargo provided online was accurate

24   and current.  Plaintiff Smith was harmed as a result of Wells Fargo's misrepresentations regarding

25   his "available balance" in that he engaged in transactions based on his false understanding—

26   caused by Wells Fargo's representations—that his available balance was sufficient to cover such

27   transactions, and thus incurred overdraft charges he would not have otherwise incurred.

28           86.    Had Wells Fargo adequately disclosed its method of calculating the

"available balance" information provided online, Plaintiff Smith would not have incurred these additional overdraft charges.

## II.      PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW

1.      For well over 100 years, it has been the law in California that

> the fact that a scheme is original in its conception is not a good argument against its circumvention.  It has been said in . . . one of the leading cases on unfair competition in this state:  'The fact that the question comes to us in an entirely new guise, and that the schemer has concocted a kind of deception heretofore unheard of in legal jurisprudence, is no reason why equity is either unable or unwilling to deal with him.  It has been said by some judge or law writer that 'no fixed rules can be established upon which to deal with fraud, for, were courts of equity to once declare rules prescribing the limitations of their power in dealing with it, the jurisdiction would be perpetually cramped and eluded by new schemes which the fertility of man's invention would contrive.''  When a scheme is evolved which on its face violates the fundamental rules of honesty and fair dealing, a court of equity is not impotent to frustrate its consummation because the scheme is an original one.  There is a maxim as old as law that there can be no right without a remedy, and in searching for a precise precedent, an equity court must not lose sight, not only of its power, but of its duty to arrive at a just solution of the problem.

*American Philatelic Soc. v. Claiborne*, 3 Cal. 2d 689, 698-99, 46 P.2d 135, 140 (1935) (quoting *Weinstock, Lubin & Co. v. Marks*, 109 Cal. 529, 539, 42 P. 142, 145 (1895)).

2.      Wells Fargo's carefully-planned, multi-phase scheme to raise overdraft fee revenue (the "Re-Ordering Scheme"), while of relatively recent invention, "on its face violates the fundamental rules of honesty and fair dealing."  *Id.*

### B.      The Class' Claim For Unfair Business Practices Under The UCL

3.      Wells Fargo's Re-Ordering Scheme, which it began implementing in April 2001, and which continues in effect to this day, constitutes an "unfair" business practice within the meaning of California's Unfair Competition Law, Bus. & Prof. Code § 17200, *et seq*. (the "UCL"), under any of the three tests in recent use by California courts.  *See Davis v. Ford Motor Credit Co*., 179 Cal. App. 4th 581, 594-97, 101 Cal. Rptr. 3d 697 (2009) (noting that "[t]he state of the law on what constitutes an unfair business practice in consumer cases is somewhat unsettled in light of *Cel-Tech*;" setting forth "a split of authority" along three lines).[1]

---

[1] Unless otherwise noted, internal quotations and citations have been omitted.

1            4.      Prior to *Cel-Tech Communications, Inc. v. Los Angeles Cellular*

2   *Telephone Co.,* 20 Cal. 4th 163, 83 Cal. Rptr. 2d 548 (1999) , the test for "unfairness" in

3   consumer cases—a test *still* applied by some California courts— "required the court to engage in

4   a balancing test," examining "the impact of the practice or act on its victim, balanced against the

5   reasons, justifications and motives of the alleged wrongdoer.  In brief, the court must weigh the

6   utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Davis*,

7   101 Cal. Rptr. 3d at 706-07.

8            5.      Applying this test, Wells Fargo's Re-Ordering Scheme is an unfair

9   business practice because Wells Fargo's primary, if not its sole motive in implementing the

10   scheme was to increase the number of overdraft charges to which its checking account customers

11   were subject, based on nothing more than an undisclosed change in computer programming.

12   Wells Fargo proposed to provide no additional services in exchange for this enormous increase in

13   anticipated revenue.  Wells Fargo proposed to assume no additional risk in exchange for this

14   enormous increase in anticipated revenue.  Wells Fargo's expert, Dr. Cox, testified that Wells

15   Fargo uses the excess profits it generates from the imposition of overdraft fees to subsidize

16   banking services that it provides to its better customers, and that if forced to disgorge those

17   amounts and cease its Re-Ordering Scheme, Wells Fargo will have to begin charging those

18   customers for those services.  This is an indictment, not a defense, of Wells Fargo's Re-Ordering

19   Scheme, which "robs from the poor to give to the rich."  This is not the type of "balance" the

20   UCL will uphold.

21            6.      The majority of California courts, following *Cel-Tech* test, hold that to be

22   "unfair," a business act or practice must contravene a legislatively declared public policy. *Davis*,

23   101 Cal. Rptr. 3d at 708.  As indicated by the Court in a prior Order (Dkt. No. 246), Wells

24   Fargo's re-ordering scheme, which maximizes the number of overdraft charges incurred by class

25   members, contravenes the public policy set forth in Cal. Com. Code § 4303(b), Calif. cmt. 7,

26   which provides that:

27             The only restraint on the discretion given to the payor bank under
            subsection (b) is that the bank act in good faith.  For example, the

28             bank could not properly follow an established practice of

1

2

maximizing the number of returned checks for the sole purpose of increasing the amount of returned check fees charged to the customer.

3

Accordingly, the *Cel-Tech* test is satisfied.

4

7.      More recently, California courts have found that "*Cel-Tech* itself holds the

5

key to the definition of 'unfair' in consumer cases," in its statement "that we may turn for

6

guidance to the jurisprudence arising under section 5 of the Federal Trade Commission Act."

7

*Davis*, 101 Cal. Rptr. 3d at 709.  These courts have held that "the factors that define unfairness

8

under section 5 are: (1) The consumer injury must be substantial; (2) the injury must not be

9

outweighed by any countervailing benefits to consumers or competition; and (3) it must be an

10

injury that consumers themselves could not reasonably have avoided."  *Id*.  Each of these factors

11

is satisfied here.

12

8.      Plaintiffs have quantified the injury to consumers during the class period at

13

over $350 million.  The class period, which extends from November 15, 2004 to June 30, 2008,

14

captures less than half of the nine years the Re-Ordering Scheme has been in operation.

15

9.      There are no countervailing benefits to consumers or competition.  Instead

16

of predictability in their financial affairs, Wells Fargo's Re-Ordering Scheme imposes substantial

17

hidden penalties on those who can least afford it.  The testimony of Wells Fargo's expert, Dr.

18

Cox, that Wells Fargo's Re-Ordering Scheme is market-driven, and necessary to compete

19

effectively with its competitors, is illogical on its face:  offering and providing banking services

20

whereby consumers are *not* gouged by predatory practices (i.e., the alternative to Wells Fargo's

21

actual practices) would obviously attract customers and give Wells Fargo a potential competitive

22

advantage.  Moreover, on March 9, 2010, Wells Fargo's principal competitor in the California

23

market, Bank of America, announced that it would end overdraft charges on debit card

24

transactions entirely, by declining to authorize transactions for which there are insufficient funds

25

at the time authorization is requested.  Accordingly, if anything, competition requires that Wells

26

Fargo abandon, not embrace, its unfair business practices.

27

10.     Finally, Wells Fargo's policy of paying debit card transactions so as to put

28

accounts in an overdraft status—contrary to its own past practice and its customers' reasonable

- 16 -

expectations—renders these injuries not reasonably avoidable by consumers, who, like Plaintiffs, generally assume that a debit card transaction will not be authorized unless the account contains sufficient funds.

11.     In governing the relationship between bank and depositor, "where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise the discretion in good faith and in accordance with fair dealing." *Perdue v. Crocker Nat'l Bank*, 38 Cal. 3d 913, 923 (1985).  As the Court previously found:

> Applying that rule here, even if the bank-depositor contract confers discretion on the bank as to the sequence of honoring presentments, the bank must exercise its discretion in accordance with fair dealing and cannot exercise its discretion to enrich itself by gouging the consumer.  Put differently, even if the bank-depositor contract purports to allow the bank to post in any order it wishes, such discretion remains subject to the bank's duty of good faith and fair dealing.  There is a duty of good faith and fair dealing to honor checks [sic] in such a way as to be fair to the consumer and that discretionary power cannot be exercised so as pile on ever greater penalties on the depositor.

> * * *

> . . . This order holds that a contract claim for breach of the covenant of good faith and fair dealing falls within the unfair prong of Section 17200, at least based on the allegations of this case.  Where a bank has discretion under its agreement and that discretion is used to gouge consumers in violation of the covenant of good faith and fair dealing, then the unfair prong of Section 17200 applies.

(Dkt. No. 246, at 8-9.)

12.     In seeking to maximize the overdraft revenue it obtained from its customers, without providing any additional services or assuming any additional risk, Wells Fargo abused the discretion it had granted itself in its consumer account agreement to determine the order of posting.  Accordingly, the Re-Ordering Scheme is an "unfair" business practice on this additional ground.

**C.     The Class' Claim For Fraudulent And Deceptive Business Practices Under The UCL**

13.     Wells Fargo's failure to adequately disclose it re-ordering practices to class members, together with the statements such as that in its account-selection brochure, under the heading "ATM & Check Card" that "Purchase amounts are automatically deducted from your

1    primary checking account," constitute fraudulent business acts and practices within the meaning

2    of the UCL. Wells Fargo made similarly misleading representations in widely-disseminated

3    "Hands on Banking" materials, designed to educate students, such as Plaintiffs Gutierrez and

4    Walker, concerning the operation of Wells Fargo checking accounts.  These materials stated that

5    debit card purchases are "immediately" or "automatically" deducted from the corresponding

6    checking account.  These representations were false when made.Further, Wells Fargo's Consumer

7    Account Agreements are misleading and deceptive with respect to their statements regarding the

8    ordering of debit transactions.  Those statements, buried in a section deep within the lengthy

9    Consumer Account Agreements, do not disclose the manner or sequence in which Wells Fargo

10   groups and posts customers' debit transactions, but rather constituted vaguely worded mumbo

11   jumbo that failed to communicate any meaningful information.  Likewise, Wells Fargo's monthly

12   bank statements failed to provide Plaintiffs or other typical customers with adequate information

13   sufficient to determine Wells Fargo's debit reordering practices.

14            14.      The UCL is a strict liability statute.  *State Farm Fire & Casualty Co. v.*

15   *Superior Court*, 45 Cal. App. 4th 1093, 1102, 53 Cal. Rptr. 2d 229, 233 (1996); *Podolsky v. First*

16   *Healthcare Corp.*, 50 Cal. App. 4th 632, 647, 58 Cal. Rptr. 2d 89, 98 (1996).  Thus, it is no

17   defense to a UCL claim to show that the defendant lacked an intent to defraud.  *People v.*

18   *Cappuccio, Inc.*, 204 Cal. App. 3d 750, 756, 251 Cal. Rptr. 657, 660 (1988); *Feather River*

19   *Trailer Sales, Inc. v. Sillas*, 96 Cal. App. 3d 234, 247, 158 Cal. Rptr. 26, 34 (1979).

20            15.      As recently summarized in *Morgan v. AT&T Wireless Services, Inc.*, 177

21   Cal. App. 4th 1235, 99 Cal. Rptr. 2d 768 (2009):

22            [A] fraudulent business practice is one that is likely to deceive
             members of the public.  A UCL claim based on the fraudulent
23            prong can be based on representations that deceive because they are
             untrue, but also those which may be accurate on some level, but
24            will nonetheless tend to mislead or deceive.... A perfectly true
             statement couched in such a manner that it is likely to mislead or
25            deceive the consumer, such as by failure to disclose other relevant
             information, is actionable under the UCL.
26
                                          * * *
27
             The determination as to whether a business practice is deceptive is
28            based on the likely effect such practice would have on a reasonable

                                    - 18 -          PLS. PROPOSED FINDINGS AND CONCLUSIONS
                                                    CASE NO. C 07-05923 WHA (JCSX)

consumer.

*Id*. at 1255-57.

16.     A duty to disclose is present in any of the following circumstances:  (1) where the defendant had knowledge of material facts not known to plaintiff; (2) where the defendant actively conceals a material fact from plaintiff; or (3) where the defendant makes partial representations but also suppresses some material fact.  *Falk v. General Motors Corp*., 496 F. Supp. 2d 1088, 1094-97 (N.D. Cal. 2007) (Alsup, J.); *Limandri v. Judkins*, 52 Cal. App. 4th 326, 337, 60 Cal. Rptr. 2d 539 (1997).  Wells Fargo had a duty to disclose its posting practices to class members under all three of these tests.

17.     First, Wells Fargo knew its Re-Ordering Scheme, and its effect on class members' propensity to incur overdraft charges on debit card transactions, as Wells Fargo paid a consultant who employed a sophisticated financial model to project the excess revenue it intended to squeeze from its loyal checking account customers based on nothing more than a change in computer programming.  Wells Fargo kept this information to itself, and did not share it with class members.  As the Court previously found, Wells Fargo's only purported disclosure to its customers of its re-ordering practices, "buried deep within" its lengthy account agreement,

> only says the bank *might* post items presented against the account in any order the bank chooses (unless the law requires otherwise).  It uses the word "may" rather than "will" leading the customers to believe, in the context of the statement, that reordering is not automatic but merely an exception – whereas reordering is a secret daily routine aimed solely at maximizing penalty revenue for the bank at the expense of the customer.

Order Denying Defendant's Motion for Summary Judgment and Granting in Part and Denying in Part Plaintiffs' Motion (Dkt. No. 98), at 15.

18.     Not only was Wells Fargo's purported disclosure of its posting practices insufficient, the above-quoted language remained unchanged before, during, and after the various stages of Wells Fargo's Re-Ordering Scheme.  A disclosure which *does not change* cannot be an adequate disclosure *of a change*.  Because it uses the same language to describe Wells Fargo's pre-April 2001, "low to high" posting order, its April-November 2001 "grouped" "high to low" posting order, and its post-November 2001, "un-grouped" "high to low" posting order, this

- 19 -

1   purported "disclosure" provides class members with no useful information concerning Wells

2   Fargo's posting practices, and works an active concealment of the underlying changes, which is

3   the second ground on which the law recognizes a duty to disclose.

4          19.    Finally, other representations widely disseminated by Wells Fargo

5   concerning its posting practices were likely to mislead a reasonable consumer.  At a minimum,

6   these partial representations created a duty to clearly and prominently disclose Wells Fargo's

7   transaction posting practices and their impact on depositors.  Specifically, the representation in

8   Wells Fargo's "Checking, Savings and More" brochure, which provides prospective depositors

9   with basic information about the types of accounts available, under the heading "ATM & Check

10  Card," that "Purchase amounts are automatically deducted from your primary checking account,"

11  falsely implied that Wells Fargo was continuing to follow its historical practice of declining to

12  authorize debit card transactions into overdraft, and reinforced the common-sense expectation,

13  held by Plaintiffs, that money would be withdrawn from their account immediately upon

14  authorization of a debit card transaction, and that if the account had insufficient funds at the time

15  authorization was requested, authorization would be declined.  These legitimate consumer

16  expectations, fostered by Wells Fargo in both its educational and promotional materials, provide

17  the third basis on which to ground  a duty to disclose.  *See Bardin v. Daimlerchrysler Corp.* 136

18  Cal. App. 4th 1255, 1275 (2006) (no duty to disclose because "[i]n order to be deceived, members

19  of the public must have had an expectation or an assumption" about the matter undisclosed).

20         20.    In addition, a duty to disclose material facts will be found where a

21  relationship of trust and confidence is involved.  In *Barrett v. Bank of America*, 183 Cal. App. 3d

22  1362, 1369, 229 Cal. Rptr. 16, 20 (1986), the court ruled that the quasi-fiduciary relationship of a

23  bank to its depositor was sufficient create a duty to disclose.  As a practical matter, it cannot

24  reasonably be disputed that a relationship of trust and confidence exists between a depositor and

25  his or her bank.  In substance, the depositor gives the bank all of his or her money, asks them to

26  hold it for safekeeping, and trusts that it will be returned when requested, minus only appropriate

27  fees.  This provides an additional ground creating Wells Fargo's duty to disclose material facts to

28  class members regarding the posting of their transactions.

1      21.      In *In re Tobacco II Cases*, 46 Cal. 4th 298, 93 Cal. Rptr. 3d 559 (2009), the

2    California Supreme Court clarified the showing required for a class to prevail on a fraudulent

3    business practices claim under the UCL:

> While a plaintiff must show that the misrepresentation was an
> immediate cause of the injury-producing conduct, the plaintiff need
> not demonstrate it was the only cause.  It is not ... necessary that
> [the plaintiff's] reliance upon the truth of the fraudulent
> misrepresentation be the sole or even the predominant or decisive
> factor influencing his conduct.... It is enough that the representation
> has played a substantial part, and so had been a substantial factor, in
> influencing his decision.  [¶]  Moreover, a presumption, or at least
> an inference, of reliance arises wherever there is a showing that a
> misrepresentation was material.  A misrepresentation is judged to
> be 'material' if 'a reasonable man would attach importance to its
> existence or nonexistence in determining his choice of action in the
> transaction in question, and as such materiality is generally a
> question of fact unless the 'fact misrepresented is so obviously
> unimportant that the jury could not reasonably find that a
> reasonable man would have been influenced by it.
>
>                          * * *
>
> [W]hile a plaintiff must allege that the defendant's
> misrepresentations were an immediate cause of the injury-causing
> conduct, the plaintiff is not required to allege that those
> misrepresentations were the sole or even the decisive cause of the
> injury-producing conduct.  Furthermore, where, as here, a plaintiff
> alleges exposure to a long-term advertising campaign, the plaintiff
> is not required to plead with an unrealistic degree of specificity that
> the plaintiff relied on particular advertisements or statements.
> Finally, an allegation of reliance is not defeated merely because
> there was alternative information available to the consumer-
> plaintiff, even regarding an issue as prominent as whether cigarette
> smoking causes cancer.  Accordingly, we conclude that a plaintiff
> must plead and prove actual reliance to satisfy the standing
> requirement of section 17204 but, consistent with the principles set
> forth above, is not required to necessarily plead and prove
> individualized reliance on specific misrepresentations or false
> statements where, as here, those misrepresentations and false
> statements were part of an extensive and long-term advertising
> campaign.

46 Cal. 4th at 326-28.

24      22.      Plaintiffs attached, and reasonable consumers would attach, importance to

25   having a clear understanding of Wells Fargo's posting procedures in determining whether to

26   proceed with a debit card transaction that would generate an overdraft.  Accordingly, reliance on

- 21 -

1    Wells Fargo's misrepresentations and nondisclosures must  be presumed with respect to the class

2    as a whole.

3            23.    In addition, inasmuch as the "Checking, Savings and More" brochure is the

4    single document most likely to be provided to and consulted by class members in determining

5    what type of account to open, it is reasonable to presume that the members of the class were

6    exposed to and relied on the misrepresentation it contains.  As the Court previously ruled:

7            Where the whole point of a brochure is to disclose key points and to
             invite the consumer to rely on it, the law should permit the
8            inference and presumption, subject to rebuttal on a case-by-case
             basis, that the brochure was relied on, at least when the consumer
9            reviewed the brochure.  The disclosures in the welcome jacket were
             intended by the bank to be relied on by consumers.  A presumption
10           of reliance is warranted.

11   (Dkt. No. 247, at 9.)

12           **D.    Restitution**

13           24.    Under the UCL, once liability is established, Plaintiffs and the class are

14   entitled to restitution of "any money . . . which may have been acquired by means of such unfair

15   competition."  Cal. Bus. & Prof. Code § 17203.  As one California court explained:

16           An order for restitution is one compelling a UCL defendant to
             return money obtained through an unfair business practice to those
17           persons in interest from whom the property was taken, that is, to
             persons who had an ownership interest in the property or those
18           claiming through that person.  Restitution is broad enough,
             however, to allow a plaintiff to recover money or property in which
19           he or she was a vested interest.  The goal of restitution is to restore
             the *status quo ante* as nearly as possible.
20
21   *Tomlinson v. Indymac Bank, F.S.B.*, 359 F. Supp. 2d 891, 893-94 (N.D. Cal. 2005) (emphasis

22   added).  *Accord Miletak v. Allstate Ins. Co.*, 2010 WL 809579, *7 (N.D. Cal. Mar. 5, 2010) ("a

23   court of equity may exercise the full range of its inherent powers in order to accomplish complete

24   justice between the parties, restoring if necessary the status quo ante as nearly as may be

25   achieved").

26           25.    In this case, the "status quo ante" is the debit processing order that Wells

27   Fargo employed immediately prior to April 2001, when it began to implement its Re-Ordering

28   Scheme.  Wells Fargo complains that the alternative processing scenarios used by Plaintiffs to

PLS. PROPOSED FINDINGS AND CONCLUSIONS
CASE NO. C 07-05923 WHA (JCSX)

1   calculate the difference between the overdraft charges actually paid to Wells Fargo and the

2   amount of charges that *would* have been paid under the alternative scenarios all suffer from the

3   defect that they do not precisely duplicate a posting procedure actually used by Wells Fargo.  No

4   such criticism can be leveled at Plaintiffs' calculations based on the *actual* posting order utilized

5   by Wells Fargo immediately before it began "rolling out" its Re-Ordering Scheme.  Accordingly,

6   the Court adopts this methodology, and awards Plaintiffs and the re-sequencing class restitution

7   in the amount of $351,494,698.49.

8            26.     Plaintiffs and the class are also entitled to prejudgment interest on this sum.

9   *Miletak*, 2010 WL 809579, *7.

10          **E.      Class' Claim For False Advertising Under the UCL**

11           27.     The statement in Wells Fargo's "Checking, Savings and More" brochure

12   under the heading "ATM & Check Card" that "Purchase amounts are automatically deducted

13   from your primary checking account." was untrue, misleading, and was known by Wells Fargo,

14   or in the exercise of reasonable care should have been known by Wells Fargo, to be untrue and

15   misleading, in violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500,

16   *et seq*.  As restitution is being awarded pursuant to the UCL, there is no need to separately

17   calculate the amount to which the class is entitled pursuant to its companion statute, the False

18   Advertising Law.

19          **F.      Class' Claim For Common Law Fraud**

20           28.     The elements of an action for fraud based on nondisclosure or concealment

21   are:  (1) nondisclosure or concealment of a material fact; (2) a duty to disclose the fact to

22   plaintiff; (3) intent to defraud; (4) plaintiff was unaware of the fact and would not have acted as

23   he or she did if he had known of the concealed or suppressed fact; and (5) as a result of the

24   concealment or nondisclosure, the plaintiff sustained damage.  *Marketing West, Inc. v. Sanyo*

25   *Fisher (USA) Corp*., 6 Cal. App. 4th 603, 612-13 (1992).

26           29.     As set forth in the foregoing discussion regarding Plaintiffs' fraudulent and

27   deceptive business practices claim, Wells Fargo breached its duty to disclose its posting

28   procedures and their impact on Plaintiffs and the class.  This information would have been

material to Plaintiffs and the class in deciding whether to proceed with debit card transactions that may be authorized into overdraft.  Wells Fargo's misrepresentation in the "Checking, Savings and More" brochure that money is withdrawn from a debit cardholder's account "automatically" would also have been material to a reasonable consumer deciding whether to proceed with debit card transactions that may be authorized into overdraft.

30.     The damages awarded to Plaintiffs and the class on their fraud claim, like the restitution awarded to Plaintiffs on their UCL claims, should likewise be based on the *status quo ante* before Wells Fargo began implementing its Re-Ordering Scheme.  Accordingly, the Court also awards (non-cumulative) damages on this claim of $351,494,698.49.

31.     As this is a bench trial, the Court will bifurcate trial on the issue of punitive damages.

## G.   Class' Claim For Negligent Misrepresentation

32.     The statement in Wells Fargo's "Checking, Savings and More" brochure under the heading "ATM & Check Card" that "Purchase amounts are automatically deducted from your primary checking account." was false, misleading, and was known by Wells Fargo, or in the exercise of reasonable care should have been known by Wells Fargo, to be false and misleading, and was detrimentally relied upon by Plaintiffs and the class in engaging in debit card transactions, causing them to incur additional, unnecessary overdraft fees.

## H.   Individual Claims

33.     In addition to the class claims, Plaintiffs William Smith and Erin Walker have individual claims based on Wells Fargo's practice of providing them with inaccurate online balance information, which induced them to engage in transactions they would not otherwise have engaged in that led to overdraft charges.

34.     Specifically, at the time authorization is requested for a debit card transaction, the amount authorized is deducted from the accountholder's available balance.  If the transaction does not settle within a certain number of days from the date of authorization, the authorized amount is added back into the accountholder's available balance.  When the transaction is settled on a subsequent day, the amount is again deducted from the customer's

1    available balance.  In this scenario, between the adding back of the authorized amount and the

2    deduction of the settlement amount, the available balance information provided by Wells Fargo

3    was inaccurate.

4            35.     Plaintiffs Smith and Walker each relied to their detriment on inaccurate

5    balance information provided to Wells Fargo in entering into transactions which they believed, at

6    the time, they had sufficient funds to "cover."  This information was material to Plaintiffs'

7    decisions to engage in those transactions.  In addition, as the Court has already held (see Dkt. No.

8    247, at 9), Plaintiff Walker is entitled to a presumption that he relied on the following statement

9    in the "Welcome to Your New Account Jacket,"  "Gain Moore Control Over Your Finances With

10   Wells Fargo Online Banking.  . . . Check your account balances  . . . ."

11           36.     Accordingly, Plaintiffs Smith and Walker assert the following claims based

12   on Wells Fargo's provision of inaccurate balance information, and, as to Plaintiff Smith, the

13   aforementioned statement in the Welcome Jacket, which was misleading:  (1) "unfair" business

14   acts and practices, in violation of the UCL; (2) "fraudulent" business acts and practices, in

15   violation of the UCL; (3) false advertising in violation of Cal. Bus. & Prof. Code § 17500, *et seq.*,

16   (as to the Welcome Jacket only); (4) fraud; and (5) negligent misrepresentation.

17           37.     On their individual "including-and-deleting" claims, as they have come to

18   be called, the Court awards plaintiff Smith his requested damages of $68, and Plaintiff Walker her

19   requested damages of $34.

20           38.     Finally, on their UCL claims, Plaintiffs and the class seek a permanent

21   injunction enjoining Wells Fargo from engaging in the unfair and fraudulent business practices at

22   issue in this case.  A separate injunction will issue.

23

24

25

26

27

28

PLS. PROPOSED FINDINGS AND CONCLUSIONS
CASE NO. C 07-05923 WHA (JCSX)

1

2    Dated:  April 13, 2010                    Respectfully submitted,

3                                              LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

4
                                               By:          /s/ *Barry Himmelstein*
5                                                           Barry Himmelstein

6                                              Richard M. Heimann (State Bar No. 063607)
                                               Barry R. Himmelstein (State Bar No. 157736)
7                                              Michael W. Sobol (State Bar No. 194857)
                                               Roger Heller (State Bar No. 215348)
8                                              Mikaela Bernstein (State Bar No. 261301)
                                               275 Battery Street, 29th Floor
9                                              San Francisco, CA  94111-3339
                                               Telephone:  (415) 956-1000
10                                             Facsimile:  (415) 956-1008

11                                             Richard D. McCune (State Bar No. 132124)
                                               E-mail:  rdm@mwtriallawyers.com
12                                             Jae (Eddie) K. Kim (State Bar No. 236805)
                                               E-mail:  jkk@mwtriallawyers.com
13                                             McCUNE & WRIGHT, LLP
                                               2068 Orange Tree Lane, Suite 216
14                                             Redlands, CA  92374
                                               Telephone:  (909) 557-1250
15                                             Facsimile:  (909) 557-1275

16                                             *Attorneys for Plaintiffs and the Class*

17

18

19   865834.1

20

21

22

23

24

25

26

27

28

PLS. PROPOSED FINDINGS AND CONCLUSIONS
CASE NO. C 07-05923 WHA (JCSX)