IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

VERONICA GUTIERREZ, ERIN WALKER, and WILLIAM SMITH, as individuals and on behalf of all others similarly situated,

    Plaintiffs,

  v.

WELLS FARGO BANK, N.A.,

    Defendant.

No. C 07-05923 WHA

**CLASS ACTION**

**ORDER DENYING MOTION TO AMEND FINDINGS OF FACT AND CONCLUSIONS OF LAW BASED UPON DISCOVERY OF THE NORWEST STUDY**

**INTRODUCTION**

Following two and a half years of extended litigation, this certified consumer class action culminated in a two-week bench trial that ended in May 2010. Three months later, in August 2010, a 90-page order set forth the findings of fact and conclusions of law after a thorough review of the trial record and the arguments presented by both sides. Now — nearly five months after the close of evidence — defendant Wells Fargo Bank, N.A. moves to amend the findings and conclusions pursuant to FRCP 52(b) due to the emergence of "newly discovered evidence" that supposedly warrants such relief. For the reasons stated below, defendant's motion is **DENIED**.

**STATEMENT**

The factual and procedural backgrounds of this class action were set forth in the August 2010 order (Dkt. No. 477). Only the essential details will be repeated here.

### 1. THE NORWEST STUDY

Wells Fargo's motion centers around a particular consumer research study that was first mentioned by bank witnesses during depositions taken in November 2008 and January 2009. The study — called the "Norwest study" herein — supposedly evidenced a depositor's preference for posting transactions from highest-to-lowest dollar amount. According to bank witnesses, this study was conducted by Norwest Bank prior to its acquisition of Wells Fargo in 1998, and was allegedly reviewed by Wells Fargo senior management, including bank witnesses Les Biller and Ken Zimmerman, prior to their decision to adopt a high-to-low posting order for Wells Fargo depositors in California. In this connection, Mr. Zimmerman, who was the Vice-President of Wells Fargo's Consumer Checking Division at the time the initial decision on posting order was made, testified at trial (Tr. 89):

> [The Norwest study] was important to the foundation that senior management believed, which was that consumers had a preference for transactions to be sorted high to low, because it ensured that their most important transactions had a better — better chance of being paid.

Other bank witnesses, including Wells Fargo's damages expert, Alan James Cox, also alluded to the supposed "findings" of the Norwest study regarding consumer preferences and the bank's supposed reliance upon the study in its decision to adopt a high-to-low posting order (*see, e.g.*, *id.* at 1822).

Despite this alleged role that the Norwest study played in the bank's decision to adopt a high-to-low posting order, *the Norwest study was never produced by Wells Fargo*. Indeed, the bank's failure to produce the Norwest study after plaintiffs had specifically asked for it during discovery was the subject of a pre-trial motion *in limine* (Dkt. No. 352). When pressed on the matter at the final pretrial conference, lead counsel for Wells Fargo stated that the missing Norwest study would *not* be relied upon by *any* of the bank's experts and that it was only being mentioned "as evidence of Mr. Zimmerman's state of mind and his good-faith consideration of factors" behind the bank's decision to post transactions in high-to-low order (Pretrial Conf. Tr. 120–21). Defense counsel also stated — point bank — that the bank was "not relying on the

2

1  survey itself" and therefore its absence was of little to no consequence (*id.* at 120).  Based upon

2  these representations, plaintiff's counsel withdrew their objections.

3        Since the Norwest study was never produced by the bank, plaintiffs were unable to verify

4  whether the study actually stated what bank witnesses represented.  Plaintiffs were also unable to

5  scrutinize the methodologies (if any) used in the research.  It was simply an unseen character in

6  the bank's proffered story, often spoken of but never seen.  Even when spoken of, however, bank

7  witnesses could not remember much about the details of the study.  For example, when asked

8  about the Norwest study on cross-examination, Mr. Zimmerman stated that he could not recall its

9  approximate length, in what decade it was conducted, where it was conducted, whether it was

10 based upon a focus group or a questionnaire, approximately how many consumers were studied,

11 the demographics of the consumers who were studied, whether the report contained any statistical

12 analyses, whether it only targeted the posting of checks versus other types of transactions, or who

13 conducted the study (Tr. 87–92).  All Mr. Zimmerman could miraculously recall while on the

14 witness stand was "the summary outcome of the study," which he was "certain" stated that more

15 than 50 percent of customers favored high-to-low posting versus those who did not (*id.* at 92–93).

16       Mr. Biller's recollection of the Norwest study — admitted into evidence at trial as

17 videotaped deposition testimony — was similarly muddled, save one convenient point of clarity.

18 In harmony with Mr. Zimmerman's testimony, Mr. Biller testified that he had read a consumer

19 research study from Norwest that supposedly showed "the importance that consumers placed on

20 making sure their most important transactions did not get rejected" (TX 220B at 92–93).

21       Wells Fargo's damages expert, Dr. Cox, relied upon these "recollections" of the supposed

22 contents of the Norwest study by bank witnesses, despite never seeing any actual copies of the

23 survey itself.

24       **2.**    **THE COURT'S FINDINGS AND CONCLUSIONS**

25       In the 90-page findings of fact and conclusions of law filed in August 2010, the

26 undersigned judge commented on the absence of the Norwest study and stated — based upon the

27 complete trial record — that "[t]he bank produced no study or documentary evidence that any

28 Wells Fargo customers preferred a high-to-low posting order" and that the bank had "been given

3

1  a full and fair opportunity to prove that depositors prefer high-to-low posting" but "utterly failed
2  to do so" (Findings ¶¶ 150, 156).  In particular, the August 2010 findings emphasized that Wells
3  Fargo had "been given a full and fair opportunity to find and procure the illusory 'Norwest
4  Study'" but that the study "proved to be an utter phantom" (*ibid.*).

5  Of course, the absence of the Norwest study at trial was only one drop of water amidst a
6  tidal wave of evidence supporting the Court's findings and conclusions.  Indeed, the many
7  internal bank memos dissected throughout the findings pertaining to the bank's "Balance Sheet
8  Engineering" initiatives provided convincing proof that the challenged posting practices were
9  motivated by profiteering and *not* by a purported consumer preference for high-to-low posting.
10 The failure by Wells Fargo to produce the supposed Norwest study simply underscored what
11 these internal memos, effective cross-examination of bank witnesses, and other documentary
12 evidence confirmed:  consumer preferences did not motivate Wells Fargo's decision to post in
13 high-to-low order.  In the end, the August 2010 order found — among many other findings —
14 that depositors expected and naturally assumed that their transactions would be posted in the
15 order transacted, and *not* in the high-to-low order adopted by the bank.

16 **3.   AN UNTIMELY DISCOVERY**

17 On September 30, nearly two months after the findings of fact and conclusions of law
18 were issued and almost five months after the close of evidence at trial, Wells Fargo filed the
19 instant motion and therein notified the Court that the Norwest study had been found after all.  The
20 circumstances behind its discovery are set forth in the declaration filed by P. Andrew Will, a
21 former Norwest Bank and Wells Fargo employee.

22 According to Mr. Will, he received a copy of the August 2010 findings and conclusions
23 from one of his colleagues at Marshall & Ilsley Corp., his current employer, shortly after it was
24 issued in August.  Up until that time, Mr. Will was supposedly unaware that Wells Fargo, his
25 former employer, was involved in the instant litigation.  Indeed, in the days "immediately before"
26 reading the August 2010 order, Mr. Will had been cleaning out his garage and "came across a few
27 papers from [his] time with Norwest Bank" (Will Decl. ¶ 3).  He was intending to throw these
28 artifacts out, but — for whatever reason — did not get around to completing the task.  When

4

reading the findings pertaining to the "phantom" Norwest study, Mr. Will realized that this very study was strewn amongst the papers discovered in his garage. Believing that the study "might be relevant to the ongoing proceedings in this litigation," Mr. Will then provided his copy of the Norwest study to the general counsel for his employer, who in turn forwarded the study to the general counsel for Wells Fargo. Soon thereafter, Mr. Will was approached by defense counsel in the instant action to memorialize and authenticate his discovery. Upon the filing of the instant motion, the Norwest study completed its journey from a garage in Milwaukee to the desk of the undersigned judge.

### 4. THE TRUTH REVEALED

Given its mythical status at trial, the *actual* Norwest study presents a compelling read. Prepared in April 1995 at the direction of Norwest Bank by a Minneapolis company called Action Marketing Research, Inc. ("AMR"), the study was aimed in part at determining depositor "preferences for how banks deal with overdrafts when multiple items are presented for payment at the same time" (*id.* at Exh. A at 1). To determine these preferences, AMR conducted a phone interview of 450 Norwest Bank customers in "the Twin Cities, Phoenix and South Dakota markets" (*id.* at 2).

As a preliminary matter, the Norwest study makes clear that the only question it attempted to answer was "what Norwest should do if multiple *checks* from a customer are presented at once without sufficient funds to cover all of them" (*id.* at 24) (emphasis added). As Wells Fargo readily admits in its briefing, the study had nothing to do with debit cards (the focus of the instant action) (Reply 4–5). Additionally, the survey methodology used by AMR was unorthodox. Two thirds of the way through interviewing depositors, AMR changed the questions it asked interviewees due to apparent "inconsistencies" in the responses it had been receiving from depositors. Even so, the results of the Norwest study and its ultimate conclusions and recommendations are astounding.

Beginning with the last set of questions that were asked of 150 Norwest Bank depositors (the last third of the 450 depositors interviewed by AMR) (*id.* at 24):

- 41% (62 consumers) said they would prefer that the bank pay the largest checks first

5

- 41% (62 consumers) said they would prefer that the bank pay them in check order number

- 9% (13 consumers) said they would prefer that the bank pay the smallest checks first

- the remaining 13 who answered the question were undecided

As these numbers plainly show, when presented with these three different check-posting options, depositors were evenly split between paying multiple checks in highest-to-lowest dollar amount and paying checks in check order number. When presented with all three of these options, 50 percent of depositors preferred a posting order *other than* highest-to-lowest dollar amount.

The survey results from the first 300 depositors interviewed by AMR, however, are even more eye-opening. These interviewees were presented with a *different* set of questions regarding what Norwest should do if multiple checks from a customer are presented at once without sufficient funds to cover all of them. The Norwest study stated (*id.* at 26):

- Paying the largest checks was preferred over paying smaller checks by 73% to 18%, respectively

But

- Paying checks "according to the order in which they were written" was preferred over paying the largest checks by 58% to 35%

In other words, while 300 depositors surveyed by AMR indicated that they preferred larger checks to be paid before smaller checks, a significant majority of depositors stated that posting checks in chronological order was preferred over a high-to-low posting order.

Given these survey results, AMR provided the following recommendation regarding what Norwest should do if multiple checks from a customer are presented at once without sufficient funds to cover all of them (*ibid.*) (emphasis added):

> We conclude that *paying in serial order is the better choice* for Norwest to make. Insofar as this policy is communicated to consumers, it should come across as unequivocal and simple. A consumer who deliberately takes a risk of check overdrafts can engineer which checks will be paid first.

This recommendation to post "in serial order" and *not* high-to-low order was echoed in AMR's "summary" of its findings and recommendations (*id.* at 3) (emphasis in original):

6

> What should Norwest do when a customer has several checks to be paid but lacks the funds to cover all of them? Results were somewhat equivocal, but *we feel that the best general policy is to pay them in check serial number.* Paying the largest checks first was the other popular alternative. When just these two were offered, payment in order was preferred more strongly. This approach has the advantage of being highly objective and easily understood by the consumer.

Significantly, nowhere in the Norwest study was anything mentioned about "the importance that consumers placed on making sure their most important transactions did not get rejected," as Mr. Biller expressly stated in his deposition testimony admitted at trial (TX 220B at 92–93). Indeed, the study made no comment whatsoever on whether larger or smaller items were more or less "important" to depositors. Interviewees who evinced a preference for a high-to-low ordering were never even asked by AMR *why* they held such a preference. Similarly, despite Mr. Zimmerman's testimony at trial that he was "certain" that the Norwest study stated that over 50 percent of surveyed depositors preferred a high-to-low posting order versus those who did not, neither the summary nor any other portion of the study said any such thing. By contrast, the summary expressly recommended *in bold lettering* that Norwest bank post check transactions in serial number order — an ordering that would be easily understood by consumers and would reasonably track the chronological order in which checks had been written.

**ANALYSIS**

Under FRCP 52(b), on "a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings — or make additional findings — and may amend the judgment accordingly." In the August 2010 findings, the parties were directed to meet and confer on both the scope of restitution (specifically, whether to extend restitution beyond the end of the original class period) and to hammer out the details surrounding how the bank would implement the equitable relief ordered therein. The fruits of these discussions — including a proposed form of judgment — will be presented on October 19. Since judgment has therefore not yet been entered, the instant motion is at least *procedurally* timely under FRCP 52(b).

Whether the instant motion is meritorious, however, is an entirely different question. The purpose of post-judgment motions under FRCP 52(b) is to allow the parties to present newly discovered evidence and give the district court an opportunity to correct manifest errors of law or

7

fact at trial, take additional testimony, make additional findings, or take other actions in the interests of justice. *See Deutsch v. Burlington Northern R.R. Co.*, 983 F.2d 741, 744 (7th Cir. 1992); *see also Metropolitan Business Management, Inc. v. Allstate Ins. Co.,* 2009 WL 4119270, at *4 (C.D. Cal. 2009). The decision to alter or amend findings is committed to the sound discretion of the trial judge.

In the instant motion, Wells Fargo contends that the post-trial discovery of the Norwest study by Mr. Will constitutes "newly discovered evidence" warranting amendment of the August 2010 findings. Under this theory, Wells Fargo must show that they discovered the evidence after trial, that they could not have discovered the evidence sooner through the exercise of reasonable diligence, and that the new evidence is of such magnitude that it would likely have changed the outcome of the case. *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 998 (9th Cir. 2001) (citation omitted). As explained below, the instant motion fails on multiple grounds.

### 1. THE BANK FAILED TO EXERCISE REASONABLE DILIGENCE TO LOCATE THE NORWEST STUDY

While it may be true that Wells Fargo conducted multiple searches of its own files to locate documents relevant to the issues litigated herein (*see* Jolley Decl. ¶¶ 5–6), given the specific role played by the Norwest study in the testimony of bank witnesses (and the bank's defense strategy in general), a more diligent search for the study should have been performed long ago. Indeed, Wells Fargo knew about the Norwest study as early as November 2008, when one of its central witnesses at trial, Mr. Zimmerman, alluded to it during his deposition. The Norwest study was again referred to in Mr. Biller's deposition in January 2009. Despite these early whispers of its potential significance at trial, no specific search for the Norwest study was ever undertaken (Reply 6). In other words, while Wells Fargo *knew* that a potentially material document could not be located amongst its own records, it made no attempt to search beyond the four walls of the bank.

Given these circumstances, the bank's limited efforts to locate the Norwest study prior to trial do not constitute reasonable diligence. Rather, by deciding to forego a particularized search for the document, Wells Fargo "rolled the dice" that the unrefreshed "recollections" of the document by bank witnesses at trial would be enough to show that the Norwest survey evidenced

8

a consumer preference for high-to-low posting and that bank management relied upon the survey when deciding to post in high-to-low order. The bet was lost.

For this reason alone, Wells Fargo's motion to amend the findings cannot be granted.

### 2. THE NORWEST STUDY IS DAMAGING TO WELLS FARGO'S DEFENSE AND CONFIRMS THE AUGUST 2010 FINDINGS AND CONCLUSIONS

Even if Wells Fargo had exercised reasonable diligence in searching for the Norwest study, the "newly discovered" copy of the study is far from evidence "of such magnitude that it would likely have changed the outcome of the case." Rather, the survey results and express recommendations within the Norwest study confirm that chronological posting is not only what depositors prefer, but it also "has the advantage of being highly objective and easily understood by the consumer" (Will Decl. Exh. A at 3).

Take, for example, the "summary" portion of the Norwest study. In summarizing what Norwest bank should do when presented with multiple checks but insufficient funds to cover them all, the study stated *in bold lettering* that "we feel that the best general policy is to pay them in check serial number" (*ibid.*). This was based upon interviews with over 450 depositors that showed — in the Norwest study's own words — that "payment in order was preferred more strongly" than paying "the largest checks first" (*ibid.*). In the hands of skilled counsel, and Attorney Richard Heimann was certainly skilled, this language would have provided fertile ground to further impeach and discredit the testimony provided by Mr. Zimmerman and Mr. Biller regarding their alleged reliance upon the "findings" of the Norwest study. In particular, contrary to the testimony of these witnesses, the Norwest study said *nothing* about "larger items" being "more important" to depositors, and did *not* state that a high-to-low posting order was preferred over all other options. The Norwest study described by Wells Fargo witnesses in their depositions and at trial was truly "illusory" and a "phantom" — exactly as the August 2010 order described it.

Wells Fargo's argument that the findings be amended to reflect the existence of the Norwest study ignores the wider implications of treating this document as if it were part of the trial record. The ability to ask questions is a trial lawyer's greatest resource in uncovering the truth. Had Mr. Zimmerman and Mr. Biller been subject to cross-examination by plaintiffs'

9

counsel about the actual contents of the Norwest survey, and had the Norwest study been admitted into evidence at trial, the case against Wells Fargo likely would have been even *more* overwhelming. In other words, rather than bolstering the credibility of bank witnesses, the Norwest study — which proved to be a very different document than Wells Fargo had represented — actually foreshadowed the very findings and conclusions reached by the Court. For these reasons, Wells Fargo's motion cannot be granted. The bank has failed to establish that the "newly discovered" Norwest study is evidence "of such magnitude that it would likely have changed the outcome of the case," or even that the mere existence of the study — which pertains solely to checks and has nothing to do with the posting of debit-card transactions — is at all material to the August 2010 findings.

## CONCLUSION

For the reasons set forth above, Wells Fargo's motion to amend the August 2010 findings of fact and conclusions of law is **DENIED**.

**IT IS SO ORDERED.**

Dated: October 18, 2010.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE