Sonya D. Winner, SB # 200348
David M Jolley, SB # 191164
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA  94111
Telephone:  (415) 591-6000
Facsimile:  (415) 591-6091

Emily Johnson Henn, SB # 269482
COVINGTON & BURLING LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA  94065
Telephone:      (650) 632-4700
Facsimile:      (650) 632-4800
E-mail:  ehenn@cov.com

Attorneys for Defendant
WELLS FARGO BANK, N.A.


# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA


| | |
|---|---|
| VERONICA GUTIERREZ, *et al.*, <br><br>     Plaintiff, <br><br>     v. <br><br> WELLS FARGO & COMPANY, *et al.* <br><br>     Defendant | Civil Case No.:  C 07-05923-WHA <br><br> **OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT FOLLOWING REMAND** <br><br> Date:  May 2, 2013 <br> Time:  8:00 a.m. <br> Dept.:  Courtroom 8, 19th Floor <br><br> **Honorable William H. Alsup** |

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................. 2

      A.   Pertinent Pretrial Proceedings.................................................................. 2

      B.   The Court's August 2010 Post-Trial Findings and Subsequent Judgment ............ 3

      C.   The Ninth Circuit's Decision .................................................................. 5

III.  ARGUMENT ...................................................................................................... 6

      A.   This Court's Original Findings and Judgment Did Not Award Restitution
           on Any Misrepresentation Claim.............................................................. 6

      B.   Plaintiffs' Waiver and Abandonment of Their Claim for Restitution
           Based on Misrepresentations Bars Any Belated Request for Such an
           Award Now.............................................................................................. 8

      C.   Plaintiffs Are Bound and Estopped by Their Judicial Admission That
           Olsen's Analysis Did Not Support a Restitution Award on Any
           Misrepresentation-Based Claim .............................................................. 11

      D.   The Record Does Not Support Any Award of Restitution for Affirmative
           Misrepresentations. .............................................................................. 12

           1.   Any Award of Restitution Must Be a Specific Measurable
                Amount Supported by Substantial Evidence, and Restitution May
                Not Be Awarded for Lawfully Charged Fees. ............................... 13

           2.   The Analysis of Plaintiffs' Expert Did Not Purport to Measure
                Harm to Customers from Affirmative Misrepresentations. ................. 15

      E.   The Court Should Not Permit Plaintiffs Yet Another Bite at the Apple. ........... 20

      F.   Plaintiffs' Arguments About Pre-judgment and Post-Judgment Interest
           Are Without Merit. ............................................................................... 21

      G.   Any Injunctive Relief Awarded Must Be Narrowly Tailored and Reflect
           the Absence of Any Current or Imminent Threat of Harm to the Class............... 22

IV.   CONCLUSION................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*American Title Ins. Co. v. Lacelaw Corp.,*
861 F.2d 224 (9th Cir. 1988) ........................................................................................11, 12

*BankAmerica Pension Plan v. McMath,*
206 F.3d 821 (9th Cir. 2000) ...................................................................................................8

*Bingham v. Zolt,*
66 F.3d 553 (2d Cir. 1995) ......................................................................................................7

*Church of Holy Light of Queen v. Holder,*
443 F. App'x 302 (9th Cir. 2011) ..........................................................................................23

*City Nat'l Bank v. United States,*
907 F.2d 536 (5th Cir. 1990) .................................................................................................12

*Columbia Pictures Indus., Inc. v. Fung,*
-- F.3d --, 2013 WL 1174151 (9th Cir. Mar. 21, 2013) ...................................................22, 23

*Comcast Corp. v. Behrend,*
569 U.S. --, 2013 WL 1222646 (Mar. 27, 2013) ...................................................................16

*Del Webb Communities, Inc. v. Partington,*
652 F.3d 1145 (9th Cir. 2011) ...............................................................................................22

*Great Am. Ins. Co. v. Wexler Ins. Agency, Inc.,*
2000 WL 290380 (C.D. Cal. Feb. 18, 2000) .........................................................................17

*Gutierrez v. Wells Fargo Bank, N.A.,*
704 F.3d 712 (9th Cir. 2012) ..........................................................................................passim

*In re eBay Litig.,*
2012 WL 3945524 (N.D. Cal. Sept. 10, 2012) ......................................................................14

*In re Google Adwords Litigation,*
2012 WL 28068 (N.D. Cal. Jan. 5, 2012) ..............................................................................20

*Magallanes-Damian v. INS,*
783 F.2d 931 (9th Cir. 1986) ........................................................................................8, 9, 12

*Martinez v. Bally's La., Inc.,*
244 F.3d 474 (5th Cir. 2001) .................................................................................................12

*Meinhold v. U.S. Dep't of Defense,*
34 F.3d 1469 (9th Cir. 1994) .................................................................................................23

*Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC,*
  692 F.3d 983 (9th Cir. 2012) ..................................................................................11

*Orantes-Hernandez v. Thornburgh,*
  919 F.2d 549 (9th Cir. 1990) ..................................................................................23

*Planned Parenthood of the Columbia/Willamette Inc. v. American Coalition of Life
  Activists,*
  518 F.3d 1013 (9th Cir. 2008) ................................................................................21

*Ramirez v. City of Buena Park,*
  560 F.3d 1012 (9th Cir. 2009) ..................................................................................8

*Savers Fed. Sav. & Loan Assoc. v. Reetz,*
  888 F.2d 1497 (5th Cir. 1989) ..................................................................................9

*Stormans, Inc. v. Selecky,*
  586 F.3d 1109 (9th Cir. 2009) ...........................................................................23, 25

*Sun Microsystems, Inc. v. Microsoft Corp.,*
  188 F.3d 1115 (9th Cir. 1999) ................................................................................24

*TrafficSchool.com v. Edriver, Inc.,*
  653 F.3d 820 (9th Cir. 2011) ..................................................................................23

*USA Petroleum Co. v. Atlantic Richfield Co.,*
  13 F.3d 1276 (9th Cir. 1994) .................................................................................8, 9

*Vitelli v. Smithkline Beecham Clinical Labs.*
  238 F.3d 433, 2000 WL 1378305 (9th Cir. Sept. 25, 2000) .....................................8

*Wal-Mart Stores, Inc. v. Dukes,*
  131 S. Ct. 2541 (2011)............................................................................................17

*Wiener v. Dannon Co., Inc.,*
  255 F.R.D. 658 (C.D. Cal. 2009) ...........................................................................17

**CALIFORNIA CASES**

*Ball v. GTE Mobilnet of Cal.,*
  81 Cal. App. 4th 529 (2000) ...................................................................................15

*Colgan v. Leatherman Tool Group, Inc.,*
  135 Cal. App. 4th 663 (2006) .................................................................13, 14, 19, 20

*Day v. AT&T Corp.,*
  63 Cal. App. 4th 325 (1998) ...............................................................................14, 15

*In re Tobacco II Cases,*
  46 Cal. 4th 298 (2009)........................................................................................18, 24

*In re Vioxx,*
    180 Cal. App. 4th 116 (2009) ...................................................................14, 20

*Korea Supply Co. v. Lockheed Martin Corp.,*
    29 Cal. 4th 1134 (2003) .........................................................................13

*M & F Fishing, Inc. v. Sea-Pac Ins. Managers, Inc.,*
    202 Cal. App. 4th 1509 (2012) ...............................................................14

*Madrid v. Perot Sys. Corp.,*
    130 Cal. App. 4th 440 (2005) .................................................................24

*Pfizer Inc.* v. *Superior Court,*
    182 Cal. App. 4th 622 (2010) ....................................................14, 16, 18

*Tucker v. Pacific Bell Mobile Servs.,*
    208 Cal. App. 4th 201 (2012) ....................................................14, 15, 18

**STATE STATUTES**

Cal. Bus. & Prof. Code § 17203 .................................................................13, 18

**FEDERAL AUTHORITIES**

Fed. R. Civ. P. 65(d) .................................................................................22

# I.     INTRODUCTION

In March 2010, plaintiffs' counsel made a tactical decision.  Having directed their expert to perform his impact analysis for the class in manner that was unlikely to survive summary judgment as applied to any misrepresentation claim, plaintiffs conceded that their expert had "not attempted to quantify the amount of damages or restitution resulting from any classwide misrepresentation-based claims."  Dkt. No. 293-11.  Plaintiffs repeated this concession to the Court and confirmed that they sought only injunctive relief on those claims.

Wells Fargo and the Court took plaintiffs at their word.  At trial, Wells Fargo did not seek to offer all possible evidence concerning the quantification of monetary relief as it might apply specifically to plaintiffs' misrepresentation claims.  And the Court, for its part, explicitly differentiated in its post-trial Findings between the monetary relief granted solely for the "unfair" practice of high-low posting and the injunctive relief granted both for that "unfair" practice and for the "fraudulent" practices of non-disclosure and misrepresentations.

This waiver by plaintiffs is binding.  As lawyers do every day, plaintiffs' counsel chose to focus their efforts on claims and theories for which they believed they had the strongest chance of success, abandoning those that seemed less promising.  They are not entitled to revisit that choice now.

Plaintiffs' choice was, moreover, an entirely rational one.  Their expert's analysis did *not* attempt to quantify a measurable amount by which each class member lost money "by means of" the bank's affirmative misrepresentation about its posting order.  Even apart from the legal effects of plaintiffs' judicial admission and waiver, the record does not contain evidence upon which such a restitution award could be based.

On the issue of injunctive relief, plaintiffs' Motion offers little analysis or assistance to the Court.  The injunctive language they casually propose is both overbroad and ill-considered.  Any injunction entered at this stage must be specific, narrowly drawn to address ongoing or threatened harm for which liability has been properly found, and carefully calculated to serve the public interest.

## II.    BACKGROUND

### A.    Pertinent Pretrial Proceedings

On September 11, 2008, this Court certified a class to pursue a challenge to Wells Fargo's practice of posting debit-card transactions in high-low order each posting day. *See* Dkt. No. 98 at 25 ("This class will consist of all Wells Fargo California customers … who incurred overdraft fees on debit card transactions as a result of the bank's practice of re-sequencing transactions from highest to lowest.").

In early 2009, Wells Fargo sought summary judgment on plaintiffs' misrepresentation claims, pointing to sworn discovery responses confirming that the named plaintiffs had not personally relied on (or, in most instances, even seen) the documents that were identified as the basis for those claims. The court granted that motion in substantial part. *See* Dkt. No. 247. The only alleged affirmative misrepresentation as to which summary judgment was denied was a sentence in a "Welcome Jacket" handed out to new customers that referred to debit-card transactions as being paid "automatically" from a customer's account.[1]

In a separate motion, Wells Fargo sought decertification of the class on the ground that the analysis of plaintiffs' damages experts was legally insufficient. The Court agreed, finding the evidence defective as a matter of law. Dkt. No. 245. However, the Court elected to give plaintiffs a chance to start over and perform a new analysis. Dkt. No. 262. The previously scheduled trial date was deferred for nearly a year for this purpose.

After plaintiffs served their new expert report, Wells Fargo observed that it did not purport to provide a basis for any monetary award based on a misrepresentation theory (as opposed to the claim that the posting practice itself was unlawful). Wells Fargo's counsel

---

[1] *Id*. at 9-10. The Court also allowed plaintiff Gutierrez (but not plaintiff Walker) to pursue claims with respect to the Consumer Account Agreement ("CAA"). *Id*. at 10. Gutierrez did not claim at trial to have been misled by any affirmative misrepresentations in the CAA; nor did the Court find that she had. *See generally* Dkt. No. 477 at 7-8. At trial, it was confirmed that Gutierrez's version of the Welcome Jacket did not contain the "automatically" sentence. *See* Trial Tr. at 377; TX 86. The only alleged misrepresentation about which Gutierrez testified was instead a statement in a "Checking, Savings & More" brochure as to which summary judgment had been *explicitly* entered against her. *See* Trial Tr. at 373-76; TX 89; Dkt. No. 247 at 10-11.

reached out to plaintiffs' counsel to meet and confer on this point before renewing the bank's

motion for summary judgment.  Plaintiffs' response was straightforward and unequivocal:

> "We agree that Mr. Olsen has not attempted to quantify the amount of damages or restitution resulting from any classwide misrepresentation-based claims, and we do not intend to seek such damages at the upcoming trial.  Accordingly, it is not necessary for your motion to seek to preclude the recovery of classwide, misrepresentation-based damages based on Mr. Olsen's failure to perform such calculations.

Dkt. No. 293-11 (Jolley Dec., Ex. 1).

Wells Fargo's subsequent motion cited this concession and argued that,

"[a]ccordingly, if and to the extent that there may be any doubt that class claims might still exist

for fraud, negligent misrepresentation, or false advertising, or under the 'fraud' prong of the

UCL, summary judgment should be confirmed on any such claims."  Dkt. No. 292 at 23.

Plaintiffs' Opposition addressed this argument in a single short paragraph under the heading

"Plaintiffs May Seek Injunctive Relief on Their Misrepresentation-Based Claims":

> "Wells Fargo is correct that Plaintiffs have not, in Mr. Olsen's latest report, attempted to quantify classwide damages on their misrepresentation-based claims. However, Plaintiffs may still seek injunctive relief based on these claims. Accordingly, summary judgment is inappropriate."

Dkt. No. 316 at 14.  The Court accepted this argument and denied the motion.  Dkt. No. 338.

At trial, the only evidence presented by plaintiffs on the quantification of

monetary relief was the analysis of their expert that had been the subject of the statements

discussed above.

## B. The Court's August 2010 Post-Trial Findings and Subsequent Judgment

On August 10, 2010, this Court entered its Findings of Fact and Conclusions of

Law After Bench Trial ("Findings") (Dkt. No. 477).  The core of the Court's decision was that

Wells Fargo's practice of posting debit-card transactions in high-to-low order was "unfair"

within the meaning of the California Unfair Competition Law ("UCL").  The majority of the

decision was dedicated to the Court's detailed findings concerning the bank's posting order, its

history and purposes, and its "unfair" effects.

The Court also found that the bank had violated the "fraud" prong of the UCL because it failed to disclose its posting practice adequately. *Id.* at 70. The Court held that the disclosure about posting order in the Consumer Account Agreement was unclear and was likely not read by customers in any event. *Id.* at 70-71.

The Court further found that plaintiff Walker had read and relied upon a statement in the bank's Welcome Jacket stating that debit-card transactions would be "automatically deducted" from her checking account, and that this statement "reinforc[ed] a customer's natural assumption that debit-card transactions would post chronologically." *Id.* at 17, 22; *see also id.* at 7, 16 (same findings as to similar statement in brochure seen by Gutierrez). Thus, the court concluded, the bank's affirmative statements "exacerbated" its "murky disclosures" and "reinforc[ed] the perception that transactions would be deducted from their accounts in chronological order." *Id.*at 54; *see also id.* at 71 (concluding that "the dissemination of misleading information enhanced the likelihood that Wells Fargo customers would be deceived") (capitalization in original omitted).[2] These affirmative misrepresentations, the Court held, also violated the "fraud" prong of the UCL. *Id.* at 69-72.

In the portion of its Findings addressing relief, the Court was precise and careful in correlating each category of relief with the specific wrongful conduct for which that relief was granted. The Court granted plaintiffs' request for injunctive relief directed at both the "*unfair* and *fraudulent business practice* found herein," *id.* at 84-85 (emphasis added) – *i.e.*, as a remedy both for the "unfair" posting order practice and for the "fraudulent" failure to disclose that practice and affirmative misrepresentations concerning it. However, the Court used a different formulation in addressing its grant of restitution: It ordered the bank to pay restitution

---

[2] The Court found that similar statements had been made in other Wells Fargo brochures and concluded that they appeared in "such a wide array of marketing documents and … were distributed in such a widespread manner that class members were likely to be misled by them." *Id.* at 55. The Court did not, however, find – and had no evidence before it on which it could have found – that *all* class members saw and were actually misled by documents containing such statements. Nor did it make findings concerning any specific impact on class members' behavior caused by these statements. It had no need to make any such findings, as no restitution or other individualized relief was sought for the misrepresentation claims.

1    "to restore those overdraft fees paid by class members that were wrongfully extracted by Wells

2    Fargo *through its unfair practice* as found herein." *Id.* at 85 (emphasis added).  The Court did

3    not award restitution as a remedy for any "fraudulent" conduct.

4           The Court found it unnecessary to address plaintiffs' common-law fraud and

5    negligent misrepresentation claims, observing that plaintiffs sought only injunctive relief on

6    those claims and such relief was already granted for the UCL claim.  *Id.* at 73.

7           After the Court issued its Findings, plaintiffs asked the Court to award pre-

8    judgment interest and punitive damages.  Dkt. No. 490 at 4, 11.  The Court rejected both

9    requests.  The Court held that prejudgment interest was not available because, *inter alia*, there

10   had been a clear factual dispute concerning the quantification of damages – indeed, plaintiffs

11   themselves had presented multiple alternative calculations.  Dkt. No. 497 at 2-3.  As for punitive

12   damages, the Court held that such an award was not possible given that there had been no award

13   of compensatory damages on any fraud claim.  "One of the reasons behind this decision," the

14   Court pointed out, "was plaintiffs' representation to the Court that they would not be seeking

15   such damages," but were instead seeking only injunctive relief.  *Id.* at 3-4.[3]

16           On October 25, 2010, the Court entered Final Judgment for plaintiffs "for all

17   claims on which plaintiffs prevailed and liability was established in the August 2010 findings."

18   Dkt. No. 498.  Judgment on "all other claims" was entered for Wells Fargo.  The judgment

19   specified restitution to individual class members and class-wide injunctive relief as provided in

20   the August 2010 Findings.  *Id.*

21        **C.    The Ninth Circuit's Decision**

22           The Ninth Circuit affirmed in part and reversed in part.  The appellate court held

23   that the National Bank Act preempted plaintiffs' state-law challenge to the bank's posting order.

24   *Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712, 722-25 (9th Cir. 2012).  Federal preemption

25

26   _____

     [3] The Court also observed that "there was never any finding that Wells Fargo was 'guilty of
27   oppression, fraud, or malice' by 'clear and convincing evidence' – a prerequisite to any award
     of punitive damages."  *Id.* at 4 (citing Cal. Civ. Code § 3294).
28

OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT FOLLOWING REMAND
Civil Case No.:  C 07-05923-WHA
                                              5

1    also precluded any effort to employ state law to condemn the adequacy of the bank's

2    disclosures. *Id.* at 726. The appellate court further held, however, that preemption did not

3    preclude claims challenging affirmative misrepresentations. *Id.* at 727. It affirmed this Court's

4    holding that Wells Fargo violated the UCL "by making misleading statements likely to deceive

5    its customers." *Id.* at 730. It also affirmed this Court's finding that both named plaintiffs "were

6    misled by Wells Fargo's statements because the extent of the falsity of the statements was not

7    known to either of them until they incurred hefty fees for having overdrawn their checking

8    accounts." *Id.* at 728. Finally, the appellate court held that "individual reliance issues" did not

9    predominate so as to bar class certification. *Id.* at 728-29.

10        The Ninth Circuit vacated the restitution award, which was "predicated on

11   liability for Wells Fargo's choice of posting method…." *Id.* at 730. Although recognizing that

12   "the injunctive relief ordered by the district court is based on both the unfair and fraudulent

13   prongs of the [UCL]," that relief was also vacated, as it "dictate[d] relief relating to the posting

14   order, which is preempted." *Id.* Expressly disavowing any view about whether restitution was

15   available on the existing record, *id.* at 728, the Ninth Circuit remanded "for the district court to

16   determine what relief, if any is appropriate and consistent with" its opinion. *Id.* at 730.

17        Plaintiffs filed a Petition for Rehearing, arguing (as they do here) that this

18   Court's Final Judgment already reflected a determination that the original restitution award was

19   appropriate for the misrepresentation claim. That petition was denied on February 19, 2013.

20   **III.   ARGUMENT**

21       **A.   This Court's Original Findings and Judgment Did Not Award Restitution
            on Any Misrepresentation Claim.**

22

23        This Court's Findings were explicit in distinguishing between the relief granted

24   for "unfair" conduct and that granted for "fraudulent" conduct. Restitution was granted *only* for

25   the "unfair" conduct of posting debit-card transactions in high-to-low order. Given plaintiffs'

26   concession that they possessed no proof to support a restitution award for any

27   "misrepresentation-based claims," and were seeking only injunctive relief for those claims, this

28

distinction was plainly no accident.  Indeed, the Court explicitly referred to this limitation

elsewhere in its Findings and in a subsequent order.  Dkt. No. 477 at 73; Dkt. No. 497 at 3-4.

          Plaintiffs' argument that the Court's Final Judgment intended to award restitution

for all three of their UCL theories – challenge to the practice itself, failure to disclose, and

affirmative misrepresentations – finds no support in the record.  Nothing in the Final Judgment

suggests that the Court intended to award broader relief than it had set out in its Findings; to the

contrary, the document makes clear the Court's intent to implement the Findings as written.

Nor have plaintiffs cited authority for the proposition that every single element of relief

identified in the Final Judgment must be read as having been granted for every theory on which

liability was found.[4]  Indeed, this argument proves too much:  The injunction's requirement that

the bank change its posting order had little to do with (and certainly would not have been

appropriate relief for) affirmative misrepresentations.

          Plaintiffs' repeated quotation of a single sentence from the Court's Findings that

mentioned "expectations" provides no greater support for their position.  (*See* Mot. at 3, 8, citing

Dkt. No. 477 at 86.)  Plaintiffs suggest that, because the Court referred to "expectations" in

discussing the methodology underlying the calculation of restitution, it must necessarily have

been expressing an intent to award restitution for misrepresentations.  This argument overlooks

the importance of "expectations" to the Court's finding that the posting order itself was "unfair"

under the UCL.  The Court held that the posting practice was "unfair" because, *inter alia*, it

violated the covenant of good faith and fair dealing in the parties' contract.  Dkt. No. 477 at 62-

65.  That finding, in turn, required reference to the reasonable expectations of the parties.  *Id*.  It

was in this context that the Court made the statement upon which plaintiffs rely:  Calculation of

restitution for the use of an "unfair" posting order required identification of a "fair" posting

---

[4] The cases plaintiffs cite on page 6 of their Motion simply confirm that when a jury in fact
awards the same damages for multiple causes of action, dismissal or reversal as to some (but not
all) of those causes of action does not require that the damages award also be vacated.  *See, e.g.*,
*Bingham v. Zolt*, 66 F.3d 553, 564 (2d Cir. 1995).  Nothing in *Bingham* or plaintiffs' other cases
suggests that every judgment *must* be read as granting the same relief on all claims.  Judgments
are entered every day that award varying relief for different claims.

OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT FOLLOWING REMAND
Civil Case No.:  C 07-05923-WHA

order to be used for comparison purposes.  The Court chose plaintiffs' "Scenario 2A" order for this purpose because (the Court found) it would be more consistent with customer expectations than the order actually used.  Dkt. No. 477 at 86.

Moreover, while the Court found that misrepresentations reinforced consumers' expectation that transactions would post chronologically, it did not hold that they were the *only* source – or even the primary source – of that expectation.  To the contrary, the Court found that chronological posting was the "natural assumption," and that the bank's disclosures were inadequate because they failed to correct this natural view, while the affirmative misrepresentations served to "reinforce" it.  *See, e.g.*, *id.* at 16, 22, 54, 71.

In short, it is simply incorrect to suggest that this Court's Findings and Final Judgment granted *any* award of restitution as relief for affirmative misrepresentations.  To the contrary, the Court intentionally awarded *no* monetary relief for any misrepresentation claim.

**B.    Plaintiffs' Waiver and Abandonment of Their Claim for Restitution Based on Misrepresentations Bars Any Belated Request for Such an Award Now.**

Plaintiffs made a deliberate, informed choice to abandon their claim for restitution for alleged affirmative misrepresentations.  "A party abandons an issue when it has a full and fair opportunity to ventilate its views with respect to an issue and instead chooses a position that removes the issue from the case."  *BankAmerica Pension Plan v. McMath*, 206 F.3d 821, 826 (9th Cir. 2000).  Once an issue is waived or abandoned, it cannot later be revived if the abandoning party's alternative arguments fail.  *Id.*; *see USA Petroleum Co. v. Atlantic Richfield Co.*, 13 F.3d 1276, 1284 (9th Cir. 1994); *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1026 (9th Cir. 2009); *Vitelli v. Smithkline Beecham Clinical Labs.*, 238 F.3d 433, 2000 WL 1378305, at *1 (9th Cir. Sept. 25, 2000) (unpublished); *Magallanes-Damian v. INS*, 783 F.2d 931, 934 (9th Cir. 1986).

*USA Petroleum* is particularly on point.  In that case, USA alleged that the defendant, ARCO, conspired to set maximum resale prices, which USA claimed was illegal *per se* under Section 1 of the Sherman Act.  13 F.3d at 1277.  ARCO moved for summary judgment, arguing that USA could not establish antitrust injury because it could not prove predatory

pricing.  Although its complaint had accused ARCO of predatory pricing, USA's opposition offered no evidence of predatory pricing, instead arguing only that no such showing was required.  *Id.* at 1277-78.  The district court rejected USA's argument, and the Supreme Court agreed.  *Id.* at 1278.  USA then asked the Ninth Circuit to remand to the district court so that it could pursue a predatory pricing theory.  *Id.*  The court refused:

> The inescapable conclusion … is that, although USA recognized below-cost pricing as an independent available theory …, it made the tactical decision not to rely on that theory but instead chose to advance only its [alternative] theory.  USA thus had a full and fair opportunity to ventilate its views with respect to below-cost pricing; however, USA chose to remove the issue from the case, and thus waived its right to adduce evidence on the matter.

*Id.* at 1282.  "It is a general rule," the Ninth Circuit explained, "that a party cannot revisit theories that it raises but abandons at summary judgment."  *Id.* at 1284 (citing, *inter alia*, *Edward B. Marks Music Corp. v. Continental Record Co.*, 222 F.2d 488, 492 (2d Cir. 1955) ("[A] plaintiff in his opposition to a motion for summary judgment cannot abandon an issue and then, after an unpalatable decision … resurrect the abandoned issue.")).

The Ninth Circuit further rejected USA's argument that its waiver was excused by a recent Supreme Court decision on the definition of predatory pricing.  Observing that the new standard was actually more onerous than the prior one, the Ninth Circuit stated that "this situation does not differ significantly from the case in which a party alleges two different (and clearly established) legal theories, chooses to pursue only one at summary judgment, and then, when the first theory fails on the merits, seeks to revisit the discarded theory."  *USA Petroleum*, 13 F.3d at 1285-86.  Allowing USA to renew "a theory that it recognized was available but expressly chose not to pursue would appear to countenance precisely the second bite at the apple that ordinarily is not permitted."  *Id.*; *Savers Fed. Sav. & Loan Assoc. v. Reetz*, 888 F.2d 1497, 1501 (5th Cir. 1989) (to allow arguments abandoned on summary judgment to be re-raised later "would encourage trial by ambush") (citation omitted).

Similarly here, plaintiffs *could* have pursued a restitution claim on a misrepresentation theory by opposing Wells Fargo's efforts to obtain summary judgment on that portion of their case and then, if successful, pursuing the theory at trial.  Instead, they made the

1   deliberate and knowing tactical decision to abandon any claim for restitution based on

2   misrepresentations, assuring Wells Fargo, and then the Court, that they sought only injunctive

3   relief on that theory.  In taking this course, plaintiffs prevented Wells Fargo from presenting its

4   arguments on summary judgment as to why Olsen's analysis was insufficient as a matter of law

5   to support a restitution award on a misrepresentation theory.  They also led Wells Fargo to tailor

6   its trial presentation on the misrepresentation claim to focus solely on injunction issues, leaving

7   Wells Fargo no reason either to dispute the applicability of Olsen's analysis in the

8   misrepresentation context or to offer evidence rebutting class members' entitlement to

9   restitution under this theory.

10          In their Motion, plaintiffs present two arguments in an effort to avoid this clear

11  waiver.  First, they assert that they abandoned only the claim for "damages" on their common-

12  law misrepresentation causes of action but not the claim for "restitution" under the UCL on a

13  misrepresentation theory.  (Mot. at 13.)  This attempted parsing of their own language does not

14  withstand scrutiny.  The original communication from plaintiffs' counsel that Wells Fargo cited

15  explicitly referred to "restitution" as well as "damages" for "any classwide misrepresentation-

16  based claims."  Jolley Dec. Ex. 1.  Plaintiffs' subsequent confirmation of this admission in their

17  brief to this Court made no effort to disavow or limit this.  Rather, plaintiffs resisted summary

18  judgment on the misrepresentation portion of their UCL claim solely on the ground that they

19  were entitled to continue to seek *injunctive* relief; they made no mention of a continuing request

20  for restitution.  *See* Dkt. No. 316 at 14.  Importantly, moreover, their brief consistently used the

21  terms "damages" and "restitution" interchangeably – indeed, they used the term "damages"

22  more often than "restitution" when referring to Olsen's analysis of the monetary relief sought on

23  the "unfair practice" portion of their UCL claim.[5]  The sharp distinction plaintiffs now seek to

24  draw between the two terms was entirely absent in their contemporaneous statements.

25

26  [5] *See, e.g., id.* at 3 (section heading stating "Plaintiffs' Damages Analysis Fits Their Claims");
    *id.* at 5 ("There is no daylight between Plaintiffs damages analysis and their theory of the case");
27  *id.* at 7 (arguing that "the LIFO approach would result in understating damages"); *id.* (referring
    to "Mr. Olsen's damage calculations"); *id.* at 8 (referring to "credit against damages").

28

Equally unavailing is plaintiffs' reliance on the fact that their Pre-Trial and Post-Trial Proposed Findings suggested an award of restitution for misrepresentation claims.  (Mot. at 13-14, *citing* Dkt. Nos. 375, 454.)  Plaintiffs neglect to mention that those same documents also suggested findings on damages for their common-law misrepresentation claims.  *See* Dkt. No. 375 at 23-24, 454 at 22-24.  And notwithstanding these submissions, the Court consistently enforced plaintiffs' prior concession that they sought only injunctive relief for *any* misrepresentation claims.  *E.g.*, Dkt. No. 477 at 73, 85; Dkt. No. 497 at 3-4.

Plaintiffs made a deliberate tactical choice to abandon the uphill battle of trying to prove a measurable amount of restitution on a misrepresentation theory.  The fact that the Ninth Circuit's decision was not what they had hoped does not give them the ability to revisit that choice.

### C.    Plaintiffs Are Bound and Estopped by Their Judicial Admission That Olsen's Analysis Did Not Support a Restitution Award on Any Misrepresentation-Based Claim.

Even apart from their outright waiver and abandonment of any restitution claim for alleged misrepresentations, plaintiffs are bound and estopped by the judicial admission that "Mr. Olsen has not attempted to quantify the amount of damages or restitution resulting from any classwide misrepresentation-based claims."  Jolley Dec. Ex. 1.  This admission, first offered in a communication to Wells Fargo designed to limit the scope of Wells Fargo's pretrial motion, was later confirmed to the Court and presented as part of an argument for why plaintiffs' misrepresentation claims, having been properly narrowed to injunctive claims only, could properly survive summary judgment.  Dkt. No. 316 at 14.

Judicial admissions "have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact."  *American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988); *see also Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 992 (9th Cir. 2012) (a judicial admission estops a party from taking a later inconsistent position where the earlier position is relied on by the opposing party and accepted by the court).  They include statements of fact made in a brief and representations made to opposing counsel to induce the opponent to limit the development and presentation of

its own case. *American Title*, 861 F.2d at 227; *Martinez v. Bally's La., Inc.*, 244 F.3d 474 (5th Cir. 2001); *City Nat'l Bank v. United States*, 907 F.2d 536, 544 (5th Cir. 1990).

For example, in *Martinez*, plaintiffs' counsel objected to deposition questions about the plaintiffs' physical condition, stating that she was "not making any kind of physical injury claims." 244 F.3d at 475. The defendant then moved for summary judgment on the basis that her claim was not viable absent physical injury. The plaintiff responded with an affidavit asserting that she had in fact suffered physical injury. The district court held that the plaintiff was bound by the previous judicial admission of her counsel, and the Fifth Circuit affirmed, holding that "counsel's statements were intended to relieve [defendant] from discovery of facts related to physical injury and were not merely asserted for an independent purpose." *Id.* at 477. Accordingly, "counsel's statement waiving all claims of physical injury was a judicial admission, which could not be contradicted by affidavit or otherwise." *Id.*; *see also Magallanes-Damian*, 783 F.2d at 934 (parties "are generally bound by the conduct of their attorneys, including admissions made by them, absent egregious circumstances").

Plaintiffs presented no evidence at trial concerning the quantification of monetary relief *other* than Olsen's analysis. Their judicial admission that this analysis did not purport to address restitution for misrepresentation-based claims therefore requires the conclusion that plaintiffs failed to carry their burden of proof as to any measurable amount of losses by class members resulting from misrepresentations.

**D.    The Record Does Not Support Any Award of Restitution for Affirmative Misrepresentations.**

Under the UCL, restitution is only available for measureable amounts that can be demonstrated, based on substantial evidence, to have been unlawfully obtained by means of the unlawful conduct. Plaintiffs presented Olsen's analysis, and the Court accepted it, as a measurement of amounts Wells Fargo received through its practice of posting debit-card transactions in high-to-low order – a practice that has now been held lawful. Olsen did not pretend to have performed any measurement of amounts Wells Fargo unlawfully obtained by misrepresenting its posting order. Any such measurement requires answers to a *different* set of

questions that would have been extremely difficult, if not impossible, to answer on a class-wide basis.  Olsen's analysis cannot be repurposed to this end after the fact.

### 1. Any Award of Restitution Must Be a Specific Measurable Amount Supported by Substantial Evidence, and Restitution May Not Be Awarded for Lawfully Charged Fees.

As the Supreme Court of California has explained, the "overarching legislative concern" reflected in the UCL was "to provide a streamlined procedure for the prevention of ongoing or threatened acts of unfair competition."  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1150 (2003) (citation omitted).  As a result, the court explained, "the remedies provided are limited."  *Id.*  The primary focus is on injunctive relief, and the *only* monetary relief available is restitution "to restore to any person in interest any money or property, real or personal, which may have been acquired *by means of such unfair competition*."  Bus. & Prof. Code § 17203 (emphasis added).  An award may be granted only to persons who actually lost money to the defendant as a result of unlawful conduct.  *Korea Supply*, 29 Cal. 4th at 1144-52.

The UCL does not empower a court to order payment of an amount broadly deemed to be "fair."  Rather, the plaintiff has the burden of providing substantial evidence to support the calculation of a *specific* monetary award.  The leading case on this point is *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal. App. 4th 663 (2006).  There, the Court of Appeal reversed a restitution award to a class of customers who bought the defendant's tools.  The trial court found that the defendant had unlawfully misrepresented its tools as having been "Made in the U.S.A."  However, the tools had value, and no evidence was presented as to the *difference* in value attributable to the misrepresentation that they were made in the United States.  The trial court estimated that 25 percent of the purchase price was "reasonable" and awarded restitution on that basis.  *Id.* at 676-77.  The Court of Appeal reversed the restitution award.

Citing *Korea Supply*, the *Colgan* court observed that "[a] court cannot, under the equitable powers of section 17203, award whatever form of monetary relief it believes might deter unfair practices."  *Id.* at 697 (internal marks omitted).  Rather, the court held that "restitution under the [UCL] must be of a measurable amount to restore to the plaintiff what has been acquired by violations of the statutes," *id.* at 698, and that amount must be "supported by

substantial evidence." *Id.* at 699.  Applying these principles to the case before it, the court observed that, while there was testimony indicating that "Made in U.S.A." claims had a significant impact on customers' purchasing decisions and that the defendant realized an advantage by using that representation, there was no record evidence of a reliable *quantification* of the dollar value of the consumer impact or the advantage realized by the defendant.  As a result, while injunctive relief was properly granted, no award of restitution could be provided. *Id.* at 700-02.  Numerous other cases, both before and since, have confirmed this standard.[6]

One corollary of the foregoing is that restitution may not under any circumstances be awarded under the UCL for amounts received as a result of *lawful* conduct. *See M & F Fishing, Inc. v. Sea-Pac Ins. Managers, Inc.*, 202 Cal. App. 4th 1509 (2012) (affirming finding that some insurance policies were sold unlawfully but reversing restitution award that included amounts paid for lawfully sold policies).  Where no reliable method has been identified to distinguish between amounts the defendant received lawfully and those it received unlawfully, injunctive relief may still be available, but restitution is not – as in *Colgan*, where there was no way to distinguish between amounts the defendant received lawfully for its tools and those it received unlawfully by misrepresenting those tools as U.S.-made.

This principle applies with special force to charges that are presumed lawful because of preemption.  This was the basis for the decision in *Day v. AT&T Corp.*, in which the plaintiffs challenged phone companies' practice of rounding up the number of minutes used on a pre-paid phone card.  The court held the plaintiffs could pursue injunctive relief against misrepresentations about the practice.  63 Cal. App. 4th at 337.  But restitution was not available, as any such award would conflict with preemption under the filed rate doctrine, under

---

[6] *See, e.g., In re eBay Litig.*, 2012 WL 3945524, at *5 (N.D. Cal. Sept. 10, 2012) (restitution unavailable under UCL where evidence not available to support a reliable measurement of amounts);  *Day v. AT&T Corp.*, 63 Cal. App. 4th 325, 339 (1998) (the UCL "operates only to return to a person those *measurable amounts* which are *wrongfully taken* by means of an unfair business practice"); *see also Tucker v. Pacific Bell Mobile Servs.*, 208 Cal. App. 4th 201, 227 (2012); *Pfizer Inc.* v. *Superior Court*, 182 Cal. App. 4th 622, 631-32 (2010); *In re Vioxx*, 180 Cal. App. 4th 116, 130-31 (2009).

which the rates charged were presumed lawful.  In order to calculate restitution, the court would have to decide "[w]hat have [the defendants] obtained which they are not entitled to keep."  *Id.* at 339.  Even if some consumers would not have bought the cards absent deceptive conduct, "once the cards were purchased and used, the members of the public received *exactly what they paid for*."  *Id.*  "The filed tariffs allow the practice of rounding up," and because rates filed with the FCC are "presumptively correct, a consumer who uses a pre-paid phone card obtains the full value of what was paid for and therefore has given up nothing, regardless of whether he or she was improperly induced to purchase the card in the first place."  *Id.* at 339-40.  "Any attempt to calculate a monetary amount to be paid on behalf of those who purchased the cards would necessarily result in a refund or rebate of properly collected fees for services."  *Id.*

*Day* is on all fours with this case.  There is no dispute that class members actually overdrafted their checking accounts and received the service of having their overdraft items paid by the bank.  And the Ninth Circuit has now confirmed that the amounts Wells Fargo charged customers for this service must be treated as entirely lawful, regardless of the posting order used.  Class members received "the full value of what was paid for and [have] given up nothing."  63 Cal. App. 4th at 340.  As a result, as in *Day*, "[a]ny attempt to calculate a monetary amount to be paid on behalf of [class members] would necessarily result in a refund or rebate of properly collected fees for services."  *Id.*; *see also Tucker*, 208 Cal. App. 4th at 229 n.17 (restitution likely precluded by "rate preemption considerations"); *Ball v. GTE Mobilnet of Cal.*, 81 Cal. App. 4th 529 (2000) (UCL challenge barred by preemption, with non-preempted claims on failure to disclose allowed to proceed if remedy sought was an injunction).

As any restitution award based on Olsen's analysis would necessarily require the Court to require refunds of lawful charges, no such award may lawfully be given here. Plaintiffs offered no alternative measurement of restitution that does not suffer from this defect.

### 2. The Analysis of Plaintiffs' Expert Did Not Purport to Measure Harm to Customers from Affirmative Misrepresentations.

Even leaving aside the principle recognized in *Day*, it is clear that the record does not contain substantial evidence of any "measurable amount" that could be awarded as

1    restitution following the Ninth Circuit's decision.  Any proper quantification of restitution

2    would require specific identification of the fees that were obtained, not simply because of the

3    bank's choice of posting order – which must be taken as lawful – but "by means of"

4    misrepresentations that caused customers to expect something different and to act differently in

5    a way that led them to incur those additional fees.  *See Comcast Corp. v. Behrend*, 569 U.S. --,

6    2013 WL 1222646, at *5 (Mar. 27, 2013) ("a model purporting to serve as evidence of damages

7    in [a] class action must measure only those damages attributable to" the theory on which

8    liability is premised, without including separate impacts from other conduct not at issue).

9            Plaintiffs did not prove, and did not (at least previously) claim to have proven,

10   that every fee included in Olsen's results was attributable to class members' improperly induced

11   belief that transactions posted in chronological order.  Nor did plaintiffs contend at trial that the

12   challenged misrepresentations were even the primary cause of customers' mistaken belief that

13   transactions posted chronologically.  Rather, their theory was that this was a natural "common

14   sense" assumption that Wells Fargo failed to correct and then exacerbated through

15   misrepresentations.  *See* Dkt No. 375 at 20, ¶ 19; *see also* Trial Tr. at 737-38 (testimony of

16   plaintiffs' consumer behavior expert).  The Court's Findings accepted this view, finding

17   chronological posting to be a natural assumption.  (*See* p. 4 above.)  No evidence was offered

18   that, absent the misrepresentations, any (much less all) class members would have incurred

19   fewer overdraft fees.  To the contrary, the only rational conclusion permitted by the record is

20   that the vast majority of customers would have simply continued in the same natural assumption

21   (which the Ninth Circuit has held the bank had no obligation to correct) and acted no differently.

22           Plaintiffs try to bridge this gap by arguing that "liability" has already been found

23   and that class-wide exposure and reliance may simply be presumed.  This argument fails on

24   multiple grounds.  Regardless of whether any such presumptions might properly apply here in

25   the first instance, they could not be *irrebuttable* presumptions and applied even where they

26   contradict the record.  *See, e.g.*, *Pfizer Inc.*, 182 Cal. App. 4th at 631 (restitution not available to

27   persons who were not in fact harmed by misrepresentations).  Wells Fargo could not, as a matter

28   of due process and the limitations on class actions under the Rules Enabling Act, be deprived of

1    the opportunity to rebut any presumption of full class-wide exposure and reliance.  *See Wal-*

2    *Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2560-61 (2011) (rejecting use of class action to

3    impose "Trial by Formula" that eliminated the defendant's ability to fully litigate its defenses to

4    the claims of individual class members and thus "abridge[d]" its "substantive right[s]").  For

5    example, as the Court found, many customers received detailed explanations of the bank's

6    posting order.  Dkt. No. 477 at 49-50.  Wells Fargo would have been entitled to show that

7    Olsen's results included, not just fees customers complained about, but also additional fees

8    incurred *after* they received such communications.[7]  Plaintiffs cannot rely on Wells Fargo's

9    failure to present this and other evidence at the 2010 trial, as there was no reason to present

10   evidence on restitution for a misrepresentation theory following plaintiffs' express abandonment

11   of that claim.

12            All of this is ultimately beside the point, however, because even if exposure and

13   reliance were fully presumed, plaintiffs still failed to carry their burden of proof as to the

14   measurable amount of loss suffered by class members as a result of misrepresentations.[8]  In the

15   context of this case, any presumption of "reliance" still begs the question of what *specific*

16   *changes in behavior* such reliance induced and what specific impact, if any, those changes had

17

18   _____

     [7] *See Great Am. Ins. Co. v. Wexler Ins. Agency, Inc.*, 2000 WL 290380, at *22 (C.D. Cal. Feb.
19   18, 2000) (plaintiff "could no longer justifiably rely" on misrepresentation once he became
     aware of information "flatly inconsistent with [the] earlier representations"); *see also Wiener v.*
20   *Dannon Co., Inc.*, 255 F.R.D. 658, 669 (C.D. Cal. 2009) (defendants entitled to introduce
     evidence to rebut inference of reliance).  Similarly, Wells Fargo would have been entitled to
21   show that individual class members were not in fact exposed to the statements at issue.  That at
     least some such class members exist cannot be disputed.  *See* Dkt. No. 247 at 8 (summary
22   judgment order finding that plaintiff Smith "did not read or rely on any advertising or marketing
     material" and granting summary judgment against the other plaintiffs on most items).

23   [8] As explained above, California law does not authorize restitution without a showing that the
     specific amount awarded was caused by the practice at issue.  Restitution may be awarded to
24   class members only to the extent of their actual loss caused by the misrepresentations.  Even if
     California law permitted this step of the analysis to be skipped, federal law would not:  As the
25   Ninth Circuit has made clear, federal law does not permit any award of restitution in this case
     for class members' fees that were caused solely by the bank's posting order and/or the
26   inadequacy of its disclosures.  Yet the blanket award plaintiffs seek would do precisely that.
     Plaintiffs cannot skip over the step of proving that the restitution they seek for each class
27   member is for loss that is in fact attributable to conduct not protected by federal preemption.

28

     OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT FOLLOWING REMAND
     Civil Case No.:  C 07-05923-WHA
                                          17

on the number of overdraft fees customers incurred.  Olsen's analysis, as plaintiffs previously admitted, did not attempt to address this question.  But without proof on this point, there can be no finding that class members lost any particular amount "by means of" misrepresentations.[9]

Olsen's scenarios all proceeded on the simple assumption that the task at hand was to measure the difference between the number of fees incurred under an "unfair" posting order and the number incurred under a "fair" posting order.  No analysis of customer behavior was needed; to the contrary, all of Olsen's scenarios assumed that class members' overspending patterns would remain completely unchanged.  *See generally* Trial Tr. at 872, 882-83.

Now the question is different.  The Court found that misrepresentations reinforced customers' belief that debit-card transactions posted "immediately."  But that mistaken belief, standing alone, harmed no one.  To establish recoverable loss, plaintiffs needed to show the extent (if any) to which class members used their debit cards differently than they would have done had the misrepresentations not been made.  No such evidence was offered. There was, for example no evidence that customers carefully ordered their transactions each day, deferring larger purchases to late in the day, so as to minimize overdraft fees.  Certainly the two plaintiffs made no such claim.  At most, plaintiffs' testimony might suggest that a belief in chronological posting caused them to underestimate the expense of overdrafting, leading them to be more careless than they might otherwise have been.  *See Gutierrez*, 704 F.3d at 728 (observing that both named plaintiffs "were misled by Wells Fargo's statements because the extent of the falsity of the statements was not known to either of them *until they incurred hefty*

---

[9] Nothing in *In re Tobacco II Cases*, 46 Cal. 4th 298 (2009), purported to deviate from the longstanding rule that the availability of restitution for a UCL claim was limited to measurable amounts class members actually lost as a result of the unlawful practice.  *See Tucker*, 208 Cal. App. 4th at 227-28; *Pfizer Inc.*, 182 Cal. App. 4th at 631-32.  *Tobacco II* simply confirmed that the new UCL standing requirements of actual exposure and reliance established by Proposition 64 did not automatically extend to absent class members; it made no change in the existing law on the proof required to support an award of restitution under the statute.  Similarly, when the Ninth Circuit cited *Tobacco II* in upholding this Court's certification of a class, it did not suggest that restitution could be awarded to absent class members without proof that the specific amounts awarded had in fact been gained "by means of" the misrepresentations at issue.  *See* Cal. Bus. & Prof. Code § 17203.

*fees* for having overdrawn their checking accounts").[10]  But none of Olsen's scenarios attempted to measure this either.  For example, he made no effort to distinguish between customers who incurred such "more expensive than expected" overdrafts for the first time and therefore might have been surprised and customers who incurred multiple overdrafts (and "hefty fees") on numerous occasions and so knew perfectly well how expensive it was.  *See* Trial Tr. at 1749-62 (evidence that majority of differential measured by Olsen was attributable to customers who had multiple overdrafts on at least ten separate occasions); *see also* TX 740, 746.

Nor would any of Olsen's scenarios serve as an appropriate basis for measuring restitution for misrepresentations even if one were to assume (without evidence and contrary to the record) that class members' spending behavior was carefully attuned to an expectation that debit-card transactions posted in chronological order.  This would require comparison with a scenario that posts the way the customer was induced to expect, with all debit-card transactions posting "immediately" and therefore in strict chronological order across time.

None of Olsen's scenarios tried to do this either.  Rather, he simply replicated the bank's existing batch-posting, which posts each day only transactions received for final settlement that day.[11]  His only effort was to re-order the debit-card purchases that happened to settle each day in chronological order vis-à-vis one another.  So if the bank posted on Thursday a transaction made on Wednesday and then posted on Friday a transaction made on Tuesday,

---

[10] In fact, neither plaintiff testified even to that much.  The Court found, rather, that each had acknowledged that she overdrafted as a result of making "a mistake."  Dkt. No. 447 at 16, 22.  The Ninth Circuit stated that misrepresentations were "a significant cause of the magnitude of the harm" the two plaintiffs experienced. *Gutierrez*, 704 F.3d at 728 n.9.  But it did not suggest that the record offered any way to quantify how *much* of that harm would have occurred absent the misrepresentations, or how much of it was "magnified."  There is certainly no evidence to show how such a calculation could be made on a class-wide basis.  *See Colgan*, 135 Cal. App. 4th at 700-02 (evidence of "significant" impact on consumers' purchasing decisions insufficient to support restitution absent evidence supporting quantification of that impact).

[11] Trial Tr. at 925-26.  Because in the real world most debit-card purchases do not settle on a same-day basis, the bank could not post in true chronological order.  But the practical ability to post in a given order, while important to determining what might be more "fair" under a UCL "fairness" theory – the question previously before the Court – is less germane to the question discussed here.

OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT FOLLOWING REMAND
Civil Case No.:  C 07-05923-WHA

19

1   Olsen would have kept that non-chronological ordering.  Among other things, this approach

2   provided no offset for a major *benefit* customers gained from non-chronological posting, in

3   which later deposits routinely covered earlier debits.  This also renders his analysis unfit as a

4   measurement of restitution here. *See In re Google Adwords Litigation*, 2012 WL 28068 (N.D.

5   Cal. Jan. 5, 2012)  (denying class certification for claim that Google failed to disclose that some

6   advertising placements were on undesirable webpages, where, among other things, no way was

7   identified to value benefits some class members received from the challenged placements).[12]

8         Even within the batch-posting constraint, Olsen's scenarios did not actually try to

9   measure the impact of an induced belief that transactions post chronologically.  If a customer

10   carefully calculates his spending based on a belief that a debit-card purchase will post

11   "immediately," there is no record evidence that he would believe (as Olsen's scenarios assume)

12   that it would post before checks he has previously written.  Such a customer surely does not rely

13   on a belief that his debit-card purchase will post *after* a deposit he has not yet made.  Yet

14   Olsen's scenarios assumed this as well.  Any adjustment for these assumptions has a large

15   impact on Olsen's calculated results.  *See, e.g.*, Trial Tr. at 1743-44, 1785-86; TX 212K, 724.

16         In short, plaintiffs were correct in their original concession that Olsen's analysis

17   did not purport to measure a proper restitution award for a misrepresentation theory.

18       **E.**    **The Court Should Not Permit Plaintiffs Yet Another Bite at the Apple.**

19         Plaintiffs have already had a full and fair opportunity to develop and present

20   evidence to support a restitution award on their misrepresentation theory.  They deliberately

21   chose not to do so, and their motion identifies no basis upon which it would be appropriate to re-

22   open the record to let them reverse that decision and try again.  This is particularly the case

23   given that the Court has *already* wiped the slate clean for plaintiffs once on their damages proof.

24

---

25   [12] *See also Colgan*, 135 Cal. App. 4th at 700-02 (reversing restitution award because no proper

26   measurement was available of legitimate value to customers of the purchased tools); *In re Vioxx*, 180 Cal App. 4th at 135-36 (holding that restitution for misrepresentation of safety of drug

27   could not be based on comparison with price of second drug in absence of proof that drugs had comparable benefits for all class members).

28

Their original damages study was found to be wholly inadequate; yet the Court elected not to grant summary judgment in Wells Fargo's favor but instead allowed plaintiffs to start all over again, delaying the trial for almost a year for that purpose. Having already received a second bite at the apple, plaintiffs are not entitled to a third.

### F.   Plaintiffs' Arguments About Pre-judgment and Post-Judgment Interest Are Without Merit.

Plaintiffs arguments about pre-judgment and post-judgment interest (Mot. at 11-12, 16-17,) should be moot, as no restitution award is proper here. Those arguments should be rejected even if some restitution award is granted.

The Court has already rejected plaintiffs' argument for pre-judgment interest. Dkt. No. 497 at 2-3. The Court held that such interest is not available where the amount of the award is in substantial dispute, observing that in this case plaintiffs themselves presented multiple alternatives with widely varying numbers. *Id.* at 2. Plaintiffs have not complied with L. R. 7-9 and sought leave to move to reconsider this ruling, and the standard for reconsideration is clearly not satisfied. Plaintiffs cite no new law, and far from being manifest error, the Court's conclusion was manifestly correct on both the facts and the law. Nor have plaintiffs identified any authority that would allow such interest as a penalty for Wells Fargo's pursuit of a lawful appeal of the original award. The Court was fully aware of Wells Fargo's appeal plans when it denied pre-judgment interest previously. *See* Dkt. No. 497 at 5.

Plaintiffs' argument that post-judgment interest should relate back to the original judgment is equally without merit. "[P]ost-judgment interest may run only from the date of a judgment later determined to be supported by the evidence. It may not run from a legally insufficient judgment, or one where the 'damages have not been "ascertained" in any meaningful way.'" *Planned Parenthood of the Columbia/Willamette Inc. v. American Coalition of Life Activists*, 518 F.3d 1013, 1021 (9th Cir. 2008) (citation omitted). Here, the Ninth Circuit vacated the original restitution order because it was "predicated on liability for Wells Fargo's choice of posting method and thus also preempted." *Gutierrez*, 704 F.3d at 730. Any new

award would require restitution to be ascertained on plaintiffs' misrepresentation claims for the first time.  Post-judgment interest would then run from the date of that new judgment.

### G.    Any Injunctive Relief Awarded Must Be Narrowly Tailored and Reflect the Absence of Any Current or Imminent Threat of Harm to the Class.

Plaintiffs' Motion offers little discussion of their request for injunctive relief, simply suggesting entry of an order that "Wells Fargo is permanently enjoined from making fraudulent or misleading representations about its system of posting in the future."  Proposed Order at 1.  They derive this language from the Ninth Circuit's statement that, while this Court may not "[require] the bank to use a particular system of posting or … to make specific disclosures, it can enjoin the bank from making fraudulent or misleading representations about its system of posting in the future."  *Gutierrez*, 704 F.3d at 728.  But the Ninth Circuit was plainly not proposing this as specific language for an injunction.  Rather, it was merely distinguishing between the kind of *affirmative* relief that preemption precludes and the kind of *prohibitive* relief that is permissible.  Any injunction using the language plaintiffs suggest would be legally improper, for multiple reasons.

*First*, an injunction that simply employed the vague generic language that plaintiffs propose would fall far short of the required standard of specificity for an injunction.  *See* Fed. R. Civ. P. 65(d) (injunction must "describe in reasonable detail … the act or acts restrained or required"); *Del Webb Communities, Inc. v. Partington*, 652 F.3d 1145, 1150 (9th Cir. 2011) (general prohibition against using "illegal, unlicensed and false practices" too vague to be enforceable under Rule 65(d)).  As the Ninth Circuit has recognized, "[o]ne basic principle built into Rule 65 is that those against whom an injunction is issued should receive fair and precisely drawn notice of what the injunction actually prohibits."  *Columbia Pictures Indus., Inc. v. Fung*, --- F.3d ---, 2013 WL 1174151 (9th Cir. Mar. 21, 2013) (citation omitted).

In *Columbia Pictures,* the Ninth Circuit rejected as excessively vague an injunction against a website found liable for contributory copyright infringement.  *Id.* at *1, *24. The injunction prohibited the defendant from using "Infringement-Related Terms," and defined those as "terms that are widely known to be associated with copyright infringement," providing

1   an illustrative list.  *Id.* at *24.  The Ninth Circuit found that "[b]eyond the specifically-named

2   examples, no one reading this injunction can tell what it means for a term to be 'widely known

3   to be associated with copyright infringement.'"  *Id*.  The appellate court ordered the injunction

4   narrowed to prohibit only specifically named terms.  *Id*. at *25.

5           The requirement of specificity is particularly significant here, as it is similarly far

6   from clear what statements would be deemed "misrepresentations."  The claim here was not that

7   Wells Fargo explicitly represented that it posted debit-card transactions in chronological order

8   or denied that those transactions were posted high-low.  Rather, the Court's Findings focused on

9   statements – in many cases statements that were, on their face, about other subjects – from

10  which customers might make *inferences* about posting order.  Specifically, the Court addressed

11  statements that the debit-card transactions were "immediately" removed from an account,

12  which, the Court found, implied that those transactions would post chronologically.  *See* DE #

13  477 at 54.  The Court also appears to have been concerned that even truthful uses of the word

14  "automatically" in connection with the removal of funds from an account could be construed as

15  "immediately," which could in turn be construed as "chronologically."  *See id.* at 17, 22.  The

16  Court even suggested that it might be misleading to encourage customers to track transactions in

17  check registers.  *Id.* at 55-56.  In this context, any injunction must specify exactly what language

18  is forbidden.  *See also TrafficSchool.com v. Edriver, Inc.*, 653 F.3d 820, 829-30 (9th Cir. 2011)

19  (injunction must be tailored "so as to burden no more protected speech than necessary").

20          *Second*, the injunction that plaintiffs propose goes well beyond the Court's

21  Findings, which addressed only the posting order for debit-card transactions; other aspects of

22  the bank's system or order used for posting were not at issue.  An injunction may not prohibit

23  conduct that is not at issue and as to which no liability has been found.  *See Stormans, Inc. v.*

24  *Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) (injunctive relief "must be tailored to remedy the

25  specific harm alleged") (citation omitted); *Meinhold v. U.S. Dep't of Defense*, 34 F.3d 1469,

26  1480 (9th Cir. 1994); *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 558 (9th Cir. 1990); *see*

27  *also Church of Holy Light of Queen v. Holder*, 443 F. App'x 302, 303 (9th Cir. 2011)

28  (unpublished) (vacating injunction as "overly broad because it reaches beyond the scope of the

OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT FOLLOWING REMAND
Civil Case No.:  C 07-05923-WHA

1   complaint and enjoins government regulations that were explicitly never challenged or

2   litigated").

3            *Third*, plaintiffs have made no showing that, at this point, injunctive relief is

4   needed to protect customers from harm, and they fail entirely to address the countervailing

5   legitimate business and public interests served by some of the challenged language.

6            No prohibitive language on this subject appeared in the Court's original

7   injunction.  The Court presumably found no need to address communications that might

8   reinforce customers' lack of understanding about high-low posting of debit-card transactions

9   because the bank was required to abandon that posting practice.  And while that injunction has

10  now been vacated, the conclusion still holds, at least so long as the bank does not return to its

11  old posting order.

12           Under the UCL, injunctive relief may only be awarded to prevent ongoing or

13  imminent harm to the class. *Madrid v. Perot Sys. Corp.*, 130 Cal. App. 4th 440, 465 (2005)

14  (injunctive relief under UCL "requires a threat that the misconduct to be enjoined is likely to be

15  repeated in the future"); *see also Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115,

16  1123 (9th Cir. 1999) (no injunctive relief available under UCL without a showing that past

17  conduct will probably recur), *abrogated on other grounds by eBay Inc. v. MercExchange,*

18  *L.L.C.*, 547 U.S. 388 (2006); *In re Tobacco II Cases*, 46 Cal. 4th at 320 (injunction under UCL

19  should not be granted where it is unlikely past acts will recur).  Wells Fargo does not post debit-

20  card transactions in high-low order, either in California or elsewhere.  It has not done so in some

21  time and has no current intention to do so in the future.[13]  There is no need to protect customers

22  from "misrepresentations" bearing on a posting order that is no longer used.

---

23  [13] The bank's current disclosure concerning its posting order is attached as Exhibit 2 to the
24  accompanying Jolley Declaration.  Should the Court desire, Wells Fargo can supply a
    declaration attesting to the bank's current posting order and its intent – developed before the
25  Ninth Circuit's decision and unaffected by that decision – not to resume high-low posting of
    debit-card transactions in the foreseeable future.  The record already confirms that the bank has
26  little incentive to return to that posting order, given the impact of federal regulations that have
    substantially constrained the circumstances under which the bank may charge overdraft fees on
27  *any* debit card transactions, regardless of posting order.  *See* Trial Tr. at 1509-11.

28

Moreover, the Court must take care to ensure that the value of any injunctive relief is not outweighed by the separate harms such relief itself threatens to the bank and its customers. *Stormans*, 586 F.3d at 1138-39 (in considering injunctive relief, district court must balance interests all parties and weigh potential damage to each, including injunction's effect on the public interest). It is plain from the record that, apart from the deleterious impacts found by the Court, there were separate and legitimate *benefits* to many of the challenged communications. For example, customers will incur no overdraft fees at all if they follow the advice (given by most banks) to use check registers or other devices to track transactions carefully to avoid spending more than they have. Similarly, it is important to explain to customers that a debit card works differently than a credit card, *i.e.*, that the money is taken "automatically" out of the customer's account without the intermediate step of a bill that the customer can pay when he chooses. Trial Tr. at 1221-22, 1224-27.

On the current record, no injunctive relief is genuinely needed at this point. However, if the Court were to determine that an injunction was appropriate, there is a simple alternative that would be narrowly tailored to the Court's liability findings while effectively matching the Court's original grant of relief. This would be an injunction *conditionally* barring the challenged uses of the term "immediately" (and, if the Court deems it necessary, "automatically"), but only *if* the bank again adopts a posting order that intentionally sorts debit-card transactions in high-low order. This would achieve the same result in addressing concerns about misrepresentations as the Court's original order and would therefore be narrowly tailored to match the Court's Findings of liability and harm.

## IV.    CONCLUSION

For the reasons set forth above, the Court should decline to award any amount in restitution and should issue either no injunction or one narrowly tailored to the Court's liability findings.

DATED:  April 4, 2013                          COVINGTON & BURLING LLP


                                               By:   /s/Sonya D. Winner
                                                     Sonya D. Winner
                                                     David M. Jolley
                                                     COVINGTON & BURLING LLP
                                                     One Front Street
                                                     San Francisco, CA  94111
                                                     Telephone:  (415) 591-6000
                                                     Facsimile:  (415) 591-6572

                                                     Emily Johnson Henn
                                                     COVINGTON & BURLING LLP
                                                     333 Twin Dolphin Drive, Suite 700
                                                     Redwood Shores, CA  94065
                                                     Telephone:  (650) 632-4700
                                                     Facsimile:  (650) 632-4800

                                                     Attorneys for Defendant
                                                     WELLS FARGO BANK, N.A.