IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERONICA GUTIERREZ, ERIN WALKER, and WILLIAM SMITH, as individuals and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO BANK, N.A.,<br><br>Defendant.<br>_____ / | No. C 07-05923 WHA<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR JUDGMENT FOLLOWING REMAND** |

### INTRODUCTION

After a bench trial in this certified consumer class action, certain overdraft practices by Wells Fargo Bank, N.A. that imposed hundreds of millions of dollars in overdraft fees on depositors were held unfair and fraudulent. Our court of appeals affirmed in part and reversed in part. On remand, plaintiffs now move to reinstate the prior judgment on narrower grounds and request injunctive relief, restitution, and interest. For the reasons explained below, plaintiffs' motion is **GRANTED IN PART AND DENIED IN PART**.

### STATEMENT

Plaintiffs brought this class action to challenge a Wells Fargo bookkeeping device known as "high-to-low" posting. In practice, processing account debits received by the bank each day in high-to-low order multiplied the overdraft fees collected by the bank by depleting the account as fast as possible and turning what might otherwise be a single overdraft into as many as ten.

Following a two-week bench trial, the Court made the following rulings on class claims relevant to the instant motion:

(1) Wells Fargo's decision to use high-to-low posting (along with certain allied practices) was made in bad faith with the sole object being to increase the overdraft fees charged to customers. This violated the "unfair" prong of Section 17200 of the California Business and Professions Code.

(2) Wells Fargo failed to disclose (or to do so adequately) the challenged resequencing practice. This violated the "fraudulent" prong of Section 17200.

(3) Wells Fargo made misleading statements to consumers regarding its resequencing practice in violation of the "fraudulent" prong of Section 17200.

(4) The deceptive conduct under the "fraudulent" prong of Section 17200 also established liability for plaintiffs' false advertising claim under Section 17500 of the California Business and Professions Code.

(5) Wells Fargo was enjoined and thereby ordered to (a) cease the high-to-low posting practice, (b) reinstate an alternative posting method for all class members, (c) file a declaration on any new posting system so that it could be vetted by the Court prior to implementation, and (d) conform all agreements, disclosures, websites, online banking statements, and promotional materials provided to class members to the new system.

(6) Wells Fargo was ordered to pay restitution for its unfair competition under Section 17200. Using a measurement method that tracked class members' most likely expectations that debits would have been posted in chronological posting order, Wells Fargo was liable for restitution to class members totaling $202,994,035.46 (as specified in the final judgment, Dkt. No. 498 at 1). This was based on the difference between the high-to-low method versus the chronological posting method.

The Findings did not reach the class claims for negligent misrepresentation and fraud because the injunctive relief sought thereunder would be duplicative.

2

On appeal, the above-numerated rulings 1–2 and 5–6 were reversed; rulings 3–4 were affirmed. *Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712, 725–30 (9th Cir. 2012).[*] Our court of appeals specifically ruled that the National Bank Act preempts the application of the "unfair" prong of Section 17200 to a national bank's order of posting. Both the posting order itself, and any requirement to make particular disclosures are within the exclusive purview of the National Bank Act. Liability based on failure to disclose was likewise preempted on the ground that it was tantamount to mandating specific disclosures.

Liability based on the "fraudulent" prong of Section 17200 for false and misleading statements, however, was held not preempted. Our court of appeals held that for these purposes Section 17200 is a non-discriminatory state law of general applicability that did not impose disclosure requirements in conflict with federal law. Rather, it prohibited statements that are likely to mislead the public. *Id.* at 726–27.

As set forth in the previous Findings — re-approved herein and incorporated by reference — Wells Fargo's affirmative misrepresentations came in several forms:

> A Wells Fargo marketing theme was that debit-card purchases were "immediately" or "automatically" deducted from an account. This likely led the class to believe: (1) that the funds would be deducted from their checking accounts in the order transacted, and (2) that the purchase would not be approved if they lacked sufficient available funds to cover the transaction. This language was present on Wells Fargo's website (TX 129), on Wells Fargo's Checking, Savings and More brochures from 2001 and 2005 (TX 88, 89), and Wells Fargo's New Account Welcome Jacket from 2004 (TX 82).
>
> . . .
>
> This order finds that these misrepresentations were placed in such a wide array of marketing documents and these documents were distributed in such a widespread manner that class members were likely to be misled by them.

(Findings, Dkt. No. 477 at 54–55).

Wells Fargo made misleading statements directly to customers, such as by telling them that "[c]heck card and ATM transactions generally reduce the balance in your account

---

[*] The opinion of our court of appeals did not expressly address the false advertising issue; the affirmance of this ruling is implicit in the affirmance of the Findings' conclusions regarding fraudulent misrepresentations.

3

immediately," that "the money comes right out of your checking account the minute you use your debit-card," and that "[i]f you don't have enough money in your account to cover the withdrawal, your purchase won't be approved" (*ibid.*). In addition, the Wells Fargo online banking service displayed pending transactions to customers in chronological order, only to rearrange them in high-to-low order at the time of posting in order to maximize the number of overdraft fees (*id*. at 71–72).

In addition to marketing materials and its website, the 60-plus page Consumer Account Agreement ("CAA") Wells Fargo distributed to its customers buried statements on posting order deep inside the thick document. The CAA was both difficult for consumers to understand and misleading. The CAA stated that the bank "if it chooses" might post transactions in high-to-low order, and that if it did so a high-to-low posting order "might" result in more overdraft and returned-item fees. The Findings specifically ruled that this language in the CAA, if it were ever discovered and read in the first place, affirmatively left the misleading impression with consumers that the bank had not yet implemented high-to-low posting (whereas, in fact, the posting practice was already in use). Such language also misled customers by suggesting that Wells Fargo might exercise discretion to modify the posting order on a case-by-case basis (*id*. at 49–51, 70–71).

Our court of appeals held that the ruling that the named plaintiffs were misled was "well supported by the evidence," that "[t]he misunderstanding that Wells Fargo's misleading statements sowed among customers about its posting scheme was a significant cause of the magnitude of the harm experienced by Gutierrez and Walker," and that "the district court's finding that Wells Fargo made misleading statements is amply supported by the court's factual findings." The court of appeals further held that "[t]he pervasive nature of Wells Fargo's misleading marketing materials amply demonstrates that class members, like the named plaintiffs, were exposed to the materials and likely relied on them." *Gutierrez*, 704 F.3d at 728–29.

The court of appeals vacated all relief prescribed by the Findings. Although the injunction was based on both unfair and fraudulent conduct and would be proper under the

4

fraudulent prong alone, it was vacated because all the injunctive relief related to posting order. *Id.* at 727–28, 730.

Regarding restitution, our court of appeals stated:

> Accordingly, we hold that Gutierrez's claim for violation of the fraudulent prong of the Unfair Competition Law by making misleading misrepresentations with regard to its posting method is not preempted, and we affirm the district court's finding to this extent. Consistent with the foregoing, the district court may provide . . . restitution against Wells Fargo.
>
> . . .
>
> The restitution order, which is predicated on liability for Wells Fargo's choice of posting method and thus also preempted, is vacated as well. The district court's finding of liability for Wells Fargo's violations of the "fraudulent" prong of California's Unfair Competition Law is affirmed, and we remand for the district court to determine what relief, if any, is appropriate and consistent with this opinion.

*Ibid.*

Plaintiffs now move for the injunction and restitution award to be reinstated in full under the claims that were affirmed on appeal, along with pre-judgment and post-judgment interest. The proposed injunction would enjoin Wells Fargo from making false and misleading representations about its posting order. Wells Fargo opposes and concedes nothing. This order follows full briefing and oral argument on remand. For the following reasons, this order agrees that the injunction and restitution order should be reinstated and re-anchored solely in the fraudulent affirmative misrepresentation prong of Section 17200.

**ANALYSIS**

Wells Fargo raises two primary objections to plaintiffs' motion: (1) plaintiffs waived any restitutionary relief for claims sounding in fraud; and (2) the damages study used at trial cannot be used to measure restitution for Wells Fargo's misrepresentations. This order begins by addressing these two issues. This order will then consider the parties' other arguments regarding pre/post-judgment interest and injunctive relief.

5

1. **PLAINTIFFS DID NOT WAIVE RESTITUTION ANCILLARY TO AN INJUNCTION UNDER SECTIONS 17200 AND 17203.**

Wells Fargo argues that, in the runup to trial, plaintiffs' counsel waived any claims to restitution based on classwide misrepresentation claims. Two months before trial, attorney Barry Himmelstein, on behalf of plaintiffs sent an email to Wells Fargo's counsel regarding a revised report from plaintiffs' damages expert, Mr. Arthur Olsen, and stated (Dkt. No. 293-11):

> We agree that Mr. Olsen has not attempted to quantify the amount of damages or restitution resulting from any classwide misrepresentation-based claims, and we do not intend to seek such damages at the upcoming trial. Accordingly, it is not necessary for your motion to seek to preclude the recovery of classwide, misrepresentation-based damages based on Mr. Olsen's failure to perform such calculations.

Wells Fargo argues that this passage waived all possible claims in the action involving deception or fraud and therefore removed the possibility of restitution for any claim involving misrepresentation. Plaintiffs respond that, understood in its proper context, the email reflected an understanding by counsel that plaintiffs would not seek damages or restitution for claims requiring individualized showings of reliance on the part of absent class members — that is, the common law claims for negligent misrepresentation and fraud. Otherwise, plaintiffs argue, both parties and the Court understood that restitution was still on the table in the event an injunction against the practice was entered. While the email was worded clumsily, this order finds that the intent of the parties and the scope of the issues to be tried were soon clarified before the trial itself, and plaintiffs view of the matter is correct, as now explained.

Under Sections 17200 and 17203, an injunction against an unfair or fraudulent business practice is usually accompanied by the ancillary equitable relief of restitution. Thus, for example, if a phony travel agent is caught taking deposits to reserve fictitious travel packages, relief normally includes an injunction to shut down the practice as well as ancillary equitable relief requiring the wrongdoer to restore the deposits to the victims. Such relief is not deemed to be "damages" for a conventional "fraud" claim — rather, it is equitable relief ancillary to the injunction suppressing the fraudulent practice. This distinction may seem odd to those unfamiliar with Section 17200 but the difference is generally known to California practitioners. To repeat, the first sentence of Section 17203 authorizes an injunction and the second sentence

provides that "[t]he court may make such order or judgments . . . as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."

Before trial, Wells Fargo appended the contested email as an exhibit to a summary judgment motion in February of 2010 (Dkt. No. 293-11). Wells Fargo contended that "plaintiffs have now conceded that they have not attempted to quantify the amount of damages or restitution resulting from any classwide misrepresentation-based claims and that they do not intend to seek such relief" (Dkt. No. 292 at 3). Wells Fargo did not specifically argue waiver of restitution. Rather, it used the email to support its (ultimately unsuccessful) contentions that (1) summary judgment had already been granted in part on the fraud claims, and (2) "if and to the extent that there may be any doubt that class claims might still exist for fraud, negligent misrepresentation, or false advertising, or under the 'fraud' prong of the UCL, summary judgment should be confirmed on any such claims" (*id.* at 22–23). In its opposition, plaintiffs disavowed only damages, stating "Plaintiffs have not, in Mr. Olsen's latest report, attempted to quantify classwide damages on their misrepresentation-based claims. However, Plaintiffs may still seek injunctive relief based on these claims" (Dkt. No. 316 at 14). Plaintiffs did not concede restitutionary relief ancillary to an injunction. A subsequent order on the motion confirmed that plaintiffs' deception-based claims were still in the case and declined to rule that Mr. Arthur Olsen's report was inadmissible to prove restitution (Dkt. No. 338 at 19–20).

Next, the final pretrial order set the stage for the issues to be tried. Importantly, the order specifically stated (Dkt. No. 399 at 1):

> The issues to be tried shall be those set forth in the joint proposed pretrial order except to the extent modified by order *in limine*. This final pretrial order supersedes the complaint, answer and any counterclaims, cross-claims or third-party complaints. Only the issues expressly identified for trial remain in the case.

In turn, plaintiffs' section of the jointly-prepared pretrial order described Wells Fargo's wrongdoing as a "carefully-orchestrated, multi-phase scheme to increase overdraft fee revenue at its customers' expense" that included a combination of changes to the posting order of transactions, fraudulent omissions, and fraudulent misrepresentations (Dkt. No. 370 at 2–5). On

7

this basis, plaintiffs asserted class claims of unfair and fraudulent business practices under Section 17200, false advertising under Section 17500, and common law claims of fraud and negligent misrepresentation. In the section labeled "Plaintiffs' Statement of All Relief Sought," the joint pretrial order stated as follows:

> *On each of the class claims*, Plaintiffs seek the difference between (1) the amount class members actually paid Wells Fargo in overdraft charges on debit card transactions, after accounting for reversals and charge-offs, and (2) the amount that class members would have paid Wells Fargo in overdraft charges on debit card transactions, had Wells Fargo not embarked on the Resequencing Scheme.
>
> \* \* \*
>
> Finally, on their UCL claims, Plaintiffs and the class seek a permanent injunction enjoining Wells Fargo from engaging in the unfair and fraudulent business practices alleged.

(*id*. at 12–13 (emphasis added)).

Wells Fargo's statement on relief painted the rest of the picture.

> Plaintiffs' descriptions of requested relief were identified to Wells Fargo for the first time in sections of this document that were provided to Wells Fargo's counsel at 6:14 p.m. on April 12, 2010, the date this submission was due. It is Wells Fargo's position that plaintiffs are not entitled to any relief on their claims in this case.

(*id.* at 13).

Although the foregoing was stated by Wells Fargo, it did not raise any waiver objection at that time. Given Wells Fargo's objection to the timing of plaintiffs' section on relief, the Court would have at least entertained an objection to the restitution section within a reasonable time frame afterward and allowed further briefing on the issue. Wells Fargo did not so object. Thus, in the runup to trial, the *operative* statement of the claims and relief *expressly* sought restitution for the Section 17200 fraud and false advertising claims.

This same understanding is reflected in the brief Wells Fargo filed just one week before the trial began. In the section of its trial brief on "issues relating to the relief sought," Wells Fargo stated that "[t]he only monetary relief available to the class is restitution, as the only remaining class damages claim is brought under the UCL, which permits only equitable remedies" (Dkt. No. 373 at 9). In an accompanying footnote, Wells Fargo referenced the

8

contested email and explained that "Plaintiffs have admitted that they lack evidence on *damages* for the class for any *legal* claim and that *no such claim* will be presented at trial" (*id.* at 9 n.3 (emphasis added)). In this footnote, Wells Fargo circumscribed its understanding of plaintiffs' waiver to class damages for legal — as opposed to equitable — claims.

In pre-trial proposed findings of fact filed the next day, plaintiffs contended that "[a]s a result of Wells Fargo's unfair and deceptive reordering practices, its failure to disclose such practices (whether or not intentional), and its misrepresentation related to such practices," the class overpaid more than $200 million in overdraft fees (Dkt. No. 375 at 8). Wells Fargo did not then retort that all restitution for deception-based claims had been waived.

The parties' pre-trial and post-trial proposed findings equally reflected plaintiffs' interpretation of the contested email. Plaintiffs' pre-trial proposed findings lumped restitution for both the unfair and fraudulent prong of the UCL into one section, and then addressed damages for the common law claims separately (*id.* at 22–25). Plaintiffs' post-trial proprosed findings took a simpler route and lumped damages and restitution into a single section (Dkt. No. 453 at 34–35). Wells Fargo's objection in its reply submission is now telling (Dkt. No. 454 at 67 (emphasis added)):

> There can be no class damages in this case, for multiple reasons. Indeed, plaintiffs conceded before trial that no award of class damages (*in contrast to restitution*) would or could be sought. Dkt. No. 316 at 14 ("Wells Fargo is correct that Plaintiffs have not … attempted to quantify classwide damages on their misrepresentation-based claims."); Dkt. No. 293 at 11 (plaintiffs "do not intend to seek such damages at the upcoming trial"). Nor could class damages be awarded, given the absence of class-wide proof of actual injury from any alleged misrepresentation.

Here, Wells Fargo itself cited the contested email for the proposition that plaintiffs waived claims to damages for their legal claims.

Consistent with plaintiffs' interpretation of the contested email, the Court's post-trial Findings likewise reflected an understanding that plaintiffs pursued only injunctive relief for their common law claims of negligent misrepresentation and fraud. The Findings addressed the classwide claims under the "fraudulent" prong of Section 17200 in a detailed subsection of the

9

1   order (Findings 69–73). In a different subsection, the Findings addressed the "remaining

2   deception claims" (*id*. at 73). That subsection stated (emphasis added):

> Plaintiffs seek *only injunctive relief for their claims of negligent misrepresentation and fraud*. Given that such relief will be ordered under plaintiffs' Section 17200 claims, it is unnecessary for this order to reach these claims. As for plaintiffs' false advertising claim, since liability under the "fraudulent" restriction of Section 17200 has been established, liability for plaintiffs' false advertising claim under Section 17500 — which is based upon the same deceptive conduct — has also been proven.

It was the understanding of the Court that full relief for the deception claims under Section 17200, relief under Section 17500, and relief under the common law were all separate, live issues at trial. The above-cited paragraph began by explaining that plaintiffs sought only injunctive relief on their common law claims. The issue of a waiver was restricted to that context — there was no reference to seeking "only" injunctive relief with respect to other claims. The Findings concluded that injunctive relief for the common law claims was not necessary because injunctive relief would be ordered under the Section 17200 claims — which included claims for both unfair practices and fraudulent practices. The paragraph then distinguished relief for these claims from the Section 17500 false advertising claim and found that the latter was proven by the same conduct. Thus, although each claim was a separate, live issue, it was not necessary to rule on them individually. Nowhere did the Court state that relief for all deception-based claims would be limited to an injunction without the possibility of the ancillary relief of restitution that usually accompanies an injunction pursuant to Sections 17200–03.

Wells Fargo argues that other findings demonstrate that the Court believed that relief for all deception claims would be limited to an injunction. In this regard, Wells Fargo compares the first line of the "Injunctive Relief" section of the Findings with the first line of the "Restitution" section (Findings 84–85). The former stated that plaintiffs sought an injunction enjoining Wells Fargo from engaging in "the *unfair and fraudulent* business practice found herein," whereas the latter awarded restitution for Wells Fargo's "*unfair* practice as found herein" (*ibid*. (emphasis added)). Wells Fargo's conclusion from these two phrases (that restitution could only result from "unfair" practices) is incorrect. The Court was merely summarizing and avoiding unnecessary repetition.

10

Nor did Wells Fargo assert that restitution for liability based on fraud was waived during ensuing post-trial briefing. The Findings directed the parties to file a joint proposal on a variety of post-trial issues (Findings 90). There, both the parties and the Court treated the question of relief under the common law claims of fraud and misrepresentation as separate and distinct from restitutionary relief under Section 17200. Plaintiffs asserted that in the Findings "the Court declined to rule on Plaintiffs' entitlement to damages under their common law fraud claims, noting, appropriately, that the restitution due under the statutory claim, Section 17200, directly corresponded to the amount of damages claimed under the common law theories" (Dkt. No. 490 at 11). Wells Fargo did not object to this phrasing on the grounds that restitution was limited to the "unfair" prong of 17200 and had been waived under the "fraudulent" prong.

A subsequent post-trial order cited the email that now undergirds Wells Fargo's waiver argument and denied punitive damages. The rationale was that plaintiffs' "pre-trial concessions" led to an award of restitution under Section 17203 and "no award of compensatory or nominal damages" under plaintiffs' common law claims of negligent misrepresentation and fraud (Dkt. No. 497 at 4). Once again, this history demonstrates that both the parties and the Court understood the waiver issue presented by the email to be limited to the common law claims.

Other than the contested email, Wells Fargo does not present any evidence of waiver. Wells Fargo now contends in the instant motion that:

> In taking this course, plaintiffs prevented Wells Fargo from presenting its arguments on summary judgment as to why Olsen's analysis was insufficient as a matter of law to support a restitution award on a misrepresentation theory. They also led Wells Fargo to tailor its trial presentation on the misrepresentation claim to focus solely on injunction issues, leaving Wells Fargo no reason either to dispute the applicability of Olsen's analysis in the misrepresentation context or to offer evidence rebutting class members' entitlement to restitution under this theory.

Wells Fargo, however, disputed the Olsen analysis at trial and had every opportunity to expose any flaws in the work done by Olsen. This contention by Wells Fargo is rejected.

In sum, by the time the case was tried, it was understood by the Court and should reasonably have been understood by all counsel that in the event an injunction was ultimately entered, restitution was a possible form of relief under Section 17203.

11

### 2. THE RESTITUTION AWARD IS REINSTATED AS ANCILLARY TO AN INJUNCTION UNDER THE "FRAUDULENT" PRONG OF SECTIONS 17200–03.

Our court of appeals affirmed the ruling in the Findings that Wells Fargo violated the unfair competition law by making misleading statements likely to deceive its customers. *Gutierrez*, 704 F.3d at 730. The court of appeals also implicitly upheld the ruling that Wells Fargo violated California's false advertising law. Noting that "[r]estitution is available for past misleading representations," our court of appeals remanded for a determination of whether and to what extent restitution should be awarded. *Id*. at 728, 730. This order finds that the full award should be reinstated.

Section 17203 provides that "[t]he court may make such orders or judgments . . . as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." "This language, providing restitution of funds which 'may have been acquired,' has been interpreted to allow recovery without proof that the funds were lost as a result of actual reliance on defendant's deceptive conduct." *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 131 (2009) (citing *In re Tobacco II Cases*, 46 Cal. 4th 298, 320 (2009)). The policy behind this rule seems clear cut — once a wrongdoer is proven to have engaged in a fraudulent business practice whose whole point was to cheat consumers out of money, restitution may be used to restore the money to the victims of the practice. It is sufficient that plaintiffs proved that class members were likely deceived by Wells Fargo's misleading statements, which finding has been affirmed on appeal. *Gutierrez*, 704 F.3d at 730. Nevertheless, there must be evidentiary support for the amount of recovery. *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 697 (2006).

Wells Fargo now attempts to slice its "resequencing scheme" into separate practices and thereby reduce its liability for restitution. For example, Wells Fargo states (Dkt. No. 581 at 12 (emphasis in original)):

> Plaintiffs presented Olsen's analysis, and the Court accepted it, as a measurement of amounts Wells Fargo received through its practice of posting debit-card transactions in high-to-low order — a practice that has now been held lawful. Olsen did not pretend to have performed any measurement of amounts Wells Fargo unlawfully obtained by misrepresenting its posting order. Any such measurement requires answers to a different set of questions

12

>that would have been extremely difficult, if not impossible, to answer on a class-wide basis.

This argument is rejected. Plaintiffs' allegation that Wells Fargo engaged in an integrateed, multi-phase "Resequencing Scheme" was proven at trial. This scheme was not limited to changes to Wells Fargo's posting method. Plaintiffs proved at trial — and our court of appeals affirmed — that Wells Fargo misled the class via affirmative misdirection that caused the class members to believe that their debits would be posted chronologically. Indeed, our court of appeals stated that for the named plaintiffs, "[t]he misunderstanding that Wells Fargo's misleading statements sowed among customers about its posting scheme was a significant cause of the magnitude of the harm experienced by [class plaintiffs] Gutierrez and Walker." *Gutierrez*, 704 F.3d at 728 n.9.

Even though liability may not now be predicated on the posting method itself, the result is the same. The harm from Wells Fargo's affirmative misrepresentations came in the form of unexpected overdraft fees — the same harm wreaked by the unfair practice of manipulating the posting method. Restitution for this harm is likewise the same.

As plaintiffs point out, Wells Fargo attempted at trial to dissect the scheme into parts and thereby reduce liability for its wrongdoing. For example, Wells Fargo argued through its trial expert Dr. Alan Cox that the restitution calculations in Mr. Arthur Olsen's report should be reduced based on assumptions about how much various categories of individuals were "on notice" of Wells Fargo's practices (*see, e.g.*, Dkt. No. 441 at 1749–52, 1756–57, 1832–35). These efforts by Wells Fargo to reduce liability were rejected in the Findings. The Findings held that the appropriate measure of damages from the *resequencing scheme* was to restore the class members to a position consistent with their reasonable expectations induced by the affirmative misrepresentations (Findings 86). This was done by calculating overdraft fees using a methodology approximating chronological order. Wells Fargo's affirmative misrepresentations are intertwined with the other elements of the scheme and cannot be meaningfully separated into discrete causes of harm.

In this regard, the facts herein are analogous to *People ex rel. Bill Lockyer v. Fremont Life Ins. Co*., 104 Cal. App. 4th 508 (2002). The plaintiffs in *Fremont Life* challenged, *inter*

13

*alia*, an annuity policy that included unusual premium charges. The trial court found that the annuity policy as a whole was misleading and ordered restitution by restoring any premium charges paid plus interest. Although the premium charge itself was lawful, the misleading annuity policy was not, and the restitution order properly returned the unexpected premium charges. *Id*. at 530–33.

In this action, it is likewise unnecessary to predicate liability on the posting order and resulting overdraft charges. Because Wells Fargo misrepresented the posting order and overdraft charges to its customers, the appropriate form of restitution is to restore the unexpected charges to Wells Fargo's customers. This is exactly the calculation performed by plaintiffs' damages expert report.

This order is not penalizing Wells Fargo for a practice protected by federal preemption. Instead, it is penalizing Wells Fargo for affirmatively misleading the class as to what the practice was, namely engaging in a practice likely to mislead the class to believe that processing would be done in chronological order when, in fact, processing was done in high-to-low, non-chronological order.

### 3. PRE/POST-JUDGMENT INTEREST.

A prior order denied pre-judgment interest on the ground that calculation of damages in this action "was only possible through trial and judgment. Under such circumstances, an award of prejudgment interest under [California Civil Code] Section 3287(a) is not appropriate" (Dkt. No. 497 at 2). For the same reason, the prior order denied pre-judgment interest under Section 3288 (*id*. at 3). Plaintiffs argue that the equities have shifted in favor of pre-judgment interest post-appeal, but this is irrelevant to the question of when damages became calculable. Plaintiffs' argument also does not account for the fact that Wells Fargo's appeal was partially successful. Plaintiffs' request for pre-judgment interest is **DENIED**.

"The purpose of post-judgment interest is to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damage and the payment by the defendant." *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835–36 (1990) (alteration omitted). Our court of appeals "may reverse and remand a

judgment without concluding that it is erroneous or unsupported by the evidence. When the legal and evidentiary basis of an award is thus preserved, post-judgment interest is ordinarily computed from the date of [the judgment's] initial entry." *Planned Parenthood of the Columbia/Willamette Inc. v. Am. Coal. of Life Activists*, 518 F.3d 1013, 1017–18 (9th Cir. 2008) (quotation and citations omitted) (alterations in original). "*Planned Parenthood* thus makes it clear that interest ordinarily should be computed from the date of the original judgment's initial entry when the evidentiary and legal bases for an award were sound." *Exxon Valdez v. Exxon Mobil*, 568 F.3d 1077, 1080 (9th Cir. 2009).

The evidentiary basis (Mr. Olsen's report) and the legal basis (fraud) for the reinstated restitution award have not changed since the Findings. Plaintiffs' request for post-judgment interest is accordingly **GRANTED**. Post-judgment interest should be computed based on the date of the original entry of judgment: October 25, 2010 (Dkt. No. 498).

### 4. INJUNCTIVE RELIEF.

Plaintiffs request that the Court "enter an injunction precisely as prescribed" by our court of appeals. In this regard, our court of appeals supplied the following guidance:

> [T]he district court may provide injunctive relief . . . against Wells Fargo. Although the court cannot issue an injunction requiring the bank to use a particular system of posting or requiring the bank to make specific disclosures, it can enjoin the bank from making fraudulent or misleading representations about its system of posting in the future.

*Gutierrez*, 704 F.3d at 727–28. Nowhere in their moving papers do plaintiffs suggest any particular language for an injunction.

Wells Fargo objects to an injunction for two primary reasons. *First*, the injunction must be specific enough to put Wells Fargo on notice of what conduct is proscribed and minimally burden speech. This merits consideration, but Wells Fargo should not escape an injunction because its misconduct was multifarious. *Second*, Wells Fargo has voluntarily ceased posting debit-card transactions in high-to-lowlow order and allegedly has no current intention of resuming the practice (Opp. 24). Absent an injunction, however, Wells Fargo would be able to return to its prior practice of misleading customers if it chose to implement modifications to its posting order.

15

The following classwide injunctive relief is hereby ordered: Wells Fargo is permanently **ENJOINED** from making or disseminating, or permitting to be made or disseminated, any false or misleading representations relating to the posting order of debit-card purchases, checks, and ACH transactions in its customer bank accounts. The effective date of this injunction shall be **JULY 15, 2013**.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion is **GRANTED IN PART AND DENIED IN PART**. Counsel shall meet and confer and recommend an updated, detailed plan of distribution and notice. Class counsel may also renew their motion for attorney's fees. Any such motion should account for the post-trial orders of this Court as well as the rulings of our court of appeals. Please recommend a form of judgment, reserving all substantive rights, that will capture the central points of this order and poise the action for any appeal.

The Court will retain jurisdiction to enforce this order.

**IT IS SO ORDERED.**

Dated: May 14, 2013.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE